'08 CIV 4810



**FOX ROTHSCHILD LLP**
Richard B. Cohen (RC 5103)
Carolyn D. Richmond (CR 0993)
Daniel A. Schnapp (DS 3484)
100 Park Avenue, Suite 1500
New York, New York 10017
Telephone: (212) 878-7900
Facsimile: (212) 692-0940
**Attorneys for Defendants**
Warrior Fitness Boot Camp, LLC
Alexander Kenneth Fell
Ruben Dario Belliard
Jennifer J. Lee
Nancy Baynard

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PURE POWER BOOT CAMP, INC., PURE POWER BOOT CAMP FRANCHISING CORPORATION, and PURE POWER BOOT CAMP JERICHO INC., | Case No._____ |
| Plaintiffs, | |
| - against – | **NOTICE OF REMOVAL** |
| WARRIOR FITNESS BOOT CAMP, LLC; ALEXANDER KENNETH FELL a/k/a ALEX FELL, Individually; RUBEN DARIO BELLIARD a/k/a RUBEN BELLIARD, Individually; JENNIFER J. LEE, Individually; and NANCY BAYNARD, Individually, | |
| Defendants. | |

TO:   THE CLERK OF THE UNITED STATES DISTRICT COURT
      FOR THE SOUTHERN DISTRICT OF NEW YORK

      Richard L. Herzfeld, Esq.
      Bahn, Herzfeld & Multer, LLP
      555 Fifth Avenue, 14th Floor
      New York, NY 10017
      Phone: (212) 818-9019
      Fax: (212) 986-5316
      **Attorneys for Plaintiffs**

Defendants Warrior Fitness Boot Camp, LLC, Alexander Kenneth Fell, Ruben Dario Belliard, Jennifer J. Lee and Nancy Baynard (hereinafter collectively referred to as "Defendants"), by and through their attorneys, Fox Rothschild LLP, hereby remove the civil action pending in the Supreme Court of the State of New York, County of New York, Index No. 601364/2008, to the United States District Court for the Southern District of New York and, in support thereof, respectfully represents as follows:

## BACKGROUND

1.      On or about May 6, 2008, Plaintiffs, Pure Power Boot Camp, Inc., Pure Power Boot Camp Franchising Corporation, and Pure Power Boot Camp Jericho Inc. (hereinafter collectively referred to as "Plaintiffs") commenced an action in the Supreme Court of the State of New York, County of New York (the "New York Court"), entitled, Pure Power Boot Camp, Inc. et al. v. Warrior Fitness Boot Camp, LLC et al., Index No. 601364/2008. (A true and correct copy of the Summons and Complaint in that action are attached as Exhibit "A").

2.      On or about May 6, 2008, Plaintiffs caused a copy of the Summons and Complaint to be served on Defendants.

3.      On or about May 6, 2008, Plaintiffs moved by Order to Show Cause for a preliminary injunction and a temporary restraining order ("TRO").

4.      On or about May 6, 2008, the New York Court heard argument on the TRO. The Court denied a significant portion of the TRO, and set the return date for the motion for a preliminary injunction for May 8, 2008. (A true and correct copy of the signed Order to Show Cause is attached as Exhibit "B").

2

5.     On May 8, 2008, the New York Court heard argument on the motion for a preliminary injunction. During argument, the Court vacated the TRO in its entirety, but scheduled a hearing to take place almost three weeks later, on May 27, 2008. (A copy of the transcript from the May 8 appearance in which the Court vacated the TRO in its entirety is attached as Exhibit "C" The vacatur of the TRO is highlighted on Page 43, Lines 13-14 for the Court's convenience).

### STATEMENT OF THE GROUNDS FOR REMOVAL – 28 U.S.C. § 1446(a)

6.     Pursuant to 28 U.S.C. § 1331, "the district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

7.     The United States Supreme Court has defined "arising under" federal law to mean "only those cases in which a well-pleaded complaint establishes either that federal law *creates the cause of action* or that the plaintiff's right necessarily depends on resolution of a substantial question of federal law." Franchise Tax Board of the State of California v. Construction Laborers Vacation Trust for Southern California, et al., 463 U.S. 1, 27-28 (1983) [*emphasis added*].

8.     Count 14 of Plaintiffs' Complaint contains federal causes of action for Trade Dress Infringement, alleged violations of 15 U.S.C. §1125 and Lanham Act §43. Accordingly, Defendants may remove this action to this Court.

9.     All defendants consent to the removal of this action to this Court.

## COPIES OF ALL PROCESS, PLEADINGS, AND
### <u>ORDERS SERVED ON DEFENDANT – 28 U.S.C. § 1446(a)</u>

10.    A true and correct copy of the original Summons and Complaint received by each of the Defendants is annexed hereto as Exhibit "A."

11.    A true and correct copy of the original Order to Show Cause received by each of the Defendants is annexed hereto as Exhibit "B."

12.    A copy of the transcript from the May 8 hearing in which the Court vacated the TRO in its entirety is attached as Exhibit "C."

### <u>TIMELINESS OF NOTICE OF REMOVAL – 28 U.S.C. § 1446(b)</u>

13.    Pursuant to 28 U.S.C. § 1446(b), a "notice of removal of a civil action or proceeding shall be filed within thirty days after the receipt by the defendant . . . of a copy of the initial pleading setting forth the claim for relief upon which the state court action is based."

14.    As set forth above, Defendants were served with a copy of the Summons and Complaint on or about May 6, 2008.

15.    Accordingly, this Notice of Removal is timely.

4

WHEREFORE, Defendants, Warrior Fitness Boot Camp, LLC, Alexander

Kenneth Fell, Ruben Dario Belliard, Jennifer J. Lee and Nancy Baynard, hereby remove

this civil action from the Supreme Court of the State of New York, County of New York,

to the United States District Court for the Southern District of New York.

Dated: May 22, 2008
       New York, NY

                          Respectfully submitted,


                          **FOX ROTHSCHILD LLP**

                          By:_____
                          Richard B. Cohen (RC 5103)
                          Carolyn D. Richmond (CR 0993)
                          Daniel A. Schnapp (DS 3484)
                          100 Park Avenue, Suite 1500
                          New York, New York 10017
                          Telephone: (212) 878-7900
                          Facsimile: (212) 692-0940
                          **Attorneys for Defendants**
                          Warrior Fitness Boot Camp, LLC
                          Alexander Kenneth Fell
                          Ruben Dario Belliard
                          Jennifer J. Lee
                          Nancy Baynard

5

**EXHIBIT A**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
_____X
                                         :
PURE POWER BOOT CAMP, INC., PURE         :
POWER BOOT CAMP FRANCHISING              :
CORPORATION, and PURE POWER BOOT         :
CAMP JERICHO INC.,                       :      Index No.: 601 364/2008

                                         :
           Plaintiff(s),                 :
                                         :
           -against-                     :      **SUMMONS**
                                         :
WARRIOR FITNESS BOOT CAMP, LLC;          :
ALEXANDER KENNETH FELL a/k/a ALEX        :      Plaintiffs designate New York
FELL, Individually; RUBEN DARIO BELLIARD :      County as the place of trial
a/k/a RUBEN BELLIARD, Individually;      :
JENNIFER J. LEE, Individually;           :      Basis of Venue:
and NANCY BAYNARD, Individually,         :      Defendant's Principal Place of
                                         :      Business
           Defendants.                   :
_____X

To the Named Defendants:

> Warrior Fitness Boot Camp, LLC
> Alexander Kenneth Fell a/k/a Alex Fell, Individually
> Ruben Dario Belliard a/k/a Ruben Belliard, Individually
> Jennifer J. Lee, Individually
> Nancy Baynard, Individually
> c/o Fox Rothschild LLP
> Carolyn D. Richmond, Esq.
> 100 Park Avenue, Suite 1500
> New York, NY 10017

**YOU ARE HEREBY SUMMONED** to answer the Complaint in this action and to serve

a copy of your answer, or, if the Complaint is not served with this summons, to serve a notice of

appearance, on the Plaintiffs' Attorney within 20 days after the service of this summons,

exclusive of the day of service (or within 30 days after the service is compete if the summons is

not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the Complaint.

Dated: May 5, 2008

CALCAGNO & ASSOCIATES
ATTORNEYS AT LAW, LLC

_____

**ANDREW JOHN CALCAGNO**
Attorney for the Plaintiffs
*Main Office*
213 South Avenue East
Cranford, NJ 07016
(908) 272-7300

*Satellite Office*
404 Manor Road
Staten Island, New York 10314
(718) 815-0200

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

———————————————————————— X
                                                        :
PURE POWER BOOT CAMP, INC., PURE              :
POWER BOOT CAMP FRANCHISING                   :
CORPORATION, and PURE POWER BOOT              :
CAMP JERICHO INC.,                                    :          Index No.:
                                                        :
                        Plaintiff(s),                   :
                                                        :
            -against-                                   :          **COMPLAINT**
                                                        :
WARRIOR FITNESS BOOT CAMP, LLC;              :
ALEXANDER KENNETH FELL a/k/a ALEX            :
FELL, Individually; RUBEN DARIO BELLIARD     :
a/k/a RUBEN BELLIARD, Individually;             :
JENNIFER J. LEE, Individually;                      :
and NANCY BAYNARD, Individually,              :
                                                        :
                        Defendants.                    :
———————————————————————— X

Plaintiffs, Pure Power Boot Camp, Inc., Pure Power Boot Camp Franchising Corporation, and Pure Power Boot Camp Jericho Inc., by their attorneys, Calcagno & Associates Attorneys At Law LLC, complaining of Defendants, Warrior Fitness Boot Camp, LLC; Alexander Kenneth Fell a/k/a Alex Fell, Individually; Ruben Dario Belliard a/k/a Ruben Belliard, Individually; Jennifer J. Lee, Individually; and Nancy Baynard, Individually, respectfully alleges as follows:

## PARTIES

1. Plaintiff, Pure Power Boot Camp, Inc. ("Pure Power"), is a corporation organized and existing under the laws of the State of New York with its principal place of business at 38 West 21st Street, New York, NY 10010. Pure Power was previously a foreign corporation organized under the laws of the State of Delaware. Pure Power is a facility

1

specializing in the operation of the nation's only indoor obstacle/confidence course which trains civilians in a military style and positive setting. Pure Power has been in business since 2003.

2. Plaintiff, Pure Power Boot Camp Franchising Corporation ("Pure Power Franchise"), is a corporation organized and existing under the laws of the State of New York with its principal place of business at 38 West 21st Street, New York, NY 10010.

3. Plaintiff, Pure Power Boot Camp Jericho Inc. ("Pure Power Jericho"), is a corporation organized and existing under the laws of the State of New York with its principal place of business at 50 S. Service Road, Jericho, New York 11753. Pure Power Jericho is the second Pure Power facility opened specializing in the operation of the nation's only indoor obstacle/confidence course which trains civilians in a military style and positive setting. Pure Power Jericho was incorporated on November 29, 2007 and has been open for business since February 25, 2008.

4. Lauren Brenner ("Brenner") is the President/Founder of Pure Power, Pure Power Franchise and Pure Power Jericho (collectively hereinafter known as "PPBC").

5. Upon information and belief, Defendant, Warrior Fitness Boot Camp, LLC ("Warrior Fitness"), is a corporation organized and existing under the laws of the State of New York, with its principal place of business at 29 West 35th Street, 3rd Floor, New York, New York 10001. Warrior Fitness was incorporated on February 28, 2008. Warrior Fitness is a facility specializing in the operation of an indoor obstacle/confidence course and is not yet open for business.

2

6. Upon information and belief, Defendant, Alexander Kenneth Fell a/k/a Alex Fell ("Fell"), is an individual, residing at 3205 Oxford Avenue, Apt. 8, Bronx. NY 1463. Fell is a former employee of Pure Power and a Co-CEO/Owner of Warrior Fitness.

7. Upon information and belief, Defendant, Ruben Dario Belliard a/k/a Ruben Belliard ("Belliard"), is an individual, residing at 201 West 83rd Street, Apt. 1D, New York, New York 10024. Belliard is a former employee of Pure Power and a Co-CEO/Owner of Warrior Fitness.

8. Upon information and belief, Defendant, Jennifer J. Lee, Individually ("Lee"), is an individual, residing at 55 West 26th Street, Apt. 11A, New York, New York 10010. Lee is a former client of Pure Power, girlfriend of Fell, and a Co-CEO/Owner of Warrior Fitness.

9. Upon information and belief, Defendant, Nancy Baynard ("Baynard"), is an individual, residing at 201 West 83rd Street, Apt. 1D, New York, New York 10024. Baynard is a former client of Pure Power, girlfriend of Belliard, and a co-conspirator.

## STATEMENT OF FACTS

10. Brenner was a Wall Street trader and a lifelong athlete.

11. After the September 11, 2001 terrorist attacks, Brenner felt that people wanted to be part of something that inspired accountability and respect.

12. Brenner wanted to combine the things she loved the most: sports, entertainment, and business and created the concept of an indoor obstacle/confidence course boot camp.

13. She created a Business Plan ("Business Plan"), found a location for the facility and transformed that location by creating twelve obstacles. She developed these twelve

3

obstacles with two to three different ways of achieving these obstacles for varying degrees of fitness levels.

14. The Pure Power facility walls are covered with green camouflage netting and the changing rooms are World War II tents.

15. The obstacle/confidence course flooring surface is a playground certified crushed rubber (recycled) surface and is bordered by military looking sandbags.

16. Some of the Pure Power obstacles are as follows:

    1. Monkey Bars
    2. Barbed Wire Crawl
    3. Swing to Beam
    4. High Hurdles
    5. Commando Crawl
    6. Belly Robbers
    7. Intensity Wall
    8. Traverse Wall
    9. Cargo Net
    10. Rope Climb
    11. Tire Run

17. Once the facility was completed, Brenner invited eight (8) Marines who had just returned from Iraq to experience the indoor obstacle/confidence course and received only the highest acclamations from them.

18. On February 4, 2004, Brenner opened the doors of Pure Power to the public.

19. Pure Power was an instant success and has gained publicity and an excellent reputation through various newspapers, magazines, televisions shows and is known nationally, as well as internationally, as the nation's only facility containing an indoor obstacle/confidence course.

20. The Drill Instructors ("D.I.s") are all former soldiers who have served in combat.

4

21. Clients ("recruits") are called by their last names and wear standard-issue military fatigues and dog tags during the class.

22. The initial program at Pure Power is called the Tour of Duty.

23. The Tour of Duty is a six-week course held four times a week for one hour, or three times a week for eight weeks.

24. Pure Power also has a Weekend Warrior program for recruits who are called Weekend Reserves.

25. The Weekend Warrior program comprises of two-hour sessions twice per week on Saturdays and Sundays for six weeks.

26. Recruits must all sign a Recruit Contract, Recruit Waiver, and receive Pure Power Boot Camp Rules.

27. When recruits step into the Pure Power facility, a life-size statue of a screaming marine greets them with a machine gun in his hand.

28. Pure Power trains civilians in a military style and positive setting and patterns recruit regimens after the armed forces.

29. Pure Power's programs are customized to suit recruits' fitness levels. Recruits are then put into platoons that consist of approximately sixteen recruits.

30. Each recruit who joins Pure Power commits to learn the following principles:

> 1. **Honor** – Pure Power Boot Camp requires that each recruit be true to his or her values, regardless of the personal cost.
> 2. **Trust** – Pure Power Boot Camp teaches each recruit to rely on the integrity, ability, or character of himself or herself and others.
> 3. **Respect** – Pure Power Boot Camp expects each recruit to view others with a high degree of reverence and special regard. Recruits are taught to admire others, seeing beneath the surface to see real worth and value.

4. **Integrity** – Pure Power Boot Camp expects each recruit to develop a personal inner sense of wholeness derived from honesty and consistent uprightness of character.

5. **Duty** – Pure Power Boot Camp teaches each recruit to practice personal accountability in relation to a principle, measuring any action (or course of action) apart from personal likes and dislikes.

6. **Loyalty** – Pure Power Boot Camp expects recruits to be faithful or devoted to one another.

7. **Power** – Pure Power Boot Camp teaches each recruit to be aware of his or her capacity to produce effects on others or to influence others.

8. **Courage** – Pure Power Boot Camp helps each recruit overcome obstacles that are encountered in daily life. Each recruit matures mentally and should exhibit an attitude of facing and dealing with anything recognized as being dangerous, difficult, or painful, instead of withdrawing from it.

9. **Dignity** – Pure Power Boot Camp teaches each recruit to respect himself or herself and others. Recruits embrace dignity, the quality or state of being worthy of esteem or respect.

10. **Wisdom** – Pure Power Boot Camp helps each recruit develop a more intelligent application of learning and/or ability to discern inner qualities and essential relationships.

11. **Pride** – Pure Power Boot Camp helps each recruit realize the reward and satisfaction taken in accomplishing an achievement.

31. On or about April 19, 2004, Brenner trademarked the names "Pure Power Boot Camp" and "Train Military Style".

32. On or about February 2, 2006, Brenner filed for trade dress of Pure Power, specifically, the design of the facility, the terms used in the facility, and indoor obstacle/confidence course used in the facility.

33. Through years of accumulated experience, time and strenuous efforts by Brenner, Pure Power has been successful in obtaining an impressive client list, and over the years has recruited approximately 1730 clients.

34. Brenner's client list is stored through a web program called Mybody.com, is not public knowledge, and is not readily obtainable.

6

35. Through extensive interactions with its clients, Pure Power has been successful in obtaining and identifying their individual tastes and preferences with respect to their workouts.

36. Defendant, Belliard, worked as an employee of Pure Power from 2004 up and until March 31, 2008, when he abruptly left Pure Power, claiming that he was starting a construction business with a family member.

37. Defendant, Fell, worked as an employee of Pure Power from 2005 up and until March 16, 2008, when he was fired for being belligerent and insubordinate to Brenner during a conversation and for not following direction by his Employer.

38. On or about January 9, 2006, Defendant, Nancy Baynard ("Baynard"), became a recruit at Pure Power and left on March 28, 2008.

39. On or about March 13, 2006, Defendant, Jennifer Lee ("Lee"), became a recruit at Pure Power and left on April 28, 2008.

40. In reality and unbeknownst to Brenner, in or about July 2007, Belliard, Fell, Lee, and Baynard conspired and devised to raid and sabotage Brenner's business and defraud, deceive, steal and misappropriate Pure Power's trade secrets, trade dress, client list, and corporate documents, including, but not limited to, hard copies of Pure Power's Operations Manual, Startup Manual, Business Plan, and D.I. employee agreements, as well as Brenner's hard copy of the first chapter of her book, and deleted various corporate documents.

41. When Belliard was hired, he told Brenner that he was married. Belliard was actually married in the Dominican Republic but never legalized the marriage in the United States.

42. When Fell was hired, he told Brenner that he was engaged.

43. One policy of Pure Power was that employees must not become intimate with clients.

44. When Belliard and Fell were first hired, they knew nothing about the physical fitness industry and Brenner invested substantial time and money to train them and obtain Fitness Certifications for them, as she did with each employee she hired to be a D.I.

45. As a result of their training, Belliard and Fell each evolved into a motivational D.I. and a trusted employee with Pure Power.

46. As D.I.s, Belliard and Fell were entrusted with substantial responsibility to work closely with, train, motivate and inspire the recruits on behalf of Pure Power.

47. Some time during their employ at Pure Power, Belliard and Fell began personal relationships with Baynard and Lee.

48. Brenner did not know initially about the relationships.

49. During the eight (8) months that Defendants conspired against Brenner and Pure Power while employed by Pure Power, neither Brenner nor any of the Pure Power recruits were aware that Lee was Fell's girlfriend.

50. Since 2006, all employees of Pure Power have been required to sign a confidentiality and non-competition agreements (the "Agreement").

51. Brenner began to develop plans for franchising the Pure Power concept in 2006 and created a Startup Manual, an Operations Manual, and a Business Plan.

52. Brenner hired a new D.I., Nicio Evertz ("Evertz"), in early 2007.

53. In mid-2007, Belliard informed Brenner that he and his wife were divorcing.

54. In or around July 2007, recruit, Baynard, approached Brenner and informed her that she was having marital problems and asked if Brenner could help her find an apartment.

55. Brenner looked for and helped Baynard find an apartment.

8

56. In 2007, Fell broke off his engagement and began dating a woman shortly thereafter whom he described as an asian woman named "Shannon".

57. In 2007, Brenner began promoting the franchise, generating additional business and publicity for Pure Power, and finalizing her plan to open other Pure Power facilities.

58. Brenner was constantly being approached by Venture Capitalists ("V.C.s") regarding national expansion of Pure Power.

59. When approached by a V.C., Brenner made sure that she stipulated that Belliard was to be the National D.I.

60. Brenner decided not to get the V.C.s involved in Pure Power at this junction.

61. Brenner entrusted Belliard and Fell with her clientele at the New York Pure Power facility.

62. Brenner told Belliard and Fell that updates must be given to her on a regular basis to ensure that the Pure Power clients continued to be motivated and inspired.

63. In October 2007, Belliard admitted to Brenner that he had been dating Baynard and had moved in with Baynard. He claimed that he hadn't told Brenner at first because he didn't want to lose his job.

64. Although this was against the Pure Power rules, Belliard was Brenner's top D.I. and most trusted employee.

65. In or around October 2007, Brenner wanted to hire another D.I.; however, Belliard, Fell and Evertz told Brenner that they wanted the hours and could handle all of the clients and classes.

66. The client renewal rate was approximately 94%.

67. In or around November 2007, Brenner began preparing for her annual holiday party taking place on December 14, 2007, and finalize the plans for the Long Island facility.

68. On or about November 24, 2007, Brenner asked Belliard if he wanted to become partners in the Long Island Pure Power facility; however, Belliard turned down the opportunity, stating that he did not have the money to invest.

69. Unbeknownst to Brenner, Belliard, Fell and Lee had already been looking for locations for Warrior Fitness; however, they were not happy with the realtor and on December 5, 2007, terminated the realtor's services.

70. The holiday party was held every year for the clients, to thank the clients for their loyalty and support.

71. The Long Island facility was set to open on February 25, 2008, with the grand opening party to be held on February 7, 2008.

72. Belliard also agreed to help paint and build at the Long Island facility, then called Brenner and cancelled the day prior.

73. Beginning in December 2007, Fell became more and more difficult when told to perform a task by Brenner and became more and more belligerent to Brenner.

74. Defendants were still looking for a location for Warrior Fitness throughout the month of February 2008.

75. On February 27, 2008, a lease was drawn up for a location that Defendants found for Warrior Fitness.

76. In February 2008, Defendants were also shopping for prices on flooring.

77. The location that Defendants' leased was located on 29th Street, 14 blocks away from Pure Power utilizing the same operating hours as Pure Power.

78. Evertz contacted Brenner regularly to report on the progress of the clients; however, Fell did not.

79. Unbeknownst to Brenner, Defendants stole Pure Power's business/corporate documents and brochure to draft Defendants' business plan, using Pure Power's concepts and ides, including, but not limited to, obstacles, guarantee, principles, programs, clothing, projections, and pricing matrix.

80. While reviewing the New York facility schedule on March 16, 2008, Brenner realized that one (1) D.I. might not be needed for the March 17, 2008 7:30 a.m. class.

81. Since Evertz or Belliard were always the D.I.s to leave, and Fell had not been reporting to Brenner regarding the clients as he was told, Brenner decided that Evertz would run the 7:30 a.m. class on March 17, 2008 if a D.I. needed to leave.

82. On March 16, 2008, Brenner contacted Fell to inform him that he would not be needed for the 7:30am class if one (1) D.I. was not needed, and that Evertz would be the D.I. instructing the class since he was always the D.I. to leave.

83. Fell became irate and said, "That's not my fucking problem." He then threatened to go to the Department of Labor if Brenner allowed Evertz to instruct the class.

84. Brenner stated, "Did you just threaten me? I am not asking you. You will be leaving at 7:30 a.m."

85. Fell replied, "Who the fuck do you think you are? You better learn who you are speaking to."

86. Brenner replied, "Who owns this business, you or me?"

87. Fell stated, "What are you going to do, fire me?"

11

88. Brenner replied, "How dare you. You are not a team player. Keep it up and you will be suspended for a week."

89. Fell again threatened Brenner by stating, "You take me off for a week and the Department of Labor will be at your door."

90. Brenner replied, "You are leaving at 7:30 a.m."

91. Fell stated, "I am not." Then again stated, "What are you going to do, fire me?"

92. Brenner then replied, "Alex, you are fired."

93. Brenner spoke to Belliard thereafter.

94. Brenner asked Belliard where he stood regarding his loyalties to Pure Power and Belliard responded, "I am here 100%."

95. On March 17, 2008, Fell and Lee admitted to their conspiracy in emails to each other.

96. During Brenner's meeting with Belliard, Belliard told Brenner that he would not have a problem with Fell's firing because there were a lot of things that Fell did that he shouldn't have done.

97. Brenner began instructing in the New York facility in the mornings, then traveling to Long Island to instruct in the afternoon.

98. Shortly after, Belliard began showing up to work late.

99. Lee and Baynard attended classes regularly at Pure Power after Fell's termination in order to befriend, manipulate and solicit as many of Pure Power's recruits as possible, and spread lies about Brenner and Pure Power, in order to entice Pure Power's recruits to leave Pure Power and sign up with Warrior Fitness.

100. Brenner met with Belliard to discuss his tardiness and asked him if there was a problem.

101. Belliard stated that there was no problem.

102. On March 25, 2008, in furtherance of their plan to conspire and sabotage Pure Power, Defendants stole a partial list of Pure Power's clients and began soliciting them to leave Pure Power and come to Warrior Fitness.

103. On March 31, 2008 at 9:09 p.m., Brenner received a phone call from Belliard.

104. Belliard told Brenner that he was giving his resignation with Pure Power, effective immediately, without notice because he was going into the construction business with his uncle.

105. Brenner asked him to give her two weeks notice, but Belliard stated that he could not.

106. Unbeknownst to Brenner, that same day, the Defendants signed the lease for the 29 West 35th Street location.

107. Upon information and belief, during the period from March 21, 2008 though March 31, 2008, the Defendants stole several business/corporate documents from Pure Power. Included in those documents were the original signed confidentiality & non-compete agreements. Also included in those documents was Pure Power's client list. Once Belliard gave the Pure Power client list to Baynard, Baynard updated the Warrior Fitness client list using the Pure Power client list.

108. Since Belliard's departure from Pure Power, Defendants have furthered their conspiracy by contacting Pure Power clients with the intent to steal them and continuing to misappropriate Pure Power's trade dress by constructing the same indoor obstacle/confidence course.

109. Lee continued to attend classes at Pure Power after Fell was terminated for the purpose of converting new Pure Power recruits to Warrior Fitness.

13

110.     In comparing the Defendants' facility and Pure Power's facility, it is obvious that the Defendants have misappropriated Pure Power's trade secrets and Trade Dress. It is clear on its face.

111.     In comparing the Recruit Contracts, Additional Terms and Conditions and Waiver and Release forms of Pure Power and Warrior Fitness, there is virtually no difference. Warrior Fitness copied Pure Power's documents word for word.

112.     The Defendants stole all of Pure Power's programs and curriculum verbatim, but changed the names. For example, Defendants "Operation Warrior" program is the same as Pure Power's "Tour of Duty" program. Pure Power has a corporate team challenge program in its Business Plan and Operations Manual and the Defendants copied it verbatim, but changed the pricing slightly. Even Defendants' pricing is structured the same way as Pure Power's.

113.     In comparing Defendants' Business Plan to Pure Power's Business Plan, Start-Up Manual, Operations Manual, Brochure, client list and clients list, it is abundantly clear that the Defendants simply stole everything from Pure Power (Pure Power's clients, concepts, curriculum, programs, pricing matrix, design, good will, and everything else about Pure Power) and made it their own by engaging in a conspiracy to willfully and maliciously sabotage and destroy Brenner and Pure Power.

## FIRST COUNT
### (Conversion)

114.  Plaintiffs repeat, reiterate and re-allege all of the allegations contained in the Statement of Facts above as if fully set forth at length herein.

115.  Plaintiffs' trade secrets, trade dress, client list, business/corporate documents, and other confidential, secret and proprietary information are represented and evidenced by the tangible documentation and other tangible property.

116.  Plaintiffs are informed and believe, and thereon allege that Defendants, Warrior Fitness, Belliard, Fell, Lee and Baynard, intentionally and deliberately, with full knowledge that such property is owned by Plaintiffs, misappropriated and converted such Plaintiffs' property to their own use and benefit without any compensation to Plaintiffs.

117.  The aforementioned acts of Defendants were, upon information and belief, willful and malicious and intended to cause harm to Plaintiffs.

118.  As a result of the foregoing, Plaintiffs have incurred damages in the millions of dollars, the extent not yet ascertained and is entitled to have returned to it all of the property Defendants have wrongfully converted to their own use.

**WHEREFORE,** Plaintiffs demand judgment against Defendants, Warrior Fitness Boot Camp, LLC; Alexander Kenneth Fell a/k/a Alex Fell, Individually; Ruben Dario Belliard a/k/a Ruben Belliard, Individually; Jennifer J. Lee, Individually; and Nancy Baynard, Individually, jointly and severally for:

      a.  Injunctive relief, enjoining the Defendants from directly and/or indirectly contacting Plaintiffs' clients, misappropriating Plaintiffs' trade secrets and infringing on Plaintiffs' trade dress;

      b.  Equitable relief demanding the immediate return of Plaintiffs' property wrongfully converted by Defendants;

      c.  Money damages in the millions of dollars, the amount of which to be determined by a jury of Plaintiffs' peers;

      d.  Consequential damages;

      e.  Incidental damages;

      f.  Punitive damages;

      g.  Reasonable attorney's fees, filing fees, costs of suit; and

      h.  Any further relief which the Court may deem just and proper.

## SECOND COUNT
### (Unjust Enrichment)

119. Plaintiffs repeat, reiterate and re-allege all of the allegations contained in the Statement of Facts and the First Count above as if fully set forth at length herein.

120. Defendants have been unjustly enriched by, inter alia, using Plaintiffs' intellectual property, client list, trade secrets, trade dress, business/corporate documents, and other confidential, secret and proprietary information.

121. As a result of the foregoing, Plaintiffs have incurred damages in the millions of dollars, the extent not yet ascertained.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, Warrior Fitness Boot Camp, LLC; Alexander Kenneth Fell a/k/a Alex Fell, Individually; Ruben Dario Belliard a/k/a Ruben Belliard, Individually; Jennifer J. Lee, Individually; and Nancy Baynard, Individually, jointly and severally for:

     a.  Injunctive relief, enjoining the Defendants from directly and/or indirectly contacting Plaintiffs' clients, misappropriating Plaintiffs' trade secrets and infringing on Plaintiffs' trade dress;

     b.  Equitable relief demanding the immediate return of Plaintiffs' property wrongfully converted by Defendants;

     c.  Money damages in the millions of dollars, the amount of which to be determined by a jury of Plaintiffs' peers;

     d.  Consequential damages;

     e.  Incidental damages;

     f.  Punitive damages;

     g.  Reasonable attorney's fees, filing fees, costs of suit; and

     h.  Any further relief which the Court may deem just and proper.

## THIRD COUNT
### (Theft of Trade Secrets, Theft of Trade Dress, and Theft by Deception)

122. Plaintiffs repeat, reiterate and re-allege all of the allegations contained in the Statement of Facts, First and Second Counts above as if fully set forth at length herein.

123. Defendants solicited, manipulated, and stole Plaintiffs' clients with the intent to deceive and injure Plaintiffs, and with the intent to economically benefit the Defendants.

124. Defendants stole the Pure Power client accounts, Plaintiffs' information, client files and client files with the intent to deceive and injure Plaintiffs, and with the intent to economically benefit the Defendants.

125. Defendants stole Plaintiffs' intellectual property, client list, trade secrets, trade dress, business/corporate documents, and other confidential, secret and proprietary information with the intent to deceive and injure Plaintiffs, and with the intent to economically benefit the Defendants.

126. Defendants misappropriated Plaintiffs' trade secrets and trade dress with the intent to deceive and injure Plaintiffs, and with the intent to economically benefit the Defendants.

127. As a result of the foregoing, Plaintiffs have incurred damages to an extent not yet ascertained.

**WHEREFORE,** Plaintiffs demand judgment against Defendants, Warrior Fitness Boot Camp, LLC; Alexander Kenneth Fell a/k/a Alex Fell, Individually; Ruben Dario Belliard a/k/a Ruben Belliard, Individually; Jennifer J. Lee, Individually; and Nancy Baynard, Individually, jointly and severally for:

      a. Injunctive relief, enjoining the Defendants from directly and/or indirectly contacting Plaintiffs' clients, misappropriating Plaintiffs' trade secrets and infringing on Plaintiffs' trade dress;

      b. Equitable relief demanding the immediate return of Plaintiffs' property wrongfully converted by Defendants;

18

    c.  Money damages in the millions of dollars, the amount of which to be determined by a jury of Plaintiffs' peers;

    d.  Consequential damages;

    e.  Incidental damages;

    f.  Punitive damages;

    g.  Reasonable attorney's fees, filing fees, costs of suit; and

    h.  Any further relief which the Court may deem just and proper.

## FOURTH COUNT
### (Civil Conspiracy)

128. Plaintiffs repeat, reiterate and re-allege all of the allegations contained in the Statement of Facts, First, Second and Third Counts above as if fully set forth at length herein.

129. Defendants conspired to cause irreparable harm and maliciously interfere with the Plaintiffs' contractual relations and usurp Plaintiffs' prospective economic advantage with the Plaintiffs' client accounts, trade secrets and trade dress.

130. As a result of the foregoing civil conspiracy, Plaintiffs' client accounts, trade secrets and trade dress have been stolen along with invaluable and unrecoverable confidential, propriety and secretive information and Plaintiffs have incurred damages to an extent not yet ascertained.

**WHEREFORE,** Plaintiffs demand judgment against Defendants, Warrior Fitness Boot Camp, LLC; Alexander Kenneth Fell a/k/a Alex Fell, Individually; Ruben Dario Belliard a/k/a Ruben Belliard, Individually; Jennifer J. Lee, Individually; and Nancy Baynard, Individually, jointly and severally for:

    a.  Injunctive relief, enjoining the Defendants from directly and/or indirectly

19

contacting Plaintiffs' clients, misappropriating Plaintiffs' trade secrets and infringing on Plaintiffs' trade dress;

   b.  Equitable relief demanding the immediate return of Plaintiffs' property wrongfully converted by Defendants;

   c.  Money damages in the millions of dollars, the amount of which to be determined by a jury of Plaintiffs' peers;

   d.  Consequential damages;

   e.  Incidental damages;

   f.  Punitive damages;

   g.  Reasonable attorney's fees, filing fees, costs of suit; and

   h.  Any further relief which the Court may deem just and proper.

## FIFTH COUNT
### (Tortious Intentional Interference With Prospective Economic Advantage)

131. Plaintiffs repeat, reiterate and re-allege all of the allegations contained in the Statement of Facts, First, Second, Third and Fourth Counts above as if fully set forth at length herein.

132. For nearly 5 years, Plaintiffs have established themselves in the fitness community as the only indoor obstacle/confidence boot camp in the U.S.A. by developing a unique, comprehensive indoor obstacle confidence program with options for different programs to suit each client's needs, along with customized nutrition plans, customized nutrition shakes, and a guarantee. As such, the Plaintiffs have gained national and international acclaim and have developed ongoing relationships with clients, specifically the clients referred to above.  Because of these efforts, Plaintiffs have every reason to expect many

20

of these existing relationships to grow and new clients to be obtained through the references of the relationships.

133. Defendants, at all times relevant herein, have known of Plaintiffs' ongoing and continuous businesses and professional relationships as alleged herein.

134. As a result of Defendants' intentional, malicious interference and without justification or excuse, the Defendants stole many of the Pure Power clients and are continuing to do so.

135. Plaintiffs have been damaged by the wrongful acts of Defendants as alleged above. Such conduct does not enhance nor promote Plaintiffs' professional standing in the fitness community, but rather detracts, tarnishes and injures Plaintiffs and Plaintiffs' reputation and goodwill.

136. The aforementioned unlawful and unfair conduct by Defendants has disrupted Plaintiffs' economic relationship with those clients named above and has resulted in, and will continue to result in, preclusion of Plaintiffs' successful continued relationship with these clients.

137. The aforementioned acts of Defendants were, upon information and belief, willful and malicious and were intended to induce or cause a breach or termination of Plaintiffs' relationships and expectancies.

138. As a result of the foregoing wrongful conduct, Plaintiffs have been damaged in an amount as yet unknown but to be proven at Trial. Plaintiffs have no adequate remedy at law for the continuing violations of its rights as set forth above.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, Warrior Fitness Boot Camp, LLC; Alexander Kenneth Fell a/k/a Alex Fell, Individually; Ruben Dario Belliard a/k/a Ruben Belliard, Individually; Jennifer J. Lee, Individually; and Nancy Baynard, Individually, jointly and severally for:

      a.  Injunctive relief, enjoining the Defendants from directly and/or indirectly contacting Plaintiffs' clients, misappropriating Plaintiffs' trade secrets and infringing on Plaintiffs' trade dress;

      b.  Equitable relief demanding the immediate return of Plaintiffs' property wrongfully converted by Defendants;

      c.  Money damages in the millions of dollars, the amount of which to be determined by a jury of Plaintiffs' peers;

      d.  Consequential damages;

      e.  Incidental damages;

      f.  Punitive damages;

      g.  Reasonable attorney's fees, filing fees, costs of suit; and

      h.  Any further relief which the Court may deem just and proper.

### SIXTH COUNT
**(Unfair Competition and NY GBL §360, *et seq.*)**

139. Plaintiffs repeat, reiterate and re-allege all of the allegations contained in the Statement of Facts, First, Second, Third, Fourth, and Fifth Counts above as if fully set forth at length herein.

140. By the acts alleged above, Defendants have engaged in unfair competition including unlawful, unfair, and fraudulent business practices, deception, theft of trade secrets, theft of trade dress, theft of business/corporate documents and use of confidential

information by former employees and third parties to solicit customers in violation of NY GBL §360, *et seq.*

141. The acts of Defendants are in violation and derogation of Plaintiffs' rights and are likely to cause confusion, mistake, and deception among consumers and the public as to the source, origin, sponsorship or quality of Defendants' product, thereby causing loss, damage, and injury to Plaintiffs and to the purchasing public.

142. Defendants knew or in the exercise of reasonable care, should have known that their conduct would likely so mislead the public and injure the business reputation of Pure Power.

143. The wrongful acts, as alleged above, have permitted or will permit Defendants to make substantial sales and profits on the artwork, corporate documents and efforts of Plaintiffs.

144. As a result of the foregoing wrongful conduct, Plaintiffs have been and will be deprived of substantial sales in an amount as yet unknown but to be proven at Trial. Plaintiffs have no adequate remedy at law for the continuing violations of its rights as set forth above.

**WHEREFORE,** Plaintiffs demand judgment against Defendants, Warrior Fitness Boot Camp, LLC; Alexander Kenneth Fell a/k/a Alex Fell, Individually; Ruben Dario Belliard a/k/a Ruben Belliard, Individually; Jennifer J. Lee, Individually; and Nancy Baynard, Individually, jointly and severally for:

a. Injunctive relief, enjoining the Defendants from directly and/or indirectly contacting Plaintiffs' clients, misappropriating Plaintiffs' trade secrets and infringing on Plaintiffs' trade dress;

23

b. Equitable relief demanding the immediate return of Plaintiffs' property wrongfully converted by Defendants;

c. Money damages in the millions of dollars, the amount of which to be determined by a jury of Plaintiffs' peers;

d. Consequential damages;

e. Incidental damages;

f. Punitive damages;

g. Treble damages;

h. Reasonable attorney's fees, filing fees, costs of suit; and

i. Any further relief which the Court may deem just and proper.

### SEVENTH COUNT
### (Breach of Duty of Loyalty)

145. Plaintiffs repeat, reiterate and re-allege all of the allegations contained in the Statement of Facts, First, Second, Third, Fourth, Fifth, and Sixth Counts above as if fully set forth at length herein.

146. By the acts alleged above, Defendants, Belliard and Fell, have breached their duty of loyalty, trust and confidence to Plaintiffs. Defendants, Belliard and Fell, purloined protected information from Plaintiffs' files while still employed by Plaintiffs for the sole purpose of effecting an advantage in competing with Plaintiffs immediately upon their conspiracy and decision to commence an indoor obstacle/confidence boot camp, namely, Warrior Fitness.

147. As a result of the foregoing wrongful conduct, Plaintiffs have been and will be deprived of substantial sales in an amount as yet unknown but to be proven at Trial. Plaintiffs

24

have no adequate remedy at law for the continuing violations of its rights as set forth above.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, Warrior Fitness Boot Camp, LLC; Alexander Kenneth Fell a/k/a Alex Fell, Individually; Ruben Dario Belliard a/k/a Ruben Belliard, Individually; Jennifer J. Lee, Individually; and Nancy Baynard, Individually, jointly and severally for:

   a. Injunctive relief, enjoining the Defendants from directly and/or indirectly contacting Plaintiffs' clients, misappropriating Plaintiffs' trade secrets and infringing on Plaintiffs' trade dress;

   b. Equitable relief demanding the immediate return of Plaintiffs' property wrongfully converted by Defendants;

   c. Money damages in the millions of dollars, the amount of which to be determined by a jury of Plaintiffs' peers;

   d. Consequential damages;

   e. Incidental damages;

   f. Punitive damages;

   g. Reasonable attorney's fees, filing fees, costs of suit; and

   h. Any further relief which the Court may deem just and proper.

## EIGHTH COUNT
### (Misappropriation of Confidential and Proprietary Information)

148. Plaintiffs repeat, reiterate and re-allege all of the allegations contained in the Statement of Facts, First, Second, Third, Fourth, Fifth, Sixth and Seventh Counts above as if fully set forth at length herein.

149. By the acts alleged above, Defendants improperly disclosed the confidential and proprietary information of Plaintiffs. Specifically, Defendants improperly disclosed and used for their personal financial benefit without Plaintiffs' authorization, Plaintiffs' trade secrets, trade dress, corporate/business documents, D.I. Agreements, Operations Manual, Business Plan, Startup Manual, clients, and client files.

150. As a result of the foregoing wrongful conduct, Plaintiffs has been and will be deprived of substantial sales in an amount as yet unknown but to be proven at Trial. Plaintiffs have no adequate remedy at law for the continuing violations of Plaintiffs' rights as set forth above.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, Warrior Fitness Boot Camp, LLC; Alexander Kenneth Fell a/k/a Alex Fell, Individually; Ruben Dario Belliard a/k/a Ruben Belliard, Individually; Jennifer J. Lee, Individually; and Nancy Baynard, Individually, jointly and severally for:

    a.  Injunctive relief, enjoining the Defendants from directly and/or indirectly contacting Plaintiffs' clients, misappropriating Plaintiffs' trade secrets and infringing on Plaintiffs' trade dress;

    b.  Equitable relief demanding the immediate return of Plaintiffs' property wrongfully converted by Defendants;

    c.  Money damages in the millions of dollars, the amount of which to be determined by a jury of Plaintiffs' peers;

    d.  Consequential damages;

    e.  Incidental damages;

    f.  Punitive damages;

g.  Reasonable attorney's fees, filing fees, costs of suit; and

h.  Any further relief which the Court may deem just and proper.

## NINTH COUNT
### (Tortious Intentional Interference With Contractual Relations)

151.  Plaintiffs repeat, reiterate and re-allege all of the allegations contained in the Statement of Facts, First, Second, Third, Fourth, Fifth, Sixth, Seventh and Eighth Counts above as if fully set forth at length herein.

152.  For nearly 5 years, Plaintiffs have established themselves in the fitness community as the only indoor obstacle/confidence boot camp in the U.S.A. by developing a unique, comprehensive indoor obstacle confidence program with options for different programs to suit each client's needs, along with customized nutrition plans, customized nutrition shakes, and a guarantee. As such, the Plaintiffs have gained national and international acclaim and have developed ongoing relationships with clients, specifically the clients referred to above. Because of these efforts, Plaintiffs have every reason to expect many of these existing relationships to grow and new clients to be obtained through the references of the relationships.

153.  Defendants, at all times relevant herein, have known of Plaintiffs' ongoing and continuous contractual relationships as alleged herein.

154.  With knowledge of the existing contractual relations with Pure Power's clients, Defendants intentionally and maliciously and without justification or excuse interfered with the aforementioned contractual relationships.

155.  The aforementioned unlawful and unfair conduct by Defendants has disrupted Plaintiffs' economic relationship with those clients and has resulted in, and will

27

continue to result in, preclusion of Plaintiffs' successful continued relationship with these clients.

156. As a result of Defendants' intentional, malicious interference and without justification or excuse, Pure Power's clients were stolen by Defendants.

157. The aforementioned acts of Defendants were, upon information and belief, willful and malicious and were intended to induce or cause a breach or termination of Plaintiffs' relationships and expectancies.

158. As a result of the foregoing wrongful conduct, Plaintiffs have been damaged in an amount as yet unknown but to be proven at Trial. Plaintiffs have no adequate remedy at law for the continuing violations of Plaintiffs' rights as set forth above.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, Warrior Fitness Boot Camp, LLC; Alexander Kenneth Fell a/k/a Alex Fell, Individually; Ruben Dario Belliard a/k/a Ruben Belliard, Individually; Jennifer J. Lee, Individually; and Nancy Baynard, Individually, jointly and severally for:

a. Injunctive relief, enjoining the Defendants from directly and/or indirectly contacting Plaintiffs' clients, misappropriating Plaintiffs' trade secrets and infringing on Plaintiffs' trade dress;

b. Equitable relief demanding the immediate return of Plaintiffs' property wrongfully converted by Defendants;

c. Money damages in the millions of dollars, the amount of which to be determined by a jury of Plaintiffs' peers;

d. Consequential damages;

e. Incidental damages;

28

    f.  Punitive damages;

    g.  Reasonable attorney's fees, filing fees, costs of suit; and

    h.  Any further relief which the Court may deem just and proper.

## TENTH COUNT
### (Breach of Contract, Breach of Restrictive Covenant, Breach of Confidentiality and Non-Competition Agreement)

159. Plaintiffs repeat, reiterate and re-allege all of the allegations contained in the Statement of Facts, First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth and Ninth Counts above as if fully set forth at length herein.

160. Defendants, Belliard and Fell, were salaried employees for Pure Power.

161. Defendant, Belliard, was employed with Pure Power as a D.I. for approximately four (4) years.

162. Defendant, Fell, was employed with Pure Power as a D.I. for approximately three (3) years.

163. Defendants, Belliard and Fell, signed confidentiality and non-competition agreements on September 26, 2006 with Pure Power.

164. The Commitment to Full Effort Sections of the Agreement specifically states the following:

> You agree that during the period of your employment you shall devote your skills and best efforts to the Company; you shall work to further the best interests of the Company; and you shall not do anything to undermine or disparage the reputation of the Company or do anything that is otherwise detrimental to the Company. You shall not, directly or indirectly, assist any competitors of the Company while you are employed by the Company.

165. The Confidential Information Section of the Agreement specifically states the following:

> You shall not disclose, either orally or in writing, to anyone outside the Company any confidential or commercially sensitive information made known to you or acquired by you in the course of your employment, including but not limited to all such information relating to marketing or strategic plans, products and/or services under development, suppliers, customers, inventions, discoveries, improvements, methods, processes, know-how, trade secrets, pricing methods, personnel information and any other information that, if disclosed, might be profitable to a competitor or other third party or detrimental to the Company.

166. The Intellectual Property Section of the Agreement specifically states the following:

> (a)    You acknowledge that the Company's PURE POWER BOOT CAMP obstacle-confidence courses and related environments, and the marketing thereof, embody and/or reflect inventions, discoveries, concepts, ideas, developments, improvements, methods, processes, know-how, trade secrets, designs, trademarks (including but not limited to the marks PURE POWER and PURE POWER BOOT CAMP), trade dress, textual and graphic material, and a distinctive overall look and feel (collectively, "Intellectual Property"). You agree that all such Intellectual Property, regardless of whether or not it is capable of patent, trademark, trade dress, trade secret or copyright protection, is exclusively owned by the Company. You shall not, during the course of your employment or at any time thereafter, challenge the Company's ownership of any Intellectual Property or the validity or enforceability thereof, nor shall you use any Intellectual Property in any competing business, or in any other way without the Company's express written permission, during or after your employment with the Company.

> (b)    You further agree that all Intellectual Property that you may conceive, develop, create or reduce to tangible form while you are employed by the Company that relates in any way to the business of the Company or that results from or is suggested by work that you do for the Company is and shall be exclusively owned by the Company. You hereby irrevocably assign to the Company all right, title and interest that you may have in and to any and all Intellectual Property. You agree that, during and after your employment with the Company, you shall execute documents of assignment or such other documents as may be necessary to effectuate the assignment set forth herein and to confirm or maintain the Company's ownership of any Intellectual Property, and you shall otherwise reasonably

cooperate with the Company in obtaining, maintaining and enforcing its rights in and to the Intellectual Property.

167. The Non-Compete Section of the Agreements specifically states the following:

"You agree that, during the term of your employment and for ten (10) years thereafter:

(a)    you shall not, and shall not assist any third party to, conduct any business or be employed by any business that competes directly with the Company. A business that competes directly with the Company shall include, but shall not be limited to, any physical exercise program, confidence program or gym: (i) that uses obstacle courses; (ii) that uses methods or exercises derived from military training; (iii) that uses a military theme in any way; or (iv) that employs the term "boot camp" in the name or description of the program or gym;

(b)    you shall not, and shall not assist any third party to, hire any employee of the Company or seek to persuade any employee of the Company to discontinue employment with the Company or to become employed by or otherwise engaged in any business that competes directly with the Company; and

(c)    you shall not, and shall not assist any third party to, solicit any client or customer of the Company to discontinue his or her use of the Company's products and services or to use the competing products or services of another business."

168. The General Provisions Section of the Agreement specifically states the following:

"This Agreement shall continue in effect after the termination of your employment by the Company and shall be binding upon and inure to the benefit of both parties and their respective successors, assigns and representatives. You hereby represent that you have read and understand all of the provisions of this Agreement and you agree that the provisions of this Agreement are reasonable and necessary for the protection of the business and goodwill of the Company and the Company's Intellectual Property. It is the intent of the parties hereto that if in the opinion of any court of competent jurisdiction any provision set forth in this Agreement is not reasonable and by reason thereof is not enforceable, such provision shall be modified to the extent necessary to render it enforceable to the maximum extent allowed by applicable law, and the validity, legality and enforceability of the remainder of the Agreement shall not in any way be affected or impaired thereby. This Agreement sets forth the entire

agreement between the parties with respect to its subject matter and supersedes all prior discussions, agreements and understandings concerning the subject matter hereof. This Agreement may be amended only by an instrument in writing signed by both parties. This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to the conflict of laws provisions thereof. You agree to accept the exclusive jurisdiction and venue of the courts of the State of New York, and the federal district courts situated in New York, New York for the adjudication of any dispute, controversy or claim arising in connection with or related to this Agreement."

169. With knowledge of said contracts, the terms and conditions agreed to therein, and based upon the foregoing Statement of Facts and Counts, Defendants, Belliard and Fell, maliciously, willfully and without justification breached every Section of the Agreement by creating Warrior Fitness and collectively conspiring to steal Pure Power's clients, corporate/business documents, proprietary and confidential information, trade secrets, and trade dress from Pure Power.

170. Belliard and Fell, directly and indirectly, continue to maliciously, willfully and without justification or excuse, interfere with Pure Power's current clients and current employees, namely Nicio Evertz, a D.I.

171. Due to the Defendants' willful and malicious interference, Pure Power has lost clients and Evertz may soon be pirated and force Pure Power to pay other employees substantially higher salaries to prevent them from joining Warrior Fitness.

172. As a result of the foregoing wrongful conduct, Plaintiffs have been damaged in an amount as yet unknown, but to be proven at Trial. Plaintiffs have no adequate remedy at law for the continuing violations of its rights as set forth above.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, Warrior Fitness Boot Camp, LLC; Alexander Kenneth Fell a/k/a Alex Fell, Individually; Ruben Dario Belliard a/k/a Ruben Belliard, Individually; Jennifer J. Lee, Individually; and Nancy Baynard, Individually, jointly and severally for:

     a.    Injunctive relief, enjoining the Defendants from directly and/or indirectly contacting Plaintiffs' clients, misappropriating Plaintiffs' trade secrets and infringing on Plaintiffs' trade dress;

     b.    Equitable relief demanding the immediate return of Plaintiffs' property wrongfully converted by Defendants;

     c.    Money damages in the millions of dollars, the amount of which to be determined by a jury of Plaintiffs' peers;

     d.    Consequential damages;

     e.    Incidental damages;

     f.    Punitive damages;

     g.    Reasonable attorney's fees, filing fees, costs of suit; and

     h.    Any further relief which the Court may deem just and proper.

## ELEVENTH COUNT
### (Breach of Good Faith and Fair Dealing)

173. Plaintiffs repeat, reiterate and re-allege all of the allegations contained in the Statement of Facts, First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, and Tenth Counts above as if fully set forth at length herein.

174. Every contract in the State of New York contains an implied covenant of good faith and fair dealing.

175. Defendants, Belliard and Fell, signed confidentiality and non-competition agreements on September 26, 2006 with Pure Power.

176. Defendants breached the implied covenant by failing to conduct themselves in good faith and in failing to carry out their contractual obligations to Pure Power.

177. As a result of the foregoing, Plaintiffs have incurred damages to an extent not yet ascertained.

**WHEREFORE,** Plaintiffs demand judgment against Defendants, Warrior Fitness Boot Camp, LLC; Alexander Kenneth Fell a/k/a Alex Fell, Individually; Ruben Dario Belliard a/k/a Ruben Belliard, Individually; Jennifer J. Lee, Individually; and Nancy Baynard, Individually, jointly and severally for:

   a.  Injunctive relief, enjoining the Defendants from directly and/or indirectly contacting Plaintiffs' clients, misappropriating Plaintiffs' trade secrets and infringing on Plaintiffs' trade dress;

   b.  Equitable relief demanding the immediate return of Plaintiffs' property wrongfully converted by Defendants;

   c.  Money damages in the millions of dollars, the amount of which to be determined by a jury of Plaintiffs' peers;

   d.  Consequential damages;

   e.  Incidental damages;

   f.  Punitive damages;

   g.  Reasonable attorney's fees, filing fees, costs of suit; and

   h.  Any further relief which the Court may deem just and proper.

## TWELFTH COUNT
### (Fraud and Misrepresentation)

178. Plaintiffs repeat, reiterate and re-allege all of the allegations contained in the Statement of Facts, First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Counts above as if fully set forth at length herein.

179. For approximately the past nine (9) months, since July 2007, the Defendants posed as loyal employees and clients and solicited, manipulated, and stole Plaintiffs' clients with the intent to deceive and injure Plaintiffs, and with the intent to economically benefit the Defendants.

180. Defendants have stolen Pure Power's intellectual property, client list, trade secrets, trade dress, business/corporate documents, and other confidential, secret and proprietary information with the intent to deceive and injure Plaintiffs, and with the intent to economically benefit the Defendants.

181. The Plaintiffs detrimentally relied upon the Defendants' misrepresentations to Plaintiffs' detriment.

182. As a result of the Defendants fraud and misrepresentations aforementioned, the Plaintiffs have incurred damages to an extent not yet ascertained.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, Warrior Fitness Boot Camp, LLC; Alexander Kenneth Fell a/k/a Alex Fell, Individually; Ruben Dario Belliard a/k/a Ruben Belliard, Individually; Jennifer J. Lee, Individually; and Nancy Baynard, Individually, jointly and severally for:

      a. Injunctive relief, enjoining the Defendants from directly and/or indirectly contacting Plaintiffs' clients, misappropriating Plaintiffs' trade secrets and infringing on Plaintiffs' trade dress;

b. Equitable relief demanding the immediate return of Plaintiffs' property wrongfully converted by Defendants;

c. Money damages in the millions of dollars, the amount of which to be determined by a jury of Plaintiffs' peers;

d. Consequential damages;

e. Incidental damages;

f. Punitive damages;

g. Reasonable attorney's fees, filing fees, costs of suit; and

h. Any further relief which the Court may deem just and proper.

## THIRTEENTH COUNT
### (Breach of Fiduciary Duty)

183. Plaintiffs repeat, reiterate and re-allege all of the allegations contained in the Statement of Facts, First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh, and Twelfth Counts above as if fully set forth at length herein.

184. By the acts alleged above, Defendants, Belliard and Fell, have breached their fiduciary duty to Plaintiffs. Defendants, Belliard and Fell, purloined protected information from Plaintiffs' files while still employed by Plaintiffs for the sole purpose of effecting an advantage in competing with Plaintiffs immediately upon their conspiracy and decision to commence an indoor obstacle/confidence boot camp, namely, Warrior Fitness.

185. As a result of the foregoing wrongful conduct, Plaintiffs have been and will be deprived of substantial sales in an amount as yet unknown but to be proven at Trial. Plaintiffs have no adequate remedy at law for the continuing violations of its rights as set forth above.

36

**WHEREFORE**, Plaintiffs demand judgment against Defendants, Warrior Fitness Boot Camp, LLC; Alexander Kenneth Fell a/k/a Alex Fell, Individually; Ruben Dario Belliard a/k/a Ruben Belliard, Individually; Jennifer J. Lee, Individually; and Nancy Baynard, Individually, jointly and severally for:

    a.  Injunctive relief, enjoining the Defendants from directly and/or indirectly contacting Plaintiffs' clients, misappropriating Plaintiffs' trade secrets and infringing on Plaintiffs' trade dress;

    b.  Equitable relief demanding the immediate return of Plaintiffs' property wrongfully converted by Defendants;

    c.  Money damages in the millions of dollars, the amount of which to be determined by a jury of Plaintiffs' peers;

    d.  Consequential damages;

    e.  Incidental damages;

    f.  Punitive damages;

    g.  Reasonable attorney's fees, filing fees, costs of suit; and

    h.  Any further relief which the Court may deem just and proper.

## FOURTEENTH COUNT
### (Trade Dress Infringement, Violation of 15 U.S.C. §1125 and Lanham Act §43)

186. Plaintiffs repeat, reiterate and re-allege all of the allegations contained in the Statement of Facts, First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh, Twelfth, and Thirteenth Counts above as if fully set forth at length herein.

187. Defendants solicited, manipulated, and stole Plaintiffs' clients with the intent to deceive and injure Plaintiffs, and with the intent to economically benefit the Defendants.

37

188. Defendants stole the Pure Power client accounts, Plaintiffs' information, client files and client files with the intent to deceive and injure Plaintiffs, and with the intent to economically benefit the Defendants.

189. Defendants stole Plaintiffs' intellectual property, client list, trade secrets, trade dress, business/corporate documents, and other confidential, secret and proprietary information with the intent to deceive and injure Plaintiffs, and with the intent to economically benefit the Defendants.

190. Defendants misappropriated Plaintiffs' trade secrets and trade dress with the intent to deceive and injure Plaintiffs, and with the intent to economically benefit the Defendants.

191. As a result of the foregoing, Plaintiffs have incurred damages to an extent not yet ascertained.

**WHEREFORE,** Plaintiffs demand judgment against Defendants, Warrior Fitness Boot Camp, LLC; Alexander Kenneth Fell a/k/a Alex Fell, Individually; Ruben Dario Belliard a/k/a Ruben Belliard, Individually; Jennifer J. Lee, Individually; and Nancy Baynard, Individually, jointly and severally for:

  a. Injunctive relief, enjoining the Defendants from directly and/or indirectly contacting Plaintiffs' clients, misappropriating Plaintiffs' trade secrets and infringing on Plaintiffs' trade dress;

  b. Equitable relief demanding the immediate return of Plaintiffs' property wrongfully converted by Defendants;

  c. Money damages in the millions of dollars, the amount of which to be determined by a jury of Plaintiffs' peers;

38

    d.  Consequential damages;

    e.  Incidental damages;

    f.  Punitive damages;

    g.  Treble damages;

    h.  Reasonable attorney's fees, filing fees, costs of suit; and

    i.  Any further relief which the Court may deem just and proper.

Dated: Staten Island, New York
      May 5, 2008

                    CALCAGNO & ASSOCIATES
                    Attorneys At Law, LLC
                    Attorneys For Plaintiffs

      BY: _____
                    ANDREW JOHN CALCAGNO
                    *Main Office*
                    213 South Avenue East
                    Cranford, NJ 07016
                    (908) 272-7300

                    *Satellite Office*
                    404 Manor Road
                    Staten Island, New York 10314
                    (718) 815-0200

**EXHIBIT B**

At I.A.S. Part ___3̶7̶___ of the
Supreme Court of the State of New
York, held in and for the County of
New York, at the County Court
House, on the ___16___ ___day of
___May___ ___2008

Present: ......................................

Hon. _H. Freedman_
                              Justice

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------------X

PURE POWER BOOT CAMP, INC., PURE
POWER BOOT CAMP FRANCHISING
CORPORATION, and PURE POWER BOOT
CAMP JERICHO INC.,

                              Plaintiff(s).

Index No.: 601364/2008

006691

MOTION SEQUENCE #001

-against-

ORDER TO SHOW CAUSE
FOR PRELIMINARY
INJUNCTION WITH
TEMPORARY RESTRAINTS

WARRIOR FITNESS BOOT CAMP, LLC;
ALEXANDER KENNETH FELL a/k/a ALEX
FELL, Individually; RUBEN DARIO BELLIARD
a/k/a RUBEN BELLIARD, Individually;
JENNIFER J. LEE, Individually;
and NANCY BAYNARD, Individually,

                              Defendants.

010690

-----------------------------------------------------------------X

Upon the affirmation of Andrew John Calcagno, Esq., sworn to the 5th day of May 2008,
Affidavit of Lauren Brenner, sworn to on the 5th day of May 2008, Affidavit of Susan Upton
Douglass, sworn to on the 30th day of April 2008, Affidavit of Cheryl Dumas, sworn to on the 5th
day of May 2008, and the Exhibits annexed thereto.

IT IS HEREBY ORDERED, that the above named Defendants, Warrior Fitness Boot
Camp, LLC; Alexander Kenneth Fell a/k/a Alex Fell, Individually; Ruben Dario Belliard a/k/a
Ruben Belliard, Individually; Jennifer J. Lee, Individually; and Nancy Baynard, Individually,
show cause before a motion term of this Court at New York County Courthouse, 60 Centre
Street, New York, New York, on ___May 16___, 2008, at ___ o'clock in the ___ noon
thereof, or as soon thereafter as counsel may be heard, why an order should not be issued
enjoining, restraining and prohibiting Defendants, during the pendency of this action from:

1. Planning, constructing, or opening any indoor obstacle/confidence course boot camp-style facility, including but not limited to the Warrior Fitness Boot Camp facility located at 29 West 35th Street, 3rd Floor, New York, NY;

2. Launching the website http://www.warriorfitnessbootcamp.com and/or any other website purporting to support Warrior Fitness Boot Camp, LLC and/or any other indoor obstacle/confidence course boot camp-style facility;

3. Advertising and/or promoting, in any way, Warrior Fitness Boot Camp, LLC and/or any other indoor obstacle/confidence course boot camp-style facility;

4. Recruiting or hiring away any employees of Pure Power Boot Camp ("Pure Power"), or otherwise interfering with Pure Power's contracts with its employees, independent contractors or agents;

5. Contacting and/or otherwise communicating or working, directly or indirectly, in any way, with any and all clients (past and present) of Pure Power;

6. Utilizing any and all client lists, client files, employee files, corporate documents (including, but not limited to, operations manuals, startup manuals, business plans, and brochures), computer files, and all proprietary, confidential, trade secrets and trade dress information of Pure Power, including, but not limited to, drawings of Pure Power's facility, styled to look like a military boot camp training course comprised of camouflage wall and ceiling decor, crushed rubber flooring, a tire run, climbing walls, climbing nets, and hurdles, using any of the following eleven (11) principles of Pure Power, namely:

   - Monkey Bars
   - Barbed Wire Crawl
   - Swing to Beam

- 2 -

- High Hurdles
- Commando Crawl
- Belly Robbers
- Intensity Wall
- Traverse Wall
- Cargo Net
- Rope Climb
- Tire Run

7.  Competing directly or indirectly, with Pure Power (including but not limited to its Chelsea and Long Island facilities); and

8.  and such other and further relief as the Court deems just and equitable; and

SUFFICIENT REASON APPEARING THEREFORE, it is hereby:

ORDERED that pending the hearing ~~and determination~~ of this Order to Show Cause, Defendants and/or anyone on behalf of Defendants are hereby temporarily enjoined and restrained from:

1,  Holding the Grand Opening Party for the Warrior Fitness Boot Camp facility and/or any other indoor obstacle/confidence course boot camp-style facility;

2,  Opening the Warrior Fitness Boot Camp facility and/or any other indoor obstacle/confidence course boot camp-style facility for viewing to the public;

3.  Opening and/or operating the Warrior Fitness Boot Camp facility and/or any other indoor obstacle/confidence course boot camp facility boot camp-style facility;

4.  Launching the website http://www.warriorfitnessbootcamp.com and/or any other website purporting to support Warrior Fitness Boot Camp, LLC and/or any other indoor obstacle/confidence course boot camp-style facility owned and/or operated by the Defendants;

5. Advertising and/or promoting, in any way, Warrior Fitness Boot Camp, LLC and/or any other indoor obstacle/confidence course boot camp-style facility owned and/or operated by the Defendants;

6. Contacting and/or otherwise communicating, directly or indirectly, with any and all agents/employees of Pure Power;

7. Competing directly or indirectly with Pure Power (including, but not limited to, its Chelsea and Long Island facilities);

8. Contacting and/or otherwise communicating and/or working, directly or indirectly, in any way, with any and all clients (past and current) of Pure Power;

9. Utilizing any and all client lists, client files, employee files, corporate documents (including, but not limited to, operations manual, startup manual, business plan, and brochure), computer files, and all other documents and/or files taken from Plaintiffs, Pure Power;

10. Spoliating, destroying, and/or tampering with any and all email accounts (personal and/or business); emails (personal and/or business); correspondence (personal and/or business); files or documents relating to Pure Power and/or Warrior Fitness; computer/electronic files (personal and/or business); website accounts and/or Facebook accounts (personal and/or business); and

11. for such other and further relief as the Court deems just and equitable; and



**IT IS FURTHER ORDERED** that any and all documents and records of Pure Power (including but not limited to, data files and information stored electronically, contracts, corporate forms, client files, client lists, planning documents, business plans, marketing reports, trade secrets and trade dress information) removed by, or at the direction of, any of the Defendants from the office

- 4 -

files, computer files or premises of Pure Power at any time, be immediately returned by delivering same via messanger to the offices of counsel for Plaintiffs; and

IT IS FURTHER ORDERED that, service of a copy of this order and annexed affirmation upon Defendants, Alexander Kenneth Fell a/k/a Alex Fell, Individually at 3205 Oxford Avenue, Apt. 8, Bronx. NY 10463; Ruben Dario Belliard n/k/a Ruben Belliard, Individually at 201 West 83rd Street, Apt. 1D, New York, New York 10024; Warrior Fitness Boot Camp, LLC at 29 West 35th Street, 3rd Floor, New York, New York 10001; Jennifer J. Lee, Individually at 55 West 26th Street, Apt. 11A, New York, New York 10010; and Nancy Baynard, Individually at 201 West 83rd Street, Apt. 1D, New York, New York 10024, via Federal Express Priority Overnight in the within action on or before _____ o'clock in the _____ noon, _____, 2008, shall be deemed good and sufficient service thereof; and

IT IS FURTHER ORDERED, that all opposition papers, if any, are due on the _____ day of _____ 2008; and

IT IS FURTHER ORDERED, that all reply papers, if any, are due on the _____ day of _____ 2008, and it is further

ORDERED, THAT pending the hearing on this Motion, the file is sealed to All, except the Court, Court personnel, Attorneys of Record or their Authorized designees in writing and upon the presentation of Appropriate identification.

TSC

ORAL ARGUMENT DIRECTED

- 5 -

J.S.C.

**EXHIBIT C**

power1.txt

1

2

    A P P E A R A N C E S: (Continued)

3

    FOX ROTHSCHILD, LLP, ESQ.

4    Attorneys for Defendants
    100 Park Avenue

5    New York, New York   10017
    212-878-7900

6    BY:  CAROLYN D. RICHMOND, ESQ.
          JOHN J. SKINNER, JR., ESQ.

7

8

9

10

11

12

13

14

15

16

17

18         MICHAEL J. DAUGENTI, RMR, CRR
          OFFICIAL COURT REPORTER

19

20

21

22

23

24

25

26

 

3

1                  Proceedings

2           MR. BUTERMAN:  I submitted a letter earlier

Page 2

**<u>EXHIBIT C</u>**

power1.txt
3      this morning.  I hand delivered it to chambers.  I
4      don't know if your Honor received it.  I have a copy
5      for your Honor.  It involves crucial issues which need
6      to be addressed.
7                  THE COURT:  What are you saying?
8                  MR. BUTERMAN:  What I'm saying is, your
9      Honor --
10                 THE COURT:  You are?
11                 MR. BUTERMAN:  I represent the defendants
12     in this case.  Plaintiffs have filed an interrogatory
13     injunction.  We received the papers yesterday and when
14     we received them, we learned that their papers were
15     based on e-mails that had been stolen from my client's
16     personal e-mail accounts.  They also contain e-mails
17     representing both myself and counsel, Miss Richmond
18     from the Fox Rothschild firm, privileged
19     communications.  And they actually took those e-mails,
20     your Honor, and they attached those as exhibits,
21     e-mails clearly, clearly showing that Miss Richmond
22     giving representation to Mr. Feldman, one of the
23     defendants in this case.  And they attached them to
24     the motion and they actually used them to support the
25     motion.
26                 MR. CALCAGNO:  Your Honor, with all due

[]

                                                        4

1                       Proceedings
2      respect, I think the first and foremost thing you need
3      to do is to address everyone at the table and who we
4      are and it's our application before this court.

Page 3

power1.txt

5    Mr. Buterman --

6            THE COURT:  What's going on here?  I walked

7    into the middle of very, very bad rumble.

8            MR. CALCAGNO:  Yeah, I'd like to give the

9    court our application and Mr. Buterman will get a

10   chance to explain his position to this respectful

11   court.  I'd like to address your Honor, without Mr.

12   Buterman interrupting plaintiff's counsel.  It's our

13   application, your Honor.  May I proceed with my

14   application, your Honor?

15           MR. BUTERMAN:  Respectfully, your Honor,

16   what I'm afraid of is counsel has submitted an

17   affidavit which contains privileged and confidential

18   communications between myself and my clients and Miss

19   Richmond and her clients from no less than three

20   separate law firms.  They've attached them as

21   exhibits.  What I'm afraid of, your Honor, is by

22   seeking defense counsel --

23           MR. CALCAGNO:  Your Honor --

24           THE COURT:  This behavior I don't want.

25           You cannot behave this way in my courtroom.

26           (There is a short recess.)

5

1                     Proceedings

2            THE COURT:  We calmed down a little?

3            MR. CALCAGNO:  We are.  Andrew Calcagno,

4    law firm of Calcagno & Associates, representing the

5    plaintiff, Pure Power Boot Camp, Pure Power Boot Camp

6    Franchise and Pure Power Boot Camp of Jericho.  With

Page 4

powerl.txt

 7  me to my right is Mr. Stephen Traflet of counsel.  To
 8  my left is Susan Douglas from the law firm of Fross &
 9  Zelnick, a trademark and trade dress expert who we
10  brought before you.  This involves trade dress
11  infringement, copyright infringement, stealing
12  someone's entire business.
13          If I could -- if you want introduction of
14  the attorneys and I'd like to explain the case briefly
15  to you, Judge, and walk you through it.  This case
16  involves, your Honor, the worse case.  I've been
17  practicing 18 years, specializing in commercial
18  litigation.  The worse case of co porate that I
19  personally have ever seen committed by two employees
20  working for Pure Power Boot Camp.
21          They not only conspired with two of the
22  gentlemen, Ruben Belliard and Alex Fell, two
23  individuals who were the key trainers of her
24  clientele, but the two girlfriends but not just
25  girlfriends.  Generally as Alex Fell's girlfriend, she
26  is also the co-owner and silent partner of the

⬜

6

 1                  Proceedings
 2  competing what's called an indoor obstacle confidence
 3  course right up the block in Manhattan.  It is very
 4  important, your Honor, that's why I brought Miss Susan
 5  Douglas with us.
 6          This concept, an indoor obstacle confidence
 7  course is the only one in the nation.  There's no
 8  other obstacle course indoor with this program, with

Page 5

power1.txt
```
 9    these concepts, with this style of military training.
10    It was so unique and so rare that the defendants in
11    exhibit P, actually admit it, it's so neat and so rare
12    that it's confidential and trade secrets.  And I will
13    refer to you exhibits as I go along.
14                   However, your Honor, please, as we
15    proceed --
16                   MR. BUTERMAN:  Your Honor --
17                   THE COURT:  You'll have a chance.
18                   MR. CALCAGNO:  She actually went to Lauren
19    Brenner who's sitting right there with the white shirt
20    and black shirt and she actually went to Miss Susan
21    Douglass from Fross Zelnick only one of the top trade
22    dress, trademark firms in New York City.  This concept
23    has been filed with the patent and trademark office
24    for over the last two and a half years.
25                   THE COURT:  They have an issue of pattern
26    and trade --
```

```
 1                        Proceedings
 2                   MR. CALCAGNO:  Not yet.  Hold on a second.
 3                   MR. BUTERMAN:  Your Honor --
 4                   MR. CALCAGNO:  Excuse me.
 5                   It is so unique that it is acquired
 6    distinctiveness by its very nature under the secondary
 7    meaning of the trademark dress laws.
 8                   THE COURT:  However --
 9                   MR. CALCAGNO:  Let me just go on.  This is
10    much more than that.
```

Page 6

power1.txt

11              THE COURT:  You should be in federal court.

12              MR. CALCAGNO:  More than that, your Honor,

13      this gets really bad.  So, here we are, she

14      establishes the entire curriculum.  I have books, her

15      business plan, her startup manual.  This concept took

16      off.  It was an instant sensation from the get-go.

17              THE COURT:  They're all upset by you.

18              MR. CALCAGNO:  I will get there and address

19      all those issues.  Give me five minutes.

20              THE COURT:  Is there going to be -- they

21      want you to be a witness or something?

22              MR. CALCAGNO:  No, no, your Honor.  Let me

23      explain it all and then the defendants will have their

24      turn.

25              I have a book that I presented to your

26      Honor at the TRO.  It's exhibit F to Miss Brenner's

 

8

1                       Proceedings

2       affidavit.  This woman who's a self-made business

3       woman was written up in all business magazines as a

4       self-starting business woman.  She was a life time

5       athlete.  She designed, conceptualized this concept.

6       It's now getting national and international

7       recognition as her concept.  Every Monday for the next

8       six weeks she's on Fox Five with Mike and Juliet.  She

9       is on Fox Five, CNBC, Wall Street Journal.  This

10      concept is sensation.  It is an acquired

11      distinctiveness that is addressed by all the public.

12      Anyone hears about this concept, even Miss Susan

powerl.txt
13    Douglass will tell you, oh, that's Pure Power Boot
14    Camp's concept.
15              The brochure and this concept, if I may
16    approach --
17              THE COURT: I don't want to see it.
18              MR. CALCAGNO:  It's exhibit A to Miss
19    Brenner's affidavit.  It was just an instant
20    sensation.
21              Now, Miss Brenner decided to do such an
22    instant sensation and it was going to be trademarked
23    and trade dressed and all her concepts, she franchised
24    it in 46 states.  And all of this knowledge was known
25    by the defendant Belliard and the defendant Fell her
26    two employees that trained the military style with

□

                                                          9

1                         Proceedings
2     her.  She in fact trained them and taught them
3     everything they know.
4               Now, her client list is privileged and
5     confidential.  No one knows her client list.  It's not
6     like public knowledge anywhere.
7               THE COURT:  There will be franchises which
8     means there will be clients all over the place.
9               MR. CALCAGNO:  No.  Here's how it goes,
10    your Honor.  We have this franchise.  Now we file the
11    franchise in 46 states.  We spent literally about
12    $450,000, when all sudden, and unbeknownst to us,
13    eight months in July of '07, the two defendants in
14    clandestine fashion, your Honor -- there's no other

power1.txt

```
15        way to say it -- they started conspiring with each
16        other, started conspiring with Miss Lee, who is an
17        executive at Bobby Flade's Place. And she's a Wharton
18        Business School graduate who should know better, here
19        they are, Ruben Fell, Alex Fell and Ruben Belliard,
20        here they are, we got a plan, we're going to steal her
21        business, literally all of her contents, her programs,
22        her concepts and they start in July of '07.
23                    First they start the web site. They go to
24        "Go Daddy" and they do Warrior Fitness Boot Camp.
25        Then they steal more documents. They steal her
26        business plan --
```

☐

10

```
1                         Proceedings
2                     THE COURT:  She didn't know about the web
3         site?
4                     MR. CALCAGNO:  Oh, no, she did. She was
5         all part of it. Now, exhibit P --
6                     THE COURT:  Wait. I mean your client?
7                     MR. CALCAGNO:  Brenner had no idea about
8         this. This was just discovered over the last week or
9         so.
10                    Now, we have this business plan which is
11        identical. It's copyright infringement. Although we
12        did not register it, it's common law copyright
13        infringement. They literally cut and pasted from her
14        business plan, her startup manual, her brochure and
15        made it their own in clandestine fashion. And then it
16        gets even worse.
```

Page 9

power1.txt

17         In December they start looking for leases.
18    This was just discovered over the last week or so.
19    They go even further and all of a sudden they break
20    into her office, your Honor, and they steal her client
21    list.   First, it wasn't the full client list.   They
22    only stole 88 clients.   And I will show you, your
23    Honor, in the exhibits there's actually exhibits that
24    refer to the partial client list.   They go into the
25    exhibits and they steal one partial client list, it's
26    exhibit U, on March 25 of '08.

11

1                    Proceedings
2         And they go in there and they actually
3    steal it and here's when Ruben Belliard was still
4    employed there.   Alex Fell they had a disagreement.
5    He was insubordinate on March 16th, your Honor, said
6    expletives to Miss Brenner that were unacceptable, the
7    F word and multiple, multiple expletives that are in
8    detail in Brenner's affidavit, so repulsive, as an
9    individual, as an ex-marine and to a woman, how dare
10   you speak like that, when all the time he had this
11   plan.   He became belligerent and arrogant because he
12   knew I'm taking your concept, I have everything I
13   want.
14        So Miss Brenner was going to put him on
15   suspension.   He goes, "Fire me."   So she fired him.
16   But guess who didn't leave?   Mr. Belliard did not
17   leave because he wasn't finished stealing the
18   corporate documents, stealing the corporate assets,

Page 10

power1.txt

| 19 | stealing the customer list. |
|---|---|
| 20 | On March 31st, your Honor, exhibit X, |
| 21 | Paragraph 116 of the affidavit what does Mr. Belliard |
| 22 | do?  Breaks into her office.  We have witnesses that |
| 23 | he broke into her office not with a hammer, opened it |
| 24 | up because they have a corporate policy no one is |
| 25 | allowed in there, and he steals her business plan, |
| 26 | steals the startup manual and guess what?  Steals all |

12

| 1 | Proceedings |
|---|---|
| 2 | of the active client list. |
| 3 | If you look at exhibit X, your Honor, I'd |
| 4 | like to read that, because it's pretty, pretty |
| 5 | malicious, willful, intentional and everything else |
| 6 | you can imagine under the sun.  This case is so |
| 7 | egregious, I just -- it's repulsive, your Honor.  It |
| 8 | says, quote, oh, oh, so I just updated our party list. |
| 9 | Open pren, with a very dear friend of ours additions |
| 10 | and ah, holy shit, there's over 330 people that might |
| 11 | come to our party. |
| 12 | Just -- and if you look on the exhibit, |
| 13 | your Honor, just look at it, it is a complete |
| 14 | spreadsheet of all the customers, e-mails, their |
| 15 | private address, the classes that they joined and all |
| 16 | at her facility.  These classes start at 5:30 in the |
| 17 | morning.  And oh, who's coming, who's not coming.  I |
| 18 | mean, this was just outrageous conduct, beyond |
| 19 | outrageous conduct. |
| 20 | Then I love this e-mail, your Honor, oh, |

Page 11

power1.txt

```
21    look at double A.  This is one of my favorite by the
22    Wharton Business School graduate, Bobby Flade
23    executive who knows better than any of her boyfriends
24    and coconspirators, calls her Miss Conversion, proud
25    of it, arrogant, belligerent.  It is really
26    misappropriation is what it is.
```

                                                              13

```
 1                      Proceedings
 2              I converted a Lauren lover, exclamation.
 3    This girl Jacobs loves Warren and hugged her one time
 4    and said all would be okay and blah blah blah blah, so
 5    I wrote her off.  Continuing with the quote, but
 6    lately she has been talking to me a lot, wanting to be
 7    partners and today I converted her, exclamation.  She
 8    said she won't sign up if I don't return and do what I
 9    do.  She promised not to renew and to sign up for
10    yours.  Man, I am good.
11              She then, in the next line, your Honor,
12    this is even more repulsive.  Now they want to
13    continue to destroy her.  Her only DI left, her drill
14    instructor, Necio.  She wants to destroy and take him
15    and sway him over.  It says hey, Necio says he's
16    leaving soon, he's miserable.  And Mylinise, another
17    person who's helping him, is a key witness in this
18    case, says she is signing up for the six month, et
19    cetera, et cetera.  I'm going to treat her to Megu for
20    dinner one time.  She is just too awesome and I dig
21    her.
22              Unbelievable evidence, your Honor, in this
```

power1.txt

23    case.

24              Now we get to -- this is really the kicker,

25    your Honor.    Here we are Ruben Fell.  I mean Ruben

26    Belliard.    Here he is in the office on March 31st of

1                         Proceedings

2     '08.   He's not done stealing because he doesn't have

3     everything he needs.   And now he gets the client list

4     I just referred to it, oh shit, 330 clients, they're

5     coming with us.   He then calls Miss Brenner on the

6     phone and says, I quit, at 9:09 p.m. leaving her with

7     no one to teach her 5:30 a.m. class.   This poor woman

8     has been trying to do a national rollout.  She opened

9     up a second location in Jericho.   The identical

10    concept pursuant to the franchise, pursuant to the

11    business model, pursuant to the trade dress, all

12    filed, registered, doing everything that you're

13    supposed to do to protect your trademark, protect your

14    copyright information, do everything you can do

15    protect your business.

16              If we did not come in on the TRO, your

17    Honor, we would be negligent in doing that.  I'm going

18    to continue, your Honor, because it gets even worse.

19              The other coconspirator, Nancy Baynard, who

20    is Mr. Ruben Belliard's girlfriend, they say oh, why

21    is the girlfriend named?  Because if you look at

22    exhibit DD and exhibit EE -- sorry, it was so many

23    exhibits we had to go into double digits -- here they

24    are campaigning generally, and Miss Nancy Baynard

power1.txt

25    campaigned for all her clients in mass e-mails.

26              Look at exhibit DD and EE, sending to all

15

1                        Proceedings

2    of the clients on the list.  Complete theft, complete

3    robbery, corporate sabotage.  And then trying to

4    defame her and then -- guess what, this is even more,

5    it gets deeper and deeper.

6              After Mr. Belliard leaves and quit, guess

7    what, your Honor?  We then have destruction of

8    evidence.  He knows he's signed noncompetes.  Fell

9    signed noncompetes.  They broke into her office and

10   stole and destroyed and we believe shredded because

11   one coconspirator to the other says I think, quote

12   unquote, he shredded the document.

13             I'd like to show you that exhibit, your

14   Honor, about shedding the exhibit.  It's exhibit CC.

15   I'd like to read it to the court.

16             MR. BUTERMAN:  This isn't --

17             MR. CALCAGNO:  Excuse me.  Please sit down,

18   Mr. Buterman.

19             MR. BUTERMAN:  Buterman.

20             MR. CALCAGNO:  Sit down, please.

21             MR. BUTERMAN:  This is my e-mail.

22             MR. CALCAGNO:  Quote, Mr. Buterman is

23   involved in this, your Honor.  He's a current client

24   of Pure Power Boot Camp.  I want to get to this.  It

25   says, quote, Ruben thinks that he shredded the copy of

26   the contract.

Page 14

power1.txt

```
 1                    Proceedings
 2              MR. BUTERMAN:  Your Honor --
 3              THE COURT:  Let's keep that for another
 4        day.
 5              MR. CALCAGNO:  Your Honor, shredded the
 6        contracts.  Let me go further, your Honor.
 7              THE COURT:  If there was any spoliation of
 8        evidence that's very, very sanctionable and we know
 9        that.  Any lawyer who participated will probably end
10        up in jail, so we don't have to worry about that.
11              MR. CALCAGNO:  Let me go further, your
12        Honor.  Before this honorable court, Mr. Buterman said
13        to you, if you recall --
14              THE COURT:  I don't recall.
15              MR. CALCAGNO:  There's no confidentiality
16        agreements, there's nothing.  And at the time this
17        e-mail was written, your Honor, on April 16th, Mr.
18        Buterman was just a client of Pure Power Boot Camp.
19        He was only involved in this case as of the day he
20        showed up.
21              THE COURT:  I don't know what you're
22        talking about.
23              MR. CALCAGNO:  Mr. Buterman was a client in
24        the boot camp.
25              THE COURT:  Wait a minute.  This gentleman
26        here?
```

power1.txt

| | |
|---|---|
| 1 | Proceedings |
| 2 | MR. CALCAGNO:  This man right here. |
| 3 | THE COURT:  The lawyer for the defendant? |
| 4 | MR. CALCAGNO:  Correct.  He is an essential |
| 5 | material witness in this case.  The e-mails establish, |
| 6 | your Honor, under double GG -- |
| 7 | THE COURT:  Why is he the central witness? |
| 8 | MR. CALCAGNO:  Look at GG, your Honor. |
| 9 | MR. BUTERMAN:  Your Honor, I respectfully |
| 10 | note that these e-mails reflect attorney/client |
| 11 | privilege information and should not be read. |
| 12 | MR. CALCAGNO:  My objection, evidentiary |
| 13 | hearings can be had at a later date. |
| 14 | THE COURT:  How did you obtain this? |
| 15 | MR. CALCAGNO:  Excuse me, we obtained them |
| 16 | because if you look at the response, thank you for |
| 17 | faxing it to me, there's an admission on Page 2 of Mr. |
| 18 | Buterman's opposition to your court and it says, |
| 19 | referring to defendant Fell on the left, states:  He |
| 20 | may have had access -- he may have accessed that |
| 21 | account from the computer in Miss Brenner's gym, |
| 22 | conceding and admitting that this e-mail account, his |
| 23 | Hot Mail account was on his computer. |
| 24 | THE COURT:  Who's he?  Wait a minute. |
| 25 | You've got to back up and explain to me who your |
| 26 | talking about. |

☐

18

| | |
|---|---|
| 1 | Proceedings |

Page 16

power1.txt

2          MR. CALCAGNO: Yes.  On the work station of

3     the front desk, there's a computer.  The woman's name

4     is Liz.  She goes in.  All of a sudden she's hearing

5     some rumors, she doesn't know if it's true, all of a

6     sudden Liz goes into the computer, she goes into her

7     Hot Mail account and low and behold, there's his

8     e-mail account and concedes he put it on the computer.

9          THE COURT: His e-mail account is on the

10    computer is probably a privilege of the attorney and

11    client.

12          MR. BUTERMAN: It's a separate e-mail

13    account.

14          MR. CALCAGNO: So he clicks -- she clicked

15    on it and lo and behold all of the e-mails except for

16    the last few come from that Hot Mail account admitting

17    to them signing noncompetes, being concerned about it.

18          I filed, I said to your Honor, I filed this

19    under seal.  As an officer of the court I have a duty

20    to turn over if there's attorney/client privileged

21    communication.  I saw it, so I asked for it to be

22    under seal so no one will see it, no one is prejudiced

23    between Carolyn Richmond and Alex Fell and Ruben

24    saying that you've got a problem, you signed a

25    noncompete.

26          After they didn't know they had a problem

1                    Proceedings

2     the e-mail appears and says I'm shredding it.

3               MR. BUTERMAN: Objection, your Honor.  He

                         Page 17

power1.txt

4       just said it's privileged information.

5                  THE COURT:  I don't think it's --

6                  MR. CALCAGNO:  It's a waiver.

7                  Now, your Honor, watch this, all of a

8       sudden, in the Hot Mail e-mail, in the Hot Mails,

9       they're watching this corporate sabotage going on,

10      stealing everything, for trade dress, copyright, her

11      clients, guess what?  I opened up a G Mail account and

12      Lauren's like flipping out, what did I do, what did I

13      do?  Guess what?  Liz says, "Mr. Alex Fell gave me his

14      password."  Because I wanted to watch, your Honor,

15      there's a -- he wanted to sell some stuff on E-Bay and

16      he tells Liz here's my password, hoo-rah, hoo-rah, and

17      guess what?  Bingo, shredded.  Criminal activity,

18      stealing corporate documents, admitting to corporate

19      sabotage.

20                 The reason why Mr. Buterman didn't want me

21      to tell you what the heck was going on, Judge, is

22      because these are so incriminating, so bad, so

23      blatant, malicious, willful, they should all be held

24      in contempt including Mr. Buterman.

25                 And in the e-mail that Mr. Buterman puts,

26      he tries to help them, says this is how you do it.

20

1                          Proceedings

2       Look at double G.  This is how you circumvent it.  He

3       didn't use those words, your Honor, no, used only

4       marine corps.  You didn't get it from Pure Power Boot

5       Camp.  You got it from --

                         Page 18

power1.txt

6           THE COURT:  I can't believe lawyers are

7     using e-mail.

8           MR. CALCAGNO:  Mr. Buterman did this, Mr.

9     Buterman in exhibit double H.  And I want you to see

10    this, Judge, this is reprehensible, this is

11    reprehensible.  He is going to quote -- and this is an

12    e-mail from Jenny Lee, defendant owner of Orient

13    Fitness, and her boyfriend coconspirator defendant

14    Alex Fell.  The last paragraph says, quote, it doesn't

15    mean Buterman won't do some little things to let

16    people know stuff that will hurt her even more, but it

17    won't hurt you guys.  He assured me of that.  He has

18    your best interest at heart, then his interest to

19    destroy her is secondary and thinks he will already

20    destroy herself.

21          And we wrote a letter to Mr. Buterman.

22    This gets even more outrageous.  I wrote him when he

23    called me up on May 5.  I said Mr. Buterman, you have

24    some serious conflicts of interest, you know about

25    this information.

26          I don't know anything.  He then says oh,


⬚

21


1                     Proceedings

2     it's ten years.

3           I said who do you know?

4           I must have seen it in documents.

5           Did you see the documents?

6           I didn't know they exist.

7           We know he lied then.  We know he lied to
                        Page 19

power1.txt

8       this court a few weeks.

9                      MR. BUTERMAN:   Objection.

10                     MR. CALCAGNO:   He lied.  Mr. Traflet

11      witnessed it as well.

12                     And then he sent a letter to Mr. Buterman

13      to recuse himself, your Honor, to recuse himself under

14      the ethical rule DR.  And it's a directive.  It's just

15      not a canon of ethics.  It's DR 5-102.  He is a

16      material witness.  I believe he's potentially -- we

17      didn't know he was a defendant yet.  I want to take

18      his deposition first, then he may be a defendant.  I

19      don't want to do that to an attorney, but at the very

20      least there's an appearance of impropriety, collusion,

21      appearance of collusion, helping them engage in

22      trademark infringement.  It is outrageous.

23                     This is the last point, your Honor, I'll be

24      finished.  I am so outraged by his opposition it

25      violates -- it's actually tantamount to extortion and

26      blackmail before this court.  When your Honor reads it


□

22


1                      Proceedings

2       you will be outraged.  I think he should be sanctioned

3       by this court.  He actually threatened.  So I think we

4       should go the U.S. Attorney's office.  I think Mr.

5       Kilpatrick should be reported to the ethics committee

6       that is a direct violation of the canon ethics rule,

7       DR 7-105, threatening a criminal prosecution in civil

8       litigation.  It's outrageous to be to sitting here.  I

9       called him three times on the phone May 5, yesterday

power1.txt

10      on May 6th.  When he showed up at court, I said please
11      don't show up, get some other attorney.
12                      I called Miss Carolyn Richmond.
13                      Where is she?
14                      I called Miss Carolyn Richmond.
15                      I said you haven't responded to any of my
16      letters, your clients are engaging in this fraudulent
17      activity, what are you doing?  She wouldn't even send
18      me a letter.  She does not represent the defendants.
19                      I said who represents the defendants?  Your
20      Honor, I need to know.  The only letters I have from
21      Carolyn Richmond from the Fox Rothschild law firm and
22      she responded I'm not sending you anything.
23                      I said Mr. Buterman called me and he said
24      quote, unquote, Mr. Traflet was with me, I'm
25      authorized to call you.
26                      I said do you represent the defendants?

23

1                       Proceedings
2                       He said no.
3                       I said, do you intend to represent them?
4       If you do, fax me a letter of rep.
5                       I don't.
6                       You want my fax number?
7                       No.  And he hung up.  Mr. Traflet was in
8       the room.  And guess what, who showed up for the TRO?
9       Guess who shows up?  Buterman.
10                      It is -- this case cries out for, your
11      Honor, irreparable harm.  Miss Susan Douglass, I'm so
                        Page 21

power1.txt

12    outraged, I take this personally, it's outrageous

13    conduct, it's malicious, it's willful, it's

14    contemptuous.  It's every awful despicable word of the

15    defendants, who think they're U.S. marines.  Pure

16    Power is built on 11 principles of integrity, loyalty

17    and trust.  And, guess what, every one of them has

18    been violated by all of them.

19             And smirk more, smirk.  You think it's

20    funny.  Miss Williams is smirking in this courtroom,

21    your Honor.  I take umbrage with her attitude and her

22    condescending and I renamed her misappropriation.

23    She's outrageous, outrageous.  I am appalled, your

24    Honor, very upset, very upset.

25             THE COURT:  You're going to have a heart

26    attack here.

⬜

24

1                         Proceedings

2                 MR. BUTERMAN:  May I?

3                 THE COURT:  Yes.

4                 MR. BUTERMAN:  I'm the only one.  I

5    represent the defendants in this case.

6                 THE COURT:  You do?

7                 MR. BUTERMAN:  Yes, I do, your Honor.

8                 MR. CALCAGNO:  I want to make a motion

9    formally to recuse him from this case.

10                THE COURT:  Disqualified is the word, too.

11                MR. CALCAGNO:  Disqualified.

12                MR. BUTERMAN:  Let me begin by explaining

13    some of the background here, your Honor, just briefly

power1.txt

14     and this all contained in the letter that I wrote to

15     the court earlier today which I do not know if the

16     court received it or not.  I have another copy of it I

17     can provide to your Honor.

18             And what I point out in the letter, your

19     Honor, is that yesterday afternoon, yesterday around

20     noon, 11:00 o'clock, noon, we received plaintiffs'

21     papers regarding their request for preliminary

22     injunction.  And when we looked at the papers what we

23     immediately noticed that they were largely -- there

24     was an affidavit from Miss Lauren Brenner that

25     contained approximately 20 e-mails taken from my

26     client, Mr. Fell's Hot personal accounts.

                                                        25

1                          Proceedings

2              I understand, your Honor --

3              THE COURT:  Who got on her e-mail system?

4              MR. BUTERMAN:  Fifteen of those e-mails

5      were taken after my client had been terminated.  My

6      client was terminated on March 16th, 2008, and your

7      Honor can look and see that most of the exhibits here

8      are e-mails that come from after March 16th, 2008.

9      They are e-mails --

10             THE COURT:  He was using?

11             MR. BUTERMAN:  No, he wasn't at the

12     facility anymore, your Honor.

13             THE COURT:  If he was using the facility.

14     If I put my home e-mails on the OCA account and I

15     leave OCA, OCA has a right to my whole e-mails.

power1.txt

16              MR. BUTERMAN:  Absolutely.  These were not
17    put on Pure Power Boot Camp's account.
18              THE COURT:  If I give OCA access one way or
19    another to my whole e-mail, that's the end of my
20    privacy.
21              MR. BUTERMAN:  First of all, Mr. Fell did
22    not give any access.
23              THE COURT:  How did he do it?
24              MR. BUTERMAN:  What's our understanding of
25    how he's got there, what happens is Mr. Fell at one
26    point in time --


                                                    26


1                     Proceedings
2              THE COURT:  Gave somebody else his
3    password?
4              MR. BUTERMAN:  No, that's not our
5    understanding.  What we understand is at one point in
6    time Mr. Fell accessed his Hot Mail account while he I
7    was employed by Miss Brenner.  He then left the
8    company and when he left the company they somehow
9    gained access to his account thereafter.  And, your
10    Honor, they continued to do that.  And, you know, the
11    point that should be made is we're not just talking
12    about Mr. Fell's Hot Mail account.  There's actually
13    three accounts here.  There's a G mail account and
14    there is a warrior Fitness account.
15              THE COURT:  All of which would had to have
16    been produced during discovery.
17              MR. CALCAGNO:  Absolutely.
                    Page 24

power1.txt

18          MR. BUTERMAN:  Here's the point with

19     respect to this.  In those files you will see not only

20     very, very privileged personal communications but also

21     attorney-client privileged communications.  And, your

22     Honor --

23          THE COURT:  I think he may have waived

24     them.

25          MR. BUTERMAN:  With all due respect --

26          MR. CALCAGNO:  Absolutely, Judge.


◻                                                           27


1                      Proceedings

2          MR. BUTERMAN:  With all due respect, it is

3     not the case he can waive attorney-client privilege.

4     Waiver is the knowing relinquishment of a right.

5          THE COURT:  Not necessarily, as long as

6     somebody else was in the room.

7          MR. BUTERMAN:  Nobody else was in the room.

8          MR. CALCAGNO:  Please don't cut the judge

9     off when she's speaking.

10          MR. BUTERMAN:  Your Honor, please.  On

11     April 1st, 2008, Miss Richmond who's from the law firm

12     of Fox Rothschild wrote a letter to Miss Brenner

13     directly, saying I represent Alex Fell in this

14     litigation, in this potential litigation and all

15     issues regarding his termination from Pure Power.

16          There is an e-mail from April 16th, 2008,

17     and it's exhibit BB, your Honor, to Miss Brenner's

18     affidavit.  It's an e-mail from Miss Richmond on her

19     Fox Rothschild e-mail accounts to Mr. Fell, after --

power1.txt

20    mind you, your Honor, this is over a month after Mr.
21    Fell had been terminated giving Mr. Fell legal advice
22    and legal opinion and discussing attorney-client
23    privilege information.
24              On the second page of the e-mail exhibit
25    BB, your Honor will see that it says clearly that this
26    document, this e-mail, contains privileged and

28

1                        Proceedings
2     confidential information intending only for the use of
3     the individual named above.  If you are not the
4     intended recipient of this e-mail or the employee or
5     agent responsible for delivering to the intended
6     recipient, you are hereby notified that any
7     dissemination or copying of this e-mail is strictly
8     prohibited.
9              Now, your Honor --
10             THE COURT:  So there's stuff in here that
11    shouldn't be.  Go ahead.
12             MR. BUTERMAN:  There's a lot of stuff in
13    here that's confidential privileged information and it
14    goes deeper, your Honor.
15             What's happened in this litigation is that
16    Miss Brenner and counsel have had access to three of
17    Mr. Fell's e-mail accounts throughout this litigation.
18             Now, these are the e-mails they chose to
19    produce but there are literally hundreds of e-mails.
20             THE COURT:  What does that got to do with
21    the issue?
                        Page 26

power1.txt

22          MR. BUTERMAN:  There are e-mails between
23     attorneys.
24          THE COURT:  Mr. Buterman, what does that
25     got to do with the issue in the case?
26          MR. BUTERMAN:  It has to do with the fact

[]

29

1                    Proceedings
2     that in sum total of a support for plaintiffs' motion
3     for preliminary injunction happens to be privileged
4     material, your Honor.
5          THE COURT:  Wait.  But if we got privileged
6     material, it shows that they stole all the documents.
7     It's out there.
8          MR. BUTERMAN:  First of all, those issues
9     are very much in dispute and I respectfully submit
10    that the evidence doesn't show that at all.  But I
11    have a much bigger problem which is that counsel has
12    been privy to my communications with my clients and
13    mind you, your Honor, up until -- we have an e-mail in
14    here from last Friday.
15          THE COURT:  Somehow you -- you know
16    something, maybe lawyers should learn -- should have
17    learned by now not to communicate with their clients
18    through e-mails particularly when a situation like
19    this arises, if you have clients who are likely to
20    have the access one way or the other.  You know, it's
21    a problem now with the electronic communications and
22    I'm going to say you have to eat it.
23          MR. BUTERMAN:  It absolutely is a problem,
                         Page 27

power1.txt

24    your Honor.  But, respectfully, we are talking about
25    private e-mails and there's no issues of waiver here.
26                THE COURT:  They may not be admissible but

☐
                                                    30


1                        Proceedings
2    there may be enough evidence to get a TRO.
3                MR. BUTERMAN:  Respectfully, your Honor, I
4    highly disagree because I also believe that the
5    e-mails themselves do not show even close to what Mr.
6    Calcagno claims that they show.  But the point is,
7    your Honor --
8                THE COURT:  Did your clients have a
9    noncompete agreement?
10               MR. BUTERMAN:  Your Honor.
11               THE COURT:  Yes or no?  You know that.
12               MR. BUTERMAN:  My clients, I will tell you
13   exactly what I know.  Mr. Fell has an exhibit here
14   that's a noncompete agreement.  He is prepared to
15   testify under oath that that is not his signature on
16   that agreement.
17               With respect to Mr. Belliard, I believe
18   that at one point in time Mr. Belliard did have a
19   noncompete agreement, it has not been produced, I have
20   never seen it.  What I do know, your Honor, is that
21   the noncompete is a ten-year noncompete agreement
22   which prohibits my client from operating anywhere in
23   the world in the fitness industry.  It is facially
24   invalid.
25               THE COURT:  A ten-year would be.
                        Page 28

power1.txt

26              MR. BUTERMAN:  Thank you, your Honor.


⬜

                                                    31


1                        Proceedings
2                MR. CALCAGNO:  But it has a savings clause,
3        your Honor, and subject to your Honor reducing it.
4        But can you ask a pointed question, did Mr. Belliard
5        shred the noncompete as stated in double C, your
6        Honor?  Can you ask that question?
7                MR. BUTERMAN:  This is inappropriate.
8                MR. CALCAGNO:  It's here right here.
9                MS. RICHMOND:  I'm Carolyn Richmond from
10       Fox Rothschild, counsel for all the defendants as
11       well.  The beginning of April when we first became
12       aware of this issue, I respectfully wrote to counsel
13       and Pure Power and requested any copies of any
14       noncompete or nondisclosure agreements.  This all
15       could have been forestalled because if there was a
16       noncompete agreement against Mr. Fell, this is what I
17       do for a living noncompete agreements in the
18       employment sector, and so if there was one as alleged
19       and attached yesterday, it should have been produced
20       six weeks ago.  It never was, which belies the
21       question of whether it is legitimate.
22               THE COURT:  Who do you write to?
23               MR. RICHMOND:  First we asked Miss Brenner;
24       then we asked the first counsel.  I repeatedly asked
25       for the last six weeks whether there was any alleged
26       intellectual properties, whether there was any

                        Page 29

                              .

power1.txt

32

| 1 | Proceedings |
| 2 | registration or trademark. If there was, I could have |
| 3 | counseled my client differently. Now all laid out |
| 4 | before you, my advice is there. |

5          And with respect to all of the wiretapping
6   laws and electronic privacy acts, I respectfully
7   disagree. Your rights actually under New York state
8   privacy protects you much greater than you believe,
9   because even if your access to your computer accounts
10  were outside of work, were in work, once your boss
11  became aware that this was private and your private
12  e-mails, they're supposed to stop, particularly when
13  they see the legends at the bottom.
14          And when you leave the bench in particular
15  and your bosses were to access your account
16  surreptitiously after you left the bench, I propose
17  that's a whole different ball of wax. When my counsel
18  attaches those e-mails to court documents, that opens
19  up a whole other can of worms.
20          THE COURT: I may have spoken quickly,
21  but --
22          MS. RICHMOND: There's a whole lot of case
23  law out there about what those acts do. And none,
24  despite all the hyperbole of counsel, none of the
25  documents without discovery would even get to the
26  point of whether or not there were documents taken or

33

power1.txt

| | |
|---|---|
| 1 | Proceedings |
| 2 | not.  What we do see here is you can't ask for an |
| 3 | equitable remedy as far as a TRO when you yourself |
| 4 | have breached and not followed the laws of equity. |
| 5 | THE COURT:  It's a problem. |
| 6 | MS. RICHMOND:  My colleague is here to |
| 7 | respond, as well, to some of the remaining points. |
| 8 | MR. CALCAGNO:  I do have Miss Douglas here. |
| 9 | After they're done I'd hike her to address the trade |
| 10 | address infringement. |
| 11 | MR. BUTERMAN:  I want to point out we are |
| 12 | here on a motion for preliminary injunction and the |
| 13 | issues that have to be resolved here are whether |
| 14 | there's a likelihood of success on the merits. |
| 15 | THE COURT:  Counsel I'm aware of it. |
| 16 | MR. BUTERMAN:  Your Honor, the issue is -- |
| 17 | one of the issues here certainly are whether the |
| 18 | equities favor one party or another.  I want to say in |
| 19 | light of what's going on in the e-mails, it's very |
| 20 | clear that the equities certainly do favor the |
| 21 | plaintiffs in this matter. |
| 22 | Moreover, your Honor, I just want to bring |
| 23 | up one fact with respect to the issue of irreparable |
| 24 | harm here.  Miss Brenner has a very, very successful |
| 25 | business.  I want to say, when Mr. Fell and Mr. |
| 26 | Belliard open on Monday, they have ten clients.  In |

34

| | |
|---|---|
| 1 | Proceedings |

Page 31

power1.txt
2      the affidavit submitted by Miss Brenner she talks

3      about having had thousands of clients over the years.

4      We're talking about a small gym, two ex-marines who

5      are trying to open with ten clients.

6              THE COURT:  Now, here, let me ask you, have

7      they taken the client list?

8              MR. BUTERMAN:  No, your Honor.  It's my

9      understanding -- let me please explain the document

10     that Mr. Calcagno referred to.  And this is

11     100 percent my understanding.  Exhibit XX, excuse me,

12     exhibit X that Mr. Calcagno referred to, which has a

13     party list, is a list that was compiled by all four of

14     the named defendants based on the personal e-mail

15     list.  When --

16             THE COURT:  That doesn't sound totally

17     believable.

18             MR. BUTERMAN:  Your Honor, the point is

19     client lists are not confidential if they are

20     available from other sources.

21             THE COURT:  Client lists of this type are

22     confidential.  If they're available for other sources

23     they still have to be given back.

24             MS. RICHMOND:  Your Honor, I'm sure you

25     have many cases with respect to documents in this

26     particular county.  New York law is very clear if you

▯

35

1                      Proceedings

2      can create a list from your head on your own --

3              THE COURT:  I agree with that, but that's

                        Page 32

power1.txt
```
 4    not this.

 5                MS. RICHMOND:  Your Honor, that's exactly

 6    what this is.  They were gym members.  You can walk

 7    in.

 8                THE COURT:  Counsel, let's say I don't

 9    believe that.  I think they took lists.  I believe

10    they took lists.  And I'm going to order those lists

11    returned.  I want them -- if they have them out of

12    their heads, then they should give over all the lists

13    and then make new lists out of their heads.

14                They don't have all the phone numbers, they

15    don't have all the e-mail numbers in their heads.

16                MR. BUTERMAN:  If your Honor would like,

17    let me represent -- let me be clear.  My clients have

18    represented to me that they do not have any customer

19    lists, that they have from Pure Power Boot Camp.

20    That's what they have represented to me.

21                THE COURT:  I am telling you that I don't

22    believe it.  And I am ordering them to return any

23    lists that they have, even ones they claim they don't

24    -- they didn't get from Pure Power.  They can start

25    over again, because any list that has either an e-mail

26    or telephone number, I want back.
```

□

36

```
 1                        Proceedings

 2                MR. BUTERMAN:  Your Honor, respectfully,

 3    while my clients will abide by your Honor's rulings,

 4    the list that they created also have personal

 5    contacts, the e-mail list attached to exhibit X which
```

Page 33

power1.txt

6    plaintiff now has.

7            THE COURT:  How did they get all those

8    e-mails?

9            MR. BUTERMAN:  Many of them are from their

10   friends.

11           THE COURT:  They have them again.

12           MR. BUTERMAN:  We will be happy to give

13   back any copies of exhibit X that we have or any other

14   master list will be given, I should say.

15           MR. CALCAGNO:  Your Honor.

16           THE COURT:  I don't want to hear from you.

17   Go ahead.

18           MR. SKINNER:  My name is John Skinner from

19   Fox Rothschild.  I'm a registered pattern and

20   trademark attorney from the U.S. PTO.

21           Somewhere in the documents here there was

22   an affidavit by Miss Susan Upton Douglass.  Mr.

23   Calcagno has said that the plaintiff has a number of

24   trademarks and one of trademarks that they are

25   claiming to have is trade dress to allay out --

26           THE COURT:  They said they applied for

1                    Proceedings

2    them.  She backed away from having one.

3            MR. SKINNER:  I just wanted to show the

4    court that an office action issued back in January of

5    2008 that finally rejects the trademark application in

6    the trademark offices said the following:  "The

7    refusal to register is made final because the proposed

Page 34

power1.txt
```
 8      mark consists of nondistinctive trade dress that would
 9      not be perceived as a service mark."
10              In the present case the proposed mark is
11      not inherently distinctive because camouflage, rubber
12      flooring, tire rungs, climbing walls, climbing nets,
13      hurdles and motivational words are commonly associated
14      with fitness centers.  Please see the previously
15      attached evidence which illustrates camouflage
16      associated with other boot camps and that military
17      style boot camps are a commonly offered physical
18      fitness service.  And they go on and list a half dozen
19      different boot camps and they also show as evidence 47
20      various pages taken off the Internet.
21              MS. DOUGLASS:  If I may?
22              THE COURT:  Yes.
23              MS. DOUGLASS:  I am Susan Douglass.  May it
24      please the court, I have been practicing trademark and
25      copyright law exclusively for 26 years at the firm of
26      Fross, Zelnick, Lehrman & Zissu, which is the largest
```

38

```
 1                      Proceedings
 2      firm in the world that specializes only in trademark
 3      and copyrights, not patents.  And we have 50 lawyers,
 4      that's all we do.  And so I can tell you it's my
 5      experience that what happens in the real world and
 6      what happens in the trademark office are two entirely
 7      different things.
 8              The Supreme Court in the Two Pacer versus
 9      Taco Sabana (phonetic) case had said that trade dress
```

Page 35

power1.txt
```
10      which are the elements, the look and feel of a
11      business are inherently protectable, which is the
12      supreme court case, Two Pacer versus Taco Sabana.
13                  THE COURT:  Come on, let's go.
14                  MS. DOUGLASS:  Anyway, the point is when
15      you file an application in the trademark office these
16      examiners are, for lack of a better word, fearful and
17      so what they do is because Section 2F of the trademark
18      office says five years of use is inherent, is prima
19      facie evidence of inherent distinctiveness --
20                  MR. SKINNER:  Objection.
21                  MS. DOUGLASS:  The examiners like to wait
22      for five years so they feel they have the comfort of
23      having the five years behind them.  We have four and a
24      half years that what counsel referred to as the final
25      refusal is the final refusal which gives us six months
26      to answer.
```

39

```
1                       Proceedings
2                   And so we are going to be filing the
3       response on July 5th, which is the last day of the
4       term to respond.  And the examiner has told us over
5       the telephone that she's just going to wait out the
6       five years.
7                   MR. SKINNER:  Objection.
8                   MS. DOUGLASS:  Excuse me, I had a telephone
9       conversation with the examining attorney.  And she
10      said I'll feel more comfortable waiting for five years
11      because the trade traditions are not within the
```

Page 36

power1.txt
12    comfort zone of the trademark examining attorneys who
13    are more accustomed to word marks and logos, than the
14    sort of thing I have in the past, for example,
15    attached to my affidavit registered the trade dress of
16    the Two Carnival store.
17            And again even though the Supreme Court has
18    said that the trade dress is inherently distinctive,
19    the examining attorneys feel more comfortable with the
20    five year period and when it comes time for me to file
21    the request for reconsideration in July, which I have
22    all of this press evidence which is very persuasive,
23    the courts have said, the trademark office has said
24    that extensive publicity, and so on, is persuasive
25    evidence of acquired distinctiveness.
26            She's basically told me on the telephone

☐

40

1                    Proceedings
2    that she's just waiting out the term.  So this is what
3    I'm going to do, I'm going to until July.  I will file
4    a request for reconsideration.  She will review it
5    over a couple of months and then we will be up to the
6    five year term amount at which point we will then file
7    a supplemental thing saying we have five years and
8    then it will go through.
9            The other point I would like to make is
10    that we have no objection to the defendants having a
11    boot camp.  What we're talking about is distinctive
12    trade dress comprising all of these elements, the
13    indoor confidence obstetrical course which is

Page 37

power1.txt
14      specifically designed.  They can do calisthenics, they
15      can have pieces of equipment when you go in this place
16      and you look at the brochures and you see the very
17      distinctive look totally non-functioning, you don't
18      need to have netting hanging from the ceiling, you
19      don't have to lay out, you don't need the words
20      stenciled on support posts in the building.
21                  THE COURT:  Is that what your client has?
22                  MS. DOUGLASS:  Yes.  And it's totally
23      arbitrary and distinctive trade dress.  That is the
24      subjects of the trademark application and which will
25      ultimately be registered.
26                  They're welcome -- there are other boot

⬚

41

1                           Proceedings
2       camps in the country.  They're welcomed to do that.
3       They can do their own boot camp.  What they can't do
4       also is a proprietary program; for example, what
5       Lauren Brenner has developed.  I've been to many gyms.
6       I belonged to one gym for 25 years.  You never walk in
7       the door and they say drop down and give me five.  And
8       the clients walk in like this in high heels and the
9       guy a suit and they do five push-ups.  And they have
10      changing dens instead of a dressing room.  This is
11      what the Lauren Brenner Pure Power Boot Camp is.  And
12      they're trying to emulate all these things.  They call
13      clients by the name recruits.
14                  THE COURT:  I find that obnoxious, calling
15      clients recruits.  I have to tell you that more than

Page 38

power1.txt

16     anything else.

17              MS. DOUGLASS:  Is that not distinctive,

18     unique?  Have you ever been to a gym where somebody

19     calls you a recruit.

20              THE COURT:  It sounds pretty hokey.

21              MS. DOUGLASS:  This what they are copying,

22     they're copying this whole program.

23              THE COURT:  By tomorrow they'll change it.

24              MR. BUTERMAN:  First of all, with respect

25     to some of these elements -- and I appreciate

26     counsel's --

☐

42

1                    Proceedings

2              MR. CALCAGNO:  Can I say one thing to Miss

3     Douglass?

4              THE COURT:  No.

5              MR. CALCAGNO:  Fine, your Honor.

6              MR. BUTERMAN:  If the concerns are with

7     respect to issues with respect to cargo netting, your

8     Honor, there will be no cargo netting in our gym.  If

9     the issues are with respect to tents, I can assure

10    your Honor there will be no tents.

11             THE COURT:  We're getting there.

12             MR. SKINNER:  I would submit that is not

13    what the trademark is.  If you look at the trademark

14    it actually has a picture of the obstacle course as

15    the examiner --

16             THE COURT:  They're not saying the obstacle

17    course.  They're saying the tents.

power1.txt

18          MR. BUTERMAN:  We will not have the

19    military green color.  I mean --

20          THE COURT:  Okay.  We're getting there.

21          MS. DOUGLASS:  In their business plan, your

22    Honor, they say the Warrior Boot Camp, they say it's a

23    completely different fitness experience based on pan

24    military style training.

25          THE COURT:  Why don't you work with --

26          MR. SKINNER:  Your Honor --

☐

43

1                    Proceedings

2          THE COURT:  I am going to walk out.

3          You know what, somehow this group has been

4    unable to conduct itself appropriately.  And for that

5    reason I am just not going to say do anything now.  If

6    you change your thing enough, the TRO goes away.  And

7    it's now up to you to change your thing enough.

8          MR. SKINNER:  Can we get a little guidance?

9          THE COURT:  Don't call everybody recruits,

10    don't come in and say drop down and do this.  If

11    there's some imitation in the program, you know, a

12    boot camp is a boot camp.  Nets gone, color's gone,

13    change your style.  Don't call them recruits, call

14    them -- come up with another word.

15          MR. BUTERMAN:  It's all agreed, your Honor.

16    That is all agreed to.

17          MS. DOUGLASS:  If there's the indoor

18    obstacle confidence course.

19          THE COURT:  I'm not going to say

Page 40

power1.txt
20    everything.   Take a look.   The three of you go look at
21    theirs, figure out something that's different.
22                 MS. RICHMOND:   Your Honor, could we have
23    the TRO lifted?
24                 MS. DOUGLASS:   Could we keep the TRO in
25    place, please.   I'd just like to make one more point
26    about irreparable harm; that is to say people are

44

1                          Proceedings
2     going to invest hundreds of thousands of dollars.
3     They do have a franchise in this.   The franchise is
4     worthless if people steal it.   There will be
5     irreparable harm.
6                 THE COURT:   I can't stop boot camps.
7                 MS. DOUGLASS:   No, but you can stop the
8     imitation of the Pure Power Boot Camp.
9                 THE COURT:   It's got to be something
10    different.
11                MS. RICHMOND:   Your Honor, with all due
12    respect, the concepts of boot camps besides being all
13    over this country in other gyms derives from the U.S.
14    Army and Marines.   Recruits all come from the army.
15                THE COURT:   I don't like it.   Get rid of
16    that.
17                MS. RICHMOND:   Personally I wouldn't like
18    it.   It's exactly what it's called.
19                MR. BUTERMAN:   My client just informed me
20    they don't refer to their clients as recruits anyway.
21    They use a specific marine term.   They call them
                          Page 41

power1.txt

22    warriors.

23              THE COURT:  Style themselves differently.

24    I can't stop competition.

25              MR. TRAFLET:  Your Honor, there's an issue

26    that the TRO hasn't been addressed.  They're supposed

                                                    45

1                       Proceedings

2    to give us back everything that they took.

3              THE COURT:  Yes, I'm ordering that back.

4              MR. TRAFLET:  That includes all of our

5    franchise material.

6              THE COURT:  Two and a half weeks from now,

7    will give you a new date.

8              MS. DOUGLASS:  What about Monday?

9              THE COURT:  They can open Monday as long

10    as --

11              MS. DOUGLASS:  They have been all set up to

12    go.

13              MR. TRAFLET:  They have all our franchise

14    documents.

15              THE COURT:  It has to be given back

16    tomorrow.

17              MR. TRAFLET:  They can't use that, correct?

18              THE COURT:  Everything has to be returned

19    by tomorrow.

20              MR. CALCAGNO:  What about the stolen

21    noncompete that Ruben said he shredded or in their

22    position that he says exist, can they return the

23    noncompete agreement?

                        Page 42

power1.txt

24          MR. BUTERMAN:  Everything we have we will
25   certainly return.
26          MR. CALCAGNO:  Your Honor, if you can just

⬚
46

1                    Proceedings
2    put in place the franchise is going to be diluted, the
3    trade dress is going to be diluted, the indoor
4    obstacle confidence course, the entire concept they
5    have stolen.  I went to their facility and they
6    created an exact replica.
7          THE COURT:  I can't do this without a
8    hearing and I can't conduct a hearing for a couple of
9    weeks now.
10          MS. DOUGLASS:  There will be irreparable
11   harm that cannot be mitigated.  If the TRO could
12   please stay in place.
13          THE COURT:  I'm not going to keep the TRO
14   in place.  They can open on the 14th.  But if in two
15   weeks you come back and show me that you haven't
16   changed everything --
17          MS. DOUGLASS:  Can we have access to take
18   photographs?
19          THE COURT:  Yes.
20          MR. BUTERMAN:  You'll obviously supervise
21   access?
22          THE COURT:  Yes.
23
24          *              *              *
25

Page 43

power1.txt

26

☐

47

1                          Proceedings

2

3              C E R T I F I C A T E

4

5

6    It is hereby certified that the foregoing is a true and
     accurate transcript of the proceedings.
7

8              ----------------------------------------
               MICHAEL J. DAUGENTI, CSR, RPR, RMR, CRR
9              OFFICIAL COURT REPORTER
               SUPREME COURT-NEW YORK COUNTY
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

power1.txt