UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

| | |
|---|---|
| PURE POWER BOOT CAMP, INC., PURE POWER BOOT CAMP FRANCHISING CORPORATION, and PURE POWER BOOT CAMP JERICHO INC., | SUPPLEMENTAL AFFIDAVIT OF LAUREN BRENNER IN SUPPORT OF MOTION Index No.: 08 CV 4810 (JGK) |

Plaintiffs

-against-

WARRIOR FITNESS BOOT CAMP, LLC,
ALEXANDER KENNETH FELL a/k/a ALEX
FELL, Individually; RUBEN DARIO BELLIARD
a/k/a RUBEN BELLIARD, Individually;
JENNIFER J. LEE Individually; and NANCY
BAYNARD, Individually,

Defendants.
------------------------------------------------------------x

STATE OF NEW YORK :
                        s.s.:
COUNTY OF NASSAU:

LAUREN BRENNER, being duly sworn, deposes and says:

1. I am the president of each of the plaintiffs and make this supplemental affidavit in support of the instant motion for a preliminary injunction prohibiting defendants from operating, together with such other relief as the court may deem appropriate.

Pure Power's Business

2. As set forth in my original affidavit, Pure Power has been in existence for roughly 5 years. Over that period, I have devoted endless hours and hundreds of thousand's of dollars, to build a company recognized as the only fitness program employing a unique indoor obstacle course and

modeling itself on military training techniques.

3. I have put a franchise offering in place (see Exhibits D and Q) and have had over 400 inquiries from across the country from people interested in purchasing a franchise.

4. My efforts to develop the Pure Power concept have been successful and as a result, Pure Power has gained fame in its field for its unique program. A sampling of the media coverage is included as part of Exhibit F.

5. Pure Power provides boot camp training using what had been the only existing indoor obstacle course, which includes 3 climbing walls, pillars with 7 marine based mottos; employees are drill instructors, clients are recruits and both wear fatigues when training. As stated in my original affidavit,

> The distinctive appearance and unique features (i.e., the "Trade Dress") of PURE POWER BOOT CAMP's exercise facility is as follows: The facility comprises a large loft space, with an indoor obstacle/confidence course styled to look like a military boot camp training course. The floor is covered with crushed rubber. As stated above, the eleven standing pillars throughout the facility are stenciled with principles of leadership that PURE POWER BOOT CAMP has selected, namely, "Loyalty," "Courage," "Duty," "Honor," "Integrity," "Pride," "Power," "Wisdom," "Dignity," "Trust," and "Respect." These principles are a major part of the PURE POWER BOOT CAMP program. Clients are greeted at the door by a mannequin of a snarling soldier holding a gun, dressed in full combat gear. The main part of the work-out area has a 15-part obstacle/confidence course with these elements: hurdles, a series of three progressively higher walls to ascend and descend, a tire run, "barbed wire" netting to crawl under, monkey bars, dip bars, rolling logs, a wrap-around climbing wall, cargo net climb, bob-and-weave boxing ropes, rope climb, a ramp with a tunnel to shoot through, and a rope swing over a water pit. All of these obstacles are surrounded by a running track. There is a separate calisthenics area with wooden crates used for jump-ups and for partnering activities. On the far side of the space, instead of the usual dressing rooms, PURE POWER BOOT CAMP features men's and women's canvas tents for changing clothes. Ceiling netting and foliage complete the look. All of the above components are collectively referred to as the "Trade Dress."

6. Defendants Belliard and Fell had been in drill instructors with Pure Power for over 3 1/2 and 2 1/2 years, respectively. Belliard was titled senior drill instructor and had been my right hand man, so much so that I had offered him a partnership in the business. Other than myself, Belliard and Fell had been the primary drill instructors for New York, although there had been other drill instructors employed from time to time; in the past year, there were Belliard Fell and one other instructor, Nicio Evertz. However, because Belliard and Fell pleaded that they needed as many hours as possible, I did not hire any others as I had planned and the third instructor had less than half the hours of Belliard and Fell.

7. Although our New York training facility is extensive, there is only one office which is occupied solely by me. It is my private office where all my corporate documents, franchise materials, business plans, employee files, financial materials such as checkbooks, bank statements, credit card information, vendor information and all clients personal files, as well as chapters of my book I am writing, DVD and video of all Pure Power proprietary footage about new curriculum etc is all in my office which is COMPLETELY OFF LIMITS to EVERYONE! It is also in the employee handbook that is on display and must be read by every employee. It is placed on the refrigerator by the front desk where all the employees spend their time before and after class. We have two computers in PURE POWER. One is on the front desk to be used only by my two assistants on their shifts, and the other one is in my private office to be used only by me.

8. In fact we have a specific employee manual (Exhibit 1 hereto), which prohibits the use of company computers for personal purposes and advises the employees that emails will be retrieved in the company's discretion and that employees have no right of privacy for such emails.

9. Apparently, Belliard and Fell not only used a company computer for personal

3

business, they used it to surreptitiously launch their competing business and to steal physical and electronic files.

## CUSTOMER LIST

10. Within my computer was a comprehensive list of Pure Power clients and included names, telephone numbers, e-mail information, credit card, health information and oftentimes, the nature of the services subscribed to by the clients.

11. Although I understand that when an employee steals a customer list, injunctive relief may follow even if the list is not considered confidential, this was confidential information, unavailable to the general public by other means. For instance, the simple fact that these were people who would engage in this manner of training alone is information which could not be easily gathered, and their names, addresses, email addresses, business contact information, and other data was also information which could not be secured readily. In addition to the list, I am advised by a computer consultant that when they downloaded my client base, they would have obtained Pure Power's entire client list of over 1,000 past and present clients, and other information which they did not include on the invitation list, such as client credit card information and health related notes, all of which is clearly non-public.

12. Defendants Fell and Belliard were subject to employee agreements which prohibited disclosure of confidential information including but not limited to customer information (Exhibit I, par. 2).

13. Fell's agreement is annexed as Exhibit I. He claims the signature on that document is not his. However, we had employees sign these agreements in September 2006, at the suggestion of counsel, when we were in the process of preparing to franchise the business.

14.  Although counsel for Belliard previously represented by letter dated April 30, 2008 that neither Belliard nor Fell were subject to any restrictive agreements (See Exhibit B to the affirmation of Andrew Calcagno in support of the original order to show cause ), <u>a letter written after emails acknowledging Belliard's execution of the agreement</u> (Exhibit BB) , when faced with e-mails which indicated that Belliard "shredded" his agreement, and letters from counsel to Fell which clearly reflected counsel's knowledge of the existence of the agreement, stating that Belliard's execution of the agreement could impact on Fell as well (Exhibit BB), on the return date of the original order show cause in state court, counsel for Belliard admitted his execution of the agreement (Transcript, p. 30).

15.  Whether by reason of the requirements of paragraph 2 of the employee contract or the general prohibition against employee malfeasance, the bottom line, as Justice Freedman concluded (Transcript pp.35-36) is that defendants stole the customer list.

16.  Defendants' assertion in State Court that the lists had not been stolen is a brazen misrepresentation and indicative of their credibility in general.

17.  One need only refer to Exhibits U, V and X to see the transparent falsity of the claim. Exhibit U is their original customer list of 88 people, following an e-mail dated March 25, 2008. Exhibit X is a list of 321 people following an email dated March 31st.. Entries on exhibit U were generally the name only while on Exhibit W, they include e-mail addresses.

18.  Perhaps the most telling proof of the theft is the timing of the "updated" list. Belliard tendered his resignation April 1st (Exhibit V.) As set forth in the affidavit of Denise Parker, Belliard was alone in my office on the evening of March 31st and the "update" was e-mailed at 11:11 p.m. on the 31st.

19. The conclusion as to what took place is self-evident.

20. As a result of their theft, defendants were able to distribute a mass e-mail to all of my clients soliciting them for their new business (Exhibit X).

21. Although Justice Freedman directed defendants to return any customer lists (Transcript, p. 36), she took no further action at that time Taking Justice Freedman literally, defendants returned physical copies of the list. There was no effort to purge electronic files, which is the form of the list when it was stolen, and even if there had been effort to purge the files, the damage had already been done; and the only remedy should be to preclude the defendants from doing business with any of these clients.

Employee agreements.

22. As indicated, Belliard was in my office on the evening of March 31st, despite the fact that he was instructed never to be in my office!!! No one is allowed in the office without being with me. However the door is not locked. Although he was specifically told the night of March 31st by Denise Parker that he is not allowed in the office when he went to enter, Belliard told her that he would deal with me and he needed privacy!

23. As set forth above, when I began preparation for a national franchise campaign in 2006 (see exhibit blank) one of the recommendations of counsel had been to secure agreements from my employees restricting them from operating boot camps, using our trade dress or taking any confidential information. As such, in September, 2006, both Fell and Belliard executed the agreements. In addition to the prohibition against disclosure of confidential information discussed above, the agreement had a restrictive covenant (par.2).

24. It did not prohibit defendants from opening a fitness related business. It limited its

restrictions to prohibit them from engaging in a business in direct competition with Pure Power, specifically one using obstacle courses, exercises derived from military training or methods, military themes in any way or using the term boot camp in any way.

25. The restriction was national in scope because this was part of a plan for a national franchise.

26. In addition, as set forth above, the agreement prohibited disclosure of confidential information, including marketing plans and customer information (par. 2).

27. Finally, it prohibited employees from challenging or using Pure Power's trade dress, textual and graphic material (par. 3 ).

28. The purpose of the agreement was twofold. The first was to protect against disclosure or use of confidential information or Pure Power's unique trade dress. To further protect Pure Power, the franchise offering has a similar requirement for franchisees (Ex. D, p. 23). I would hardly restrict people who invested in a franchise and let employees do as they pleased.

29. The second purpose was to protect Pure Power against an employee-drill instructor raiding clients should they leave. This is particularly important for while Pure Power expended time, energy and money to develop and attract a client base and establish itself in the public eye (see exhibit F for samples of our marketing and notoriety), the drill instructors had the direct relationship with the clients.

30. As far as the period of ten years for the restrictive covenant, I understand that this will most likely be deemed excessive. However, I also understand that in accordance with case law and in accordance with the specific provisions of section 5 of the employee agreement, this Court is empowered, and in section 5 it is specifically authorized, to modify any offending clause to the

extent necessary to render it enforceable.

31. Given the conduct of defendants, as described above, stealing the customer list, stealing and destroying employee contracts, and the conduct described below, enrolling ostensibly as clients to subvert my existing clients, and stealing other corporate documents and then infringing on copyright and trade dress rights, I would hope this Court agrees that the equities warrant enforcement of the agreement, reducing the restrictive covenant to such term as the court deems reasonable under the circumstances.

## TORTIOUS INFERENCE, BREACH OF EMPLOYEE FIDUCIARY DUTY

32. For at least eight months prior to their leaving, defendants schemed to undermine my business and start their own, while on my payroll. The eight month estimate is based upon the e-mail of Jennifer Lee in July 2007 (Exhibit H), the registration by them of their domain name, and Fell's email to a friend in March explaining how he had been in the process of setting up his business for 8 months.. Over that period, defendants Lee and Baynard, under the guise of enrollment as clients, ingratiated themselves with other clients all for the purpose of ultimately subverting them to defendant's facility. Should there be any question in that regard, apart from the extensive involvement of both women in establishing the new business, Lee's email of April 18, 2008 sums it all up, in which she states, "Call me Ms. Conversion. I converted a Lauren lover!" (see Exhibit AA).

33. Defendants' subterfuge was unconscionable, in violation of the basic premise of employee loyalty and apart from monetary damages, warrants severe sanctions.

## TRADE DRESS

34. During this period of time, defendants stole my customer list, stole and destroyed

8

employment agreements, and stole other confidential corporate documents, such as the business plan developed for franchising. Defendants used that business plan, as well as other corporate documents, such as the form for client contracts, pricing information and promotional literature, either directly copying or paraphrasing the documents, further infringing on copyright protection and, last but far from least, defendants have misappropriated the Pure Power's trade dress in violation of their employee agreement (the 10 year term would not affect their par. 2 obligations) and in violation of Federal and Sate law..

35. The Pure Power concept had been unique. Indeed, defendants acknowledge this in their own business plan (Exhibit P). On the fourth page of the plan headed "Opportunity", defendants state that the use of an indoor obstacle confidence course is "rare". The indoor obstacle course is part of the trade dress copied by defendants and an integral part of its program (See Exhibit A, page 2, in which Pure Power explains in promotion of its facility that it has only indoor obstacle/confidence course n the nation).

36. Not only did they take the course itself, but they designed their's to virtually mirror Pure Power's. Examples include the crushed rubber matting for the floor identical to Pure Power's (Exhibit M), tunnels (Exhibit Y), the set of three climbing walls in progressive heights, the pillars with 7 tenets of military training, the military style itself and even, as reflected by the email inquiry to determine the size of the climbing ropes used by Pure Power (Exhibit Y, fourth email), the ropes. Their concern over a claim was significant enough to have a former client of Pure Power, Larry Buterman, who is an attorney as well, suggest that whatever they do, they should not compare themselves to Pure Power (see Exhibit GG).

37. Cheryl Dumas's affidavit is part of the original motion papers; she compares the

Warrior facility to Pure Power's and finds it virtually the same.

38. The similarities were sufficient to prompt the Justice Freedman to direct defendants to change their operation so that it was easily differentiated from Pure Power (this would not address the restrictive covenant, tortious interference or customer list issues) and provide us with access to view and photograph the operation (Transcript pp. 42-46 ).

39. Defendants have not complied with Justice Freedman's direction. Annexed as exhibit 2 is the last page of a blog by one of my former clients confirming that Warrior Fitness' operation is essentially the same as ours.

40. Ironically, on the day this court conference to the matter, I was told by my assistant Elizabeth Lorenzi that a sanitation worker came to solicit our business and commented that Pure Power's facility looked just like Warrior Fitness'.

41. One would also have to conclude that there is something to hide since despite Justice Freedman's direction to afford access, access has been denied.

42. It is also curious that they still have not launched their web site which would include photographs of their operation. Given the client blog, the refusal of access, and the

statement to my assistant regarding the similar looks of the facilities, it is my belief that they have not changed their trade dress as directed by the court.

43. The issue of irreparable injury has been addressed in my original moving papers. Needless to say, with defendants' subverting my clients using my proprietary information, stealing my trade dress and copyrighted materials, all in violation of their employee agreement as well, I will suffer irreparable injury to my business and reputation.

44. Based upon (a) the stolen customer list, (b) the terms of the employee agreements (and defendants' efforts to eliminate those agreements by theft and destruction, (c) the underhanded tortious interference by defendants and the violation of copyright and trade dress protections, a balance of the equities should clearly weigh in Pure Power's favor and immediate injunctive relief prohibiting Warrior Fitness' operation, or at least their servicing of my clients, should follow.

LAUREN BRENNER

Sworn and subscribed to before
me this 6 day of June, 2008

NOTARY PUBLIC

EILEEN C. BAKER
NOTARY PUBLIC-STATE OF NEW YORK
No. 01BA6150252
Qualified in Nassau County
My Commission Expires July 24, 20 09

11

# EMPLOYEE WORKPLACE CONDUCT POLICIES

## COMPUTERS

**Procedure:**

PURE POWER BOOT CAMP (the Company) utilizes computer technology and computers to manage the day-to-day operation of the Company's business matters, to plan strategically, to organize fiscal matters and to accomplish a host of other management issues. As with many businesses, electronic records and the programs that drive our system are critical components of the Company's infrastructure. In this regard, to ensure the operational capabilities of the Company's system, it is expressly forbidden for employees to access or tamper with computer hardware and software applications. It is also against Company policy to install unauthorized software programs or hardware.

**Internet:**

The Company's computers are Internet access ready or compatible. The Internet may only be accessed via a Company owned PC configured with the appropriate software security application. Employees are not to access the Internet via unauthorized means.

In addition to the above, the unauthorized downloading and sharing of inappropriate material is also forbidden. Finally, Internet access shall not be utilized for shopping or for conducting other transactions or personal business matters.

Employees are advised that the Company's PCs are the sole property of the Company and are subject to auditing and or confiscation without prior notice. Employees are advised that violations of this policy may result in disciplinary action that could result in sanctions that include the possibility of the loss of pay and/or the termination of services.


## ELECTRONIC MAIL

**Policy:**

The E-mail system is the Company's property. It has been provided by the Company for use in conducting Company business. All communications and information transmitted by, received from, or stored in the system are the Company's records and property. This system is to be used for Company purposes only and should not be used for transmitting information unrelated to the business of the Company. E-mail addresses should not be provided to individuals outside of the Company, except for the purpose of conducting Company business.

E-mail users have no right of personal privacy in any matter stored in, created on, received from, or sent through or over the system. This includes the use of personal e-mail accounts on Company equipment. The Company, in its discretion as owner of the E-mail system, reserves the right to review, monitor, access, retrieve, and delete any matter stored in, created on, received from, or sent through the system, for any reason, without the permission of any system user, and without notice.

**EMPLOYEE WORKPLACE CONDUCT POLICIES**

Despite the Company's right to retrieve and read any E-mail, they should still be treated as confidential by other employees and accessed only by the intended recipient. E-mail users are not authorized to retrieve, open or read any messages that are not sent to them unless they have been specifically authorized to do so by the intended recipient.

E-mail users should be aware that deletion of any E-mail messages or files will not eliminate the messages from the system. All E-mail messages are stored on a central back-up system in the normal course of data management. Assume that any E-mail message you send will remain in the Company's records forever.

E-mail users are reminded to be courteous to other users of the system and to conduct themselves in a professional manner. Transmissions are sometimes misdirected or forwarded and may be viewed by persons other than the intended recipient. Users should write E-mail communications with no less care, judgment and responsibility than they would use for letters or internal memoranda written on Company letterhead.

Because E-mail records may be subject to discovery in litigation, all users are expected to avoid making statements in E-mail that would not reflect favorably on the user or the Company if disclosed in litigation or otherwise.

Do not incorporate material into E-mail messages for which neither you nor the Company has the copyright or copyright license. This includes materials received by E-mail via the Internet.

Use of any aspect of the Company's computer system constitutes consent to all of the terms and conditions of this policy statement.


**TELEPHONES**

**Policy:**

It is the policy of the Company to permit employees reasonable access to Company telephones for urgent issues.

**Procedure:**

Company telephones are the property of the Company and accordingly, excessive use or abuse of Company telephones is not acceptable. Notwithstanding this, access to Company telephones for emergency purposes or to facilitate pressing issues shall not be unreasonably denied.

While Company telephones are intended solely for the purpose of communicating to individuals with whom we conduct business, the Company recognizes that in many instances utilization of the phone may be necessary for family/personal matters when time is of the essence. To that extent, and in the interest of morale and efficiency the occasional short telephone call is permitted under this policy.

## EMPLOYEE WORKPLACE CONDUCT POLICIES

### UNAUTHORIZED ENTRY

**Policy:**

Unauthorized entry into, or occupation of, the private office of the Commanding Officer/Manager/Owner is strictly prohibited. Employees are advised that violations of this policy may result in disciplinary action.

February (23)
January (27)

2007 (126)
2006 (89)
2005 (3)

**friends and family**

Sublime Guile

Kori Jane Jugi

The Ephemerist

Rumproast

Bittersoft

**theater blogs (a small selection)**

Adam Szymkowicz

Beyond Absurdity

Jamespeak Loser Actor

nytheatre Mike On

Theatre and Politics

Scrappy Jack's Slow

Learner The nytheatre i

Voucher Ankles

**theater reviews**

nytheatre.com Just

Shows to Go You New

Theater Corps

Show Showdown Posted by rr

**other art/design stuff**
Design Sponge

FFFFound!

**thursday, may 29, 2008**

### Did Anyone Here Do 300 Sit-ups Before 9am This Morning?

I did.

That's right, folk(s). I went back to Bootcamp.

Back when I was dying and sweating my ass off in the winter, I swore OUT LOUD that I would never do it again.

But there really isn't any better way to ... well, work out that hard. Period. I'd never go run fast for an hour straight of my own volition. But I can easily (debatable) endure an hour of insanity with Alex and Ruben at the helm.

The boys have ventured out from the old digs and set up their own shop near Herald Square. It's pretty sweet--tidier and brighter than the old place, and it's all their own.

A few things have changed:

- no more uniform (read: no ladies in Man Pants)
- slight differences in the core workout (warm-ups, etc)
- no strict use of Last Names Only (once today Ruben actually called me RobinReed--yes, all at once!)

but a LOT has remained the same, namely one full hour of ass-kicking work out.

And this time, they've got stairs.

Their place is on the third floor of a maybe 15-floor building. One activity today was to run (!) up to 11 and back down. Easier said than done. Then run only up to 10, but with a MEDICINE BALL!!!

And, rest assured, I saw some tires in the joint. I'm sure that torture will resurface. There was one that looks like it was ripped straight off a monster truck. I plan on hiding that ASAP.

at 11:05 AM      2 comments
Labels: workout

**friday, february 29, 2008**

### Bootcamp: Day 24 -- The End of the Line!