UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PURE POWER BOOT CAMP, INC. PURE POWER BOOT CAMP FRANCHISING CORPORATION, and PURE POWER BOOT CAMP JERICHO INC., <br><br> Plaintiffs, <br><br> - against – <br><br> WARRIOR FITNESS BOOT CAMP, LLC; ALEXANDER KENNETH FELL a/k/a ALEX FELL, Individually; RUBEN DARIO BELLIARD a/k/a RUBEN BELLIARD, Individually; JENNIFER J. LEE, Individually; and NANCY BAYNARD, Individually, <br><br> Defendants. | Case No. 08-cv-4810 (JGK)(THK) <br><br> **ECF CASE** <br><br> **DECLARATION OF DANIEL A. SCHNAPP, ESQ.** |

**DANIEL A. SCHNAPP, ESQ.,** declares pursuant to 28 U.S.C. § 1746 as follows:

1.  I am an attorney at the law firm of Fox Rothschild LLP, counsel for Warrior Fitness Boot Camp, LLC, Alexander Kenneth Fell, Ruben Dario Belliard, Jennifer J. Lee and Nancy Baynard ("Defendants"). I am familiar with the facts and circumstances set forth herein.

2.  This declaration is respectfully submitted in opposition to the Motion for a Preliminary Injunction filed by Pure Power Boot Camp, Inc., Pure Power Boot Camp Franchising Corp., (collectively "PPBC") and Pure Power Boot Camp Jericho Inc. ("PBCJ") (collectively "Plaintiffs").

**Background of this Lawsuit**

3.  Plaintiffs commenced this action in the Supreme Court, State of New York, County of New York (the "New York Court") by filing a summons and complaint on May 5, 2008 (the "Complaint"), more than a month after Plaintiffs allege that Defendants misappropriated essential confidential and proprietary information. A copy of Plaintiffs' Complaint is annexed hereto as Exhibit "A."

4.    In their Complaint, Plaintiffs alleged, among other things, claims for trade dress infringement, misappropriation of trade secrets, breach of duties of loyalty, breach of a restrictive covenant, and unfair competition.

## The New York Court Found No Irreparable Harm

5.    At the same time that they filed their Complaint, Plaintiffs requested from the New York Court a wide-ranging 11-point temporary restraining order ("TRO"). On May 6, 2008, the New York Court struck half of the proposed TRO. After oral argument on the motion two days later, the New York Court dissolved the TRO in its entirety.

6.    In addition to dissolving the TRO, the New York Court refused to restrain Defendants from opening their business because it found that the Plaintiffs could not establish irreparable harm provided that Defendants: (1) stop calling their customers "recruits," (2) stop requiring customers entering their gym to do pushups in their street clothes, (3) remove all netting, (4) paint their gym in a color other than camouflage, and (5) return all customer lists to Defendants. A copy of the transcript of the May 8, 2008 Oral Argument is annexed hereto as Exhibit "B."

7.    As a matter of fact, Defendants never had netting in its design, never called their customers "recruits," never required customers to do push-ups upon arrival, and their gym was always painted in the Marine Corps colors. In addition, Defendants have returned all alleged customer lists to Plaintiffs, even though they did not remove any confidential lists from Plaintiffs' possession. *See* ¶10 below.

## Plaintiffs Have Repeatedly and Publicly Disclosed Their Purportedly Confidential Information

8.    Plaintiffs have repeatedly publicized the names of their clients and have, therefore, waived their right to assert that their client lists are confidential  For example, in the present federal action, Plaintiffs submitted a list of their purported client names allegedly purloined by Defendants in a letter to the Court dated May 28, 2008. Prior to submitting this letter, Plaintiffs also did not attempt to place

2

their exhibits, which purportedly constitute the misappropriated "confidential information" under seal. A true and correct copy of Plaintiffs May 28, 2008 letter is attached hereto as Exhibit "C."

9.    Moreover, Plaintiffs violated the terms of the Order to keep the court papers under seal in the New York Action by sending a mass email on May 29, 2008 to their customers.  In this email, Plaintiffs, through Brenner, publicized the instant lawsuit, defamed Defendants' characters (by accusing them of theft and disloyalty), and invited hundreds of their customers to review the Court documents containing the allegedly confidential information which she stated are "public."  A copy of Plaintiffs' May 29, 2008 email is attached hereto as Exhibit "D."

### Plaintiffs Have No Confidential Information or Other Information Worthy of Protection

10.    The "customer lists" that Plaintiffs claim is proprietary is actually a list generated by Defendants from their own contacts.   Many of the names on this "party list" are friends and acquaintances known only to Defendants, and who never had any connection to Plaintiffs or their principal, Lauren Brenner. *See* accompanying Affidavit of Alexander Fell, sworn to on July 3, 2008.

11.    The New York Court held that the purported restrictive covenant that Plaintiffs claim Defendants executed upon their employment was facially invalid because it restricted competition against Defendants for a period of ten years. *See* Ex. "B," at p. 28.

12.    The New York Court also held that Plaintiffs had no proprietary rights in either the boot camp concept or in the concept of indoor obstacle courses. *See* Ex. "B," at pp. 41-44.

13.    Indeed, Plaintiffs own attorney admitted that Defendants were free to run their own boot camp. During the hearing before the New York Court, Plaintiffs' attorney stated, "there are other boot camps in the country.  They're welcome to do that.  They can do their own boot camp." *See* Ex. "B," at pp. 40.

3

**<u>Removal to this Court and Plaintiffs' Contradictory Allegations</u>**

14.    After dissolving the TRO in its entirety, the New York State Court scheduled a "Preliminary Conference" for a date almost 3 weeks later -- May 27, 2008. A true and correct copy of the calendar call from the New York Law Journal noticing the Preliminary Conference is annexed hereto as Exhibit "E." As this court has noted, the New York Court's lack or urgency in scheduling the conference, indicated that the New York Court believed that Plaintiffs bore no risk of irreparable harm and/or believed that the Plaintiffs were unlikely to succeed on the merits of their claims.

15.    Prior to the scheduled conference, Defendants removed this action from the New York Court to this Court ("the Federal Action").

16.    Shortly after filing the Notice of Removal, the Court scheduled an initial conference for June 4, 2008. During the conference, Plaintiffs sought leave to supplement their voluminous filings in the New York Court. The Court granted Plaintiffs' request. A copy of the transcript from the June 4, 2008 conference is annexed hereto as Exhibit "F."

17.    In their supplemental motion papers, Plaintiffs have introduced new allegations, filed new affidavits and modified their requests for relief. As a result, this firm sent a letter to Court on June 9, 2008 seeking to clarify the allegations to which Defendants were required to respond. The Court ordered Defendants to respond to each allegation and to enumerate each of Plaintiffs' modified allegations. A copy of Defendants' endorsed letter is attached hereto as Exhibit "G."

18.    The list of new and/or modified allegations introduced for the first time in the Federal Action include:

- Plaintiffs, for the first time, introduced an affidavit by one of its employees alleging that she witnessed Defendant Belliard trespass into the office of Plaintiffs' principal, Lauren Brenner, and declare that he was going to "deal with [Brenner]." Aside from the fact that

the affidavit constitutes rank hearsay, it is suspicious that Plaintiffs waited to introduce this allegation for several weeks after their initial filings;

- Plaintiffs, for the first time, introduced an affidavit from another employee who allegedly spoke to a garbage collector who purportedly stated that Defendants' gym is similar to Plaintiffs' gym. Once again the affidavit constitutes rank hearsay and a notable lack of credibility;

- Plaintiffs, for the first time, allege that they received advice from counsel in September 2006 suggesting that they require employees to sign restrictive covenants in September 2006. Plaintiffs should be required to produce proof that: (a) they require each individual employee to sign these purported restrictive covenants; and (b) Plaintiffs have strictly enforced the terms of these alleged agreements for all employees who, like Defendants Fell and Belliard, have left Plaintiffs' employ;

- Plaintiffs, for the first time, allege that nobody was allowed to enter Brenner's private office while simultaneously admitting that she rarely locked her own office (*See* Supplemental Affidavit of Lauren Brenner in Support of Motion, ¶ 22; *Compare* Affidavit of Lauren Brenner in Support of Plaintiffs' Order to Show Cause For Preliminary Injunction with Temporary Restraints, ¶ 113). This admission counsels against a finding that Plaintiffs took any measures to protect their confidential information;

- Plaintiffs, for the first time, allege that they maintain an employee manual which contains a policy on electronic surveillance and a policy prohibiting the use of Plaintiffs' computers for personal email use. Plaintiffs have not explained why the manual is not dated and have not produced any documentation demonstrating that Defendants actually received a copy of the handbook. Defendants deny that any such policy was in place, further deny that they

ever reviewed this purported policy, and demand discovery concerning the date the "policy" was drafted, the date the policy was implemented, and the date the policy was distributed;

- Plaintiffs, for the first time, concede that the restrictive covenant that they seek to enforce is overbroad and that the Court should "blue pencil" the purported restrictive covenant; and,

- Plaintiffs, for the first time, admit that an appropriate remedy on their Motion would be for Defendants to limit their clientele to persons who were not former members of Plaintiffs' gym. Such an admissions counsels against a finding that Plaintiffs are suffering irreparable harm. *See e.g.,* Plaintiffs' Supplemental Memorandum of Law, at p.5; Supplemental Affidavit of Lauren Brenner in Support of Motion, ¶ 44.

### Plaintiffs Stole Defendants Privileged and Confidential E-Mails

19.     Plaintiffs base a large part of their claims on their gross misinterpretation of stolen emails drafted by Defendant Fell both prior to and after his departure from Plaintiffs' employ.  Fell sent emails from three separate email accounts - - his personal google account, his personal hotmail account and his business account at Defendant Warrior Fitness.  None of the emails relied upon by Plaintiffs in filing this action in the New York Court were sent to or from any Pure Power email account or sent while Fell was actually at Pure Power's premises at work.

20.     In order to gain access to these e-mails, Plaintiffs' Principal, Lauren Brenner, and/or her agents, apparently hacked into Defendants' personal computers, and then read, downloaded, and printed these e-mails without the consent of the Defendants.  This was done after Defendants ceased working for Plaintiffs.

21.     Plaintiffs have read and reviewed hundreds of Fell's personal emails even though Plaintiffs attached approximately thirty emails to their moving papers to the New York Court.  As set

6

forth in the accompanying Affidavits of Amy Marks, Elizabeth Friesell, and Nicolhe Davis, Brenner has publicly read from the contents of these private emails.

22.     On June 4, 2008, Plaintiffs falsely claimed, on the record before this Court, that these e-mails were recovered because Defendants actually gave them their passwords for their e-mail accounts.

23.     Defendants never granted consent or authorization to Plaintiffs to access their e-mail accounts under any circumstances.

24.     Finally, Plaintiffs are illegally utilizing the images of the individual Defendants in their advertisement and in their website. For example, Brenner has begun marketing her gym by placing large advertisements on the sides of New York City busses. These advertisements bear the images of Defendants Fell and Belliard. Neither Fell nor Belliard consented to Plaintiffs' use of their images for this purpose. A copy of Plaintiffs' advertisements and website bearing Defendants' images are attached hereto as Exhibit "H."

25.     Moreover, Plaintiffs are marketing their gyms on the internet. These internet materials also bear the images of Fell and Belliard. Once again, neither Fell nor Belliard have consented to the use of their images for this purpose. A copy of a Cease and Desist letter sent to Plaintiffs' counsel dated June 24, 2008 is annexed hereto as Exhibit "I." This letter has apparently been ignored.

WHEREFORE, Defendants respectfully urge that the Court deny Plaintiffs' Motion for a Preliminary Injunction.

Dated: New York, New York
       July 3, 2008

Daniel A. Schnapp (DS 3484)

7

**EXHIBIT A**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
                                                    X
                                                    :
PURE POWER BOOT CAMP, INC., PURE          :
POWER BOOT CAMP FRANCHISING               :
CORPORATION, and PURE POWER BOOT          :
CAMP JERICHO INC.,                        :          Index No.: 601 364/2008

                                                    :
        Plaintiff(s),                               :
                                                    :
        -against-                                   :          **SUMMONS**
                                                    :
WARRIOR FITNESS BOOT CAMP, LLC;           :
ALEXANDER KENNETH FELL a/k/a ALEX         :          Plaintiffs designate New York
FELL, Individually; RUBEN DARIO BELLIARD  :          County as the place of trial
a/k/a RUBEN BELLIARD, Individually;       :
JENNIFER J. LEE, Individually;            :          Basis of Venue:
and NANCY BAYNARD, Individually,          :          Defendant's Principal Place of
                                                    :          Business
        Defendants.                                 :
                                                    X

To the Named Defendants:

        Warrior Fitness Boot Camp, LLC
        Alexander Kenneth Fell a/k/a Alex Fell, Individually
        Ruben Dario Belliard a/k/a Ruben Belliard, Individually
        Jennifer J. Lee, Individually
        Nancy Baynard, Individually
        c/o Fox Rothschild LLP
        Carolyn D. Richmond, Esq.
        100 Park Avenue, Suite 1500
        New York, NY 10017

        **YOU ARE HEREBY SUMMONED** to answer the Complaint in this action and to serve

a copy of your answer, or, if the Complaint is not served with this summons, to serve a notice of

appearance, on the Plaintiffs' Attorney within 20 days after the service of this summons,

exclusive of the day of service (or within 30 days after the service is compete if the summons is

not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the Complaint.

Dated: May 5, 2008

CALCAGNO & ASSOCIATES
ATTORNEYS AT LAW, LLC

**ANDREW JOHN CALCAGNO**
Attorney for the Plaintiffs
*Main Office*
213 South Avenue East
Cranford, NJ 07016
(908) 272-7300

*Satellite Office*
404 Manor Road
Staten Island, New York 10314
(718) 815-0200

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

————————————————————— X
                                                                      :
PURE POWER BOOT CAMP, INC., PURE                                      :
POWER BOOT CAMP FRANCHISING                                          :
CORPORATION, and PURE POWER BOOT                                     :
CAMP JERICHO INC.,                                                   :        Index No.:
                                                                      :
                    Plaintiff(s),                                    :
                                                                      :
            -against-                                                :        **COMPLAINT**
                                                                      :
WARRIOR FITNESS BOOT CAMP, LLC;                                      :
ALEXANDER KENNETH FELL a/k/a ALEX                                    :
FELL, Individually; RUBEN DARIO BELLIARD                             :
a/k/a RUBEN BELLIARD, Individually;                                  :
JENNIFER J. LEE, Individually;                                       :
and NANCY BAYNARD, Individually,                                     :
                                                                      :
                    Defendants.                                      :
————————————————————— X

Plaintiffs, Pure Power Boot Camp, Inc., Pure Power Boot Camp Franchising Corporation,

and Pure Power Boot Camp Jericho Inc., by their attorneys, Calcagno & Associates Attorneys At

Law LLC, complaining of Defendants, Warrior Fitness Boot Camp, LLC; Alexander Kenneth

Fell a/k/a Alex Fell, Individually; Ruben Dario Belliard a/k/a Ruben Belliard, Individually;

Jennifer J. Lee, Individually; and Nancy Baynard, Individually, respectfully alleges as follows:

## PARTIES

1. Plaintiff, Pure Power Boot Camp, Inc. ("Pure Power"), is a corporation organized and
   existing under the laws of the State of New York with its principal place of business at 38
   West 21st Street, New York, NY 10010.  Pure Power was previously a foreign
   corporation organized under the laws of the State of Delaware.  Pure Power is a facility

specializing in the operation of the nation's only indoor obstacle/confidence course which trains civilians in a military style and positive setting. Pure Power has been in business since 2003.

2. Plaintiff, Pure Power Boot Camp Franchising Corporation ("Pure Power Franchise"), is a corporation organized and existing under the laws of the State of New York with its principal place of business at 38 West 21st Street, New York, NY 10010.

3. Plaintiff, Pure Power Boot Camp Jericho Inc. ("Pure Power Jericho"), is a corporation organized and existing under the laws of the State of New York with its principal place of business at 50 S. Service Road, Jericho, New York 11753. Pure Power Jericho is the second Pure Power facility opened specializing in the operation of the nation's only indoor obstacle/confidence course which trains civilians in a military style and positive setting. Pure Power Jericho was incorporated on November 29, 2007 and has been open for business since February 25, 2008.

4. Lauren Brenner ("Brenner") is the President/Founder of Pure Power, Pure Power Franchise and Pure Power Jericho (collectively hereinafter known as "PPBC").

5. Upon information and belief, Defendant, Warrior Fitness Boot Camp, LLC ("Warrior Fitness"), is a corporation organized and existing under the laws of the State of New York, with its principal place of business at 29 West 35th Street, 3rd Floor, New York, New York 10001. Warrior Fitness was incorporated on February 28, 2008. Warrior Fitness is a facility specializing in the operation of an indoor obstacle/confidence course and is not yet open for business.

2

6.  Upon information and belief, Defendant, Alexander Kenneth Fell a/k/a Alex Fell ("Fell"), is an individual, residing at 3205 Oxford Avenue, Apt. 8, Bronx. NY 1463.  Fell is a former employee of Pure Power and a Co-CEO/Owner of Warrior Fitness.

7.  Upon information and belief, Defendant, Ruben Dario Belliard a/k/a Ruben Belliard ("Belliard"), is an individual, residing at 201 West 83rd Street, Apt. 1D, New York, New York 10024.  Belliard is a former employee of Pure Power and a Co-CEO/Owner of Warrior Fitness.

8.  Upon information and belief, Defendant, Jennifer J. Lee, Individually ("Lee"), is an individual, residing at 55 West 26th Street, Apt. 11A, New York, New York 10010.  Lee is a former client of Pure Power, girlfriend of Fell, and a Co-CEO/Owner of Warrior Fitness.

9.  Upon information and belief, Defendant, Nancy Baynard ("Baynard"), is an individual, residing at 201 West 83rd Street, Apt. 1D, New York, New York 10024.  Baynard is a former client of Pure Power, girlfriend of Belliard, and a co-conspirator.


## STATEMENT OF FACTS

10. Brenner was a Wall Street trader and a lifelong athlete.

11. After the September 11, 2001 terrorist attacks, Brenner felt that people wanted to be part of something that inspired accountability and respect.

12. Brenner wanted to combine the things she loved the most: sports, entertainment, and business and created the concept of an indoor obstacle/confidence course boot camp.

13. She created a Business Plan ("Business Plan"), found a location for the facility and transformed that location by creating twelve obstacles.  She developed these twelve

3

obstacles with two to three different ways of achieving these obstacles for varying degrees of fitness levels.

14. The Pure Power facility walls are covered with green camouflage netting and the changing rooms are World War II tents.

15. The obstacle/confidence course flooring surface is a playground certified crushed rubber (recycled) surface and is bordered by military looking sandbags.

16. Some of the Pure Power obstacles are as follows:

   1. Monkey Bars
   2. Barbed Wire Crawl
   3. Swing to Beam
   4. High Hurdles
   5. Commando Crawl
   6. Belly Robbers
   7. Intensity Wall
   8. Traverse Wall
   9. Cargo Net
   10. Rope Climb
   11. Tire Run

17. Once the facility was completed, Brenner invited eight (8) Marines who had just returned from Iraq to experience the indoor obstacle/confidence course and received only the highest acclamations from them.

18. On February 4, 2004, Brenner opened the doors of Pure Power to the public.

19. Pure Power was an instant success and has gained publicity and an excellent reputation through various newspapers, magazines, televisions shows and is known nationally, as well as internationally, as the nation's only facility containing an indoor obstacle/confidence course.

20. The Drill Instructors ("D.I.s") are all former soldiers who have served in combat.

21. Clients ("recruits") are called by their last names and wear standard-issue military fatigues and dog tags during the class.

22. The initial program at Pure Power is called the Tour of Duty.

23. The Tour of Duty is a six-week course held four times a week for one hour, or three times a week for eight weeks.

24. Pure Power also has a Weekend Warrior program for recruits who are called Weekend Reserves.

25. The Weekend Warrior program comprises of two-hour sessions twice per week on Saturdays and Sundays for six weeks.

26. Recruits must all sign a Recruit Contract, Recruit Waiver, and receive Pure Power Boot Camp Rules.

27. When recruits step into the Pure Power facility, a life-size statue of a screaming marine greets them with a machine gun in his hand.

28. Pure Power trains civilians in a military style and positive setting and patterns recruit regimens after the armed forces.

29. Pure Power's programs are customized to suit recruits' fitness levels. Recruits are then put into platoons that consist of approximately sixteen recruits.

30. Each recruit who joins Pure Power commits to learn the following principles:

   1. **Honor** – Pure Power Boot Camp requires that each recruit be true to his or her values, regardless of the personal cost.
   2. **Trust** – Pure Power Boot Camp teaches each recruit to rely on the integrity, ability, or character of himself or herself and others.
   3. **Respect** – Pure Power Boot Camp expects each recruit to view others with a high degree of reverence and special regard. Recruits are taught to admire others, seeing beneath the surface to see real worth and value.

4. **Integrity** – Pure Power Boot Camp expects each recruit to develop a personal inner sense of wholeness derived from honesty and consistent uprightness of character.

5. **Duty** – Pure Power Boot Camp teaches each recruit to practice personal accountability in relation to a principle, measuring any action (or course of action) apart from personal likes and dislikes.

6. **Loyalty** – Pure Power Boot Camp expects recruits to be faithful or devoted to one another.

7. **Power** – Pure Power Boot Camp teaches each recruit to be aware of his or her capacity to produce effects on others or to influence others.

8. **Courage** – Pure Power Boot Camp helps each recruit overcome obstacles that are encountered in daily life. Each recruit matures mentally and should exhibit an attitude of facing and dealing with anything recognized as being dangerous, difficult, or painful, instead of withdrawing from it.

9. **Dignity** – Pure Power Boot Camp teaches each recruit to respect himself or herself and others. Recruits embrace dignity, the quality or state of being worthy of esteem or respect.

10. **Wisdom** – Pure Power Boot Camp helps each recruit develop a more intelligent application of learning and/or ability to discern inner qualities and essential relationships.

11. **Pride** – Pure Power Boot Camp helps each recruit realize the reward and satisfaction taken in accomplishing an achievement.

31. On or about April 19, 2004, Brenner trademarked the names "Pure Power Boot Camp" and "Train Military Style".

32. On or about February 2, 2006, Brenner filed for trade dress of Pure Power, specifically, the design of the facility, the terms used in the facility, and indoor obstacle/confidence course used in the facility.

33. Through years of accumulated experience, time and strenuous efforts by Brenner, Pure Power has been successful in obtaining an impressive client list, and over the years has recruited approximately 1730 clients.

34. Brenner's client list is stored through a web program called Mybody.com, is not public knowledge, and is not readily obtainable.

35. Through extensive interactions with its clients, Pure Power has been successful in obtaining and identifying their individual tastes and preferences with respect to their workouts.

36. Defendant, Belliard, worked as an employee of Pure Power from 2004 up and until March 31, 2008, when he abruptly left Pure Power, claiming that he was starting a construction business with a family member.

37. Defendant, Fell, worked as an employee of Pure Power from 2005 up and until March 16, 2008, when he was fired for being belligerent and insubordinate to Brenner during a conversation and for not following direction by his Employer.

38. On or about January 9, 2006, Defendant, Nancy Baynard ("Baynard"), became a recruit at Pure Power and left on March 28, 2008.

39. On or about March 13, 2006, Defendant, Jennifer Lee ("Lee"), became a recruit at Pure Power and left on April 28, 2008.

40. In reality and unbeknownst to Brenner, in or about July 2007, Belliard, Fell, Lee, and Baynard conspired and devised to raid and sabotage Brenner's business and defraud, deceive, steal and misappropriate Pure Power's trade secrets, trade dress, client list, and corporate documents, including, but not limited to, hard copies of Pure Power's Operations Manual, Startup Manual, Business Plan, and D.I. employee agreements, as well as Brenner's hard copy of the first chapter of her book, and deleted various corporate documents.

41. When Belliard was hired, he told Brenner that he was married.  Belliard was actually married in the Dominican Republic but never legalized the marriage in the United States.

42. When Fell was hired, he told Brenner that he was engaged.

7

43. One policy of Pure Power was that employees must not become intimate with clients.

44. When Belliard and Fell were first hired, they knew nothing about the physical fitness industry and Brenner invested substantial time and money to train them and obtain Fitness Certifications for them, as she did with each employee she hired to be a D.I.

45. As a result of their training, Belliard and Fell each evolved into a motivational D.I. and a trusted employee with Pure Power.

46. As D.I.s, Belliard and Fell were entrusted with substantial responsibility to work closely with, train, motivate and inspire the recruits on behalf of Pure Power.

47. Some time during their employ at Pure Power, Belliard and Fell began personal relationships with Baynard and Lee.

48. Brenner did not know initially about the relationships.

49. During the eight (8) months that Defendants conspired against Brenner and Pure Power while employed by Pure Power, neither Brenner nor any of the Pure Power recruits were aware that Lee was Fell's girlfriend.

50. Since 2006, all employees of Pure Power have been required to sign a confidentiality and non-competition agreements (the "Agreement").

51. Brenner began to develop plans for franchising the Pure Power concept in 2006 and created a Startup Manual, an Operations Manual, and a Business Plan.

52. Brenner hired a new D.I., Nicio Evertz ("Evertz"), in early 2007.

53. In mid-2007, Belliard informed Brenner that he and his wife were divorcing.

54. In or around July 2007, recruit, Baynard, approached Brenner and informed her that she was having marital problems and asked if Brenner could help her find an apartment.

55. Brenner looked for and helped Baynard find an apartment.

8

56. In 2007, Fell broke off his engagement and began dating a woman shortly thereafter whom he described as an asian woman named "Shannon".

57. In 2007, Brenner began promoting the franchise, generating additional business and publicity for Pure Power, and finalizing her plan to open other Pure Power facilities.

58. Brenner was constantly being approached by Venture Capitalists ("V.C.s") regarding national expansion of Pure Power.

59. When approached by a V.C., Brenner made sure that she stipulated that Belliard was to be the National D.I.

60. Brenner decided not to get the V.C.s involved in Pure Power at this junction.

61. Brenner entrusted Belliard and Fell with her clientele at the New York Pure Power facility.

62. Brenner told Belliard and Fell that updates must be given to her on a regular basis to ensure that the Pure Power clients continued to be motivated and inspired.

63. In October 2007, Belliard admitted to Brenner that he had been dating Baynard and had moved in with Baynard. He claimed that he hadn't told Brenner at first because he didn't want to lose his job.

64. Although this was against the Pure Power rules, Belliard was Brenner's top D.I. and most trusted employee.

65. In or around October 2007, Brenner wanted to hire another D.I.; however, Belliard, Fell and Evertz told Brenner that they wanted the hours and could handle all of the clients and classes.

66. The client renewal rate was approximately 94%.

9

67. In or around November 2007, Brenner began preparing for her annual holiday party taking place on December 14, 2007, and finalize the plans for the Long Island facility.

68. On or about November 24, 2007, Brenner asked Belliard if he wanted to become partners in the Long Island Pure Power facility; however, Belliard turned down the opportunity, stating that he did not have the money to invest.

69. Unbeknownst to Brenner, Belliard, Fell and Lee had already been looking for locations for Warrior Fitness; however, they were not happy with the realtor and on December 5, 2007, terminated the realtor's services.

70. The holiday party was held every year for the clients, to thank the clients for their loyalty and support.

71. The Long Island facility was set to open on February 25, 2008, with the grand opening party to be held on February 7, 2008.

72. Belliard also agreed to help paint and build at the Long Island facility, then called Brenner and cancelled the day prior.

73. Beginning in December 2007, Fell became more and more difficult when told to perform a task by Brenner and became more and more belligerent to Brenner.

74. Defendants were still looking for a location for Warrior Fitness throughout the month of February 2008.

75. On February 27, 2008, a lease was drawn up for a location that Defendants found for Warrior Fitness.

76. In February 2008, Defendants were also shopping for prices on flooring.

77. The location that Defendants' leased was located on 29th Street, 14 blocks away from Pure Power utilizing the same operating hours as Pure Power.

10

78. Evertz contacted Brenner regularly to report on the progress of the clients; however, Fell did not.

79. Unbeknownst to Brenner, Defendants stole Pure Power's business/corporate documents and brochure to draft Defendants' business plan, using Pure Power's concepts and ides, including, but not limited to, obstacles, guarantee, principles, programs, clothing, projections, and pricing matrix.

80. While reviewing the New York facility schedule on March 16, 2008, Brenner realized that one (1) D.I. might not be needed for the March 17, 2008 7:30 a.m. class.

81. Since Evertz or Belliard were always the D.I.s to leave, and Fell had not been reporting to Brenner regarding the clients as he was told, Brenner decided that Evertz would run the 7:30 a.m. class on March 17, 2008 if a D.I. needed to leave.

82. On March 16, 2008, Brenner contacted Fell to inform him that he would not be needed for the 7:30am class if one (1) D.I. was not needed, and that Evertz would be the D.I. instructing the class since he was always the D.I. to leave.

83. Fell became irate and said, "That's not my fucking problem." He then threatened to go to the Department of Labor if Brenner allowed Evertz to instruct the class.

84. Brenner stated, "Did you just threaten me? I am not asking you. You will be leaving at 7:30 a.m."

85. Fell replied, "Who the fuck do you think you are? You better learn who you are speaking to."

86. Brenner replied, "Who owns this business, you or me?"

87. Fell stated, "What are you going to do, fire me?"

11

88. Brenner replied, "How dare you. You are not a team player. Keep it up and you will be suspended for a week."

89. Fell again threatened Brenner by stating, "You take me off for a week and the Department of Labor will be at your door."

90. Brenner replied, "You are leaving at 7:30 a.m."

91. Fell stated, "I am not." Then again stated, "What are you going to do, fire me?"

92. Brenner then replied, "Alex, you are fired."

93. Brenner spoke to Belliard thereafter.

94. Brenner asked Belliard where he stood regarding his loyalties to Pure Power and Belliard responded, "I am here 100%."

95. On March 17, 2008, Fell and Lee admitted to their conspiracy in emails to each other.

96. During Brenner's meeting with Belliard, Belliard told Brenner that he would not have a problem with Fell's firing because there were a lot of things that Fell did that he shouldn't have done.

97. Brenner began instructing in the New York facility in the mornings, then traveling to Long Island to instruct in the afternoon.

98. Shortly after, Belliard began showing up to work late.

99. Lee and Baynard attended classes regularly at Pure Power after Fell's termination in order to befriend, manipulate and solicit as many of Pure Power's recruits as possible, and spread lies about Brenner and Pure Power, in order to entice Pure Power's recruits to leave Pure Power and sign up with Warrior Fitness.

100. Brenner met with Belliard to discuss his tardiness and asked him if there was a problem.

101. Belliard stated that there was no problem.

102. On March 25, 2008, in furtherance of their plan to conspire and sabotage Pure Power, Defendants stole a partial list of Pure Power's clients and began soliciting them to leave Pure Power and come to Warrior Fitness.

103. On March 31, 2008 at 9:09 p.m., Brenner received a phone call from Belliard.

104. Belliard told Brenner that he was giving his resignation with Pure Power, effective immediately, without notice because he was going into the construction business with his uncle.

105. Brenner asked him to give her two weeks notice, but Belliard stated that he could not.

106. Unbeknownst to Brenner, that same day, the Defendants signed the lease for the 29 West 35th Street location.

107. Upon information and belief, during the period from March 21, 2008 though March 31, 2008, the Defendants stole several business/corporate documents from Pure Power. Included in those documents were the original signed confidentiality & non-compete agreements. Also included in those documents was Pure Power's client list. Once Belliard gave the Pure Power client list to Baynard, Baynard updated the Warrior Fitness client list using the Pure Power client list.

108. Since Belliard's departure from Pure Power, Defendants have furthered their conspiracy by contacting Pure Power clients with the intent to steal them and continuing to misappropriate Pure Power's trade dress by constructing the same indoor obstacle/confidence course.

109. Lee continued to attend classes at Pure Power after Fell was terminated for the purpose of converting new Pure Power recruits to Warrior Fitness.

13

110.    In comparing the Defendants' facility and Pure Power's facility, it is obvious that the Defendants have misappropriated Pure Power's trade secrets and Trade Dress. It is clear on its face.

111.    In comparing the Recruit Contracts, Additional Terms and Conditions and Waiver and Release forms of Pure Power and Warrior Fitness, there is virtually no difference. Warrior Fitness copied Pure Power's documents word for word.

112.    The Defendants stole all of Pure Power's programs and curriculum verbatim, but changed the names. For example, Defendants "Operation Warrior" program is the same as Pure Power's "Tour of Duty" program. Pure Power has a corporate team challenge program in its Business Plan and Operations Manual and the Defendants copied it verbatim, but changed the pricing slightly. Even Defendants' pricing is structured the same way as Pure Power's.

113.    In comparing Defendants' Business Plan to Pure Power's Business Plan, Start-Up Manual, Operations Manual, Brochure, client list and clients list, it is abundantly clear that the Defendants simply stole everything from Pure Power (Pure Power's clients, concepts, curriculum, programs, pricing matrix, design, good will, and everything else about Pure Power) and made it their own by engaging in a conspiracy to willfully and maliciously sabotage and destroy Brenner and Pure Power.

## FIRST COUNT
### (Conversion)

114. Plaintiffs repeat, reiterate and re-allege all of the allegations contained in the Statement of Facts above as if fully set forth at length herein.

115. Plaintiffs' trade secrets, trade dress, client list, business/corporate documents, and other confidential, secret and proprietary information are represented and evidenced by the tangible documentation and other tangible property.

116. Plaintiffs are informed and believe, and thereon allege that Defendants, Warrior Fitness, Belliard, Fell, Lee and Baynard, intentionally and deliberately, with full knowledge that such property is owned by Plaintiffs, misappropriated and converted such Plaintiffs' property to their own use and benefit without any compensation to Plaintiffs.

117. The aforementioned acts of Defendants were, upon information and belief, willful and malicious and intended to cause harm to Plaintiffs.

118. As a result of the foregoing, Plaintiffs have incurred damages in the millions of dollars, the extent not yet ascertained and is entitled to have returned to it all of the property Defendants have wrongfully converted to their own use.

**WHEREFORE,** Plaintiffs demand judgment against Defendants, Warrior Fitness Boot Camp, LLC; Alexander Kenneth Fell a/k/a Alex Fell, Individually; Ruben Dario Belliard a/k/a Ruben Belliard, Individually; Jennifer J. Lee, Individually; and Nancy Baynard, Individually, jointly and severally for:

      a.  Injunctive relief, enjoining the Defendants from directly and/or indirectly contacting Plaintiffs' clients, misappropriating Plaintiffs' trade secrets and infringing on Plaintiffs' trade dress;

      b.  Equitable relief demanding the immediate return of Plaintiffs' property wrongfully converted by Defendants;

      c.  Money damages in the millions of dollars, the amount of which to be determined by a jury of Plaintiffs' peers;

      d.  Consequential damages;

      e.  Incidental damages;

      f.  Punitive damages;

      g.  Reasonable attorney's fees, filing fees, costs of suit; and

      h.  Any further relief which the Court may deem just and proper.

## SECOND COUNT
### (Unjust Enrichment)

119. Plaintiffs repeat, reiterate and re-allege all of the allegations contained in the Statement of Facts and the First Count above as if fully set forth at length herein.

120. Defendants have been unjustly enriched by, inter alia, using Plaintiffs' intellectual property, client list, trade secrets, trade dress, business/corporate documents, and other confidential, secret and proprietary information.

121. As a result of the foregoing, Plaintiffs have incurred damages in the millions of dollars, the extent not yet ascertained.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, Warrior Fitness Boot Camp, LLC; Alexander Kenneth Fell a/k/a Alex Fell, Individually; Ruben Dario Belliard a/k/a Ruben Belliard, Individually; Jennifer J. Lee, Individually; and Nancy Baynard, Individually, jointly and severally for:

> a. Injunctive relief, enjoining the Defendants from directly and/or indirectly contacting Plaintiffs' clients, misappropriating Plaintiffs' trade secrets and infringing on Plaintiffs' trade dress;
>
> b. Equitable relief demanding the immediate return of Plaintiffs' property wrongfully converted by Defendants;
>
> c. Money damages in the millions of dollars, the amount of which to be determined by a jury of Plaintiffs' peers;
>
> d. Consequential damages;
>
> e. Incidental damages;
>
> f. Punitive damages;
>
> g. Reasonable attorney's fees, filing fees, costs of suit; and
>
> h. Any further relief which the Court may deem just and proper.

### THIRD COUNT
**(Theft of Trade Secrets, Theft of Trade Dress, and Theft by Deception)**

122. Plaintiffs repeat, reiterate and re-allege all of the allegations contained in the Statement of Facts, First and Second Counts above as if fully set forth at length herein.

17

123. Defendants solicited, manipulated, and stole Plaintiffs' clients with the intent to deceive and injure Plaintiffs, and with the intent to economically benefit the Defendants.

124. Defendants stole the Pure Power client accounts, Plaintiffs' information, client files and client files with the intent to deceive and injure Plaintiffs, and with the intent to economically benefit the Defendants.

125. Defendants stole Plaintiffs' intellectual property, client list, trade secrets, trade dress, business/corporate documents, and other confidential, secret and proprietary information with the intent to deceive and injure Plaintiffs, and with the intent to economically benefit the Defendants.

126. Defendants misappropriated Plaintiffs' trade secrets and trade dress with the intent to deceive and injure Plaintiffs, and with the intent to economically benefit the Defendants.

127. As a result of the foregoing, Plaintiffs have incurred damages to an extent not yet ascertained.

**WHEREFORE,** Plaintiffs demand judgment against Defendants, Warrior Fitness Boot Camp, LLC; Alexander Kenneth Fell a/k/a Alex Fell, Individually; Ruben Dario Belliard a/k/a Ruben Belliard, Individually; Jennifer J. Lee, Individually; and Nancy Baynard, Individually, jointly and severally for:

      a.  Injunctive relief, enjoining the Defendants from directly and/or indirectly contacting Plaintiffs' clients, misappropriating Plaintiffs' trade secrets and infringing on Plaintiffs' trade dress;

      b.  Equitable relief demanding the immediate return of Plaintiffs' property wrongfully converted by Defendants;

18

    c.  Money damages in the millions of dollars, the amount of which to be determined by a jury of Plaintiffs' peers;

    d.  Consequential damages;

    e.  Incidental damages;

    f.  Punitive damages;

    g.  Reasonable attorney's fees, filing fees, costs of suit; and

    h.  Any further relief which the Court may deem just and proper.

## FOURTH COUNT
### (Civil Conspiracy)

128. Plaintiffs repeat, reiterate and re-allege all of the allegations contained in the Statement of Facts, First, Second and Third Counts above as if fully set forth at length herein.

129. Defendants conspired to cause irreparable harm and maliciously interfere with the Plaintiffs' contractual relations and usurp Plaintiffs' prospective economic advantage with the Plaintiffs' client accounts, trade secrets and trade dress.

130. As a result of the foregoing civil conspiracy, Plaintiffs' client accounts, trade secrets and trade dress have been stolen along with invaluable and unrecoverable confidential, propriety and secretive information and Plaintiffs have incurred damages to an extent not yet ascertained.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, Warrior Fitness Boot Camp, LLC; Alexander Kenneth Fell a/k/a Alex Fell, Individually; Ruben Dario Belliard a/k/a Ruben Belliard, Individually; Jennifer J. Lee, Individually; and Nancy Baynard, Individually, jointly and severally for:

    a.  Injunctive relief, enjoining the Defendants from directly and/or indirectly

contacting Plaintiffs' clients, misappropriating Plaintiffs' trade secrets and infringing on Plaintiffs' trade dress;

b.  Equitable relief demanding the immediate return of Plaintiffs' property wrongfully converted by Defendants;

c.  Money damages in the millions of dollars, the amount of which to be determined by a jury of Plaintiffs' peers;

d.  Consequential damages;

e.  Incidental damages;

f.  Punitive damages;

g.  Reasonable attorney's fees, filing fees, costs of suit; and

h.  Any further relief which the Court may deem just and proper.

### FIFTH COUNT
### (Tortious Intentional Interference With Prospective Economic Advantage)

131.  Plaintiffs repeat, reiterate and re-allege all of the allegations contained in the Statement of Facts, First, Second, Third and Fourth Counts above as if fully set forth at length herein.

132.  For nearly 5 years, Plaintiffs have established themselves in the fitness community as the only indoor obstacle/confidence boot camp in the U.S.A. by developing a unique, comprehensive indoor obstacle confidence program with options for different programs to suit each client's needs, along with customized nutrition plans, customized nutrition shakes, and a guarantee. As such, the Plaintiffs have gained national and international acclaim and have developed ongoing relationships with clients, specifically the clients referred to above.  Because of these efforts, Plaintiffs have every reason to expect many

of these existing relationships to grow and new clients to be obtained through the references of the relationships.

133. Defendants, at all times relevant herein, have known of Plaintiffs' ongoing and continuous businesses and professional relationships as alleged herein.

134. As a result of Defendants' intentional, malicious interference and without justification or excuse, the Defendants stole many of the Pure Power clients and are continuing to do so.

135. Plaintiffs have been damaged by the wrongful acts of Defendants as alleged above. Such conduct does not enhance nor promote Plaintiffs' professional standing in the fitness community, but rather detracts, tarnishes and injures Plaintiffs and Plaintiffs' reputation and goodwill.

136. The aforementioned unlawful and unfair conduct by Defendants has disrupted Plaintiffs' economic relationship with those clients named above and has resulted in, and will continue to result in, preclusion of Plaintiffs' successful continued relationship with these clients.

137. The aforementioned acts of Defendants were, upon information and belief, willful and malicious and were intended to induce or cause a breach or termination of Plaintiffs' relationships and expectancies.

138. As a result of the foregoing wrongful conduct, Plaintiffs have been damaged in an amount as yet unknown but to be proven at Trial. Plaintiffs have no adequate remedy at law for the continuing violations of its rights as set forth above.

21

**WHEREFORE**, Plaintiffs demand judgment against Defendants, Warrior Fitness Boot Camp, LLC; Alexander Kenneth Fell a/k/a Alex Fell, Individually; Ruben Dario Belliard a/k/a Ruben Belliard, Individually; Jennifer J. Lee, Individually; and Nancy Baynard, Individually, jointly and severally for:

      a.  Injunctive relief, enjoining the Defendants from directly and/or indirectly contacting Plaintiffs' clients, misappropriating Plaintiffs' trade secrets and infringing on Plaintiffs' trade dress;

      b.  Equitable relief demanding the immediate return of Plaintiffs' property wrongfully converted by Defendants;

      c.  Money damages in the millions of dollars, the amount of which to be determined by a jury of Plaintiffs' peers;

      d.  Consequential damages;

      e.  Incidental damages;

      f.  Punitive damages;

      g.  Reasonable attorney's fees, filing fees, costs of suit; and

      h.  Any further relief which the Court may deem just and proper.

## SIXTH COUNT
### (Unfair Competition and NY GBL §360, *et seq.*)

139. Plaintiffs repeat, reiterate and re-allege all of the allegations contained in the Statement of Facts, First, Second, Third, Fourth, and Fifth Counts above as if fully set forth at length herein.

140. By the acts alleged above, Defendants have engaged in unfair competition including unlawful, unfair, and fraudulent business practices, deception, theft of trade secrets, theft of trade dress, theft of business/corporate documents and use of confidential

information by former employees and third parties to solicit customers in violation of NY GBL §360, *et seq.*

141. The acts of Defendants are in violation and derogation of Plaintiffs' rights and are likely to cause confusion, mistake, and deception among consumers and the public as to the source, origin, sponsorship or quality of Defendants' product, thereby causing loss, damage, and injury to Plaintiffs and to the purchasing public.

142. Defendants knew or in the exercise of reasonable care, should have known that their conduct would likely so mislead the public and injure the business reputation of Pure Power.

143. The wrongful acts, as alleged above, have permitted or will permit Defendants to make substantial sales and profits on the artwork, corporate documents and efforts of Plaintiffs.

144. As a result of the foregoing wrongful conduct, Plaintiffs have been and will be deprived of substantial sales in an amount as yet unknown but to be proven at Trial. Plaintiffs have no adequate remedy at law for the continuing violations of its rights as set forth above.

**WHEREFORE,** Plaintiffs demand judgment against Defendants, Warrior Fitness Boot Camp, LLC; Alexander Kenneth Fell a/k/a Alex Fell, Individually; Ruben Dario Belliard a/k/a Ruben Belliard, Individually; Jennifer J. Lee, Individually; and Nancy Baynard, Individually, jointly and severally for:

      a.  Injunctive relief, enjoining the Defendants from directly and/or indirectly contacting Plaintiffs' clients, misappropriating Plaintiffs' trade secrets and infringing on Plaintiffs' trade dress;

23

b. Equitable relief demanding the immediate return of Plaintiffs' property wrongfully converted by Defendants;

c. Money damages in the millions of dollars, the amount of which to be determined by a jury of Plaintiffs' peers;

d. Consequential damages;

e. Incidental damages;

f. Punitive damages;

g. Treble damages;

h. Reasonable attorney's fees, filing fees, costs of suit; and

i. Any further relief which the Court may deem just and proper.

## SEVENTH COUNT
### (Breach of Duty of Loyalty)

145. Plaintiffs repeat, reiterate and re-allege all of the allegations contained in the Statement of Facts, First, Second, Third, Fourth, Fifth, and Sixth Counts above as if fully set forth at length herein.

146. By the acts alleged above, Defendants, Belliard and Fell, have breached their duty of loyalty, trust and confidence to Plaintiffs. Defendants, Belliard and Fell, purloined protected information from Plaintiffs' files while still employed by Plaintiffs for the sole purpose of effecting an advantage in competing with Plaintiffs immediately upon their conspiracy and decision to commence an indoor obstacle/confidence boot camp, namely, Warrior Fitness.

147. As a result of the foregoing wrongful conduct, Plaintiffs have been and will be deprived of substantial sales in an amount as yet unknown but to be proven at Trial. Plaintiffs

24

have no adequate remedy at law for the continuing violations of its rights as set forth above.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, Warrior Fitness Boot Camp, LLC; Alexander Kenneth Fell a/k/a Alex Fell, Individually; Ruben Dario Belliard a/k/a Ruben Belliard, Individually; Jennifer J. Lee, Individually; and Nancy Baynard, Individually, jointly and severally for:

      a.  Injunctive relief, enjoining the Defendants from directly and/or indirectly contacting Plaintiffs' clients, misappropriating Plaintiffs' trade secrets and infringing on Plaintiffs' trade dress;

      b.  Equitable relief demanding the immediate return of Plaintiffs' property wrongfully converted by Defendants;

      c.  Money damages in the millions of dollars, the amount of which to be determined by a jury of Plaintiffs' peers;

      d.  Consequential damages;

      e.  Incidental damages;

      f.  Punitive damages;

      g.  Reasonable attorney's fees, filing fees, costs of suit; and

      h.  Any further relief which the Court may deem just and proper.

## EIGHTH COUNT
### (Misappropriation of Confidential and Proprietary Information)

148. Plaintiffs repeat, reiterate and re-allege all of the allegations contained in the Statement of Facts, First, Second, Third, Fourth, Fifth, Sixth and Seventh Counts above as if fully set forth at length herein.

149. By the acts alleged above, Defendants improperly disclosed the confidential and proprietary information of Plaintiffs. Specifically, Defendants improperly disclosed and used for their personal financial benefit without Plaintiffs' authorization, Plaintiffs' trade secrets, trade dress, corporate/business documents, D.I. Agreements, Operations Manual, Business Plan, Startup Manual, clients, and client files.

150. As a result of the foregoing wrongful conduct, Plaintiffs has been and will be deprived of substantial sales in an amount as yet unknown but to be proven at Trial. Plaintiffs have no adequate remedy at law for the continuing violations of Plaintiffs' rights as set forth above.

**WHEREFORE,** Plaintiffs demand judgment against Defendants, Warrior Fitness Boot Camp, LLC; Alexander Kenneth Fell a/k/a Alex Fell, Individually; Ruben Dario Belliard a/k/a Ruben Belliard, Individually; Jennifer J. Lee, Individually; and Nancy Baynard, Individually, jointly and severally for:

    a. Injunctive relief, enjoining the Defendants from directly and/or indirectly contacting Plaintiffs' clients, misappropriating Plaintiffs' trade secrets and infringing on Plaintiffs' trade dress;

    b. Equitable relief demanding the immediate return of Plaintiffs' property wrongfully converted by Defendants;

    c. Money damages in the millions of dollars, the amount of which to be determined by a jury of Plaintiffs' peers;

    d. Consequential damages;

    e. Incidental damages;

    f. Punitive damages;

     g.  Reasonable attorney's fees, filing fees, costs of suit; and

     h.  Any further relief which the Court may deem just and proper.

**NINTH COUNT**
**(Tortious Intentional Interference With Contractual Relations)**

151. Plaintiffs repeat, reiterate and re-allege all of the allegations contained in the Statement of Facts, First, Second, Third, Fourth, Fifth, Sixth, Seventh and Eighth Counts above as if fully set forth at length herein.

152. For nearly 5 years, Plaintiffs have established themselves in the fitness community as the only indoor obstacle/confidence boot camp in the U.S.A. by developing a unique, comprehensive indoor obstacle confidence program with options for different programs to suit each client's needs, along with customized nutrition plans, customized nutrition shakes, and a guarantee. As such, the Plaintiffs have gained national and international acclaim and have developed ongoing relationships with clients, specifically the clients referred to above. Because of these efforts, Plaintiffs have every reason to expect many of these existing relationships to grow and new clients to be obtained through the references of the relationships.

153. Defendants, at all times relevant herein, have known of Plaintiffs' ongoing and continuous contractual relationships as alleged herein.

154. With knowledge of the existing contractual relations with Pure Power's clients, Defendants intentionally and maliciously and without justification or excuse interfered with the aforementioned contractual relationships.

155. The aforementioned unlawful and unfair conduct by Defendants has disrupted Plaintiffs' economic relationship with those clients and has resulted in, and will

27

continue to result in, preclusion of Plaintiffs' successful continued relationship with these clients.

156. As a result of Defendants' intentional, malicious interference and without justification or excuse, Pure Power's clients were stolen by Defendants.

157. The aforementioned acts of Defendants were, upon information and belief, willful and malicious and were intended to induce or cause a breach or termination of Plaintiffs' relationships and expectancies.

158. As a result of the foregoing wrongful conduct, Plaintiffs have been damaged in an amount as yet unknown but to be proven at Trial. Plaintiffs have no adequate remedy at law for the continuing violations of Plaintiffs' rights as set forth above.

**WHEREFORE,** Plaintiffs demand judgment against Defendants, Warrior Fitness Boot Camp, LLC; Alexander Kenneth Fell a/k/a Alex Fell, Individually; Ruben Dario Belliard a/k/a Ruben Belliard, Individually; Jennifer J. Lee, Individually; and Nancy Baynard, Individually, jointly and severally for:

     a. Injunctive relief, enjoining the Defendants from directly and/or indirectly contacting Plaintiffs' clients, misappropriating Plaintiffs' trade secrets and infringing on Plaintiffs' trade dress;

     b. Equitable relief demanding the immediate return of Plaintiffs' property wrongfully converted by Defendants;

     c. Money damages in the millions of dollars, the amount of which to be determined by a jury of Plaintiffs' peers;

     d. Consequential damages;

     e. Incidental damages;

f.  Punitive damages;

g.  Reasonable attorney's fees, filing fees, costs of suit; and

h.  Any further relief which the Court may deem just and proper.

### TENTH COUNT
### (Breach of Contract, Breach of Restrictive Covenant, Breach of Confidentiality and Non-Competition Agreement)

159. Plaintiffs repeat, reiterate and re-allege all of the allegations contained in the Statement of Facts, First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth and Ninth Counts above as if fully set forth at length herein.

160. Defendants, Belliard and Fell, were salaried employees for Pure Power.

161. Defendant, Belliard, was employed with Pure Power as a D.I. for approximately four (4) years.

162. Defendant, Fell, was employed with Pure Power as a D.I. for approximately three (3) years.

163. Defendants, Belliard and Fell, signed confidentiality and non-competition agreements on September 26, 2006 with Pure Power.

164. The Commitment to Full Effort Sections of the Agreement specifically states the following:

> You agree that during the period of your employment you shall devote your skills and best efforts to the Company; you shall work to further the best interests of the Company; and you shall not do anything to undermine or disparage the reputation of the Company or do anything that is otherwise detrimental to the Company. You shall not, directly or indirectly, assist any competitors of the Company while you are employed by the Company.

165. The Confidential Information Section of the Agreement specifically states the following:

> You shall not disclose, either orally or in writing, to anyone outside the Company any confidential or commercially sensitive information made known to you or acquired by you in the course of your employment, including but not limited to all such information relating to marketing or strategic plans, products and/or services under development, suppliers, customers, inventions, discoveries, improvements, methods, processes, know-how, trade secrets, pricing methods, personnel information and any other information that, if disclosed, might be profitable to a competitor or other third party or detrimental to the Company.

166. The Intellectual Property Section of the Agreement specifically states the following:

> (a)    You acknowledge that the Company's PURE POWER BOOT CAMP obstacle-confidence courses and related environments, and the marketing thereof, embody and/or reflect inventions, discoveries, concepts, ideas, developments, improvements, methods, processes, know-how, trade secrets, designs, trademarks (including but not limited to the marks PURE POWER and PURE POWER BOOT CAMP), trade dress, textual and graphic material, and a distinctive overall look and feel (collectively, "Intellectual Property"). You agree that all such Intellectual Property, regardless of whether or not it is capable of patent, trademark, trade dress, trade secret or copyright protection, is exclusively owned by the Company. You shall not, during the course of your employment or at any time thereafter, challenge the Company's ownership of any Intellectual Property or the validity or enforceability thereof, nor shall you use any Intellectual Property in any competing business, or in any other way without the Company's express written permission, during or after your employment with the Company.

> (b)    You further agree that all Intellectual Property that you may conceive, develop, create or reduce to tangible form while you are employed by the Company that relates in any way to the business of the Company or that results from or is suggested by work that you do for the Company is and shall be exclusively owned by the Company. You hereby irrevocably assign to the Company all right, title and interest that you may have in and to any and all Intellectual Property. You agree that, during and after your employment with the Company, you shall execute documents of assignment or such other documents as may be necessary to effectuate the assignment set forth herein and to confirm or maintain the Company's ownership of any Intellectual Property, and you shall otherwise reasonably

30

cooperate with the Company in obtaining, maintaining and enforcing its
rights in and to the Intellectual Property.

167. The Non-Compete Section of the Agreements specifically states the following:

"You agree that, during the term of your employment and for ten (10)
years thereafter:

(a)      you shall not, and shall not assist any third party to,
conduct any business or be employed by any business that competes
directly with the Company. A business that competes directly with the
Company shall include, but shall not be limited to, any physical exercise
program, confidence program or gym: (i) that uses obstacle courses; (ii)
that uses methods or exercises derived from military training; (iii) that
uses a military theme in any way; or (iv) that employs the term "boot
camp" in the name or description of the program or gym;

(b)      you shall not, and shall not assist any third party to, hire
any employee of the Company or seek to persuade any employee of the
Company to discontinue employment with the Company or to become
employed by or otherwise engaged in any business that competes directly
with the Company; and

(c)      you shall not, and shall not assist any third party to, solicit
any client or customer of the Company to discontinue his or her use of the
Company's products and services or to use the competing products or
services of another business."

168. The General Provisions Section of the Agreement specifically states the following:

"This Agreement shall continue in effect after the termination of your
employment by the Company and shall be binding upon and inure to the
benefit of both parties and their respective successors, assigns and
representatives. You hereby represent that you have read and understand
all of the provisions of this Agreement and you agree that the provisions
of this Agreement are reasonable and necessary for the protection of the
business and goodwill of the Company and the Company's Intellectual
Property. It is the intent of the parties hereto that if in the opinion of any
court of competent jurisdiction any provision set forth in this Agreement is
not reasonable and by reason thereof is not enforceable, such provision
shall be modified to the extent necessary to render it enforceable to the
maximum extent allowed by applicable law, and the validity, legality and
enforceability of the remainder of the Agreement shall not in any way be
affected or impaired thereby. This Agreement sets forth the entire

agreement between the parties with respect to its subject matter and supersedes all prior discussions, agreements and understandings concerning the subject matter hereof. This Agreement may be amended only by an instrument in writing signed by both parties. This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to the conflict of laws provisions thereof. You agree to accept the exclusive jurisdiction and venue of the courts of the State of New York, and the federal district courts situated in New York, New York for the adjudication of any dispute, controversy or claim arising in connection with or related to this Agreement."

169.  With knowledge of said contracts, the terms and conditions agreed to therein, and based upon the foregoing Statement of Facts and Counts, Defendants, Belliard and Fell, maliciously, willfully and without justification breached every Section of the Agreement by creating Warrior Fitness and collectively conspiring to steal Pure Power's clients, corporate/business documents, proprietary and confidential information, trade secrets, and trade dress from Pure Power.

170.  Belliard and Fell, directly and indirectly, continue to maliciously, willfully and without justification or excuse, interfere with Pure Power's current clients and current employees, namely Nicio Evertz, a D.I.

171.  Due to the Defendants' willful and malicious interference, Pure Power has lost clients and Evertz may soon be pirated and force Pure Power to pay other employees substantially higher salaries to prevent them from joining Warrior Fitness.

172.  As a result of the foregoing wrongful conduct, Plaintiffs have been damaged in an amount as yet unknown, but to be proven at Trial. Plaintiffs have no adequate remedy at law for the continuing violations of its rights as set forth above.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, Warrior Fitness Boot Camp, LLC; Alexander Kenneth Fell a/k/a Alex Fell, Individually; Ruben Dario Belliard a/k/a Ruben Belliard, Individually; Jennifer J. Lee, Individually; and Nancy Baynard, Individually, jointly and severally for:

      a.    Injunctive relief, enjoining the Defendants from directly and/or indirectly contacting Plaintiffs' clients, misappropriating Plaintiffs' trade secrets and infringing on Plaintiffs' trade dress;

      b.    Equitable relief demanding the immediate return of Plaintiffs' property wrongfully converted by Defendants;

      c.    Money damages in the millions of dollars, the amount of which to be determined by a jury of Plaintiffs' peers;

      d.    Consequential damages;

      e.    Incidental damages;

      f.    Punitive damages;

      g.    Reasonable attorney's fees, filing fees, costs of suit; and

      h.    Any further relief which the Court may deem just and proper.

### ELEVENTH COUNT
#### (Breach of Good Faith and Fair Dealing)

173. Plaintiffs repeat, reiterate and re-allege all of the allegations contained in the Statement of Facts, First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, and Tenth Counts above as if fully set forth at length herein.

174. Every contract in the State of New York contains an implied covenant of good faith and fair dealing.

175. Defendants, Belliard and Fell, signed confidentiality and non-competition agreements on September 26, 2006 with Pure Power.

176. Defendants breached the implied covenant by failing to conduct themselves in good faith and in failing to carry out their contractual obligations to Pure Power.

177. As a result of the foregoing, Plaintiffs have incurred damages to an extent not yet ascertained.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, Warrior Fitness Boot Camp, LLC; Alexander Kenneth Fell a/k/a Alex Fell, Individually; Ruben Dario Belliard a/k/a Ruben Belliard, Individually; Jennifer J. Lee, Individually; and Nancy Baynard, Individually, jointly and severally for:

     a. Injunctive relief, enjoining the Defendants from directly and/or indirectly contacting Plaintiffs' clients, misappropriating Plaintiffs' trade secrets and infringing on Plaintiffs' trade dress;

     b. Equitable relief demanding the immediate return of Plaintiffs' property wrongfully converted by Defendants;

     c. Money damages in the millions of dollars, the amount of which to be determined by a jury of Plaintiffs' peers;

     d. Consequential damages;

     e. Incidental damages;

     f. Punitive damages;

     g. Reasonable attorney's fees, filing fees, costs of suit; and

     h. Any further relief which the Court may deem just and proper.

### TWELFTH COUNT
### (Fraud and Misrepresentation)

178. Plaintiffs repeat, reiterate and re-allege all of the allegations contained in the Statement of Facts, First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Counts above as if fully set forth at length herein.

179. For approximately the past nine (9) months, since July 2007, the Defendants posed as loyal employees and clients and solicited, manipulated, and stole Plaintiffs' clients with the intent to deceive and injure Plaintiffs, and with the intent to economically benefit the Defendants.

180. Defendants have stolen Pure Power's intellectual property, client list, trade secrets, trade dress, business/corporate documents, and other confidential, secret and proprietary information with the intent to deceive and injure Plaintiffs, and with the intent to economically benefit the Defendants.

181. The Plaintiffs detrimentally relied upon the Defendants' misrepresentations to Plaintiffs' detriment.

182. As a result of the Defendants fraud and misrepresentations aforementioned, the Plaintiffs have incurred damages to an extent not yet ascertained.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, Warrior Fitness Boot Camp, LLC; Alexander Kenneth Fell a/k/a Alex Fell, Individually; Ruben Dario Belliard a/k/a Ruben Belliard, Individually; Jennifer J. Lee, Individually; and Nancy Baynard, Individually, jointly and severally for:

    a. Injunctive relief, enjoining the Defendants from directly and/or indirectly contacting Plaintiffs' clients, misappropriating Plaintiffs' trade secrets and infringing on Plaintiffs' trade dress;

35

b.  Equitable relief demanding the immediate return of Plaintiffs' property
    wrongfully converted by Defendants;

c.  Money damages in the millions of dollars, the amount of which to be
    determined by a jury of Plaintiffs' peers;

d.  Consequential damages;

e.  Incidental damages;

f.  Punitive damages;

g.  Reasonable attorney's fees, filing fees, costs of suit; and

h.  Any further relief which the Court may deem just and proper.

## THIRTEENTH COUNT
### (Breach of Fiduciary Duty)

183. Plaintiffs repeat, reiterate and re-allege all of the allegations contained in the Statement
     of Facts, First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth,
     Eleventh, and Twelfth Counts above as if fully set forth at length herein.

184. By the acts alleged above, Defendants, Belliard and Fell, have breached their fiduciary
     duty to Plaintiffs. Defendants, Belliard and Fell, purloined protected information from
     Plaintiffs' files while still employed by Plaintiffs for the sole purpose of effecting an
     advantage in competing with Plaintiffs immediately upon their conspiracy and decision
     to commence an indoor obstacle/confidence boot camp, namely, Warrior Fitness.

185. As a result of the foregoing wrongful conduct, Plaintiffs have been and will be deprived
     of substantial sales in an amount as yet unknown but to be proven at Trial. Plaintiffs
     have no adequate remedy at law for the continuing violations of its rights as set forth
     above.

36

**WHEREFORE**, Plaintiffs demand judgment against Defendants, Warrior Fitness Boot Camp, LLC; Alexander Kenneth Fell a/k/a Alex Fell, Individually; Ruben Dario Belliard a/k/a Ruben Belliard, Individually; Jennifer J. Lee, Individually; and Nancy Baynard, Individually, jointly and severally for:

   a. Injunctive relief, enjoining the Defendants from directly and/or indirectly contacting Plaintiffs' clients, misappropriating Plaintiffs' trade secrets and infringing on Plaintiffs' trade dress;

   b. Equitable relief demanding the immediate return of Plaintiffs' property wrongfully converted by Defendants;

   c. Money damages in the millions of dollars, the amount of which to be determined by a jury of Plaintiffs' peers;

   d. Consequential damages;

   e. Incidental damages;

   f. Punitive damages;

   g. Reasonable attorney's fees, filing fees, costs of suit; and

   h. Any further relief which the Court may deem just and proper.

### FOURTEENTH COUNT
**(Trade Dress Infringement, Violation of 15 U.S.C. §1125 and Lanham Act §43)**

186. Plaintiffs repeat, reiterate and re-allege all of the allegations contained in the Statement of Facts, First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh, Twelfth, and Thirteenth Counts above as if fully set forth at length herein.

187. Defendants solicited, manipulated, and stole Plaintiffs' clients with the intent to deceive and injure Plaintiffs, and with the intent to economically benefit the Defendants.

188.  Defendants stole the Pure Power client accounts, Plaintiffs' information, client files and client files with the intent to deceive and injure Plaintiffs, and with the intent to economically benefit the Defendants.

189.  Defendants stole Plaintiffs' intellectual property, client list, trade secrets, trade dress, business/corporate documents, and other confidential, secret and proprietary information with the intent to deceive and injure Plaintiffs, and with the intent to economically benefit the Defendants.

190.  Defendants misappropriated Plaintiffs' trade secrets and trade dress with the intent to deceive and injure Plaintiffs, and with the intent to economically benefit the Defendants.

191.  As a result of the foregoing, Plaintiffs have incurred damages to an extent not yet ascertained.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, Warrior Fitness Boot Camp, LLC; Alexander Kenneth Fell a/k/a Alex Fell, Individually; Ruben Dario Belliard a/k/a Ruben Belliard, Individually; Jennifer J. Lee, Individually; and Nancy Baynard, Individually, jointly and severally for:

     a.  Injunctive relief, enjoining the Defendants from directly and/or indirectly contacting Plaintiffs' clients, misappropriating Plaintiffs' trade secrets and infringing on Plaintiffs' trade dress;

     b.  Equitable relief demanding the immediate return of Plaintiffs' property wrongfully converted by Defendants;

     c.  Money damages in the millions of dollars, the amount of which to be determined by a jury of Plaintiffs' peers;

    d.   Consequential damages;

    e.   Incidental damages;

    f.   Punitive damages;

    g.   Treble damages;

    h.   Reasonable attorney's fees, filing fees, costs of suit; and

    i.   Any further relief which the Court may deem just and proper.

Dated: Staten Island, New York
      May 5, 2008

CALCAGNO & ASSOCIATES
Attorneys At Law, LLC
Attorneys for Plaintiffs

BY: _____
ANDREW JOHN CALCAGNO
*Main Office*
213 South Avenue East
Cranford, NJ 07016
(908) 272-7300

*Satellite Office*
404 Manor Road
Staten Island, New York 10314
(718) 815-0200

39

**EXHIBIT B**

power1.txt

1

```
 1

 2    SUPREME COURT OF THE STATE OF NEW YORK
      NEW YORK COUNTY  - CIVIL TERM - PART  39
 3    -------------------------------------------------X
      PURE POWER BOOT CAMP, INC., PURE POWER
 4    BOOT CAMP, INC., FRANCHISING CORPORATION
      and PURE POWER BOOT CAMP JERICHO,
 5
                          PLAINTIFFS,
 6
                        -against-
 7
      WARRIOR FITNESS BOOT CAMP, LLC., ALEXANDER
 8    KENNETH FELL a/k/a ALEX FELL, individually,
      RUBEN DARIO BELLIARD, a/k/a RUBEN BELLIARD,
 9    individually; JENNIFER J. LEE, individually,
      and NANCY BAYNARD, individually
10
                         DEFENDANTS
11    -------------------------------------------------X
      Index No. 601364/08        60 Centre Street
12    MOTION                     New York, New York
                                 May 8, 2008
13
      B E F O R E:  HONORABLE HELEN E. FREEDMAN, Justice
14

15    A P P E A R A N C E S:
           CALCAGNO & ASSOCIATES
16         Attorneys for the Plaintiffs
           404 Manor Road
17         Staten Island, New York   10314
           718-815-0200
18         BY:  ANDREW JOHN CALCAGNO, ESQ.
                STEPHEN G. TRAFLET, ESQ., of counsel
19              and
           FROSS, ZELNICK, LEHRMAN & ZISSU, P.C.
20         TRADEMARK COUNSEL
           866 United Nations Plaza
21         New York, New York   10017
           212-813-5995
22         BY: SUSAN UPTON DOUGLASS, ESQ.

23         CHADBOURNE & PARKE, LLP
           Attorneys for the Defendants
24         30 Rockefeller Plaza
           New York, New York   10112
25         212-408-5100
           BY:  LAWRENCE E. BUTERMAN, ESQ.
26
```

⬜

2

power1.txt

1

2

A P P E A R A N C E S: (Continued)

3

FOX ROTHSCHILD, LLP, ESQ.
4    Attorneys for Defendants
100 Park Avenue
5    New York, New York    10017
212-878-7900
6    BY:   CAROLYN D. RICHMOND, ESQ.
JOHN J. SKINNER, JR., ESQ.
7

8

9

10

11

12

13

14

15

16

17

18            MICHAEL J. DAUGENTI, RMR, CRR
OFFICIAL COURT REPORTER
19

20

21

22

23

24

25

26



3

1                        Proceedings
2                MR. BUTERMAN:  I submitted a letter earlier

power1.txt

3     this morning.  I hand delivered it to chambers.  I
4     don't know if your Honor received it.  I have a copy
5     for your Honor.  It involves crucial issues which need
6     to be addressed.
7                    THE COURT:  What are you saying?
8                    MR. BUTERMAN:  What I'm saying is, your
9     Honor --
10                   THE COURT:  You are?
11                   MR. BUTERMAN:  I represent the defendants
12    in this case.  Plaintiffs have filed an interrogatory
13    injunction.  We received the papers yesterday and when
14    we received them, we learned that their papers were
15    based on e-mails that had been stolen from my client's
16    personal e-mail accounts.  They also contain e-mails
17    representing both myself and counsel, Miss Richmond
18    from the Fox Rothschild firm, privileged
19    communications.  And they actually took those e-mails,
20    your Honor, and they attached those as exhibits,
21    e-mails clearly, clearly showing that Miss Richmond
22    giving representation to Mr. Feldman, one of the
23    defendants in this case.  And they attached them to
24    the motion and they actually used them to support the
25    motion.
26                   MR. CALCAGNO:  Your Honor, with all due

[]

4

1                         Proceedings
2     respect, I think the first and foremost thing you need
3     to do is to address everyone at the table and who we
4     are and it's our application before this court.

Page 3

```
                              power1.txt
    5    Mr. Buterman --
    6              THE COURT:  What's going on here?  I walked
    7    into the middle of very, very bad rumble.
    8              MR. CALCAGNO:  Yeah, I'd like to give the
    9    court our application and Mr. Buterman will get a
   10    chance to explain his position to this respectful
   11    court.  I'd like to address your Honor, without Mr.
   12    Buterman interrupting plaintiff's counsel.  It's our
   13    application, your Honor.  May I proceed with my
   14    application, your Honor?
   15              MR. BUTERMAN:  Respectfully, your Honor,
   16    what I'm afraid of is counsel has submitted an
   17    affidavit which contains privileged and confidential
   18    communications between myself and my clients and Miss
   19    Richmond and her clients from no less than three
   20    separate law firms.  They've attached them as
   21    exhibits.  What I'm afraid of, your Honor, is by
   22    seeking defense counsel --
   23              MR. CALCAGNO:  Your Honor --
   24              THE COURT:  This behavior I don't want.
   25              You cannot behave this way in my courtroom.
   26              (There is a short recess.)
```

0

5

```
    1                         Proceedings
    2              THE COURT:  We calmed down a little?
    3              MR. CALCAGNO:  We are.  Andrew Calcagno,
    4    law firm of Calcagno & Associates, representing the
    5    plaintiff, Pure Power Boot Camp, Pure Power Boot Camp
    6    Franchise and Pure Power Boot Camp of Jericho.  with
```

Page 4

power1.txt
```
 7     me to my right is Mr. Stephen Traflet of counsel.  To
 8     my left is Susan Douglas from the law firm of Fross &
 9     Zelnick, a trademark and trade dress expert who we
10     brought before you.  This involves trade dress
11     infringement, copyright infringement, stealing
12     someone's entire business.
13             If I could -- if you want introduction of
14     the attorneys and I'd like to explain the case briefly
15     to you, Judge, and walk you through it.  This case
16     involves, your Honor, the worse case.  I've been
17     practicing 18 years, specializing in commercial
18     litigation.  The worse case of co porate that I
19     personally have ever seen committed by two employees
20     working for Pure Power Boot Camp.
21             They not only conspired with two of the
22     gentlemen, Ruben Belliard and Alex Fell, two
23     individuals who were the key trainers of her
24     clientele, but the two girlfriends but not just
25     girlfriends.  Generally as Alex Fell's girlfriend, she
26     is also the co-owner and silent partner of the
```

⬚

6

```
 1                     Proceedings
 2     competing what's called an indoor obstacle confidence
 3     course right up the block in Manhattan.  It is very
 4     important, your Honor, that's why I brought Miss Susan
 5     Douglas with us.
 6             This concept, an indoor obstacle confidence
 7     course is the only one in the nation.  There's no
 8     other obstacle course indoor with this program, with
```

Page 5

power1.txt
9    these concepts, with this style of military training.

10    It was so unique and so rare that the defendants in

11    exhibit P, actually admit it, it's so neat and so rare

12    that it's confidential and trade secrets.  And I will

13    refer to you exhibits as I go along.

14             However, your Honor, please, as we

15    proceed --

16             MR. BUTERMAN:  Your Honor --

17             THE COURT:  You'll have a chance.

18             MR. CALCAGNO:  She actually went to Lauren

19    Brenner who's sitting right there with the white shirt

20    and black shirt and she actually went to Miss Susan

21    Douglass from Fross Zelnick only one of the top trade

22    dress, trademark firms in New York City.  This concept

23    has been filed with the patent and trademark office

24    for over the last two and a half years.

25             THE COURT:  They have an issue of pattern

26    and trade --

Ƿ

7

1                     Proceedings

2             MR. CALCAGNO:  Not yet.  Hold on a second.

3             MR. BUTERMAN:  Your Honor --

4             MR. CALCAGNO:  Excuse me.

5             It is so unique that it is acquired

6    distinctiveness by its very nature under the secondary

7    meaning of the trademark dress laws.

8             THE COURT:  However --

9             MR. CALCAGNO:  Let me just go on.  This is

10    much more than that.

Page 6

power1.txt
```
11              THE COURT:  You should be in federal court.
12              MR. CALCAGNO:  More than that, your Honor,
13    this gets really bad.  So, here we are, she
14    establishes the entire curriculum.  I have books, her
15    business plan, her startup manual.  This concept took
16    off.  It was an instant sensation from the get-go.
17              THE COURT:  They're all upset by you.
18              MR. CALCAGNO:  I will get there and address
19    all those issues.  Give me five minutes.
20              THE COURT:  Is there going to be -- they
21    want you to be a witness or something?
22              MR. CALCAGNO:  No, no, your Honor.  Let me
23    explain it all and then the defendants will have their
24    turn.
25              I have a book that I presented to your
26    Honor at the TRO.  It's exhibit F to Miss Brenner's
```

☐

8

```
1                    Proceedings
2    affidavit.  This woman who's a self-made business
3    woman was written up in all business magazines as a
4    self-starting business woman.  She was a life time
5    athlete.  She designed, conceptualized this concept.
6    It's now getting national and international
7    recognition as her concept.  Every Monday for the next
8    six weeks she's on Fox Five with Mike and Juliet.  She
9    is on Fox Five, CNBC, Wall Street Journal.  This
10   concept is sensation.  It is an acquired
11   distinctiveness that is addressed by all the public.
12   Anyone hears about this concept, even Miss Susan
```

Page 7

power1.txt

13    Douglass will tell you, oh, that's Pure Power Boot

14    Camp's concept.

15              The brochure and this concept, if I may

16    approach --

17              THE COURT:  I don't want to see it.

18              MR. CALCAGNO:  It's exhibit A to Miss

19    Brenner's affidavit.  It was just an instant

20    sensation.

21              Now, Miss Brenner decided to do such an

22    instant sensation and it was going to be trademarked

23    and trade dressed and all her concepts, she franchised

24    it in 46 states.  And all of this knowledge was known

25    by the defendant Belliard and the defendant Fell her

26    two employees that trained the military style with

☐

9

1                    Proceedings

2     her.  She in fact trained them and taught them

3     everything they know.

4               Now, her client list is privileged and

5     confidential.  No one knows her client list.  It's not

6     like public knowledge anywhere.

7               THE COURT:  There will be franchises which

8     means there will be clients all over the place.

9               MR. CALCAGNO:  No.  Here's how it goes,

10    your Honor.  We have this franchise.  Now we file the

11    franchise in 46 states.  We spent literally about

12    $450,000, when all sudden, and unbeknownst to us,

13    eight months in July of '07, the two defendants in

14    clandestine fashion, your Honor -- there's no other

Page 8

power1.txt

15    way to say it -- they started conspiring with each
16    other, started conspiring with Miss Lee, who is an
17    executive at Bobby Flade's Place. And she's a Wharton
18    Business School graduate who should know better, here
19    they are, Ruben Fell, Alex Fell and Ruben Belliard,
20    here they are, we got a plan, we're going to steal her
21    business, literally all of her contents, her programs,
22    her concepts and they start in July of '07.
23              First they start the Web site. They go to
24    "Go Daddy" and they do Warrior Fitness Boot Camp.
25    Then they steal more documents. They steal her
26    business plan --

☐

10

1                        Proceedings
2              THE COURT:  She didn't know about the Web
3    site?
4              MR. CALCAGNO:  Oh, no, she did.  She was
5    all part of it.  Now, exhibit P --
6              THE COURT:  Wait.  I mean your client?
7              MR. CALCAGNO:  Brenner had no idea about
8    this.  This was just discovered over the last week or
9    so.
10              Now, we have this business plan which is
11    identical.  It's copyright infringement.  Although we
12    did not register it, it's common law copyright
13    infringement.  They literally cut and pasted from her
14    business plan, her startup manual, her brochure and
15    made it their own in clandestine fashion.  And then it
16    gets even worse.

Page 9

power1.txt

17          In December they start looking for leases.

18     This was just discovered over the last week or so.

19     They go even further and all of a sudden they break

20     into her office, your Honor, and they steal her client

21     list.  First, it wasn't the full client list.  They

22     only stole 88 clients.  And I will show you, your

23     Honor, in the exhibits there's actually exhibits that

24     refer to the partial client list.  They go into the

25     exhibits and they steal one partial client list, it's

26     exhibit U, on March 25 of '08.

11

1                      Proceedings

2          And they go in there and they actually

3     steal it and here's when Ruben Belliard was still

4     employed there.  Alex Fell they had a disagreement.

5     He was insubordinate on March 16th, your Honor, said

6     expletives to Miss Brenner that were unacceptable, the

7     F word and multiple, multiple expletives that are in

8     detail in Brenner's affidavit, so repulsive, as an

9     individual, as an ex-marine and to a woman, how dare

10     you speak like that, when all the time he had this

11     plan.  He became belligerent and arrogant because he

12     knew I'm taking your concept, I have everything I

13     want.

14          So Miss Brenner was going to put him on

15     suspension.  He goes, "Fire me."  So she fired him.

16     But guess who didn't leave?  Mr. Belliard did not

17     leave because he wasn't finished stealing the

18     corporate documents, stealing the corporate assets,

Page 10

```
                              power1.txt
19    stealing the customer list.
20            On March 31st, your Honor, exhibit X,
21    Paragraph 116 of the affidavit what does Mr. Belliard
22    do?  Breaks into her office.  We have witnesses that
23    he broke into her office not with a hammer, opened it
24    up because they have a corporate policy no one is
25    allowed in there, and he steals her business plan,
26    steals the startup manual and guess what?  Steals all
```

                                                          12

```
1                      Proceedings
2     of the active client list.
3             If you look at exhibit X, your Honor, I'd
4     like to read that, because it's pretty, pretty
5     malicious, willful, intentional and everything else
6     you can imagine under the sun.  This case is so
7     egregious, I just -- it's repulsive, your Honor.  It
8     says, quote, oh, oh, so I just updated our party list.
9     Open pren, with a very dear friend of ours additions
10    and ah, holy shit, there's over 330 people that might
11    come to our party.
12            Just -- and if you look on the exhibit,
13    your Honor, just look at it, it is a complete
14    spreadsheet of all the customers, e-mails, their
15    private address, the classes that they joined and all
16    at her facility.  These classes start at 5:30 in the
17    morning.  And oh, who's coming, who's not coming.  I
18    mean, this was just outrageous conduct, beyond
19    outrageous conduct.
20            Then I love this e-mail, your Honor, oh,
                           Page 11
```

power1.txt

21    look at double A.  This is one of my favorite by the
22    Wharton Business School graduate, Bobby Flade
23    executive who knows better than any of her boyfriends
24    and coconspirators, calls her Miss Conversion, proud
25    of it, arrogant, belligerent.  It is really
26    misappropriation is what it is.


⬚

13


1                      Proceedings
2                I converted a Lauren lover, exclamation.
3    This girl Jacobs loves Warren and hugged her one time
4    and said all would be okay and blah blah blah blah, so
5    I wrote her off.  Continuing with the quote, but
6    lately she has been talking to me a lot, wanting to be
7    partners and today I converted her, exclamation.  She
8    said she won't sign up if I don't return and do what I
9    do.  She promised not to renew and to sign up for
10    yours.  Man, I am good.
11                She then, in the next line, your Honor,
12    this is even more repulsive.  Now they want to
13    continue to destroy her.  Her only DI left, her drill
14    instructor, Necio.  She wants to destroy and take him
15    and sway him over.  It says hey, Necio says he's
16    leaving soon, he's miserable.  And Mylinise, another
17    person who's helping him, is a key witness in this
18    case, says she is signing up for the six month, et
19    cetera, et cetera.  I'm going to treat her to Megu for
20    dinner one time.  She is just too awesome and I dig
21    her.
22                Unbelievable evidence, your Honor, in this

Page 12

power1.txt

23    case.

24              Now we get to -- this is really the kicker,

25    your Honor.    Here we are Ruben Fell.    I mean Ruben

26    Belliard.    Here he is in the office on March 31st of

☐

14

1                        Proceedings

2     '08.    He's not done stealing because he doesn't have

3     everything he needs. . And now he gets the client list

4     I just referred to it, oh shit, 330 clients, they're

5     coming with us.    He then calls Miss Brenner on the

6     phone and says, I quit, at 9:09 p.m. leaving her with

7     no one to teach her 5:30 a.m. class.    This poor woman

8     has been trying to do a national rollout.    She opened

9     up a second location in Jericho.    The identical

10    concept pursuant to the franchise, pursuant to the

11    business model, pursuant to the trade dress, all

12    filed, registered, doing everything that you're

13    supposed to do to protect your trademark, protect your

14    copyright information, do everything you can do

15    protect your business.

16              If we did not come in on the TRO, your

17    Honor, we would be negligent in doing that.    I'm going

18    to continue, your Honor, because it gets even worse.

19              The other coconspirator, Nancy Baynard, who

20    is Mr. Ruben Belliard's girlfriend, they say oh, why

21    is the girlfriend named?    Because if you look at

22    exhibit DD and exhibit EE -- sorry, it was so many

23    exhibits we had to go into double digits -- here they

24    are campaigning generally, and Miss Nancy Baynard

Page 13

power1.txt

25  campaigned for all her clients in mass e-mails.

26              Look at exhibit DD and EE, sending to all

                                                    15

1                       Proceedings

2   of the clients on the list.  Complete theft, complete

3   robbery, corporate sabotage.  And then trying to

4   defame her and then -- guess what, this is even more,

5   it gets deeper and deeper.

6              After Mr. Belliard leaves and quit, guess

7   what, your Honor?  We then have destruction of

8   evidence.  He knows he's signed noncompetes.  Fell

9   signed noncompetes.  They broke into her office and

10  stole and destroyed and we believe shredded because

11  one coconspirator to the other says I think, quote

12  unquote, he shredded the document.

13              I'd like to show you that exhibit, your

14  Honor, about shedding the exhibit.  It's exhibit CC.

15  I'd like to read it to the court.

16              MR. BUTERMAN:  This isn't --

17              MR. CALCAGNO:  Excuse me.  Please sit down,

18  Mr. Buterman.

19              MR. BUTERMAN:  Buterman.

20              MR. CALCAGNO:  Sit down, please.

21              MR. BUTERMAN:  This is my e-mail.

22              MR. CALCAGNO:  Quote, Mr. Buterman is

23  involved in this, your Honor.  He's a current client

24  of Pure Power Boot Camp.  I want to get to this.  It

25  says, quote, Ruben thinks that he shredded the copy of

26  the contract.

                        Page 14

power1.txt

16

```
 1                        Proceedings
 2                MR. BUTERMAN:  Your Honor --
 3                THE COURT:  Let's keep that for another
 4       day.
 5                MR. CALCAGNO:  Your Honor, shredded the
 6       contracts.  Let me go further, your Honor.
 7                THE COURT:  If there was any spoliation of
 8       evidence that's very, very sanctionable and we know
 9       that.  Any lawyer who participated will probably end
10       up in jail, so we don't have to worry about that.
11                MR. CALCAGNO:  Let me go further, your
12       Honor.  Before this honorable court, Mr. Buterman said
13       to you, if you recall --
14                THE COURT:  I don't recall.
15                MR. CALCAGNO:  There's no confidentiality
16       agreements, there's nothing.  And at the time this
17       e-mail was written, your Honor, on April 16th, Mr.
18       Buterman was just a client of Pure Power Boot Camp.
19       He was only involved in this case as of the day he
20       showed up.
21                THE COURT:  I don't know what you're
22       talking about.
23                MR. CALCAGNO:  Mr. Buterman was a client in
24       the boot camp.
25                THE COURT:  Wait a minute.  This gentleman
26       here?
```

17

Page 15

power1.txt

```
 1                    Proceedings
 2              MR. CALCAGNO:  This man right here.
 3              THE COURT:  The lawyer for the defendant?
 4              MR. CALCAGNO:  Correct.  He is an essential
 5    material witness in this case.  The e-mails establish,
 6    your Honor, under double GG --
 7              THE COURT:  Why is he the central witness?
 8              MR. CALCAGNO:  Look at GG, your Honor.
 9              MR. BUTERMAN:  Your Honor, I respectfully
10    note that these e-mails reflect attorney/client
11    privilege information and should not be read.
12              MR. CALCAGNO:  My objection, evidentiary
13    hearings can be had at a later date.
14              THE COURT:  How did you obtain this?
15              MR. CALCAGNO:  Excuse me, we obtained them
16    because if you look at the response, thank you for
17    faxing it to me, there's an admission on Page 2 of Mr.
18    Buterman's opposition to your court and it says,
19    referring to defendant Fell on the left, states:  He
20    may have had access -- he may have accessed that
21    account from the computer in Miss Brenner's gym,
22    conceding and admitting that this e-mail account, his
23    Hot Mail account was on his computer.
24              THE COURT:  Who's he?  Wait a minute.
25    You've got to back up and explain to me who your
26    talking about.
```

18

```
 1                    Proceedings
                      Page 16
```

power1.txt

2          MR. CALCAGNO:  Yes.  On the work station of

3     the front desk, there's a computer.  The woman's name

4     is Liz.  She goes in.  All of a sudden she's hearing

5     some rumors, she doesn't know if it's true, all of a

6     sudden Liz goes into the computer, she goes into her

7     Hot Mail account and low and behold, there's his

8     e-mail account and concedes he put it on the computer.

9          THE COURT:  His e-mail account is on the

10    computer is probably a privilege of the attorney and

11    client.

12          MR. BUTERMAN:  It's a separate e-mail

13    account.

14          MR. CALCAGNO:  So he clicks -- she clicked

15    on it and lo and behold all of the e-mails except for

16    the last few come from that Hot Mail account admitting

17    to them signing noncompetes, being concerned about it.

18          I filed, I said to your Honor, I filed this

19    under seal.  As an officer of the court I have a duty

20    to turn over if there's attorney/client privileged

21    communication.  I saw it, so I asked for it to be

22    under seal so no one will see it, no one is prejudiced

23    between Carolyn Richmond and Alex Fell and Ruben

24    saying that you've got a problem, you signed a

25    noncompete.

26          After they didn't know they had a problem

☐

19

1               Proceedings

2     the e-mail appears and says I'm shredding it.

3               MR. BUTERMAN:  Objection, your Honor.  He
                         Page 17

power1.txt

```
 4        just said it's privileged information.
 5                     THE COURT:  I don't think it's --
 6                     MR. CALCAGNO:  It's a waiver.
 7                     Now, your Honor, watch this, all of a
 8        sudden, in the Hot Mail e-mail, in the Hot Mails,
 9        they're watching this corporate sabotage going on,
10        stealing everything, for trade dress, copyright, her
11        clients, guess what?  I opened up a G Mail account and
12        Lauren's like flipping out, what did I do, what did I
13        do?  Guess what?  Liz says, "Mr. Alex Fell gave me his
14        password."  Because I wanted to watch, your Honor,
15        there's a -- he wanted to sell some stuff on E-Bay and
16        he tells Liz here's my password, hoo-rah, hoo-rah, and
17        guess what?  Bingo, shredded.  Criminal activity,
18        stealing corporate documents, admitting to corporate
19        sabotage.
20                     The reason why Mr. Buterman didn't want me
21        to tell you what the heck was going on, Judge, is
22        because these are so incriminating, so bad, so
23        blatant, malicious, willful, they should all be held
24        in contempt including Mr. Buterman.
25                     And in the e-mail that Mr. Buterman puts,
26        he tries to help them, says this is how you do it.
```

20

```
 1                          Proceedings
 2        Look at double G.  This is how you circumvent it.  He
 3        didn't use those words, your Honor, no, used only
 4        marine corps.  You didn't get it from Pure Power Boot
 5        Camp.  You got it from --
```

power1.txt

6              THE COURT:  I can't believe lawyers are
7       using e-mail.
8              MR. CALCAGNO:  Mr. Buterman did this, Mr.
9       Buterman in exhibit double H.  And I want you to see
10      this, Judge, this is reprehensible, this is
11      reprehensible.  He is going to quote -- and this is an
12      e-mail from Jenny Lee, defendant owner of Orient
13      Fitness, and her boyfriend coconspirator defendant
14      Alex Fell.  The last paragraph says, quote, it doesn't
15      mean Buterman won't do some little things to let
16      people know stuff that will hurt her even more, but it
17      won't hurt you guys.  He assured me of that.  He has
18      your best interest at heart, then his interest to
19      destroy her is secondary and thinks he will already
20      destroy herself.
21             And we wrote a letter to Mr. Buterman.
22      This gets even more outrageous.  I wrote him when he
23      called me up on May 5.  I said Mr. Buterman, you have
24      some serious conflicts of interest, you know about
25      this information.
26             I don't know anything.  He then says oh,

🞏

21

1                        Proceedings
2       it's ten years.
3              I said who do you know?
4              I must have seen it in documents.
5              Did you see the documents?
6              I didn't know they exist.
7              We know he lied then.  We know he lied to
                            Page 19

power1.txt

8       this court a few weeks.

9                    MR. BUTERMAN:  Objection.

10                   MR. CALCAGNO:  He lied.  Mr. Traflet

11      witnessed it as well.

12                   And then he sent a letter to Mr. Buterman

13      to recuse himself, your Honor, to recuse himself under

14      the ethical rule DR.  And it's a directive.  It's just

15      not a canon of ethics.  It's DR 5-102.  He is a

16      material witness.  I believe he's potentially -- we

17      didn't know he was a defendant yet.  I want to take

18      his deposition first, then he may be a defendant.  I

19      don't want to do that to an attorney, but at the very

20      least there's an appearance of impropriety, collusion,

21      appearance of collusion, helping them engage in

22      trademark infringement.  It is outrageous.

23                   This is the last point, your Honor, I'll be

24      finished.  I am so outraged by his opposition it

25      violates -- it's actually tantamount to extortion and

26      blackmail before this court.  When your Honor reads it

0

22

1                         Proceedings

2       you will be outraged.  I think he should be sanctioned

3       by this court.  He actually threatened.  So I think we

4       should go the U.S. Attorney's office.  I think Mr.

5       Kilpatrick should be reported to the ethics committee

6       that is a direct violation of the canon ethics rule,

7       DR 7-105, threatening a criminal prosecution in civil

8       litigation.  It's outrageous to be to sitting here.  I

9       called him three times on the phone May 5, yesterday

power1.txt

| | |
|---|---|
| 10 | on May 6th.  When he showed up at court, I said please |
| 11 | don't show up, get some other attorney. |
| 12 | I called Miss Carolyn Richmond. |
| 13 | where is she? |
| 14 | I called Miss Carolyn Richmond. |
| 15 | I said you haven't responded to any of my |
| 16 | letters, your clients are engaging in this fraudulent |
| 17 | activity, what are you doing?  She wouldn't even send |
| 18 | me a letter.  She does not represent the defendants. |
| 19 | I said who represents the defendants?  Your |
| 20 | Honor, I need to know.  The only letters I have from |
| 21 | Carolyn Richmond from the Fox Rothschild law firm and |
| 22 | she responded I'm not sending you anything. |
| 23 | I said Mr. Buterman called me and he said |
| 24 | quote, unquote, Mr. Traflet was with me, I'm |
| 25 | authorized to call you. |
| 26 | I said do you represent the defendants? |

23

| | |
|---|---|
| 1 | Proceedings |
| 2 | He said no. |
| 3 | I said, do you intend to represent them? |
| 4 | If you do, fax me a letter of rep. |
| 5 | I don't. |
| 6 | You want my fax number? |
| 7 | No.  And he hung up.  Mr. Traflet was in |
| 8 | the room.  And guess what, who showed up for the TRO? |
| 9 | Guess who shows up?  Buterman. |
| 10 | It is -- this case cries out for, your |
| 11 | Honor, irreparable harm.  Miss Susan Douglass, I'm so |

power1.txt

12     outraged, I take this personally, it's outrageous

13     conduct, it's malicious, it's willful, it's

14     contemptuous.  It's every awful despicable word of the

15     defendants, who think they're U.S. marines.  Pure

16     Power is built on 11 principles of integrity, loyalty

17     and trust.  And, guess what, every one of them has

18     been violated by all of them.

19               And smirk more, smirk.  You think it's

20     funny.  Miss Williams is smirking in this courtroom,

21     your Honor.  I take umbrage with her attitude and her

22     condescending and I renamed her misappropriation.

23     She's outrageous, outrageous.  I am appalled, your

24     Honor, very upset, very upset.

25               THE COURT:  You're going to have a heart

26     attack here.

24

1                         Proceedings

2                    MR. BUTERMAN:  May I?

3                    THE COURT:  Yes.

4                    MR. BUTERMAN:  I'm the only one.  I

5      represent the defendants in this case.

6                    THE COURT:  You do?

7                    MR. BUTERMAN:  Yes, I do, your Honor.

8                    MR. CALCAGNO:  I want to make a motion

9      formally to recuse him from this case.

10                   THE COURT:  Disqualified is the word, too.

11                   MR. CALCAGNO:  Disqualified.

12                   MR. BUTERMAN:  Let me begin by explaining

13     some of the background here, your Honor, just briefly

power1.txt

14    and this all contained in the letter that I wrote to
15    the court earlier today which I do not know if the
16    court received it or not.  I have another copy of it I
17    can provide to your Honor.
18              And what I point out in the letter, your
19    Honor, is that yesterday afternoon, yesterday around
20    noon, 11:00 o'clock, noon, we received plaintiffs'
21    papers regarding their request for preliminary
22    injunction.  And when we looked at the papers what we
23    immediately noticed that they were largely -- there
24    was an affidavit from Miss Lauren Brenner that
25    contained approximately 20 e-mails taken from my
26    client, Mr. Fell's Hot personal accounts.

                                                        25

1                         Proceedings
2                 I understand, your Honor --
3                 THE COURT:  Who got on her e-mail system?
4                 MR. BUTERMAN:  Fifteen of those e-mails
5     were taken after my client had been terminated.  My
6     client was terminated on March 16th, 2008, and your
7     Honor can look and see that most of the exhibits here
8     are e-mails that come from after March 16th, 2008.
9     They are e-mails --
10                THE COURT:  He was using?
11                MR. BUTERMAN:  No, he wasn't at the
12    facility anymore, your Honor.
13                THE COURT:  If he was using the facility.
14    If I put my home e-mails on the OCA account and I
15    leave OCA, OCA has a right to my whole e-mails.
                        Page 23

power1.txt

16            MR. BUTERMAN:  Absolutely.  These were not

17    put on Pure Power Boot Camp's account.

18            THE COURT:  If I give OCA access one way or

19    another to my whole e-mail, that's the end of my

20    privacy.

21            MR. BUTERMAN:  First of all, Mr. Fell did

22    not give any access.

23            THE COURT:  How did he do it?

24            MR. BUTERMAN:  What's our understanding of

25    how he's got there, what happens is Mr. Fell at one

26    point in time --

                                                    26

1                      Proceedings

2            THE COURT:  Gave somebody else his

3    password?

4            MR. BUTERMAN:  No, that's not our

5    understanding.  What we understand is at one point in

6    time Mr. Fell accessed his Hot Mail account while he I

7    was employed by Miss Brenner.  He then left the

8    company and when he left the company they somehow

9    gained access to his account thereafter.  And, your

10    Honor, they continued to do that.  And, you know, the

11    point that should be made is we're not just talking

12    about Mr. Fell's Hot Mail account.  There's actually

13    three accounts here.  There's a G mail account and

14    there is a Warrior Fitness account.

15            THE COURT:  All of which would had to have

16    been produced during discovery.

17            MR. CALCAGNO:  Absolutely.
                      Page 24

power1.txt

```
18              MR. BUTERMAN:  Here's the point with
19    respect to this.  In those files you will see not only
20    very, very privileged personal communications but also
21    attorney-client privileged communications.  And, your
22    Honor --
23              THE COURT:  I think he may have waived
24    them.
25              MR. BUTERMAN:  With all due respect --
26              MR. CALCAGNO:  Absolutely, Judge.
```

27

```
1                    Proceedings
2              MR. BUTERMAN:  With all due respect, it is
3    not the case he can waive attorney-client privilege.
4    Waiver is the knowing relinquishment of a right.
5              THE COURT:  Not necessarily, as long as
6    somebody else was in the room.
7              MR. BUTERMAN:  Nobody else was in the room.
8              MR. CALCAGNO:  Please don't cut the judge
9    off when she's speaking.
10              MR. BUTERMAN:  Your Honor, please.  On
11    April 1st, 2008, Miss Richmond who's from the law firm
12    of Fox Rothschild wrote a letter to Miss Brenner
13    directly, saying I represent Alex Fell in this
14    litigation, in this potential litigation and all
15    issues regarding his termination from Pure Power.
16              There is an e-mail from April 16th, 2008,
17    and it's exhibit BB, your Honor, to Miss Brenner's
18    affidavit.  It's an e-mail from Miss Richmond on her
19    Fox Rothschild e-mail accounts to Mr. Fell, after --
```

Page 25

power1.txt

20      mind you, your Honor, this is over a month after Mr.

21      Fell had been terminated giving Mr. Fell legal advice

22      and legal opinion and discussing attorney-client

23      privilege information.

24              On the second page of the e-mail exhibit

25      BB, your Honor will see that it says clearly that this

26      document, this e-mail, contains privileged and

28

1                       Proceedings

2       confidential information intending only for the use of

3       the individual named above.  If you are not the

4       intended recipient of this e-mail or the employee or

5       agent responsible for delivering to the intended

6       recipient, you are hereby notified that any

7       dissemination or copying of this e-mail is strictly

8       prohibited.

9               Now, your Honor --

10              THE COURT:  So there's stuff in here that

11      shouldn't be.  Go ahead.

12              MR. BUTERMAN:  There's a lot of stuff in

13      here that's confidential privileged information and it

14      goes deeper, your Honor.

15              what's happened in this litigation is that

16      Miss Brenner and counsel have had access to three of

17      Mr. Fell's e-mail accounts throughout this litigation.

18              Now, these are the e-mails they chose to

19      produce but there are literally hundreds of e-mails.

20              THE COURT:  What does that got to do with

21      the issue?

                        Page 26

power1.txt

```
22              MR. BUTERMAN:  There are e-mails between
23     attorneys.
24              THE COURT:  Mr. Buterman, what does that
25     got to do with the issue in the case?
26              MR. BUTERMAN:  It has to do with the fact
```

[]

29

```
1                      Proceedings
2      that in sum total of a support for plaintiffs' motion
3      for preliminary injunction happens to be privileged
4      material, your Honor.
5               THE COURT:  Wait.  But if we got privileged
6      material, it shows that they stole all the documents.
7      It's out there.
8               MR. BUTERMAN:  First of all, those issues
9      are very much in dispute and I respectfully submit
10     that the evidence doesn't show that at all.  But I
11     have a much bigger problem which is that counsel has
12     been privy to my communications with my clients and
13     mind you, your Honor, up until -- we have an e-mail in
14     here from last Friday.
15              THE COURT:  Somehow you -- you know
16     something, maybe lawyers should learn -- should have
17     learned by now not to communicate with their clients
18     through e-mails particularly when a situation like
19     this arises, if you have clients who are likely to
20     have the access one way or the other.  You know, it's
21     a problem now with the electronic communications and
22     I'm going to say you have to eat it.
23              MR. BUTERMAN:  It absolutely is a problem,
                          Page 27
```

power1.txt

24      your Honor.  But, respectfully, we are talking about
25      private e-mails and there's no issues of waiver here.
26              THE COURT:  They may not be admissible but

                                                              30

1                          Proceedings
2       there may be enough evidence to get a TRO.
3               MR. BUTERMAN:  Respectfully, your Honor, I
4       highly disagree because I also believe that the
5       e-mails themselves do not show even close to what Mr.
6       Calcagno claims that they show.  But the point is,
7       your Honor --
8               THE COURT:  Did your clients have a
9       noncompete agreement?
10              MR. BUTERMAN:  Your Honor.
11              THE COURT:  Yes or no?  You know that.
12              MR. BUTERMAN:  My clients, I will tell you
13      exactly what I know.  Mr. Fell has an exhibit here
14      that's a noncompete agreement.  He is prepared to
15      testify under oath that that is not his signature on
16      that agreement.
17              With respect to Mr. Belliard, I believe
18      that at one point in time Mr. Belliard did have a
19      noncompete agreement, it has not been produced, I have
20      never seen it.  What I do know, your Honor, is that
21      the noncompete is a ten-year noncompete agreement
22      which prohibits my client from operating anywhere in
23      the world in the fitness industry.  It is facially
24      invalid.
25              THE COURT:  A ten-year would be.
                        Page 28

power1.txt

26              MR. BUTERMAN:  Thank you, your Honor.


                                                                    31


1                           Proceedings
2               MR. CALCAGNO:  But it has a savings clause,
3       your Honor, and subject to your Honor reducing it.
4       But can you ask a pointed question, did Mr. Belliard
5       shred the noncompete as stated in double C, your
6       Honor?  Can you ask that question?
7               MR. BUTERMAN:  This is inappropriate.
8               MR. CALCAGNO:  It's here right here.
9               MS. RICHMOND:  I'm Carolyn Richmond from
10      Fox Rothschild, counsel for all the defendants as
11      well.  The beginning of April when we first became
12      aware of this issue, I respectfully wrote to counsel
13      and Pure Power and requested any copies of any
14      noncompete or nondisclosure agreements.  This all
15      could have been forestalled because if there was a
16      noncompete agreement against Mr. Fell, this is what I
17      do for a living noncompete agreements in the
18      employment sector, and so if there was one as alleged
19      and attached yesterday, it should have been produced
20      six weeks ago.  It never was, which belies the
21      question of whether it is legitimate.
22              THE COURT:  Who do you write to?
23              MR. RICHMOND:  First we asked Miss Brenner;
24      then we asked the first counsel.  I repeatedly asked
25      for the last six weeks whether there was any alleged
26      intellectual properties, whether there was any

                            Page 29

power1.txt

32

```
 1                    Proceedings
 2      registration or trademark.  If there was, I could have
 3      counseled my client differently.  Now all laid out
 4      before you, my advice is there.
 5              And with respect to all of the wiretapping
 6      laws and electronic privacy acts, I respectfully
 7      disagree.  Your rights actually under New York state
 8      privacy protects you much greater than you believe,
 9      because even if your access to your computer accounts
10      were outside of work, were in work, once your boss
11      became aware that this was private and your private
12      e-mails, they're supposed to stop, particularly when
13      they see the legends at the bottom.
14              And when you leave the bench in particular
15      and your bosses were to access your account
16      surreptitiously after you left the bench, I propose
17      that's a whole different ball of wax.  When my counsel
18      attaches those e-mails to court documents, that opens
19      up a whole other can of worms.
20              THE COURT:  I may have spoken quickly,
21      but --
22              MS. RICHMOND:  There's a whole lot of case
23      law out there about what those acts do.  And none,
24      despite all the hyperbole of counsel, none of the
25      documents without discovery would even get to the
26      point of whether or not there were documents taken or
```

33

power1.txt

```
 1                    Proceedings
 2      not.  What we do see here is you can't ask for an
 3      equitable remedy as far as a TRO when you yourself
 4      have breached and not followed the laws of equity.
 5                THE COURT:  It's a problem.
 6                MS. RICHMOND:  My colleague is here to
 7      respond, as well, to some of the remaining points.
 8                MR. CALCAGNO:  I do have Miss Douglas here.
 9      After they're done I'd hike her to address the trade
10      address infringement.
11                MR. BUTERMAN:  I want to point out we are
12      here on a motion for preliminary injunction and the
13      issues that have to be resolved here are whether
14      there's a likelihood of success on the merits.
15                THE COURT:  Counsel I'm aware of it.
16                MR. BUTERMAN:  Your Honor, the issue is --
17      one of the issues here certainly are whether the
18      equities favor one party or another.  I want to say in
19      light of what's going on in the e-mails, it's very
20      clear that the equities certainly do favor the
21      plaintiffs in this matter.
22                Moreover, your Honor, I just want to bring
23      up one fact with respect to the issue of irreparable
24      harm here.  Miss Brenner has a very, very successful
25      business.  I want to say, when Mr. Fell and Mr.
26      Belliard open on Monday, they have ten clients.  In
```

34

```
 1                    Proceedings
```
Page 31

power1.txt
2      the affidavit submitted by Miss Brenner she talks

3      about having had thousands of clients over the years.

4      We're talking about a small gym, two ex-marines who

5      are trying to open with ten clients.

6                  THE COURT:  Now, here, let me ask you, have

7      they taken the client list?

8                  MR. BUTERMAN:  No, your Honor.  It's my

9      understanding -- let me please explain the document

10     that Mr. Calcagno referred to.  And this is

11     100 percent my understanding.  Exhibit XX, excuse me,

12     exhibit X that Mr. Calcagno referred to, which has a

13     party list, is a list that was compiled by all four of

14     the named defendants based on the personal e-mail

15     list.  When --

16                  THE COURT:  That doesn't sound totally

17     believable.

18                  MR. BUTERMAN:  Your Honor, the point is

19     client lists are not confidential if they are

20     available from other sources.

21                  THE COURT:  Client lists of this type are

22     confidential.  If they're available for other sources

23     they still have to be given back.

24                  MS. RICHMOND:  Your Honor, I'm sure you

25     have many cases with respect to documents in this

26     particular county.  New York law is very clear if you

▯

35

1                           Proceedings

2      can create a list from your head on your own --

3                  THE COURT:  I agree with that, but that's

Page 32

power1.txt
4      not this.

5                    MS. RICHMOND: Your Honor, that's exactly

6      what this is.  They were gym members.  You can walk

7      in.

8                    THE COURT: Counsel, let's say I don't

9      believe that.  I think they took lists.  I believe

10     they took lists.  And I'm going to order those lists

11     returned.  I want them -- if they have them out of

12     their heads, then they should give over all the lists

13     and then make new lists out of their heads.

14                    They don't have all the phone numbers, they

15     don't have all the e-mail numbers in their heads.

16                    MR. BUTERMAN: If your Honor would like,

17     let me represent -- let me be clear.  My clients have

18     represented to me that they do not have any customer

19     lists, that they have from Pure Power Boot Camp.

20     That's what they have represented to me.

21                    THE COURT:  I am telling you that I don't

22     believe it.  And I am ordering them to return any

23     lists that they have, even ones they claim they don't

24     -- they didn't get from Pure Power.  They can start

25     over again, because any list that has either an e-mail

26     or telephone number, I want back.


□

36

1                         Proceedings

2                    MR. BUTERMAN: Your Honor, respectfully,

3      while my clients will abide by your Honor's rulings,

4      the list that they created also have personal

5      contacts, the e-mail list attached to exhibit X which

Page 33

                                        power1.txt
 6      plaintiff now has.

 7                  THE COURT:  How did they get all those

 8      e-mails?

 9                  MR. BUTERMAN:  Many of them are from their

10      friends.

11                  THE COURT:  They have them again.

12                  MR. BUTERMAN:  We will be happy to give

13      back any copies of exhibit X that we have or any other

14      master list will be given, I should say.

15                  MR. CALCAGNO:  Your Honor.

16                  THE COURT:  I don't want to hear from you.

17      Go ahead.

18                  MR. SKINNER:  My name is John Skinner from

19      Fox Rothschild.  I'm a registered pattern and

20      trademark attorney from the U.S. PTO.

21                  Somewhere in the documents here there was

22      an affidavit by Miss Susan Upton Douglass.  Mr.

23      Calcagno has said that the plaintiff has a number of

24      trademarks and one of trademarks that they are

25      claiming to have is trade dress to allay out --

26                  THE COURT:  They said they applied for

⬚

                                                              37

 1                         Proceedings

 2      them.  She backed away from having one.

 3                  MR. SKINNER:  I just wanted to show the

 4      court that an office action issued back in January of

 5      2008 that finally rejects the trademark application in

 6      the trademark offices said the following:  "The

 7      refusal to register is made final because the proposed

                              Page 34

power1.txt
8      mark consists of nondistinctive trade dress that would
9      not be perceived as a service mark."
10             In the present case the proposed mark is
11     not inherently distinctive because camouflage, rubber
12     flooring, tire rungs, climbing walls, climbing nets,
13     hurdles and motivational words are commonly associated
14     with fitness centers.  Please see the previously
15     attached evidence which illustrates camouflage
16     associated with other boot camps and that military
17     style boot camps are a commonly offered physical
18     fitness service.  And they go on and list a half dozen
19     different boot camps and they also show as evidence 47
20     various pages taken off the Internet.
21             MS. DOUGLASS:   If I may?
22             THE COURT:  Yes.
23             MS. DOUGLASS:  I am Susan Douglass.  May it
24     please the court, I have been practicing trademark and
25     copyright law exclusively for 26 years at the firm of
26     Fross, Zelnick, Lehrman & Zissu, which is the largest

38

1                     Proceedings
2      firm in the world that specializes only in trademark
3      and copyrights, not patents.  And we have 50 lawyers,
4      that's all we do.  And so I can tell you it's my
5      experience that what happens in the real world and
6      what happens in the trademark office are two entirely
7      different things.
8             The Supreme Court in the Two Pacer versus
9      Taco Sabana (phonetic) case had said that trade dress
                        Page 35

power1.txt
10      which are the elements, the look and feel of a
11      business are inherently protectable, which is the
12      supreme court case, Two Pacer versus Taco Sabana.
13                 THE COURT:  Come on, let's go.
14                 MS. DOUGLASS:  Anyway, the point is when
15      you file an application in the trademark office these
16      examiners are, for lack of a better word, fearful and
17      so what they do is because Section 2F of the trademark
18      office says five years of use is inherent, is prima
19      facie evidence of inherent distinctiveness --
20                 MR. SKINNER:  Objection.
21                 MS. DOUGLASS:  The examiners like to wait
22      for five years so they feel they have the comfort of
23      having the five years behind them.  We have four and a
24      half years that what counsel referred to as the final
25      refusal is the final refusal which gives us six months
26      to answer.

39

1                          Proceedings
2                 And so we are going to be filing the
3       response on July 5th, which is the last day of the
4       term to respond.  And the examiner has told us over
5       the telephone that she's just going to wait out the
6       five years.
7                 MR. SKINNER:  Objection.
8                 MS. DOUGLASS:  Excuse me, I had a telephone
9       conversation with the examining attorney.  And she
10      said I'll feel more comfortable waiting for five years
11      because the trade traditions are not within the

Page 36

power1.txt

12    comfort zone of the trademark examining attorneys who

13    are more accustomed to word marks and logos, than the

14    sort of thing I have in the past, for example,

15    attached to my affidavit registered the trade dress of

16    the Two Carnival store.

17          And again even though the Supreme Court has

18    said that the trade dress is inherently distinctive,

19    the examining attorneys feel more comfortable with the

20    five year period and when it comes time for me to file

21    the request for reconsideration in July, which I have

22    all of this press evidence which is very persuasive,

23    the courts have said, the trademark office has said

24    that extensive publicity, and so on, is persuasive

25    evidence of acquired distinctiveness.

26          She's basically told me on the telephone

[]

40

1                     Proceedings

2    that she's just waiting out the term.  So this is what

3    I'm going to do, I'm going to until July.  I will file

4    a request for reconsideration.  She will review it

5    over a couple of months and then we will be up to the

6    five year term amount at which point we will then file

7    a supplemental thing saying we have five years and

8    then it will go through.

9          The other point I would like to make is

10    that we have no objection to the defendants having a

11    boot camp.  What we're talking about is distinctive

12    trade dress comprising all of these elements, the

13    indoor confidence obstetrical course which is

Page 37

power1.txt

| 14 | specifically designed.  They can do calisthenics, they |
|---|---|
| 15 | can have pieces of equipment when you go in this place |
| 16 | and you look at the brochures and you see the very |
| 17 | distinctive look totally non-functioning, you don't |
| 18 | need to have netting hanging from the ceiling, you |
| 19 | don't have to lay out, you don't need the words |
| 20 | stenciled on support posts in the building. |
| 21 | THE COURT:  Is that what your client has? |
| 22 | MS. DOUGLASS:  Yes.  And it's totally |
| 23 | arbitrary and distinctive trade dress.  That is the |
| 24 | subjects of the trademark application and which will |
| 25 | ultimately be registered. |
| 26 | They're welcome -- there are other boot |

☐

41

| 1 | Proceedings |
|---|---|
| 2 | camps in the country.  They're welcomed to do that. |
| 3 | They can do their own boot camp.  What they can't do |
| 4 | also is a proprietary program; for example, what |
| 5 | Lauren Brenner has developed.  I've been to many gyms. |
| 6 | I belonged to one gym for 25 years.  You never walk in |
| 7 | the door and they say drop down and give me five.  And |
| 8 | the clients walk in like this in high heels and the |
| 9 | guy a suit and they do five push-ups.  And they have |
| 10 | changing dens instead of a dressing room.  This is |
| 11 | what the Lauren Brenner Pure Power Boot Camp is.  And |
| 12 | they're trying to emulate all these things.  They call |
| 13 | clients by the name recruits. |
| 14 | THE COURT:  I find that obnoxious, calling |
| 15 | clients recruits.  I have to tell you that more than |

Page 38

                              power1.txt
16      anything else.
17                  MS. DOUGLASS:  Is that not distinctive,
18      unique?  Have you ever been to a gym where somebody
19      calls you a recruit.
20                  THE COURT:  It sounds pretty hokey.
21                  MS. DOUGLASS:  This what they are copying,
22      they're copying this whole program.
23                  THE COURT:  By tomorrow they'll change it.
24                  MR. BUTERMAN:  First of all, with respect
25      to some of these elements -- and I appreciate
26      counsel's --

☐

                                                              42

1                        Proceedings
2                   MR. CALCAGNO:  Can I say one thing to Miss
3       Douglass?
4                   THE COURT:  No.
5                   MR. CALCAGNO:  Fine, your Honor.
6                   MR. BUTERMAN:  If the concerns are with
7       respect to issues with respect to cargo netting, your
8       Honor, there will be no cargo netting in our gym.  If
9       the issues are with respect to tents, I can assure
10      your Honor there will be no tents.
11                  THE COURT:  We're getting there.
12                  MR. SKINNER:  I would submit that is not
13      what the trademark is.  If you look at the trademark
14      it actually has a picture of the obstacle course as
15      the examiner --
16                  THE COURT:  They're not saying the obstacle
17      course.  They're saying the tents.
                         Page 39

power1.txt

18          MR. BUTERMAN:  We will not have the

19    military green color.  I mean --

20          THE COURT:  Okay.  We're getting there.

21          MS. DOUGLASS:  In their business plan, your

22    Honor, they say the Warrior Boot Camp, they say it's a

23    completely different fitness experience based on pan

24    military style training.

25          THE COURT:  Why don't you work with --

26          MR. SKINNER:  Your Honor --

43

1                    Proceedings

2          THE COURT:  I am going to walk out.

3          You know what, somehow this group has been

4    unable to conduct itself appropriately.  And for that

5    reason I am just not going to say do anything now.  If

6    you change your thing enough, the TRO goes away.  And

7    it's now up to you to change your thing enough.

8          MR. SKINNER:  Can we get a little guidance?

9          THE COURT:  Don't call everybody recruits,

10    don't come in and say drop down and do this.  If

11    there's some imitation in the program, you know, a

12    boot camp is a boot camp.  Nets gone, color's gone,

13    change your style.  Don't call them recruits, call

14    them -- come up with another word.

15          MR. BUTERMAN:  It's all agreed, your Honor.

16    That is all agreed to.

17          MS. DOUGLASS:  If there's the indoor

18    obstacle confidence course.

19          THE COURT:  I'm not going to say

power1.txt
20    everything.  Take a look.  The three of you go look at
21    theirs, figure out something that's different.
22                  MS. RICHMOND:  Your Honor, could we have
23    the TRO lifted?
24                  MS. DOUGLASS:  Could we keep the TRO in
25    place, please.  I'd just like to make one more point
26    about irreparable harm; that is to say people are

[]

44

1                         Proceedings
2     going to invest hundreds of thousands of dollars.
3     They do have a franchise in this.  The franchise is
4     worthless if people steal it.  There will be
5     irreparable harm.
6                  THE COURT:  I can't stop boot camps.
7                  MS. DOUGLASS:  No, but you can stop the
8     imitation of the Pure Power Boot Camp.
9                  THE COURT:  It's got to be something
10    different.
11                 MS. RICHMOND:  Your Honor, with all due
12    respect, the concepts of boot camps besides being all
13    over this country in other gyms derives from the U.S.
14    Army and Marines.  Recruits all come from the army.
15                 THE COURT:  I don't like it.  Get rid of
16    that.
17                 MS. RICHMOND:  Personally I wouldn't like
18    it.  It's exactly what it's called.
19                 MR. BUTERMAN:  My client just informed me
20    they don't refer to their clients as recruits anyway.
21    They use a specific marine term.  They call them

Page 41

power1.txt

22    warriors.

23              THE COURT:  Style themselves differently.

24    I can't stop competition.

25              MR. TRAFLET:  Your Honor, there's an issue

26    that the TRO hasn't been addressed.  They're supposed

☐
                                                    45

1                     Proceedings

2    to give us back everything that they took.

3              THE COURT:  Yes, I'm ordering that back.

4              MR. TRAFLET:  That includes all of our

5    franchise material.

6              THE COURT:  Two and a half weeks from now,

7    will give you a new date.

8              MS. DOUGLASS:  What about Monday?

9              THE COURT:  They can open Monday as long

10   as --

11             MS. DOUGLASS:  They have been all set up to

12   go.

13             MR. TRAFLET:  They have all our franchise

14   documents.

15             THE COURT:  It has to be given back

16   tomorrow.

17             MR. TRAFLET:  They can't use that, correct?

18             THE COURT:  Everything has to be returned

19   by tomorrow.

20             MR. CALCAGNO:  What about the stolen

21   noncompete that Ruben said he shredded or in their

22   position that he says exist, can they return the

23   noncompete agreement?

Page 42

power1.txt
24              MR. BUTERMAN:  Everything we have we will

25      certainly return.

26              MR. CALCAGNO:  Your Honor, if you can just

46

1                       Proceedings

2       put in place the franchise is going to be diluted, the

3       trade dress is going to be diluted, the indoor

4       obstacle confidence course, the entire concept they

5       have stolen.  I went to their facility and they

6       created an exact replica.

7               THE COURT:  I can't do this without a

8       hearing and I can't conduct a hearing for a couple of

9       weeks now.

10              MS. DOUGLASS:  There will be irreparable

11      harm that cannot be mitigated.  If the TRO could

12      please stay in place.

13              THE COURT:  I'm not going to keep the TRO

14      in place.  They can open on the 14th.  But if in two

15      weeks you come back and show me that you haven't

16      changed everything --

17              MS. DOUGLASS:  Can we have access to take

18      photographs?

19              THE COURT:  Yes.

20              MR. BUTERMAN:  You'll obviously supervise

21      access?

22              THE COURT:  Yes.

23

24              *               *               *

25

Page 43

power1.txt

26

47

1                              Proceedings

2

3                C E R T I F I C A T E

4

5

6    It is hereby certified that the foregoing is a true and
     accurate transcript of the proceedings.
7

8           ----------------------------------------
            MICHAEL J. DAUGENTI, CSR, RPR, RMR, CRR
9           OFFICIAL COURT REPORTER
            SUPREME COURT-NEW YORK COUNTY
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

power1.txt

**<u>EXHIBIT C</u>**

**BAHN, HERZFELD & MULTER, LLP**

ATTORNEYS AT LAW

**555 FIFTH AVENUE**
**NEW YORK, NY 10017**

ALLAN M. BAHN
RICHARD L. HERZFELD
ANDREW MULTER

TELEPHONE: (212) 818-9019
FACSIMILE: (212) 986-5316
E-MAIL: BHMLLP@AOL.COM

May 28, 2008

212-805-7912

Hon. John G. Koetl
United States District Court
Southern District of New York
500 Pearl Street
Courtroom 12B
New York, New York 10007
Attn: Donnie Fletcher

Re: Pure Power Boot Camp, et. al. v. Warrior Fitness Boot
Camp, et. al. 08 CV 4810 (JGK)

Dear Judge Koetl:

This letter is in reply to the letter of Richard B. Cohen dated May 27, 2008 on behalf of defendants. Mr. Cohen suggests that prompt attention to plaintiff's pending motion for a preliminary injunction is unnecessary because Justice Freedman has already considered the merits of the application, dissolved the TRO and concluded that there was no need for expedited treatment of the motion or irreparable harm to plaintiffs.

It is submitted that a review of the transcript does not support Mr. Cohen's suggestions. To the contrary, Justice Freedman was clearly concerned with the allegations that defendants stole plaintiff's client list. Excerpts of the transcript (obtained from Mr. Cohen) are included herewith. At oral argument, the court asked the simple question of whether defendants had taken the client list which was included in plaintiff's motion papers as Exhibit X (transcript, p. 32-the transcript printout has conflicting page numbers. References are to the page numbers at the very bottom of the page).

Exhibit X is a list of 321 clients, most with e-mail addresses, comments such as the class times, number of sessions left with plaintiff or other notes. A copy is included herewith as well.

It is important to point out that because many of exhibits in this matter contain the proprietary information which plaintiffs are seeking to protect, Justice Freedman granted plaintiffs' request that the file be sealed to all other than court personnel and attorneys of record. A copy of that portion of the court's

**BAHN, HERZFELD & MULTER, LLP**

Hon. John G. Koetl
May 28, 2008
Page 2

order is also included here with and we request that this Court
continue that direction and mark the file accordingly.

Although this was the roster of plaintiffs' clients, one of
the attorneys for defendants at the time stated that this list was
compiled by the defendants based upon their personal e-mail list
(32). When the court indicated that that was not believable,
counsel argued that the lists were not confidential.   The court
concluded that the client lists were confidential, stated that she
believed the defendants took the lists and directed that all of the
lists the returned.  Counsel reiterated that defendants represented
that they had no customer lists and the court reiterated its
disbelief (33-34).

Ultimately, the court directed that everything be returned and
that a hearing was required before the court could rule; however,
the court was unable to schedule a hearing for a couple of weeks
(42-43).  In the interim, the court granted plaintiffs access to
the premises to photograph in connection with the trade dress
infringement issue and started to address what would happen if
things were not changed by the time the parties returned, at which
point the court was interrupted (43).

Although Mr. Cohen suggests that the court simply scheduled a
conference for May 27th, pointing to the New York Law Journal
calendar, it is clear from the transcript that the court
contemplated a hearing.  Indeed, when Mr. Cohen and his associate
Daniel Schnapp initially contacted me on or about May 21, 2008, to
advise me that the matter would be removed to Federal Court, their
inquiry was whether I would be pressing forward with a hearing
immediately given the imminent return date.  It was only after a
conference call by Mr. Schnapp and myself to Justice Freedman's
part to advise the court that the matter had been removed that we
were advised by the clerk of his belief that the matter was
scheduled for conference.

The issue of e-mails and defendants' waiver of any privacy
rights will undoubtedly be addressed by the court, but where
defendants have (a) engaged in documented tortious interference,
with Lee and Bayard surreptitiously joining as clients to alienate
and subvert genuine clients, (b) stolen corporate files containing
noncompete agreements and apparently shredded those agreements, (c)
stolen customer lists, business plans and corporate files, and (d)
copied plaintiff's trade dress and proprietary manuals, counsel's
suggestion that "to seek equity one must do equity" carries little
weight.

BAHN, HERZFELD & MULTER, LLP

Hon. John G. Koetl
May 28, 2008
Page 3

Although as indicated, a hearing will most likely be required
with respect to trade dress, tortious interference, restrictive
covenants, copyright infringement and related issues, the one issue
which is clear and compelling is the combination of defendants'
acts as faithless employees, establishing the competing facility
while employed by plaintiff and at the same time, alienating
clients against plaintiff and stealing the customer list. The case
law addressing the sanctions for this clear breach of fiduciary
obligations is substantial. For instance, in Innoviant Pharmacy,
Inc. v. Morganstern, 390 F.Supp.2d 179 (N.D.N.Y.,2005), the court
enjoined any contact with customers on a list stolen by the former
employee from the employer. In Westcom Corp. v. Dedicated Private
Connections, LLC, 9 A.D.3d 331, 781 N.Y.S.2d 322 (1st Dept 2004),
the court ultimately required the corporate defendant to cease
doing business while imposing restrictive covenants on the
faithless employees for periods one 1 to 1 1/2 years. In Laro
Maintenance Corp. v. Culkin, 255 A.D.2d 560, 681 N.Y.S.2d 79 (2d
Dept. 1998) , the theft of proprietary information warranted a
preliminary injunction prohibiting the former employees from
contacting or soliciting those customers of the plaintiffs who
previously were served by the individual defendants when they were
employed by the plaintiffs. See also North Atlantic Instruments,
Inc. v. Haber, 188 F.3d 38 (2d Cir. 1999), citing Laro, and
generally discussing the protection afforded client lists.

Counsel's suggestion that defendants will not "solicit"
plaintiff's customers until such time as a conference may be held,
provides little relief. The clients have already been solicited
and subverted; non-solicitation provides no relief. There must be
a prohibition against any contact or servicing of plaintiffs'
customers.

Defendants' argument that they have only subverted 34 clients
thus far, and so there is no irreparable injury is also incorrect.
Contrary to Mr. Cohen's suggestion, the estimate of 34 lost clients
came from my client (I believe his estimate was far less) and since
it is too early to tell, my client believes that the ultimate loss
will be far more. Defendants have carefully laid the groundwork for
the subversion over the many months preceding their departure. The
only interim remedy which will address their malfeasance is a
blanket prohibition against contact with these clients, as in the
above cases.

Finally, to the extent that defendants argue a new motion must
be made as the matter has been removed, defendants are again
incorrect. Unless the court requires otherwise, there is already a
pending motion for a preliminary injunction. The fact that
defendants have removed the action does not moot the pending
motion. All that a new motion would do is generate additional

**BAHN, HERZFELD & MULTER, LLP**

Hon. John G. Koetl
May 28, 2008
Page 4

legal fees and allow defendants to continue to reap the benefit of
their misconduct.  It is respectfully requested that a hearing be
immediately scheduled.

Respectfully,

RICHARD L. HERZFELD

cc:  Richard Cohen, Esq.

**EXHIBIT D**

**From:** Lsbrenner
[mailto:LSBrenner@purepowerbootcamp.commailto:LSBrenner@purepowerbootcamp.com]
**Sent:** Thursday, May 29, 2008 2:24 PM
**Subject:** Pure Power Boot Camp

Hi Everyone:

I hope this beautiful weather is finding you well and it is the beginning of a wonderful summer
for all of you. The purpose if this email is to dispel rumors and clarify the record as to what has
actually transpired in the last several weeks with Pure Power Boot Camp and two former
employees.

Approximately three weeks ago, two former employees of Pure Power Boot Camp opened a
competing facility. This happens in all fields; and most of us would agree that fair competition
makes us all better at what we do. I for one am a huge advocate for competition and I welcome
it in all arenas of my life, especially in business. However, recent discoveries belie the supposed
honest nature of their departure and the new business venture.

As you know Pure Power Boot Camp ("PPBC")is not simply a physical fitness program, it's a
way of living your life through principles of leadership; namely "Integrity", "Loyalty", "Honor",
"Trust", "Respect" , "Courage", "Power", "Wisdom", "Duty", "Dignity" and "Pride". These
principles are not simply clichés but rather form the core basis by which I believe we achieve
physical and emotional health. Recently these principles were betrayed by those they had been
entrusted to as mentors and teachers to many of you.

Approximately five weeks ago when I first learned that former "PPBC" employees were starting
a competing business I also discovered that many business documents that I had spent over five
years developing, including PPBC's client lists had been downloaded off my computer and
taken from my private office without my knowledge or authorization. In addition, I also
discovered that my Business Plan, Startup Manual, and Operations Manual had been removed
from my office without my knowledge or authorization.

In addition to what I described above I also discovered that the former PPBC employees' efforts
to start their business started over ten months ago while still employed at PPBC and involved the
use of confidential and proprietary information shared with these employees under a written
confidentiality agreement. Copies of those agreements were also removed from my office
without my knowledge or consent. It is my further understanding that other individuals who
were involved in this matter were clients of PPBC who kept their personal relationship with the
employees hidden so as to aid the surreptitious nature of their involvement. One of these clients
is the girlfriend of one of the former employee's and is a silent partner and the financial backer
of the two former employees' business venture.

Upon discovering what I believe was a dishonest attempt to appropriate PPBC through illegal
means I filed suit in New York State Supreme Court seeking redress. During the initial hearing
the Court ordered the former employees to return stolen material. Shortly thereafter I received
PPBC's client list of names, telephone numbers and email addresses from the defendant

employees.   Recently, the case has been moved to federal court as there are federal trademark, trade dress and copyright claims along with state fraud, breach of contract and trespass claims.

As I mentioned at the beginning of this note, I have e mailed this information to you to set the record straight as far as I can. The principles of PPBC are a part of my life as I know they are for many of you. PPBC has brought many people together and it is more than just a physical fitness facility. It is a place where people have bonded, laughed, cried and shared together. It is a place where people grow as individuals as well as a community. To many of you, it has been a second home. And that is what validates to me why I even created Pure Power in the first place.

Anyone can take an aerobics class, do military jumping jacks, count in cadence and lift weights without thought or conviction; or for that matter claim principles but act without them. That is not what we do and that is not what Pure Power Boot Camp stands for.    That being said, this episode is a momentary distraction which I believe needed an explanation before we move on and do what we all do so well. I guess in some ways this is just another part of our journey.

I would like to thank those of you who have really rallied behind me and Pure Power Boot Camp and showed your support, love, and absolute integrity. I wish you all health and happiness and I appreciate you taking your time to read this email. If you have any questions regarding anything that has been said please feel free to call me and know that my door is always open for any explanation or clarification to support all of which I have said.

Have a wonderful day.

Very truly yours,

Lauren Brenner

PS: I have been told by my counsel that certain facts which are in dispute cannot be discussed. However, the court papers are a public document and if interested can be read in my office.  LB

**<u>EXHIBIT E</u>**

## Part 39
## Commercial Div.

Justice Helen E. Freedman
60 Centre Street
Phone 646-386-3275
Room 208

Conferences are held at 9:30.
Motions are held on Thursdays
at 2 P.M.

### TUESDAY, MAY 27

**Preliminary Conference**

604504/05 American Transit v.
  Rogers—9:30 A.M.
105693/07 Blandi v. Corts
600941/06 Current Medical
  Directions v. Salomone
601532/07 Delj Capital Mgt. v. Rhone
  Group L.L.C.
601908/07 Diversified Investors
  Capital v. Vertical Branding Inc
100089/06 Ferrante Immobiliare v.
  Guido A. Pace
115205/08 Hankin v. Karman—9:30
  A.M.
601021/08 LJ Franklin LLC v.
  Franklin Pl.
601349/07 Warrior Boot Camp v.
  Warrior Fitness Boot
108463/07 Tonche v. Cohen—9:30
  A.M.

**Compliance Conference**

601339/07 360networks v. Toronto
  Dominion (texas)—9:30 A.M.
601230/07 Toot Sweet Toys v.
  Charles Zadeh Enterprises—9:30
  A.M.

### WEDNESDAY, MAY 28

**Status Conference**

117876/06 Belgium Jewelry v. Shah

**<u>EXHIBIT F</u>**

```
                                                                    1
        864rpurc
    1   UNITED STATES DISTRICT COURT
    1   SOUTHERN DISTRICT OF NEW YORK
    2   ------------------------------x
    2
    3   PURE POWER BOOT CAMP, INC.,
    3   et al.,
    4
    4                   Plaintiffs,
    5
    5           v.                          08 Civ. 4810 (JGK)
    6
    6   WARRIOR FITNESS BOOT CAMP,
    7   LLC, et al.,
    7                                       Conference
    8                   Defendants.
    8
    9   ------------------------------x
    9
   10                                       New York, N.Y.
   10                                       June 4, 2008
   11                                       3:10 p.m.
   11   Before:
   12
   12           HON. JOHN G. KOELTL
   13
   13                                       District Judge
   14
   14
   15
   15           APPEARANCES
   16
   16
   17
   17   BAHN, HERZFELD & MULTER, LLP
   18       Attorneys for Plaintiffs
   18   RICHARD L. HERZFELD, ESQ.
   19
   19
   20   FROSS ZELNICK LEHRMAN & ZISSU, P.C.
   20       Attorneys for Plaintiffs
   21   SUSAN UPTON DOUGLASS, ESQ.
   21
   22
   22   ROX ROTHSCHILD LLP
   23       Attorneys for Defendants
   23   DANIEL A. SCHNAPP, ESQ.
   24   ELI Z. FREEDBERG, ESQ.
   24
   25
   25
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

```
        864rpurc
    1           (Case called)
    2           THE COURT:  Good afternoon all.  I've read the
    3   correspondence.  The case is now before me.  There is an issue
    4   with respect to a preliminary injunction.  Let me ask a couple
    5   of questions.
    6           Has there been an answer already to the complaint?
    7           MR. SCHNAPP:  Your Honor, there has not been.  We have
    8   agreed to adjourn that until I believe it is 20 days from last
```

```
 9    week, something like June 23rd.
10         THE COURT:  There are two issues.  One is the issue of
11    the preliminary injunction, and the second issue is simply the
12    scheduling order for the case now that you are all here and
13    before me.  I'll certainly listen to the parties.
14         My understanding from the correspondence is the
15    parties dispute to a certain degree whether the state court
16    held a hearing and denied a preliminary injunction.  Plainly,
17    what the state court did was require that the defendants return
18    certain material to the plaintiff, and the state court
19    dissolved the previously issued TRO.
20         The issue of whether there was a preliminary
21    injunction that the state court denied or whether there was no
22    preliminary injunction, or whatever, really seems to me to be
23    irrelevant for my purposes.  There is no pending motion for a
24    preliminary injunction.
25         the plaintiff could make a motion for a preliminary
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

```
      864rpurc
 1    injunction, and I would read all the papers and make a
 2    decision.  If the plaintiff wished to make a motion for a
 3    preliminary injunction, the plaintiff would make the motion and
 4    the defendant would respond, the plaintiff would reply, and I
 5    would set it down.  That's the first issue, preliminary
 6    injunction.
 7         The second issue is the scheduling order.  I'm
 8    perfectly prepared to enter a scheduling order for the case
 9    today which schedules completion of discovery, dispositive
10    motions, joint pretrial order, etc.  I'm prepared to listen to
11    the parties.  I understand what the case is about from reading
12    your correspondence.
13         Before I set any deadlines or the like, Mr. Herzfeld,
14    what would you like to tell me?
15         MR. HERZFELD:  Your Honor, maybe I'm mistaken, but the
16    state court motion is still pending.  My understanding has been
17    that with it removed, that doesn't disappear, it's before this
18    Court now.  It hasn't been initiated in this court, but it was
19    pending before Judge Friedman, and now, as I understand it,
20    it's pending before you.
21         THE COURT:  The defendant says it was denied in state
22    court.
23         MR. HERZFELD:  Judge, I'm sorry, I don't think they
24    are saying that, to tell you the truth.  None of us, other than
25    Ms. Douglass and Ms. Brenner, were at the actual appearance
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

```
      864rpurc
 1    before Judge Friedman.  My understanding of what Judge Friedman
 2    did was as an afterthought.  It was only at the very end of all
 3    the colloquy, and no testimony was taken.  Someone said, Judge
 4    Friedman, will you continue the TRO?  And she said no, but come
 5    back in two weeks and everything better be different.
 6         Basically, my information of the transcript is that
 7    Judge Friedman put everything on hold, she felt a TRO was
 8    unnecessary, a conclusion we disagree with but that's beside
 9    the point right now, and ordered everybody to come back.
10         Everybody, both myself and the other side, believe
11    that a hearing should take place.  When I introduced myself to
12    the other side, they asked me if I was going forward with the
13    hearing on Monday.  They had that impression, I had that
14    impression.
                              Page 2
```

```
15              I don't think they are saying she denied the
16  preliminary injunction.  They are simply saying that she denied
17  the TRO, so clearly she didn't believe there was any immediate
18  harm, so this Court can take its time.  That's my understanding
19  of their position.
20              Certainly there was absolutely nothing on the record
21  or even discussed relating to the preliminary injunction, only
22  the TRO and what would happen in that two-week interim.  As a
23  matter of fact, Judge Friedman said, I can't hold the hearing
24  for two weeks, so she rescheduled it for the next available
25  date she had.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5

864rpurc
```
 1              THE COURT:  Is that right, Mr. Schnapp?
 2              MR. SCHNAPP:  Your Honor, no, that is not our
 3  position.  We think, in fact, that the court did deny the
 4  preliminary injunction.  What the court did was set it down for
 5  a conference.  I think we forwarded to the Court --
 6              THE COURT:  That's what I read your papers to say.
 7              MR. SCHNAPP:  It is our position that it was set down
 8  for a conference; that, if anything, the court wished us to
 9  return and simply tell the court that we had changed whatever
10  might potentially have been infringement.  We, of course,
11  contend that nothing infringed.  But for all intents and
12  purposes the motion had been denied.
13              MR. HERZFELD:  Perhaps Mr. Schnapp could point to the
14  record where Judge Friedman denied the preliminary injunction,
15  because there is nothing in that record.  Once again, she set
16  it down for two weeks.  She said everybody better change or
17  else, and then she was interrupted and she didn't finish the or
18  else.
19              MS. DOUGLASS:  Your Honor, may I interject?
20              THE COURT:  No.  One at a time.
21              Maybe you can help me, Mr. Herzfeld.  I clearly
22  understood the defendant's position just on the correspondence.
23  I don't understand how you can tell me that there is no dispute
24  as to whether the state court judge denied the preliminary
25  injunction.  I got from the papers that the defendant was
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6

864rpurc
```
 1  contending exactly that.
 2              MR. HERZFELD:  My understanding was that they were
 3  contending the TRO was dissolved and therefore there was no
 4  urgency to go forward.  Apparently Mr. Schnapp says I'm
 5  mistaken.  I'll accept his word for it.  But that was my
 6  understanding.
 7              Once again, when I had my preliminary conversation
 8  with Mr. Schnapp and Mr. Cohen of his firm, it wasn't there's
 9  no motion pending, there's nothing going on.  It was, are you
10  pressing forward on Tuesday, because it's Memorial Day weekend?
11              What happened was in fact we had a conference call
12  with Mr. Schnapp and I with Judge Friedman's part that Friday
13  to find out how the we could expedite the transfer of the file
14  to you and what was going on.  It was the clerk who said, it's
15  on for a conference because that's her conference date.  When I
16  explained it was for a hearing, he said, I don't know, I just
17  know ordinarily it's on for a conference.
18              Maybe Judge Friedman had it down for a conference to
19  see whether or not things had changed enough so she didn't have
20  to go forward with a hearing.  But under no circumstances did
```
Page 3

```
21  she ever say preliminary injunction denied.  She dissolved the
22  TRO as an afterthought at the end when somebody asked about it,
23  never addressed preliminary injunction.  If Mr. Schnapp can
24  show you where, I'm happy to make a new motion.
25          MR. SCHNAPP:  Your Honor, may I address counsel?
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300
```
                                                                7
```
      864rpurc
 1          THE COURT:  Sure.
 2          MR. SCHNAPP:  To begin with, at the time that we
 3  actually became involved with the case, we frankly didn't know
 4  exactly what was going on.  The substance of the conversation
 5  that counsel just repeated to you took place in a conversation
 6  in which we approached and asked him whether or not there was
 7  any room for settlement of this matter.
 8          So first of all, I object to the fact that this is
 9  being brought up.  But to the extent that that conversation did
10  take place, it doesn't matter what we may have thought was
11  going on or we had asked Mr. Herzfeld was going on.  It
12  mattered what Judge Friedman thought was going on.
13          The fact is that it was in the journal as a
14  conference, the judge put it off for three weeks, dissolved the
15  TRO, and told everybody to come back and make sure things had
16  been changed.  In our view, in essence, as I think we have
17  already stated in our letters to the Court, and I don't want to
18  waste time, I think the judge denied the motion and simply
19  wanted to make sure at the conference that whatever potential
20  infringement had been changed.
21          MR. HERZFELD:  Judge, can I read to you from the
22  transcript, please?  Judge Friedman at the very end of the
23  colloquy:  "I can't do this without a hearing, and I can't
24  conduct the hearing for a couple of weeks now."
25          THE COURT:  In the absence of an order from the state
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300
```
                                                                8
```
      864rpurc
 1  court that denied the preliminary injunction, whether the judge
 2  set it down for a conference or, based on the justice's
 3  familiarity with the case, decided that it was really not of
 4  such urgency that she was about to grant a preliminary
 5  injunction in any event, there doesn't appear to be an order
 6  denying the preliminary injunction.
 7          So if the parties are satisfied with the papers that
 8  they submitted in connection with the application for a
 9  preliminary injunction, I'll review those papers and make a
10  determination whether there is a basis for a preliminary
11  injunction.
12          MR. HERZFELD:  Judge, the other side hasn't put in any
13  papers yet in response.  I would also like to supplement to
14  bring the Court up to date on events that have transpired.
15          THE COURT:  That's really what I was getting to at the
16  outset.  Whatever the state court did on the preliminary
17  injunction, the plaintiff has a right to make a motion for a
18  preliminary injunction.  The parties have a right to brief a
19  motion for preliminary injunction.  You can put in brand new
20  papers to me on a motion for a preliminary injunction or you
21  can take the motion papers and supplement them, and I'll
22  certainly give the defendants the opportunity to respond and
23  you to reply.
24          MR. HERZFELD:  I think that's the way we'd like to
25  proceed, to supplement the papers on as expedited a schedule as
              SOUTHERN DISTRICT REPORTERS, P.C.
                        Page 4
```

(212) 805-0300

9

864rpurc
1  we possibly can at this point.
2        THE COURT:  OK.  Plaintiffs' supplemental papers in
3  support of a motion for preliminary injunction are due June 6.
4  How much time does the defendant want to respond?
5        MR. SCHNAPP:  Your Honor, we'd ask for a week for our
6  opposition.
7        THE COURT:  Sure.  Responsive papers due June 13th,
8  reply papers June 17th, hearing June the 27th at 2:30 p.m.
9        MR. HERZFELD:  Judge, I'm not available on the 27th.
10 I'm sorry.
11       THE COURT:  June 26th at 4:30 p.m.
12       MR. SCHNAPP:  Your Honor, may I inquire whether the
13 Court will be hearing live testimony at that time or it will
14 merely be oral argument on the motion?
15       THE COURT:  I was just going to get to that.  The
16 overwhelming number of preliminary injunctions are decided on
17 the papers.  If the parties think based on the papers that they
18 want to present oral testimony on either side, please let me
19 know in advance and I'll reschedule it because it's unlikely
20 that I would have an evidentiary hearing beginning at 4:30.
21 Just let me know on the papers whether the parties want to
22 present live testimony.  Otherwise, I'll take the papers, hear
23 argument on the papers.
24       MR. HERZFELD:  Judge, it's my anticipation that there
25 are going to be a number of credibility issues for you to
             SOUTHERN DISTRICT REPORTERS, P.C.
                  (212) 805-0300

10

864rpurc
1  resolve.  If that is the case, I imagine we would need
2  testimony.
3        THE COURT:  Let me know in the papers.  Do you all
4  want to have any discovery in preparation for the preliminary
5  injunction?
6        MR. HERZFELD:  As a matter of fact, Judge, yes.  One
7  of the provisions that Judge Friedman granted was the right to
8  inspect and photograph the Warrior Fitness facility.  It's my
9  understanding, and I have no direct knowledge, that counsel
10 attempted to do that and was refused.
11       That aside, what I ask this Court to direct is that we
12 have the ability to access it unannounced to prevent them from
13 sanitizing whatever they are doing.  One of the issues is trade
14 dress.  For them to be able to rearrange things to minimize the
15 trade dress issue on advance notice is a real concern.
16       MR. SCHNAPP:  Your Honor, obviously, we think that
17 that that's quite absurd.  In any event, we are of course open
18 to having someone visit our gym.
19       The only thing I would say is that if we are going to
20 conduct discovery of that kind, I imagine those kinds of things
21 will be making it into counsel's papers, in which case I think
22 that briefing schedule might have to be pushed back.
23       THE COURT:  I was surprised that you agreed to
24 responsive papers by June 13th.  If you want discovery in
25 connection with the preliminary injunction, the results of that
             SOUTHERN DISTRICT REPORTERS, P.C.
                  (212) 805-0300

11

864rpurc
1  discovery should be put in the papers.
2        MR. HERZFELD:  Judge, I'll withdraw the request.  We'd
3  rather get a prompt determination by you than have the ability
                  Page 5

```
 4    to inspect the facility.
 5         THE COURT:  OK.  So the parties don't want discovery.
 6    Let me know in the papers whether you want an evidentiary
 7    hearing, how long you expect the evidentiary hearing to take,
 8    who the witnesses are that you intend to call at the
 9    evidentiary hearing.  I will attempt to reschedule it.
10         MR. SCHNAPP:  Your Honor, may I address one other
11    issue?
12         THE COURT: Sure.
13         MR. SCHNAPP:  I think in our preliminary letter to the
14    Court and in our letter on Monday we addressed the fact that
15    the majority of counsel's papers as they occurred in the state
16    court action -- again, obviously, they may supplement them --
17    but as they currently exist, they cite to and actually include
18    as exhibits a total of 33 emails.
19         We reviewed those emails, and it appears that 23 of
20    those emails were either attorney-client privileged or they
21    were essentially stolen.  By that I mean that we believe that
22    plaintiff's owner or someone working on her behalf hacked into
23    a computer and went into our client's personal email accounts
24    and took these emails and have now presented them with their
25    papers.
```

```
      864rpurc
 1         We ask the Court in the letter that some way somehow
 2    this be addressed so that we are not forced to have to confront
 3    these allegations based upon stolen privileged emails.
 4         THE COURT:  Mr. Herzfeld?
 5         MR. HERZFELD:  First of all, the fact that it's an
 6    attorney-client communication doesn't necessarily mean it's
 7    privileged.  What happened here is Pure Power had a firm
 8    policy, employee policy, against using email on firm premises,
 9    using the firm computer, which was located in my client's
10    office.  The defendants apparently ignored that policy and used
11    the computer.  Those are for the most part the emails which my
12    client has recovered.
13         In addition, other emails were recovered because the
14    defendants actually gave my client, or an employee of my
15    client, their password.  That's how those were accessed.
16    Finally, in terms of attorney-client communications, a number
17    of those emails reflect the sharing of those communications
18    with third parties, which would also break the privilege.
19         So I think there are a number of issues that are going
20    to be before this Court, whether my client rightfully accessed
21    them.  It is at least the New York State court that
22    specifically provides that you lose the expectation of privacy
23    where your employer has a specific policy prohibiting emails
24    and you ignore that policy.  Scott v. Beth Israel.  I think it
25    is actually recited in their responding letter.
```

```
      864rpurc
 1         So you have whether or not the defendants waived any
 2    rights with respect to those emails, all of which were housed
 3    on my client's computer, and whether or not they actually
 4    shared advice with a third party, which would also waive
 5    attorney-client communications.  And my client advises me that
 6    apart from verbally sharing their password, they actually left
 7    it on the computer.
 8         THE COURT:  I'm sorry?
 9         MR. HERZFELD:  In addition to verbally sharing their
```

```
10   password with a Pure Power employee, they actually left the
11   password on the Pure Power computer.
12          MR. SCHNAPP:  Your Honor, I think, if anything,
13   putting aside the issue of whether or not that password was
14   given to plaintiff's owner, it does appear then that in fact
15   they hacked into the computer in one way, shape, or form using
16   a password that I highly doubt that anyone willingly supplied.
17   In addition, you have just heard in fact that there are
18   communications to attorneys.
19          whether or not there was a waiver, I think that's an
20   issue that probably should be addressed.  Certainly, as I said,
21   the majority of these emails that we are talking about now form
22   the basis of their complaint and the motion as it occurred in
23   state court.
24          MR. HERZFELD:  Just so the Court is aware, to address
25   the quote-unquote hacking, these were emails that were for the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```
                                                                    14
```
 1   most part housed in the Pure Power computer.
 2          MR. SCHNAPP:  On personal email accounts, your Honor.
 3          MR. FREEDBERG:  Your Honor, if I may.
 4          THE COURT:  No.  Rules apply equal to both sides.  You
 5   remind me that I asked Mr. Herzfeld's colleague not to
 6   interrupt a conversation between myself and Mr. Herzfeld.  I
 7   wanted to go back to his colleague to ask her if she wanted to
 8   say something that I prevented from before.
 9          MS. DOUGLASS:  I just wanted to say, and I think
10   you've covered it, Judge Friedman said we would have complete
11   access to photograph and view the premises, and it was my
12   understanding that counsel refused to allow them in and the
13   owners of the Warrior Boot Camp barred them from entering.
14          THE COURT:  If the judge in the state court had given
15   you that right, I'm not going to prevent that right.  You're
16   welcome to exercise whatever right the judge in the state court
17   has already given you with respect to photographing or anything
18   else.
19          Certainly the judge in the state court said to return
20   certain materials.  I understand from the papers the defendant
21   has done that.  If the defendant hasn't complied with another
22   order of the state court, it's still an order that's out there.
23   Mr. Schnapp, you shouldn't be interfering with an order of the
24   state court.
25          MR. SCHNAPP:  Your Honor, to begin with, we have
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```
                                                                    15
```
 1   returned everything.  Secondly --
 2          THE COURT:  I'm sorry?  You have?
 3          MR. SCHNAPP:  Yes.  Everything has been returned.
 4   Let's put it this way:  We have lived by the letter of what the
 5   state court has told us.  We are aware that there is an
 6   outstanding order.  We have every intent to live up to it.
 7          I don't know what prior counsel did with respect to
 8   entering into the premises.  Again, we don't object to that.
 9   The state court may have ordered it, and we're not here to
10   object to it.  We'd only ask that in the event that is going to
11   occur, that brings us back into what we just talked about a few
12   minutes ago, as I understood it, that they are now going to be
13   taking discovery, and they just seemed to have waived that.  So
14   I'm a little confused.
15          THE COURT:  Did the state court specify the conditions
```
                          Page 7

```
16   under which the photographing would occur?
17           MR. HERZFELD:  It was less than clear.  Someone asked
18   about supervision.  If you read the transcript, it almost looks
19   like it's asking the court to supervise, which I can't imagine
20   was the case.  I suspect they were looking for attorney
21   supervision of what was taking place.  But I wasn't there.
22   Maybe Ms. Douglass can add to that.
23           MS. DOUGLASS:  It was a very disjointed conversation.
24   Judge Friedman was sort of like out the door and talking over
25   her shoulder, which is why perhaps the transcript doesn't read
```
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                    16
     864rpurc
```
 1   as well as it might.  She basically just said change
 2   everything, you know what you're supposed to do, and come back
 3   in two weeks and I want to hear about it.
 4           She didn't specify.  Obviously, I think if you were to
 5   come announced, maybe there would be ballet classes or swimming
 6   going on there, I don't know.  She didn't say.  She simply said
 7   change it and you can go and take pictures, photographs.
 8           I've seen the Pure Power Boot Camp facility, I have
 9   not seen the Warrior Fitness one.  But the nature of the
10   facility would obviously lend itself better to a video view
11   than still photography.  But she did not specify.
12           THE COURT:  Thank you.
13           MR. HERZFELD:  To follow up, if I may, on the other
14   aspect of the judge's order?
15           THE COURT:  All right.
16           MR. HERZFELD:  Mr. Schnapp I think chose his words
17   carefully.  What the judge ordered, unfortunately, was return
18   of physical copies of customer lists.  As far as I know, they
19   were returned.  She didn't say anything about electronic
20   copies.  She didn't address the fact that, unfortunately, the
21   well has already been poisoned by the mass email to all of
22   these people already.  So all she did was say return the
23   physical copies and that's the way it was left.
24           If the Court is of a mind to broaden that order, we
25   think it is appropriate and would certainly appreciate that.
```
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                    17
     864rpurc
```
 1           THE COURT:  No, I'm not going to broaden the order.  I
 2   can tell you what I'm going to do because it's related to the
 3   issue of the emails.  Also, I didn't want to cut off -- Mr.
 4   Schnapp, your colleague wanted to tell me something.
 5           MR. FREEDBERG:  Thank you, your Honor.  I just wanted
 6   to address the fact that the emails were housed on the
 7   plaintiff's computers.  I don't see how that is possible in any
 8   way, shape, or form, considering that a majority of the emails
 9   were taken after our clients had already left the employ of
10   plaintiffs.  So the mails could not have been written or
11   drafted or reviewed.
12           THE COURT:  How do you suggest they got them?
13           MR. FREEDBERG:  By somehow surreptitiously getting our
14   client's password or otherwise.  Frankly, I'm not sure how they
15   got them.  That's an issue that we expect will certainly come
16   out at some point mitigates proceeding.  Our client Mr. Fell
17   left plaintiff's employ, I believe it was March 16th, 2008, and
18   the majority of the emails were taken from March 17th and
19   beyond, well into May.  For them to make that claim is . . . .
20           THE COURT:  Some of the emails, the representation is,
21   had been given to third parties, they were copied, and that
```
                              Page 8

```
22  your client gave them to third party, which would waive the
23  privilege.
24          MR. FREEDBERG:  I'm not even talking about the
25  privilege issue for this matter, your Honor.  Just to address
```

                                                                    18
```
864rpurc
1   the point of how they got the emails in the first place.  The
2   fact is that most of the emails were between the co-defendants,
3   Mr. Fell and Ms. Lee.  So they were actually between parties.
4           THE COURT:  Thank you.  It's clear to me that I should
5   do two things.  First, the instinct of the state court was to
6   see if it can't be resolved.  I will send you to the magistrate
7   judge to see if it can be resolved.  I've given you the
8   schedule for the preliminary injunction.  I'll refer you to the
9   magistrate judge for the possibility of settlement, and I'll
10  refer it to the magistrate judge for general pretrial,
11  including, obviously, discovery.
12          The preliminary injunction I retain because it's a
13  dispositive motion, I believe.  I'll so I'll hear the
14  preliminary injunction.
15          Discovery disputes, including whether to have
16  photographing, under what conditions, and whether there should
17  be any protective order with respect to the emails and sorting
18  through the claims of privilege I will give to Magistrate Judge
19  Katz.  That should also expedite things.  You can talk to the
20  magistrate judge about the discovery disputes.
21          If it were necessary to adjourn any of the dates for
22  the preliminary injunction because of developments on discovery
23  or settlement, I would be prepared to adjourn the dates on the
24  preliminary injunction.  But based on the what the parties have
25  told me now, they don't want me to adjourn the dates.  I'll
```

                                                                    19
```
864rpurc
1   keep those dates and ask Magistrate Judge Katz to see you as
2   soon as possible on the issues of settlement and discovery.
3           MR. SCHNAPP:  Your Honor, I would only ask that if now
4   the discovery issues will be before the magistrate and we will
5   be making an application in some way, shape, or form to prevent
6   plaintiffs from putting those into their papers, I wonder if it
7   doesn't make sense, even if we had to go through those dates,
8   to perhaps push them back so there is an opportunity to address
9   those issues prior to us briefing the motion.
10          MR. HERZFELD:  Judge, I don't see why all of this
11  can't be folded into the motion itself and resolved by the
12  Court in one fell swoop.
13          THE COURT:  Perhaps.  But if it could be resolved
14  before then, it would be certainly preferable.  I'll adjourn
15  the schedule slightly.  Supplemental papers are due June 6th,
16  responsive papers due June 20th, reply papers June 27th,
17  hearing July 10 at 4:00 p.m.
18          MR. HERZFELD:  Judge, my only concern with that, and
19  obviously your Honor makes the schedule, is the longer we wait,
20  the more damage my client suffers.  They already, as I
21  indicated, took the client list, mass emailed the clients.
22  Every day she loses more clients.
23          We believe there is significant merit to her position.
24  If it's based on the client list alone, the noncompete which
25  they admit had been signed, the trade dress, any number of the
```

20

864rpurc
1  issues would give rise to injunctive relief on my client's
2  part, and we request, as I indicated, as prompt a hearing on
3  this as possible.
4            THE COURT:  It makes sense to attempt to resolve it
5  before the magistrate judge.  The defendant at least has a fair
6  position that the need for such expediency was not viewed as so
7  great that the state court thought that it was sufficient for a
8  temporary restraining order.
9            Whether the state court intended to be commenting on
10 the preliminary injunction, it's crystal clear that the state
11 court dissolved the temporary restraining order and so did not
12 find the matter to be of such urgency that it required a
13 decision from the state court pending a decision on any motion
14 for preliminary injunction.
15           I adjourned the schedule from June 26th for the
16 hearing to July 10th, not a substantial adjournment.  The
17 schedule for the preliminary injunction is a very reasonable
18 and prompt schedule.  I will send out the reference to the
19 magistrate judge instantly, today.  If you don't hear from the
20 magistrate judge, although I expect you will, you're welcome to
21 call the magistrate judge and ask to set up a conference with
22 the magistrate judge.
23           MR. SCHNAPP:  Thank you, your Honor.
24           Judge, just one other loose end.  The file in state
25 court was under seal because there is proprietary information
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

21

864rpurc
1  and trade secrets.  We would request that this Court continue
2  that.
3            THE COURT:  Tell me, do you know what the status is
4  right now of the file in our court?
5            MR. HERZFELD:  No, I don't.  Sorry.
6            THE COURT:  The docket sheet reflects the notice of
7  removal and attachments.  I suspect it's not under seal.
8            MR. HERZFELD:  I don't believe those attachments
9  included the exhibits.
10           MR. SCHNAPP:  They did not, your Honor.
11           THE COURT:  The issue of sealing raises questions
12 under the First Amendment.  The practice is that only so much
13 of the record should be sealed as is necessary.  The question
14 would be what papers are there associated with the filings that
15 need to be separately filed under seal.  Any other papers
16 should be filed not under seal.
17           You're welcome to look at whatever the filings have
18 been so far.  If it's necessary to say that there are any
19 portion of those filings that should be removed from the public
20 record and filed separately under seal, let either the clerk's
21 office or my deputy know and submit an order that says these
22 documents should be removed from the public file and filed
23 under seal and give me the good cause for doing that:  That it
24 contains proprietary information, confidential proprietary
25 information, it really should be an affidavit indicating that
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

22

864rpurc
1  these are the records to be removed and filed separately under
2  seal.  Subsequently, file what you can publicly and file
3  separately what you want under seal because it contains
4  confidential proprietary information.
                      Page 10

```
 5              MR. HERZFELD:  Thank you.
 6              THE COURT:  Anything else?
 7              MR. SCHNAPP:  Not from the defendants, your Honor.
 8              THE COURT:  Am I correct that there's no reason for me
 9    to give you a full scheduling order at this point for
10    completion of discovery and the like until I decide the
11    preliminary injunction motion?
12              MR. HERZFELD:  I think that would be correct, Judge.
13              MR. SCHNAPP:  I think that's correct as well, your
14    Honor.
15              THE COURT:  Anything else that I can do for you?
16              MR. HERZFELD:  No.  Thank you, Judge.
17              MR. SCHNAPP:  No.  Thank you, your Honor.
18              (Adjourned)
19
20
21
22
23
24
25
```

**EXHIBIT G**

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/10/08

# MEMO ENDORSED



**Fox Rothschild LLP**
ATTORNEYS AT LAW

100 Park Avenue, Suite 1500
New York, NY 10017
Tel 212.878.7900 Fax 212.692.0940
www.foxrothschild.com

Daniel A. Schnapp
Direct Dial: (212) 878-7960
Email Address: dschnapp@foxrothschild.com

June 9, 2008

*The defendants should respond to all of the allegations. If the allegations are contradictory, the defendants can point that out. If the defendants need more time, they should ask for that.*

*So ordered.*

*6/9/08*

*JGK*

*U.S.D.J.*

**VIA FAX (212) 805-7912**
Hon. John G. Koeltl
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:    **Pure Power Boot Camp, et al. v. Warrior Fitness, et al.**
       **08 Civ. 4810 (JGK)**

Your Honor:

This firm represents Defendants in the above-referenced action. We write to respectfully request clarification from the Court as to which set of Plaintiff's motion papers and affidavits Defendants are required to respond to by June 20, 2008.

As the Court may recall from the conference that took place before Your Honor on June 6, 2008, Plaintiffs initially commenced this action in State Court by filing a Memorandum of Law and an Affidavit from Lauren Brenner (the owner of Pure Power Boot Camp), among other affidavits, in support of their Motion for a Preliminary Injunction. Defendants then removed the case to this Court.

During the June 6 conference, Plaintiffs requested permission to supplement their papers and the Court granted this request. Unfortunately, however, Plaintiffs did not merely supplement their papers but instead attempted to file a second memorandum of law (raising new arguments) and a new affidavit of Lauren Brenner ("Brenner Aff. II"). Plaintiffs also filed new affidavits from Denise Parker and Elizabeth Lorenzi.[1] (Plaintiffs did not properly file the papers through the ECF system but did properly serve defendants with the new papers and have been directed by the Clerk of Court to re-file them through the ECF system).

---

[1] Defendants do not dispute the propriety of the filing of the Parker and Lorenzi affidavits even though they contain alleged facts that, despite pre-dating Plaintiffs' motion before the state court, were not raised at that time.

A Pennsylvania Limited Liability Partnership

California      Delaware      Florida      Nevada      New Jersey      New York      Pennsylvania



**Fox Rothschild** LLP
ATTORNEYS AT LAW

Hon. John G. Koeltl
June 9, 2008
Page 2

Defendants will be unduly prejudiced by responding to both of Plaintiffs' memoranda of law and Brenner affidavits because the "supplemental" filings raise new issues of fact and law and, in fact, consistently contradict the original filings.[2]  For example, Brenner admits in her "supplemental" affidavit that her alleged covenant not to compete is unenforceable as drafted since it is "excessive" and that the Court should "reduce" the restrictive covenant. *See* Brenner Aff. II at ¶¶30-31.  This is inconsistent with the factual allegations set forth in the first Brenner affidavit.

In addition, the respective filings seek *contradictory* relief.  For example, Plaintiff's proposed order for a preliminary injunction in the state court proceeding seeks, among other things, to prevent Defendants from opening their gym, launching their website, advertising, recruiting any employees, or utilizing any client lists or other allegedly proprietary documents (which have been, by Plaintiffs' admission in ¶21 of the Brenner Aff. II, returned). (A copy of the proposed order is annexed hereto as Exhibit "A").

In contrast, Plaintiffs' "supplemental" motion asks this Court for "immediate injunctive relief prohibiting Warrior Fitness' operation, or at least the servicing of [Pure Power's] clients." *See* Brenner Aff. II at ¶44.  In light of Justice Freedman's May 8, 2008 Order *allowing* Warrior to open and operate, Plaintiffs are now moving the target and asking this Court to take the extraordinary step of shutting down defendants' ongoing business operation.  On the other hand, since Plaintiffs now concede that they will be satisfied if the Court only directs defendants to stop the alleged "servicing of [Pure Power's] clients," then Plaintiffs have *admittedly* suffered no irreparable harm as a result of any alleged trade dress violation and Defendants should not be forced to have to oppose Plaintiffs on this point—as it is moot.

Accordingly, Defendants respectfully request that: (1) in light of Plaintiffs' contradictory and excessive filings, Defendants be directed to respond only to Plaintiffs' "supplemental" memorandum of law, "supplemental" Brenner affidavit, and the new Parker and Lorenzi affidavits; and that (2) the issues before the Court be limited to solely the parameters of a new restrictive covenant and whether defendants are wrongly "servicing" Pure Power's clients.

---

[2] The memorandums of law, taken together, also exceed the Court's 25 page limit.



**Fox Rothschild** LLP
ATTORNEYS AT LAW

Hon. John G. Koeltl
June 9, 2008
Page 3

We thank the Court for its attention to these matters.

Respectfully submitted,

Daniel A. Schnapp

Enc.

cc:    Richard L. Herzfeld, Esq.

**EXHIBIT H**

Alex Fell
↓



Rueben Belliard
↓



## **EXHIBIT I**



# Fox Rothschild LLP
### ATTORNEYS AT LAW

100 Park Avenue, Suite 1500
New York, NY 10017
Tel 212.878.7900  Fax 212.692.0940
www.foxrothschild.com

Daniel A. Schnapp
Direct Dial: (212) 878-7960
Email Address: dschnapp@foxrothschild.com

June 24, 2008

***VIA FACSIMILE: (212) 986-5316***
***AND EMAIL: bhmllp@aol.com***
Richard L. Herzfeld, Esq.
Bahn, Herzfeld & Multer, LLP
555 Fifth Avenue
New York, NY 10017

**Re:    Pure Power Boot Camp, et al. v. Warrior Fitness, *et al.***
**08 Civ. 4810 (JGK) (THK)**

Dear Mr. Herzfeld:

As you know, this firm represents defendants in the above-referenced action.

Our clients have advised us that Pure Power Boot Camp and its principals are using, without authorization, the likenesses of Ruben Belliard and Alex Fell on Pure Power Boot Camp's website and in Pure Power's advertising on city buses. Such unauthorized use constitutes, at a minimum, a violation of New York Civil Rights Law § 51.

As a result, Pure Power Boot Camp and its principals are hereby directed to **CEASE & DESIST** from the continued use of these likenesses.

In addition, defendants reserve all rights, including without limitation, the right to assert counterclaims in the captioned litigation and all monetary and exemplary damages and equitable remedies to which defendants are entitled.

A Pennsylvania Limited Liability Partnership

California        Delaware        Florida        Nevada        New Jersey        New York        Pennsylvania



**Fox Rothschild** LLP
ATTORNEYS AT LAW

Richard L. Herzfeld, Esq.
June 24, 2008
Page 2

This communication is without prejudice.

Please be guided accordingly.

Sincerely,

Daniel A. Schnapp

cc:    Alex Feil
       Ruben Belliard

NY1 154093v1 06/23/08