UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

PURE POWER BOOT CAMP, INC.,
PURE POWER BOOT CAMP FRANCHISING      AFFIDAVIT OF LAUREN
CORPORATION, and PURE POWER BOOT     BRENNER IN OPPOSITION TO
CAMP JERICHO INC.,     MOTION TO PRECLUDE EMAILS
    Index No.: 08 CV 4810 (JGK)(THK)

               Plaintiffs

         -against-

WARRIOR FITNESS BOOT CAMP, LLC,
ALEXANDER KENNETH FELL a/k/a ALEX
FELL, Individually; RUBEN DARIO BELLIARD
a/k/a RUBEN BELLIARD, Individually;
JENNIFER J. LEE Individually; and NANCY
BAYNARD, Individually,

             Defendants.
----------------------------------------------------------------x

STATE OF NEW YORK :

            s.s.:

COUNTY OF NEW YORK:

     LAUREN BRENNER, being duly sworn, deposes and says:

     1.     I am the president of each of the plaintiffs and make this affidavit in opposition to the instant motion by defendants to preclude the use of the emails attached to my motion for a preliminary injunction.

1

2. As set forth prior in my prior supplemental affidavit in support of the motion for injunctive relief, we have two computers at Pure Power. One is on the front desk to be used only by my two assistants on their shifts, and the other one is in my private office to be used only by me.

3. In fact we have a specific employee manual (Exhibit 1 to my supplemental affidavit), which prohibits the use of company computers for personal purposes. It specifically advises the employees that emails will be retrieved in the company's discretion and that employees have no right of privacy for such emails.

4. For the period from July, 2007 until they implemented their plan in April, 2008, defendants Belliard and Fell, along with their accomplice girlfriends, defendants Lee and Baynard, plotted to steal away my business.

5. While Belliard and Fell were employed by me, they established a competing business, looked for and leased space, purchased equipment, imitated my trade dress, stole our business plan, our customer forms and our customer list from Pure Power's computer and then solicited and stole our customers.

6. When they downloaded my client base, they would have obtained client credit card information and health related notes as well.

7. In addition, Belliard stole his personnel file and as well as the general drill instructor file, then shredded his employment/non-compete agreement; although Carolyn Richmond, a partner at defendants' present counsel, Fox Rothschild, knew of the non-compete (see Exhibit BB to my original affidavit in support of the preliminary injunction sworn to May 5, 2008 and email 28 of defendants Exhibit 1 to this motion), after the shredding, she wrote to my then counsel and asserted

that neither Belliard nor Fell were subject to restrictive agreements (See Exhibit B to the affirmation of Andrew Calcagno in support of the original order to show cause).

8. I am advised that defendants' conduct is not only in violation of their obligations to Pure Power as employees, the theft of Pure Power computer files (the customer lists included customer credit card information) is a criminal act as well.

9. Not surprisingly, as the e-mails attached to the motion for preliminary injunctive relief document defendants' malfeasance, they wish to suppress the evidence. To do so, Fell does not deny his use of Pure Power's computer, but claims that he neither received or sent the subject e-mails from Pure Power. Significantly, Belliard, who shredded his non-compete, offers no affidavit to support defendants' claims.

10. So the court is clear, Fell does not deny using Pure Power computers. In opposition to the original motion in state court, defendants were apparently represented briefly by Chadbourne and Park. The sole position taken by defendants at that time is that the emails should be suppressed, a position taken by letter dated May 8, 2008 ( Exhibit A hereto).

11. In that letter counsel specifically states, " Mr. Fell does not dispute the possibility that while an employee of Pure Power Boot Camp, he may have accessed that account from the computer in Ms. Brenner's gym", contending only that there was an expectation of privacy. This was reiterated during the state court conference at p. 26-27 (Exhibit B to the Schnapp declaration in opposition to the preliminary injunction), at which time counsel acknowledged that Fell accessed his account while at Pure Power.

12. Indeed, as set forth in the affidavit of Elizabeth Lorenzi, submitted herewith, Fell used

the computer often.

13. As such, when my assistant Elizabeth Lorenzi attempted to access Hotmail on the computer outside my office in late April, 2008, it immediately opened to a page which had Fell's username and password saved and on display. As I understand it, this is accomplished by an option provided by Hotmail and other e-mail providers which allows the user to save the username and password for ease of use and could only occur if Fell had accessed his hotmail account from my computer, and as set forth in my assistant's affidavit, he used the computer often.

14. Given his improper use of Pure Power computers, his voluntary storage of his username and password, and his criminal and civil misconduct, I do not believe it should matter whether the specific emails in issue were sent from Pure Power or not. If it is an issue, the claim should be rejected. Given his use of Pure Power computers and the period of time and number of emails in issue, it would be impossible for him to state with certainty where each email had been sent from and as far as receipt, he would not receive an email in any computer. It would go into the account he voluntarily provided access to and accessed from any location at all. Moreover, since he is in control of the information necessary to substantiate his claim, absent affirmative proof as to where and when each email originated, his self-serving claim should be rejected.

15. To the extent there is any credibility contest, the court should keep in mind defendants' deceitful, criminal conduct in the 9 months prior to their leaving Pure Power and the misrepresentations in this action.

16. Regarding the misrepresentations, as indicated, on March 31st, Belliard barged his way into my office, where he was not allowed to be, over my assistant's objection. On the 25th,

defendants had a client list of 88 with no telephone numbers (other than their own) and two e-mail addresses. See Exhibit U to my original affidavit in support of the motion for a preliminary injunction sworn to May 5, 2008, and e-mail 19 on defendant's Exhibit 1).

17.     Within my computer was a comprehensive list of Pure Power clients and included names, telephone numbers, e-mail information, credit card, health information and oftentimes, the nature of the services subscribed to by the clients.

18.     Six days later on the evening of March 31st, the very evening that Belliard was alone in my office without permission, the e-mail list expanded to 321 Pure Power clients virtually all of whom had their e-mail addresses included. See Exhibit X to my May 5th affidavit and e-mail 21 to defendant's Exhibit 1. Although defendants claim the expansion was from personal contact information, in the cover email from Lee on the 31st, she states, "I just updated our party list (w/a VERY DEAR FRIEND OF OUR'S additions)(Exhibit X). Thus it is clear that this was not their personal contact information and I firmly believe that this was a sarcastic reference to the fact that they took the clients from my database.

19.     Defendants also claim no solicitation of clients took place while Fell and Belliard were employed or at any time thererafter. Apart from the mass emailing which refute their claim (Exhibit DD and EE to my original a affidavit), even more telling is the "friends" list (Exhbiti U). It has 6 lettered columns and F and G clearly reflect ongoing solicitation as of March 25th while Belliard was still employed; given the breadth of solicitation, it undoubtedly was going on for some time.

20.     As such, the court should evaluate credibility bearing in mind that defendants will say

5

whatever it takes to avoid liability.

21.  I am advised by my assistants that there are many occasions when I was not present and defendants improperly used my computers without my knowledge or consent and in violation of our policy.

22.  As set forth in my assistant's affidavit, the e-mail account was discovered toward the end of April It was only at that juncture that I first learned of defendants' pervasive conspiracy. At no time was I able (or would I even know how) to access emails while they were made. Anything I accessed was after the fact.

23.  In seeking suppression of these damning emails, defendants apparently suggest that with the knowledge of their ongoing illegal and immoral activity, I should have turned a blind eye to this evidence and allowed them to pillage my company. Clearly I was not about to sit by idly and allow that to happen.

24.  Defendants also contend my prior explanation for access to Fell's email address is inconsistent with the foregoing because my attorney stated during a court conference that a password had been given to my employee.

25.  Defendants are mistaken. I have consistently explained that access was because the user name and password were saved in my computer and appeared as soon as hotmail was accessed. (Exhibit B to the Schnapp declaration in opposition to the preliminary injunction, p. 19).

26.  In fact, if one reads the colloquy before Judge Koetl which defendants point to, my

attorney said that most emails had been recovered due to illicit use of the computers.. That would be the emails discussed above.

27. Counsel added that in addition to the illicit use which led to the recovery of most of the emails, an email password had been given by Fell to my assistant, Elizabeth Lorenzi to check the status of an ebay sale.

28. I believed at the time I accessed the emails, and continue to believe now that the emails were legitimately secured, by reason of Fell's use of the computer in violation of firm policy, the firm policy which alerted employees that their emails would be scrutinized and by reason of the criminal conduct and civil malfeasance by defendants. I continue to believe the access was proper.

29. Should this court conclude otherwise, it is my understanding that the court must still weigh the equities to determine what should be done. Given the actions of defendants, with Fell and Belliard as faithless employees, setting up a competing business, stealing corporate papers, including our business plan, operations manual and startup manual, and even the first chapter of my book, the drill instructors file and Belliard's personnel file, stealing our customer lists with credit card information, and using their girlfriends as spies to "convert" Pure Power clients (see Lee email dated April 18, 2008, Exhibit AA to my affidavit and email 27 to defendants exhibit 1), the spoliation of evidence by stealing and shredding Belliard's non-compete agreement, any access to the emails which this court feels was not proper pales in significance and is certainly justified by the immoral and illegal attack on my business. I f the court does wieg the equities, I request that it review my affidavit, supplemental affidavit and reply affidavit submitted in conjunction with the motion for injunctive relief to see the full extent of defendants' malfeasance.

31.  Defendants' motion should be denied.

*LAUREN BRENNER*

LAUREN BRENNER

Sworn and subscribed to before
me this 10 day of July, 2008

NOTARY PUBLIC

*Nicole Georgiafentis*
Nicole Georgiafentis
Notary Public, State of New York
No. 01GE6150326
Qualified in Nassau County
My Commission Expire 07/24/2010

8

# CHADBOURNE & PARKE LLP

30 Rockefeller Plaza, New York, NY 10112
tel 212 408-5100 fax 212 541 5369

Lawrence E. Buterman
direct tel (212) 408-5209  fax (646) 710-5209
lbuterman@chadbourne.com

May 8, 2008

The Honorable Helen E. Freedman
New York State Supreme Court
Commercial Division
New York County Courthouse
60 Centre Street, Room 609
New York, New York 10007

Re: <u>Pure Power Boot Camp, Inc., v. Warrior Fitness Boot Camp, LLC</u>

Dear Justice Freedman:

We represent defendants in the above-entitled action concerning plaintiffs' attempt to prohibit two former marines from opening a gym in Manhattan. I write in response to Mr. Andrew John Calcagno's letter of May 7, 2008.

Yesterday morning[1], defendants received a copy of plaintiffs' papers in support of their Order to Show Cause For Preliminary Injunction With Temporary Restraints. Upon reviewing the papers, defendants were shocked to see that Ms. Lauren Brenner's Affidavit, and plaintiffs' papers as a whole, rely primarily upon over 20 separate email chains from my clients' personal email accounts. It is unclear how Ms. Brenner (and more troublingly, Mr. Calcagno) obtained access to my clients' personal emails; however, each of my clients will testify under oath that they never provided Ms. Brenner with the passwords to their personal accounts or with permission to access those accounts. As explained below, Ms. Brenner's and Mr. Calcagno's actions raise serious potential criminal and ethical issue and mandate the immediate dismissal of this action with prejudice.

---

[1] Despite filing plaintiffs' papers on Tuesday, May 6, 2008, and in direct contravention of 22 N.Y.C.R.R. 202.8(c), counsel did not immediately serve defendants with the papers supporting its Motion for an Order to Show Cause for Preliminary Injunction With Temporary Restraints, but rather placed those papers in overnight Federal Express so that defendants would not receive them until the morning of Wednesday May 7th – 27 hours before the hearing.

**CHADBOURNE
& PARKE LLP**

The Honorable Helen E. Freedman      -2-      May 8, 2008

      Mr. Fell has several personal email accounts, including his primary account of kappamarine@hotmail.com. This account is the email that Mr. Fell used (until yesterday) primarily to communicate regarding business matters, personal matters, and legal matters. Mr. Fell does not dispute the possibility that, while an employee of Pure Power Boot Camp, Inc. ("Pure Power"), he may have accessed that account from the computer in Ms. Brenner's gym. However, Mr. Fell at all times had a reasonable expectation of privacy that his emails would not be reviewed by Ms. Brenner.[2] Moreover, the third-parties with which Mr. Fell communicated also had an expectation of privacy that their electronic communications were private. Indeed, at no time did Ms. Brenner suggest to Mr. Fell that either she or any other employee of Pure Power might access his emails – no less personal emails – and there exists no document that informs him otherwise.

      Putting aside the legal issue of whether Ms. Brenner had a right to review emails sent from Mr. Fell's email account using Ms. Brenner's computer[3], there can be no dispute that Ms. Brenner did not have a legal right to review Mr. Fell's emails from that account that were not sent using her computers. Yet, on their face, several of the emails contained in Ms. Brenner's affidavit could not have been sent from Ms. Brenner's computer, but rather were sent from a personal handheld blackberry device (See, e.g., Brenner Affidavit Ex. W ("sent from my Blackberry wireless handheld")) and at hours Mr. Fell was not at Pure Power (see, e.g., Ex. M. (Thu 2/28/08 3:35 AM")). Moreover, plaintiffs' papers rely on no less than 15 emails from Mr. Fell's various email accounts that postdate Mr. Fell's termination date of

---

[2] C.P.L.R. 4548 provides that parties to a privileged relationship who communicate by email have a reasonable expectation of privacy. Scott v. Beth Israel Medical Center Inc., 847 N.Y.S.2d 436, 440 (Sup. Ct. 2007).

[3] The attorney-client privilege may not protect email communications transmitted through an employer's email server from an employee to his outside counsel where the employer has an email policy prohibiting personal use. Beth Israel, 847 N.Y.S.2d at 440-41 (emphasizing that the existence of the "no personal use" policy was "critical" to the court's holding that emails sent on an employer's email server from an employee to his counsel were not protected by the attorney-client privilege). However, where the employer does not have a "no personal use" policy, where the employee does not use his employer's email server, and where the employee does not use his employer's computers to transmit attorney-client privileged emails, Beth Israel is not instructive. See id.

CHADBOURNE
& PARKE LLP

The Honorable Helen E. Freedman        -3-                    May 8, 2008

March 16, 2008. In other words, from the face of Ms. Brenner's affidavit, it is clear that she was accessing and monitoring Mr. Fell's personal email accounts surreptitiously – and under a false identity – even when she could not have had any legitimate reason for doing so.[4] Indeed, two of the accounts that Ms. Brenner accessed were kappamarine@gmail.com (an alternate personal email address) and alex@warriorfitnessbootcamp.com (Mr. Fell's current business email)—email accounts that were not actively being used until Mr. Fell was terminated from Pre Power Boot Camp. (See, e.g., Brenner Affidavit Exs. CC & FF.) Even more troubling is the fact that Ms. Brenner was accessing those emails after she became aware of the possibility of litigation – and that Mr. Fell was represented by counsel – up to at least this past Friday. (See, e.g., Brenner Affidavit Ex. HH.)

This is where the matter becomes extremely problematic. Ms. Brenner was informed on April 1, 2008, that Carolyn D. Richmond, Esq., of the firm Fox Rothschild LLP was representing Mr. Fell. (A copy of which is attached here at tab A to this letter.) Nonetheless, Ms. Brenner has attached as Exhibit BB to her affidavit an April 16, 2008 email chain from between Ms. Richmond (from her Fox Rothschild email address) and Mr. Fell. The email chain clearly shows that Ms. Richmond was Mr. Fell's attorney and contains attorney-client privileged information, legal advice and legal opinion. The second page of the email makes clear that the email contains "PRIVILEGED AND CONFIDENTIAL INFORMATION".[5] (A copy of Exhibit BB is attached here for the Court's convenience at tab B.) Because these emails were incorporated into plaintiffs' pleadings, it is clear that Ms. Brenner's counsel has had access to and reviewed all of the emails from my clients' accounts, including those that would be considered privileged and confidential and/or constitute attorney work product. Indeed, counsel had the temerity to include these surreptitiously obtained privileged and confidential communications in its pleadings and, in fact, rely upon them.[6] At no time has Mr. Fell or other defendants waived their attorney-client privileges, nor has work-product protection been waived.

---

[4] It is absurd to believe that Mr. Fell's act of using Ms. Brenner's computer to access his personal email account on one occasion gave Ms. Brenner the right to go into that personal account in perpetuity, even after she had terminated Mr. Fell.

[5] Similarly, several exhibits reflect legal advice that I gave to various defendants in this action under joint defendant arrangements.

[6] Even assuming that plaintiffs somehow could claim that the simple act of Mr. Fell checking his email from plaintiffs' computer on one occasion were to constitute a waiver

(Cont'd on following page)

**CHADBOURNE**
**& PARK LLP**

The Honorable Helen E. Freedman          -4-                    May 8, 2008

    Preliminary research and consultation has established that Ms. Brenner's actions may give rise to numerous state and federal criminal violations. That research also suggests that by knowingly reviewing and using in its pleadings knowingly illegally obtained confidential and attorney-client privileged emails, Mr. Calcagno may be subject to serious disciplinary proceedings – as well as obvious contempt of court citations.[7] Furthermore, depending on the facts and his complicity, there is a possibility that Mr. Calcagno might be subject to criminal charges as well.[8]

---

(Cont'd from preceding page)

  of his expectation of privacy in perpetuity, that does not explain Exhibit X. Exhibit X is an email from defendant Nancy Baynard to defendant Jennifer Lee. Neither Ms. Baynard nor Ms. Lee has ever accessed their emails from the computer at Pure Power Boot Camp – they were never employees. Accordingly, it appears that either Ms. Brenner or someone acting on her behalf, hacked into Ms. Baynard and/or Ms. Lee's email accounts.

[7] If an attorney receives materials that appear to be confidential or subject to the attorney-client privilege, the ABA requires that attorney to return the privileged documents. ABA Formal Opinion 92-368 (1992). ABA Formal Opinion 92-368 reads, in relevant part: "A lawyer who receives materials that on their face appear to be subject to the attorney-client privilege or otherwise confidential, under circumstances where it is clear they were not intended for the receiving lawyer, should refrain from examining the materials, notify the sending lawyer and abide the instructions of the lawyer who sent them." By violating the ABA ethical requirements, Mr. Calacagno has exposed himself to significant disciplinary action.

[8] Ms. Brenner's and counsel's actions may constitute, among other things, federal violations of the Stored Communications Act ("SCA") and "Offenses Against the Right to Privacy" under the New York penal statutes. The SCA makes it a criminal offense to "intentionally access[] without authorization a facility through which an electronic communication service is provided . . . and thereby obtain[] . . . access to a wire or electronic communication while it is in electronic storage in such system." 18 U.S.C. § 2701(a)(1). The New York penal statutes prohibit "eavesdropping," which occurs when a person "unlawfully engages in wiretapping, mechanical overhearing of a conversation, or intercepting or accessing of an electronic communication." N.Y. C.L.S. Penal § 250.05 (indicating that eavesdropping is a Class E felony). Depending on what state the emails were accessed from, federal charges may apply as well.

**CHADBOURNE**
**& PARKE LLP**

The Honorable Helen E. Freedman     -5-     May 8, 2008

      Only a full evidentiary hearing will determine whether the matter should properly be referred to the United States Attorneys' Office, the District Attorney's Office and/or the Bar. However, what is clear is that this case cannot proceed any further in this Court. This Court cannot hear argument regarding a preliminary injunction when the core of the allegations come from illegally obtained material and attorney-client privileged communications contained in the pleadings. Indeed, the fact that plaintiffs believe they can seek to invoke the equitable powers of this Court while relying on stolen documents and privileged communications shocks the conscience.

      Irrespective of the necessary striking of these papers, there is no way for this case to proceed. Mr. Calacagno and his accomplice Ms. Brenner have accessed literally dozens (if not hundreds) of privileged communications that contain both mine and Ms. Richmond's legal opinions and legal strategy.[9] (They only chose to include the ones they believed helped their cause.) Even after Mr. Calcagno and his firm are disqualified from this case, Ms. Brenner would still be present, aware of my clients' confidential information and legal strategies, and be able to benefit from her illegal activities.

      Breaking into personal email accounts, accessing personal, confidential and privileged information, choosing the documents believed to be the most damaging, and then arguing after the fact that those documents were either not illegally obtained or that privilege has been waived is not a litigation strategy. Rather, these are crimes and ethical violations. Indeed, as the court in Lipin v. Bender, a seminal New York case involving a plaintiff's improper accessing and use of defendants' confidential documents makes clear, "regardless of whether the documents were privileged, the highly improper manner in which they were obtained, combined with their subsequent use by plaintiff's counsel to defendants' detriment, constitutes a sufficient basis for [dismissing plaintiff's case with prejudice]". 193 A.D.2d 424, 428 (1st Dep't 1993). "It is not unduly harsh to expect and indeed require that civil litigants gather the information needed to prosecute or defend their actions in conformity with the applicable C.P.L.R. provisions". Id.

---

[9]    Indeed, on this past Tuesday, both before and after the brief hearing before Your Honor, I was in constant email communication with Mr. Fell on his personal email account discussing my legal strategy both with respect to the TRO as well as the preliminary injunction. Little did I know that Ms. Brenner and counsel could very well have been reading those communications as they sat across from me in the courtroom.

**CHADBOURNE**
**& PARKE LLP**

The Honorable Helen E. Freedman     -6-     May 8, 2008

       Respectfully, consistent with New York practice, defendants request that Your Honor's TRO be lifted, that the preliminary injunction be denied and that all pleadings submitted by plaintiffs be stricken and the case against my clients be dismissed with prejudice. Defendants further request that (1) Ms. Brenner, plaintiffs, plaintiffs' counsel, and anyone acting on any of their behalves, be permanently prohibited from accessing any of the personal email accounts of any of my clients or referring to information learned from those files; (2) all copies of such materials be immediately returned (not destroyed); (3) all materials used to perpetrate these actions be maintained; and (4) the caption be kept open solely so that defendants, and any aggrieved parties, may bring their claims against plaintiffs and their counsel.[10] Provided herewith at tab C is a proposed order reflecting those remedies.

                           Respectfully submitted,

                           Lawrence Buterman

cc:    Andrew John Calcagno, Esq.
       Calcagno & Associates
       213 South Avenue East
       Cranford, New Jersey 07016

---

[10]   Finally, in response to Mr. Calcagno's letter to the Court, Your Honor will take note that the basis for Mr. Calcagno's assertion that I may be a potential fact witness arises solely out of his review and attachment of several privileged and confidential emails that reflect legal advice and strategy between me and my clients. The fact that Mr. Calcagno discloses my confidential communications and then wishes to question me regarding those communications does not make me a fact witness.