UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PURE POWER BOOT CAMP, INC. PURE POWER BOOT CAMP FRANCHISING CORPORATION, and PURE POWER BOOT CAMP JERICHO INC., <br><br> Plaintiffs, <br><br> - against – <br><br> WARRIOR FITNESS BOOT CAMP, LLC; ALEXANDER KENNETH FELL a/k/a ALEX FELL, Individually; RUBEN DARIO BELLIARD a/k/a RUBEN BELLIARD, Individually; JENNIFER J. LEE, Individually; and NANCY BAYNARD, Individually, <br><br> Defendants. | **Case No. 08-cv-4810 (JGK)(THK)** <br><br> **ECF CASE** <br><br> **DECLARATION OF DANIEL A. SCHNAPP, ESQ.** |

**DANIEL A. SCHNAPP, ESQ.,** declares pursuant to 28 U.S.C. § 1746 as follows:

1.     I am an attorney at the law firm of Fox Rothschild LLP, counsel for Warrior Fitness Boot Camp, LLC, Alexander Kenneth Fell, Ruben Dario Belliard, Jennifer J. Lee and Nancy Baynard ("Defendants"). I am familiar with the facts and circumstances set forth herein.

2.     This declaration is respectfully submitted in support of Defendants' Motion to Dismiss Plaintiffs' Complaint its entirety pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP") and/or for summary judgment pursuant to FRCP 12(d).

### Background of this Lawsuit

3.     Plaintiffs commenced this action in the Supreme Court, State of New York, County of New York (the "New York Court") by filing a summons and complaint on May 5, 2008 (the "Complaint"), more than a month after Plaintiffs allege that Defendants misappropriated essential confidential and proprietary information. A copy of Plaintiffs' Complaint is annexed hereto as Exhibit "A."

4.    At the same time that they filed their Complaint, Plaintiffs requested from the New York Court a wide-ranging 11-point temporary restraining order ("TRO"). The New York Court immediately struck half of the proposed TRO.

5.    During the oral argument on the TRO, Plaintiffs' attorney conceded that Plaintiffs could not stop Defendants from operating a boot-camp. (A copy of the transcript from the hearing before the New York Court is annexed hereto as Exhibit "B.") Plaintiffs' attorney stated, "there are other boot camps in the country. They're welcome to do that. They can do their own boot camp." *See* Ex. "B," at pp. 40-41.

6.    The New York Court determined that the Plaintiffs' alleged non-compete clause was unenforceable as drafted. *See* Ex. "B," at p. 30, lines 12-25. The Court also directed that Defendants return certain allegedly confidential documents and Defendants did so. Plaintiffs have not alleged (and nor could they) that these documents have not been returned or that Defendants had the only copies of these documents.

7.    After oral argument, the New York Court dissolved the TRO in its entirety and refused to restrain Defendants from opening their business. Subsequently, Defendants removed this action to this Court.

8.    As this Court has noted, the New York Court's lack of urgency in scheduling the conference indicated that the New York Court believed that Plaintiffs bore no risk of irreparable harm and/or believed that the Plaintiffs were unlikely to succeed on the merits of their claims.

**Plaintiffs Have Admitted Their Restrictive Covenant is Unenforceable and That Their Purported Trade Dress is Not Entitled to Protection**

9.    On their Motion for a Preliminary Injunction, pending before the Court, Plaintiffs' principal, Lauren Brenner, submitted a sworn affidavit in which she concedes that Plaintiffs' purported restrictive covenant is unenforceable as drafted. *See* Supplemental Affidavit of Lauren Brenner in

NY1 300524v1 07/16/08

Support of Motion for Preliminary Injunction, annexed hereto as Exhibit "C."[1]

10. Plaintiffs have also admitted in their moving papers that they have copied their allegedly proprietary trade dress directly from the United States military. *See* Affidavit of Lauren Brenner in Support of Motion for Preliminary Injunction, annexed hereto as Exhibit "D."

11. In fact, Plaintiffs, and their attorney *admit* in sworn testimony that it is impossible to establish secondary meaning without having exclusive use of trade dress for five years and that they cannot establish this element of trade dress protection. *See* Affidavit of Susan Upton Douglass, Esq. annexed hereto as Exhibit "E" at ¶ 7.

## Plaintiffs Have Repeatedly and Publicly Disclosed Their Purportedly Confidential Information

12. Plaintiffs have repeatedly publicized the names of their clients and have, therefore, waived their right to assert that their client lists are confidential. For example, in the present federal action, Plaintiffs submitted a list of their purported client names allegedly purloined by Defendants in a letter to the Court dated May 28, 2008. Prior to submitting this letter, Plaintiffs also did not attempt to place their exhibits, which purportedly constitute the misappropriated "confidential information" under seal. A true and correct copy of Plaintiffs May 28, 2008 letter is attached hereto as Exhibit "F."

13. Moreover, Plaintiffs violated the terms of the Order to keep the court papers under seal in the New York Action by sending a mass email on May 29, 2008 to their customers. In this email, Plaintiffs, through Brenner, publicized the instant lawsuit, defamed Defendants' characters (by accusing them of theft and disloyalty), and invited hundreds of their customers to review the Court documents containing the allegedly confidential information which she stated are "public." A copy of Plaintiffs' May 29, 2008 email is attached hereto as Exhibit "G."

---

[1] For sake of brevity Defendants have only attached to this declaration copies of Plaintiffs' affidavit without copies of the exhibits. Defendants, however, respectfully refer the court to the original affidavits and hereby incorporate the exhibits to the original affidavits.

CRITICAL

14.    The New York Court also held that Plaintiffs had no proprietary rights in either the boot camp concept or in the concept of indoor obstacle courses. *See* Ex. "B," at pp. 41-44.

### Plaintiffs' Complaint Must be Dismissed in its Entirety

15.    As more fully set forth in the accompanying Memorandum of Law, Plaintiffs have failed to state any cause of action whatsoever and their Complaint should be dismissed in its entirety. In addition, this Court should treat this Motion as one for summary judgment and summarily dispose of Plaintiffs' case.

WHEREFORE, Defendants respectfully urge that the Court grant Plaintiffs' Motion in its entirety.

Dated: New York, New York
      July 15, 2008

                                                     Daniel A. Schnapp (DS 5484)

4

**EXHIBIT A**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
_____X
                                           :
PURE POWER BOOT CAMP, INC., PURE           :
POWER BOOT CAMP FRANCHISING                :
CORPORATION, and PURE POWER BOOT           :
CAMP JERICHO INC.,                         :     Index No.: 601 364/2008
                                           :
            Plaintiff(s),                  :
                                           :
            -against-                      :     **SUMMONS**
                                           :
WARRIOR FITNESS BOOT CAMP, LLC;            :
ALEXANDER KENNETH FELL a/k/a ALEX          :     Plaintiffs designate New York
FELL, Individually; RUBEN DARIO BELLIARD   :     County as the place of trial
a/k/a RUBEN BELLIARD, Individually;        :
JENNIFER J. LEE, Individually;             :     Basis of Venue:
and NANCY BAYNARD, Individually,           :     Defendant's Principal Place of
                                           :     Business
            Defendants.                    :
_____X

To the Named Defendants:

       Warrior Fitness Boot Camp, LLC
       Alexander Kenneth Fell a/k/a Alex Fell, Individually
       Ruben Dario Belliard a/k/a Ruben Belliard, Individually
       Jennifer J. Lee, Individually
       Nancy Baynard, Individually
       c/o Fox Rothschild LLP
       Carolyn D. Richmond, Esq.
       100 Park Avenue, Suite 1500
       New York, NY 10017

       **YOU ARE HEREBY SUMMONED** to answer the Complaint in this action and to serve

a copy of your answer, or, if the Complaint is not served with this summons, to serve a notice of

appearance, on the Plaintiffs' Attorney within 20 days after the service of this summons,

exclusive of the day of service (or within 30 days after the service is compete if the summons is

not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the Complaint.

Dated: May 5, 2008

CALCAGNO & ASSOCIATES
ATTORNEYS AT LAW, LLC

_____

**ANDREW JOHN CALCAGNO**
Attorney for the Plaintiffs
*Main Office*
213 South Avenue East
Cranford, NJ 07016
(908) 272-7300

*Satellite Office*
404 Manor Road
Staten Island, New York 10314
(718) 815-0200

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

———————————————————— X

| | |
|---|---|
| PURE POWER BOOT CAMP, INC., PURE POWER BOOT CAMP FRANCHISING CORPORATION, and PURE POWER BOOT CAMP JERICHO INC., : : : : | |
| Plaintiff(s), : | Index No.: |
| -against- : | **COMPLAINT** |
| WARRIOR FITNESS BOOT CAMP, LLC; ALEXANDER KENNETH FELL a/k/a ALEX FELL, Individually; RUBEN DARIO BELLIARD a/k/a RUBEN BELLIARD, Individually; JENNIFER J. LEE, Individually; and NANCY BAYNARD, Individually, : : : : : : : | |
| Defendants. : | |

———————————————————— X

Plaintiffs, Pure Power Boot Camp, Inc., Pure Power Boot Camp Franchising Corporation, and Pure Power Boot Camp Jericho Inc., by their attorneys, Calcagno & Associates Attorneys At Law LLC, complaining of Defendants, Warrior Fitness Boot Camp, LLC; Alexander Kenneth Fell a/k/a Alex Fell, Individually; Ruben Dario Belliard a/k/a Ruben Belliard, Individually; Jennifer J. Lee, Individually; and Nancy Baynard, Individually, respectfully alleges as follows:

## PARTIES

1. Plaintiff, Pure Power Boot Camp, Inc. ("Pure Power"), is a corporation organized and existing under the laws of the State of New York with its principal place of business at 38 West 21st Street, New York, NY 10010. Pure Power was previously a foreign corporation organized under the laws of the State of Delaware. Pure Power is a facility

1

specializing in the operation of the nation's only indoor obstacle/confidence course which trains civilians in a military style and positive setting. Pure Power has been in business since 2003.

2. Plaintiff, Pure Power Boot Camp Franchising Corporation ("Pure Power Franchise"), is a corporation organized and existing under the laws of the State of New York with its principal place of business at 38 West 21st Street, New York, NY 10010.

3. Plaintiff, Pure Power Boot Camp Jericho Inc. ("Pure Power Jericho"), is a corporation organized and existing under the laws of the State of New York with its principal place of business at 50 S. Service Road, Jericho, New York 11753. Pure Power Jericho is the second Pure Power facility opened specializing in the operation of the nation's only indoor obstacle/confidence course which trains civilians in a military style and positive setting. Pure Power Jericho was incorporated on November 29, 2007 and has been open for business since February 25, 2008.

4. Lauren Brenner ("Brenner") is the President/Founder of Pure Power, Pure Power Franchise and Pure Power Jericho (collectively hereinafter known as "PPBC").

5. Upon information and belief, Defendant, Warrior Fitness Boot Camp, LLC ("Warrior Fitness"), is a corporation organized and existing under the laws of the State of New York, with its principal place of business at 29 West 35th Street, 3rd Floor, New York, New York 10001. Warrior Fitness was incorporated on February 28, 2008. Warrior Fitness is a facility specializing in the operation of an indoor obstacle/confidence course and is not yet open for business.

2

6.  Upon information and belief, Defendant, Alexander Kenneth Fell a/k/a Alex Fell ("Fell"), is an individual, residing at 3205 Oxford Avenue, Apt. 8, Bronx. NY 1463.  Fell is a former employee of Pure Power and a Co-CEO/Owner of Warrior Fitness.

7.  Upon information and belief, Defendant, Ruben Dario Belliard a/k/a Ruben Belliard ("Belliard"), is an individual, residing at 201 West 83rd Street, Apt. 1D, New York, New York 10024.  Belliard is a former employee of Pure Power and a Co-CEO/Owner of Warrior Fitness.

8.  Upon information and belief, Defendant, Jennifer J. Lee, Individually ("Lee"), is an individual, residing at 55 West 26th Street, Apt. 11A, New York, New York 10010.  Lee is a former client of Pure Power, girlfriend of Fell, and a Co-CEO/Owner of Warrior Fitness.

9.  Upon information and belief, Defendant, Nancy Baynard ("Baynard"), is an individual, residing at 201 West 83rd Street, Apt. 1D, New York, New York 10024.  Baynard is a former client of Pure Power, girlfriend of Belliard, and a co-conspirator.

## STATEMENT OF FACTS

10. Brenner was a Wall Street trader and a lifelong athlete.

11. After the September 11, 2001 terrorist attacks, Brenner felt that people wanted to be part of something that inspired accountability and respect.

12. Brenner wanted to combine the things she loved the most: sports, entertainment, and business and created the concept of an indoor obstacle/confidence course boot camp.

13. She created a Business Plan ("Business Plan"), found a location for the facility and transformed that location by creating twelve obstacles.  She developed these twelve

3

obstacles with two to three different ways of achieving these obstacles for varying degrees of fitness levels.

14. The Pure Power facility walls are covered with green camouflage netting and the changing rooms are World War II tents.

15. The obstacle/confidence course flooring surface is a playground certified crushed rubber (recycled) surface and is bordered by military looking sandbags.

16. Some of the Pure Power obstacles are as follows:

> 1. Monkey Bars
> 2. Barbed Wire Crawl
> 3. Swing to Beam
> 4. High Hurdles
> 5. Commando Crawl
> 6. Belly Robbers
> 7. Intensity Wall
> 8. Traverse Wall
> 9. Cargo Net
> 10. Rope Climb
> 11. Tire Run

17. Once the facility was completed, Brenner invited eight (8) Marines who had just returned from Iraq to experience the indoor obstacle/confidence course and received only the highest acclamations from them.

18. On February 4, 2004, Brenner opened the doors of Pure Power to the public.

19. Pure Power was an instant success and has gained publicity and an excellent reputation through various newspapers, magazines, televisions shows and is known nationally, as well as internationally, as the nation's only facility containing an indoor obstacle/confidence course.

20. The Drill Instructors ("D.I.s") are all former soldiers who have served in combat.

4

21. Clients ("recruits") are called by their last names and wear standard-issue military fatigues and dog tags during the class.

22. The initial program at Pure Power is called the Tour of Duty.

23. The Tour of Duty is a six-week course held four times a week for one hour, or three times a week for eight weeks.

24. Pure Power also has a Weekend Warrior program for recruits who are called Weekend Reserves.

25. The Weekend Warrior program comprises of two-hour sessions twice per week on Saturdays and Sundays for six weeks.

26. Recruits must all sign a Recruit Contract, Recruit Waiver, and receive Pure Power Boot Camp Rules.

27. When recruits step into the Pure Power facility, a life-size statue of a screaming marine greets them with a machine gun in his hand.

28. Pure Power trains civilians in a military style and positive setting and patterns recruit regimens after the armed forces.

29. Pure Power's programs are customized to suit recruits' fitness levels. Recruits are then put into platoons that consist of approximately sixteen recruits.

30. Each recruit who joins Pure Power commits to learn the following principles:

   1. **Honor** – Pure Power Boot Camp requires that each recruit be true to his or her values, regardless of the personal cost.
   2. **Trust** – Pure Power Boot Camp teaches each recruit to rely on the integrity, ability, or character of himself or herself and others.
   3. **Respect** – Pure Power Boot Camp expects each recruit to view others with a high degree of reverence and special regard. Recruits are taught to admire others, seeing beneath the surface to see real worth and value.

4. **Integrity** – Pure Power Boot Camp expects each recruit to develop a personal inner sense of wholeness derived from honesty and consistent uprightness of character.

5. **Duty** – Pure Power Boot Camp teaches each recruit to practice personal accountability in relation to a principle, measuring any action (or course of action) apart from personal likes and dislikes.

6. **Loyalty** – Pure Power Boot Camp expects recruits to be faithful or devoted to one another.

7. **Power** – Pure Power Boot Camp teaches each recruit to be aware of his or her capacity to produce effects on others or to influence others.

8. **Courage** – Pure Power Boot Camp helps each recruit overcome obstacles that are encountered in daily life. Each recruit matures mentally and should exhibit an attitude of facing and dealing with anything recognized as being dangerous, difficult, or painful, instead of withdrawing from it.

9. **Dignity** – Pure Power Boot Camp teaches each recruit to respect himself or herself and others. Recruits embrace dignity, the quality or state of being worthy of esteem or respect.

10. **Wisdom** – Pure Power Boot Camp helps each recruit develop a more intelligent application of learning and/or ability to discern inner qualities and essential relationships.

11. **Pride** – Pure Power Boot Camp helps each recruit realize the reward and satisfaction taken in accomplishing an achievement.

31. On or about April 19, 2004, Brenner trademarked the names "Pure Power Boot Camp" and "Train Military Style".

32. On or about February 2, 2006, Brenner filed for trade dress of Pure Power, specifically, the design of the facility, the terms used in the facility, and indoor obstacle/confidence course used in the facility.

33. Through years of accumulated experience, time and strenuous efforts by Brenner, Pure Power has been successful in obtaining an impressive client list, and over the years has recruited approximately 1730 clients.

34. Brenner's client list is stored through a web program called Mybody.com, is not public knowledge, and is not readily obtainable.

6

35. Through extensive interactions with its clients, Pure Power has been successful in obtaining and identifying their individual tastes and preferences with respect to their workouts.

36. Defendant, Belliard, worked as an employee of Pure Power from 2004 up and until March 31, 2008, when he abruptly left Pure Power, claiming that he was starting a construction business with a family member.

37. Defendant, Fell, worked as an employee of Pure Power from 2005 up and until March 16, 2008, when he was fired for being belligerent and insubordinate to Brenner during a conversation and for not following direction by his Employer.

38. On or about January 9, 2006, Defendant, Nancy Baynard ("Baynard"), became a recruit at Pure Power and left on March 28, 2008.

39. On or about March 13, 2006, Defendant, Jennifer Lee ("Lee"), became a recruit at Pure Power and left on April 28, 2008.

40. In reality and unbeknownst to Brenner, in or about July 2007, Belliard, Fell, Lee, and Baynard conspired and devised to raid and sabotage Brenner's business and defraud, deceive, steal and misappropriate Pure Power's trade secrets, trade dress, client list, and corporate documents, including, but not limited to, hard copies of Pure Power's Operations Manual, Startup Manual, Business Plan, and D.I. employee agreements, as well as Brenner's hard copy of the first chapter of her book, and deleted various corporate documents.

41. When Belliard was hired, he told Brenner that he was married. Belliard was actually married in the Dominican Republic but never legalized the marriage in the United States.

42. When Fell was hired, he told Brenner that he was engaged.

7

43. One policy of Pure Power was that employees must not become intimate with clients.

44. When Belliard and Fell were first hired, they knew nothing about the physical fitness industry and Brenner invested substantial time and money to train them and obtain Fitness Certifications for them, as she did with each employee she hired to be a D.I.

45. As a result of their training, Belliard and Fell each evolved into a motivational D.I. and a trusted employee with Pure Power.

46. As D.I.s, Belliard and Fell were entrusted with substantial responsibility to work closely with, train, motivate and inspire the recruits on behalf of Pure Power.

47. Some time during their employ at Pure Power, Belliard and Fell began personal relationships with Baynard and Lee.

48. Brenner did not know initially about the relationships.

49. During the eight (8) months that Defendants conspired against Brenner and Pure Power while employed by Pure Power, neither Brenner nor any of the Pure Power recruits were aware that Lee was Fell's girlfriend.

50. Since 2006, all employees of Pure Power have been required to sign a confidentiality and non-competition agreements (the "Agreement").

51. Brenner began to develop plans for franchising the Pure Power concept in 2006 and created a Startup Manual, an Operations Manual, and a Business Plan.

52. Brenner hired a new D.I., Nicio Evertz ("Evertz"), in early 2007.

53. In mid-2007, Belliard informed Brenner that he and his wife were divorcing.

54. In or around July 2007, recruit, Baynard, approached Brenner and informed her that she was having marital problems and asked if Brenner could help her find an apartment.

55. Brenner looked for and helped Baynard find an apartment.

8

56. In 2007, Fell broke off his engagement and began dating a woman shortly thereafter whom he described as an asian woman named "Shannon".

57. In 2007, Brenner began promoting the franchise, generating additional business and publicity for Pure Power, and finalizing her plan to open other Pure Power facilities.

58. Brenner was constantly being approached by Venture Capitalists ("V.C.s") regarding national expansion of Pure Power.

59. When approached by a V.C., Brenner made sure that she stipulated that Belliard was to be the National D.I.

60. Brenner decided not to get the V.C.s involved in Pure Power at this junction.

61. Brenner entrusted Belliard and Fell with her clientele at the New York Pure Power facility.

62. Brenner told Belliard and Fell that updates must be given to her on a regular basis to ensure that the Pure Power clients continued to be motivated and inspired.

63. In October 2007, Belliard admitted to Brenner that he had been dating Baynard and had moved in with Baynard. He claimed that he hadn't told Brenner at first because he didn't want to lose his job.

64. Although this was against the Pure Power rules, Belliard was Brenner's top D.I. and most trusted employee.

65. In or around October 2007, Brenner wanted to hire another D.I.; however, Belliard, Fell and Evertz told Brenner that they wanted the hours and could handle all of the clients and classes.

66. The client renewal rate was approximately 94%.

9

67. In or around November 2007, Brenner began preparing for her annual holiday party taking place on December 14, 2007, and finalize the plans for the Long Island facility.

68. On or about November 24, 2007, Brenner asked Belliard if he wanted to become partners in the Long Island Pure Power facility; however, Belliard turned down the opportunity, stating that he did not have the money to invest.

69. Unbeknownst to Brenner, Belliard, Fell and Lee had already been looking for locations for Warrior Fitness; however, they were not happy with the realtor and on December 5, 2007, terminated the realtor's services.

70. The holiday party was held every year for the clients, to thank the clients for their loyalty and support.

71. The Long Island facility was set to open on February 25, 2008, with the grand opening party to be held on February 7, 2008.

72. Belliard also agreed to help paint and build at the Long Island facility, then called Brenner and cancelled the day prior.

73. Beginning in December 2007, Fell became more and more difficult when told to perform a task by Brenner and became more and more belligerent to Brenner.

74. Defendants were still looking for a location for Warrior Fitness throughout the month of February 2008.

75. On February 27, 2008, a lease was drawn up for a location that Defendants found for Warrior Fitness.

76. In February 2008, Defendants were also shopping for prices on flooring.

77. The location that Defendants' leased was located on 29th Street, 14 blocks away from Pure Power utilizing the same operating hours as Pure Power.

78. Evertz contacted Brenner regularly to report on the progress of the clients; however, Fell did not.

79. Unbeknownst to Brenner, Defendants stole Pure Power's business/corporate documents and brochure to draft Defendants' business plan, using Pure Power's concepts and ides, including, but not limited to, obstacles, guarantee, principles, programs, clothing, projections, and pricing matrix.

80. While reviewing the New York facility schedule on March 16, 2008, Brenner realized that one (1) D.I. might not be needed for the March 17, 2008 7:30 a.m. class.

81. Since Evertz or Belliard were always the D.I.s to leave, and Fell had not been reporting to Brenner regarding the clients as he was told, Brenner decided that Evertz would run the 7:30 a.m. class on March 17, 2008 if a D.I. needed to leave.

82. On March 16, 2008, Brenner contacted Fell to inform him that he would not be needed for the 7:30am class if one (1) D.I. was not needed, and that Evertz would be the D.I. instructing the class since he was always the D.I. to leave.

83. Fell became irate and said, "That's not my fucking problem." He then threatened to go to the Department of Labor if Brenner allowed Evertz to instruct the class.

84. Brenner stated, "Did you just threaten me? I am not asking you. You will be leaving at 7:30 a.m."

85. Fell replied, "Who the fuck do you think you are? You better learn who you are speaking to."

86. Brenner replied, "Who owns this business, you or me?"

87. Fell stated, "What are you going to do, fire me?"

11

88. Brenner replied, "How dare you. You are not a team player. Keep it up and you will be suspended for a week."

89. Fell again threatened Brenner by stating, "You take me off for a week and the Department of Labor will be at your door."

90. Brenner replied, "You are leaving at 7:30 a.m."

91. Fell stated, "I am not." Then again stated, "What are you going to do, fire me?"

92. Brenner then replied, "Alex, you are fired."

93. Brenner spoke to Belliard thereafter.

94. Brenner asked Belliard where he stood regarding his loyalties to Pure Power and Belliard responded, "I am here 100%."

95. On March 17, 2008, Fell and Lee admitted to their conspiracy in emails to each other.

96. During Brenner's meeting with Belliard, Belliard told Brenner that he would not have a problem with Fell's firing because there were a lot of things that Fell did that he shouldn't have done.

97. Brenner began instructing in the New York facility in the mornings, then traveling to Long Island to instruct in the afternoon.

98. Shortly after, Belliard began showing up to work late.

99. Lee and Baynard attended classes regularly at Pure Power after Fell's termination in order to befriend, manipulate and solicit as many of Pure Power's recruits as possible, and spread lies about Brenner and Pure Power, in order to entice Pure Power's recruits to leave Pure Power and sign up with Warrior Fitness.

100. Brenner met with Belliard to discuss his tardiness and asked him if there was a problem.

101. Belliard stated that there was no problem.

102. On March 25, 2008, in furtherance of their plan to conspire and sabotage Pure Power, Defendants stole a partial list of Pure Power's clients and began soliciting them to leave Pure Power and come to Warrior Fitness.

103. On March 31, 2008 at 9:09 p.m., Brenner received a phone call from Belliard.

104. Belliard told Brenner that he was giving his resignation with Pure Power, effective immediately, without notice because he was going into the construction business with his uncle.

105. Brenner asked him to give her two weeks notice, but Belliard stated that he could not.

106. Unbeknownst to Brenner, that same day, the Defendants signed the lease for the 29 West 35th Street location.

107. Upon information and belief, during the period from March 21, 2008 though March 31, 2008, the Defendants stole several business/corporate documents from Pure Power. Included in those documents were the original signed confidentiality & non-compete agreements. Also included in those documents was Pure Power's client list. Once Belliard gave the Pure Power client list to Baynard, Baynard updated the Warrior Fitness client list using the Pure Power client list.

108. Since Belliard's departure from Pure Power, Defendants have furthered their conspiracy by contacting Pure Power clients with the intent to steal them and continuing to misappropriate Pure Power's trade dress by constructing the same indoor obstacle/confidence course.

109. Lee continued to attend classes at Pure Power after Fell was terminated for the purpose of converting new Pure Power recruits to Warrior Fitness.

110.    In comparing the Defendants' facility and Pure Power's facility, it is obvious that the Defendants have misappropriated Pure Power's trade secrets and Trade Dress. It is clear on its face.

111.    In comparing the Recruit Contracts, Additional Terms and Conditions and Waiver and Release forms of Pure Power and Warrior Fitness, there is virtually no difference. Warrior Fitness copied Pure Power's documents word for word.

112.    The Defendants stole all of Pure Power's programs and curriculum verbatim, but changed the names. For example, Defendants "Operation Warrior" program is the same as Pure Power's "Tour of Duty" program. Pure Power has a corporate team challenge program in its Business Plan and Operations Manual and the Defendants copied it verbatim, but changed the pricing slightly. Even Defendants' pricing is structured the same way as Pure Power's.

113.    In comparing Defendants' Business Plan to Pure Power's Business Plan, Start-Up Manual, Operations Manual, Brochure, client list and clients list, it is abundantly clear that the Defendants simply stole everything from Pure Power (Pure Power's clients, concepts, curriculum, programs, pricing matrix, design, good will, and everything else about Pure Power) and made it their own by engaging in a conspiracy to willfully and maliciously sabotage and destroy Brenner and Pure Power.

## FIRST COUNT
### (Conversion)

114. Plaintiffs repeat, reiterate and re-allege all of the allegations contained in the Statement of Facts above as if fully set forth at length herein.

115. Plaintiffs' trade secrets, trade dress, client list, business/corporate documents, and other confidential, secret and proprietary information are represented and evidenced by the tangible documentation and other tangible property.

116. Plaintiffs are informed and believe, and thereon allege that Defendants, Warrior Fitness, Belliard, Fell, Lee and Baynard, intentionally and deliberately, with full knowledge that such property is owned by Plaintiffs, misappropriated and converted such Plaintiffs' property to their own use and benefit without any compensation to Plaintiffs.

117. The aforementioned acts of Defendants were, upon information and belief, willful and malicious and intended to cause harm to Plaintiffs.

118. As a result of the foregoing, Plaintiffs have incurred damages in the millions of dollars, the extent not yet ascertained and is entitled to have returned to it all of the property Defendants have wrongfully converted to their own use.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, Warrior Fitness Boot Camp, LLC; Alexander Kenneth Fell a/k/a Alex Fell, Individually; Ruben Dario Belliard a/k/a Ruben Belliard, Individually; Jennifer J. Lee, Individually; and Nancy Baynard, Individually, jointly and severally for:

   a.  Injunctive relief, enjoining the Defendants from directly and/or indirectly contacting Plaintiffs' clients, misappropriating Plaintiffs' trade secrets and infringing on Plaintiffs' trade dress;

   b.  Equitable relief demanding the immediate return of Plaintiffs' property wrongfully converted by Defendants;

   c.  Money damages in the millions of dollars, the amount of which to be determined by a jury of Plaintiffs' peers;

   d.  Consequential damages;

   e.  Incidental damages;

   f.  Punitive damages;

   g.  Reasonable attorney's fees, filing fees, costs of suit; and

   h.  Any further relief which the Court may deem just and proper.

### SECOND COUNT
### (Unjust Enrichment)

119. Plaintiffs repeat, reiterate and re-allege all of the allegations contained in the Statement of Facts and the First Count above as if fully set forth at length herein.

120. Defendants have been unjustly enriched by, inter alia, using Plaintiffs' intellectual property, client list, trade secrets, trade dress, business/corporate documents, and other confidential, secret and proprietary information.

121. As a result of the foregoing, Plaintiffs have incurred damages in the millions of dollars, the extent not yet ascertained.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, Warrior Fitness Boot Camp, LLC; Alexander Kenneth Fell a/k/a Alex Fell, Individually; Ruben Dario Belliard a/k/a Ruben Belliard, Individually; Jennifer J. Lee, Individually; and Nancy Baynard, Individually, jointly and severally for:

    a. Injunctive relief, enjoining the Defendants from directly and/or indirectly contacting Plaintiffs' clients, misappropriating Plaintiffs' trade secrets and infringing on Plaintiffs' trade dress;

    b. Equitable relief demanding the immediate return of Plaintiffs' property wrongfully converted by Defendants;

    c. Money damages in the millions of dollars, the amount of which to be determined by a jury of Plaintiffs' peers;

    d. Consequential damages;

    e. Incidental damages;

    f. Punitive damages;

    g. Reasonable attorney's fees, filing fees, costs of suit; and

    h. Any further relief which the Court may deem just and proper.

### THIRD COUNT
### (Theft of Trade Secrets, Theft of Trade Dress, and Theft by Deception)

122. Plaintiffs repeat, reiterate and re-allege all of the allegations contained in the Statement of Facts, First and Second Counts above as if fully set forth at length herein.

123. Defendants solicited, manipulated, and stole Plaintiffs' clients with the intent to deceive and injure Plaintiffs, and with the intent to economically benefit the Defendants.

124. Defendants stole the Pure Power client accounts, Plaintiffs' information, client files and client files with the intent to deceive and injure Plaintiffs, and with the intent to economically benefit the Defendants.

125. Defendants stole Plaintiffs' intellectual property, client list, trade secrets, trade dress, business/corporate documents, and other confidential, secret and proprietary information with the intent to deceive and injure Plaintiffs, and with the intent to economically benefit the Defendants.

126. Defendants misappropriated Plaintiffs' trade secrets and trade dress with the intent to deceive and injure Plaintiffs, and with the intent to economically benefit the Defendants.

127. As a result of the foregoing, Plaintiffs have incurred damages to an extent not yet ascertained.

**WHEREFORE,** Plaintiffs demand judgment against Defendants, Warrior Fitness Boot Camp, LLC; Alexander Kenneth Fell a/k/a Alex Fell, Individually; Ruben Dario Belliard a/k/a Ruben Belliard, Individually; Jennifer J. Lee, Individually; and Nancy Baynard, Individually, jointly and severally for:

        a. Injunctive relief, enjoining the Defendants from directly and/or indirectly contacting Plaintiffs' clients, misappropriating Plaintiffs' trade secrets and infringing on Plaintiffs' trade dress;

        b. Equitable relief demanding the immediate return of Plaintiffs' property wrongfully converted by Defendants;

18

    c.  Money damages in the millions of dollars, the amount of which to be

        determined by a jury of Plaintiffs' peers;

    d.  Consequential damages;

    e.  Incidental damages;

    f.  Punitive damages;

    g.  Reasonable attorney's fees, filing fees, costs of suit; and

    h.  Any further relief which the Court may deem just and proper.

### FOURTH COUNT
#### (Civil Conspiracy)

128.  Plaintiffs repeat, reiterate and re-allege all of the allegations contained in the Statement

of Facts, First, Second and Third Counts above as if fully set forth at length herein.

129.  Defendants conspired to cause irreparable harm and maliciously interfere with the

Plaintiffs' contractual relations and usurp Plaintiffs' prospective economic advantage

with the Plaintiffs' client accounts, trade secrets and trade dress.

130.  As a result of the foregoing civil conspiracy, Plaintiffs' client accounts, trade secrets

and trade dress have been stolen along with invaluable and unrecoverable confidential,

propriety and secretive information and Plaintiffs have incurred damages to an extent

not yet ascertained.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, Warrior Fitness Boot

Camp, LLC; Alexander Kenneth Fell a/k/a Alex Fell, Individually; Ruben Dario Belliard

a/k/a Ruben Belliard, Individually; Jennifer J. Lee, Individually; and Nancy Baynard,

Individually, jointly and severally for:

    a.  Injunctive relief, enjoining the Defendants from directly and/or indirectly

contacting Plaintiffs' clients, misappropriating Plaintiffs' trade secrets and infringing on Plaintiffs' trade dress;

b.  Equitable relief demanding the immediate return of Plaintiffs' property wrongfully converted by Defendants;

c.  Money damages in the millions of dollars, the amount of which to be determined by a jury of Plaintiffs' peers;

d.  Consequential damages;

e.  Incidental damages;

f.  Punitive damages;

g.  Reasonable attorney's fees, filing fees, costs of suit; and

h.  Any further relief which the Court may deem just and proper.

### FIFTH COUNT
### (Tortious Intentional Interference With Prospective Economic Advantage)

131. Plaintiffs repeat, reiterate and re-allege all of the allegations contained in the Statement of Facts, First, Second, Third and Fourth Counts above as if fully set forth at length herein.

132. For nearly 5 years, Plaintiffs have established themselves in the fitness community as the only indoor obstacle/confidence boot camp in the U.S.A. by developing a unique, comprehensive indoor obstacle confidence program with options for different programs to suit each client's needs, along with customized nutrition plans, customized nutrition shakes, and a guarantee. As such, the Plaintiffs have gained national and international acclaim and have developed ongoing relationships with clients, specifically the clients referred to above.  Because of these efforts, Plaintiffs have every reason to expect many

20

of these existing relationships to grow and new clients to be obtained through the references of the relationships.

133. Defendants, at all times relevant herein, have known of Plaintiffs' ongoing and continuous businesses and professional relationships as alleged herein.

134. As a result of Defendants' intentional, malicious interference and without justification or excuse, the Defendants stole many of the Pure Power clients and are continuing to do so.

135. Plaintiffs have been damaged by the wrongful acts of Defendants as alleged above. Such conduct does not enhance nor promote Plaintiffs' professional standing in the fitness community, but rather detracts, tarnishes and injures Plaintiffs and Plaintiffs' reputation and goodwill.

136. The aforementioned unlawful and unfair conduct by Defendants has disrupted Plaintiffs' economic relationship with those clients named above and has resulted in, and will continue to result in, preclusion of Plaintiffs' successful continued relationship with these clients.

137. The aforementioned acts of Defendants were, upon information and belief, willful and malicious and were intended to induce or cause a breach or termination of Plaintiffs' relationships and expectancies.

138. As a result of the foregoing wrongful conduct, Plaintiffs have been damaged in an amount as yet unknown but to be proven at Trial. Plaintiffs have no adequate remedy at law for the continuing violations of its rights as set forth above.

21

**WHEREFORE**, Plaintiffs demand judgment against Defendants, Warrior Fitness Boot Camp, LLC; Alexander Kenneth Fell a/k/a Alex Fell, Individually; Ruben Dario Belliard a/k/a Ruben Belliard, Individually; Jennifer J. Lee, Individually; and Nancy Baynard, Individually, jointly and severally for:

      a. Injunctive relief, enjoining the Defendants from directly and/or indirectly contacting Plaintiffs' clients, misappropriating Plaintiffs' trade secrets and infringing on Plaintiffs' trade dress;

      b. Equitable relief demanding the immediate return of Plaintiffs' property wrongfully converted by Defendants;

      c. Money damages in the millions of dollars, the amount of which to be determined by a jury of Plaintiffs' peers;

      d. Consequential damages;

      e. Incidental damages;

      f. Punitive damages;

      g. Reasonable attorney's fees, filing fees, costs of suit; and

      h. Any further relief which the Court may deem just and proper.

### SIXTH COUNT
**(Unfair Competition and NY GBL §360, *et seq*.)**

139. Plaintiffs repeat, reiterate and re-allege all of the allegations contained in the Statement of Facts, First, Second, Third, Fourth, and Fifth Counts above as if fully set forth at length herein.

140. By the acts alleged above, Defendants have engaged in unfair competition including unlawful, unfair, and fraudulent business practices, deception, theft of trade secrets, theft of trade dress, theft of business/corporate documents and use of confidential

22

information by former employees and third parties to solicit customers in violation of NY GBL §360, *et seq*.

141. The acts of Defendants are in violation and derogation of Plaintiffs' rights and are likely to cause confusion, mistake, and deception among consumers and the public as to the source, origin, sponsorship or quality of Defendants' product, thereby causing loss, damage, and injury to Plaintiffs and to the purchasing public.

142. Defendants knew or in the exercise of reasonable care, should have known that their conduct would likely so mislead the public and injure the business reputation of Pure Power.

143. The wrongful acts, as alleged above, have permitted or will permit Defendants to make substantial sales and profits on the artwork, corporate documents and efforts of Plaintiffs.

144. As a result of the foregoing wrongful conduct, Plaintiffs have been and will be deprived of substantial sales in an amount as yet unknown but to be proven at Trial. Plaintiffs have no adequate remedy at law for the continuing violations of its rights as set forth above.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, Warrior Fitness Boot Camp, LLC; Alexander Kenneth Fell a/k/a Alex Fell, Individually; Ruben Dario Belliard a/k/a Ruben Belliard, Individually; Jennifer J. Lee, Individually; and Nancy Baynard, Individually, jointly and severally for:

      a. Injunctive relief, enjoining the Defendants from directly and/or indirectly contacting Plaintiffs' clients, misappropriating Plaintiffs' trade secrets and infringing on Plaintiffs' trade dress;

23

b.  Equitable relief demanding the immediate return of Plaintiffs' property
    wrongfully converted by Defendants;

c.  Money damages in the millions of dollars, the amount of which to be
    determined by a jury of Plaintiffs' peers;

d.  Consequential damages;

e.  Incidental damages;

f.  Punitive damages;

g.  Treble damages;

h.  Reasonable attorney's fees, filing fees, costs of suit; and

i.  Any further relief which the Court may deem just and proper.

### SEVENTH COUNT
### (Breach of Duty of Loyalty)

145. Plaintiffs repeat, reiterate and re-allege all of the allegations contained in the Statement
     of Facts, First, Second, Third, Fourth, Fifth, and Sixth Counts above as if fully set forth
     at length herein.

146. By the acts alleged above, Defendants, Belliard and Fell, have breached their duty of
     loyalty, trust and confidence to Plaintiffs. Defendants, Belliard and Fell, purloined
     protected information from Plaintiffs' files while still employed by Plaintiffs for the
     sole purpose of effecting an advantage in competing with Plaintiffs immediately upon
     their conspiracy and decision to commence an indoor obstacle/confidence boot camp,
     namely, Warrior Fitness.

147. As a result of the foregoing wrongful conduct, Plaintiffs have been and will be deprived
     of substantial sales in an amount as yet unknown but to be proven at Trial. Plaintiffs

24

have no adequate remedy at law for the continuing violations of its rights as set forth above.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, Warrior Fitness Boot Camp, LLC; Alexander Kenneth Fell a/k/a Alex Fell, Individually; Ruben Dario Belliard a/k/a Ruben Belliard, Individually; Jennifer J. Lee, Individually; and Nancy Baynard, Individually, jointly and severally for:

    a. Injunctive relief, enjoining the Defendants from directly and/or indirectly contacting Plaintiffs' clients, misappropriating Plaintiffs' trade secrets and infringing on Plaintiffs' trade dress;

    b. Equitable relief demanding the immediate return of Plaintiffs' property wrongfully converted by Defendants;

    c. Money damages in the millions of dollars, the amount of which to be determined by a jury of Plaintiffs' peers;

    d. Consequential damages;

    e. Incidental damages;

    f. Punitive damages;

    g. Reasonable attorney's fees, filing fees, costs of suit; and

    h. Any further relief which the Court may deem just and proper.

## EIGHTH COUNT
### (Misappropriation of Confidential and Proprietary Information)

148. Plaintiffs repeat, reiterate and re-allege all of the allegations contained in the Statement of Facts, First, Second, Third, Fourth, Fifth, Sixth and Seventh Counts above as if fully set forth at length herein.

149. By the acts alleged above, Defendants improperly disclosed the confidential and proprietary information of Plaintiffs. Specifically, Defendants improperly disclosed and used for their personal financial benefit without Plaintiffs' authorization, Plaintiffs' trade secrets, trade dress, corporate/business documents, D.I. Agreements, Operations Manual, Business Plan, Startup Manual, clients, and client files.

150. As a result of the foregoing wrongful conduct, Plaintiffs has been and will be deprived of substantial sales in an amount as yet unknown but to be proven at Trial. Plaintiffs have no adequate remedy at law for the continuing violations of Plaintiffs' rights as set forth above.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, Warrior Fitness Boot Camp, LLC; Alexander Kenneth Fell a/k/a Alex Fell, Individually; Ruben Dario Belliard a/k/a Ruben Belliard, Individually; Jennifer J. Lee, Individually; and Nancy Baynard, Individually, jointly and severally for:

      a.  Injunctive relief, enjoining the Defendants from directly and/or indirectly contacting Plaintiffs' clients, misappropriating Plaintiffs' trade secrets and infringing on Plaintiffs' trade dress;

      b.  Equitable relief demanding the immediate return of Plaintiffs' property wrongfully converted by Defendants;

      c.  Money damages in the millions of dollars, the amount of which to be determined by a jury of Plaintiffs' peers;

      d.  Consequential damages;

      e.  Incidental damages;

      f.  Punitive damages;

    g.  Reasonable attorney's fees, filing fees, costs of suit; and

    h.  Any further relief which the Court may deem just and proper.

### NINTH COUNT
### (Tortious Intentional Interference With Contractual Relations)

151.  Plaintiffs repeat, reiterate and re-allege all of the allegations contained in the Statement of Facts, First, Second, Third, Fourth, Fifth, Sixth, Seventh and Eighth Counts above as if fully set forth at length herein.

152.  For nearly 5 years, Plaintiffs have established themselves in the fitness community as the only indoor obstacle/confidence boot camp in the U.S.A. by developing a unique, comprehensive indoor obstacle confidence program with options for different programs to suit each client's needs, along with customized nutrition plans, customized nutrition shakes, and a guarantee. As such, the Plaintiffs have gained national and international acclaim and have developed ongoing relationships with clients, specifically the clients referred to above. Because of these efforts, Plaintiffs have every reason to expect many of these existing relationships to grow and new clients to be obtained through the references of the relationships.

153.  Defendants, at all times relevant herein, have known of Plaintiffs' ongoing and continuous contractual relationships as alleged herein.

154.  With knowledge of the existing contractual relations with Pure Power's clients, Defendants intentionally and maliciously and without justification or excuse interfered with the aforementioned contractual relationships.

155.  The aforementioned unlawful and unfair conduct by Defendants has disrupted Plaintiffs' economic relationship with those clients and has resulted in, and will

27

continue to result in, preclusion of Plaintiffs' successful continued relationship with these clients.

156. As a result of Defendants' intentional, malicious interference and without justification or excuse, Pure Power's clients were stolen by Defendants.

157. The aforementioned acts of Defendants were, upon information and belief, willful and malicious and were intended to induce or cause a breach or termination of Plaintiffs' relationships and expectancies.

158. As a result of the foregoing wrongful conduct, Plaintiffs have been damaged in an amount as yet unknown but to be proven at Trial. Plaintiffs have no adequate remedy at law for the continuing violations of Plaintiffs' rights as set forth above.

**WHEREFORE,** Plaintiffs demand judgment against Defendants, Warrior Fitness Boot Camp, LLC; Alexander Kenneth Fell a/k/a Alex Fell, Individually; Ruben Dario Belliard a/k/a Ruben Belliard, Individually; Jennifer J. Lee, Individually; and Nancy Baynard, Individually, jointly and severally for:

a. Injunctive relief, enjoining the Defendants from directly and/or indirectly contacting Plaintiffs' clients, misappropriating Plaintiffs' trade secrets and infringing on Plaintiffs' trade dress;

b. Equitable relief demanding the immediate return of Plaintiffs' property wrongfully converted by Defendants;

c. Money damages in the millions of dollars, the amount of which to be determined by a jury of Plaintiffs' peers;

d. Consequential damages;

e. Incidental damages;

28

f.  Punitive damages;

g.  Reasonable attorney's fees, filing fees, costs of suit; and

h.  Any further relief which the Court may deem just and proper.

### TENTH COUNT
### (Breach of Contract, Breach of Restrictive Covenant, Breach of Confidentiality and Non-Competition Agreement)

159.  Plaintiffs repeat, reiterate and re-allege all of the allegations contained in the Statement of Facts, First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth and Ninth Counts above as if fully set forth at length herein.

160.  Defendants, Belliard and Fell, were salaried employees for Pure Power.

161.  Defendant, Belliard, was employed with Pure Power as a D.I. for approximately four (4) years.

162.  Defendant, Fell, was employed with Pure Power as a D.I. for approximately three (3) years.

163.  Defendants, Belliard and Fell, signed confidentiality and non-competition agreements on September 26, 2006 with Pure Power.

164.  The Commitment to Full Effort Sections of the Agreement specifically states the following:

> You agree that during the period of your employment you shall devote your skills and best efforts to the Company; you shall work to further the best interests of the Company; and you shall not do anything to undermine or disparage the reputation of the Company or do anything that is otherwise detrimental to the Company. You shall not, directly or indirectly, assist any competitors of the Company while you are employed by the Company.

165. The Confidential Information Section of the Agreement specifically states the following:

> You shall not disclose, either orally or in writing, to anyone outside the Company any confidential or commercially sensitive information made known to you or acquired by you in the course of your employment, including but not limited to all such information relating to marketing or strategic plans, products and/or services under development, suppliers, customers, inventions, discoveries, improvements, methods, processes, know-how, trade secrets, pricing methods, personnel information and any other information that, if disclosed, might be profitable to a competitor or other third party or detrimental to the Company.

166. The Intellectual Property Section of the Agreement specifically states the following:

> (a)    You acknowledge that the Company's PURE POWER BOOT CAMP obstacle-confidence courses and related environments, and the marketing thereof, embody and/or reflect inventions, discoveries, concepts, ideas, developments, improvements, methods, processes, know-how, trade secrets, designs, trademarks (including but not limited to the marks PURE POWER and PURE POWER BOOT CAMP), trade dress, textual and graphic material, and a distinctive overall look and feel (collectively, "Intellectual Property"). You agree that all such Intellectual Property, regardless of whether or not it is capable of patent, trademark, trade dress, trade secret or copyright protection, is exclusively owned by the Company. You shall not, during the course of your employment or at any time thereafter, challenge the Company's ownership of any Intellectual Property or the validity or enforceability thereof, nor shall you use any Intellectual Property in any competing business, or in any other way without the Company's express written permission, during or after your employment with the Company.

> (b)    You further agree that all Intellectual Property that you may conceive, develop, create or reduce to tangible form while you are employed by the Company that relates in any way to the business of the Company or that results from or is suggested by work that you do for the Company is and shall be exclusively owned by the Company. You hereby irrevocably assign to the Company all right, title and interest that you may have in and to any and all Intellectual Property. You agree that, during and after your employment with the Company, you shall execute documents of assignment or such other documents as may be necessary to effectuate the assignment set forth herein and to confirm or maintain the Company's ownership of any Intellectual Property, and you shall otherwise reasonably

30

cooperate with the Company in obtaining, maintaining and enforcing its rights in and to the Intellectual Property.

167. The Non-Compete Section of the Agreements specifically states the following:

"You agree that, during the term of your employment and for ten (10) years thereafter:

(a)    you shall not, and shall not assist any third party to, conduct any business or be employed by any business that competes directly with the Company. A business that competes directly with the Company shall include, but shall not be limited to, any physical exercise program, confidence program or gym: (i) that uses obstacle courses; (ii) that uses methods or exercises derived from military training; (iii) that uses a military theme in any way; or (iv) that employs the term "boot camp" in the name or description of the program or gym;

(b)    you shall not, and shall not assist any third party to, hire any employee of the Company or seek to persuade any employee of the Company to discontinue employment with the Company or to become employed by or otherwise engaged in any business that competes directly with the Company; and

(c)    you shall not, and shall not assist any third party to, solicit any client or customer of the Company to discontinue his or her use of the Company's products and services or to use the competing products or services of another business."

168. The General Provisions Section of the Agreement specifically states the following:

"This Agreement shall continue in effect after the termination of your employment by the Company and shall be binding upon and inure to the benefit of both parties and their respective successors, assigns and representatives. You hereby represent that you have read and understand all of the provisions of this Agreement and you agree that the provisions of this Agreement are reasonable and necessary for the protection of the business and goodwill of the Company and the Company's Intellectual Property. It is the intent of the parties hereto that if in the opinion of any court of competent jurisdiction any provision set forth in this Agreement is not reasonable and by reason thereof is not enforceable, such provision shall be modified to the extent necessary to render it enforceable to the maximum extent allowed by applicable law, and the validity, legality and enforceability of the remainder of the Agreement shall not in any way be affected or impaired thereby. This Agreement sets forth the entire

31

agreement between the parties with respect to its subject matter and supersedes all prior discussions, agreements and understandings concerning the subject matter hereof. This Agreement may be amended only by an instrument in writing signed by both parties. This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to the conflict of laws provisions thereof. You agree to accept the exclusive jurisdiction and venue of the courts of the State of New York, and the federal district courts situated in New York, New York for the adjudication of any dispute, controversy or claim arising in connection with or related to this Agreement."

169. With knowledge of said contracts, the terms and conditions agreed to therein, and based upon the foregoing Statement of Facts and Counts, Defendants, Belliard and Fell, maliciously, willfully and without justification breached every Section of the Agreement by creating Warrior Fitness and collectively conspiring to steal Pure Power's clients, corporate/business documents, proprietary and confidential information, trade secrets, and trade dress from Pure Power.

170. Belliard and Fell, directly and indirectly, continue to maliciously, willfully and without justification or excuse, interfere with Pure Power's current clients and current employees, namely Nicio Evertz, a D.I.

171. Due to the Defendants' willful and malicious interference, Pure Power has lost clients and Evertz may soon be pirated and force Pure Power to pay other employees substantially higher salaries to prevent them from joining Warrior Fitness.

172. As a result of the foregoing wrongful conduct, Plaintiffs have been damaged in an amount as yet unknown, but to be proven at Trial. Plaintiffs have no adequate remedy at law for the continuing violations of its rights as set forth above.

32

**WHEREFORE**, Plaintiffs demand judgment against Defendants, Warrior Fitness Boot Camp, LLC; Alexander Kenneth Fell a/k/a Alex Fell, Individually; Ruben Dario Belliard a/k/a Ruben Belliard, Individually; Jennifer J. Lee, Individually; and Nancy Baynard, Individually, jointly and severally for:

      a.      Injunctive relief, enjoining the Defendants from directly and/or indirectly contacting Plaintiffs' clients, misappropriating Plaintiffs' trade secrets and infringing on Plaintiffs' trade dress;

      b.      Equitable relief demanding the immediate return of Plaintiffs' property wrongfully converted by Defendants;

      c.      Money damages in the millions of dollars, the amount of which to be determined by a jury of Plaintiffs' peers;

      d.      Consequential damages;

      e.      Incidental damages;

      f.      Punitive damages;

      g.      Reasonable attorney's fees, filing fees, costs of suit; and

      h.      Any further relief which the Court may deem just and proper.

### ELEVENTH COUNT
**(Breach of Good Faith and Fair Dealing)**

173. Plaintiffs repeat, reiterate and re-allege all of the allegations contained in the Statement of Facts, First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, and Tenth Counts above as if fully set forth at length herein.

174. Every contract in the State of New York contains an implied covenant of good faith and fair dealing.

33

175. Defendants, Belliard and Fell, signed confidentiality and non-competition agreements on September 26, 2006 with Pure Power.

176. Defendants breached the implied covenant by failing to conduct themselves in good faith and in failing to carry out their contractual obligations to Pure Power.

177. As a result of the foregoing, Plaintiffs have incurred damages to an extent not yet ascertained.

**WHEREFORE,** Plaintiffs demand judgment against Defendants, Warrior Fitness Boot Camp, LLC; Alexander Kenneth Fell a/k/a Alex Fell, Individually; Ruben Dario Belliard a/k/a Ruben Belliard, Individually; Jennifer J. Lee, Individually; and Nancy Baynard, Individually, jointly and severally for:

      a. Injunctive relief, enjoining the Defendants from directly and/or indirectly contacting Plaintiffs' clients, misappropriating Plaintiffs' trade secrets and infringing on Plaintiffs' trade dress;

      b. Equitable relief demanding the immediate return of Plaintiffs' property wrongfully converted by Defendants;

      c. Money damages in the millions of dollars, the amount of which to be determined by a jury of Plaintiffs' peers;

      d. Consequential damages;

      e. Incidental damages;

      f. Punitive damages;

      g. Reasonable attorney's fees, filing fees, costs of suit; and

      h. Any further relief which the Court may deem just and proper.

## TWELFTH COUNT
### (Fraud and Misrepresentation)

178. Plaintiffs repeat, reiterate and re-allege all of the allegations contained in the Statement of Facts, First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Counts above as if fully set forth at length herein.

179. For approximately the past nine (9) months, since July 2007, the Defendants posed as loyal employees and clients and solicited, manipulated, and stole Plaintiffs' clients with the intent to deceive and injure Plaintiffs, and with the intent to economically benefit the Defendants.

180. Defendants have stolen Pure Power's intellectual property, client list, trade secrets, trade dress, business/corporate documents, and other confidential, secret and proprietary information with the intent to deceive and injure Plaintiffs, and with the intent to economically benefit the Defendants.

181. The Plaintiffs detrimentally relied upon the Defendants' misrepresentations to Plaintiffs' detriment.

182. As a result of the Defendants fraud and misrepresentations aforementioned, the Plaintiffs have incurred damages to an extent not yet ascertained.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, Warrior Fitness Boot Camp, LLC; Alexander Kenneth Fell a/k/a Alex Fell, Individually; Ruben Dario Belliard a/k/a Ruben Belliard, Individually; Jennifer J. Lee, Individually; and Nancy Baynard, Individually, jointly and severally for:

    a. Injunctive relief, enjoining the Defendants from directly and/or indirectly contacting Plaintiffs' clients, misappropriating Plaintiffs' trade secrets and infringing on Plaintiffs' trade dress;

35

b.  Equitable relief demanding the immediate return of Plaintiffs' property
    wrongfully converted by Defendants;

c.  Money damages in the millions of dollars, the amount of which to be
    determined by a jury of Plaintiffs' peers;

d.  Consequential damages;

e.  Incidental damages;

f.  Punitive damages;

g.  Reasonable attorney's fees, filing fees, costs of suit; and

h.  Any further relief which the Court may deem just and proper.

## THIRTEENTH COUNT
### (Breach of Fiduciary Duty)

183.  Plaintiffs repeat, reiterate and re-allege all of the allegations contained in the Statement
      of Facts, First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth,
      Eleventh, and Twelfth Counts above as if fully set forth at length herein.

184.  By the acts alleged above, Defendants, Belliard and Fell, have breached their fiduciary
      duty to Plaintiffs. Defendants, Belliard and Fell, purloined protected information from
      Plaintiffs' files while still employed by Plaintiffs for the sole purpose of effecting an
      advantage in competing with Plaintiffs immediately upon their conspiracy and decision
      to commence an indoor obstacle/confidence boot camp, namely, Warrior Fitness.

185.  As a result of the foregoing wrongful conduct, Plaintiffs have been and will be deprived
      of substantial sales in an amount as yet unknown but to be proven at Trial. Plaintiffs
      have no adequate remedy at law for the continuing violations of its rights as set forth
      above.

36

**WHEREFORE,** Plaintiffs demand judgment against Defendants, Warrior Fitness Boot Camp, LLC; Alexander Kenneth Fell a/k/a Alex Fell, Individually; Ruben Dario Belliard a/k/a Ruben Belliard, Individually; Jennifer J. Lee, Individually; and Nancy Baynard, Individually, jointly and severally for:

   a. Injunctive relief, enjoining the Defendants from directly and/or indirectly contacting Plaintiffs' clients, misappropriating Plaintiffs' trade secrets and infringing on Plaintiffs' trade dress;

   b. Equitable relief demanding the immediate return of Plaintiffs' property wrongfully converted by Defendants;

   c. Money damages in the millions of dollars, the amount of which to be determined by a jury of Plaintiffs' peers;

   d. Consequential damages;

   e. Incidental damages;

   f. Punitive damages;

   g. Reasonable attorney's fees, filing fees, costs of suit; and

   h. Any further relief which the Court may deem just and proper.

**FOURTEENTH COUNT**
**(Trade Dress Infringement, Violation of 15 U.S.C. §1125 and Lanham Act §43)**

186. Plaintiffs repeat, reiterate and re-allege all of the allegations contained in the Statement of Facts, First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh, Twelfth, and Thirteenth Counts above as if fully set forth at length herein.

187. Defendants solicited, manipulated, and stole Plaintiffs' clients with the intent to deceive and injure Plaintiffs, and with the intent to economically benefit the Defendants.

188. Defendants stole the Pure Power client accounts, Plaintiffs' information, client files and client files with the intent to deceive and injure Plaintiffs, and with the intent to economically benefit the Defendants.

189. Defendants stole Plaintiffs' intellectual property, client list, trade secrets, trade dress, business/corporate documents, and other confidential, secret and proprietary information with the intent to deceive and injure Plaintiffs, and with the intent to economically benefit the Defendants.

190. Defendants misappropriated Plaintiffs' trade secrets and trade dress with the intent to deceive and injure Plaintiffs, and with the intent to economically benefit the Defendants.

191. As a result of the foregoing, Plaintiffs have incurred damages to an extent not yet ascertained.

**WHEREFORE,** Plaintiffs demand judgment against Defendants, Warrior Fitness Boot Camp, LLC; Alexander Kenneth Fell a/k/a Alex Fell, Individually; Ruben Dario Belliard a/k/a Ruben Belliard, Individually; Jennifer J. Lee, Individually; and Nancy Baynard, Individually, jointly and severally for:

      a. Injunctive relief, enjoining the Defendants from directly and/or indirectly contacting Plaintiffs' clients, misappropriating Plaintiffs' trade secrets and infringing on Plaintiffs' trade dress;

      b. Equitable relief demanding the immediate return of Plaintiffs' property wrongfully converted by Defendants;

      c. Money damages in the millions of dollars, the amount of which to be determined by a jury of Plaintiffs' peers;

    d.  Consequential damages;

    e.  Incidental damages;

    f.  Punitive damages;

    g.  Treble damages;

    h.  Reasonable attorney's fees, filing fees, costs of suit; and

    i.  Any further relief which the Court may deem just and proper.

Dated: Staten Island, New York
      May 5, 2008

                    CALCAGNO & ASSOCIATES
                    Attorneys At Law, LLC
                    Attorneys for Plaintiffs

BY:                     
                    ANDREW JOHN CALCAGNO
                    *Main Office*
                    213 South Avenue East
                    Cranford, NJ 07016
                    (908) 272-7300

                    *Satellite Office*
                    404 Manor Road
                    Staten Island, New York 10314
                    (718) 815-0200

**EXHIBIT B**

power1.txt

```
 1

 2   SUPREME COURT OF THE STATE OF NEW YORK
     NEW YORK COUNTY  - CIVIL TERM - PART  39
 3   ------------------------------------------------X
     PURE POWER BOOT CAMP, INC., PURE POWER
 4   BOOT CAMP, INC., FRANCHISING CORPORATION
     and PURE POWER BOOT CAMP JERICHO,
 5
                        PLAINTIFFS,
 6
                        -against-
 7
     WARRIOR FITNESS BOOT CAMP, LLC., ALEXANDER
 8   KENNETH FELL a/k/a ALEX FELL, individually,
     RUBEN DARIO BELLIARD, a/k/a RUBEN BELLIARD,
 9   individually; JENNIFER J. LEE, individually,
     and NANCY BAYNARD, individually
10
                        DEFENDANTS
11   ------------------------------------------------X
     Index No. 601364/08        60 Centre Street
12   MOTION                     New York, New York
                                May 8, 2008
13
     B E F O R E:  HONORABLE HELEN E. FREEDMAN, Justice
14

15   A P P E A R A N C E S:
          CALCAGNO & ASSOCIATES
16        Attorneys for the Plaintiffs
          404 Manor Road
17        Staten Island, New York   10314
          718-815-0200
18        BY:  ANDREW JOHN CALCAGNO, ESQ.
               STEPHEN G. TRAFLET, ESQ., of counsel
19             and
          FROSS, ZELNICK, LEHRMAN & ZISSU, P.C.
20        TRADEMARK COUNSEL
          866 United Nations Plaza
21        New York, New York   10017
          212-813-5995
22        BY: SUSAN UPTON DOUGLASS, ESQ.

23        CHADBOURNE & PARKE, LLP
          Attorneys for the Defendants
24        30 Rockefeller Plaza
          New York, New York   10112
25        212-408-5100
          BY:  LAWRENCE E. BUTERMAN, ESQ.
26
```

Page 1

power1.txt

1

2
```
          A P P E A R A N C E S: (Continued)
3
          FOX ROTHSCHILD, LLP, ESQ.
4         Attorneys for Defendants
          100 Park Avenue
5         New York, New York    10017
          212-878-7900
6         BY:  CAROLYN D. RICHMOND, ESQ.
               JOHN J. SKINNER, JR., ESQ.
7

8

9

10

11

12

13

14

15

16

17

18             MICHAEL J. DAUGENTI, RMR, CRR
                  OFFICIAL COURT REPORTER
19

20

21

22

23

24

25

26
```

⬚

3

```
1                      Proceedings
2              MR. BUTERMAN:  I submitted a letter earlier
```

power1.txt

3    this morning.  I hand delivered it to chambers.  I

4    don't know if your Honor received it.  I have a copy

5    for your Honor.  It involves crucial issues which need

6    to be addressed.

7                    THE COURT:  What are you saying?

8                    MR. BUTERMAN:  what I'm saying is, your

9    Honor --

10                   THE COURT:  You are?

11                   MR. BUTERMAN:  I represent the defendants

12   in this case.  Plaintiffs have filed an interrogatory

13   injunction.  We received the papers yesterday and when

14   we received them, we learned that their papers were

15   based on e-mails that had been stolen from my client's

16   personal e-mail accounts.  They also contain e-mails

17   representing both myself and counsel, Miss Richmond

18   from the Fox Rothschild firm, privileged

19   communications.  And they actually took those e-mails,

20   your Honor, and they attached those as exhibits,

21   e-mails clearly, clearly showing that Miss Richmond

22   giving representation to Mr. Feldman, one of the

23   defendants in this case.  And they attached them to

24   the motion and they actually used them to support the

25   motion.

26                   MR. CALCAGNO:  Your Honor, with all due

[]

4

1                         Proceedings

2    respect, I think the first and foremost thing you need

3    to do is to address everyone at the table and who we

4    are and it's our application before this court.

Page 3

power1.txt

```
 5    Mr. Buterman --
 6              THE COURT:  What's going on here?  I walked
 7    into the middle of very, very bad rumble.
 8              MR. CALCAGNO:  Yeah, I'd like to give the
 9    court our application and Mr. Buterman will get a
10    chance to explain his position to this respectful
11    court.  I'd like to address your Honor, without Mr.
12    Buterman interrupting plaintiff's counsel.  It's our
13    application, your Honor.  May I proceed with my
14    application, your Honor?
15              MR. BUTERMAN:  Respectfully, your Honor,
16    what I'm afraid of is counsel has submitted an
17    affidavit which contains privileged and confidential
18    communications between myself and my clients and Miss
19    Richmond and her clients from no less than three
20    separate law firms.  They've attached them as
21    exhibits.  What I'm afraid of, your Honor, is by
22    seeking defense counsel --
23              MR. CALCAGNO:  Your Honor --
24              THE COURT:  This behavior I don't want.
25              You cannot behave this way in my courtroom.
26              (There is a short recess.)
```

[]

5

```
 1                      Proceedings
 2              THE COURT:  We calmed down a little?
 3              MR. CALCAGNO:  We are.  Andrew Calcagno,
 4    law firm of Calcagno & Associates, representing the
 5    plaintiff, Pure Power Boot Camp, Pure Power Boot Camp
 6    Franchise and Pure Power Boot Camp of Jericho.  With
```

Page 4

power1.txt

```
 7      me to my right is Mr. Stephen Traflet of counsel.  To
 8      my left is Susan Douglas from the law firm of Fross &
 9      Zelnick, a trademark and trade dress expert who we
10      brought before you.  This involves trade dress
11      infringement, copyright infringement, stealing
12      someone's entire business.
13              If I could -- if you want introduction of
14      the attorneys and I'd like to explain the case briefly
15      to you, Judge, and walk you through it.  This case
16      involves, your Honor, the worse case.  I've been
17      practicing 18 years, specializing in commercial
18      litigation.  The worse case of co porate that I
19      personally have ever seen committed by two employees
20      working for Pure Power Boot Camp.
21              They not only conspired with two of the
22      gentlemen, Ruben Belliard and Alex Fell, two
23      individuals who were the key trainers of her
24      clientele, but the two girlfriends but not just
25      girlfriends.  Generally as Alex Fell's girlfriend, she
26      is also the co-owner and silent partner of the
```

☐

6

```
 1                      Proceedings
 2      competing what's called an indoor obstacle confidence
 3      course right up the block in Manhattan.  It is very
 4      important, your Honor, that's why I brought Miss Susan
 5      Douglas with us.
 6              This concept, an indoor obstacle confidence
 7      course is the only one in the nation.  There's no
 8      other obstacle course indoor with this program, with
```

Page 5

power1.txt

```
 9    these concepts, with this style of military training.
10    It was so unique and so rare that the defendants in
11    exhibit P, actually admit it, it's so neat and so rare
12    that it's confidential and trade secrets.  And I will
13    refer to you exhibits as I go along.
14                 However, your Honor, please, as we
15    proceed --
16                 MR. BUTERMAN:  Your Honor --
17                 THE COURT:  You'll have a chance.
18                 MR. CALCAGNO:  She actually went to Lauren
19    Brenner who's sitting right there with the white shirt
20    and black shirt and she actually went to Miss Susan
21    Douglass from Fross Zelnick only one of the top trade
22    dress, trademark firms in New York City.  This concept
23    has been filed with the patent and trademark office
24    for over the last two and a half years.
25                 THE COURT:  They have an issue of pattern
26    and trade --
```

〇

7

```
 1                         Proceedings
 2                 MR. CALCAGNO:  Not yet.  Hold on a second.
 3                 MR. BUTERMAN:  Your Honor --
 4                 MR. CALCAGNO:  Excuse me.
 5                 It is so unique that it is acquired
 6    distinctiveness by its very nature under the secondary
 7    meaning of the trademark dress laws.
 8                 THE COURT:  However --
 9                 MR. CALCAGNO:  Let me just go on.  This is
10    much more than that.
```

Page 6

power1.txt
```
11                THE COURT:  You should be in federal court.
12                MR. CALCAGNO:  More than that, your Honor,
13       this gets really bad.  So, here we are, she
14       establishes the entire curriculum.  I have books, her
15       business plan, her startup manual.  This concept took
16       off.  It was an instant sensation from the get-go.
17                THE COURT:  They're all upset by you.
18                MR. CALCAGNO:  I will get there and address
19       all those issues.  Give me five minutes.
20                THE COURT:  Is there going to be -- they
21       want you to be a witness or something?
22                MR. CALCAGNO:  No, no, your Honor.  Let me
23       explain it all and then the defendants will have their
24       turn.
25                I have a book that I presented to your
26       Honor at the TRO.  It's exhibit F to Miss Brenner's
```

☐

8

```
1                        Proceedings
2        affidavit.  This woman who's a self-made business
3        woman was written up in all business magazines as a
4        self-starting business woman.  She was a life time
5        athlete.  She designed, conceptualized this concept.
6        It's now getting national and international
7        recognition as her concept.  Every Monday for the next
8        six weeks she's on Fox Five with Mike and Juliet.  She
9        is on Fox Five, CNBC, Wall Street Journal.  This
10       concept is sensation.  It is an acquired
11       distinctiveness that is addressed by all the public.
12       Anyone hears about this concept, even Miss Susan
```

Page 7

power1.txt
13      Douglass will tell you, oh, that's Pure Power Boot

14      Camp's concept.

15              The brochure and this concept, if I may

16      approach --

17              THE COURT:  I don't want to see it.

18              MR. CALCAGNO:  It's exhibit A to Miss

19      Brenner's affidavit.  It was just an instant

20      sensation.

21              Now, Miss Brenner decided to do such an

22      instant sensation and it was going to be trademarked

23      and trade dressed and all her concepts, she franchised

24      it in 46 states.  And all of this knowledge was known

25      by the defendant Belliard and the defendant Fell her

26      two employees that trained the military style with

[]

9

1                       Proceedings

2       her.  She in fact trained them and taught them

3       everything they know.

4               Now, her client list is privileged and

5       confidential.  No one knows her client list.  It's not

6       like public knowledge anywhere.

7               THE COURT:  There will be franchises which

8       means there will be clients all over the place.

9               MR. CALCAGNO:  No.  Here's how it goes,

10      your Honor.  We have this franchise.  Now we file the

11      franchise in 46 states.  We spent literally about

12      $450,000, when all sudden, and unbeknownst to us,

13      eight months in July of '07, the two defendants in

14      clandestine fashion, your Honor -- there's no other

Page 8

power1.txt

```
15        way to say it -- they started conspiring with each
16        other, started conspiring with Miss Lee, who is an
17        executive at Bobby Flade's Place. And she's a Wharton
18        Business School graduate who should know better, here
19        they are, Ruben Fell, Alex Fell and Ruben Belliard,
20        here they are, we got a plan, we're going to steal her
21        business, literally all of her contents, her programs,
22        her concepts and they start in July of '07.
23                    First they start the Web site. They go to
24        "Go Daddy" and they do Warrior Fitness Boot Camp.
25        Then they steal more documents. They steal her
26        business plan --
```

10

```
1                         Proceedings
2                    THE COURT: She didn't know about the Web
3        site?
4                    MR. CALCAGNO: Oh, no, she did. She was
5        all part of it. Now, exhibit P --
6                    THE COURT: Wait. I mean your client?
7                    MR. CALCAGNO: Brenner had no idea about
8        this. This was just discovered over the last week or
9        so.
10                   Now, we have this business plan which is
11       identical. It's copyright infringement. Although we
12       did not register it, it's common law copyright
13       infringement. They literally cut and pasted from her
14       business plan, her startup manual, her brochure and
15       made it their own in clandestine fashion. And then it
16       gets even worse.
```

Page 9

power1.txt

17            In December they start looking for leases.

18    This was just discovered over the last week or so.

19    They go even further and all of a sudden they break

20    into her office, your Honor, and they steal her client

21    list.  First, it wasn't the full client list.  They

22    only stole 88 clients.  And I will show you, your

23    Honor, in the exhibits there's actually exhibits that

24    refer to the partial client list.  They go into the

25    exhibits and they steal one partial client list, it's

26    exhibit U, on March 25 of '08.

11

1                      Proceedings

2            And they go in there and they actually

3     steal it and here's when Ruben Belliard was still

4     employed there.  Alex Fell they had a disagreement.

5     He was insubordinate on March 16th, your Honor, said

6     expletives to Miss Brenner that were unacceptable, the

7     F word and multiple, multiple expletives that are in

8     detail in Brenner's affidavit, so repulsive, as an

9     individual, as an ex-marine and to a woman, how dare

10    you speak like that, when all the time he had this

11    plan.  He became belligerent and arrogant because he

12    knew I'm taking your concept, I have everything I

13    want.

14            So Miss Brenner was going to put him on

15    suspension.  He goes, "Fire me."  So she fired him.

16    But guess who didn't leave?  Mr. Belliard did not

17    leave because he wasn't finished stealing the

18    corporate documents, stealing the corporate assets,

Page 10

power1.txt

19    stealing the customer list.

20           On March 31st, your Honor, exhibit X,

21    Paragraph 116 of the affidavit what does Mr. Belliard

22    do?  Breaks into her office.  We have witnesses that

23    he broke into her office not with a hammer, opened it

24    up because they have a corporate policy no one is

25    allowed in there, and he steals her business plan,

26    steals the startup manual and guess what?  Steals all

☐

                                                      12

1                        Proceedings

2     of the active client list.

3            If you look at exhibit X, your Honor, I'd

4     like to read that, because it's pretty, pretty

5     malicious, willful, intentional and everything else

6     you can imagine under the sun.  This case is so

7     egregious, I just -- it's repulsive, your Honor.  It

8     says, quote, oh, oh, so I just updated our party list.

9     Open pren, with a very dear friend of ours additions

10    and ah, holy shit, there's over 330 people that might

11    come to our party.

12           Just -- and if you look on the exhibit,

13    your Honor, just look at it, it is a complete

14    spreadsheet of all the customers, e-mails, their

15    private address, the classes that they joined and all

16    at her facility.  These classes start at 5:30 in the

17    morning.  And oh, who's coming, who's not coming.  I

18    mean, this was just outrageous conduct, beyond

19    outrageous conduct.

20           Then I love this e-mail, your Honor, oh,

                        Page 11

power1.txt

21    look at double A.  This is one of my favorite by the

22    Wharton Business School graduate, Bobby Flade

23    executive who knows better than any of her boyfriends

24    and coconspirators, calls her Miss Conversion, proud

25    of it, arrogant, belligerent.  It is really

26    misappropriation is what it is.

⬜

13

1                    Proceedings

2              I converted a Lauren lover, exclamation.

3    This girl Jacobs loves Warren and hugged her one time

4    and said all would be okay and blah blah blah blah, so

5    I wrote her off.  Continuing with the quote, but

6    lately she has been talking to me a lot, wanting to be

7    partners and today I converted her, exclamation.  She

8    said she won't sign up if I don't return and do what I

9    do.  She promised not to renew and to sign up for

10    yours.  Man, I am good.

11              She then, in the next line, your Honor,

12    this is even more repulsive.  Now they want to

13    continue to destroy her.  Her only DI left, her drill

14    instructor, Necio.  She wants to destroy and take him

15    and sway him over.  It says hey, Necio says he's

16    leaving soon, he's miserable.  And Mylinise, another

17    person who's helping him, is a key witness in this

18    case, says she is signing up for the six month, et

19    cetera, et cetera.  I'm going to treat her to Megu for

20    dinner one time.  She is just too awesome and I dig

21    her.

22              Unbelievable evidence, your Honor, in this

Page 12

power1.txt

23    case.

24              Now we get to -- this is really the kicker,

25    your Honor.    Here we are Ruben Fell.  I mean Ruben

26    Belliard.  Here he is in the office on March 31st of

1                         Proceedings

2    '08.  He's not done stealing because he doesn't have

3    everything he needs.  And now he gets the client list

4    I just referred to it, oh shit, 330 clients, they're

5    coming with us.  He then calls Miss Brenner on the

6    phone and says, I quit, at 9:09 p.m. leaving her with

7    no one to teach her 5:30 a.m. class.  This poor woman

8    has been trying to do a national rollout.  She opened

9    up a second location in Jericho.  The identical

10   concept pursuant to the franchise, pursuant to the

11   business model, pursuant to the trade dress, all

12   filed, registered, doing everything that you're

13   supposed to do to protect your trademark, protect your

14   copyright information, do everything you can do

15   protect your business.

16              If we did not come in on the TRO, your

17   Honor, we would be negligent in doing that.  I'm going

18   to continue, your Honor, because it gets even worse.

19              The other coconspirator, Nancy Baynard, who

20   is Mr. Ruben Belliard's girlfriend, they say oh, why

21   is the girlfriend named?  Because if you look at

22   exhibit DD and exhibit EE -- sorry, it was so many

23   exhibits we had to go into double digits -- here they

24   are campaigning generally, and Miss Nancy Baynard

power1.txt

25      campaigned for all her clients in mass e-mails.

26                  Look at exhibit DD and EE, sending to all

                                                              15

1                          Proceedings

2       of the clients on the list.  Complete theft, complete

3       robbery, corporate sabotage.  And then trying to

4       defame her and then -- guess what, this is even more,

5       it gets deeper and deeper.

6                  After Mr. Belliard leaves and quit, guess

7       what, your Honor?  We then have destruction of

8       evidence.  He knows he's signed noncompetes.  Fell

9       signed noncompetes.  They broke into her office and

10      stole and destroyed and we believe shredded because

11      one coconspirator to the other says I think, quote

12      unquote, he shredded the document.

13                 I'd like to show you that exhibit, your

14      Honor, about shedding the exhibit.  It's exhibit CC.

15      I'd like to read it to the court.

16                 MR. BUTERMAN:  This isn't --

17                 MR. CALCAGNO:  Excuse me.  Please sit down,

18      Mr. Buterman.

19                 MR. BUTERMAN:  Buterman.

20                 MR. CALCAGNO:  Sit down, please.

21                 MR. BUTERMAN:  This is my e-mail.

22                 MR. CALCAGNO:  Quote, Mr. Buterman is

23      involved in this, your Honor.  He's a current client

24      of Pure Power Boot Camp.  I want to get to this.  It

25      says, quote, Ruben thinks that he shredded the copy of

26      the contract.

                        Page 14

power1.txt

16

```
 1                        Proceedings
 2                MR. BUTERMAN:  Your Honor --
 3                THE COURT:  Let's keep that for another
 4      day.
 5                MR. CALCAGNO:  Your Honor, shredded the
 6      contracts.  Let me go further, your Honor.
 7                THE COURT:  If there was any spoliation of
 8      evidence that's very, very sanctionable and we know
 9      that.  Any lawyer who participated will probably end
10      up in jail, so we don't have to worry about that.
11                MR. CALCAGNO:  Let me go further, your
12      Honor.  Before this honorable court, Mr. Buterman said
13      to you, if you recall --
14                THE COURT:  I don't recall.
15                MR. CALCAGNO:  There's no confidentiality
16      agreements, there's nothing.  And at the time this
17      e-mail was written, your Honor, on April 16th, Mr.
18      Buterman was just a client of Pure Power Boot Camp.
19      He was only involved in this case as of the day he
20      showed up.
21                THE COURT:  I don't know what you're
22      talking about.
23                MR. CALCAGNO:  Mr. Buterman was a client in
24      the boot camp.
25                THE COURT:  Wait a minute.  This gentleman
26      here?
```

power1.txt

```
 1                        Proceedings
 2              MR. CALCAGNO:  This man right here.
 3              THE COURT:  The lawyer for the defendant?
 4              MR. CALCAGNO:  Correct.  He is an essential
 5    material witness in this case.  The e-mails establish,
 6    your Honor, under double GG --
 7              THE COURT:  Why is he the central witness?
 8              MR. CALCAGNO:  Look at GG, your Honor.
 9              MR. BUTERMAN:  Your Honor, I respectfully
10    note that these e-mails reflect attorney/client
11    privilege information and should not be read.
12              MR. CALCAGNO:  My objection, evidentiary
13    hearings can be had at a later date.
14              THE COURT:  How did you obtain this?
15              MR. CALCAGNO:  Excuse me, we obtained them
16    because if you look at the response, thank you for
17    faxing it to me, there's an admission on Page 2 of Mr.
18    Buterman's opposition to your court and it says,
19    referring to defendant Fell on the left, states:  He
20    may have had access -- he may have accessed that
21    account from the computer in Miss Brenner's gym,
22    conceding and admitting that this e-mail account, his
23    Hot Mail account was on his computer.
24              THE COURT:  Who's he?  Wait a minute.
25    You've got to back up and explain to me who your
26    talking about.
```

18

```
 1                        Proceedings
                          Page 16
```

power1.txt

2            MR. CALCAGNO:  Yes.  On the work station of
3    the front desk, there's a computer.  The woman's name
4    is Liz.  She goes in.  All of a sudden she's hearing
5    some rumors, she doesn't know if it's true, all of a
6    sudden Liz goes into the computer, she goes into her
7    Hot Mail account and low and behold, there's his
8    e-mail account and concedes he put it on the computer.
9            THE COURT:  His e-mail account is on the
10   computer is probably a privilege of the attorney and
11   client.
12           MR. BUTERMAN:  It's a separate e-mail
13   account.
14           MR. CALCAGNO:  So he clicks -- she clicked
15   on it and lo and behold all of the e-mails except for
16   the last few come from that Hot Mail account admitting
17   to them signing noncompetes, being concerned about it.
18           I filed, I said to your Honor, I filed this
19   under seal.  As an officer of the court I have a duty
20   to turn over if there's attorney/client privileged
21   communication.  I saw it, so I asked for it to be
22   under seal so no one will see it, no one is prejudiced
23   between Carolyn Richmond and Alex Fell and Ruben
24   saying that you've got a problem, you signed a
25   noncompete.
26           After they didn't know they had a problem

⬚

                                                    19


1                       Proceedings
2    the e-mail appears and says I'm shredding it.
3                 MR. BUTERMAN:  Objection, your Honor.  He
                            Page 17

power1.txt

4       just said it's privileged information.

5                   THE COURT:  I don't think it's --

6                   MR. CALCAGNO:  It's a waiver.

7                   Now, your Honor, watch this, all of a

8       sudden, in the Hot Mail e-mail, in the Hot Mails,

9       they're watching this corporate sabotage going on,

10      stealing everything, for trade dress, copyright, her

11      clients, guess what?  I opened up a G Mail account and

12      Lauren's like flipping out, what did I do, what did I

13      do?  Guess what?  Liz says, "Mr. Alex Fell gave me his

14      password."  Because I wanted to watch, your Honor,

15      there's a -- he wanted to sell some stuff on E-Bay and

16      he tells Liz here's my password, hoo-rah, hoo-rah, and

17      guess what?  Bingo, shredded.  Criminal activity,

18      stealing corporate documents, admitting to corporate

19      sabotage.

20                  The reason why Mr. Buterman didn't want me

21      to tell you what the heck was going on, Judge, is

22      because these are so incriminating, so bad, so

23      blatant, malicious, willful, they should all be held

24      in contempt including Mr. Buterman.

25                  And in the e-mail that Mr. Buterman puts,

26      he tries to help them, says this is how you do it.


20

1                           Proceedings

2       Look at double G.  This is how you circumvent it.  He

3       didn't use those words, your Honor, no, used only

4       marine corps.  You didn't get it from Pure Power Boot

5       Camp.  You got it from --
                    Page 18

power1.txt

6            THE COURT:  I can't believe lawyers are
7    using e-mail.
8            MR. CALCAGNO:  Mr. Buterman did this, Mr.
9    Buterman in exhibit double H.  And I want you to see
10   this, Judge, this is reprehensible, this is
11   reprehensible.  He is going to quote -- and this is an
12   e-mail from Jenny Lee, defendant owner of Orient
13   Fitness, and her boyfriend coconspirator defendant
14   Alex Fell.  The last paragraph says, quote, it doesn't
15   mean Buterman won't do some little things to let
16   people know stuff that will hurt her even more, but it
17   won't hurt you guys.  He assured me of that.  He has
18   your best interest at heart, then his interest to
19   destroy her is secondary and thinks he will already
20   destroy herself.
21            And we wrote a letter to Mr. Buterman.
22   This gets even more outrageous.  I wrote him when he
23   called me up on May 5.  I said Mr. Buterman, you have
24   some serious conflicts of interest, you know about
25   this information.
26            I don't know anything.  He then says oh,

[]

21

1                    Proceedings
2    it's ten years.
3            I said who do you know?
4            I must have seen it in documents.
5            Did you see the documents?
6            I didn't know they exist.
7            We know he lied then.  We know he lied to
                        Page 19

power1.txt

8      this court a few weeks.

9                  MR. BUTERMAN:  Objection.

10                 MR. CALCAGNO:  He lied.  Mr. Traflet

11     witnessed it as well.

12                 And then he sent a letter to Mr. Buterman

13     to recuse himself, your Honor, to recuse himself under

14     the ethical rule DR.  And it's a directive.  It's just

15     not a canon of ethics.  It's DR 5-102.  He is a

16     material witness.  I believe he's potentially -- we

17     didn't know he was a defendant yet.  I want to take

18     his deposition first, then he may be a defendant.  I

19     don't want to do that to an attorney, but at the very

20     least there's an appearance of impropriety, collusion,

21     appearance of collusion, helping them engage in

22     trademark infringement.  It is outrageous.

23                 This is the last point, your Honor, I'll be

24     finished.  I am so outraged by his opposition it

25     violates -- it's actually tantamount to extortion and

26     blackmail before this court.  When your Honor reads it

&#9633;

22

1                         Proceedings

2      you will be outraged.  I think he should be sanctioned

3      by this court.  He actually threatened.  So I think we

4      should go the U.S. Attorney's office.  I think Mr.

5      Kilpatrick should be reported to the ethics committee

6      that is a direct violation of the canon ethics rule,

7      DR 7-105, threatening a criminal prosecution in civil

8      litigation.  It's outrageous to be to sitting here.  I

9      called him three times on the phone May 5, yesterday

Page 20

power1.txt

```
10        on May 6th.  When he showed up at court, I said please
11        don't show up, get some other attorney.
12                    I called Miss Carolyn Richmond.
13                    Where is she?
14                    I called Miss Carolyn Richmond.
15                    I said you haven't responded to any of my
16        letters, your clients are engaging in this fraudulent
17        activity, what are you doing?  She wouldn't even send
18        me a letter.  She does not represent the defendants.
19                    I said who represents the defendants?  Your
20        Honor, I need to know.  The only letters I have from
21        Carolyn Richmond from the Fox Rothschild law firm and
22        she responded I'm not sending you anything.
23                    I said Mr. Buterman called me and he said
24        quote, unquote, Mr. Traflet was with me, I'm
25        authorized to call you.
26                    I said do you represent the defendants?
```

```
1                           Proceedings
2                     He said no.
3                     I said, do you intend to represent them?
4         If you do, fax me a letter of rep.
5                     I don't.
6                     You want my fax number?
7                     No.  And he hung up.  Mr. Traflet was in
8         the room.  And guess what, who showed up for the TRO?
9         Guess who shows up?  Buterman.
10                    It is -- this case cries out for, your
11        Honor, irreparable harm.  Miss Susan Douglass, I'm so
```

Page 21

power1.txt

```
12      outraged, I take this personally, it's outrageous

13      conduct, it's malicious, it's willful, it's

14      contemptuous.  It's every awful despicable word of the

15      defendants, who think they're U.S. marines.  Pure

16      Power is built on 11 principles of integrity, loyalty

17      and trust.  And, guess what, every one of them has

18      been violated by all of them.

19              And smirk more, smirk.  You think it's

20      funny.  Miss Williams is smirking in this courtroom,

21      your Honor.  I take umbrage with her attitude and her

22      condescending and I renamed her misappropriation.

23      She's outrageous, outrageous.  I am appalled, your

24      Honor, very upset, very upset.

25              THE COURT:  You're going to have a heart

26      attack here.
```

```
1                       Proceedings

2               MR. BUTERMAN:  May I?

3               THE COURT:  Yes.

4               MR. BUTERMAN:  I'm the only one.  I

5       represent the defendants in this case.

6               THE COURT:  You do?

7               MR. BUTERMAN:  Yes, I do, your Honor.

8               MR. CALCAGNO:  I want to make a motion

9       formally to recuse him from this case.

10              THE COURT:  Disqualified is the word, too.

11              MR. CALCAGNO:  Disqualified.

12              MR. BUTERMAN:  Let me begin by explaining

13      some of the background here, your Honor, just briefly
```

Page 22

power1.txt

14    and this all contained in the letter that I wrote to
15    the court earlier today which I do not know if the
16    court received it or not.  I have another copy of it I
17    can provide to your Honor.
18            And what I point out in the letter, your
19    Honor, is that yesterday afternoon, yesterday around
20    noon, 11:00 o'clock, noon, we received plaintiffs'
21    papers regarding their request for preliminary
22    injunction.  And when we looked at the papers what we
23    immediately noticed that they were largely -- there
24    was an affidavit from Miss Lauren Brenner that
25    contained approximately 20 e-mails taken from my
26    client, Mr. Fell's Hot personal accounts.

25

1                    Proceedings
2            I understand, your Honor --
3            THE COURT:  Who got on her e-mail system?
4            MR. BUTERMAN:  Fifteen of those e-mails
5    were taken after my client had been terminated.  My
6    client was terminated on March 16th, 2008, and your
7    Honor can look and see that most of the exhibits here
8    are e-mails that come from after March 16th, 2008.
9    They are e-mails --
10            THE COURT:  He was using?
11            MR. BUTERMAN:  No, he wasn't at the
12    facility anymore, your Honor.
13            THE COURT:  If he was using the facility.
14    If I put my home e-mails on the OCA account and I
15    leave OCA, OCA has a right to my whole e-mails.

Page 23

power1.txt

16                MR. BUTERMAN:  Absolutely.  These were not
17    put on Pure Power Boot Camp's account.
18                THE COURT:  If I give OCA access one way or
19    another to my whole e-mail, that's the end of my
20    privacy.
21                MR. BUTERMAN:  First of all, Mr. Fell did
22    not give any access.
23                THE COURT:  How did he do it?
24                MR. BUTERMAN:  What's our understanding of
25    how he's got there, what happens is Mr. Fell at one
26    point in time --

                                                    26

1                         Proceedings
2                 THE COURT:  Gave somebody else his
3     password?
4                 MR. BUTERMAN:  No, that's not our
5     understanding.  What we understand is at one point in
6     time Mr. Fell accessed his Hot Mail account while he I
7     was employed by Miss Brenner.  He then left the
8     company and when he left the company they somehow
9     gained access to his account thereafter.  And, your
10    Honor, they continued to do that.  And, you know, the
11    point that should be made is we're not just talking
12    about Mr. Fell's Hot Mail account.  There's actually
13    three accounts here.  There's a G mail account and
14    there is a Warrior Fitness account.
15                THE COURT:  All of which would had to have
16    been produced during discovery.
17                MR. CALCAGNO:  Absolutely.
                       Page 24

power1.txt

18          MR. BUTERMAN:  Here's the point with
19    respect to this.  In those files you will see not only
20    very, very privileged personal communications but also
21    attorney-client privileged communications.  And, your
22    Honor --
23          THE COURT:  I think he may have waived
24    them.
25          MR. BUTERMAN:  With all due respect --
26          MR. CALCAGNO:  Absolutely, Judge.


                                                          27


1                        Proceedings
2          MR. BUTERMAN:  With all due respect, it is
3    not the case he can waive attorney-client privilege.
4    Waiver is the knowing relinquishment of a right.
5          THE COURT:  Not necessarily, as long as
6    somebody else was in the room.
7          MR. BUTERMAN:  Nobody else was in the room.
8          MR. CALCAGNO:  Please don't cut the judge
9    off when she's speaking.
10          MR. BUTERMAN:  Your Honor, please.  On
11    April 1st, 2008, Miss Richmond who's from the law firm
12    of Fox Rothschild wrote a letter to Miss Brenner
13    directly, saying I represent Alex Fell in this
14    litigation, in this potential litigation and all
15    issues regarding his termination from Pure Power.
16          There is an e-mail from April 16th, 2008,
17    and it's exhibit BB, your Honor, to Miss Brenner's
18    affidavit.  It's an e-mail from Miss Richmond on her
19    Fox Rothschild e-mail accounts to Mr. Fell, after --

power1.txt

20       mind you, your Honor, this is over a month after Mr.
21       Fell had been terminated giving Mr. Fell legal advice
22       and legal opinion and discussing attorney-client
23       privilege information.
24               On the second page of the e-mail exhibit
25       BB, your Honor will see that it says clearly that this
26       document, this e-mail, contains privileged and

⬚

28

1                       Proceedings
2       confidential information intending only for the use of
3       the individual named above.  If you are not the
4       intended recipient of this e-mail or the employee or
5       agent responsible for delivering to the intended
6       recipient, you are hereby notified that any
7       dissemination or copying of this e-mail is strictly
8       prohibited.
9               Now, your Honor --
10              THE COURT:  So there's stuff in here that
11      shouldn't be.  Go ahead.
12              MR. BUTERMAN:  There's a lot of stuff in
13      here that's confidential privileged information and it
14      goes deeper, your Honor.
15              What's happened in this litigation is that
16      Miss Brenner and counsel have had access to three of
17      Mr. Fell's e-mail accounts throughout this litigation.
18              Now, these are the e-mails they chose to
19      produce but there are literally hundreds of e-mails.
20              THE COURT:  What does that got to do with
21      the issue?
                        Page 26

power1.txt

```
22              MR. BUTERMAN:  There are e-mails between
23        attorneys.
24              THE COURT:  Mr. Buterman, what does that
25        got to do with the issue in the case?
26              MR. BUTERMAN:  It has to do with the fact
```

[]

29

```
 1                      Proceedings
 2        that in sum total of a support for plaintiffs' motion
 3        for preliminary injunction happens to be privileged
 4        material, your Honor.
 5              THE COURT:  Wait.  But if we got privileged
 6        material, it shows that they stole all the documents.
 7        It's out there.
 8              MR. BUTERMAN:  First of all, those issues
 9        are very much in dispute and I respectfully submit
10        that the evidence doesn't show that at all.  But I
11        have a much bigger problem which is that counsel has
12        been privy to my communications with my clients and
13        mind you, your Honor, up until -- we have an e-mail in
14        here from last Friday.
15              THE COURT:  Somehow you -- you know
16        something, maybe lawyers should learn -- should have
17        learned by now not to communicate with their clients
18        through e-mails particularly when a situation like
19        this arises, if you have clients who are likely to
20        have the access one way or the other.  You know, it's
21        a problem now with the electronic communications and
22        I'm going to say you have to eat it.
23              MR. BUTERMAN:  It absolutely is a problem,
```

Page 27

power1.txt

24          your Honor.  But, respectfully, we are talking about
25          private e-mails and there's no issues of waiver here.
26                    THE COURT:  They may not be admissible but

⬚

                                                                30


1                              Proceedings
2          there may be enough evidence to get a TRO.
3                    MR. BUTERMAN:  Respectfully, your Honor, I
4          highly disagree because I also believe that the
5          e-mails themselves do not show even close to what Mr.
6          Calcagno claims that they show.  But the point is,
7          your Honor --
8                    THE COURT:  Did your clients have a
9          noncompete agreement?
10                    MR. BUTERMAN:  Your Honor.
11                    THE COURT:  Yes or no?  You know that.
12                    MR. BUTERMAN:  My clients, I will tell you
13          exactly what I know.  Mr. Fell has an exhibit here
14          that's a noncompete agreement.  He is prepared to
15          testify under oath that that is not his signature on
16          that agreement.
17                    With respect to Mr. Belliard, I believe
18          that at one point in time Mr. Belliard did have a
19          noncompete agreement, it has not been produced, I have
20          never seen it.  What I do know, your Honor, is that
21          the noncompete is a ten-year noncompete agreement
22          which prohibits my client from operating anywhere in
23          the world in the fitness industry.  It is facially
24          invalid.
25                    THE COURT:  A ten-year would be.

power1.txt

26                    MR. BUTERMAN:   Thank you, your Honor.


                                                              31


        1                         Proceedings
        2                    MR. CALCAGNO:   But it has a savings clause,
        3         your Honor, and subject to your Honor reducing it.
        4         But can you ask a pointed question, did Mr. Belliard
        5         shred the noncompete as stated in double C, your
        6         Honor?   Can you ask that question?
        7                    MR. BUTERMAN:   This is inappropriate.
        8                    MR. CALCAGNO:   It's here right here.
        9                    MS. RICHMOND:   I'm Carolyn Richmond from
       10         Fox Rothschild, counsel for all the defendants as
       11         well.   The beginning of April when we first became
       12         aware of this issue, I respectfully wrote to counsel
       13         and Pure Power and requested any copies of any
       14         noncompete or nondisclosure agreements.   This all
       15         could have been forestalled because if there was a
       16         noncompete agreement against Mr. Fell, this is what I
       17         do for a living noncompete agreements in the
       18         employment sector, and so if there was one as alleged
       19         and attached yesterday, it should have been produced
       20         six weeks ago.   It never was, which belies the
       21         question of whether it is legitimate.
       22                    THE COURT:   Who do you write to?
       23                    MR. RICHMOND:   First we asked Miss Brenner;
       24         then we asked the first counsel.   I repeatedly asked
       25         for the last six weeks whether there was any alleged
       26         intellectual properties, whether there was any

                               Page 29

power1.txt

32

| | |
|---|---|
| 1 | Proceedings |
| 2 | registration or trademark.  If there was, I could have |
| 3 | counseled my client differently.  Now all laid out |
| 4 | before you, my advice is there. |
| 5 | And with respect to all of the wiretapping |
| 6 | laws and electronic privacy acts, I respectfully |
| 7 | disagree.  Your rights actually under New York state |
| 8 | privacy protects you much greater than you believe, |
| 9 | because even if your access to your computer accounts |
| 10 | were outside of work, were in work, once your boss |
| 11 | became aware that this was private and your private |
| 12 | e-mails, they're supposed to stop, particularly when |
| 13 | they see the legends at the bottom. |
| 14 | And when you leave the bench in particular |
| 15 | and your bosses were to access your account |
| 16 | surreptitiously after you left the bench, I propose |
| 17 | that's a whole different ball of wax.  When my counsel |
| 18 | attaches those e-mails to court documents, that opens |
| 19 | up a whole other can of worms. |
| 20 | THE COURT:  I may have spoken quickly, |
| 21 | but -- |
| 22 | MS. RICHMOND:  There's a whole lot of case |
| 23 | law out there about what those acts do.  And none, |
| 24 | despite all the hyperbole of counsel, none of the |
| 25 | documents without discovery would even get to the |
| 26 | point of whether or not there were documents taken or |

33

power1.txt

```
 1                    Proceedings
 2      not.  What we do see here is you can't ask for an
 3      equitable remedy as far as a TRO when you yourself
 4      have breached and not followed the laws of equity.
 5                    THE COURT:  It's a problem.
 6                    MS. RICHMOND:  My colleague is here to
 7      respond, as well, to some of the remaining points.
 8                    MR. CALCAGNO:  I do have Miss Douglas here.
 9      After they're done I'd hike her to address the trade
10      address infringement.
11                    MR. BUTERMAN:  I want to point out we are
12      here on a motion for preliminary injunction and the
13      issues that have to be resolved here are whether
14      there's a likelihood of success on the merits.
15                    THE COURT:  Counsel I'm aware of it.
16                    MR. BUTERMAN:  Your Honor, the issue is --
17      one of the issues here certainly are whether the
18      equities favor one party or another.  I want to say in
19      light of what's going on in the e-mails, it's very
20      clear that the equities certainly do favor the
21      plaintiffs in this matter.
22                    Moreover, your Honor, I just want to bring
23      up one fact with respect to the issue of irreparable
24      harm here.  Miss Brenner has a very, very successful
25      business.  I want to say, when Mr. Fell and Mr.
26      Belliard open on Monday, they have ten clients.  In
```

⬚

34

```
 1                    Proceedings
```

power1.txt
2      the affidavit submitted by Miss Brenner she talks

3      about having had thousands of clients over the years.

4      We're talking about a small gym, two ex-marines who

5      are trying to open with ten clients.

6                  THE COURT:  Now, here, let me ask you, have

7      they taken the client list?

8                  MR. BUTERMAN:  No, your Honor.  It's my

9      understanding -- let me please explain the document

10     that Mr. Calcagno referred to.  And this is

11     100 percent my understanding.  Exhibit XX, excuse me,

12     exhibit X that Mr. Calcagno referred to, which has a

13     party list, is a list that was compiled by all four of

14     the named defendants based on the personal e-mail

15     list.  When --

16                 THE COURT:  That doesn't sound totally

17     believable.

18                 MR. BUTERMAN:  Your Honor, the point is

19     client lists are not confidential if they are

20     available from other sources.

21                 THE COURT:  Client lists of this type are

22     confidential.  If they're available for other sources

23     they still have to be given back.

24                 MS. RICHMOND:  Your Honor, I'm sure you

25     have many cases with respect to documents in this

26     particular county.  New York law is very clear if you

⧠

35

1                          Proceedings

2      can create a list from your head on your own --

3                  THE COURT:  I agree with that, but that's

Page 32

power1.txt
 4    not this.

 5                MS. RICHMOND:  Your Honor, that's exactly
 6    what this is.  They were gym members.  You can walk
 7    in.

 8                THE COURT:  Counsel, let's say I don't
 9    believe that.  I think they took lists.  I believe
10    they took lists.  And I'm going to order those lists
11    returned.  I want them -- if they have them out of
12    their heads, then they should give over all the lists
13    and then make new lists out of their heads.

14                They don't have all the phone numbers, they
15    don't have all the e-mail numbers in their heads.

16                MR. BUTERMAN:  If your Honor would like,
17    let me represent -- let me be clear.  My clients have
18    represented to me that they do not have any customer
19    lists, that they have from Pure Power Boot Camp.
20    That's what they have represented to me.

21                THE COURT:  I am telling you that I don't
22    believe it.  And I am ordering them to return any
23    lists that they have, even ones they claim they don't
24    -- they didn't get from Pure Power.  They can start
25    over again, because any list that has either an e-mail
26    or telephone number, I want back.

☐

36

 1                        Proceedings
 2                MR. BUTERMAN:  Your Honor, respectfully,
 3    while my clients will abide by your Honor's rulings,
 4    the list that they created also have personal
 5    contacts, the e-mail list attached to exhibit X which

Page 33

power1.txt
6    plaintiff now has.
7              THE COURT:  How did they get all those
8    e-mails?
9              MR. BUTERMAN:  Many of them are from their
10   friends.
11             THE COURT:  They have them again.
12             MR. BUTERMAN:  We will be happy to give
13   back any copies of exhibit X that we have or any other
14   master list will be given, I should say.
15             MR. CALCAGNO:  Your Honor.
16             THE COURT:  I don't want to hear from you.
17   Go ahead.
18             MR. SKINNER:  My name is John Skinner from
19   Fox Rothschild.  I'm a registered pattern and
20   trademark attorney from the U.S. PTO.
21             Somewhere in the documents here there was
22   an affidavit by Miss Susan Upton Douglass.  Mr.
23   Calcagno has said that the plaintiff has a number of
24   trademarks and one of trademarks that they are
25   claiming to have is trade dress to allay out --
26             THE COURT:  They said they applied for

1                     Proceedings
2    them.  She backed away from having one.
3              MR. SKINNER:  I just wanted to show the
4    court that an office action issued back in January of
5    2008 that finally rejects the trademark application in
6    the trademark offices said the following:  "The
7    refusal to register is made final because the proposed

Page 34

power1.txt

8      mark consists of nondistinctive trade dress that would

9      not be perceived as a service mark."

10            In the present case the proposed mark is

11     not inherently distinctive because camouflage, rubber

12     flooring, tire rungs, climbing walls, climbing nets,

13     hurdles and motivational words are commonly associated

14     with fitness centers.  Please see the previously

15     attached evidence which illustrates camouflage

16     associated with other boot camps and that military

17     style boot camps are a commonly offered physical

18     fitness service.  And they go on and list a half dozen

19     different boot camps and they also show as evidence 47

20     various pages taken off the Internet.

21            MS. DOUGLASS:   If I may?

22            THE COURT:  Yes.

23            MS. DOUGLASS:   I am Susan Douglass.  May it

24     please the court, I have been practicing trademark and

25     copyright law exclusively for 26 years at the firm of

26     Fross, Zelnick, Lehrman & Zissu, which is the largest

⌂

38

1                    Proceedings

2      firm in the world that specializes only in trademark

3      and copyrights, not patents.  And we have 50 lawyers,

4      that's all we do.  And so I can tell you it's my

5      experience that what happens in the real world and

6      what happens in the trademark office are two entirely

7      different things.

8            The Supreme Court in the Two Pacer versus

9      Taco Sabana (phonetic) case had said that trade dress

Page 35

power1.txt
```
10        which are the elements, the look and feel of a
11        business are inherently protectable, which is the
12        supreme court case, Two Pacer versus Taco Sabana.
13                   THE COURT:  Come on, let's go.
14                   MS. DOUGLASS:  Anyway, the point is when
15        you file an application in the trademark office these
16        examiners are, for lack of a better word, fearful and
17        so what they do is because Section 2F of the trademark
18        office says five years of use is inherent, is prima
19        facie evidence of inherent distinctiveness --
20                   MR. SKINNER:  Objection.
21                   MS. DOUGLASS:  The examiners like to wait
22        for five years so they feel they have the comfort of
23        having the five years behind them.  We have four and a
24        half years that what counsel referred to as the final
25        refusal is the final refusal which gives us six months
26        to answer.
```

39

```
1                         Proceedings
2                    And so we are going to be filing the
3         response on July 5th, which is the last day of the
4         term to respond.  And the examiner has told us over
5         the telephone that she's just going to wait out the
6         five years.
7                    MR. SKINNER:  Objection.
8                    MS. DOUGLASS:  Excuse me, I had a telephone
9         conversation with the examining attorney.  And she
10        said I'll feel more comfortable waiting for five years
11        because the trade traditions are not within the
```

Page 36

power1.txt

12    comfort zone of the trademark examining attorneys who

13    are more accustomed to word marks and logos, than the

14    sort of thing I have in the past, for example,

15    attached to my affidavit registered the trade dress of

16    the Two Carnival store.

17          And again even though the Supreme Court has

18    said that the trade dress is inherently distinctive,

19    the examining attorneys feel more comfortable with the

20    five year period and when it comes time for me to file

21    the request for reconsideration in July, which I have

22    all of this press evidence which is very persuasive,

23    the courts have said, the trademark office has said

24    that extensive publicity, and so on, is persuasive

25    evidence of acquired distinctiveness.

26          She's basically told me on the telephone

▯

40

1                         Proceedings

2    that she's just waiting out the term.  So this is what

3    I'm going to do, I'm going to until July.  I will file

4    a request for reconsideration.  She will review it

5    over a couple of months and then we will be up to the

6    five year term amount at which point we will then file

7    a supplemental thing saying we have five years and

8    then it will go through.

9          The other point I would like to make is

10   that we have no objection to the defendants having a

11   boot camp.  What we're talking about is distinctive

12   trade dress comprising all of these elements, the

13   indoor confidence obstetrical course which is

Page 37

power1.txt
```
14      specifically designed.  They can do calisthenics, they
15      can have pieces of equipment when you go in this place
16      and you look at the brochures and you see the very
17      distinctive look totally non-functioning, you don't
18      need to have netting hanging from the ceiling, you
19      don't have to lay out, you don't need the words
20      stenciled on support posts in the building.
21                  THE COURT:  Is that what your client has?
22                  MS. DOUGLASS:  Yes.  And it's totally
23      arbitrary and distinctive trade dress.  That is the
24      subjects of the trademark application and which will
25      ultimately be registered.
26                  They're welcome -- there are other boot
```

☐

41

```
1                         Proceedings
2       camps in the country.  They're welcomed to do that.
3       They can do their own boot camp.  What they can't do
4       also is a proprietary program; for example, what
5       Lauren Brenner has developed.  I've been to many gyms.
6       I belonged to one gym for 25 years.  You never walk in
7       the door and they say drop down and give me five.  And
8       the clients walk in like this in high heels and the
9       guy a suit and they do five push-ups.  And they have
10      changing dens instead of a dressing room.  This is
11      what the Lauren Brenner Pure Power Boot Camp is.  And
12      they're trying to emulate all these things.  They call
13      clients by the name recruits.
14                  THE COURT:  I find that obnoxious, calling
15      clients recruits.  I have to tell you that more than
```
Page 38

                                power1.txt
16      anything else.
17              MS. DOUGLASS:  Is that not distinctive,
18      unique?  Have you ever been to a gym where somebody
19      calls you a recruit.
20              THE COURT:  It sounds pretty hokey.
21              MS. DOUGLASS:  This what they are copying,
22      they're copying this whole program.
23              THE COURT:  By tomorrow they'll change it.
24              MR. BUTERMAN:  First of all, with respect
25      to some of these elements -- and I appreciate
26      counsel's --

⬜

                                                        42

1                       Proceedings
2               MR. CALCAGNO:  Can I say one thing to Miss
3       Douglass?
4               THE COURT:  No.
5               MR. CALCAGNO:  Fine, your Honor.
6               MR. BUTERMAN:  If the concerns are with
7       respect to issues with respect to cargo netting, your
8       Honor, there will be no cargo netting in our gym.  If
9       the issues are with respect to tents, I can assure
10      your Honor there will be no tents.
11              THE COURT:  We're getting there.
12              MR. SKINNER:  I would submit that is not
13      what the trademark is.  If you look at the trademark
14      it actually has a picture of the obstacle course as
15      the examiner --
16              THE COURT:  They're not saying the obstacle
17      course.  They're saying the tents.
                            Page 39

power1.txt

18          MR. BUTERMAN:  We will not have the
19     military green color.  I mean --
20          THE COURT:  Okay.  We're getting there.
21          MS. DOUGLASS:  In their business plan, your
22     Honor, they say the Warrior Boot Camp, they say it's a
23     completely different fitness experience based on pan
24     military style training.
25          THE COURT:  Why don't you work with --
26          MR. SKINNER:  Your Honor --

43

1                    Proceedings
2          THE COURT:  I am going to walk out.
3          You know what, somehow this group has been
4     unable to conduct itself appropriately.  And for that
5     reason I am just not going to say do anything now.  If
6     you change your thing enough, the TRO goes away.  And
7     it's now up to you to change your thing enough.
8          MR. SKINNER:  Can we get a little guidance?
9          THE COURT:  Don't call everybody recruits,
10     don't come in and say drop down and do this.  If
11     there's some imitation in the program, you know, a
12     boot camp is a boot camp.  Nets gone, color's gone,
13     change your style.  Don't call them recruits, call
14     them -- come up with another word.
15          MR. BUTERMAN:  It's all agreed, your Honor.
16     That is all agreed to.
17          MS. DOUGLASS:  If there's the indoor
18     obstacle confidence course.
19          THE COURT:  I'm not going to say
                    Page 40

power1.txt
20    everything.   Take a look.   The three of you go look at
21    theirs, figure out something that's different.
22                    MS. RICHMOND:   Your Honor, could we have
23    the TRO lifted?
24                    MS. DOUGLASS:   Could we keep the TRO in
25    place, please.   I'd just like to make one more point
26    about irreparable harm; that is to say people are

44

1                        Proceedings
2    going to invest hundreds of thousands of dollars.
3    They do have a franchise in this.   The franchise is
4    worthless if people steal it.   There will be
5    irreparable harm.
6                    THE COURT:   I can't stop boot camps.
7                    MS. DOUGLASS:   No, but you can stop the
8    imitation of the Pure Power Boot Camp.
9                    THE COURT:   It's got to be something
10    different.
11                    MS. RICHMOND:   Your Honor, with all due
12    respect, the concepts of boot camps besides being all
13    over this country in other gyms derives from the U.S.
14    Army and Marines.   Recruits all come from the army.
15                    THE COURT:   I don't like it.   Get rid of
16    that.
17                    MS. RICHMOND:   Personally I wouldn't like
18    it.   It's exactly what it's called.
19                    MR. BUTERMAN:   My client just informed me
20    they don't refer to their clients as recruits anyway.
21    They use a specific marine term.   They call them

Page 41

power1.txt

22    warriors.

23            THE COURT:  Style themselves differently.

24    I can't stop competition.

25            MR. TRAFLET:  Your Honor, there's an issue

26    that the TRO hasn't been addressed.  They're supposed

45

1                      Proceedings

2    to give us back everything that they took.

3            THE COURT:  Yes, I'm ordering that back.

4            MR. TRAFLET:  That includes all of our

5    franchise material.

6            THE COURT:  Two and a half weeks from now,

7    will give you a new date.

8            MS. DOUGLASS:  What about Monday?

9            THE COURT:  They can open Monday as long

10    as --

11            MS. DOUGLASS:  They have been all set up to

12    go.

13            MR. TRAFLET:  They have all our franchise

14    documents.

15            THE COURT:  It has to be given back

16    tomorrow.

17            MR. TRAFLET:  They can't use that, correct?

18            THE COURT:  Everything has to be returned

19    by tomorrow.

20            MR. CALCAGNO:  What about the stolen

21    noncompete that Ruben said he shredded or in their

22    position that he says exist, can they return the

23    noncompete agreement?

power1.txt
```
24                    MR. BUTERMAN:  Everything we have we will
25       certainly return.
26                    MR. CALCAGNO:  Your Honor, if you can just
```

⬜

46


```
1                         Proceedings
2        put in place the franchise is going to be diluted, the
3        trade dress is going to be diluted, the indoor
4        obstacle confidence course, the entire concept they
5        have stolen.  I went to their facility and they
6        created an exact replica.
7                    THE COURT:  I can't do this without a
8        hearing and I can't conduct a hearing for a couple of
9        weeks now.
10                   MS. DOUGLASS:  There will be irreparable
11       harm that cannot be mitigated.  If the TRO could
12       please stay in place.
13                   THE COURT:  I'm not going to keep the TRO
14       in place.  They can open on the 14th.  But if in two
15       weeks you come back and show me that you haven't
16       changed everything --
17                   MS. DOUGLASS:  Can we have access to take
18       photographs?
19                   THE COURT:  Yes.
20                   MR. BUTERMAN:  You'll obviously supervise
21       access?
22                   THE COURT:  Yes.
23
24              *              *              *
25
```

Page 43

power1.txt

26

47

1                              Proceedings

2

3                      C E R T I F I C A T E

4

5

6    It is hereby certified that the foregoing is a true and
     accurate transcript of the proceedings.
7

8             ----------------------------------------
              MICHAEL J. DAUGENTI, CSR, RPR, RMR, CRR
9             OFFICIAL COURT REPORTER
              SUPREME COURT-NEW YORK COUNTY
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

power1.txt

**EXHIBIT C**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

PURE POWER BOOT CAMP, INC.,                    SUPPLEMENTAL
PURE POWER BOOT CAMP FRANCHISING               AFFIDAVIT OF LAUREN
CORPORATION, and PURE POWER BOOT               BRENNER IN SUPPORT OF MOTION
CAMP JERICHO INC.,                             Index No.: 08 CV 4810 (JGK)

                        Plaintiffs

            -against-

WARRIOR FITNESS BOOT CAMP, LLC,
ALEXANDER KENNETH FELL a/k/a ALEX
FELL, Individually; RUBEN DARIO BELLIARD
a/k/a RUBEN BELLIARD, Individually;
JENNIFER J. LEE Individually; and NANCY
BAYNARD, Individually,

                        Defendants.
-------------------------------------------------------------------x

STATE OF NEW YORK :
                        s.s.:
COUNTY OF NASSAU:

        LAUREN BRENNER, being duly sworn, deposes and says:

        1.      I am the president of each of the plaintiffs and make this supplemental affidavit in

support of the instant motion for a preliminary injunction prohibiting defendants from operating,

together with such other relief as the court may deem appropriate.

                            Pure Power's Business

        2.      As set forth in my original affidavit, Pure Power has been in existence for roughly 5

years. Over that period, I have devoted endless hours and hundreds of thousand's of dollars, to build

a company recognized as the only fitness program employing a unique indoor obstacle course and

                                        1

modeling itself on military training techniques.

3.     I have put a franchise offering in place (see Exhibits D and Q) and have had over 400

inquiries from across the country from people interested in purchasing a franchise.

4.     My efforts to develop the Pure Power concept have been successful and as a result,

Pure Power has gained fame in its field for its unique program.  A sampling of the media coverage

is included as part of Exhibit F.

5.     Pure Power provides boot camp training using what had been the only existing indoor

obstacle course, which includes 3 climbing walls, pillars with 7 marine based mottos; employees are

drill instructors, clients are recruits and both wear fatigues when training.  As stated in my original

affidavit,

> The distinctive appearance and unique features (i.e., the "Trade Dress") of PURE
> POWER BOOT CAMP's exercise facility is as follows: The facility comprises a
> large loft space, with an indoor obstacle/confidence course styled to look like a
> military boot camp training course.  The floor is covered with crushed rubber.  As
> stated above, the eleven standing pillars throughout the facility are stenciled with
> principles of leadership that PURE POWER BOOT CAMP has selected, namely,
> "Loyalty," "Courage," "Duty," "Honor," "Integrity," "Pride," "Power," "Wisdom,"
> "Dignity," "Trust," and "Respect."  These principles are a major part of the PURE
> POWER BOOT CAMP program.  Clients are greeted at the door by a mannequin of
> a snarling soldier holding a gun, dressed in full combat gear.  The main part of the
> work-out area has a 15-part obstacle/confidence course with these elements: hurdles,
> a series of three progressively higher walls to ascend and descend, a tire run, "barbed
> wire" netting to crawl under, monkey bars, dip bars, rolling logs, a wrap-around
> climbing wall, cargo net climb, bob-and-weave boxing ropes, rope climb, a ramp
> with a tunnel to shoot through, and a rope swing over a water pit.  All of these
> obstacles are surrounded by a running track.  There is a separate calisthenics area
> with wooden crates used for jump-ups and for partnering activities.  On the far side
> of the space, instead of the usual dressing rooms, PURE POWER BOOT CAMP
> features men's and women's canvas tents for changing clothes.  Ceiling netting and
> foliage complete the look.  All of the above components are collectively referred to
> as the "Trade Dress."

6.    Defendants Belliard and Fell had been in drill instructors with Pure Power for over 3 1/2 and 2 1/2 years, respectively. Belliard was titled senior drill instructor and had been my right hand man, so much so that I had offered him a partnership in the business. Other than myself, Belliard and Fell had been the primary drill instructors for New York, although there had been other drill instructors employed from time to time; in the past year, there were Belliard Fell and one other instructor, Nicio Evertz. However, because Belliard and Fell pleaded that they needed as many hours as possible, I did not hire any others as I had planned and the third instructor had less than half the hours of Belliard and Fell.

7.    Although our New York training facility is extensive, there is only one office which is occupied solely by me. It is my private office where all my corporate documents, franchise materials, business plans, employee files, financial materials such as checkbooks, bank statements, credit card information, vendor information and all clients personal files, as well as chapters of my book I am writing, DVD and video of all Pure Power proprietary footage about new curriculum etc is all in my office which is COMPLETELY OFF LIMITS to EVERYONE! It is also in the employee handbook that is on display and must be read by every employee. It is placed on the refrigerator by the front desk where all the employees spend their time before and after class. We have two computers in PURE POWER. One is on the front desk to be used only by my two assistants on their shifts, and the other one is in my private office to be used only by me.

8.    In fact we have a specific employee manual (Exhibit 1 hereto), which prohibits the use of company computers for personal purposes and advises the employees that emails will be retrieved in the company's discretion and that employees have no right of privacy for such emails.

9.    Apparently, Belliard and Fell not only used a company computer for personal

3

business, they used it to surreptitiously launch their competing business and to steal physical and electronic files.

CUSTOMER LIST

10.    Within my computer was a comprehensive list of Pure Power clients and included names, telephone numbers, e-mail information, credit card, health information and oftentimes, the nature of the services subscribed to by the clients.

11.    Although I understand that when an employee steals a customer list, injunctive relief may follow even if the list is not considered confidential, this was confidential information, unavailable to the general public by other means. For instance, the simple fact that these were people who would engage in this manner of training alone is information which could not be easily gathered, and their names, addresses, email addresses, business contact information, and other data was also information which could not be secured readily. In addition to the list, I am advised by a computer consultant that   when they downloaded my client base, they would have obtained Pure Power's entire client list of over 1,000 past and present clients, and other information which they did not include on the invitation list, such as client credit card information and health related notes, all of which is clearly non-public.

12.    Defendants Fell and Belliard were subject to employee agreements which prohibited disclosure of confidential information including but not limited to customer information (Exhibit I, par. 2).

13.    Fell's agreement is annexed as Exhibit I. He claims the signature on that document is not his. However, we had  employees sign these agreements in September 2006, at the suggestion of counsel, when we were in the process of preparing to franchise the business.

4

14. Although counsel for Belliard previously represented by letter dated April 30, 2008 that neither Belliard nor Fell were subject to any restrictive agreements (See Exhibit B to the affirmation of Andrew Calcagno in support of the original order to show cause ), a letter written after emails acknowledging Belliard's execution of the agreement (Exhibit BB), when faced with e-mails which indicated that Belliard "shredded" his agreement, and letters from counsel to Fell which clearly reflected counsel's knowledge of the existence of the agreement, stating that Belliard's execution of the agreement could impact on Fell as well (Exhibit BB), on the return date of the original order show cause in state court, counsel for Belliard admitted his execution of the agreement (Transcript, p. 30).

15. Whether by reason of the requirements of paragraph 2 of the employee contract or the general prohibition against employee malfeasance, the bottom line, as Justice Freedman concluded (Transcript pp.35-36) is that defendants stole the customer list.

16. Defendants' assertion in State Court that the lists had not been stolen is a brazen misrepresentation and indicative of their credibility in general.

17. One need only refer to Exhibits U, V and X to see the transparent falsity of the claim. Exhibit U is their original customer list of 88 people, following an e-mail dated March 25, 2008. Exhibit X is a list of 321 people following an email dated March 31st.. Entries on exhibit U were generally the name only while on Exhibit W, they include e-mail addresses.

18. Perhaps the most telling proof of the theft is the timing of the "updated" list. Belliard tendered his resignation April 1st (Exhibit V.) As set forth in the affidavit of Denise Parker, Belliard was alone in my office on the evening of March 31st and the "update" was e-mailed at 11:11 p.m. on the 31st.

19.   The conclusion as to what took place is self-evident.

20.   As a result of their theft, defendants were able to distribute a mass e-mail to all of my clients soliciting them for their new business (Exhibit X).

21.   Although Justice Freedman directed defendants to return any customer lists (Transcript, p. 36), she took no further action at that time  Taking Justice Freedman literally, defendants returned physical copies of the list.  There was no effort to purge electronic files, which is the form of the list when it was stolen, and even if there had been effort to purge the files, the damage had already been done; and the only remedy should be to preclude the defendants from doing business with any of these clients.

Employee agreements.

22.   As indicated, Belliard was in my office on the evening of March 31st, despite the fact that  he was instructed never to be in my office!!! No one is allowed in the office without being with me.  However the door is not locked.  Although he was specifically told the night of March 31st by Denise Parker that he is not allowed in the office when he went to enter, Belliard told her that he would deal with me and he needed privacy!

23.   As set forth above, when I began preparation for a national franchise campaign in 2006 (see exhibit blank) one of the recommendations of counsel had been to secure agreements from my employees restricting them from operating boot camps, using our trade dress or taking any confidential information.  As such, in September, 2006, both Fell and Belliard executed the agreements.  In addition to the prohibition against disclosure of confidential information discussed above, the agreement had a restrictive covenant (par.2).

24.   It did not prohibit defendants from opening a fitness related business.  It limited its

6

restrictions to prohibit them from engaging in a business in direct competition with Pure Power, specifically one using obstacle courses, exercises derived from military training or methods, military themes in any way or using the term boot camp in any way.

25. The restriction was national in scope because this was part of a plan for a national franchise.

26. In addition, as set forth above, the agreement prohibited disclosure of confidential information, including marketing plans and customer information (par. 2).

27. Finally, it prohibited employees from challenging or using Pure Power's trade dress, textual and graphic material (par. 3 ).

28. The purpose of the agreement was twofold. The first was to protect against disclosure or use of confidential information or Pure Power's unique trade dress. To further protect Pure Power, the franchise offering has a similar requirement for franchisees (Ex. D, p. 23). I would hardly restrict people who invested in a franchise and let employees do as they pleased.

29. The second purpose was to protect Pure Power against an employee-drill instructor raiding clients should they leave. This is particularly important for while Pure Power expended time, energy and money to develop and attract a client base and establish itself in the public eye (see exhibit F for samples of our marketing and notoriety), the drill instructors had the direct relationship with the clients.

30. As far as the period of ten years for the restrictive covenant, I understand that this will most likely be deemed excessive. However, I also understand that in accordance with case law and in accordance with the specific provisions of section 5 of the employee agreement , this Court is empowered, and in section 5 it is specifically authorized, to modify any offending clause to the

7

extent necessary to render it enforceable.

31.    Given the conduct of defendants, as described above, stealing the customer list, stealing and destroying employee contracts, and the conduct described below, enrolling ostensibly as clients to subvert my existing clients, and stealing other corporate documents and then infringing on copyright and trade dress rights, I would hope this Court agrees that the equities warrant enforcement of the agreement, reducing the restrictive covenant to such term as the court deems reasonable under the circumstances.

TORTIOUS INFERENCE, BREACH OF EMPLOYEE FIDUCIARY DUTY

32.    For at least eight months prior to their leaving, defendants schemed to undermine my business and start their own, while on my payroll. The eight month estimate is based upon the e-mail of Jennifer Lee in July 2007 (Exhibit H ), the registration by them of their domain name, and Fell's email to a friend in March explaining how he had been in the process of setting up his business for 8 months.. Over that period, defendants Lee and Baynard, under the guise of enrollment as clients, ingratiated themselves with other clients all for the purpose of ultimately subverting them to defendant's facility. Should there be any question in that regard, apart from the extensive involvement of both women in establishing the new business, Lee's email of April 18, 2008 sums it all up, in which she states, "Call me Ms. Conversion. I converted a Lauren lover!" (see Exhibit AA).

33.    Defendants' subterfuge was unconscionable, in violation of the basic premise of employee loyalty and apart from monetary damages, warrants severe sanctions.

TRADE DRESS

34.    During this period of time, defendants stole my customer list, stole and destroyed

8

employment agreements, and stole other confidential corporate documents, such as the business plan developed for franchising. Defendants used that business plan, as well as other corporate documents, such as the form for client contracts, pricing information and promotional literature, either directly copying or paraphrasing the documents, further infringing on copyright protection and, last but far from least, defendants have misappropriated the Pure Power's trade dress in violation of their employee agreement (the 10 year term would not affect their par. 2 obligations) and in violation of Federal and Sate law..

35.    The Pure Power concept had been unique.  Indeed, defendants acknowledge this in their own business plan (Exhibit P). On the fourth page of the plan headed "Opportunity", defendants state that the use of an indoor obstacle confidence course is "rare".  The indoor obstacle course is part of the trade dress copied by defendants and an integral part of its program (See Exhibit A, page 2, in which Pure Power explains in promotion of its facility that it has only indoor obstacle/confidence course n the nation).

36.    Not only did they take the course itself, but they designed their's to virtually mirror Pure Power's. Examples include the crushed rubber matting for the floor identical to Pure Power's (Exhibit M), tunnels (Exhibit Y), the set of three climbing walls in progressive heights, the pillars with 7 tenets of military training, the military style itself and even, as reflected by the email inquiry to determine the size of the climbing ropes used by Pure Power (Exhibit Y, fourth email), the ropes. Their concern over a claim was significant enough to have a former client of Pure Power, Larry Buterman, who is an attorney as well, suggest that whatever they do, they should not compare themselves to Pure Power (see Exhibit GG).

37.    Cheryl Dumas's affidavit is part of the original motion papers; she compares the

9

Warrior facility to Pure Power's and finds it virtually the same.

38.    The similarities were sufficient to prompt the Justice Freedman to direct defendants to change their operation so that it was easily differentiated from Pure Power (this would not address the restrictive covenant, tortious interference or customer list issues) and provide us with access to view and photograph the operation (Transcript pp. 42-46 ).

39.    Defendants have not complied with Justice Freedman's direction.    Annexed as exhibit 2 is the last page of a blog by one of my former clients confirming that Warrior Fitness' operation is essentially the same as ours.

40.    Ironically, on the day this court conference to the matter, I was told by my assistant Elizabeth Lorenzi that a sanitation worker came to solicit our business and commented that Pure Power's facility looked just like Warrior Fitness'.

41.    One would also have to conclude that there is something to hide since despite Justice Freedman's direction to afford access, access has been denied.

42.    It is also curious that they still have not launched their web site which would include photographs of their operation.  Given the client blog, the refusal of access, and the

10

statement to my assistant regarding the similar looks of the facilities, it is my belief that they have not changed their trade dress as directed by the court.

43. The issue of irreparable injury has been addressed in my original moving papers. Needless to say, with defendants' subverting my clients using my proprietary information, stealing my trade dress and copyrighted materials, all in violation of their employee agreement as well, I will suffer irreparable injury to my business and reputation.

44. Based upon (a) the stolen customer list, (b) the terms of the employee agreements (and defendants' efforts to eliminate those agreements by theft and destruction, (c) the underhanded tortious interference by defendants and the violation of copyright and trade dress protections, a balance of the equities should clearly weigh in Pure Power's favor and immediate injunctive relief prohibiting Warrior Fitness' operation, or at least their servicing of my clients, should follow.

LAUREN BRENNER

Sworn and subscribed to before
me this _6_ day of June, 2008

NOTARY PUBLIC

EILEEN C. BAKER
NOTARY PUBLIC-STATE OF NEW YORK
No. 01BA6150252
Qualified in Nassau County
My Commission Expires July 24, 20_09_

11

TOTAL P.02

**<u>EXHIBIT D</u>**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

————————————————————————X

PURE POWER BOOT CAMP, INC.,           :
PURE POWER BOOT CAMP FRANCHISING      :
CORPORATION, and PURE POWER BOOT      :
CAMP JERICHO INC.,                    :          Index No.: 60/364/2008
                                      :
          Plaintiffs                  :
                                      :
     -against-                        :          **AFFIDAVIT OF**
                                      :          **LAUREN BRENNER**
WARRIOR FITNESS BOOT CAMP, LLC,       :          **IN SUPPORT OF**
ALEXANDER KENNETH FELL a/k/a ALEX     :          **PLAINTIFFS' ORDER**
FELL, Individually; RUBEN DARIO BELLIARD :       **TO SHOW CAUSE**
a/k/a RUBEN BELLIARD, Individually;   :          **FOR PRELIMINARY**
JENNIFER J. LEE Individually; and NANCY :        **INJUNCTION WITH**
BAYNARD, Individually,                :          **TEMPORARY**
                                      :          **RESTRAINTS**
          Defendants.                 :
————————————————————————X

I, LAUREN BRENNER, being duly sworn according to law, depose and say:

### PARTIES

1. I am the President, Sole Shareholder and Founder of Plaintiffs, PURE POWER
   BOOT CAMP, INC., PURE POWER BOOT CAMP FRANCHISING
   CORPORATION and PURE POWER BOOT CAMP JERICHO INC. (located at 50
   South Service Road, Jericho Road, Jericho, New York) with their principal place of
   business located at 38 West 21 Street, New York, New York (collectively referred
   to hereinafter as "PURE POWER BOOT CAMP"). As such, I am fully familiar
   with the facts and circumstances herein.

2. Upon information and belief, Defendant, Alexander Kenneth Fell a/k/a Alex Fell
   ("Fell" or "Defendant Fell"), is an individual, residing at 3205 Oxford Avenue, Apt.
   8, Bronx, New York 10463.

3. Defendant Fell is a former employee of PURE POWER BOOT CAMP and now a Co-CEO/Owner of Warrior Fitness Boot Camp, LLC ("Warrior Fitness"), which is unlawfully competing with PURE POWER BOOT CAMP.

4. Upon information and belief, Defendant, Ruben Dario Belliard a/k/a Ruben Belliard ("Belliard" or "Defendant Belliard"), is an individual, residing at 201 West 83rd Street, Apt. 1D, New York, New York 10024. Belliard is a former employee of PURE POWER BOOT CAMP and a Co-CEO/Owner of Warrior Fitness, which is unlawfully competing with PURE POWER BOOT CAMP and has engaged in, among other things, a civil conspiracy to sabotage PURE POWER BOOT CAMP and steal its trade secrets, confidential information, clients and trade dress.

5. Upon information and belief, Defendant, Jennifer J. Lee, Individually ("Lee" or "Defendant Lee"), is an individual, residing at 55 West 26th Street, Apt. 11A, New York, New York 10010. Lee is a client of PURE POWER BOOT CAMP, girlfriend of Fell, and Co-CEO/Owner of Warrior Fitness and a co-conspirator with all of the Defendants.

6. Upon information and belief, Defendant, Nancy Baynard ("Baynard" or "Defendant Baynard"), is an individual, residing at 201 West 83rd Street, Apt. 1D, New York, New York 10024. Baynard is a former client of PURE POWER BOOT CAMP, girlfriend of Belliard, and a co-conspirator with all of the Defendants.

7. Defendants Warrior Fitness, Belliard, Fell, Lee and Baynard shall collectively be referred to hereinafter as the "Defendants."

2

## BEFORE STARTING PURE POWER BOOT CAMP

8. Before starting PURE POWER BOOT CAMP almost five (5) years ago, I was a Trader on Wall Street for seven (7) years and a life-long athlete.

9. After the September 11, 2001 terrorist attacks, I believed that people wanted to be part of something that inspired accountability and respect.

10. I wanted to start a business that combined the things I loved most: sports, entertainment, and business and thought of creating the first and only indoor obstacle confidence course in the nation.

## ACQUIRED DISTINCTIVENESS OF PURE POWER BOOT CAMP

## AS TRADE DRESS

11. My objective in creating PURE POWER BOOT CAMP almost five (5) years ago was to devise a unique exercise facility and program which is based on a military-style indoor obstacle/confidence course. I invested hundreds of thousands of dollars and many months of concerted research (even visiting the Army's Fort Knox training facility in Louisville, Kentucky) to create this unique military style, indoor fitness facility.

12. The distinctive appearance and unique features (i.e., the "Trade Dress") of PURE POWER BOOT CAMP's exercise facility is as follows: The facility comprises a large loft space, with an indoor obstacle/confidence course styled to look like a military boot camp training course. The floor is covered with crushed rubber. As stated above, the eleven standing pillars throughout the facility are stenciled with principles of leadership that PURE POWER BOOT CAMP has selected, namely,

3

"Loyalty," "Courage," "Duty," "Honor," "Integrity," "Pride," "Power," "Wisdom," "Dignity," "Trust," and "Respect." These principles are a major part of the PURE POWER BOOT CAMP program. Clients are greeted at the door by a mannequin of a snarling soldier holding a gun, dressed in full combat gear. The main part of the work-out area has a 15-part obstacle/confidence course with these elements: hurdles, a series of three progressively higher walls to ascend and descend, a tire run, "barbed wire" netting to crawl under, monkey bars, dip bars, rolling logs, a wrap-around climbing wall, cargo net climb, bob-and-weave boxing ropes, rope climb, a ramp with a tunnel to shoot through, and a rope swing over a water pit. All of these obstacles are surrounded by a running track. There is a separate calisthenics area with wooden crates used for jump-ups and for partnering activities. On the far side of the space, instead of the usual dressing rooms, PURE POWER BOOT CAMP features men's and women's canvas tents for changing clothes. Ceiling netting and foliage complete the look. All of the above components are collectively referred to as the "Trade Dress."

13. The PURE POWER BOOT CAMP proprietary concept extends to the staff and clients. Each client is issued military fatigues and dog tags when they "enlist." The clients, called "recruits," sign up for the initial "Tour of Duty," either four times a week for six weeks, or three times a week for eight weeks. The recruits are called by their last names, as "Private ____," the instructors are called "Drill Instructors" or "DIs," and I am the "Commanding Officer." When the recruits walk in the front door, the program requires that they perform five push-ups in street clothes before even beginning the session. All of these features combined with the

4

Trade Dress create a unique and distinctive environment that is completely different from the usual gym or exercise facility and program. *See* PURE POWER BOOT CAMP'S brochure entitled "Enlistment Guide," a copy of which is attached hereto as Exhibit A.

14. The Trade Dress was first used in November 2003 in connection with PURE POWER BOOT CAMP'S indoor obstacle/confidence course in the Chelsea neighborhood of Manhattan. *See* Photographs of PURE POWER BOOT CAMP'S facility demonstrating PURE POWER BOOT CAMP'S Trade Dress described below, copies of which are attached hereto as Exhibit B.

15. PURE POWER BOOT CAMP is also recognized as a leader in the corporate team-building industry. PURE POWER BOOT CAMP is hired by corporations to hone communication skills, enhance leadership and confidence skills of their employees.

16. On February 2, 2006, PURE POWER BOOT CAMP filed an application to register the Trade Dress of PURE POWER BOOT CAMP, based on use in commerce since November 2, 2003. *See* proof of Trademark filings, a copy of which is attached hereto as Exhibit C.

17. According to my Trademark lawyer, Susan Upton Douglass, PURE POWER BOOT CAMP'S Trade Dress will be registrable as of November 2, 2008, when the mark has been in use in commerce for five years. *See* Affidavit of Susan Upton Douglass, Esq. submitted herewith.

18. I started PURE POWER BOOT CAMP with the intention of franchising the concept and the Trade Dress and doing a national rollout. To that end, PURE POWER BOOT CAMP is now registered in 46 states and has been accepting franchise applications since November 2006. *See* PURE POWER BOOT CAMP FRANCHISING CORPORATION'S UNIFORM FRANCHISE OFFERING CIRCULAR, a copy of which is attached hereto as Exhibit D.

19. On December 15, 2007, we began promoting our second PURE POWER BOOT CAMP facility in Jericho, New York. The first classes were held on February 25, 2008.

20. The Trade Dress and other unique indicia associated with PURE POWER BOOT CAMP have been used substantially, exclusively and continuously by PURE POWER BOOT CAMP as a trademark to designate the source of our indoor obstacle/confidence course and fitness training programs. To the best of my knowledge, PURE POWER BOOT CAMP is the only indoor obstacle/confidence course in the nation with this combination of features.

21. A core element of the PURE POWER BOOT CAMP is the indoor obstacle confidence court as well as the unique "look and feel" of the exercise facility – i.e., the Trade Dress, as well as the specific method of training. The entire program, such as multi-tiered programs with special pricing (24 sessions, 36 sessions, 48 sessions, 72 sessions and 96 sessions with volume discounts), the way in which the classes operate, the military language (such as "Recruits" and "DIs"), using the last names of recruits, issuing fatigues as uniforms, and hiring only former military personnel as DIs, has made this unique concept the subject of international and

national media, which has given fuel to PURE POWER BOOT CAMP. A franchise cannot be successful if others are free to copy the unique and proprietary Trade Dress and business model. All of the new PURE POWER BOOT CAMP facilities, whether franchised or company-owned, will use the same indoor obstacle confidence course, trade secrets, Trade Dress and methods as the current facilities, with all aspects of the Trade Dress implemented in each new location.

22. The PURE POWER BOOT CAMP concept was immediately successful. We were making a profit within the first seven months from opening. In the nearly 4 ½ years since we first began operations, revenues have quadrupled.

23. PURE POWER BOOT CAMP has received such extensive media coverage that it has launched me as the Fitness Contributor on the *Today* Show on the NBC national network. I have also had a main segment on the Donny Deutsch show, *The Big Idea*, as well as being called the "Number One Entrepreneur" on CNN's Anderson Cooper Show, "*On the Rise*." We have also had major segments on MSNBC where I was the number one story on *Keith Oberman's Countdown*, also on CNBC, *Good Day New York* on Fox News, WB11, and ABC. I have also hosted several TV shows as a celebrity fitness expert on the Discovery Network.

24. I have been the celebrity fitness expert in over 22 reality TV shows, and am in the process of being the star of my own reality program based on the indoor obstacle/confidence course and curriculum of PURE POWER BOOT CAMP.

25. Currently, I have been named the Best East Coast Trainer, and am featured in a series of competitions on Fox against the Best West Coast Trainer based on the

nation's only indoor obstacle confidence course and PURE POWER BOOT CAMP'S curriculum.

26. This past Monday morning, April 28, 2008, I was on Channel 5, Good Day New York, and on the Mike and Juliet Show, as the Physical Fitness Trainer representing the East against the West. I will be on the Mike and Juliet Show every Monday for the next eight (8) weeks, training my new "Recruits" in the East versus the West competition on my indoor obstacle confidence course. *See* PR letter from me to Fox's producers outlining Lauren Brenner and PURE POWER BOOT CAMP, a copy of which is attached as Exhibit E.

27. In addition, PURE POWER BOOT CAMP and I have been featured in *The New York Times, Newsday, Men's Fitness, USA Today, New York Daily News, The Wall Street Journal, Staten Island Advance, The New York Post, Prevention, amNew York, People Magazine's Celeb Diet & Fitness, Fitness Magazine, CNN.COM, Contemporary Bride Magazine Writer, Daily Candy, Ok! Magazine, Time Out New York, MetroSports New York* and *MSNBC.com*. Attached as Exhibit A to the "Response to Office Action" (which is attached to my Affidavit as Exhibit F) are representative samples of such publications and television clips. Most of these publications and news clips feature photographs of the PURE POWER BOOT CAMP indoor obstacle confidence course, Trade Dress, as well as the program and concept. As such, clients and potential clients throughout the country, as well as in other countries, have been exposed to the indoor obstacle confidence course, unique Trade Dress and curriculum of PURE POWER BOOT CAMP.

8

28. Because I own the only indoor obstacle confidence course in the nation, and my uniqueness in my military style physical fitness program at PURE POWER BOOT CAMP, I am known to the media and press as "G.I. Jane."

29. In addition, PURE POWER BOOT CAMP has expended significant resources in printing brochures, advertisements, promotional materials, franchise documents, Operations Manual, Start-Up Manual, Business Plan and legal fees, totaling in excess of $450,000. Copies of these promotional materials are attached as Exhibit F. In addition, we promote PURE POWER BOOT CAMP at the www.purepowerbootcamp.com website, which displays elements of PURE POWER BOOT CAMP'S indoor obstacle confidence course and Trade Dress.

30. Because of the extensive and exclusive use of the only indoor obstacle confidence course, the unique and distinctive Trade Dress, coupled with the extensive unsolicited publicity and media attention, as well as the advertising and promotional activities undertaken by PURE POWER BOOT CAMP, the Trade Dress is recognized by the trade and public as indicating a mark to designate PURE POWER BOOT CAMP's fitness facility and services.

31. Members of the pubic who are familiar with PURE POWER BOOT CAMP would recognize PURE POWER BOOT CAMP'S Trade Dress and would associate the Trade Dress of our facilities exclusively with PURE POWER BOOT CAMP. As such, the Trade Dress functions as a trademark and has become distinctive of PURE POWER BOOT CAMP's services.

**DEFENDANTS' CIVIL CONSPIRACY TO DEFRAUD PURE POWER BOOT CAMP, MISAPPROPRIATE TRADE SECRETS AND CONFIDENTIAL INFORMATION, TRADE DRESS INFRINGEMENT, UNFAIR COMPETITION, BREACH OF NON-COMPETE AGREEMENTS AND DUTY OF LOYALTY**

32. Unbeknownst to me, in July 2007, while Defendant Belliard and Defendant Fell were still employed by PURE POWER BOOT CAMP, the Defendants devised a scheme to steal and destroy my business.

33. Unbeknownst to me, the Defendants engage in a civil conspiracy to raid my company and steal PURE POWER BOOT CAMP'S assets approximately ten (10) months ago.

34. In or about July 2007, the Defendants, in clandestine fashion, conspired and devised an unlawful and malicious plan to raid and sabotage PURE POWER BOOT CAMP's business for their own personal benefit and gain. *See* Defendant Fell's email dated July 24, 2007 regarding outdoor boot camps as competitors; Defendant Fell's email dated July 25, 2007 evidencing purchase of domain name WARRIORFITNESSBOOTCAMP.COM from GoDaddy.com; Fell's emails dated March 12, 2008 and March 13, 2008, evidencing that Defendants were planning to steal PURE POWER BOOT CAMP'S clients, trade secrets and trade dress during their employment with PURE POWER BOOT CAMP for at least eight (8) months prior to March 13, 2008, copies of which are attached hereto as Exhibit H.

35. Over the course of the last ten (10) months, the Defendants, in clandestine fashion, have been stealing and misappropriating PURE POWER BOOT CAMP's trade secrets, confidential information, client list, clients, trade dress, and corporate documents, including, but not limited to, hard copies of PURE POWER BOOT

10

CAMP's Operations Manual, Startup Manual, Business Plan, the original signed D.I. employee confidentiality and non-compete agreements of Defendant Belliard and Defendant Fell, the hard copy of the first chapter of my book, and deleted various corporate documents from PURE POWER BOOT CAMP'S computer.

36. The Defendants infringed on PURE POWER BOOT CAMP'S trade secrets and Trade Dress, creating the same indoor obstacle confidence course as PURE POWER BOOT CAMP, in direct violation of the Defendant Belliard and Defendant Fell's confidentiality and non-compete agreements.

37. Warrior Fitness is planning a viewing to the public mid-week next week, and is planning to open its doors to the public on Monday, May 12, 2008.

38. As set forth below, the Defendants have engaged in, and continue to engage in a civil conspiracy to steal my Trade Dress, breached the confidentiality and non-competition agreements signed by Defendant Belliard and Defendant Fell, misappropriated PURE POWER BOOT CAMP'S trade secrets and confidential information; stole PURE POWER BOOT CAMP'S client list; stole PURE POWER BOOT CAMP'S clients and are continuing to steal PURE POWER BOOT CAMP'S clients; stole PURE POWER BOOT CAMP'S business model, programs, pricing structure, recruit contracts, and related documents; and upon information and belief, stole PURE POWER BOOT CAMP'S Business Plan, Operations Manual, Start-Up Manual, Brochure, the original signed Drill Instructors' confidentiality and non-compete agreements, computer files and the first chapter of my book.

**39.** Defendant Belliard worked as an employee of PURE POWER BOOT CAMP from 2004 up and until March 31, 2008, when he abruptly left PURE POWER BOOT CAMP, claiming that he was starting a construction business with a family member.

**40.** Defendant Fell worked as an employee of PURE POWER BOOT CAMP from 2005 up and until March 16, 2008, when he was terminated for insubordination, using profanity and expletives toward me, and refusing to do his job as instructed.

**41.** On or about January 9, 2006, Defendant Baynard became a recruit at PURE POWER BOOT CAMP and left on March 28, 2008.

**42.** On or about March 13, 2006, Defendant Lee became a recruit at PURE POWER BOOT CAMP and left on April 28, 2008. At no time during or after her Recruit status at PURE POWER BOOT CAMP did Defendant Lee disclose to anyone, including the clients, that she was unlawfully soliciting for the Defendants, that she is a partner and main investor in Defendant Warrior Fitness. In other words, she was soliciting my clients to bring them to Defendant Warrior Fitness under false pretenses.

**43.** When Defendant Belliard was hired, he was involved in a serious relationship with Ellen Rodriquez. He got engaged to her while employed at PURE POWER BOOT CAMP. He was married to Ellen in August 2006 in the Dominican Republic. Because he was such a trusted and valuable employee and friend, I planned and paid for a wedding to be held in New York four (4) days later for all of his friends and family who could not travel to the Dominican Republic. Defendant Belliard cancelled the wedding two (2) days before, causing me to lose approximately $8,000.

44. When Defendant Fell was hired by PURE POWER BOOT CAMP in 2005, he told me that he was engaged.

45. PURE POWER BOOT CAMP's corporate policy has always been that employees must not become intimate with clients or Recruits.

46. When Defendants Belliard and Fell were first hired, they knew nothing about the physical fitness industry. I invested a substantial amount of time and money to train them so they could obtain their Fitness Certifications, which was required for each employee of PURE POWER BOOT CAMP hired to be a D.I.

47. As a result of their training, Defendant Belliard and Fell each evolved into key employees with PURE POWER BOOT CAMP.

48. As D.I.s, Defendants Belliard and Fell were entrusted with substantial responsibility to work closely with, train, motivate and inspire the Recruits on behalf of PURE POWER BOOT CAMP.

49. Unbeknownst to me (and only learned recently), some time during their employment at PURE POWER BOOT CAMP, Defendants Belliard and Fell began personal relationships with Defendants Baynard and Lee, who were clients/recruits at PURE POWER BOOT CAMP.

50. In fact, Defendant Fell referred to his girlfriend and Defendant Lee as "Shannon," not only because he knew he was breaking PURE POWER BOOT CAMP'S corporate policy against dating the Recruits, but mainly because it was part of the Defendants' conspiracy to steal PURE POWER BOOT CAMP'S clients/recruits in clandestine fashion. She was literally a spy for the Defendants and sabotaging me and my business for her own personal gain and benefit. She was also giving my

13

clients false and defamatory information to persuade them to leave PURE POWER
BOOT CAMP and join Warrior Fitness.

51. Initially, I did not know about the relationships with the two (2) Recruits,
Defendants Lee and Baynard.

52. Since 2006, it has been PURE POWER BOOT CAMP'S corporate policy and
standard operating procedure that all employees of PURE POWER BOOT CAMP
sign a confidentiality and non-competition agreement.

53. Following PURE POWER BOOT CAMP'S STANDARD OPERATING
PROCEDURES, on September 26, 2006, Defendants Belliard and Fell signed
confidentiality and non-compete agreements. *See copy of* agreement signed by
Defendant Fell attached hereto as Exhibit I.

54. During this same time frame, I began developing plans to franchise PURE POWER
BOOT CAMP, which is now licensed to be franchised in 46 of the 50 States. *See*
Exhibit D.

55. PURE POWER BOOT CAMP hired a new D.I., Nicio Evertz ("Evertz"), in early
2007.

56. In August 2007, Defendant Belliard informed me that he and his wife, Ellen, were
going through a divorce and he did not have a place to live. I told him he could live
me with for as long as he needed, but he declined the offer because he was dating a
married woman, namely, Defendant Baynard. Upon information and belief, he
declined the offer because he was dating Defendant Baynard, who was a
client/recruit of PURE POWER BOOT CAMP, which was a violation of PURE
POWER BOOT CAMP'S corporate policy against dating the recruits.

14

57. In or around July 2007, Defendant Baynard, a client/Recruit of PURE POWER BOOT CAMP, approached me and informed me that she was having marital problems and asked if I could help her find an apartment, which I did.

58. In 2007, I began promoting the franchise, generating additional business and publicity for PURE POWER BOOT CAMP, and actively looking to open other PURE POWER BOOT CAMP facilities throughout the country.  *See* Exhibit D attached hereto.

59. Starting in late 2005-early 2006, I was constantly approached by Venture Capitalists ("V.C.s") to expand my business nationally.

60. When approached by the V.C.'s, I made sure that Defendant Belliard would be the National D.I. for PURE POWER BOOT CAMP nationwide.

61. Because I was building the corporate brand and researching other locations to open up other company-owned locations, I was not teaching as much and delegated that task to Defendants Belliard and Fell, who ensured me that they would provide me with daily progress reports on all the recruits and what was going on with the recruits on a daily basis.

62. While I was traveling and trying to secure other PURE POWER BOOT CAMP locations, I specially directed Defendants Belliard and Fell to provide me with updates on a daily basis of the clients/Recruits' progress in class so I can personally call them to motivate and inspire them.

63. Contrary to my instructions, Defendant Belliard and Fell repeatedly disregarded my instructions and failed to provide me with daily updates of the Recuits' progress

during class. In retrospect, I now know why they failed to comply with their specific duties as an employee and D.I. for PURE POWER BOOT CAMP.

64. In October 2007, Defendant Belliard admitted to me that he had been dating Defendant Baynard and had moved in with Defendant Baynard in August 2007. He claimed that he did not tell me at first because he did not want to lose his job.

65. Although this was against the PURE POWER BOOT CAMP rules, Defendant Belliard was PURE POWER BOOT CAMP'S top D.I. and, who I thought was, my most trusted employee.

66. In or around October 2007, I wanted to hire another D.I.; however, Defendants Belliard and Fell told me that they wanted more hours and could handle all of the clients and classes so they asked me not to hire another D.I. Again, in retrospect, I now know why.

67. In or about November 2007, I began preparing for PURE POWER BOOT CAMP'S annual holiday party, which took place on December 14, 2007, and the opening of PURE POWER BOOT CAMP'S new Jericho location.

68. Unbeknownst to me, Defendants Belliard, Fell and Lee, since July 2007, were already looking for space to open a competing indoor obstacle confidence course known as Warrior Fitness Boot Camp. *See* Defendant Fell's email and attached letter dated December 5, 2007, a copy of which is attached hereto as Exhibit J, which shows that a lease for space to house their competing facility fell through.

69. Defendant Belliard and Defendant Fell were paid very well; Defendant Belliard was paid $65/hour and Defendant Fell was paid $50/hour. In calendar year 2007,

Defendant Belliard made approximately $85,000 as a D.I. for PURE POWER BOOT CAMP.

70. In or about mid-November 2007, I offered Defendant Belliard a partnership in the Jericho PURE POWER BOOT CAMP facility; but Defendant Belliard turned my offer down, stating that he did not have the money to invest.

71. At that time, I then had a "heart to heart" conversation with Defendant Belliard and told him that I was planning to sign the lease for the Jericho location in the next few weeks, but that I did not want to sign the lease if Defendant Belliard's intentions of having a career with PURE POWER BOOT CAMP had changed. Defendant Belliard reassured me that he was with me 100%. He told me "you are like family to me." In retrospect, that was completely false and misleading, for the sole purpose to defraud me and steal my business.

72. Based on Defendant Belliard's misrepresentations and fraud, I signed the lease for the Jericho space the following day, December 15, 2007.

73. For the next two and one-half months, I constructed and marketed the Jericho facility to get ready for the grand opening on February 25, 2008, with the grand opening party to be held on February 7, 2008.

74. During the construction phase of the Jericho location, I asked Defendant Belliard to help build and paint the Jericho facility. The day he was scheduled to help me, he called and cancelled.

75. Beginning in December 2007, Defendant Fell's attitude and conduct got progressively worse, making it very difficult to work with. Every time I asked him

17

to perform his job duties or to keep me updated regarding the Recruits' progress in class at the New York facility, he became more and more belligerent to me.

76. In February 2008, while I am planning the grand opening party in Jericho, the Defendants were secretly looking for a location for Warrior Fitness. *See* Defendant Fell's emails dated February 11, 2008 and February 20, 2008 regarding various real estate locations, copies of which are attached hereto as Exhibit K.

77. When the Long Island facility opened, Evertz stepped up and worked more hours at the New York facility, so Belliard could work at the Long Island facility.

78. Again, I asked the D.I.s to keep me informed on the progress of the clients and to contact the clients to keep them motivated and inspired.

79. On February 27, 2008, a lease was drawn up for a location that Defendants found for Warrior Fitness. See Fell's email to Belliard dated February 27, 2008, a copy of which is attached hereto as Exhibit L.

80. In February 2008, Defendants were also shopping for prices on flooring. See emails dated February 27, 2008 and February 28, 2008 requesting flooring prices, copies of which are attached hereto as Exhibit M.

81. The location that Defendants' leased was located on 29th Street, 14 blocks away from PURE POWER BOOT CAMP and utilized the same operating hours as PURE POWER BOOT CAMP. See Fell's emails dated February 28, 2008, a copy of which is attached hereto as Exhibit N.

82. Warrior Fitness Boot Camp, LLC ("Warrior Fitness"), a corporation organized and existing under the laws of the State of New York, with its principal place of business at 29 West 35th Street, 3rd Floor, New York, New York 10001 was

officially formed on February 28, 2008. *See* proof from the Department of State, evidencing that Warrior Fitness was formed on February 28, 2008, a copy of which is attached hereto as Exhibit G.

83. While I was in Jericho, New York running the Long Island location of PURE POWER BOOT CAMP, D.I. Evertz contacted me on a daily basis and reported on the progress of the clients. To the contrary, Defendants Belliard and Fell simply refused to comply with my repeated requests to keep me updated. In retrospect, I now know why. It was all part of the Defendants' willful and malicious scheme to steal my business by creating distance between me and my clients. Furthermore, it has now been brought to my attention that the Defendants have been organizing and attending happy hours with the clients without my knowledge as part of their civil conspiracy to sabotage and raid my company.

84. Meanwhile, Defendants registered Warrior Fitness with the State of New York and obtained an EIN. See Defendant Fell's emails dated March 5, 2008 and March 20, 2008, copies of which are attached hereto as Exhibit O.

85. Unbeknownst to me, Defendants were using PURE POWER BOOT CAMP's business/corporate documents and brochure to draft a business plan for Warrior Fitness, using PURE POWER BOOT CAMP's concepts and ideas, including, but not limited to, obstacles, guarantee, principles, programs, clothing, projections, and revenues. See Defendant Fell's email dated March 20, 2008 with Warrior Fitness Business Plan attached, which is a misappropriation of PURE POWER BOOT CAMP'S Business Plan.

19

86. Attached hereto as Exhibit Q are excerpts of my Business Plan, Operations Manual and Start-Up Manual which clearly establish that the Defendants stole my entire business plan and concept for PURE POWER BOOT CAMP.

87. As further prove of stealing PURE POWER BOOT CAMP'S business model and program, Defendant Fell writes an e-mail to his friend telling him that he is opening an indoor obstacle confidence course just like PURE POWER BOOT CAMP. *See* Defendant Fell's email dated March 13, 2008 through March 15, 2008, copies of which are attached hereto as Exhibit R (wherein, Fell states that he is working as a fitness trainer and details the PURE POWER BOOT CAMP program and some of the obstacles as if the program and obstacles belonged to Warrior Fitness.)

88. While I was getting Jericho up and running from mid-December 2007 through the end of February 2008, D.I. Evertz, as instructed, communicated with me on a daily basis, keeping me updated on the Recruits' progress in class so I can keep in contact with them and motivate them.   It is part of the whole experience at PURE POWER BOOT CAMP.

89. As the person in charge of scheduling the D.I.'s work schedule, on March 16, 2008, it was determined that only one (1) D.I. was needed for the March 17, 2008 7:30 a.m. class.

90. Because D.I. Evertz had been doing a great job and Defendant Fell had a bad attitude and not doing his job by failing to report to me on the clients' progress as instructed, I decided that D.I. Evertz (and not Defendant Fell) would run the 7:30 a.m. class on March 17, 2008 to reward D.I. Evertz for a job well done.

91. That evening, on March 16, 2008, I contacted Defendant Fell to inform him that he would not be needed for the 7:30 am class, if one (1) D.I. was not needed, and that D.I. Evertz would be the D.I. instructing the class since he was always the D.I. to leave, which was not fair, and because Defendant Fell was, of late, not doing his job as instructed.

92. In response, Defendant Fell became irate and belligerent and said, "That's not my fucking problem. You are not going to tell me what to do." He then threatened me and made some crazy and baseless threat that he would go down to the Department of Labor if I allowed Evertz to instruct the 7:30 class instead of him.

93. In response, I asked, "Did you just threaten me?" I then advised him that I was not asking. I am advising him that he would be leaving at 7:30 a.m. because D.I. Evertz would be running the 7:30 am class.

94. Defendant Fell replied, "Who the fuck do you think you are? You better learn who you are speaking to." I replied, "Who owns this business, you or me?" Defendant Fell replied, "What are you going to do, fire me?" I replied, "How dare you. You are not a team player. Keep it up and you will be suspended for a week." Defendant Fell again threatened me and stated, "You take me off for a week and the Department of Labor will be at your door." I then replied, "You are leaving at 7:30 a.m." Defendant Fell then stated, "I am not leaving." What are you going to do, fire me?" I then replied, "Alex, you're fired," and hung up the phone.

95. I then attempted to contact Defendant Belliard for approximately twenty (20) minutes in order to inform him that Defendant Fell was no longer employed by PURE POWER BOOT CAMP, but to no avail. I then called Defendant Fell once

again and left Defendant Fell a voicemail message, stating, "You are no longer employed by PURE POWER BOOT CAMP. You are not permitted to go on my property. Do not contact my employees or my clients at any time."

96. Later on that evening, I spoke to Defendant Belliard and informed him that Defendant Fell was not permitted in PURE POWER BOOT CAMP'S facility.

97. I then asked Defendant Belliard where he stood regarding his loyalties to PURE POWER BOOT CAMP and Defendant Belliard responded, "I am here 100%."

98. Although not learned until just recently, the very next day, on March 17, 2008, Defendant Fell and Defendant Lee admitted to their civil conspiracy to misappropriate PURE POWER BOOT CAMP'S trade secrets and client list, and to infringe upon PURE POWER BOOT CAMP'S Trade Dress. *See* Fell's email dated March 17, 2008, a copy of which is attached hereto as Exhibit S.

99. On March 17, 2008, still not knowing about Defendants' conspiracy to take my business, I made an announcement in class in order to put the clients at ease regarding Defendant Fell's dismissal from PURE POWER BOOT CAMP.

100. After class, I held a staff meeting, then spoke with Defendant Belliard alone in my office.

101. During my meeting with Defendant Belliard, Defendant Belliard told me that he was upset, personally, but he understood because there were a lot of things that Defendant Fell did that he should not have done.

102. Over the next few days, I contacted my clients to reassure them that everything would be okay, even though Defendant Fell was no longer employed by PURE POWER BOOT CAMP.

103. I then began instructing in the New York facility in the mornings, then traveling to Long Island to instruct in the afternoon.

104. Shortly after, Defendant Belliard began showing up to work late and not doing his job as expected.

105. On March 20, 2008, Newsday did a lead story on PURE POWER BOOT CAMP'S new location in Jericho, New York.

106. On March 22, 2008, Defendant Belliard cancelled a class he was scheduled to teach with me for the Officer Candidacy Training Program for the U.S. Marines. PURE POWER BOOT CAMP is the only outside vendor for the U.S. Marines to teach their new cadets before going to Officer Candidacy School.

107. As part of the Defendants' civil conspiracy to defraud and steal PURE POWER BOOT CAMP'S clients, trade secrets, concept of an indoor obstacle confidence course and Trade Dress, throughout March and April 2008, Defendants Lee and Baynard attended classes regularly at PURE POWER BOOT CAMP in order to befriend, manipulate and solicit as many of PURE POWER BOOT CAMP's clients/Recuits to possibly entice them to leave PURE POWER BOOT CAMP and sign up with Warrior Fitness. *See* Fell's email dated March 24, 2008 (wherein a recruit states that "Lee has filled me in" on "what really happened"), a copy of which is attached hereto as Exhibit T.

108. On March 25, 2008, in furtherance of Defendants' conspiracy to steal from and sabotage PURE POWER BOOT CAMP, Defendants stole a list of PURE POWER BOOT CAMP's clients and spoke with them to solicit them to leave PURE POWER BOOT CAMP and join Warrior Fitness. *See* Fell's email dated March 25,

2008 with attached PURE POWER BOOT client list named "Jen and Nancy's Party List" which clearly demonstrates that Defendants Fell, Belliard, Lee and Baynard were contacting PURE POWER BOOT CAMP clients to leave PURE POWER BOOT CAMP and join Warrior Fitness, copies of which are attached hereto as Exhibit U.

109. On March 31, 2008 at 9:09 p.m., I received a phone call from Defendant Belliard, who resigned effective immediately without any notice. Defendant Belliard claimed he was going to work for a family business in construction and could not give me any notice.

110. Defendant Belliard then sends me a formal resignation letter dated April 1, 2008 stating that he "will be pursuing another opportunity with a family member, thus will only be available to teach the morning classes for the next week" even though he had no intentions of teaching the morning classes. *See* letter from Defendant Belliard to PURE POWER BOOT CAMP dated April 1, 2008, a copy of which is attached hereto as Exhibit V.

111. After being employed by PURE POWER BOOT CAMP for three and one-half (3 ½) years, I expected Defendant Belliard to give me at least two weeks notice before leaving. In response, Defendant Belliard stated that he could not give me any notice because his construction business with his uncle needed to start immediately, and it was an opportunity that he could not turn down. I then said, "How can you tell me at 9:09 at night when you know I have a 5:30 class in the morning with only one D.I.?" He said, "It's not my problem. Don't worry, Lauren, you always land on your feet."

24

112. When I asked Defendant Belliard what had happened to him, he simply stated, "People change Lauren; I always told you that you were too nice. Goals change. Priorities change. People take care of themselves, including me." I then terminated the call and taught the 5:30 a.m. class the following morning with Nicio.

113. I learned the following morning that at the time Defendant Belliard tendered his resignation the night before, he was in my personal office with the door closed. This was against corporate policy.

114. Upon information and belief, during the period from March 21, 2008 through March 31, 2008, while I was at the Jericho location and Defendant Belliard was at the New York location, Defendant Belliard stole the following PURE POWER BOOT CAMP corporate documents from PURE POWER BOOT CAMP'S New York Office: Business Plan, Operations Manual, Start-Up Manual, brochure, Defendant Belliard and Defendant Fell's original signed Drill Instructors' confidentiality and non-compete agreements (which were signed on September 26, 2006), PURE POWER BOOT CAMP'S client list, and the first chapter of my book that I am writing involving the eleven principles upon which PURE POWER BOOT CAMP is based, and all of which have been violated by the Defendants.

115. Unbeknownst to me, on March 31, 2008, the same day Defendant Belliard resigned without notice, the Defendants Warrior Fitness, Belliard, Fell and Lee signed the lease for Warrior Fitness' location at 29 West 35th Street. *See* Fell's email dated March 31, 2008 attaching Warrior Fitness' Lease for their new space on 35th Street, just 14 blocks from PURE POWER BOOT CAMP, a copy of which is attached hereto as Exhibit W.

**116.** Also on March 31, 2008, while I was at the Jericho location and Defendant Belliard was at the New York location, upon information and belief, Defendant Belliard stole the active client list from PURE POWER BOOT CAMP'S New York location, which was then given to Defendant Baynard. Defendant Baynard then unlawfully created an updated Warrior Fitness client list using PURE POWER BOOT CAMP'S client list. *See* Defendant Fell's emails dated March 31, 2008 at 11:11 p.m. and 11:14 p.m. with PURE POWER BOOT CAMP'S active client list attached thereto, wherein Baynard states, "Um… ok so I just updated our party list (w/ a VERY DEAR FRIEND OF OUR's additions) and, um HOLY SHIT. There's over 330 people that might come to our party!!!!!!," copies of which are attached hereto as Exhibit X.

**117.** Since Belliard abruptly left PURE POWER BOOT CAMP on March 31, 2008, the Defendants have continued their conspiracy to defraud and steal from me and my company by continuing to contact PURE POWER BOOT CAMP clients with the intent to steal them, and by misappropriating PURE POWER BOOT CAMP's trade dress and trade secrets by purchasing the same obstacle course items. *See* Defendant Fell's email dated April 5, 2008 ordering tunnels which are the same tunnels at the PURE POWER BOOT CAMP Jericho location; *see* Fell's email dated April 5, 2007, purchasing a traverse (climbing) wall; *see* Fell's email dated April 7, 2008 asking Belliard how big the ropes are at PURE POWER BOOT CAMP; *see* Fell's email dated April 7, 2008 ordering tank tops and t-shirts, infringing on PURE POWER BOOT CAMP'S Trade Dress, copies of which are attached hereto as Exhibit Y.

118. Even though Defendant Belliard and Defendant Fell were no longer employed by PURE POWER BOOT CAMP, Defendant Lee, as part of the Defendants' civil conspiracy to misappropriate PURE POWER BOOT CAMP'S trade secrets and confidential information, continued to attend classes at PURE POWER BOOT CAMP until Friday, April 25, 2008, with the specific purpose to steal PURE POWER BOOT CAMP clients/recruits on behalf of Defendant Warrior Fitness. *See* Defendant Fell's emails dated April 1, 2008, establishing that Defendant Lee, on behalf of the Defendants, was soliciting PURE POWER BOOT CAMP clients/Recruits for Defendant Warrior Fitness, copies of which are attached as Exhibit Z.

119. As further evidence of the Defendants stealing PURE POWER BOOT CAMP'S clients/Recruits, Defendant Lee admits that she is converting and stealing my clients. She writes an e-mail on April 18, 2008 to her boyfriend and co-conspirator, Defendant Fell as follows:

> "Call me Miss Conversion. I converted a Lauren Lover! This girl, Jacobs, loves Lauren and hugged her one time and said all would be okay and blah blah blah. So, I wrote her off. But lately, she has been talking to me a lot, wanting to be partners, etc. and today, I converted her! She said she won't sign up if [PURE POWER BOOT CAMP] I don't return and will do what I do. She promised not to renew and to sign up for yours. Man I am good.
>
> Also, Nicio [PURE POWER BOOT CAMP'S current Drill Instructor] said he's leaving soon. He's MISERABLE.
>
> And, Melynis said she is signing up for 6 months with you. . . . Also, she converted Anderson and Pierre and said she would work on more people for you guys." *See* **Defendant Lee e-mail dated April 18, 2008, a copy of which is attached hereto as Exhibit AA.**

120. I am outraged by the corporate sabotage, and conspiracy to steal my entire concept and business. They are destroying my business and this Honorable Court must stop them by signing the TRO and granting the Preliminary Injunction.

121. On April 16, 2008, after hearing rumors that Defendant Belliard was not going into a family construction business, but rather was intending to open up a competing indoor obstacle confidence course somewhere in New York City, I called Defendant Belliard to remind him that he, as well as Defendant Fell, had both signed confidential and non-compete agreements. In response, Defendant Belliard was silent, then denied that he had any intentions of opening a competing business, then hung up. *See* Fell's emails dated April 16, 2008, a copy of which is attached hereto as Exhibit BB.

122. Even more outrageous, not only did Defendants Belliard and Fell steal my original confidentiality and non-competition agreements from my office, but we now know that Defendant Belliard destroyed evidence by shredding the agreement. *See* Defendant Fell's e-mail to Defendant Lee dated April 16, 2008 at 3:16 pm confessing that "Ruben [Defendant Belliard] thinks that he shredded the copy of the contract," a copy of which is attached hereto as Exhibit CC.

123. Then on April 24, 2008, Defendant and co-conspirator and co-owner of Defendant Warrior Fitness sends a mass e-mail to my clients at PURE POWER BOOT CAMP, directly soliciting my clients to come to Warrior Fitness, which is replicating and stealing PURE POWER BOOT CAMP'S indoor obstacle confidence course, curriculum, program, pricing structure, hours of operation, method and concept of military fitness training, trade secrets and Trade Dress. In

short, the Defendants are stealing my entire business lock, stock and barrel. This is outrageous and they must be stopped. *See* e-mail from Defendant Lee dated April 24, 2008 to dozens of PURE POWER BOOT CAMP'S clients/recruits, directly soliciting PURE POWER BOOT CAMP'S clients, a copy of which is attached hereto as Exhibit DD.

124. Then Defendant and co-conspirator, Baynard (Defendant Belliard's girlfriend) does the same thing as Defendant Lee and sends a mass e-mail to all of PURE POWER BOOT CAMP'S clients/recruits, attempting to steal them from PURE POWER BOOT CAMP and lure them to the unlawful competitor, Warrior Fitness. *See* e-mail from Defendant Baynard to all of the clients on my client list, a copy of which is attached hereto as Exhibit EE.

125. Then Defendant Fell, like co-conspirators, Defendants Lee and Baynard, sends and continues to send e-mails to all of PURE POWER BOOT CAMP'S current clients/recruits, offering the same exact curriculum in the same exact setting at PURE POWER BOOT CAMP. This is a blatant disregard and misappropriation for PURE POWER BOOT CAMP'S concept, trade secrets, confidential information, client list, clientele and Trade Dress. What the Defendants are doing is outright stealing. *See* e-mail from Defendant Fell to PURE POWER BOOT CAMP'S clients/recruits dated May 1, 2008, attempting to steal clients, a copy of which is attached hereto as Exhibit FF.

126. To make matters worse, one of my clients, Larry Buterman, who is a lawyer working for a large law firm in New York City, is aiding and abetting the Defendants' conspiracy to destroy and take my business, and assist the Defendants

is "covering up" their illegal activities.  In one e-mail, he was coaching the Defendants how to misappropriate PURE POWER BOOT CAMP'S trade secrets and Trade Dress infringement, making it appear as though the Defendants' ideas came from the Marine Corp. rather than using confidential information and trade secrets they acquired only through the Defendants' employment with PURE POWER BOOT CAMP.  *See* e-mail from Defendant Lee to Defendant Fell dated April 16, 2008 at 5:32 pm stating, in part, that "Buterman called me again and said more stuff . . . .  Basically, it's stuff you are already doing (*like never referencing PPBC, always saying that you are doing different things based on Marine Corps, etc.)." See* e-mail from Defendant Lee to Defendant Fell dated April 16, 2008 at 5:32 pm, a copy of which is attached hereto as Exhibit GG.

127. To further demonstrate the Defendants' willful and malicious attempt to sabotage and destroy PURE POWER BOOT CAMP'S business, Defendant Lee then continues to write to Defendant Fell in the same April 16, 2008 e-mail at 6:12 pm that "you know I am here for you always.  I support you 100%.  I feel like we both can overcome anything, as long as we are together, right?  I ain't scared of this Lauren nonsense, but, I am glad you and Ruben [Defendant Belliard] are taking it seriously and are armed and prepared." *See* Exhibit GG.

128. To demonstrate the willful and malicious conduct on the part of all the Defendants and their friends who are attempting to damage me and my business, Larry Buterman is intending to destroy me and PURE POWER BOOT CAMP.

129. According to an e-mail between Defendant Lee and Defendant Fell, Larry Buterman intends to do "things to let people know stuff that will hurt [me and

PURE POWER BOOT CAMP] even more… but it won't hurt you guys. He assures me of that. He has your best interest at heart first. *Then his interest to destroy her is secondary . . . ." See* e-mail from Defendant Lee to Defendant Fell dated May 2, 2008 at 4:57 pm, a copy of which is attached hereto as Exhibit HH.

130. When you compare the Defendants' facility and PURE POWER BOOT CAMP'S facility, it is obvious that the Defendants have misappropriated PURE POWER BOOT CAMP'S trade secrets and Trade Dress. It is clear on its face. *See* Affidavit of Cheryl Dumas submitted herewith.

131. When you compare the Recruit Contracts, Additional Terms and Conditions and Waiver and Release forms of PURE POWER BOOT CAMP and Warrior Fitness, there is virtually no difference. Warrior Fitness copied PURE POWER BOOT CAMP'S documents word for word. *See* Spreadsheet, along with the Contract, Terms and Conditions and Waiver/Release forms of both companies, copies of which are attached hereto as Exhibit II.

132. The Defendants stole all of my programs and curriculum verbatim, but changed the names. For example, Defendants "Operation Warrior" program is the same as PURE POWER BOOT CAMP'S "Tour of Duty" program. *See* PURE POWER BOOT CAMP'S brochure (Exhibit A attached) and Defendants' Business Plan dated March 20, 2008 (Exhibit P), which is before Defendant Belliard left PURE POWER BOOT CAMP. PURE POWER BOOT CAMP has a corporate team challenge program in its Business Plan and Operations Manual and the Defendants copied it verbatim, but changed the pricing slightly. *See* PURE POWER BOOT CAMP'S corporate challenge program attached hereto as Exhibit JJ and

Defendants' Business Plan attached as Exhibit P, which incorporates the same concepts to market corporations, which is a large part of PURE POWER BOOT CAMP'S business. Even Defendants' pricing is structured the same way as PURE POWER BOOT CAMP'S. *See* PURE POWER BOOT CAMP'S "Maintenance Program Savings Matrix" attached hereto as Exhibit KK.

133. When you compare Defendants' Business Plan (Exhibit P) to PURE POWER BOOT CAMP'S Business Plan, Start-Up Manual, Operations Manual, Brochure, client list and clients list, it is abundantly clear that the Defendants simply stole everything from me (my clients, concepts, curriculum, programs, pricing matrix, design, good will, and everything else about PURE POWER BOOT CAMP) and made it their own by engaging in a conspiracy to willfully and maliciously sabotage and destroy me and PURE POWER BOOT CAMP.

LAUREN BRENNER

Sworn and subscribed to before
me this 5th day of May, 2008

NOTARY PUBLIC

ANDREW J. CALCAGNO
NOTARY PUBLIC STATE OF NEW YORK
NEW YORK COUNTY
LIC. #02CA4985449
COMM. EXPIRES 08/19/200

**EXHIBIT E**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

———————————————————————X
:
PURE POWER BOOT CAMP, INC., PURE :
POWER BOOT CAMP FRANCHISING :
CORPORATION, and PURE POWER BOOT :
CAMP JERICHO INC., :        Index No.: *60136/2008*
:
              Plaintiff(s), :
:
          -against- :        **AFFIDAVIT OF**
:        **SUSAN UPTON DOUGLASS**
WARRIOR FITNESS BOOT CAMP, LLC; :        **IN SUPPORT OF**
ALEXANDER KENNETH FELL a/k/a ALEX :        **PLAINTIFFS' ORDER**
FELL, Individually; RUBEN DARIO BELLIARD :        **TO SHOW CAUSE**
a/k/a RUBEN BELLIARD, Individually; :        **FOR PRELIMINARY**
JENNIFER J. LEE, Individually; :        **INJUNCTION WITH**
and NANCY BAYNARD, Individually, :        **TEMPORARY**
:        **RESTRAINTS and FOR**
              Defendants. :        **A PERMANENT**
———————————————————————X        **INJUNCTION**

I, Susan Upton Douglass, being duly sworn according to law, depose and say:

1.  I am an Attorney at Law admitted to practice law in the State of New York, and have

    been representing the Plaintiff, Pure Power Boot Camp, Inc., located at 38 West 21st

    Street, New York, New York ("Pure Power") since November 17, 2005 in connection

    with the protection of Pure Power's trade dress. As such, I am fully familiar with the

    facts and circumstances herein.

2.  I am a member of the law firm Fross Zelnick Lehrman & Zissu, P.C. ("Fross

    Zelnick"). I joined Fross Zelnick in May 1982, and became a member of the firm on

    March 1, 1988. Fross Zelnick's practice is limited to trademark, copyright, unfair

    competition, and related causes associated with trademarks and copyrights.

3.  My specialty includes domestic trademark prosecution, i.e., filing trademark applications in the U.S. Patent and Trademark Office ("PTO") and securing registrations for various types of trademarks. Attached as Exhibit A is a copy of my curriculum vitae demonstrating my experience and expertise as a trademark lawyer.

4.  Fross Zelnick as a firm has been recognized for the past ten years or so as being among the top trademark law firms with the most trademark filings in the country. I handle more trademark applications at Fross Zelnick than any other attorney; last year, I was honored by the PTO for being the most prolific filer of electronic applications from any law firm. I personally have prosecuted hundreds of trademark applications during my career, touching on virtually every type of application.

5.  As a result of my experience in the PTO, I am frequently called upon to serve as an expert. For example, I was named to the PTO's Congressionally-appointed Public Advisory Committee in 1997. I initiated a program that was delivered for many years to the Examining Attorneys in the PTO, entitled "A View From the Outside." I authored a fifty-five page chapter in trademark law for the International Trademark Association's practice manual. I have spoken on the topic of trademark law and trademark filings at various trade association meetings and as a featured speaker for both legal groups and clients. I have also been asked to testify as an expert witness for cases, although all of the cases were ultimately settled.

6.  One of the types of trademarks that can be registered is a trademark encompassing trade dress, including the appearance of a business facility. For example, I registered as a trademark the interior of the Shoe Carnival store, including the center aisle, signage, display racks and other decorative features, as shown in Registration No.

2254662, a copy of which is attached as Exhibit B. The Supreme Court has held that trade dress may be inherently distinctive; the PTO has on many occasions registered trade dress for stores, restaurants and other facilities, although usually with proof of acquired distinctiveness. Section 2(f) of the Trademark Act, 15 U.S.C. § 1052(f), provides that prima facie evidence of distinctiveness is made if the mark has been in substantially continuous and exclusive use in commerce for the goods or services for five years.

7. On February 2, 2006, I filed on behalf of Pure Power an application to register the trade dress of the PURE POWER BOOT CAMP exercise facility, based on use in commerce since November 2, 2003. This application was assigned Serial No. 78/805804. Based upon the statutory definition in Section 2(f) of the Trademark Act, as well as my experience and expertise in the field, it is my opinion within a reasonable degree of certainty that the mark will be registrable as of November 2, 2008, when the mark has been in use in commerce for five years. We are in the process of filing additional evidence clearly documenting the acquired distinctiveness of the trade dress of Pure Power.

8. Based on my extensive experience in the trademark field, it is my opinion within a reasonable degree of certainty that the existing evidence already establishes that the trade dress of Pure Power has acquired distinctiveness under the Lanham Act. The tremendous amount of national media coverage featuring the mark is the type of evidence that the PTO and the courts rely upon in finding acquired distinctiveness in less than five years. Thus, I am confident that the trade dress for Pure Power's indoor

obstacle/confidence course will be approved for registration with the PTO by the end

of the year.

SUSAN UPTON DOUGLASS, ESQ.

Sworn and subscribed to before
me this 30th day of April, 2008

NOTARY PUBLIC

DAVID W. EHRLICH
**Notary** Public, State of New York
No. 31-4711143
Qualified in New York County
**Commission** Expires March 30, 2010

EXHIBIT A

## SUSAN UPTON DOUGLASS

### EDUCATION

New York University School of Law - J.D. 1980

University of Chicago - B.A. 1977, with Honors

### PROFESSIONAL EXPERIENCE

Fross Zelnick Lehrman & Zissu, P.C. - 1982-present

- Specialist in trademark, copyright and unfair competition law for worldwide clientele, focusing on counseling, protection of proprietary rights, licensing, and dispute resolution.  Extensive experience in prosecuting domestic trademark and copyright applications, proceedings before the administrative tribunals, and negotiating and drafting licenses ranging from character merchandising to software development.

- Partner since March 1, 1988

Patterson, Belknap, Webb & Tyler - 1980-1982

- Litigation associate

### PUBLISHED ARTICLES

"Copyrights," Ch. 4 of The Intellectual Property Handbook: A Practical Guide for Franchise, Business and IP Counsel  (ABA 2005)

"U.S. Application Practice Pointers," The International Who's Who of Trademark Lawyers (2d Ed. 2004)

"A Dozen Questions on Copyright Law," Women's Business NY, p. 10   (May 2003)

"Musical Sampling:  More Than Digital Theft?", with C.S. Mende, Copyright World, p. 23 (Aug. 1998)

"Deconstructing Music Sampling," with C.S. Mende, N.Y.L.J., p. S3 (Nov. 3, 1997)

"Hey, They're Playing My Song!", with C.S. Mende, N.Y.L.J., p. S1 (July 14, 1997)

"Color Me Happy: The Supreme Court Rules on the Trademark Registrability of Color," 7 The Journal of Proprietary Rights 2 (May 1995)

"Trademark and Copyright Licensing: An Overview,"  14 The Licensing Journal 6

(June/July 1994)

"Trademark Clearance is a Risky Business," N.Y.L.J., p. 1 (March 18, 1993)

"Overview of Basic Principles of Trademark Law," with B.A. Solomon, 20 The Lawyer's Brief 13 (Nov. 15, 1990)

## LECTURES AND SEMINARS

American Bar Association, 22nd Annual Intellectual Property Law Conference, "Recent Developments in Trademark Law and Practice" - Filings Under the Madrid Protocol – April 2007

New York State Bar Association, Intellectual Property in Action: A look at the Practical Side of, and Current Controversies in, Intellectual Property Law, "Intellectual Property Protection Strategies" – October 2006

American Bar Association Forum on Franchising, Bridging the Divide, "Copyright Basics," October 2005

Practising Law Institute, Navigating Trademark Trial & Appeal Board Practice 2003, "Settlement, Arbitration, and Other Pre-Trial Dispositions of Contested Proceedings" – February 2003

International Trademark Association, Trademark Basics Forum, "Trademark Office Practice," a two-hour presentation, along with a 55-page book chapter on this topic, presented at a two-day forum in February 2001 and February 2002

New York State Bar Association, TRADEMARK PRACTICE IN A DYNAMIC ECONOMY: More Marks, More Laws, More Resources than ever for the Trademark Practitioner, "Trademark Searching: Traps for the Wary and the Weary" – December 1999

Legalseminars.com, Drafting and Enforcing License Agreements – November 1999

Counsel Connect Online, Drafting and Negotiating License Agreements - October 1998

Practising Law Institute Fourth Annual Institute for Intellectual Property Law, "What's Hot and What's Not: Recent Developments in Trademark Law" - October 1998

"The Crowded Register: Making 2(d) Cites for Trite Trademarks" - presented to the Examining Corps at the U.S. PTO - June 1997

Practising Law Institute, Copyright and Trademark Law for the Nonspecialist, "Trademark and Copyright Licenses" – April 1999, March 1998, March 1997, March 1996, March 1995, March 1994

"Trademark Practice in a Law Firm" - presentation to new Examining Attorneys, - January 1999, July 1998, November 1997, September 1996, October 1993, March 1991

Practising Law Institute, Drafting License Agreements: initiated and chaired intensive seminar on negotiating trademark, copyright and multimedia licenses worldwide - October 1995 and October 1994

International Trademark Association, Trademarks Beyond the Lanham Act, "Pushing the Envelope and Getting Paper Cuts: Cutting-Edge Lanham Act Cases" - March 1995

Presented a program on protection of product configurations to the Japanese Patent Office (March 1995), and on trade dress infringement under U.S. law to the Japan External Trade Organization (December 1990)

International Franchise Association 24th Annual Legal Symposium, "Maximizing Benefits Under the Trademark Law" - May 1991

United States Trademark Association 112th Annual Meeting, "Trademark Basics and Filing Strategies Under Intent to Use" - April 1990

Practising Law Institute, "Overview of Basic Principles of Trademark Law" - February 1990, June 1989

United States Trademark Association, Dimensions: A Forum for Trademark Paralegals, "U.S. Filing (A Quick Guide to the Hows, Whys and Wherefores)" - September 1988

Numerous seminars presented to corporate and trademark attorneys, including attorneys for American Express Company, New York; NYNEX Corporation, New York; Ernst & Young LLP, New York; Reebok International Limited, Stoughton, MA; Bugle Boy Industries, Inc., Los Angeles; Kao Corporation, Tokyo; Kao Corporation of America, Los Angeles; Hanna-Barbera Productions, Inc., Hollywood, CA; and Brothers Gourmet Coffees, Inc., Denver, CO; New York City Health and Hospitals Corporation, New York

## PROFESSIONAL ACTIVITIES AND AWARDS

United States Patent and Trademark Office Public Advisory Committee

- Appointed in 1997 for a two-year term representing the International Trademark Association on a Congressionally approved public oversight panel.

International Trademark Association

- Member, Fraudulent Filing Subcommittee (2006-08); U.S. Patent and

3

Trademark Office Committee, 2001-2005, and for eleven years previously.  Chair, U.S. PTO Subcommittee, 1996-99.  Chaired Subcommittee on U.S. Practices and Procedures for five years. Participated in reviewing and revising the rules and regulations for the Trademark Law Revision Act of 1988.  Chair of Education Subcommittee from 1993-95.

- Member, U.S. Legislative Analysis Subcommittee 1999-2001.

- Task Force Member, The Government Corporation Group.  Studied the ramifications of converting the Patent and Trademark Office to a government corporation.

- Participant in roundtable discussions and on panels regarding policies and procedures in the U.S. Patent and Trademark Office in Washington, D.C. and at INTA Annual Meetings.

Panel participant – National Academy of Public Administration, "The Role of the U.S. Patent and Trademark Office and measuring the value of the U.S. trademark system," January 1999

Copyright Society of the U.S.A.

Practising Law Institute - Member of the Advisory Board

CT Corsearch – Member of Advisory Board

Who's Who Legal – Trademarks: 2002-2007

Managing Intellectual Property – Top Trademark and Copyright Firms: featured attorney 2005-2007

Madison's Who's Who – 2006-2007

Lawdragon 500 Leading Lawyers in America – 2006

Asialaw Leading Lawyer – 2006-2007

Awarded the "Most Prolific Electronic Filer" award by the U.S. Patent and Trademark Office for law firms – April 2007

Named the "Expert's Expert" in the July/August 2007 issue of World Trademark Review

**TEACHING EXPERIENCE**

New York City Technical College, City University of New York - Fall 1991 and Fall 1993

4

- Developed, wrote course materials, and taught a course on domestic trademark and copyright law for students enrolled in a four-year paralegal studies degree program.

## REPORTED DECISIONS

Rivard v. Linville, 31 U.S.P.Q.2d 1218 (Fed. Cir. 1993)

Banff, Ltd. v. Colberts, Inc., 810 F. Supp. 79 (S.D.N.Y. 1992)

Maher & Maher, Inc. v. Unisonic Products Corp., 719 F. Supp. 161 (S.D.N.Y. 1989)

Adolphe Lafont, S.A. v. S.A.C.S.E. Societa Azioni Confezione Sportive Ellera, S.p.A., 228 U.S.P.Q. 589 (TTAB 1985)

In re Carvel Corp., 223 U.S.P.Q. 65 (TTAB 1984)

EXHIBIT B

Thank you for your request. Here are the latest results from the <u>TARR web server.</u>

This page was generated by the TARR system on 2008-04-30 17:09:04 ET

**Serial Number:** 75138348 <u>Assignment Information</u>          <u>Trademark Document Retrieval</u>

**Registration Number:** 2254662

**Mark**



**(words only):** SHOE CARNIVAL NAME BRANDS FAMILY FUN LOWEST PRICES

**Standard Character claim:** No

**Current Status:** Section 8 and 15 affidavits have been accepted and acknowledged.

**Date of Status:** 2005-02-09

**Filing Date:** 1996-07-23

**Transformed into a National Application:** No

**Registration Date:** 1999-06-22

**Register:** Principal

**Law Office Assigned:** LAW OFFICE 106

**If you are the applicant or applicant's attorney and have questions about this file, please contact the Trademark Assistance Center at <u>TrademarkAssistanceCenter@uspto.gov</u>**

**Current Location:** 830 -Post Registration

**Date In Location:** 2005-02-09

---

### LAST APPLICANT(S)/OWNER(S) OF RECORD

1. SCLC, INC.

**Address:**
SCLC, INC.
300 DELAWARE AVENUE, 9TH FLOOR

WILMINGTON, DE 19801
United States
**Legal Entity Type:** Corporation
**State or Country of Incorporation:** Delaware

## GOODS AND/OR SERVICES

**International Class:** 035
**Class Status:** Active
retail store services for footwear
**Basis:** 1(a)
**First Use Date:** 1995-11-09
**First Use in Commerce Date:** 1995-11-09

## ADDITIONAL INFORMATION

**Disclaimer:** "SHOE", LOWEST PRICES" and "NAME BRANDS"

**Description of Mark:** The mark comprises, inter alia, a microphone stand featuring games on the periphery, large shoe replicas, a center aisle leading to a center circle and the microphone stand, a checkered design with circles for signage, staggered display racks, seating pods, neon lighting on the signage featuring "circus" lettering with the wording "SHOE CARNIVAL", "FAMILY FUN", "NAME BRANDS" and "LOWEST PRICES", and department signage in "bullhorn" style lettering.

**Lining and Stippling:** The lining shown in the drawing is a feature of the mark and is not intended to indicate color.

**Section 2(f)**

**Design Search Code(s):**
**06.09.25** - Cemeteries
**07.05.25** - Closets; Gymnasiums (interior); Hallways; Storage closets
**07.13.02** - Advertising, signs, alone; Street signs not attached to a support
**09.07.02** - Athletic shoes; Boots, ski; Exercise shoes; Gym shoes; Roller skates; Skates; Ski boots
**12.01.08** - Bathroom articles, cabinets; Benches, Work; Book shelves; Bookcase; Cabinets, bathroom; Cabinets, file; Cabinets, gun; Cabinets, kitchen; Cabinets, medicine; Chests, bedroom; Chests, medicine; China cabinets; Counters, store; Cupboard; Curio cabinets; Drawers (chests); Dressers; File cabinets; Gun cabinets; Medicine cabinets; Phonograph record cabinets; Record cabinets; Shelves; Storage cabinets; Work benches

## MADRID PROTOCOL INFORMATION

(NOT AVAILABLE)

## PROSECUTION HISTORY

**NOTE: To view any document referenced below, click on the link to "Trademark Document Retrieval" shown near the top of this page.**

2005-02-09 - Section 8 (6-year) accepted & Section 15 acknowledged

2005-01-10 - Section 8 (6-year) and Section 15 Filed

2005-01-10 - PAPER RECEIVED

1999-06-22 - Registered - Principal Register

1999-03-30 - Published for opposition

1999-02-26 - Notice of publication

1998-11-20 - Approved for Pub - Principal Register (Initial exam)

1998-11-10 - Examiner's amendment mailed

1997-07-28 - Communication received from applicant

1997-01-27 - Non-final action mailed

1997-01-13 - Assigned To Examiner

---

## ATTORNEY/CORRESPONDENT INFORMATION

**Attorney of Record**
SUSAN UPTON DOUGLASS

**Correspondent**
SUSAN UPTON DOUGLASS
FROSS ZELNICK LEHRMAN & ZISSU PC
866 UNITED NATIONS PLAZA
NEW YORK NY 10017

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

———————————————————————X
                                                            :
PURE POWER BOOT CAMP, INC., PURE           :
POWER BOOT CAMP FRANCHISING                :
CORPORATION, and PURE POWER BOOT        :
CAMP JERICHO INC.,                                        :        Index No.:
                                                            :
                          Plaintiff(s),                      :
                                                            :
              -against-                                      :
                                                            :
WARRIOR FITNESS BOOT CAMP, LLC;            :
ALEXANDER KENNETH FELL a/k/a ALEX      :
FELL, Individually; RUBEN DARIO BELLIARD  :
a/k/a RUBEN BELLIARD, Individually;           :
JENNIFER J. LEE, Individually;                       :
and NANCY BAYNARD, Individually,             :
                                                            :
                          Defendants.                     :
———————————————————————X

## AFFIDAVIT OF SUSAN UPTON DOUGLASS, ESQ.

Calcagno & Associates
Attorneys at Law, LLC

*Main Office*
213 South Avenue East
Cranford, NJ 07016
Tel: (908) 272-7300
Fax: (908) 272-5577

*Alternate Office*
404 Manor Road
Staten Island, NY 10314
Alt. Tel: (718) 815-0200

*Please direct all correspondence to the New Jersey office*

*Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information and belief and reasonable inquiry, the contentions contained in the annexed document are not frivolous.*

*Dated: May 5, 2008*          Signature:
                                        Print Signer's Name:    ANDREW JOHN CALCAGNO, ESQ.

**<u>EXHIBIT F</u>**

**BAHN, HERZFELD & MULTER, LLP**
ATTORNEYS AT LAW
**555 FIFTH AVENUE**
**NEW YORK, NY 10017**

ALLAN M. BAHN
RICHARD L. HERZFELD
ANDREW MULTER

TELEPHONE: (212) 818-9019
FACSIMILE: (212) 986-5316
E-MAIL: BHMLLP@AOL.COM

May 28, 2008

212-805-7912

Hon. John G. Koetl
United States District Court
Southern District of New York
500 Pearl Street
Courtroom 12B
New York, New York 10007
Attn: Donnie Fletcher

        Re: Pure Power Boot Camp, et. al.  v. Warrior Fitness Boot
            Camp, et. al. 08 CV 4810 (JGK)

Dear Judge Koetl:

        This letter is in reply  to the letter of Richard B. Cohen
dated May 27, 2008 on behalf of defendants.   Mr. Cohen suggests
that  prompt  attention  to  plaintiff's  pending  motion  for  a
preliminary injunction is unnecessary because  Justice Freedman has
already considered the merits of the application, dissolved the TRO
and concluded that there was no need for expedited treatment of the
motion or irreparable harm to plaintiffs.

        It is submitted that a review of the transcript does not
support Mr. Cohen's suggestions.  To the contrary, Justice Freedman
was clearly concerned with the allegations that defendants stole
plaintiff's client list. Excerpts of the transcript (obtained from
Mr. Cohen) are included herewith. At oral argument, the court asked
the simple question of whether defendants had taken the client list
which was included in plaintiff's motion papers as Exhibit X
(transcript, p. 32-the transcript printout has conflicting page
numbers.  References are to the page numbers at the very bottom of
the page).

        Exhibit X is a list of 321 clients, most with e-mail
addresses, comments such as the class times, number of sessions
left with plaintiff or other notes. A copy is included herewith as
well.

        It is important to point out that because many of exhibits in
this matter contain the proprietary information which plaintiffs
are seeking to protect, Justice Freedman granted plaintiffs'
request that the file be sealed to all other than court personnel
and attorneys of record.  A copy of that portion of the court's

BAHN, HERZFELD & MULTER, LLP

Hon. John G. Koetl
May 28, 2008
Page 2

order is also included here with and we request that this Court continue that direction and mark the file accordingly.

Although this was the roster of plaintiffs' clients, one of the attorneys for defendants at the time stated that this list was compiled by the defendants based upon their personal e-mail list (32). When the court indicated that that was not believable, counsel argued that the lists were not confidential. The court concluded that the client lists were confidential, stated that she believed the defendants took the lists and directed that all of the lists the returned. Counsel reiterated that defendants represented that they had no customer lists and the court reiterated its disbelief (33-34).

Ultimately, the court directed that everything be returned and that a hearing was required before the court could rule; however, the court was unable to schedule a hearing for a couple of weeks (42-43). In the interim, the court granted plaintiffs access to the premises to photograph in connection with the trade dress infringement issue and started to address what would happen if things were not changed by the time the parties returned, at which point the court was interrupted (43).

Although Mr. Cohen suggests that the court simply scheduled a conference for May 27th, pointing to the New York Law Journal calendar, it is clear from the transcript that the court contemplated a hearing. Indeed, when Mr. Cohen and his associate Daniel Schnapp initially contacted me on or about May 21, 2008, to advise me that the matter would be removed to Federal Court, their inquiry was whether I would be pressing forward with a hearing immediately given the imminent return date. It was only after a conference call by Mr. Schnapp and myself to Justice Freedman's part to advise the court that the matter had been removed that we were advised by the clerk of his belief that the matter was scheduled for conference.

The issue of e-mails and defendants' waiver of any privacy rights will undoubtedly be addressed by the court, but where defendants have (a) engaged in documented tortious interference, with Lee and Bayard surreptitiously joining as clients to alienate and subvert genuine clients, (b) stolen corporate files containing noncompete agreements and apparently shredded those agreements, (c) stolen customer lists, business plans and corporate files, and (d) copied plaintiff's trade dress and proprietary manuals, counsel's suggestion that "to seek equity one must do equity" carries little weight.

BAHN, HERZFELD & MULTER, LLP

Hon. John G. Koetl
May 28, 2008
Page 3

Although as indicated, a hearing will most likely be required with respect to trade dress, tortious interference, restrictive covenants, copyright infringement and related issues, the one issue which is clear and compelling is the combination of defendants' acts as faithless employees, establishing the competing facility while employed by plaintiff and at the same time, alienating clients against plaintiff and stealing the customer list. The case law addressing the sanctions for this clear breach of fiduciary obligations is substantial. For instance, in Innoviant Pharmacy, Inc. v. Morganstern, 390 F.Supp.2d 179 (N.D.N.Y.,2005), the court enjoined any contact with customers on a list stolen by the former employee from the employer. In Westcom Corp. v. Dedicated Private Connections, LLC, 9 A.D.3d 331, 781 N.Y.S.2d 322 (1st Dept 2004), the court ultimately required the corporate defendant to cease doing business while imposing restrictive covenants on the faithless employees for periods one 1 to 1 1/2 years. In Laro Maintenance Corp. v. Culkin, 255 A.D.2d 560, 681 N.Y.S.2d 79 (2d Dept. 1998) , the theft of proprietary information warranted a preliminary injunction prohibiting the former employees from contacting or soliciting those customers of the plaintiffs who previously were served by the individual defendants when they were employed by the plaintiffs. See also North Atlantic Instruments, Inc. v. Haber, 188 F.3d 38 (2d Cir. 1999), citing Laro, and generally discussing the protection afforded client lists.

Counsel's suggestion that defendants will not "solicit" plaintiff's customers until such time as a conference may be held, provides little relief. The clients have already been solicited and subverted; non-solicitation provides no relief. There must be a prohibition against any contact or servicing of plaintiffs' customers.

Defendants' argument that they have only subverted 34 clients thus far, and so there is no irreparable injury is also incorrect. Contrary to Mr. Cohen's suggestion, the estimate of 34 lost clients came from my client (I believe his estimate was far less) and since it is too early to tell, my client believes that the ultimate loss will be far more. Defendants have carefully laid the groundwork for the subversion over the many months preceding their departure. The only interim remedy which will address their malfeasance is a blanket prohibition against contact with these clients, as in the above cases.

Finally, to the extent that defendants argue a new motion must be made as the matter has been removed, defendants are again incorrect. Unless the court requires otherwise, there is already a pending motion for a preliminary injunction. The fact that defendants have removed the action does not moot the pending motion. All that a new motion would do is generate additional

# BAHN, HERZFELD & MULTER, LLP

Hon. John G. Koetl
May 28, 2008
Page 4

legal fees and allow defendants to continue to reap the benefit of
their misconduct.  It is respectfully requested that a hearing be
immediately scheduled.

Respectfully,

RICHARD L. HERZFELD

cc:  Richard Cohen, Esq.

**<u>EXHIBIT G</u>**

**From:** Lsbrenner
[mailto:LSBrenner@purepowerbootcamp.commailto:LSBrenner@purepowerbootcamp.com]
**Sent:** Thursday, May 29, 2008 2:24 PM
**Subject:** Pure Power Boot Camp

Hi Everyone:

I hope this beautiful weather is finding you well and it is the beginning of a wonderful summer
for all of you. The purpose if this email is to dispel rumors and clarify the record as to what has
actually transpired in the last several weeks with Pure Power Boot Camp and two former
employees.

Approximately three weeks ago, two former employees of Pure Power Boot Camp opened a
competing facility. This happens in all fields; and most of us would agree that fair competition
makes us all better at what we do. I for one am a huge advocate for competition and I welcome
it in all arenas of my life, especially in business. However, recent discoveries belie the supposed
honest nature of their departure and the new business venture.

As you know Pure Power Boot Camp ("PPBC")is not simply a physical fitness program, it's a
way of living your life through principles of leadership; namely "Integrity", "Loyalty", "Honor",
"Trust", "Respect" , "Courage", "Power", "Wisdom", "Duty", "Dignity" and "Pride". These
principles are not simply clichés but rather form the core basis by which I believe we achieve
physical and emotional health. Recently these principles were betrayed by those they had been
entrusted to as mentors and teachers to many of you.

Approximately five weeks ago when I first learned that former "PPBC" employees were starting
a competing business I also discovered that many business documents that I had spent over five
years developing, including PPBC's client lists had been downloaded off my computer and
taken from my private office without my knowledge or authorization. In addition, I also
discovered that my Business Plan, Startup Manual, and Operations Manual had been removed
from my office without my knowledge or authorization.

In addition to what I described above I also discovered that the former PPBC employees' efforts
to start their business started over ten months ago while still employed at PPBC and involved the
use of confidential and proprietary information shared with these employees under a written
confidentiality agreement. Copies of those agreements were also removed from my office
without my knowledge or consent. It is my further understanding that other individuals who
were involved in this matter were clients of PPBC who kept their personal relationship with the
employees hidden so as to aid the surreptitious nature of their involvement. One of these clients
is the girlfriend of one of the former employee's and is a silent partner and the financial backer
of the two former employees' business venture.

Upon discovering what I believe was a dishonest attempt to appropriate PPBC through illegal
means I filed suit in New York State Supreme Court seeking redress. During the initial hearing
the Court ordered the former employees to return stolen material. Shortly thereafter I received
PPBC's client list of names, telephone numbers and email addresses from the defendant

employees.   Recently, the case has been moved to federal court as there are federal trademark, trade dress and copyright claims along with state fraud, breach of contract and trespass claims.

As I mentioned at the beginning of this note, I have e mailed this information to you to set the record straight as far as I can.  The principles of PPBC are a part of my life as I know they are for many of you.  PPBC has brought many people together and it is more than just a physical fitness facility.  It is a place where people have bonded, laughed, cried and shared together.  It is a place where people grow as individuals as well as a community.  To many of you, it has been a second home.  And that is what validates to me why I even created Pure Power in the first place.

Anyone can take an aerobics class, do military jumping jacks, count in cadence and lift weights without thought or conviction; or for that matter claim principles but act without them.  That is not what we do and that is not what Pure Power Boot Camp stands for.     That being said, this episode is a momentary distraction which I believe needed an explanation before we move on and do what we all do so well.  I guess in some ways this is just another part of our journey.

I would like to thank those of you who have really rallied behind me and Pure Power Boot Camp and showed your support, love, and absolute integrity.  I wish you all health and happiness and I appreciate you taking your time to read this email.  If you have any questions regarding anything that has been said please feel free to call me and know that my door is always open for any explanation or clarification to support all of which I have said.

Have a wonderful day.

Very truly yours,

Lauren Brenner

PS: I have been told by my counsel that certain facts which are in dispute cannot be discussed. However, the court papers are a public document and if interested can be read in my office.  LB