

**Fox Rothschild** LLP
ATTORNEYS AT LAW

100 Park Avenue, Suite 1500
New York, NY 10017
Tel 212.878.7900  Fax 212.692.0940
www.foxrothschild.com

Daniel A. Schnapp
Direct Dial: (212) 878-7960
Email Address: dschnapp@foxrothschild.com

July 17, 2008

**VIA HAND DELIVERY and ECF**

Hon. John G. Koeltl
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

**Re:    Pure Power Boot Camp, *et al.* v. Warrior Fitness, *et al.*
         08 Civ. 4810 (JGK) (THK)**

Your Honor:

This firm represents Defendants in the above-captioned action. We write to oppose the recent application by Plaintiffs to partially seal the record in this case. The application should be denied because: (1) Plaintiffs have waived their right to claim that the documents are confidential and worthy of protection; (2) the application is procedurally improper and misleading; and (3) Plaintiffs have failed to overcome or even acknowledge the public's right to access the subject documents or the First Amendment concerns inherent in sealing the record—a concern previously raised by this Court.

### 1. **Plaintiffs Have Waived Any Right to Claim that the Documents are Confidential**

The documents and materials claimed by Plaintiffs to be confidential have already been willingly disclosed to the public. For example, in the present federal action, Plaintiffs submitted a list of their purported client names allegedly purloined by Defendants in a letter to the Court dated May 28, 2008.  A true and correct copy of Plaintiffs May 28, 2008 letter is attached hereto as Exhibit "A."

In addition, Plaintiffs sent a mass email on May 29, 2008 to their customers.  In this email, Plaintiffs publicized the instant lawsuit, defamed Defendants' characters (by accusing them of theft and disloyalty), and invited hundreds of their customers to review the court documents containing the allegedly confidential information which Plaintiffs stated are "public." A copy of Plaintiffs' May 29, 2008 email is attached hereto as Exhibit "B."



**Fox Rothschild LLP**
ATTORNEYS AT LAW

Hon. John G. Koeltl
July 17, 2008
Page 2

### 2. <u>Plaintiffs' Application is Procedurally Improper and Misleading</u>

As the Court may recall, at the conference before the Court on June 4, 2008, in response to a question raised by Plaintiffs' counsel concerning the sealing of the record, the Court directed Plaintiffs to file an affidavit and/or a proposed order setting forth why the documents should be placed under seal. (A copy of the transcript is annexed hereto as Exhibit "C." The relevant exchange is on pp. 20-22.) In support of their application, however, Plaintiffs have only filed an affirmation from their counsel—not an affidavit and/or order as directed by the Court.

In addition, Plaintiffs' counsel represented before the Court at the conference (at pp. 20-21), and, again in his affirmation before the Court, that the original Temporary Restraining Order ("TRO") in the New York State Court included a requirement that the file be sealed because "there is proprietary information and trade secrets." This is incorrect and misleading. In fact, as shown on page 18 of the transcript of the hearing on the TRO and preliminary injunction before the New York Court, the file was placed under seal because Plaintiffs' counsel was concerned about the privileged nature of certain emails misappropriated by Plaintiffs. (A copy of the transcript from the New York State Court proceeding is annexed hereto as Exhibit "D.")

To the extent that the TRO did include any provision for filing the documents under seal because of alleged "proprietary information and trade secrets," the TRO cannot control here. As this Court has recognized, the TRO was dissolved in its entirety by the New York State Court. This necessarily includes any portion of the TRO directing that the file be placed under seal.

### 3. <u>The Public Has a Right to Access Plaintiffs' Documents</u>

Plaintiffs request that the documents annexed to their Motion for a Preliminary Injunction be placed under seal. Yet, it is well-established that documents submitted to a court in connection with a motion are within the presumption of the public's right to access those documents. *Lugosch v. Pyramid Company of Onondaga,* 435 F.3d 110, 119 (2d Cir. 2006). For example, as the Second Circuit stated in *Lugosch,* "documents used by parties moving for, or opposing, summary judgment should not remain under seal absent *the most compelling reasons*." *Id.* (emphasis supplied).

As this Court emphasized at the conference, there is also a qualified right of access recognized under the First Amendment. *See* Exhibit "C" at p. 21, lines 11-12. Once it is determined that a document is within the qualified First Amendment right of access, the court may seal the document only if "specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest."



**Fox Rothschild** LLP
ATTORNEYS AT LAW

Hon. John G. Koeltl
July 17, 2008
Page 3

*Lugosch*, 435 F.3d at 120, quoting, *In re New York Times,* 828 F.2d 110, 116 (2d Cir. 1987). "Broad and general findings" offered in support of sealing are not sufficient. *Id.*

Here, Plaintiffs seek protection of documents that have been already submitted in connection with their Motion for a Preliminary Injunction. Plaintiffs have failed to identify, however, as the Second Circuit required in *Lugosch*, any compelling reasons for the sealing of the documents.

Plaintiffs' Exhibit "U" is an email stolen by Plaintiffs from Defendants Jennifer Lee and Alex Fell. This email was drafted and received after Defendant Alex Fell was no longer in Plaintiffs' employ. The document attached to the email, which Plaintiffs claim as their own customer list, is nothing of the sort. This document, entitled "Jen and Nancy's Party List," is Defendants' property and includes names and contact information of Defendants' acquaintances who have no relationship whatsoever with Plaintiffs. This document bears no markings whatsoever from Plaintiffs. Similarly, Exhibit "X" is a stolen email that was written and received after Defendant Fell left Plaintiffs' employ and also attaches Defendants' "party list." Exhibit "DD" is another stolen email that has no relationship with the Plaintiffs' business. Plaintiffs' Exhibit "D" is a franchise offering circular that is apparently available to anyone who wishes to see it. Exhibit "Q" is a corporate business plan that includes only a table of contents and a boilerplate notice provision. Exhibit "JJ" is a sample proposal for competitive team challenge program but contains nothing that can be considered confidential.

Based upon the critical and countervailing interests of the public's right to access these documents and the First Amendment, this Court should deny Plaintiffs' application.

Ultimately, Plaintiffs' deficient request to have their allegedly confidential documents placed under seal is emblematic of their ulterior motives in bringing this action. As more fully set forth in Defendants' Motion to Dismiss and opposition to the Motion for Preliminary Injunction, Plaintiffs do not actually possess any proprietary trade secrets or trade dress. They have not taken any measures to safeguard their purported confidential information. Their application for trade dress was rejected by the Trademark Office. Plaintiffs simply want to extinguish perceived competition and retaliate against their former employees who wanted to start their own gym based upon their service in the Marine Corps.

Accordingly, for the reasons set forth herein, Plaintiffs' application should be denied in its entirety.



**Fox Rothschild** LLP
ATTORNEYS AT LAW

Hon. John G. Koeltl
July 17, 2008
Page 4

Respectfully submitted,

Daniel A. Schnapp (DS 3484)

cc. Richard Herzfeld, Esq.

**BAHN, HERZFELD & MULTER, LLP**
ATTORNEYS AT LAW
**555 FIFTH AVENUE**
**NEW YORK, NY 10017**

ALLAN M. BAHN
RICHARD L. HERZFELD
ANDREW MULTER

TELEPHONE: (212) 818-9019
FACSIMILE: (212) 986-5316
E-MAIL: BHMLLP@AOL.COM

May 28, 2008

212-805-7912

Hon. John G. Koetl
United States District Court
Southern District of New York
500 Pearl Street
Courtroom 12B
New York, New York 10007
Attn: Donnie Fletcher

      Re: Pure Power Boot Camp, et. al. v. Warrior Fitness Boot
          Camp, et. al. 08 CV 4810 (JGK)

Dear Judge Koetl:

    This letter is in reply to the letter of Richard B. Cohen
dated May 27, 2008 on behalf of defendants. Mr. Cohen suggests
that prompt attention to plaintiff's pending motion for a
preliminary injunction is unnecessary because Justice Freedman has
already considered the merits of the application, dissolved the TRO
and concluded that there was no need for expedited treatment of the
motion or irreparable harm to plaintiffs.

    It is submitted that a review of the transcript does not
support Mr. Cohen's suggestions. To the contrary, Justice Freedman
was clearly concerned with the allegations that defendants stole
plaintiff's client list. Excerpts of the transcript (obtained from
Mr. Cohen) are included herewith. At oral argument, the court asked
the simple question of whether defendants had taken the client list
which was included in plaintiff's motion papers as Exhibit X
(transcript, p. 32-the transcript printout has conflicting page
numbers. References are to the page numbers at the very bottom of
the page).

    Exhibit X is a list of 321 clients, most with e-mail
addresses, comments such as the class times, number of sessions
left with plaintiff or other notes. A copy is included herewith as
well.

    It is important to point out that because many of exhibits in
this matter contain the proprietary information which plaintiffs
are seeking to protect, Justice Freedman granted plaintiffs'
request that the file be sealed to all other than court personnel
and attorneys of record. A copy of that portion of the court's

**BAHN, HERZFELD & MULTER, LLP**

Hon. John G. Koetl
May 28, 2008
Page 2

order is also included here with and we request that this Court
continue that direction and mark the file accordingly.

Although this was the roster of plaintiffs' clients, one of
the attorneys for defendants at the time stated that this list was
compiled by the defendants based upon their personal e-mail list
(32). When the court indicated that that was not believable,
counsel argued that the lists were not confidential.  The court
concluded that the client lists were confidential, stated that she
believed the defendants took the lists and directed that all of the
lists the returned.  Counsel reiterated that defendants represented
that they had no customer lists and the court reiterated its
disbelief (33-34).

Ultimately, the court directed that everything be returned and
that a hearing was required before the court could rule; however,
the court was unable to schedule a hearing for a couple of weeks
(42-43).  In the interim, the court granted plaintiffs access to
the premises to photograph in connection with the trade dress
infringement issue and started to address what would happen if
things were not changed by the time the parties returned, at which
point the court was interrupted (43).

Although Mr. Cohen suggests that the court simply scheduled a
conference for May 27th, pointing to the New York Law Journal
calendar, it is clear from the transcript that the court
contemplated a hearing.  Indeed, when Mr. Cohen and his associate
Daniel Schnapp initially contacted me on or about May 21, 2008, to
advise me that the matter would be removed to Federal Court, their
inquiry was whether I would be pressing forward with a hearing
immediately given the imminent return date.  It was only after a
conference call by Mr. Schnapp and myself to Justice Freedman's
part to advise the court that the matter had been removed that we
were advised by the clerk of his belief that the matter was
scheduled for conference.

The issue of e-mails and defendants' waiver of any privacy
rights will undoubtedly be addressed by the court, but where
defendants have (a) engaged in documented tortious interference,
with Lee and Bayard surreptitiously joining as clients to alienate
and subvert genuine clients, (b) stolen corporate files containing
noncompete agreements and apparently shredded those agreements, (c)
stolen customer lists, business plans and corporate files, and (d)
copied plaintiff's trade dress and proprietary manuals, counsel's
suggestion that "to seek equity one must do equity" carries little
weight.

**BAHN, HERZFELD & MULTER, LLP**

Hon. John G. Koetl
May 28, 2008
Page 3

Although as indicated, a hearing will most likely be required with respect to trade dress, tortious interference, restrictive covenants, copyright infringement and related issues, the one issue which is clear and compelling is the combination of defendants' acts as faithless employees, establishing the competing facility while employed by plaintiff and at the same time, alienating clients against plaintiff and stealing the customer list. The case law addressing the sanctions for this clear breach of fiduciary obligations is substantial. For instance, in <u>Innoviant Pharmacy, Inc. v. Morganstern</u>, 390 F.Supp.2d 179 (N.D.N.Y.,2005), the court enjoined any <u>contact</u> with customers on a list stolen by the former employee from the employer. In <u>Westcom Corp. v. Dedicated Private Connections, LLC</u>, 9 A.D.3d 331, 781 N.Y.S.2d 322 (1st Dept 2004), the court ultimately required the corporate defendant to cease doing business while imposing restrictive covenants on the faithless employees for periods one 1 to 1 1/2 years. In <u>Laro Maintenance Corp. v. Culkin</u>, 255 A.D.2d 560, 681 N.Y.S.2d 79 (2d Dept. 1998), the theft of proprietary information warranted a preliminary injunction prohibiting the former employees from contacting or soliciting those customers of the plaintiffs who previously were served by the individual defendants when they were employed by the plaintiffs. See also <u>North Atlantic Instruments, Inc. v. Haber</u>, 188 F.3d 38 (2d Cir. 1999), citing Laro, and generally discussing the protection afforded client lists.

Counsel's suggestion that defendants will not "solicit" plaintiff's customers until such time as a conference may be held, provides little relief. The clients have already been solicited and subverted; non-solicitation provides no relief. There must be a prohibition against any contact or servicing of plaintiffs' customers.

Defendants' argument that they have only subverted 34 clients thus far, and so there is no irreparable injury is also incorrect. Contrary to Mr. Cohen's suggestion, the estimate of 34 lost clients came from my client (I believe his estimate was far less) and since it is too early to tell, my client believes that the ultimate loss will be far more. Defendants have carefully laid the groundwork for the subversion over the many months preceding their departure. The only interim remedy which will address their malfeasance is a blanket prohibition against contact with these clients, as in the above cases.

Finally, to the extent that defendants argue a new motion must be made as the matter has been removed, defendants are again incorrect. Unless the court requires otherwise, there is already a pending motion for a preliminary injunction. The fact that defendants have removed the action does not moot the pending motion. All that a new motion would do is generate additional

# BAHN, HERZFELD & MULTER, LLP

Hon. John G. Koetl
May 28, 2008
Page 4

legal fees and allow defendants to continue to reap the benefit of
their misconduct.  It is respectfully requested that a hearing be
immediately scheduled.

Respectfully,

RICHARD L. HERZFELD

cc:  Richard Cohen, Esq.

**From:** Lsbrenner
[mailto:LSBrenner@purepowerbootcamp.commailto:LSBrenner@purepowerbootcamp.com]
**Sent:** Thursday, May 29, 2008 2:24 PM
**Subject:** Pure Power Boot Camp

Hi Everyone:

I hope this beautiful weather is finding you well and it is the beginning of a wonderful summer for all of you. The purpose if this email is to dispel rumors and clarify the record as to what has actually transpired in the last several weeks with Pure Power Boot Camp and two former employees.

Approximately three weeks ago, two former employees of Pure Power Boot Camp opened a competing facility. This happens in all fields; and most of us would agree that fair competition makes us all better at what we do. I for one am a huge advocate for competition and I welcome it in all arenas of my life, especially in business. However, recent discoveries belie the supposed honest nature of their departure and the new business venture.

As you know Pure Power Boot Camp ("PPBC")is not simply a physical fitness program, it's a way of living your life through principles of leadership; namely "Integrity", "Loyalty", "Honor", "Trust", "Respect" , "Courage", "Power", "Wisdom", "Duty", "Dignity" and "Pride". These principles are not simply clichés but rather form the core basis by which I believe we achieve physical and emotional health. Recently these principles were betrayed by those they had been entrusted to as mentors and teachers to many of you.

Approximately five weeks ago when I first learned that former "PPBC" employees were starting a competing business I also discovered that many business documents that I had spent over five years developing, including PPBC's client lists had been downloaded off my computer and taken from my private office without my knowledge or authorization. In addition, I also discovered that my Business Plan, Startup Manual, and Operations Manual had been removed from my office without my knowledge or authorization.

In addition to what I described above I also discovered that the former PPBC employees' efforts to start their business started over ten months ago while still employed at PPBC and involved the use of confidential and proprietary information shared with these employees under a written confidentiality agreement. Copies of those agreements were also removed from my office without my knowledge or consent. It is my further understanding that other individuals who were involved in this matter were clients of PPBC who kept their personal relationship with the employees hidden so as to aid the surreptitious nature of their involvement. One of these clients is the girlfriend of one of the former employee's and is a silent partner and the financial backer of the two former employees' business venture.

Upon discovering what I believe was a dishonest attempt to appropriate PPBC through illegal means I filed suit in New York State Supreme Court seeking redress. During the initial hearing the Court ordered the former employees to return stolen material. Shortly thereafter I received PPBC's client list of names, telephone numbers and email addresses from the defendant

employees.    Recently, the case has been moved to federal court as there are federal trademark, trade dress and copyright claims along with state fraud, breach of contract and trespass claims.

As I mentioned at the beginning of this note, I have e mailed this information to you to set the record straight as far as I can.  The principles of PPBC are a part of my life as I know they are for many of you.  PPBC has brought many people together and it is more than just a physical fitness facility.  It is a place where people have bonded, laughed, cried and shared together.  It is a place where people grow as individuals as well as a community.  To many of you, it has been a second home.  And that is what validates to me why I even created Pure Power in the first place.

Anyone can take an aerobics class, do military jumping jacks, count in cadence and lift weights without thought or conviction; or for that matter claim principles but act without them.  That is not what we do and that is not what Pure Power Boot Camp stands for.    That being said, this episode is a momentary distraction which I believe needed an explanation before we move on and do what we all do so well.  I guess in some ways this is just another part of our journey.

I would like to thank those of you who have really rallied behind me and Pure Power Boot Camp and showed your support, love, and absolute integrity.  I wish you all health and happiness and I appreciate you taking your time to read this email.  If you have any questions regarding anything that has been said please feel free to call me and know that my door is always open for any explanation or clarification to support all of which I have said.

Have a wonderful day.

Very truly yours,

Lauren Brenner

PS: I have been told by my counsel that certain facts which are in dispute cannot be discussed. However, the court papers are a public document and if interested can be read in my office.  LB

1

```
      864rpurc
 1    UNITED STATES DISTRICT COURT
 1    SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x
 2
 3    PURE POWER BOOT CAMP, INC.,
 3    et al.,
 4
 4                    Plaintiffs,
 5
 5            v.                          08 Civ. 4810 (JGK)
 6
 6    WARRIOR FITNESS BOOT CAMP,
 7    LLC, et al.,
 7                                        Conference
 8                    Defendants.
 8
 9    ------------------------------x
 9
10                                        New York, N.Y.
10                                        June 4, 2008
11                                        3:10 p.m.
11    Before:
12
12            HON. JOHN G. KOELTL
13
13                                        District Judge
14
14
15
15            APPEARANCES
16
16
17
17    BAHN, HERZFELD & MULTER, LLP
18         Attorneys for Plaintiffs
18    RICHARD L. HERZFELD, ESQ.
19
19
20    FROSS ZELNICK LEHRMAN & ZISSU, P.C.
20         Attorneys for Plaintiffs
21    SUSAN UPTON DOUGLASS, ESQ.
21
22
22    ROX ROTHSCHILD LLP
23         Attorneys for Defendants
23    DANIEL A. SCHNAPP, ESQ.
24    ELI Z. FREEDBERG, ESQ.
24
25
25
```

2

```
      864rpurc
 1            (Case called)
 2            THE COURT:  Good afternoon all.  I've read the
 3    correspondence.  The case is now before me.  There is an issue
 4    with respect to a preliminary injunction.  Let me ask a couple
 5    of questions.
 6            Has there been an answer already to the complaint?
 7            MR. SCHNAPP:  Your Honor, there has not been.  We have
 8    agreed to adjourn that until I believe it is 20 days from last
```

```
 9    week, something like June 23rd.
10         THE COURT:  There are two issues.  One is the issue of
11    the preliminary injunction, and the second issue is simply the
12    scheduling order for the case now that you are all here and
13    before me.  I'll certainly listen to the parties.
14         My understanding from the correspondence is the
15    parties dispute to a certain degree whether the state court
16    held a hearing and denied a preliminary injunction.  Plainly,
17    what the state court did was require that the defendants return
18    certain material to the plaintiff, and the state court
19    dissolved the previously issued TRO.
20         The issue of whether there was a preliminary
21    injunction that the state court denied or whether there was no
22    preliminary injunction, or whatever, really seems to me to be
23    irrelevant for my purposes.  There is no pending motion for a
24    preliminary injunction.
25         the plaintiff could make a motion for a preliminary
```

3

```
      864rpurc
 1    injunction, and I would read all the papers and make a
 2    decision.  If the plaintiff wished to make a motion for a
 3    preliminary injunction, the plaintiff would make the motion and
 4    the defendant would respond, the plaintiff would reply, and I
 5    would set it down.  That's the first issue, preliminary
 6    injunction.
 7         The second issue is the scheduling order.  I'm
 8    perfectly prepared to enter a scheduling order for the case
 9    today which schedules completion of discovery, dispositive
10    motions, joint pretrial order, etc.  I'm prepared to listen to
11    the parties.  I understand what the case is about from reading
12    your correspondence.
13         Before I set any deadlines or the like, Mr. Herzfeld,
14    what would you like to tell me?
15         MR. HERZFELD:  Your Honor, maybe I'm mistaken, but the
16    state court motion is still pending.  My understanding has been
17    that with it removed, that doesn't disappear, it's before this
18    Court now.  It hasn't been initiated in this court, but it was
19    pending before Judge Friedman, and now, as I understand it,
20    it's pending before you.
21         THE COURT:  The defendant says it was denied in state
22    court.
23         MR. HERZFELD:  Judge, I'm sorry, I don't think they
24    are saying that, to tell you the truth.  None of us, other than
25    Ms. Douglass and Ms. Brenner, were at the actual appearance
```

4

```
      864rpurc
 1    before Judge Friedman.  My understanding of what Judge Friedman
 2    did was as an afterthought.  It was only at the very end of all
 3    the colloquy, and no testimony was taken.  Someone said, Judge
 4    Friedman, will you continue the TRO?  And she said no, but come
 5    back in two weeks and everything better be different.
 6         Basically, my information of the transcript is that
 7    Judge Friedman put everything on hold, she felt a TRO was
 8    unnecessary, a conclusion we disagree with but that's beside
 9    the point right now, and ordered everybody to come back.
10         Everybody, both myself and the other side, believe
11    that a hearing should take place.  When I introduced myself to
12    the other side, they asked me if I was going forward with the
13    hearing on Monday.  They had that impression, I had that
14    impression.
```

Page 2

```
15            I don't think they are saying she denied the
16   preliminary injunction.  They are simply saying that she denied
17   the TRO, so clearly she didn't believe there was any immediate
18   harm, so this Court can take its time.  That's my understanding
19   of their position.
20            Certainly there was absolutely nothing on the record
21   or even discussed relating to the preliminary injunction, only
22   the TRO and what would happen in that two-week interim.  As a
23   matter of fact, Judge Friedman said, I can't hold the hearing
24   for two weeks, so she rescheduled it for the next available
25   date she had.
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                5
864rpurc
```
 1            THE COURT:  Is that right, Mr. Schnapp?
 2            MR. SCHNAPP:  Your Honor, no, that is not our
 3   position.  We think, in fact, that the court did deny the
 4   preliminary injunction.  What the court did was set it down for
 5   a conference.  I think we forwarded to the Court --
 6            THE COURT:  That's what I read your papers to say.
 7            MR. SCHNAPP:  It is our position that it was set down
 8   for a conference; that, if anything, the court wished us to
 9   return and simply tell the court that we had changed whatever
10   might potentially have been infringement.  We, of course,
11   contend that nothing infringed.  But for all intents and
12   purposes the motion had been denied.
13            MR. HERZFELD:  Perhaps Mr. Schnapp could point to the
14   record where Judge Friedman denied the preliminary injunction,
15   because there is nothing in that record.  Once again, she set
16   it down for two weeks.  She said everybody better change or
17   else, and then she was interrupted and she didn't finish the or
18   else.
19            MS. DOUGLASS:  Your Honor, may I interject?
20            THE COURT:  No.  One at a time.
21            Maybe you can help me, Mr. Herzfeld.  I clearly
22   understood the defendant's position just on the correspondence.
23   I don't understand how you can tell me that there is no dispute
24   as to whether the state court judge denied the preliminary
25   injunction.  I got from the papers that the defendant was
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                6
864rpurc
```
 1   contending exactly that.
 2            MR. HERZFELD:  My understanding was that they were
 3   contending the TRO was dissolved and therefore there was no
 4   urgency to go forward.  Apparently Mr. Schnapp says I'm
 5   mistaken.  I'll accept his word for it.  But that was my
 6   understanding.
 7            Once again, when I had my preliminary conversation
 8   with Mr. Schnapp and Mr. Cohen of his firm, it wasn't there's
 9   no motion pending, there's nothing going on.  It was, are you
10   pressing forward on Tuesday, because it's Memorial Day weekend?
11            What happened was in fact we had a conference call
12   with Mr. Schnapp and I with Judge Friedman's part that Friday
13   to find out how the we could expedite the transfer of the file
14   to you and what was going on.  It was the clerk who said, it's
15   on for a conference because that's her conference date.  When I
16   explained it was for a hearing, he said, I don't know, I just
17   know ordinarily it's on for a conference.
18            Maybe Judge Friedman had it down for a conference to
19   see whether or not things had changed enough so she didn't have
20   to go forward with a hearing.  But under no circumstances did
```
                              Page 3

```
21   she ever say preliminary injunction denied.  She dissolved the
22   TRO as an afterthought at the end when somebody asked about it,
23   never addressed preliminary injunction.  If Mr. Schnapp can
24   show you where, I'm happy to make a new motion.
25              MR. SCHNAPP:  Your Honor, may I address counsel?
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```
                                                                    7
```
     864rpurc
 1              THE COURT:  Sure.
 2              MR. SCHNAPP:  To begin with, at the time that we
 3   actually became involved with the case, we frankly didn't know
 4   exactly what was going on.  The substance of the conversation
 5   that counsel just repeated to you took place in a conversation
 6   in which we approached and asked him whether or not there was
 7   any room for settlement of this matter.
 8              So first of all, I object to the fact that this is
 9   being brought up.  But to the extent that that conversation did
10   take place, it doesn't matter what we may have thought was
11   going on or we had asked Mr. Herzfeld was going on.  It
12   mattered what Judge Friedman thought was going on.
13              The fact is that it was in the journal as a
14   conference, the judge put it off for three weeks, dissolved the
15   TRO, and told everybody to come back and make sure things had
16   been changed.  In our view, in essence, as I think we have
17   already stated in our letters to the Court, and I don't want to
18   waste time, I think the judge denied the motion and simply
19   wanted to make sure at the conference that whatever potential
20   infringement had been changed.
21              MR. HERZFELD:  Judge, can I read to you from the
22   transcript, please?  Judge Friedman at the very end of the
23   colloquy:  "I can't do this without a hearing, and I can't
24   conduct the hearing for a couple of weeks now."
25              THE COURT:  In the absence of an order from the state
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```
                                                                    8
```
     864rpurc
 1   court that denied the preliminary injunction, whether the judge
 2   set it down for a conference or, based on the justice's
 3   familiarity with the case, decided that it was really not of
 4   such urgency that she was about to grant a preliminary
 5   injunction in any event, there doesn't appear to be an order
 6   denying the preliminary injunction.
 7              So if the parties are satisfied with the papers that
 8   they submitted in connection with the application for a
 9   preliminary injunction, I'll review those papers and make a
10   determination whether there is a basis for a preliminary
11   injunction.
12              MR. HERZFELD:  Judge, the other side hasn't put in any
13   papers yet in response.  I would also like to supplement to
14   bring the Court up to date on events that have transpired.
15              THE COURT:  That's really what I was getting to at the
16   outset.  Whatever the state court did on the preliminary
17   injunction, the plaintiff has a right to make a motion for a
18   preliminary injunction.  The parties have a right to brief a
19   motion for preliminary injunction.  You can put in brand new
20   papers to me on a motion for a preliminary injunction or you
21   can take the motion papers and supplement them, and I'll
22   certainly give the defendants the opportunity to respond and
23   you to reply.
24              MR. HERZFELD:  I think that's the way we'd like to
25   proceed, to supplement the papers on as expedited a schedule as
                   SOUTHERN DISTRICT REPORTERS, P.C.
                            Page 4
```

(212) 805-0300

9

864rpurc
1  we possibly can at this point.
2          THE COURT:  OK.  Plaintiffs' supplemental papers in
3  support of a motion for preliminary injunction are due June 6.
4  How much time does the defendant want to respond?
5          MR. SCHNAPP:  Your Honor, we'd ask for a week for our
6  opposition.
7          THE COURT:  Sure.  Responsive papers due June 13th,
8  reply papers June 17th, hearing June the 27th at 2:30 p.m.
9          MR. HERZFELD:  Judge, I'm not available on the 27th.
10  I'm sorry.
11          THE COURT:  June 26th at 4:30 p.m.
12          MR. SCHNAPP:  Your Honor, may I inquire whether the
13  Court will be hearing live testimony at that time or it will
14  merely be oral argument on the motion?
15          THE COURT:  I was just going to get to that.  The
16  overwhelming number of preliminary injunctions are decided on
17  the papers.  If the parties think based on the papers that they
18  want to present oral testimony on either side, please let me
19  know in advance and I'll reschedule it because it's unlikely
20  that I would have an evidentiary hearing beginning at 4:30.
21  Just let me know on the papers whether the parties want to
22  present live testimony.  Otherwise, I'll take the papers, hear
23  argument on the papers.
24          MR. HERZFELD:  Judge, it's my anticipation that there
25  are going to be a number of credibility issues for you to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

10

864rpurc
1  resolve.  If that is the case, I imagine we would need
2  testimony.
3          THE COURT:  Let me know in the papers.  Do you all
4  want to have any discovery in preparation for the preliminary
5  injunction?
6          MR. HERZFELD:  As a matter of fact, Judge, yes.  One
7  of the provisions that Judge Friedman granted was the right to
8  inspect and photograph the Warrior Fitness facility.  It's my
9  understanding, and I have no direct knowledge, that counsel
10  attempted to do that and was refused.
11          That aside, what I ask this Court to direct is that we
12  have the ability to access it unannounced to prevent them from
13  sanitizing whatever they are doing.  One of the issues is trade
14  dress.  For them to be able to rearrange things to minimize the
15  trade dress issue on advance notice is a real concern.
16          MR. SCHNAPP:  Your Honor, obviously, we think that
17  that that's quite absurd.  In any event, we are of course open
18  to having someone visit our gym.
19          The only thing I would say is that if we are going to
20  conduct discovery of that kind, I imagine those kinds of things
21  will be making it into counsel's papers, in which case I think
22  that briefing schedule might have to be pushed back.
23          THE COURT:  I was surprised that you agreed to
24  responsive papers by June 13th.  If you want discovery in
25  connection with the preliminary injunction, the results of that
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

11

864rpurc
1  discovery should be put in the papers.
2          MR. HERZFELD:  Judge, I'll withdraw the request.  We'd
3  rather get a prompt determination by you than have the ability
                            Page 5

```
 4    to inspect the facility.
 5         THE COURT:  OK.  So the parties don't want discovery.
 6    Let me know in the papers whether you want an evidentiary
 7    hearing, how long you expect the evidentiary hearing to take,
 8    who the witnesses are that you intend to call at the
 9    evidentiary hearing.  I will attempt to reschedule it.
10         MR. SCHNAPP:  Your Honor, may I address one other
11    issue?
12         THE COURT: Sure.
13         MR. SCHNAPP:  I think in our preliminary letter to the
14    Court and in our letter on Monday we addressed the fact that
15    the majority of counsel's papers as they occurred in the state
16    court action -- again, obviously, they may supplement them --
17    but as they currently exist, they cite to and actually include
18    as exhibits a total of 33 emails.
19         We reviewed those emails, and it appears that 23 of
20    those emails were either attorney-client privileged or they
21    were essentially stolen.  By that I mean that we believe that
22    plaintiff's owner or someone working on her behalf hacked into
23    a computer and went into our client's personal email accounts
24    and took these emails and have now presented them with their
25    papers.
```

```
864rpurc
 1         We ask the Court in the letter that some way somehow
 2    this be addressed so that we are not forced to have to confront
 3    these allegations based upon stolen privileged emails.
 4         THE COURT: Mr. Herzfeld?
 5         MR. HERZFELD:  First of all, the fact that it's an
 6    attorney-client communication doesn't necessarily mean it's
 7    privileged.  What happened here is Pure Power had a firm
 8    policy, employee policy, against using email on firm premises,
 9    using the firm computer, which was located in my client's
10    office.  The defendants apparently ignored that policy and used
11    the computer.  Those are for the most part the emails which my
12    client has recovered.
13         In addition, other emails were recovered because the
14    defendants actually gave my client, or an employee of my
15    client, their password.  That's how those were accessed.
16    Finally, in terms of attorney-client communications, a number
17    of those emails reflect the sharing of those communications
18    with third parties, which would also break the privilege.
19         So I think there are a number of issues that are going
20    to be before this Court, whether my client rightfully accessed
21    them.  It is at least the New York State court that
22    specifically provides that you lose the expectation of privacy
23    where your employer has a specific policy prohibiting emails
24    and you ignore that policy.  Scott v. Beth Israel.  I think it
25    is actually recited in their responding letter.
```

```
864rpurc
 1         So you have whether or not the defendants waived any
 2    rights with respect to those emails, all of which were housed
 3    on my client's computer, and whether or not they actually
 4    shared advice with a third party, which would also waive
 5    attorney-client communications.  And my client advises me that
 6    apart from verbally sharing their password, they actually left
 7    it on the computer.
 8         THE COURT:  I'm sorry?
 9         MR. HERZFELD:  In addition to verbally sharing their
```

```
10  password with a Pure Power employee, they actually left the
11  password on the Pure Power computer.
12          MR. SCHNAPP: Your Honor, I think, if anything,
13  putting aside the issue of whether or not that password was
14  given to plaintiff's owner, it does appear then that in fact
15  they hacked into the computer in one way, shape, or form using
16  a password that I highly doubt that anyone willingly supplied.
17  In addition, you have just heard in fact that there are
18  communications to attorneys.
19          whether or not there was a waiver, I think that's an
20  issue that probably should be addressed. Certainly, as I said,
21  the majority of these emails that we are talking about now form
22  the basis of their complaint and the motion as it occurred in
23  state court.
24          MR. HERZFELD: Just so the Court is aware, to address
25  the quote-unquote hacking, these were emails that were for the
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300
                                                              14
```

```
    864rpurc
1   most part housed in the Pure Power computer.
2           MR. SCHNAPP: On personal email accounts, your Honor.
3           MR. FREEDBERG: Your Honor, if I may.
4           THE COURT: No. Rules apply equal to both sides. You
5   remind me that I asked Mr. Herzfeld's colleague not to
6   interrupt a conversation between myself and Mr. Herzfeld. I
7   wanted to go back to his colleague to ask her if she wanted to
8   say something that I prevented from before.
9           MS. DOUGLASS: I just wanted to say, and I think
10  you've covered it, Judge Friedman said we would have complete
11  access to photograph and view the premises, and it was my
12  understanding that counsel refused to allow them in and the
13  owners of the Warrior Boot Camp barred them from entering.
14          THE COURT: If the judge in the state court had given
15  you that right, I'm not going to prevent that right. You're
16  welcome to exercise whatever right the judge in the state court
17  has already given you with respect to photographing or anything
18  else.
19          Certainly the judge in the state court said to return
20  certain materials. I understand from the papers the defendant
21  has done that. If the defendant hasn't complied with another
22  order of the state court, it's still an order that's out there.
23  Mr. Schnapp, you shouldn't be interfering with an order of the
24  state court.
25          MR. SCHNAPP: Your Honor, to begin with, we have
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300
                                                              15
```

```
    864rpurc
1   returned everything. Secondly --
2           THE COURT: I'm sorry? You have?
3           MR. SCHNAPP: Yes. Everything has been returned.
4   Let's put it this way: We have lived by the letter of what the
5   state court has told us. We are aware that there is an
6   outstanding order. We have every intent to live up to it.
7           I don't know what prior counsel did with respect to
8   entering into the premises. Again, we don't object to that.
9   The state court may have ordered it, and we're not here to
10  object to it. We'd only ask that in the event that is going to
11  occur, that brings us back into what we just talked about a few
12  minutes ago, as I understood it, that they are now going to be
13  taking discovery, and they just seemed to have waived that. So
14  I'm a little confused.
15          THE COURT: Did the state court specify the conditions
                            Page 7
```

```
16   under which the photographing would occur?
17           MR. HERZFELD:  It was less than clear.  Someone asked
18   about supervision.  If you read the transcript, it almost looks
19   like it's asking the court to supervise, which I can't imagine
20   was the case.  I suspect they were looking for attorney
21   supervision of what was taking place.  But I wasn't there.
22   Maybe Ms. Douglass can add to that.
23           MS. DOUGLASS:  It was a very disjointed conversation.
24   Judge Friedman was sort of like out the door and talking over
25   her shoulder, which is why perhaps the transcript doesn't read
```

```
     864rpurc
 1   as well as it might.  She basically just said change
 2   everything, you know what you're supposed to do, and come back
 3   in two weeks and I want to hear about it.
 4           She didn't specify.  Obviously, I think if you were to
 5   come announced, maybe there would be ballet classes or swimming
 6   going on there, I don't know.  She didn't say.  She simply said
 7   change it and you can go and take pictures, photographs.
 8           I've seen the Pure Power Boot Camp facility, I have
 9   not seen the Warrior Fitness one.  But the nature of the
10   facility would obviously lend itself better to a video view
11   than still photography.  But she did not specify.
12           THE COURT:  Thank you.
13           MR. HERZFELD:  To follow up, if I may, on the other
14   aspect of the judge's order?
15           THE COURT:  All right.
16           MR. HERZFELD:  Mr. Schnapp I think chose his words
17   carefully.  What the judge ordered, unfortunately, was return
18   of physical copies of customer lists.  As far as I know, they
19   were returned.  She didn't say anything about electronic
20   copies.  She didn't address the fact that, unfortunately, the
21   well has already been poisoned by the mass email to all of
22   these people already.  So all she did was say return the
23   physical copies and that's the way it was left.
24           If the Court is of a mind to broaden that order, we
25   think it is appropriate and would certainly appreciate that.
```

```
     864rpurc
 1           THE COURT:  No, I'm not going to broaden the order.  I
 2   can tell you what I'm going to do because it's related to the
 3   issue of the emails.  Also, I didn't want to cut off -- Mr.
 4   Schnapp, your colleague wanted to tell me something.
 5           MR. FREEDBERG:  Thank you, your Honor.  I just wanted
 6   to address the fact that the emails were housed on the
 7   plaintiff's computers.  I don't see how that is possible in any
 8   way, shape, or form, considering that a majority of the emails
 9   were taken after our clients had already left the employ of
10   plaintiffs.  So the mails could not have been written or
11   drafted or reviewed.
12           THE COURT:  How do you suggest they got them?
13           MR. FREEDBERG:  By somehow surreptitiously getting our
14   client's password or otherwise.  Frankly, I'm not sure how they
15   got them.  That's an issue that we expect will certainly come
16   out at some point mitigates proceeding.  Our client Mr. Fell
17   left plaintiff's employ, I believe it was March 16th, 2008, and
18   the majority of the emails were taken from March 17th and
19   beyond, well into May.  For them to make that claim is . . . .
20           THE COURT:  Some of the emails, the representation is,
21   had been given to third parties, they were copied, and that
```

```
22  your client gave them to third party, which would waive the
23  privilege.
24          MR. FREEDBERG:  I'm not even talking about the
25  privilege issue for this matter, your Honor.  Just to address
```

                                                                    18
```
    864rpurc
 1  the point of how they got the emails in the first place.  The
 2  fact is that most of the emails were between the co-defendants,
 3  Mr. Fell and Ms. Lee.  So they were actually between parties.
 4          THE COURT:  Thank you.  It's clear to me that I should
 5  do two things.  First, the instinct of the state court was to
 6  see if it can't be resolved.  I will send you to the magistrate
 7  judge to see if it can be resolved.  I've given you the
 8  schedule for the preliminary injunction.  I'll refer you to the
 9  magistrate judge for the possibility of settlement, and I'll
10  refer it to the magistrate judge for general pretrial,
11  including, obviously, discovery.
12          The preliminary injunction I retain because it's a
13  dispositive motion, I believe.  I'll so I'll hear the
14  preliminary injunction.
15          Discovery disputes, including whether to have
16  photographing, under what conditions, and whether there should
17  be any protective order with respect to the emails and sorting
18  through the claims of privilege I will give to Magistrate Judge
19  Katz.  That should also expedite things.  You can talk to the
20  magistrate judge about the discovery disputes.
21          If it were necessary to adjourn any of the dates for
22  the preliminary injunction because of developments on discovery
23  or settlement, I would be prepared to adjourn the dates on the
24  preliminary injunction.  But based on the what the parties have
25  told me now, they don't want me to adjourn the dates.  I'll
```

                                                                    19
```
    864rpurc
 1  keep those dates and ask Magistrate Judge Katz to see you as
 2  soon as possible on the issues of settlement and discovery.
 3          MR. SCHNAPP:  Your Honor, I would only ask that if now
 4  the discovery issues will be before the magistrate and we will
 5  be making an application in some way, shape, or form to prevent
 6  plaintiffs from putting those into their papers, I wonder if it
 7  doesn't make sense, even if we had to go through those dates,
 8  to perhaps push them back so there is an opportunity to address
 9  those issues prior to us briefing the motion.
10          MR. HERZFELD:  Judge, I don't see why all of this
11  can't be folded into the motion itself and resolved by the
12  Court in one fell swoop.
13          THE COURT:  Perhaps.  But if it could be resolved
14  before then, it would be certainly preferable.  I'll adjourn
15  the schedule slightly.  Supplemental papers are due June 6th,
16  responsive papers due June 20th, reply papers June 27th,
17  hearing July 10 at 4:00 p.m.
18          MR. HERZFELD:  Judge, my only concern with that, and
19  obviously your Honor makes the schedule, is the longer we wait,
20  the more damage my client suffers.  They already, as I
21  indicated, took the client list, mass emailed the clients.
22  Every day she loses more clients.
23          We believe there is significant merit to her position.
24  If it's based on the client list alone, the noncompete which
25  they admit had been signed, the trade dress, any number of the
```

20

864rpurc

1  issues would give rise to injunctive relief on my client's
2  part, and we request, as I indicated, as prompt a hearing on
3  this as possible.
4          THE COURT: It makes sense to attempt to resolve it
5  before the magistrate judge. The defendant at least has a fair
6  position that the need for such expediency was not viewed as so
7  great that the state court thought that it was sufficient for a
8  temporary restraining order.
9          Whether the state court intended to be commenting on
10  the preliminary injunction, it's crystal clear that the state
11  court dissolved the temporary restraining order and so did not
12  find the matter to be of such urgency that it required a
13  decision from the state court pending a decision on any motion
14  for preliminary injunction.
15          I adjourned the schedule from June 26th for the
16  hearing to July 10th, not a substantial adjournment. The
17  schedule for the preliminary injunction is a very reasonable
18  and prompt schedule. I will send out the reference to the
19  magistrate judge instantly, today. If you don't hear from the
20  magistrate judge, although I expect you will, you're welcome to
21  call the magistrate judge and ask to set up a conference with
22  the magistrate judge.
23          MR. SCHNAPP: Thank you, your Honor.
24          Judge, just one other loose end. The file in state
25  court was under seal because there is proprietary information
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

21

864rpurc

1  and trade secrets. We would request that this Court continue
2  that.
3          THE COURT: Tell me, do you know what the status is
4  right now of the file in our court?
5          MR. HERZFELD: No, I don't. Sorry.
6          THE COURT: The docket sheet reflects the notice of
7  removal and attachments. I suspect it's not under seal.
8          MR. HERZFELD: I don't believe those attachments
9  included the exhibits.
10          MR. SCHNAPP: They did not, your Honor.
11          THE COURT: The issue of sealing raises questions
12  under the First Amendment. The practice is that only so much
13  of the record should be sealed as is necessary. The question
14  would be what papers are there associated with the filings that
15  need to be separately filed under seal. Any other papers
16  should be filed not under seal.
17          You're welcome to look at whatever the filings have
18  been so far. If it's necessary to say that there are any
19  portion of those filings that should be removed from the public
20  record and filed separately under seal, let either the clerk's
21  office or my deputy know and submit an order that says these
22  documents should be removed from the public file and filed
23  under seal and give me the good cause for doing that: That it
24  contains proprietary information, confidential proprietary
25  information, it really should be an affidavit indicating that
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

22

864rpurc

1  these are the records to be removed and filed separately under
2  seal. Subsequently, file what you can publicly and file
3  separately what you want under seal because it contains
4  confidential proprietary information.
                        Page 10

```
 5              MR. HERZFELD:  Thank you.
 6              THE COURT:  Anything else?
 7              MR. SCHNAPP:  Not from the defendants, your Honor.
 8              THE COURT:  Am I correct that there's no reason for me
 9    to give you a full scheduling order at this point for
10    completion of discovery and the like until I decide the
11    preliminary injunction motion?
12              MR. HERZFELD:  I think that would be correct, Judge.
13              MR. SCHNAPP:  I think that's correct as well, your
14    Honor.
15              THE COURT:  Anything else that I can do for you?
16              MR. HERZFELD:  No.  Thank you, Judge.
17              MR. SCHNAPP:  No.  Thank you, your Honor.
18              (Adjourned)
19
20
21
22
23
24
25
```

power1.txt

1

1

2  SUPREME COURT OF THE STATE OF NEW YORK
   NEW YORK COUNTY  - CIVIL TERM - PART  39
3  -------------------------------------------------X
   PURE POWER BOOT CAMP, INC., PURE POWER
4  BOOT CAMP, INC., FRANCHISING CORPORATION
   and PURE POWER BOOT CAMP JERICHO,
5
                        PLAINTIFFS,
6
                     -against-
7
   WARRIOR FITNESS BOOT CAMP, LLC., ALEXANDER
8  KENNETH FELL a/k/a ALEX FELL, individually,
   RUBEN DARIO BELLIARD, a/k/a RUBEN BELLIARD,
9  individually; JENNIFER J. LEE, individually,
   and NANCY BAYNARD, individually
10
                      DEFENDANTS
11 -------------------------------------------------X
   Index No. 601364/08        60 Centre Street
12 MOTION                     New York, New York
                              May 8, 2008
13
   B E F O R E:  HONORABLE HELEN E. FREEDMAN, Justice
14

15 A P P E A R A N C E S:
        CALCAGNO & ASSOCIATES
16      Attorneys for the Plaintiffs
        404 Manor Road
17      Staten Island, New York   10314
        718-815-0200
18      BY:  ANDREW JOHN CALCAGNO, ESQ.
             STEPHEN G. TRAFLET, ESQ., of counsel
19           and
        FROSS, ZELNICK, LEHRMAN & ZISSU, P.C.
20      TRADEMARK COUNSEL
        866 United Nations Plaza
21      New York, New York   10017
        212-813-5995
22      BY: SUSAN UPTON DOUGLASS, ESQ.

23      CHADBOURNE & PARKE, LLP
        Attorneys for the Defendants
24      30 Rockefeller Plaza
        New York, New York   10112
25      212-408-5100
        BY:  LAWRENCE E. BUTERMAN, ESQ.
26

⬛

2

power1.txt

1

2

A P P E A R A N C E S: (Continued)

3

FOX ROTHSCHILD, LLP, ESQ.
4    Attorneys for Defendants
100 Park Avenue
5    New York, New York    10017
212-878-7900
6    BY:  CAROLYN D. RICHMOND, ESQ.
JOHN J. SKINNER, JR., ESQ.
7

8

9

10

11

12

13

14

15

16

17

18    MICHAEL J. DAUGENTI, RMR, CRR
OFFICIAL COURT REPORTER
19

20

21

22

23

24

25

26


⬜

3

1    Proceedings

2    MR. BUTERMAN:  I submitted a letter earlier

power1.txt
```
 3     this morning.  I hand delivered it to chambers.  I
 4     don't know if your Honor received it.  I have a copy
 5     for your Honor.  It involves crucial issues which need
 6     to be addressed.
 7                  THE COURT:  What are you saying?
 8                  MR. BUTERMAN:  What I'm saying is, your
 9     Honor --
10                  THE COURT:  You are?
11                  MR. BUTERMAN:  I represent the defendants
12     in this case.  Plaintiffs have filed an interrogatory
13     injunction.  We received the papers yesterday and when
14     we received them, we learned that their papers were
15     based on e-mails that had been stolen from my client's
16     personal e-mail accounts.  They also contain e-mails
17     representing both myself and counsel, Miss Richmond
18     from the Fox Rothschild firm, privileged
19     communications.  And they actually took those e-mails,
20     your Honor, and they attached those as exhibits,
21     e-mails clearly, clearly showing that Miss Richmond
22     giving representation to Mr. Feldman, one of the
23     defendants in this case.  And they attached them to
24     the motion and they actually used them to support the
25     motion.
26                  MR. CALCAGNO:  Your Honor, with all due
```

[]

4

```
 1                        Proceedings
 2     respect, I think the first and foremost thing you need
 3     to do is to address everyone at the table and who we
 4     are and it's our application before this court.
```

Page 3

power1.txt

5    Mr. Buterman --

6              THE COURT:  What's going on here?  I walked

7    into the middle of very, very bad rumble.

8              MR. CALCAGNO:  Yeah, I'd like to give the

9    court our application and Mr. Buterman will get a

10   chance to explain his position to this respectful

11   court.  I'd like to address your Honor, without Mr.

12   Buterman interrupting plaintiff's counsel.  It's our

13   application, your Honor.  May I proceed with my

14   application, your Honor?

15             MR. BUTERMAN:  Respectfully, your Honor,

16   what I'm afraid of is counsel has submitted an

17   affidavit which contains privileged and confidential

18   communications between myself and my clients and Miss

19   Richmond and her clients from no less than three

20   separate law firms.  They've attached them as

21   exhibits.  What I'm afraid of, your Honor, is by

22   seeking defense counsel --

23             MR. CALCAGNO:  Your Honor --

24             THE COURT:  This behavior I don't want.

25             You cannot behave this way in my courtroom.

26             (There is a short recess.)

5

1                     Proceedings

2              THE COURT:  We calmed down a little?

3              MR. CALCAGNO:  We are.  Andrew Calcagno,

4    law firm of Calcagno & Associates, representing the

5    plaintiff, Pure Power Boot Camp, Pure Power Boot Camp

6    Franchise and Pure Power Boot Camp of Jericho.  With

Page 4

power1.txt

```
 7      me to my right is Mr. Stephen Traflet of counsel.  To
 8      my left is Susan Douglas from the law firm of Fross &
 9      Zelnick, a trademark and trade dress expert who we
10      brought before you.  This involves trade dress
11      infringement, copyright infringement, stealing
12      someone's entire business.
13              If I could -- if you want introduction of
14      the attorneys and I'd like to explain the case briefly
15      to you, Judge, and walk you through it.  This case
16      involves, your Honor, the worse case.  I've been
17      practicing 18 years, specializing in commercial
18      litigation.  The worse case of co porate that I
19      personally have ever seen committed by two employees
20      working for Pure Power Boot Camp.
21              They not only conspired with two of the
22      gentlemen, Ruben Belliard and Alex Fell, two
23      individuals who were the key trainers of her
24      clientele, but the two girlfriends but not just
25      girlfriends.  Generally as Alex Fell's girlfriend, she
26      is also the co-owner and silent partner of the
```

 6

```
 1                      Proceedings
 2      competing what's called an indoor obstacle confidence
 3      course right up the block in Manhattan.  It is very
 4      important, your Honor, that's why I brought Miss Susan
 5      Douglas with us.
 6              This concept, an indoor obstacle confidence
 7      course is the only one in the nation.  There's no
 8      other obstacle course indoor with this program, with
```

Page 5

power1.txt
9       these concepts, with this style of military training.

10      It was so unique and so rare that the defendants in

11      exhibit P, actually admit it, it's so neat and so rare

12      that it's confidential and trade secrets.  And I will

13      refer to you exhibits as I go along.

14              However, your Honor, please, as we

15      proceed --

16              MR. BUTERMAN:  Your Honor --

17              THE COURT:  You'll have a chance.

18              MR. CALCAGNO:  She actually went to Lauren

19      Brenner who's sitting right there with the white shirt

20      and black shirt and she actually went to Miss Susan

21      Douglass from Fross Zelnick only one of the top trade

22      dress, trademark firms in New York City.  This concept

23      has been filed with the patent and trademark office

24      for over the last two and a half years.

25              THE COURT:  They have an issue of pattern

26      and trade --

☐

7

1                       Proceedings

2               MR. CALCAGNO:  Not yet.  Hold on a second.

3               MR. BUTERMAN:  Your Honor --

4               MR. CALCAGNO:  Excuse me.

5               It is so unique that it is acquired

6       distinctiveness by its very nature under the secondary

7       meaning of the trademark dress laws.

8               THE COURT:  However --

9               MR. CALCAGNO:  Let me just go on.  This is

10      much more than that.

Page 6

power1.txt

11            THE COURT:  You should be in federal court.

12            MR. CALCAGNO:  More than that, your Honor,

13   this gets really bad.  So, here we are, she

14   establishes the entire curriculum.  I have books, her

15   business plan, her startup manual.  This concept took

16   off.  It was an instant sensation from the get-go.

17            THE COURT:  They're all upset by you.

18            MR. CALCAGNO:  I will get there and address

19   all those issues.  Give me five minutes.

20            THE COURT:  Is there going to be -- they

21   want you to be a witness or something?

22            MR. CALCAGNO:  No, no, your Honor.  Let me

23   explain it all and then the defendants will have their

24   turn.

25            I have a book that I presented to your

26   Honor at the TRO.  It's exhibit F to Miss Brenner's

                                                          8

1                     Proceedings

2    affidavit.  This woman who's a self-made business

3    woman was written up in all business magazines as a

4    self-starting business woman.  She was a life time

5    athlete.  She designed, conceptualized this concept.

6    It's now getting national and international

7    recognition as her concept.  Every Monday for the next

8    six weeks she's on Fox Five with Mike and Juliet.  She

9    is on Fox Five, CNBC, Wall Street Journal.  This

10   concept is sensation.  It is an acquired

11   distinctiveness that is addressed by all the public.

12   Anyone hears about this concept, even Miss Susan

power1.txt

13    Douglass will tell you, oh, that's Pure Power Boot

14    Camp's concept.

15              The brochure and this concept, if I may

16    approach --

17              THE COURT:  I don't want to see it.

18              MR. CALCAGNO:  It's exhibit A to Miss

19    Brenner's affidavit.  It was just an instant

20    sensation.

21              Now, Miss Brenner decided to do such an

22    instant sensation and it was going to be trademarked

23    and trade dressed and all her concepts, she franchised

24    it in 46 states.  And all of this knowledge was known

25    by the defendant Belliard and the defendant Fell her

26    two employees that trained the military style with

9

1                         Proceedings

2    her.  She in fact trained them and taught them

3    everything they know.

4              Now, her client list is privileged and

5    confidential.  No one knows her client list.  It's not

6    like public knowledge anywhere.

7              THE COURT:  There will be franchises which

8    means there will be clients all over the place.

9              MR. CALCAGNO:  No.  Here's how it goes,

10   your Honor.  We have this franchise.  Now we file the

11   franchise in 46 states.  We spent literally about

12   $450,000, when all sudden, and unbeknownst to us,

13   eight months in July of '07, the two defendants in

14   clandestine fashion, your Honor -- there's no other

Page 8

power1.txt

15    way to say it -- they started conspiring with each
16    other, started conspiring with Miss Lee, who is an
17    executive at Bobby Flade's Place.  And she's a Wharton
18    Business School graduate who should know better, here
19    they are, Ruben Fell, Alex Fell and Ruben Belliard,
20    here they are, we got a plan, we're going to steal her
21    business, literally all of her contents, her programs,
22    her concepts and they start in July of '07.
23              First they start the Web site.  They go to
24    "Go Daddy" and they do Warrior Fitness Boot Camp.
25    Then they steal more documents.  They steal her
26    business plan --

⬜

10

1                         Proceedings
2              THE COURT:  She didn't know about the Web
3    site?
4              MR. CALCAGNO:  Oh, no, she did.  She was
5    all part of it.  Now, exhibit P --
6              THE COURT:  Wait.  I mean your client?
7              MR. CALCAGNO:  Brenner had no idea about
8    this.  This was just discovered over the last week or
9    so.
10             Now, we have this business plan which is
11    identical.  It's copyright infringement.  Although we
12    did not register it, it's common law copyright
13    infringement.  They literally cut and pasted from her
14    business plan, her startup manual, her brochure and
15    made it their own in clandestine fashion.  And then it
16    gets even worse.

power1.txt

17            In December they start looking for leases.

18    This was just discovered over the last week or so.

19    They go even further and all of a sudden they break

20    into her office, your Honor, and they steal her client

21    list.  First, it wasn't the full client list.  They

22    only stole 88 clients.  And I will show you, your

23    Honor, in the exhibits there's actually exhibits that

24    refer to the partial client list.  They go into the

25    exhibits and they steal one partial client list, it's

26    exhibit U, on March 25 of '08.

11

1                      Proceedings

2            And they go in there and they actually

3    steal it and here's when Ruben Belliard was still

4    employed there.  Alex Fell they had a disagreement.

5    He was insubordinate on March 16th, your Honor, said

6    expletives to Miss Brenner that were unacceptable, the

7    F word and multiple, multiple expletives that are in

8    detail in Brenner's affidavit, so repulsive, as an

9    individual, as an ex-marine and to a woman, how dare

10    you speak like that, when all the time he had this

11    plan.  He became belligerent and arrogant because he

12    knew I'm taking your concept, I have everything I

13    want.

14            So Miss Brenner was going to put him on

15    suspension.  He goes, "Fire me."  So she fired him.

16    But guess who didn't leave?  Mr. Belliard did not

17    leave because he wasn't finished stealing the

18    corporate documents, stealing the corporate assets,

Page 10

power1.txt

19    stealing the customer list.

20          On March 31st, your Honor, exhibit X,

21    Paragraph 116 of the affidavit what does Mr. Belliard

22    do?  Breaks into her office.  We have witnesses that

23    he broke into her office not with a hammer, opened it

24    up because they have a corporate policy no one is

25    allowed in there, and he steals her business plan,

26    steals the startup manual and guess what?  Steals all


                                                    12


1                    Proceedings

2     of the active client list.

3           If you look at exhibit X, your Honor, I'd

4     like to read that, because it's pretty, pretty

5     malicious, willful, intentional and everything else

6     you can imagine under the sun.  This case is so

7     egregious, I just -- it's repulsive, your Honor.  It

8     says, quote, oh, oh, so I just updated our party list.

9     Open pren, with a very dear friend of ours additions

10    and ah, holy shit, there's over 330 people that might

11    come to our party.

12          Just -- and if you look on the exhibit,

13    your Honor, just look at it, it is a complete

14    spreadsheet of all the customers, e-mails, their

15    private address, the classes that they joined and all

16    at her facility.  These classes start at 5:30 in the

17    morning.  And oh, who's coming, who's not coming.  I

18    mean, this was just outrageous conduct, beyond

19    outrageous conduct.

20          Then I love this e-mail, your Honor, oh,

                    Page 11

power1.txt

21    look at double A.  This is one of my favorite by the

22    Wharton Business School graduate, Bobby Flade

23    executive who knows better than any of her boyfriends

24    and coconspirators, calls her Miss Conversion, proud

25    of it, arrogant, belligerent.  It is really

26    misappropriation is what it is.

⬜

13

1                         Proceedings

2              I converted a Lauren lover, exclamation.

3    This girl Jacobs loves Warren and hugged her one time

4    and said all would be okay and blah blah blah blah, so

5    I wrote her off.  Continuing with the quote, but

6    lately she has been talking to me a lot, wanting to be

7    partners and today I converted her, exclamation.  She

8    said she won't sign up if I don't return and do what I

9    do.  She promised not to renew and to sign up for

10    yours.  Man, I am good.

11              She then, in the next line, your Honor,

12    this is even more repulsive.  Now they want to

13    continue to destroy her.  Her only DI left, her drill

14    instructor, Necio.  She wants to destroy and take him

15    and sway him over.  It says hey, Necio says he's

16    leaving soon, he's miserable.  And Mylinise, another

17    person who's helping him, is a key witness in this

18    case, says she is signing up for the six month, et

19    cetera, et cetera.  I'm going to treat her to Megu for

20    dinner one time.  She is just too awesome and I dig

21    her.

22              Unbelievable evidence, your Honor, in this

power1.txt

23    case.

24              Now we get to -- this is really the kicker,

25    your Honor.   Here we are Ruben Fell.   I mean Ruben

26    Belliard.   Here he is in the office on March 31st of

☐

14

1                         Proceedings

2     '08.   He's not done stealing because he doesn't have

3     everything he needs. . And now he gets the client list

4     I just referred to it, oh shit, 330 clients, they're

5     coming with us.   He then calls Miss Brenner on the

6     phone and says, I quit, at 9:09 p.m. leaving her with

7     no one to teach her 5:30 a.m. class.   This poor woman

8     has been trying to do a national rollout.   She opened

9     up a second location in Jericho.   The identical

10    concept pursuant to the franchise, pursuant to the

11    business model, pursuant to the trade dress, all

12    filed, registered, doing everything that you're

13    supposed to do to protect your trademark, protect your

14    copyright information, do everything you can do

15    protect your business.

16              If we did not come in on the TRO, your

17    Honor, we would be negligent in doing that.   I'm going

18    to continue, your Honor, because it gets even worse.

19              The other coconspirator, Nancy Baynard, who

20    is Mr. Ruben Belliard's girlfriend, they say oh, why

21    is the girlfriend named?   Because if you look at

22    exhibit DD and exhibit EE -- sorry, it was so many

23    exhibits we had to go into double digits -- here they

24    are campaigning generally, and Miss Nancy Baynard

                         Page 13

power1.txt

25    campaigned for all her clients in mass e-mails.

26            Look at exhibit DD and EE, sending to all

15

1                    Proceedings

2    of the clients on the list.  Complete theft, complete

3    robbery, corporate sabotage.  And then trying to

4    defame her and then -- guess what, this is even more,

5    it gets deeper and deeper.

6            After Mr. Belliard leaves and quit, guess

7    what, your Honor?  We then have destruction of

8    evidence.  He knows he's signed noncompetes.  Fell

9    signed noncompetes.  They broke into her office and

10   stole and destroyed and we believe shredded because

11   one coconspirator to the other says I think, quote

12   unquote, he shredded the document.

13            I'd like to show you that exhibit, your

14   Honor, about shedding the exhibit.  It's exhibit CC.

15   I'd like to read it to the court.

16            MR. BUTERMAN:  This isn't --

17            MR. CALCAGNO:  Excuse me.  Please sit down,

18   Mr. Buterman.

19            MR. BUTERMAN:  Buterman.

20            MR. CALCAGNO:  Sit down, please.

21            MR. BUTERMAN:  This is my e-mail.

22            MR. CALCAGNO:  Quote, Mr. Buterman is

23   involved in this, your Honor.  He's a current client

24   of Pure Power Boot Camp.  I want to get to this.  It

25   says, quote, Ruben thinks that he shredded the copy of

26   the contract.

                    Page 14

power1.txt

```
 1                      Proceedings
 2               MR. BUTERMAN:  Your Honor --
 3               THE COURT:  Let's keep that for another
 4       day.
 5               MR. CALCAGNO:  Your Honor, shredded the
 6       contracts.  Let me go further, your Honor.
 7               THE COURT:  If there was any spoliation of
 8       evidence that's very, very sanctionable and we know
 9       that.  Any lawyer who participated will probably end
10       up in jail, so we don't have to worry about that.
11               MR. CALCAGNO:  Let me go further, your
12       Honor.  Before this honorable court, Mr. Buterman said
13       to you, if you recall --
14               THE COURT:  I don't recall.
15               MR. CALCAGNO:  There's no confidentiality
16       agreements, there's nothing.  And at the time this
17       e-mail was written, your Honor, on April 16th, Mr.
18       Buterman was just a client of Pure Power Boot Camp.
19       He was only involved in this case as of the day he
20       showed up.
21               THE COURT:  I don't know what you're
22       talking about.
23               MR. CALCAGNO:  Mr. Buterman was a client in
24       the boot camp.
25               THE COURT:  Wait a minute.  This gentleman
26       here?
```

power1.txt

```
1                      Proceedings
2              MR. CALCAGNO:  This man right here.
3              THE COURT:  The lawyer for the defendant?
4              MR. CALCAGNO:  Correct.  He is an essential
5    material witness in this case.  The e-mails establish,
6    your Honor, under double GG --
7              THE COURT:  Why is he the central witness?
8              MR. CALCAGNO:  Look at GG, your Honor.
9              MR. BUTERMAN:  Your Honor, I respectfully
10   note that these e-mails reflect attorney/client
11   privilege information and should not be read.
12             MR. CALCAGNO:  My objection, evidentiary
13   hearings can be had at a later date.
14             THE COURT:  How did you obtain this?
15             MR. CALCAGNO:  Excuse me, we obtained them
16   because if you look at the response, thank you for
17   faxing it to me, there's an admission on Page 2 of Mr.
18   Buterman's opposition to your court and it says,
19   referring to defendant Fell on the left, states:  He
20   may have had access -- he may have accessed that
21   account from the computer in Miss Brenner's gym,
22   conceding and admitting that this e-mail account, his
23   Hot Mail account was on his computer.
24             THE COURT:  Who's he?  Wait a minute.
25   You've got to back up and explain to me who your
26   talking about.
```

18

```
1                      Proceedings
                       Page 16
```

power1.txt

2          MR. CALCAGNO:  Yes.  On the work station of

3     the front desk, there's a computer.  The woman's name

4     is Liz.  She goes in.  All of a sudden she's hearing

5     some rumors, she doesn't know if it's true, all of a

6     sudden Liz goes into the computer, she goes into her

7     Hot Mail account and low and behold, there's his

8     e-mail account and concedes he put it on the computer.

9          THE COURT:  His e-mail account is on the

10     computer is probably a privilege of the attorney and

11     client.

12          MR. BUTERMAN:  It's a separate e-mail

13     account.

14          MR. CALCAGNO:  So he clicks -- she clicked

15     on it and lo and behold all of the e-mails except for

16     the last few come from that Hot Mail account admitting

17     to them signing noncompetes, being concerned about it.

18          I filed, I said to your Honor, I filed this

19     under seal.  As an officer of the court I have a duty

20     to turn over if there's attorney/client privileged

21     communication.  I saw it, so I asked for it to be

22     under seal so no one will see it, no one is prejudiced

23     between Carolyn Richmond and Alex Fell and Ruben

24     saying that you've got a problem, you signed a

25     noncompete.

26          After they didn't know they had a problem

19

1                    Proceedings

2     the e-mail appears and says I'm shredding it.

3          MR. BUTERMAN:  Objection, your Honor.  He
                         Page 17

power1.txt

4      just said it's privileged information.

5                    THE COURT:  I don't think it's --

6                    MR. CALCAGNO:  It's a waiver.

7                    Now, your Honor, watch this, all of a

8      sudden, in the Hot Mail e-mail, in the Hot Mails,

9      they're watching this corporate sabotage going on,

10     stealing everything, for trade dress, copyright, her

11     clients, guess what?  I opened up a G Mail account and

12     Lauren's like flipping out, what did I do, what did I

13     do?  Guess what?  Liz says, "Mr. Alex Fell gave me his

14     password."  Because I wanted to watch, your Honor,

15     there's a -- he wanted to sell some stuff on E-Bay and

16     he tells Liz here's my password, hoo-rah, hoo-rah, and

17     guess what?  Bingo, shredded.  Criminal activity,

18     stealing corporate documents, admitting to corporate

19     sabotage.

20                   The reason why Mr. Buterman didn't want me

21     to tell you what the heck was going on, Judge, is

22     because these are so incriminating, so bad, so

23     blatant, malicious, willful, they should all be held

24     in contempt including Mr. Buterman.

25                   And in the e-mail that Mr. Buterman puts,

26     he tries to help them, says this is how you do it.

20

1                         Proceedings

2      Look at double G.  This is how you circumvent it.  He

3      didn't use those words, your Honor, no, used only

4      marine corps.  You didn't get it from Pure Power Boot

5      Camp.  You got it from --
                     Page 18

power1.txt

```
 6              THE COURT:  I can't believe lawyers are
 7      using e-mail.
 8              MR. CALCAGNO:  Mr. Buterman did this, Mr.
 9      Buterman in exhibit double H.  And I want you to see
10      this, Judge, this is reprehensible, this is
11      reprehensible.  He is going to quote -- and this is an
12      e-mail from Jenny Lee, defendant owner of Orient
13      Fitness, and her boyfriend coconspirator defendant
14      Alex Fell.  The last paragraph says, quote, it doesn't
15      mean Buterman won't do some little things to let
16      people know stuff that will hurt her even more, but it
17      won't hurt you guys.  He assured me of that.  He has
18      your best interest at heart, then his interest to
19      destroy her is secondary and thinks he will already
20      destroy herself.
21              And we wrote a letter to Mr. Buterman.
22      This gets even more outrageous.  I wrote him when he
23      called me up on May 5.  I said Mr. Buterman, you have
24      some serious conflicts of interest, you know about
25      this information.
26              I don't know anything.  He then says oh,
```

```
 1                       Proceedings
 2      it's ten years.
 3              I said who do you know?
 4              I must have seen it in documents.
 5              Did you see the documents?
 6              I didn't know they exist.
 7              We know he lied then.  We know he lied to
```
                            Page 19

power1.txt

8       this court a few weeks.

9                    MR. BUTERMAN:  Objection.

10                   MR. CALCAGNO:  He lied.  Mr. Traflet

11      witnessed it as well.

12                   And then he sent a letter to Mr. Buterman

13      to recuse himself, your Honor, to recuse himself under

14      the ethical rule DR.  And it's a directive.  It's just

15      not a canon of ethics.  It's DR 5-102.  He is a

16      material witness.  I believe he's potentially -- we

17      didn't know he was a defendant yet.  I want to take

18      his deposition first, then he may be a defendant.  I

19      don't want to do that to an attorney, but at the very

20      least there's an appearance of impropriety, collusion,

21      appearance of collusion, helping them engage in

22      trademark infringement.  It is outrageous.

23                   This is the last point, your Honor, I'll be

24      finished.  I am so outraged by his opposition it

25      violates -- it's actually tantamount to extortion and

26      blackmail before this court.  When your Honor reads it

☐

                                                           22

1                            Proceedings

2       you will be outraged.  I think he should be sanctioned

3       by this court.  He actually threatened.  So I think we

4       should go the U.S. Attorney's office.  I think Mr.

5       Kilpatrick should be reported to the ethics committee

6       that is a direct violation of the canon ethics rule,

7       DR 7-105, threatening a criminal prosecution in civil

8       litigation.  It's outrageous to be to sitting here.  I

9       called him three times on the phone May 5, yesterday

power1.txt

```
10        on May 6th.  When he showed up at court, I said please
11        don't show up, get some other attorney.
12                    I called Miss Carolyn Richmond.
13                    Where is she?
14                    I called Miss Carolyn Richmond.
15                    I said you haven't responded to any of my
16        letters, your clients are engaging in this fraudulent
17        activity, what are you doing?  She wouldn't even send
18        me a letter.  She does not represent the defendants.
19                    I said who represents the defendants?  Your
20        Honor, I need to know.  The only letters I have from
21        Carolyn Richmond from the Fox Rothschild law firm and
22        she responded I'm not sending you anything.
23                    I said Mr. Buterman called me and he said
24        quote, unquote, Mr. Traflet was with me, I'm
25        authorized to call you.
26                    I said do you represent the defendants?
```

☐

23

```
1                         Proceedings
2                    He said no.
3                    I said, do you intend to represent them?
4         If you do, fax me a letter of rep.
5                    I don't.
6                    You want my fax number?
7                    No.  And he hung up.  Mr. Traflet was in
8         the room.  And guess what, who showed up for the TRO?
9         Guess who shows up?  Buterman.
10                   It is -- this case cries out for, your
11        Honor, irreparable harm.  Miss Susan Douglass, I'm so
```

power1.txt

```
12        outraged, I take this personally, it's outrageous
13        conduct, it's malicious, it's willful, it's
14        contemptuous.  It's every awful despicable word of the
15        defendants, who think they're U.S. marines.  Pure
16        Power is built on 11 principles of integrity, loyalty
17        and trust.  And, guess what, every one of them has
18        been violated by all of them.
19                    And smirk more, smirk.  You think it's
20        funny.  Miss Williams is smirking in this courtroom,
21        your Honor.  I take umbrage with her attitude and her
22        condescending and I renamed her misappropriation.
23        She's outrageous, outrageous.  I am appalled, your
24        Honor, very upset, very upset.
25                    THE COURT:  You're going to have a heart
26        attack here.
```

```
                                                                24
```

```
 1                         Proceedings
 2                    MR. BUTERMAN:  May I?
 3                    THE COURT:  Yes.
 4                    MR. BUTERMAN:  I'm the only one.  I
 5        represent the defendants in this case.
 6                    THE COURT:  You do?
 7                    MR. BUTERMAN:  Yes, I do, your Honor.
 8                    MR. CALCAGNO:  I want to make a motion
 9        formally to recuse him from this case.
10                    THE COURT:  Disqualified is the word, too.
11                    MR. CALCAGNO:  Disqualified.
12                    MR. BUTERMAN:  Let me begin by explaining
13        some of the background here, your Honor, just briefly
```

power1.txt

14    and this all contained in the letter that I wrote to

15    the court earlier today which I do not know if the

16    court received it or not.  I have another copy of it I

17    can provide to your Honor.

18            And what I point out in the letter, your

19    Honor, is that yesterday afternoon, yesterday around

20    noon, 11:00 o'clock, noon, we received plaintiffs'

21    papers regarding their request for preliminary

22    injunction.  And when we looked at the papers what we

23    immediately noticed that they were largely -- there

24    was an affidavit from Miss Lauren Brenner that

25    contained approximately 20 e-mails taken from my

26    client, Mr. Fell's Hot personal accounts.

25

1                        Proceedings

2            I understand, your Honor --

3            THE COURT:  Who got on her e-mail system?

4            MR. BUTERMAN:  Fifteen of those e-mails

5    were taken after my client had been terminated.  My

6    client was terminated on March 16th, 2008, and your

7    Honor can look and see that most of the exhibits here

8    are e-mails that come from after March 16th, 2008.

9    They are e-mails --

10            THE COURT:  He was using?

11            MR. BUTERMAN:  No, he wasn't at the

12    facility anymore, your Honor.

13            THE COURT:  If he was using the facility.

14    If I put my home e-mails on the OCA account and I

15    leave OCA, OCA has a right to my whole e-mails.

power1.txt

16              MR. BUTERMAN:  Absolutely.  These were not
17     put on Pure Power Boot Camp's account.
18              THE COURT:  If I give OCA access one way or
19     another to my whole e-mail, that's the end of my
20     privacy.
21              MR. BUTERMAN:  First of all, Mr. Fell did
22     not give any access.
23              THE COURT:  How did he do it?
24              MR. BUTERMAN:  What's our understanding of
25     how he's got there, what happens is Mr. Fell at one
26     point in time --

                                                              26


1                         Proceedings
2              THE COURT:  Gave somebody else his
3     password?
4              MR. BUTERMAN:  No, that's not our
5     understanding.  What we understand is at one point in
6     time Mr. Fell accessed his Hot Mail account while he I
7     was employed by Miss Brenner.  He then left the
8     company and when he left the company they somehow
9     gained access to his account thereafter.  And, your
10    Honor, they continued to do that.  And, you know, the
11    point that should be made is we're not just talking
12    about Mr. Fell's Hot Mail account.  There's actually
13    three accounts here.  There's a G mail account and
14    there is a Warrior Fitness account.
15              THE COURT:  All of which would had to have
16    been produced during discovery.
17                   MR. CALCAGNO:  Absolutely.
                          Page 24

power1.txt

18          MR. BUTERMAN: Here's the point with
19    respect to this.  In those files you will see not only
20    very, very privileged personal communications but also
21    attorney-client privileged communications.  And, your
22    Honor --
23          THE COURT:  I think he may have waived
24    them.
25          MR. BUTERMAN:  With all due respect --
26          MR. CALCAGNO:  Absolutely, Judge.



                                                    27


1                    Proceedings
2          MR. BUTERMAN:  With all due respect, it is
3    not the case he can waive attorney-client privilege.
4    Waiver is the knowing relinquishment of a right.
5          THE COURT:  Not necessarily, as long as
6    somebody else was in the room.
7          MR. BUTERMAN:  Nobody else was in the room.
8          MR. CALCAGNO:  Please don't cut the judge
9    off when she's speaking.
10          MR. BUTERMAN:  Your Honor, please.  On
11    April 1st, 2008, Miss Richmond who's from the law firm
12    of Fox Rothschild wrote a letter to Miss Brenner
13    directly, saying I represent Alex Fell in this
14    litigation, in this potential litigation and all
15    issues regarding his termination from Pure Power.
16          There is an e-mail from April 16th, 2008,
17    and it's exhibit BB, your Honor, to Miss Brenner's
18    affidavit.  It's an e-mail from Miss Richmond on her
19    Fox Rothschild e-mail accounts to Mr. Fell, after --

power1.txt

20    mind you, your Honor, this is over a month after Mr.

21    Fell had been terminated giving Mr. Fell legal advice

22    and legal opinion and discussing attorney-client

23    privilege information.

24              On the second page of the e-mail exhibit

25    BB, your Honor will see that it says clearly that this

26    document, this e-mail, contains privileged and

28

1                      Proceedings

2     confidential information intending only for the use of

3     the individual named above.  If you are not the

4     intended recipient of this e-mail or the employee or

5     agent responsible for delivering to the intended

6     recipient, you are hereby notified that any

7     dissemination or copying of this e-mail is strictly

8     prohibited.

9              Now, your Honor --

10             THE COURT:  So there's stuff in here that

11    shouldn't be.  Go ahead.

12             MR. BUTERMAN:  There's a lot of stuff in

13    here that's confidential privileged information and it

14    goes deeper, your Honor.

15             What's happened in this litigation is that

16    Miss Brenner and counsel have had access to three of

17    Mr. Fell's e-mail accounts throughout this litigation.

18             Now, these are the e-mails they chose to

19    produce but there are literally hundreds of e-mails.

20             THE COURT:  What does that got to do with

21    the issue?

Page 26

power1.txt

22              MR. BUTERMAN:   There are e-mails between
23      attorneys.
24              THE COURT:   Mr. Buterman, what does that
25      got to do with the issue in the case?
26              MR. BUTERMAN:   It has to do with the fact

[]

29

1                      Proceedings
2       that in sum total of a support for plaintiffs' motion
3       for preliminary injunction happens to be privileged
4       material, your Honor.
5               THE COURT:   Wait.  But if we got privileged
6       material, it shows that they stole all the documents.
7       It's out there.
8               MR. BUTERMAN:   First of all, those issues
9       are very much in dispute and I respectfully submit
10      that the evidence doesn't show that at all.  But I
11      have a much bigger problem which is that counsel has
12      been privy to my communications with my clients and
13      mind you, your Honor, up until -- we have an e-mail in
14      here from last Friday.
15              THE COURT:   Somehow you -- you know
16      something, maybe lawyers should learn -- should have
17      learned by now not to communicate with their clients
18      through e-mails particularly when a situation like
19      this arises, if you have clients who are likely to
20      have the access one way or the other.  You know, it's
21      a problem now with the electronic communications and
22      I'm going to say you have to eat it.
23              MR. BUTERMAN:   It absolutely is a problem,
                        Page 27

power1.txt

24        your Honor.  But, respectfully, we are talking about
25        private e-mails and there's no issues of waiver here.
26                  THE COURT:  They may not be admissible but

30

1                         Proceedings
2        there may be enough evidence to get a TRO.
3                  MR. BUTERMAN:  Respectfully, your Honor, I
4        highly disagree because I also believe that the
5        e-mails themselves do not show even close to what Mr.
6        Calcagno claims that they show.  But the point is,
7        your Honor --
8                  THE COURT:  Did your clients have a
9        noncompete agreement?
10                  MR. BUTERMAN:  Your Honor.
11                  THE COURT:  Yes or no?  You know that.
12                  MR. BUTERMAN:  My clients, I will tell you
13        exactly what I know.  Mr. Fell has an exhibit here
14        that's a noncompete agreement.  He is prepared to
15        testify under oath that that is not his signature on
16        that agreement.
17                  With respect to Mr. Belliard, I believe
18        that at one point in time Mr. Belliard did have a
19        noncompete agreement, it has not been produced, I have
20        never seen it.  What I do know, your Honor, is that
21        the noncompete is a ten-year noncompete agreement
22        which prohibits my client from operating anywhere in
23        the world in the fitness industry.  It is facially
24        invalid.
25                  THE COURT:  A ten-year would be.

power1.txt

```
26               MR. BUTERMAN:  Thank you, your Honor.


                                                              31


 1                         Proceedings
 2               MR. CALCAGNO:  But it has a savings clause,
 3       your Honor, and subject to your Honor reducing it.
 4       But can you ask a pointed question, did Mr. Belliard
 5       shred the noncompete as stated in double C, your
 6       Honor?  Can you ask that question?
 7               MR. BUTERMAN:  This is inappropriate.
 8               MR. CALCAGNO:  It's here right here.
 9               MS. RICHMOND:  I'm Carolyn Richmond from
10       Fox Rothschild, counsel for all the defendants as
11       well.  The beginning of April when we first became
12       aware of this issue, I respectfully wrote to counsel
13       and Pure Power and requested any copies of any
14       noncompete or nondisclosure agreements.  This all
15       could have been forestalled because if there was a
16       noncompete agreement against Mr. Fell, this is what I
17       do for a living noncompete agreements in the
18       employment sector, and so if there was one as alleged
19       and attached yesterday, it should have been produced
20       six weeks ago.  It never was, which belies the
21       question of whether it is legitimate.
22               THE COURT:  Who do you write to?
23               MR. RICHMOND:  First we asked Miss Brenner;
24       then we asked the first counsel.  I repeatedly asked
25       for the last six weeks whether there was any alleged
26       intellectual properties, whether there was any
```

Page 29

power1.txt

32

```
 1                      Proceedings
 2    registration or trademark.  If there was, I could have
 3    counseled my client differently.  Now all laid out
 4    before you, my advice is there.
 5              And with respect to all of the wiretapping
 6    laws and electronic privacy acts, I respectfully
 7    disagree.  Your rights actually under New York state
 8    privacy protects you much greater than you believe,
 9    because even if your access to your computer accounts
10    were outside of work, were in work, once your boss
11    became aware that this was private and your private
12    e-mails, they're supposed to stop, particularly when
13    they see the legends at the bottom.
14              And when you leave the bench in particular
15    and your bosses were to access your account
16    surreptitiously after you left the bench, I propose
17    that's a whole different ball of wax.  When my counsel
18    attaches those e-mails to court documents, that opens
19    up a whole other can of worms.
20              THE COURT:  I may have spoken quickly,
21    but --
22              MS. RICHMOND:  There's a whole lot of case
23    law out there about what those acts do.  And none,
24    despite all the hyperbole of counsel, none of the
25    documents without discovery would even get to the
26    point of whether or not there were documents taken or
```

33

power1.txt

```
1                        Proceedings
2        not.   What we do see here is you can't ask for an
3        equitable remedy as far as a TRO when you yourself
4        have breached and not followed the laws of equity.
5                        THE COURT:   It's a problem.
6                        MS. RICHMOND:   My colleague is here to
7        respond, as well, to some of the remaining points.
8                        MR. CALCAGNO:   I do have Miss Douglas here.
9        After they're done I'd hike her to address the trade
10       address infringement.
11                       MR. BUTERMAN:   I want to point out we are
12       here on a motion for preliminary injunction and the
13       issues that have to be resolved here are whether
14       there's a likelihood of success on the merits.
15                       THE COURT:   Counsel I'm aware of it.
16                       MR. BUTERMAN:   Your Honor, the issue is --
17       one of the issues here certainly are whether the
18       equities favor one party or another.  I want to say in
19       light of what's going on in the e-mails, it's very
20       clear that the equities certainly do favor the
21       plaintiffs in this matter.
22                       Moreover, your Honor, I just want to bring
23       up one fact with respect to the issue of irreparable
24       harm here.   Miss Brenner has a very, very successful
25       business.   I want to say, when Mr. Fell and Mr.
26       Belliard open on Monday, they have ten clients.   In
```

34

```
1                        Proceedings
```

Page 31

power1.txt
2      the affidavit submitted by Miss Brenner she talks
3      about having had thousands of clients over the years.
4      We're talking about a small gym, two ex-marines who
5      are trying to open with ten clients.
6                  THE COURT:  Now, here, let me ask you, have
7      they taken the client list?
8                  MR. BUTERMAN:  No, your Honor.  It's my
9      understanding -- let me please explain the document
10     that Mr. Calcagno referred to.  And this is
11     100 percent my understanding.  Exhibit XX, excuse me,
12     exhibit X that Mr. Calcagno referred to, which has a
13     party list, is a list that was compiled by all four of
14     the named defendants based on the personal e-mail
15     list.  When --
16                  THE COURT:  That doesn't sound totally
17     believable.
18                  MR. BUTERMAN:  Your Honor, the point is
19     client lists are not confidential if they are
20     available from other sources.
21                  THE COURT:  Client lists of this type are
22     confidential.  If they're available for other sources
23     they still have to be given back.
24                  MS. RICHMOND:  Your Honor, I'm sure you
25     have many cases with respect to documents in this
26     particular county.  New York law is very clear if you

▯

35

1                         Proceedings
2      can create a list from your head on your own --
3                  THE COURT:  I agree with that, but that's
                         Page 32

powerl.txt

```
 4    not this.

 5                  MS. RICHMOND:  Your Honor, that's exactly

 6    what this is.  They were gym members.  You can walk

 7    in.

 8                  THE COURT:  Counsel, let's say I don't

 9    believe that.  I think they took lists.  I believe

10    they took lists.  And I'm going to order those lists

11    returned.  I want them -- if they have them out of

12    their heads, then they should give over all the lists

13    and then make new lists out of their heads.

14                  They don't have all the phone numbers, they

15    don't have all the e-mail numbers in their heads.

16                  MR. BUTERMAN:  If your Honor would like,

17    let me represent -- let me be clear.  My clients have

18    represented to me that they do not have any customer

19    lists, that they have from Pure Power Boot Camp.

20    That's what they have represented to me.

21                  THE COURT:  I am telling you that I don't

22    believe it.  And I am ordering them to return any

23    lists that they have, even ones they claim they don't

24    -- they didn't get from Pure Power.  They can start

25    over again, because any list that has either an e-mail

26    or telephone number, I want back.
```

□

36

```
 1                            Proceedings

 2                  MR. BUTERMAN:  Your Honor, respectfully,

 3    while my clients will abide by your Honor's rulings,

 4    the list that they created also have personal

 5    contacts, the e-mail list attached to exhibit X which
```

Page 33

power1.txt
```
 6    plaintiff now has.
 7                THE COURT:  How did they get all those
 8    e-mails?
 9                MR. BUTERMAN:  Many of them are from their
10    friends.
11                THE COURT:  They have them again.
12                MR. BUTERMAN:  We will be happy to give
13    back any copies of exhibit X that we have or any other
14    master list will be given, I should say.
15                MR. CALCAGNO:  Your Honor.
16                THE COURT:  I don't want to hear from you.
17    Go ahead.
18                MR. SKINNER:  My name is John Skinner from
19    Fox Rothschild.  I'm a registered pattern and
20    trademark attorney from the U.S. PTO.
21                Somewhere in the documents here there was
22    an affidavit by Miss Susan Upton Douglass.  Mr.
23    Calcagno has said that the plaintiff has a number of
24    trademarks and one of trademarks that they are
25    claiming to have is trade dress to allay out --
26                THE COURT:  They said they applied for
```

37

```
 1                        Proceedings
 2    them.  She backed away from having one.
 3                MR. SKINNER:  I just wanted to show the
 4    court that an office action issued back in January of
 5    2008 that finally rejects the trademark application in
 6    the trademark offices said the following:  "The
 7    refusal to register is made final because the proposed
```

power1.txt

8    mark consists of nondistinctive trade dress that would

9    not be perceived as a service mark."

10          In the present case the proposed mark is

11    not inherently distinctive because camouflage, rubber

12    flooring, tire rungs, climbing walls, climbing nets,

13    hurdles and motivational words are commonly associated

14    with fitness centers.  Please see the previously

15    attached evidence which illustrates camouflage

16    associated with other boot camps and that military

17    style boot camps are a commonly offered physical

18    fitness service.  And they go on and list a half dozen

19    different boot camps and they also show as evidence 47

20    various pages taken off the Internet.

21          MS. DOUGLASS:  If I may?

22          THE COURT:  Yes.

23          MS. DOUGLASS:  I am Susan Douglass.  May it

24    please the court, I have been practicing trademark and

25    copyright law exclusively for 26 years at the firm of

26    Fross, Zelnick, Lehrman & Zissu, which is the largest

38

1                    Proceedings

2    firm in the world that specializes only in trademark

3    and copyrights, not patents.  And we have 50 lawyers,

4    that's all we do.  And so I can tell you it's my

5    experience that what happens in the real world and

6    what happens in the trademark office are two entirely

7    different things.

8          The Supreme Court in the Two Pacer versus

9    Taco Sabana (phonetic) case had said that trade dress

Page 35

power1.txt
```
10    which are the elements, the look and feel of a
11    business are inherently protectable, which is the
12    supreme court case, Two Pacer versus Taco Sabana.
13                THE COURT:  Come on, let's go.
14                MS. DOUGLASS:  Anyway, the point is when
15    you file an application in the trademark office these
16    examiners are, for lack of a better word, fearful and
17    so what they do is because Section 2F of the trademark
18    office says five years of use is inherent, is prima
19    facie evidence of inherent distinctiveness --
20                MR. SKINNER:  Objection.
21                MS. DOUGLASS:  The examiners like to wait
22    for five years so they feel they have the comfort of
23    having the five years behind them.  We have four and a
24    half years that what counsel referred to as the final
25    refusal is the final refusal which gives us six months
26    to answer.
```

39

```
1                        Proceedings
2                And so we are going to be filing the
3     response on July 5th, which is the last day of the
4     term to respond.  And the examiner has told us over
5     the telephone that she's just going to wait out the
6     five years.
7                MR. SKINNER:  Objection.
8                MS. DOUGLASS:  Excuse me, I had a telephone
9     conversation with the examining attorney.  And she
10    said I'll feel more comfortable waiting for five years
11    because the trade traditions are not within the
```

Page 36

power1.txt

12    comfort zone of the trademark examining attorneys who

13    are more accustomed to word marks and logos, than the

14    sort of thing I have in the past, for example,

15    attached to my affidavit registered the trade dress of

16    the Two Carnival store.

17            And again even though the Supreme Court has

18    said that the trade dress is inherently distinctive,

19    the examining attorneys feel more comfortable with the

20    five year period and when it comes time for me to file

21    the request for reconsideration in July, which I have

22    all of this press evidence which is very persuasive,

23    the courts have said, the trademark office has said

24    that extensive publicity, and so on, is persuasive

25    evidence of acquired distinctiveness.

26            She's basically told me on the telephone

□

40

1                        Proceedings

2    that she's just waiting out the term.  So this is what

3    I'm going to do, I'm going to until July.  I will file

4    a request for reconsideration.  She will review it

5    over a couple of months and then we will be up to the

6    five year term amount at which point we will then file

7    a supplemental thing saying we have five years and

8    then it will go through.

9            The other point I would like to make is

10    that we have no objection to the defendants having a

11    boot camp.  What we're talking about is distinctive

12    trade dress comprising all of these elements, the

13    indoor confidence obstetrical course which is

Page 37

power1.txt
14      specifically designed.  They can do calisthenics, they
15      can have pieces of equipment when you go in this place
16      and you look at the brochures and you see the very
17      distinctive look totally non-functioning, you don't
18      need to have netting hanging from the ceiling, you
19      don't have to lay out, you don't need the words
20      stenciled on support posts in the building.
21              THE COURT:  Is that what your client has?
22              MS. DOUGLASS:  Yes.  And it's totally
23      arbitrary and distinctive trade dress.  That is the
24      subjects of the trademark application and which will
25      ultimately be registered.
26              They're welcome -- there are other boot

41

1                       Proceedings
2       camps in the country.  They're welcomed to do that.
3       They can do their own boot camp.  What they can't do
4       also is a proprietary program; for example, what
5       Lauren Brenner has developed.  I've been to many gyms.
6       I belonged to one gym for 25 years.  You never walk in
7       the door and they say drop down and give me five.  And
8       the clients walk in like this in high heels and the
9       guy a suit and they do five push-ups.  And they have
10      changing dens instead of a dressing room.  This is
11      what the Lauren Brenner Pure Power Boot Camp is.  And
12      they're trying to emulate all these things.  They call
13      clients by the name recruits.
14              THE COURT:  I find that obnoxious, calling
15      clients recruits.  I have to tell you that more than

Page 38

power1.txt

16    anything else.

17                    MS. DOUGLASS:  Is that not distinctive,

18    unique?  Have you ever been to a gym where somebody

19    calls you a recruit.

20                    THE COURT:  It sounds pretty hokey.

21                    MS. DOUGLASS:  This what they are copying,

22    they're copying this whole program.

23                    THE COURT:  By tomorrow they'll change it.

24                    MR. BUTERMAN:  First of all, with respect

25    to some of these elements -- and I appreciate

26    counsel's --

42

1                        Proceedings

2                    MR. CALCAGNO:  Can I say one thing to Miss

3    Douglass?

4                    THE COURT:  No.

5                    MR. CALCAGNO:  Fine, your Honor.

6                    MR. BUTERMAN:  If the concerns are with

7    respect to issues with respect to cargo netting, your

8    Honor, there will be no cargo netting in our gym.  If

9    the issues are with respect to tents, I can assure

10    your Honor there will be no tents.

11                    THE COURT:  We're getting there.

12                    MR. SKINNER:  I would submit that is not

13    what the trademark is.  If you look at the trademark

14    it actually has a picture of the obstacle course as

15    the examiner --

16                    THE COURT:  They're not saying the obstacle

17    course.  They're saying the tents.

Page 39

power1.txt

18              MR. BUTERMAN:  We will not have the
19      military green color.  I mean --
20              THE COURT:  Okay.  We're getting there.
21              MS. DOUGLASS:  In their business plan, your
22      Honor, they say the Warrior Boot Camp, they say it's a
23      completely different fitness experience based on pan
24      military style training.
25              THE COURT:  Why don't you work with --
26              MR. SKINNER:  Your Honor --

43

1                        Proceedings
2               THE COURT:  I am going to walk out.
3               You know what, somehow this group has been
4       unable to conduct itself appropriately.  And for that
5       reason I am just not going to say do anything now.  If
6       you change your thing enough, the TRO goes away.  And
7       it's now up to you to change your thing enough.
8               MR. SKINNER:  Can we get a little guidance?
9               THE COURT:  Don't call everybody recruits,
10      don't come in and say drop down and do this.  If
11      there's some imitation in the program, you know, a
12      boot camp is a boot camp.  Nets gone, color's gone,
13      change your style.  Don't call them recruits, call
14      them -- come up with another word.
15              MR. BUTERMAN:  It's all agreed, your Honor.
16      That is all agreed to.
17              MS. DOUGLASS:  If there's the indoor
18      obstacle confidence course.
19              THE COURT:  I'm not going to say

Page 40

power1.txt

20    everything.  Take a look.  The three of you go look at

21    theirs, figure out something that's different.

22             MS. RICHMOND:  Your Honor, could we have

23    the TRO lifted?

24             MS. DOUGLASS:  Could we keep the TRO in

25    place, please.  I'd just like to make one more point

26    about irreparable harm; that is to say people are

44

1                    Proceedings

2    going to invest hundreds of thousands of dollars.

3    They do have a franchise in this.  The franchise is

4    worthless if people steal it.  There will be

5    irreparable harm.

6             THE COURT:  I can't stop boot camps.

7             MS. DOUGLASS:  No, but you can stop the

8    imitation of the Pure Power Boot Camp.

9             THE COURT:  It's got to be something

10    different.

11             MS. RICHMOND:  Your Honor, with all due

12    respect, the concepts of boot camps besides being all

13    over this country in other gyms derives from the U.S.

14    Army and Marines.  Recruits all come from the army.

15             THE COURT:  I don't like it.  Get rid of

16    that.

17             MS. RICHMOND:  Personally I wouldn't like

18    it.  It's exactly what it's called.

19             MR. BUTERMAN:  My client just informed me

20    they don't refer to their clients as recruits anyway.

21    They use a specific marine term.  They call them

Page 41

power1.txt
22    warriors.
23            THE COURT:  Style themselves differently.
24    I can't stop competition.
25            MR. TRAFLET:  Your Honor, there's an issue
26    that the TRO hasn't been addressed.  They're supposed

45

1                        Proceedings
2    to give us back everything that they took.
3            THE COURT:  Yes, I'm ordering that back.
4            MR. TRAFLET:  That includes all of our
5    franchise material.
6            THE COURT:  Two and a half weeks from now,
7    will give you a new date.
8            MS. DOUGLASS:  What about Monday?
9            THE COURT:  They can open Monday as long
10    as --
11            MS. DOUGLASS:  They have been all set up to
12    go.
13            MR. TRAFLET:  They have all our franchise
14    documents.
15            THE COURT:  It has to be given back
16    tomorrow.
17            MR. TRAFLET:  They can't use that, correct?
18            THE COURT:  Everything has to be returned
19    by tomorrow.
20            MR. CALCAGNO:  What about the stolen
21    noncompete that Ruben said he shredded or in their
22    position that he says exist, can they return the
23    noncompete agreement?
Page 42

```
                              power1.txt
24                 MR. BUTERMAN:  Everything we have we will
25        certainly return.
26                 MR. CALCAGNO:  Your Honor, if you can just
```

□

46

```
 1                         Proceedings
 2        put in place the franchise is going to be diluted, the
 3        trade dress is going to be diluted, the indoor
 4        obstacle confidence course, the entire concept they
 5        have stolen.  I went to their facility and they
 6        created an exact replica.
 7                 THE COURT:  I can't do this without a
 8        hearing and I can't conduct a hearing for a couple of
 9        weeks now.
10                 MS. DOUGLASS:  There will be irreparable
11        harm that cannot be mitigated.  If the TRO could
12        please stay in place.
13                 THE COURT:  I'm not going to keep the TRO
14        in place.  They can open on the 14th.  But if in two
15        weeks you come back and show me that you haven't
16        changed everything --
17                 MS. DOUGLASS:  Can we have access to take
18        photographs?
19                 THE COURT:  Yes.
20                 MR. BUTERMAN:  You'll obviously supervise
21        access?
22                 THE COURT:  Yes.
23
24            *              *              *
25
```

Page 43

power1.txt
26

47

```
 1                      Proceedings

 2

 3              C E R T I F I C A T E

 4

 5

 6    It is hereby certified that the foregoing is a true and
      accurate transcript of the proceedings.
 7

 8              ----------------------------------------
                MICHAEL J. DAUGENTI, CSR, RPR, RMR, CRR
 9              OFFICIAL COURT REPORTER
                SUPREME COURT-NEW YORK COUNTY
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26
```

power1.txt