

**Fox Rothschild** LLP
ATTORNEYS AT LAW

100 Park Avenue, Suite 1500
New York, NY 10017
Tel 212.878.7900 Fax 212.692.0940
www.foxrothschild.com

Daniel A. Schnapp
Direct Dial: (212) 878-7960
Email Address: dschnapp@foxrothschild.com

July 23, 2008

**VIA HAND and ECF**
Hon. Theodore H. Katz
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:    **Pure Power Boot Camp, et al. v. Warrior Fitness, et al.**
       **08 Civ. 4810 (JGK) (THK)**

> **THE COURT:** Well, I certainly have been wondering how your
> client would have had access to [the Warrior Fitness email
> account].
>
> **MR. HERZFELD:** Okay. Warrior Fitness was a lucky guess.
> He used the same password as he did for his Hotmail account.
> They tried it, it worked. . . *See* Trans. 17:4-9 (July 18, 2008).
>
> ***WILLIAM SHAKESPEARE****: Something is rotten in the state of
> Denmark. Hamlet, Act I, scene 4.*

Your Honor:

        This firm represents Defendants in the above-referenced action.  Pursuant to the Court's
direction, we write to further address Plaintiffs' sanctionable spoliation of documents.

        It is now undisputed that, in a shocking display of audacity and disregard for the Rule of
Law, Plaintiffs stole and then attached to their Motion for a Preliminary Injunction
approximately thirty-four (34) privileged and confidential e-mails that were sent from
Defendants' personal computers and/or personal digital assistants, and that were drafted on their
own personal time.

        Most of the thirty-four (34) emails were sent or received by Defendant Fell <u>after</u> his
employment with Plaintiffs had already terminated.  Nevertheless, Plaintiffs intercepted these

A Pennsylvania Limited Liability Partnership

California      Delaware      Florida      Nevada      New Jersey      New York      Pennsylvania



**Fox Rothschild** LLP
ATTORNEYS AT LAW

Hon. Theodore H. Katz
July 23, 2008
Page 2

emails by eavesdropping on several of Defendants' email accounts for the sole purpose of attempting to use these entirely private communications to their advantage.[1]

In an attempt to hide the fact from the courts that the emails were accessed and printed after Fell's employment with Plaintiffs had terminated, Plaintiffs intentionally deleted the date and time stamp that should have appeared at the bottom of every page. Plaintiffs have now, for the first time, produced these emails in their actual form. These newly produced emails show the time when Plaintiffs' printed Defendants' emails. What remains unclear is the time that Plaintiffs actually <u>first</u> accessed these emails. As the Court noted at oral argument last Friday, Plaintiffs should have, but elected not to, conduct a forensic examination of their computers. *See* Trans. P. 22, lines 11-24.

Indeed, Plaintiffs have thus far failed to produce any evidence demonstrating when they first illegally accessed the Defendants' email accounts. However, some of the emails, Exhibit FF for example, were printed out within hours of their original transmission. This information is significant because it demonstrates that Plaintiffs may have been intercepting the emails at the same time that they were transmitted, thus bringing Plaintiffs' illegal behavior squarely within the ambit of the ECPA.

Plaintiffs have also, for the first time, offered the feeble explanation that the time stamps were deleted because of a "copier malfunction." This is simply beyond the pale. None of the approximately thirty-five exhibits that Plaintiffs attached to their Motion for a Preliminary Injunction exhibited any other signs of a "copier malfunction." In other words, the "copier malfunction" coincidentally seems limited to altering the ***bottoms*** of documents where the time and date stamps are printed. The alleged "copier malfunction" does not seem to have affected the tops and middle of any of Plaintiffs' exhibits.

In addition, the bottom portions of all of the non-email exhibits do not seem to exhibit any of the symptoms of the same purported "copier malfunction." Strangely enough, the "copier malfunction" seems to have only affected emails while all other documents seem to have been

---

[1] Indeed, as the Court pointed out at the oral argument:

**THE COURT:** So counsel, your position is, your client, by guessing at somebody's password, goes into their personal email account after they've left her employ and prints, reads and downloads emails of theirs, and that's not conduct that violates the Stored Communications Act?
*See* Trans. 17:13-17, annexed hereto.



**Fox Rothschild** LLP
ATTORNEYS AT LAW

Hon. Theodore H. Katz
July 23, 2008
Page 3

printed normally. For these reasons, we urge the Court to reject this thoroughly implausible explanation for the clearly purposeful and deliberate alteration of Defendants' emails.[2] If in fact no "copier malfunction" occurred as claimed, then Plaintiffs and their counsel have proffered perjured testimony to this Court and must be sanctioned accordingly.

In an effort to excuse Plaintiffs' intentional alteration of Defendants' emails, Plaintiffs claim that spoliation only applies to the destruction of documents. *See* Transcr. 15:14-15. Plaintiffs are wrong. There is an abundance of caselaw holding that the significant alteration of documents constitutes spoliation. *See e.g., Jung v. Neschis*, 2007 WL 5256966 (SDNY 2007) (precluding use of opinions from doctor, and precluding expert testimony based on doctor's opinions as to whether patient was suffering from Alzheimer's based in part because plaintiffs produced altered copies of tape recordings); *Great Northern Ins. Co. v. Power Cooling*, 2007 WL 2687666 (EDNY 2007) (precluding evidence regarding altered or missing turbines, where missing evidence was necessary to contest the cause of turbine's failure, which was central to case); *West v. Goodyear Tire and Rubber Co.*, 167 F.3d 776 (2d Cir. 1999) (precluding use of evidence regarding tires where tires were not preserved in "inflated" state, and were purposely deflated during the case).

In addition, Plaintiffs argued that materials precluded because they were obtained in violation of the ECPA can still be used for impeachment purposes. In fact, such documents cannot be used for impeachment purposes. *U.S. v. Wuliger*, 981 F.2d 1497 (6th Cir. 1992) (the express language in the ECPA is absolute and does not provide for an impeachment exception in civil cases).

Ultimately, the Court does not even need to reach the issue of whether Plaintiffs violated a state or federal statute. As this Court noted at oral argument, the Court has an inherent ability to impose sanctions in order prevent abuses of process, and to punish abuses that have already occurred, such as the ones perpetrated by Plaintiffs here. *See Fayemi v. Hambrecht & Quist Inc.*, 174 FRD 319 (S.D.N.Y. 1997); Trans. p. 9, lines 3-4. The Court also has broad power to prevent discovery of these materials pursuant to Fed. R. Civ. P. 26(c). It is now indisputable that Plaintiffs have committed the most egregious violations of Defendants' privacy rights by hacking into Defendants' private email accounts without any express or implied authorization. Additionally, it is patently clear that Plaintiffs have spoliated evidence and perhaps committed perjury in an attempt to cover up their misdeeds. To allow this misconduct to escape the Court's broad equitable powers of preclusion and sanctions would be tantamount to giving those who

---

[2] This Court may wish to call Mr. Calcagano to testify as to the nature of the purported copier malfunction in order to determine the veracity of this implausible explanation.



**Fox Rothschild** LLP
ATTORNEYS AT LAW

Hon. Theodore H. Katz
July 23, 2008
Page 4

wish to invade one's zone or privacy *carte blanche* to do so.[3]   Accordingly, this Court must impose equitable and monetary sanctions for Plaintiffs' spoliation and discovery misconduct. *See Turner v. Hudson Transit Lines, Inc.* 142 F.R.D. 68, 77 (S.D.N.Y. 1991).

      We thank the Court for its attention to these matters.

                              Respectfully submitted,

                              Daniel A. Schnapp, Esq.

cc:    Hon. John G. Koeltl
       Richard L. Herzfeld, Esq. via fax (212) 986-5316

---

[3] In remarkably similarly circumstances, Plaintiffs' misconduct has resulted in criminal prosecution.  Attached is an indictment that was filed by the United States Attorney for the United Stated District Court, Eastern District of Pennsylvania, alleging almost the exact same activity.

NY1 302257v3 07/23/08

87i1purc (2).txt

1

87i1purc

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    PURE POWER BOOT CAMP,

4                    Plaintiff,

5              v.                          08-CV-4810 (JGK)(THK)

6    WARRIOR FITNESS,

7                    Defendant.

8    ------------------------------x
                                          New York, N.Y.
9                                         July 18, 2008
                                          12:09 p.m.
10
     Before:
11
                          HON. THEODORE H. KATZ,
12
                                          Magistrate Judge
13
                              APPEARANCES
14
     BAHN, HERZFELD & MULTER, LLP
15       Attorneys for Plaintiff
     BY:  RICHARD L. HERZFELD, ESQ.
16
     FOX ROTHSCHILD, LLP
17       Attorneys for Defendants
     BY:  DANIEL A. SCHNAPP, ESQ.
18       ELI Z. FREEDBERG, ESQ.

19

20

21

22

23

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

⬚
                                                              2

     87i1purc

                            Page 1

87i1purc (2).txt
```
 1              (In open court)
 2              THE COURT:  We scheduled oral argument today on
 3     defendant's motion to preclude the use of emails that plaintiff
 4     secured on a computer at her work site.  I want to just begin
 5     by saying, it's unclear right now, but probably more likely
 6     than not that Judge Koeltl's going to actually decide this
 7     motion, for the reason that obviously he's going to be deciding
 8     the preliminary injunction motion and ultimately trial issues,
 9     and it's probably more appropriate that he decide what evidence
10     he's going to consider, and as I understand it, much of this
11     evidence is already in front of him on the preliminary
12     injunction motion.
13              MR. SCHNAPP:  That's correct.
14              THE COURT:  But, you know, he and I have been in
15     communication.  He wanted us to go ahead with this hearing,
16     have questions answered, and he'll have the transcript of this
17     proceeding before him.
18              How do you want to proceed?  Do you want to,
19     Mr. Herzfeld, Mr. Schnapp, do you have statements you want to
20     make in addition to your papers or do you want to just answer
21     some questions I have?
22              MR. SCHNAPP:  Your Honor, if I may, I'd like to just
23     briefly address what has been put in their opposition papers.
24     I know the Court's had an opportunity to review all the papers,
25     but I think that does bear noting, but I will not go through
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3

87i1purc
```
 1     the entire litany of facts, but I do think that that is
 2     something that we should address here today.
 3              MR. HERZFELD:  I do have a few things to say, Judge.
```
Page 2

87i1purc (2).txt

 4          THE COURT:  Okay, fine.

 5          MR. SCHNAPP:  So your Honor, if I may, obviously we

 6  commenced this motion because after the defendants Fell and

 7  Belliard no longer worked for the plaintiffs, it's clear that

 8  no fewer than approximately 30 to 40 emails, possibly many

 9  more, were taken from the defendants' personal email accounts.

10  There were three email accounts at issue.  There was a Hotmail

11  account, there's a gmail account, and then there was a Warrior

12  corporate account.

13          Now we've addressed in our papers the fact not only

14  that they were all taken after they were no longer employed by

15  the plaintiffs, many of the emails were drafted when the

16  defendants no longer worked for the plaintiffs, and to the

17  extent that any of the emails coincide in terms of time period

18  with their actual employ, the bottom line is that these emails

19  were written on their own personal computers, on their own

20  personal time.  Now --

21          THE COURT:  Now one thing you're not in a position to

22  say is whether they viewed or read any of these emails while

23  they were at work using the work computer, are you?

24          MR. SCHNAPP:  Are you speaking of the defendants or --

25          THE COURT:  The defendants.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                              4

87i1purc

 1          MR. SCHNAPP:  No, your Honor, I'm not in a position to

 2  say that, although it does appear, at the very least, that all

 3  of the emails that were written during that time period were

 4  sent or received at times that it's quite unlikely that they

 5  could have been at work because they bare time stamps from the

Page 3

87i1purc (2).txt
6  middle of the night.

7          Now in their opposition papers, the plaintiffs did not

8  deny certain things.  They did not deny the fact that the

9  emails were stolen from an account other than the Hotmail

10  account, specifically the gmail account and the Warrior

11  corporate account.  And I think it's very telling.  They have

12  put in no evidence whatsoever to counter that obvious fact.

13          Secondly, they do argue that the Hotmail account was

14  available to them because the defendant Alex Fell left a

15  password on the Hotmail account.  Now aside from the issue as

16  to whether or not this is even true, the bottom line is that

17  this in no way gave the plaintiff some kind of consent to look

18  at his account.  But even if it -- even if he did leave the

19  password on, the plaintiffs were still required to use the

20  password to read, to download, to print out and to ultimately

21  read all of those emails to several of the people that were at

22  the Pure Power facility.  Certainly the consent, if any, could

23  not possibly cover those kinds of actions.

24          And I'd also say that the plaintiffs for the first

25  time have just produced an alleged workplace policy, but the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

⬜

87i1purc                                                5

1  workplace policy certainly does not cover the fact that emails

2  are taken after the defendants are no longer in the plaintiff's

3  employ.

4          And the last thing that I think --

5          THE COURT:  Do you concede that it covers the emails

6  that were written while they were at the --

7          MR. SCHNAPP:  If in fact the policy existed, I would

8  concede that the policy would cover emails that were sent or
                          Page 4

87i1purc (2).txt

 9    drafted during the time, or accessed during the time period
10    that plaintiffs were actually in the employ.  But it can go no
11    further, and it certainly does not survive postemployment.

12            And I think the other very curious thing is that they
13    have not even really dealt with the issue of spoliation of the
14    evidence.  All of the emails have the time and date erased, and
15    I think that that is a -- aside from the fact it's an obvious
16    alteration of the evidence, I think that the fact that they've
17    done that is very telling.  I think they did that precisely
18    because they did not want it to become apparent when and how
19    they were actually able to acquire these emails.

20            And I want to just say one last thing, which is that,
21    there are emails that simply defy how it's possible that they
22    had gotten their hands on them.  I mean, there are emails that
23    are between people such as defendant Baynard and defendant Lee.
24    These people have never even stepped -- they have never used a
25    Pure Power computer.  It's just inconceivable how they were

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    6

      87i1purc

 1    able to get the emails.  Now there is some suggestion -- and I
 2    don't know for sure, but there is some suggestion that there
 3    was a use of a keystroke program.  But aside from that, we have
 4    no idea how else they may have gotten their hands on those
 5    emails.

 6            So the bottom line is that all of the emails were
 7    taken after they left.  That was when their expectation of
 8    privacy was at its height.  There was -- those emails were not
 9    taken while they were in the plaintiff's employ; accordingly,
10    any kind of workplace manual they have cannot control.

                            Page 5

87i1purc (2).txt

11          Thank you.

12          THE COURT:  Just a few questions.

13          MR. SCHNAPP:  Sure.

14          THE COURT:  Recognizing that these emails were viewed

15  subsequent to having been sent, when they were in storage,

16  correct, what's the authority for arguing that these would be

17  covered by the ECPA versus the Stored Communications Act?

18          MR. SCHNAPP:  Yes, your Honor, it's a good question.

19  I think the first issue is that the Court is granted broad

20  discretion to decide how to deal with the emails, whether it's

21  under a federal or a state statute.  Now, for example, the

22  Court could decide that because of the spoliation of the

23  emails, the emails should be precluded from use.  The Court

24  could decide that based upon the fact that some of the emails

25  are attorney/client privileged, they should not be in use.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

7

87i1purc

1          With respect to the actual federal statutes, in

2  respect to the ECPA, the bottom line is that if you take off

3  the time and date, it's difficult for us to know, without

4  getting certain Medidata, exactly when it was that you hacked

5  into the computer.  For all we know, for the emails that were

6  drafted after the defendants were no longer in their employ,

7  those emails were in fact taken contemporaneous with their

8  transmission.  And not only that, but the -- I actually should

9  point out that in our papers we've addressed the number of

10  emails, and many of them, in fact, the bulk of the emails were

11  taken after they left.  So it is entirely possible they were

12  taken during the transmission.

13          THE COURT:  But would you concede if they were not
                                Page 6

87i1purc (2).txt

14   taken during the transmission that the Stored Communications

15   Act would be the applicable statute?

16          MR. SCHNAPP:  I would agree that the ECPA covers

17   transmissions that were sent contemporaneously, so yes, if as

18   an evidentiary matter it is found that they were not

19   intercepted at that precise moment or within a -- some

20   contemporaneous period of time, I agree, the ECPA may not cover

21   it.  However, the CPLR does cover it.  The CPLR has no

22   requirement that the transmission be contemporaneous.  And even

23   the plaintiffs try to get around that by trying to read in some

24   kind of a contemporaneous requirement into the state statute.

25   But that doesn't exist.  The state statute is silent on that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8

87i1purc

1    point.  In fact, if they were taken at any time, the state

2    statute would mean that they would be precluded from use at the

3    hearing.

4           THE COURT:  The state statute precludes the use of

5    such email?

6           MR. SCHNAPP:  Yes.  The state statute is almost

7    entirely like the ECPA but does not include the contemporaneous

8    aspect.

9           THE COURT:  Why should the state statute apply in

10   federal court, in terms of remedy?

11          MR. SCHNAPP:  Because the state statute incorporates a

12   substantive rule.  It is -- CPLR 4506 speaks to the New York

13   penal statute.  The New York penal statute can control in this

14   proceeding.  Not to mention the fact that many of the claims

15   that are at bar are state claims.  In fact, there's only one

87i1purc (2).txt

16    claim that I know of offhand that is actually a federal claim,

17    which is the Lanham Act claim.  And --

18              THE COURT:  But isn't the admission of evidence in the

19    federal court a federal question?

20              MR. SCHNAPP:  Your Honor, we -- we can submit a

21    supplementary brief, if the Court requires, showing that the

22    state suppression remedy could apply and does apply to this

23    proceeding.  And even though the CPLR in many respects does

24    cover certain procedural requirements that are germane to state

25    court, it does not mean that, to the extent that there is a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9

87i1purc

1     substantive requirement, it cannot have bearing on the federal

2     proceeding.

3               THE COURT:  But aren't you essentially asking the

4     Court to exercise equitable power?

5               MR. SCHNAPP:  Yes, your Honor, absolutely we are.

6     Absolutely.

7               THE COURT:  In that regard, how do you address the

8     issue that virtually all of these emails would otherwise have

9     been discoverable in this case if sought in discovery?

10              MR. SCHNAPP:  Well, your Honor, I assume for the

11    moment we'd be putting aside the issue of what emails are

12    privileged.

13              THE COURT:  Right.

14              MR. SCHNAPP:  Well, we have cited cases, first of all,

15    that do speak to whether or not certain emails or

16    communications would be permitted in discovery, and we do think

17    there is some caselaw in our papers that says that if it is

18    found that they are taken illegally, that they would not be

Page 8

87i1purc (2).txt

19    available in discovery.

20         But I think that the ECPA and the Stored

21    Communications Act and the CPLR speak to the use of the emails

22    at a hearing.  So even aside -- if the Court decides that it

23    doesn't want to exercise its broad discretion in limiting

24    discovery some way, which of course we respectfully urge the

25    Court to do, but even if it does not, then the bottom line is

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                            10

         87i1purc

1     that the statutes themselves speak to the use of intercepted

2     communications in hearings, so I think the idea is that even if

3     ultimately the case gets into the discovery phase and it's not

4     dismissed -- and incidentally, we have just recently filed a

5     motion to dismiss -- but even if it's not dismissed, in terms

6     of the motion for preliminary injunction and in terms of a

7     trial or a hearing, the statute speaks specifically to those

8     events and says that those emails, because they were

9     intercepted illegally, cannot be used.

10         THE COURT:  What does use mean in this context?  Does

11    that mean that they can't be used for impeachment purposes

12    either?

13         MR. SCHNAPP:  Your Honor, I would agree -- I don't

14    know, because it does say at a trial.  I think it would cover

15    impeachment.  I think it's broad enough to discover

16    impeachment, it's broad enough to discover -- I'm sorry --

17    broad enough to cover impeachment, broad enough to cover

18    something that was submitted on direct testimony.  I don't

19    think the statute parses it out so it speaks to impeachment.

20         THE COURT:  So theoretically --

                           Page 9

87i1purc (2).txt

21          MR. SCHNAPP:  Yes.

22          THE COURT:  -- if your client was questioned on the

23    stand about whether he secured and transmitted some of the

24    plaintiff's business information and he said no, he could not

25    be confronted with these, under your theory?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                              11

      87i1purc

 1          MR. SCHNAPP:  Yes, your Honor, that's the way we read

 2    the statute.  The statute does not parse it out by impeachment

 3    or how exactly; it just says at a trial or hearing.  It's -- I

 4    think the analogy is one to, in a criminal case, where, if a

 5    defense lawyer asked that certain evidence be suppressed

 6    because it's fruit of the poisonous tree, it's evidence taken

 7    in contravention of the Fourth Amendment, theoretically that

 8    evidence is then suppressed, it is not available for use at

 9    trial, and I think that that is what this statute in some sense

10    analogizes.

11          THE COURT:  But even under the Fourth Amendment,

12    there's an inevitable discovery rule which allows the use of

13    information that would otherwise be discoverable even if it was

14    obtained in violation of the Fourth Amendment.

15          MR. SCHNAPP:  Your Honor, it may be, except that the

16    statute does not speak to that.  The statute is explicit in

17    saying at a trial or a hearing and there's no -- as far as I

18    know, there is no exception whatsoever.

19          There's no -- there is no inevitable discovery rule in

20    the ECPA or in the SCA.

21          THE COURT:  Well, the SCA doesn't have a preclusion

22    privilege, correct?

23          MR. SCHNAPP:  That is correct, your Honor.
                            Page 10

87i1purc (2).txt

24          THE COURT: So it would have to be the ECPA.

25          MR. SCHNAPP: Yes, your Honor.


SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                        12
87i1purc

1          THE COURT:  And you've pretty much conceded that if

2     these were not seized while in transmission, that doesn't

3     apply.

4          MR. SCHNAPP:  Your Honor, I only -- I agree that

5     the -- I just want to be clear about that.  The ECPA would not

6     apply only to emails that were taken outside of the period of

7     what is contemporaneous, and again, we -- because of the

8     spoliation of the evidence, because we know that it appears

9     that the plaintiffs were monitoring our email accounts

10    throughout the entirety of our time there, it's very likely --

11    and it may be that we need an evidentiary hearing or we need

12    discovery on this issue -- it's very likely that in fact these

13    were taken contemporaneously, but if it does -- I do concede

14    that the statute has a contemporaneous requirement, yes, that

15    is absolutely correct.

16         THE COURT:  So just to nail this down on the

17    preclusion, defendant Lee is testifying, and are you saying

18    that she could not be questioned about emails sent by her to

19    defendant Fell if those emails were produced as part of the

20    discovery that she was required to produce?

21         MR. SCHNAPP:  Yes, your Honor.

22         THE COURT:  Because they would also be the same emails

23    that were found when Fell --

24         MR. SCHNAPP:  Absolutely, your Honor.  If they found

25    to have violated one of the statutes that we discussed, the

Page 11

87i1purc (2).txt

13

87i1purc

1    statute speaks to the availability or the use of those, of that
2    evidence at trial or a hearing.  Therefore, it could not be
3    used.  And again, there is no -- there is no inevitable
4    discovery rule in the statutes.  And again, there's no
5    inevitable discovery rule in the CPLR statutes, and again, to
6    the extent that the CPLR controls here and we're not speaking
7    of things that were taken in a contemporaneous time frame, the
8    CPLR would, at the very least, bar the entirety of emails,
9    whether or not they were taken in the contemporaneous time
10   period.
11            THE COURT:  Okay.  Mr. Herzfeld.
12            MR. HERZFELD:  Thank you, Judge.
13            Let me jump around a little bit.  Let me discuss
14   impeachment first so I don't forget it.  I didn't focus on it.
15   I do have one case -- I don't have it with me, I don't have the
16   cite -- that says you can use it for impeachment.  I'll provide
17   it to the Court on Monday, if you'd like.
18            THE COURT:  Sure.
19            MR. HERZFELD:  And my recollection of criminal law is,
20   even if it's suppressed, defendant gets up and testifies, "I
21   didn't do it," you can impeach him.  So as far as impeachment
22   goes, I think it's perfectly appropriate, but I don't think you
23   have to get to that because I don't think any of these are
24   going to be suppressed.
25            The ECPA, I'm still not sure if they're asserting that

87i1purc (2).txt
87i1purc

1    or not.  In their memorandum of law -- I was preparing this
2    morning -- they're asserting that all of these emails were
3    taken about a month after the defendants left, end of April of
4    '08.  That's certainly not contemporaneous for the nine months
5    before that, it's not contemporaneous for probably 99 percent
6    of the emails before you.  And I find it hard to believe that
7    if in fact this were being monitored on a constant basis over
8    those nine months, Ms. Brenner wouldn't have fired them
9    immediately.  She's going to sit back and watch them do what
10   they did and do nothing about it?  I don't think that's going
11   to happen.
12           As far as --
13           THE COURT:  Well, what is the explanation for why the
14   emails have dates and times omitted?
15           MR. HERZFELD:  I was going to get to that, Judge, and
16   I don't have an explanation for that.  What I do have are the
17   actual emails with the date and time, which I can provide to
18   the Court.
19           THE COURT:  You do have them.
20           MR. HERZFELD:  I do have those.  Those were not
21   destroyed.  They were not altered.  I don't know why prior
22   counsel put it in like that.  I didn't ask him.  There's a
23   dispute going on between plaintiff and counsel.  I really
24   didn't feel like getting into that with him.  But I've got
25   them, and they all bear out April 28th as roughly the first

15

87i1purc

1    one, which was just what Ms. Brenner said, a month after they

87i1purc (2).txt
2    left.  That's when they found out that the password and the
3    user ID was embedded into the computer, and that's when they
4    looked at them, and that's when they printed them out.
5                THE COURT:  So have you provided those yet to --
6                MR. HERZFELD:  I haven't, because, I mean, what
7    they've argued here -- and I want to address that too because
8    I'm a little bit concerned.  Their argument is that because of
9    spoliation, this Court should sanction us and preclude emails.
10   They're not arguing, or they didn't argue before, that the
11   Court should take any adverse inference.  Had they argued that,
12   I would have produced them immediately.  But they're arguing
13   spoliation.  There's no spoliation here.
14                First of all, for spoliation, you have to show
15   destruction.  There's no destruction here.
16                Second of all, for spoliation, you have to show
17   relevance.  They've acknowledged that the emails were taken a
18   month after.  So how is it relevant what the date and print
19   time is?  Even if the date and print time were contemporaneous
20   with the transmission, all that shows is that they were
21   vigilantly monitoring the account.  You're not going to be able
22   to print out, monitor and print out; you simply access the
23   account, you see what they did and you print it out.  It's
24   going to show them absolutely nothing.  I'm happy to provide
25   it, I have no problem with it at all, I'll do it on Monday,

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                              16
          87i1purc

1    but...
2                THE COURT:  So were they all printed out on the same
3    date?
4                MR. HERZFELD:  No.  I believe all of the ones up to
                          Page 14

87i1purc (2).txt

5    that date were most likely printed out on that date.

6                    Is that true?

7                    THE PLAINTIFF:  Am I allowed to speak?

8                    MR. HERZFELD:  You can tell me.

9                    (Plaintiff and counsel conferring)

10                    MR. HERZFELD:  Over a period of time, Judge.  About a

11    week.  I mean, the dates and times are on all of them.  I have

12    no idea why counsel did that.  I can guess maybe --

13                    THE COURT:  But all of the dates are subsequent to the

14    term of their employment.

15                    MR. HERZFELD:  Absolutely.  Subsequent to their

16    termination, yes.

17                    One other thing I'd like to point out about the

18    emails, in case it becomes an issue, first of all, they assert

19    that we haven't addressed the other two email accounts.  We can

20    if you like, Judge, but from my perspective, this is their

21    burden of proof.  If they're talking about Warrior Fitness, if

22    they're talking about Lee's account, Warrior Fitness,

23    specifically Belliard, who's silent throughout this whole

24    thing, as I think the Court recognizes, and Lee, have to come

25    in and say there was no consent before you can sanction access

                                                                    17

87i1purc

1    to the email account.  And they haven't done that.  If the

2    Court wants an explanation, we can give the Court an

3    explanation.

4                    THE COURT:  Well, I certainly have been wondering how

5    your client would have had access to that.

6                    MR. HERZFELD:  Okay.  Warrior Fitness was a lucky

87i1purc (2).txt

 7    guess.  He used the same password as he did for his Hotmail
 8    account.  They tried it, it worked.

 9            Lee, she gave Fell her email address, or her password
10    and user name in an email, which they accessed, so they had
11    that, on Hotmail.  That's how they got it.  I have the email
12    that shows the password and user name, if the Court wants it.

13            THE COURT:  So counsel, your position is, your client,
14    by guessing at somebody's password, goes into their personal
15    email account after they've left her employ and prints, reads
16    and downloads emails of theirs, and that's not conduct that
17    violates the Stored Communications Act?

18            MR. HERZFELD:  Well, first of all, Judge, that's not
19    exactly our position.  All of the emails from Fell were
20    because, A, he left his password and his user name in the
21    computer at Pure Power, and, B, because he actually gave his
22    password to one of the Pure Power employees at a prior time.

23            THE COURT:  Well, but --

24            MR. HERZFELD:  As far as Lee goes, as far as Warrior
25    Fitness goes, the only argument I have with respect to that and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                              18

87i1purc

 1    the Stored Communications Act is the crime-fraud exception to
 2    confidentiality, which we would submit applies here.  The whole
 3    purpose of the Stored Communications Act, ECPA, CPLR 4506 is an
 4    expectation of privacy, and once -- and the same is true for
 5    attorney/client privilege.  But once you engage in a crime, in
 6    fraud, in breach of fiduciary duty, all of which they were
 7    doing, we submit that any prohibition under the SCPA [sic]
 8    would not apply, and even if it did, then you've got to get to
 9    your equitable powers and you've got to balance what was going
                              Page 16

87i1purc (2).txt

10    on against what was done, and what --

11            THE COURT:  So I understand on the equitable side,

12    you're basically saying they don't have clean hands.

13            MR. HERZFELD:  Yes, Judge.

14            THE COURT:  You're saying that that doctrine applies

15    with respect to the statutory prohibitions of entering into

16    somebody's private email account and reading their emails?

17            MR. HERZFELD:  No, to the sanctions which would apply.

18    The SCA does not have a preclusionary clause, despite counsel's

19    argument to the contrary in his brief.  The ECPA doesn't apply.

20    And 4506, quite frankly, doesn't apply, and I'll tell you why

21    45 -- I'll address my --

22            THE COURT:  But would you concede that it would be a

23    violation of the SCA to do that, to do what's been described?

24            MR. HERZFELD:  As far as Lee and Warrior Fitness goes?

25            THE COURT:  Yes.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                            19

        87i1purc

1            MR. HERZFELD:  Only if you disagree with my argument

2    that the crime-fraud, fiduciary duty breach would be an

3    exception to that.

4            THE COURT:  Okay.  Let's talk about Fell.  Why is that

5    not a violation of the statute?

6            MR. HERZFELD:  Of the SCA?

7            THE COURT:  Yes.

8            MR. HERZFELD:  From the outset?  Well, basically, for

9    several reasons.  One is consent.

10            THE COURT:  You're saying because he -- although he

11    says he didn't do this, let's assume he inadvertently left his

                            Page 17

87i1purc (2).txt

12   password embedded in his Yahoo account and it came up. You're

13   saying by doing that, he was consenting to anybody clicking on

14   that account and reading his emails?

15          MR. HERZFELD:  That's one of the things I'm saying,

16   but Judge, what's very interesting, and perhaps I missed it,

17   but I don't see in Fell's affidavit where he denies doing that.

18   He says all of the emails that he sent that are at issue here

19   were sent from his home computer, off hours, and I don't see a

20   statement that says he did not use the computer, which he's

21   acknowledged in state court, or that he left his password and

22   his email address behind.  I know counsel --

23          THE COURT:  Okay.  So let's assume he used it, but you

24   will agree that we don't know that he used it to write these

25   emails, correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

20

87i1purc

1          MR. HERZFELD:  That's true.  I don't concede it, as

2    counsel suggests, but I don't know.

3          THE COURT:  But you don't have any evidence that he

4    did.

5          MR. HERZFELD:  No.

6          THE COURT:  Okay.  So at some point he uses the

7    computer, and perhaps he uses the computer while he's at work

8    to read personal emails on his Yahoo account, which is not your

9    client's email system.  Correct?

10          MR. HERZFELD:  True.

11          THE COURT:  And his personal password is embedded,

12   comes up automatically as a memory, comes up when Yahoo is

13   opened.  By doing that, he's consenting to anybody who wants to

14   going into his email account and read both emails that are

Page 18

87i1purc (2).txt

15    there at the present time and emails that are going to be sent
16    to him subsequently?
17              MR. HERZFELD:  I would argue yes, but there are other
18    arguments as well.  I would argue yes because, first of all, as
19    far as consent goes, it's not limited to employer-provided
20    servers.  There's a federal case we cite, which I don't recall
21    off the top of my head, which was cited in Scott, deals with
22    private email accounts, and the company policy is that anything
23    you put into the computer, leave in the computer is the
24    company's.  You forfeit any right of privacy.  What I
25    analogized it to in my memo, Scott analogizes using --

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                               21
          87i1purc

1               THE COURT:  Yeah, but he didn't put his entire Yahoo
2     email account onto her computer.  You have to do something to
3     bring it up on her computer --
4               MR. HERZFELD:  That's true.
5               THE COURT:  -- correct?  Actually, we're talking about
6     Hotmail.
7               (Plaintiff and counsel conferring)
8               MR. HERZFELD:  I'm sorry, Judge.
9               THE COURT:  I said he didn't leave all of his emails
10    opened to be viewed and read, downloaded onto that computer.
11              MR. HERZFELD:  No, but I don't believe in Scott or
12    the --
13              THE COURT:  There's a Hotmail site, you have to do
14    something to get into it, and then you have to take some
15    affirmative action to read his emails, correct?
16              MR. HERZFELD:  Yes, Judge, but the point is that the
                              Page 19

87i1purc (2).txt

17    company policy says if you use it, then it's subject to review,

18    everything's subject to review, and that's what they -- How are

19    they going to be able to parse out what he did off hours and on

20    hours?  Can't be done.  But we know he used it.  He doesn't

21    deny it.  He admitted it in state court.  We have Lorenzi's

22    affidavit that said he used it frequently.  He doesn't refute

23    that.  So we know he used it, we know he used it often.

24         Just briefly, to the extent that they argue that

25    company policy's been waived, because they used it often, the

22

87i1purc

1    affidavits, both Brenner and Lorenzi, is that he used it when

2    Brenner wasn't around.  She had no idea it was going on.  So

3    the fact that there was unauthorized use certainly doesn't

4    constitute a waiver.

5         Getting back to the consent issue, as I said, it's not

6    limited to an employer server.  It can be a private email

7    account.  And when the company policy says, if you use it, it's

8    going to be subject to our auditing, our review, there's no way

9    you can tell what was done unless you look at the emails.  So

10   it's fair game.

11        THE COURT:  Well, there is a way to tell if you want

12   to do a forensic examination of the computer, which you

13   apparently didn't do.

14        MR. HERZFELD:  In what respect, Judge?  They had

15   access to the premises at all hours, so how are we going to

16   tell --

17        THE COURT:  Well, a forensic exam, number one, you

18   know whether or not he actually downloaded something on the

19   computer.  You can find that out.  There's a great deal of

87i1purc (2).txt

20    information that's available in terms of time, when something
21    is done, what was downloaded.  There was no attempt to find
22    that out.
23              MR. HERZFELD:  No, Judge.
24              THE COURT:  So we don't know.
25              MR. HERZFELD:  And then the other issue, of course, is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

23
87i1purc

1     the, again, the crime-fraud --
2              THE COURT:  And also, if he actually opened an email
3     on the computer, then Medidata may actually have an image of
4     that.  But if he simply read an email on his Hotmail account
5     and closed the account, you're saying that therefore his entire
6     Hotmail account, he's consented to his employer viewing all the
7     emails on his Hotmail account?
8              MR. HERZFELD:  Yes, Judge.  I was also --
9              THE COURT:  Even if those emails are created after he
10    left his employer's employ.
11             MR. HERZFELD:  I'm sorry?
12             THE COURT:  Even after he left the employ of your
13    client?
14             MR. HERZFELD:  In that respect, because he left his
15    password and his user ID behind, we would argue that, yes, that
16    constitutes a continuing consent.
17             THE COURT:  If he left a credit card on the desk,
18    would she be free to use that too?
19             MR. HERZFELD:  No.  But as I said, it's almost
20    equivalent to him leaving a file of papers behind, and you open
21    up the file, and that's what you -- you look what's in the

Page 21

87i1purc (2).txt
22   file.  Instead it's on the computer.

23          Also, again, we get back to the crime-fraud, breach of

24   fiduciary duty issue, and the fact that if you're going under

25   the SCA, if you conclude it's a violation of the SCA, you still

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

24

87i1purc

1    have to decide what to do about it.  And given what was going

2    on, I don't think it -- and we've got at least one federal case

3    that indicates where the plaintiff did something wrong, the

4    defendant did something wrong, the Court basically washed its

5    hands of it and said no sanctions.

6           THE COURT:  But the problem is, what you're saying

7    they did wrong goes to the underlying claims in the litigation,

8    which the Court has yet to decide.  So at this point the Court

9    doesn't know whether something they did was improper or

10   illegal.  You're alleging that as part of the complaint.

11          MR. HERZFELD:  I'm alleging that as part of the

12   complaint, but the emails document that wrongdoing, and a lot

13   of the allegations are simply not denied.  The allegations that

14   Belliard shredded his noncompete, not denied; the allegations

15   that Lee and Baynard acted as corporate spies, not denied.

16          THE COURT:  I thought Fell denied ever having a

17   noncompete.

18          MR. HERZFELD:  Fell denies having a noncompete;

19   Belliard does not.  Belliard admitted that he did have a

20   noncompete, and the email documents, that it was shredded.

21          THE COURT:  Those were what, those were electronic

22   documents on your client's --

23          MR. HERZFELD:  No, those were physical documents that

24   were taken.  The electronic documents were, among other things,
Page 22

87i1purc (2).txt

25    the customer lists, the employee manual, the startup manual,

                                                                    25
        87i1purc

1     physical documents.

2             THE COURT:  I see.

3             MR. HERZFELD:  As far as 4506 goes, Judge, the

4     statute's virtually identical to the ECPA.  It's got the same

5     definition of electronic communications, same definition of

6     intercept, the same analysis applies.  The federal cases look

7     to the fact that you've got to intercept, the electronic

8     communication definition is a transmittal, so the courts

9     conclude that intercept.

10            And lastly, if you take a look at the statute, Judge,

11    it applies only to state courts.  The preclusion is in any

12    court or -- of this state or any subdivision thereof.

13            THE COURT:  The CPLR?

14            MR. HERZFELD:  Yeah.  So by its definition, it

15    wouldn't apply to this court.

16            Unless you have any other questions, Judge...

17            THE COURT:  I don't think I do.

18            MR. SCHNAPP:  Your Honor, may I just briefly address

19    some of counsel's arguments?

20            THE COURT:  Yes.

21            MR. SCHNAPP:  I think that we now know, and it's been

22    represented on the record, that all of these emails were taken

23    after the defendants no longer worked for the plaintiffs.  So I

24    think that the question here is, where do we draw the line on

25    privacy and employee manuals.  As your Honor pointed out, if I

87i1purc (2).txt
(212) 805-0300

87i1purc

26

1    leave my credit card behind, does that mean that after I leave,
2    you can just take my credit card and use it?
3            I think that they've argued that there's an employee
4    manual in place, and maybe that's true for the time period they
5    were actually in the employ, but this cannot, does not cover a
6    time period after they no longer worked for plaintiffs.  If we
7    were to adopt that rule, then people could -- the right of
8    privacy would essentially be abrogated everywhere and in every
9    setting.
10            THE COURT:  But let me ask you something.
11            MR. SCHNAPP:  Yes.
12            THE COURT:  Ms. Brenner, the evening that your client
13   leaves his job, she finds out -- and I'm just surmising, I'm
14   not saying this is a fact, but I think it's been claimed --
15   she's told by an employee that your client's in her office when
16   she's not there, going through her computer and files when he's
17   not supposed to be there, and she comes back to her office and
18   ascertains that he's stolen documents from her office and from
19   her computer.  She goes on to another business computer and his
20   email account comes up.  Are you saying under those
21   circumstances she should not be doing anything, in light of
22   what she's just found out about stolen documents?
23            MR. SCHNAPP:  Your Honor, I know at the very least,
24   even in that limited set of facts, which I don't agree occurred
25   here, but even if it does, it certainly does not give her a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

27

87i1purc

Page 24

87i1purc (2).txt

1   right, 30 days later, to use that password that was allegedly
2   left on the computer, to hack into not only the corporate
3   account, the gmail account, but we even had emails that were
4   taken from a BlackBerry wireless device.  So if those emails --
5   if there's a workplace policy in place and on that evening that
6   she finds out that -- and she goes on to a Hotmail account, I
7   do submit that it does not give you permission to download,
8   read, access, read all those emails out in public, but I know
9   at the very least, it does not give you the right a month later
10  to come in and take any emails you want and try to use -- and
11  try and take passwords and hack into other accounts.  That --
12  that I know for sure is on point.
13          THE COURT:  So under that scenario, you might see a
14  distinction between categories of emails that are on this list.
15          MR. SCHNAPP:  I see a distinction for categories that
16  were drafted during the time period that Fell -- only for
17  Fell's emails while he worked for plaintiffs, only if in fact a
18  policy was in place.  All of the cases that were cited by the
19  plaintiffs involve a policy that was in place and/or emails
20  that were drafted during the time period that the defendant
21  worked at the plaintiff's place of employ.  And I would also
22  add that in all of those cases, all of those emails were
23  drafted using the company's server, the company's email
24  exchange and on company time.  Here we have -- here we have
25  Fell drafting emails on his own home computer at a time when he

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

87i1purc

28

1   was not in the office, not in plaintiff's place of employ.
2           I want to also address the crime-fraud exception.  The

Page 25

87i1purc (2).txt
3   crime-fraud exception does not apply to the SCA.  Counsel has
4   not cited any caselaw where it does.  He's trying to read in
5   something that is in another common law for release of
6   attorney/client privilege into the SCA.  We're unaware of any
7   provision in the SCA that actually speaks to crime or fraud.
8   But as your Honor has pointed out, the entire argument they're
9   making is outcome-determinative.  They're basically saying,
10  well, because we found -- because we hacked into your email
11  accounts after you left and we found something that we think --
12  although we deny it -- constitutes wrongdoing, somehow we're
13  able to kind of take a step back and say, well, it's
14  crime-fraud, we're able to do it in the first place.  That
15  doesn't make sense.  The Court has to start at the starting
16  line, which says, what is the right of privacy, what are they
17  allowed to do, is there a manual in place, what time period
18  does it cover.  We can't look into the actual emails and
19  determine, what are the merits of the emails and then decide
20  whether or not the right to privacy was abrogated.
21          In addition, I want to point out that counsel has
22  again raised the issue of the CPLR, and again, not only does
23  it -- it does apply to this proceeding, but in addition, he
24  has -- in his brief and perhaps also today, he has said, well,
25  the federal statute should -- basically the federal statute, we

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

87i1purc

1   should read the contemporaneous requirement into the CPLR, and
2   again, it just -- it's not there and there is -- he hasn't
3   cited any caselaw, nor could he, that such contemporaneous
4   requirement exists in the CPLR.
5          I think ultimately the bottom line is, there's no
                            Page 26

87i1purc (2).txt

6    question, it's now on the record, we now all agree that all of

7    the emails were taken after the defendants had long gone from

8    plaintiff's place of employ. I think if it's to happen that

9    somehow they're able to have these emails and use them in the

10    context of this proceeding, then the right of privacy, it

11    just -- it doesn't exist anymore.

12          And I would add lastly that counsel has agreed that

13    the Court has broad discretion to fashion a remedy, and I think

14    the Court should do so.

15          Thank you.

16          MR. HERZFELD: Just a couple things, Judge, and I

17    should have mentioned this before.

18          To the extent that the Court decides the issue of the

19    emails based upon whose email account it came from, one of the

20    critical emails, Exhibit X, is the party list email. That,

21    based upon what was submitted as Exhibit X, would appear that

22    it came from a Baynard account, which was not the case. In

23    fact, it was part of a chain of an email that was again taken

24    from Fell's account. So I just don't want the Court to, if it

25    decides that it's based upon the account, to think that that

30

87i1purc

1    was not a Fell email. In fact, it was, and I can provide the

2    Court with the initial page that shows that.

3          As far as 4506, counsel's right. I don't have any

4    cases. I have federal cases. There are no state cases. So

5    the Court's got to decide as an issue of first impression

6    whether those federal cases and the theories that they espouse

7    apply to the state statutes, which are exactly the same as the

87i1purc (2).txt
```
 8   federal statutes.  If it even wants to bother, since 4506, by

 9   its own terms, applies to state courts.

10          Other than that, I have nothing further.

11          THE COURT:  Doesn't it also, for the remedies,

12   contemplate that there's a cause of action pursuant to that

13   statute?

14          MR. SCHNAPP:  Your Honor, I think the -- If I

15   understand your Honor's question, I think it would apply to

16   state causes of action.  The case was removed to court, to this

17   court based upon federal question jurisdiction because there

18   is, I believe, 13 causes of action, there's one federal cause

19   of action.  It's our understanding that a state suppression

20   remedy is, it's based upon a substantive, not procedural rule

21   but would apply to all of the claims.  However, we would --

22   Ultimately, as a practical matter, it probably doesn't matter

23   because it would at least apply to all the state causes of

24   action, which are 12 of the 13 causes of action in the

25   complaint.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

31

87i1purc

```
 1          THE COURT:  One additional question.

 2          MR. SCHNAPP:  Sure.

 3          THE COURT:  If we're proceeding on the basis of the

 4   Stored Communications Act, which doesn't specifically provide

 5   for preclusion, and you're simply relying on an equity, I mean,

 6   there are other remedies for this violation if it occurred, are

 7   there not?

 8          MR. SCHNAPP:  Yes.

 9          THE COURT:  The statute itself provides remedies.

10          MR. SCHNAPP:  Yes, your Honor.  I would agree that the
```
Page 28

87i1purc (2).txt

11    text of the SCA does not speak to an actual preclusion remedy.
12    I think that it is relevant because it does speak to issues of
13    equity.
14             Now I would also say that, you know, obviously SCA
15    provides a counterclaim, which of course, you know, if in fact
16    the motion is not dismissed and -- or one way or the other, we
17    intend to pursue that counterclaim.
18             THE COURT:  Right now, though, there is no
19    counterclaim.
20             MR. SCHNAPP:  No.  Right now because of the motion to
21    dismiss, there is no counterclaim.
22             THE COURT:  What was the basis of the motion to
23    dismiss?
24             MR. SCHNAPP:  It was all based upon 12(b)(6), each and
25    every one of the causes of action failed to allege, whether it

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                            32
       87i1purc

1    was in detail, whether it was just to lay out the basic
2    elements of causes of action, how those causes of action exist,
3    I think there is, also, as part of that, we are seeking relief
4    under Rule 12(d) because we think that based upon some of the
5    exhibits that have been put in, it assures that the Court can
6    dispose of this case on a summary basis.  That's the basis of
7    the motion.
8             THE COURT:  Thank you.
9             MR. SCHNAPP:  Yes, your Honor.
10             THE COURT:  Anything else?
11             MR. HERZFELD:  Just one other thing, Judge.
12             As far as the Court exercising its equitable powers, I
                            Page 29

87i1purc (2).txt

13    mean, obviously you're not going to decide the case on the
14    merits, but you do have to weigh what's been alleged and what's
15    before you and the harm to each of the parties if it's allowed
16    or not allowed, and I think at the end of the day, especially
17    based upon their failure to deny a number of these very serious
18    allegations, I think that analysis has to come out in favor of
19    the plaintiffs.
20            MR. SCHNAPP:  Your Honor, may I just briefly respond
21    to that?
22            THE COURT:  Sure.
23            MR. SCHNAPP:  I just want to say that it's just, you
24    know -- they say we haven't -- we haven't dealt with their
25    allegations.  Your Honor, again, if our privacy rights were

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                            33
        87i1purc

1    invaded and the Court is going to fashion an exclusionary
2    remedy, we have no obligation and nor should we address any of
3    the merits of what's in the email.  We cannot reverse engineer
4    this process to suit the plaintiffs.  The process is such that
5    you look to see whether or not the right was breached.  If it
6    was breached, the emails are excluded.  That's all.
7            THE COURT:  I haven't read the papers but, I mean,
8    have you addressed the merits of the allegations in the
9    preliminary injunction?
10           MR. SCHNAPP:  In part we have, your Honor.  I mean, I
11    can say at the very least, we, you know -- if it is not clear
12    in the papers, we deny each and every allegation of wrongdoing.
13    But I do think in part we have dealt with some of the documents
14    in particular.  If it's not in our motion on the emails, it's
15    in our motion on the injunction.  Where, for example, you know,
                        Page 30

87i1purc (2).txt

16   they raise certain emails as being, you know, alleged client

17   lists, and we just point out they were nothing of the sort.

18   But it doesn't change the fact that, again, the process doesn't

19   work that way.  It's -- you have to look to see whether or not

20   a right was breached, and if so, we fashion a remedy.

21          THE COURT:  Thanks, folks.

22          MR. SCHNAPP:  Thank you, your Honor.

23          MR. HERZFELD:  Judge, can I just get a direction on

24   those emails with dates and times and the one email to show

25   that it was from Fell's account?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

34
87i1purc

1          THE COURT:  Yes, I'd like those produced.

2          MR. HERZFELD:  Okay.

3          THE COURT:  And I think it would be helpful to produce

4   them to the Court.

5          MR. HERZFELD:  So just file it ECF?

6          THE COURT:  Yes.

7          MR. SCHNAPP:  Your Honor, if that in fact happens,

8   then are we allowed to point out the fact that, now based upon

9   the proceeding today and based upon the emails, can we repoint

10   out the fact that there is spoliation, perhaps seek additional

11   sanctions because of the difference between the emails, if

12   we're able to show that those dates and times have been

13   intentionally deleted?

14          THE COURT:  So you're saying there's spoliation

15   because the initial ones were altered?

16          MR. SCHNAPP:  Yes, your Honor.  I mean, I think we've

17   had an admission here today, for some reason apparently

Page 31

87i1purc (2).txt
18   plaintiff's prior counsel had deleted the times and dates, and

19   I think on some level that does result in spoliation.

20         THE COURT:  Well, I mean, it's not your classic case

21   of spoliation because obviously the evidence hasn't been

22   destroyed.

23         MR. SCHNAPP:  Well, your Honor, I think we pointed out

24   in our papers that spoliation can occur when there's alteration

25   of the evidence, and I think the alteration is relevant and the

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                              35
        87i1purc

 1   prejudice to us, because to the extent the ECPA may apply, it

 2   deals with the contemporaneous issue, and we know exactly which

 3   emails were taken contemporaneously with the erasing of the

 4   time and date.

 5         THE COURT:  How do you know when?  This won't tell you

 6   which ones were taken contemporaneously, will it?

 7         MR. SCHNAPP:  Well, we'll know, for example, that on

 8   April 28, 2008, that's when they were printed out, at the very

 9   least.

10         THE COURT:  Right.

11         MR. SCHNAPP:  We can then cross-reference those

12   against the emails and the times and dates of those emails

13   because many of those emails are from the March/April time

14   period.

15         THE COURT:  What I would say is this:  I would

16   suggest, since you haven't had this evidence, if you want to do

17   a three-page supplement to your submissions based on this

18   evidence, you can do that and get it in by next Wednesday.

19         MR. SCHNAPP:  Yes, your Honor.

20         MR. HERZFELD:  I won't be getting these out until
                           Page 32

87i1purc (2).txt

21    Monday, just so you know.

22            THE COURT:  Okay.

23            MR. SCHNAPP:  We can put in a letter to the Court by

24    next Wednesday, no longer than three pages.

25            THE COURT:  Okay.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                36
        87i1purc

 1            MR. HERZFELD:  And just so the record is clear, I

 2    haven't conceded anything.  I don't know what happened with

 3    prior counsel, I don't know if he enlarged it and it got cut

 4    off, I don't know if he intentionally did it, I don't know what

 5    happened.  If there's an issue between client and counsel, I

 6    will try.

 7            THE COURT:  Okay.  Thanks, folks.

 8            ALL COUNSEL:  Thank you.

 9                            oOo

10

11

12

13

14

15

16

17

18

19

20

21

22

                            Page 33

87i1purc (2).txt

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | DATE FILED: |
| v. | : | CRIMINAL NO. |
| LAWRENCE MENDTE | : | CHARGES: 18 U.S.C. |
| | | § 1030(a)(2)(C) and(c)(2)(B) |
| | : | (intentionally accessing a protected |
| | | computer without authorization |
| | : | and thereby obtaining information |
| | | in furtherance of a tortious act – |
| | : | 1 count) |

### INFORMATION

**THE UNITED STATES ATTORNEY CHARGES THAT:**

### INTRODUCTION

1.    At all times relevant to this Information, defendant LAWRENCE MENDTE, a resident of Philadelphia, PA, was a news reporter, employed by KYW-TV in Philadelphia. KYW-TV was an affiliate of CBS, Inc.

2.    Alycia Lane was employed by KYW-TV from in or about 2003 up to and including on or about January 1, 2008.

3.    All employees at KYW were assigned an e-mail account that required the combination of a user name and a password to gain access to the account. Alycia Lane had such an e-mail account ("the KYW account"). The e-mail server for the KYW e-mail accounts was located in New York.

4.    Alycia Lane also had two personal e-mail accounts – one with Apple Computer ("the .mac account") and one with Yahoo! ( "the Yahoo account"). These accounts also required

the combination of a username and a password to gain access to them. The e-mail servers for .mac and Yahoo accounts are located in California.

5. Beginning as early as in or about March 2006, and continuing up to and including on or about May 28, 2008, defendant LAWRENCE MENDTE gained access to these e-mail accounts of Alycia Lane and read her e-mail messages. When he did this, defendant MENDTE was not authorized by Ms. Lane, or anyone else, to access these e-mail accounts.

THE HISTORY OF UNAUTHORIZED ACCESS TO ALYCIA LANE'S E-MAIL ACCOUNTS

6. In or about March 2006, defendant LAWRENCE MENDTE accessed Alycia Lane's Yahoo account without authorization and printed an e-mail message from that account, which he saved.

7. In or about June 2006, defendant LAWRENCE MENDTE accessed Alycia Lane's KYW account without authorization and printed two e-mail messages from that account, which he saved.

8. In or about April 2007, Alycia Lane, using her .mac account, sent several photographs of herself with friends at a beach to another friend.

9. In or about April 2007, the wife of the friend sent an e-mail to Alycia Lane about these photographs.

10. On or about May 29, 2008, defendant LAWRENCE MENDTE possessed, on a computer that was inside his home, the text of the e-mail sent by the wife of the friend referred to in Paragraph 9 and several of the photographs referred to in Paragraph 8.

2

11.     On or about May 29, 2008, defendant LAWRENCE MENDTE possessed, on a computer that was inside his home, e-mails from Alycia Lane's .mac account that had been sent in February 2007.

12.     Beginning on or about January 1, 2008 and continuing to on or about May 28, 2008, defendant LAWRENCE MENDTE accessed Alycia Lane's .mac account without authorization approximately 452 times, from his home, from KYW, and from other places, as follows:

| DATE | TIME | | LOCATION |
|------|------|---|----------|
| 1/1/2008 | 10:25 AM | EST | Residence |
| 1/1/2008 | 7:55 PM | EST | KYW |
| 1/1/2008 | 8:22 PM | EST | KYW |
| 1/1/2008 | 10:09 PM | EST | KYW |
| 1/2/2008 | 10:21 AM | EST | Residence |
| 1/2/2008 | 2:37 PM | EST | Residence |
| 1/2/2008 | 5:10 PM | EST | KYW |
| 1/2/2008 | 6:23 PM | EST | KYW |
| 1/2/2008 | 1:16 AM | EST | Residence |
| 1/3/2008 | 10:57 AM | EST | Residence |
| 1/3/2008 | 12:05 PM | EST | Residence |
| 1/3/2008 | 1:13 PM | EST | Residence |
| 1/3/2008 | 5:35 PM | EST | KYW |
| 1/3/2008 | 7:50 PM | EST | KYW |
| 1/3/2008 | 9:06 PM | EST | KYW |
| 1/3/2008 | 12:34 AM | EST | Residence |
| 1/3/2008 | 12:35 AM | EST | Residence |
| 1/4/2008 | 3:11 AM | EST | Residence |
| 1/4/2008 | 11:08 AM | EST | Residence |
| 1/4/2008 | 11:30 AM | EST | Residence |
| 1/4/2008 | 3:29 PM | EST | KYW |
| 1/4/2008 | 6:34 PM | EST | KYW |
| 1/4/2008 | 8:06 PM | EST | KYW |
| 1/4/2008 | 10:05 PM | EST | KYW |
| 1/4/2008 | 10:53 PM | EST | KYW |
| 1/4/2008 | 1:25 AM | EST | Residence |

3

| DATE | TIME | | LOCATION |
|---|---|---|---|
| 1/5/2008 | 11:21 AM | EST | Residence |
| 1/5/2008 | 1:01 PM | EST | Residence |
| 1/5/2008 | 1:44 PM | EST | Residence |
| 1/5/2008 | 2:40 PM | EST | Residence |
| 1/5/2008 | 8:08 PM | EST | Residence |
| 1/5/2008 | 11:14 PM | EST | Residence |
| 1/5/2008 | 1:27 AM | EST | Residence |
| 1/6/2008 | 12:23 PM | EST | Residence |
| 1/6/2008 | 3:59 PM | EST | Residence |
| 1/6/2008 | 5:18 PM | EST | Residence |
| 1/6/2008 | 9:23 PM | EST | Residence |
| 1/6/2008 | 10:31 PM | EST | Residence |
| 1/6/2008 | 1:16 AM | EST | Residence |
| 1/7/2008 | 1:11 PM | EST | KYW |
| 1/7/2008 | 2:40 PM | EST | KYW |
| 1/7/2008 | 6:32 PM | EST | KYW |
| 1/7/2008 | 7:41 PM | EST | KYW |
| 1/7/2008 | 9:17 PM | EST | KYW |
| 1/7/2008 | 10:40 PM | EST | KYW |
| 1/8/2008 | 11:31 AM | EST | Residence |
| 1/8/2008 | 12:29 PM | EST | Residence |
| 1/8/2008 | 1:17 PM | EST | Residence |
| 1/8/2008 | 1:55 PM | EST | Residence |
| 1/8/2008 | 3:51 PM | EST | KYW |
| 1/8/2008 | 5:06 PM | EST | KYW |
| 1/8/2008 | 5:44 PM | EST | KYW |
| 1/8/2008 | 1:26 AM | EST | Residence |
| 1/8/2008 | 2:11 AM | EST | Residence |
| 1/9/2008 | 10:51 AM | EST | Residence |
| 1/9/2008 | 12:46 PM | EST | Residence |
| 1/9/2008 | 3:19 PM | EST | KYW |
| 1/9/2008 | 5:40 PM | EST | KYW |
| 1/9/2008 | 7:25 PM | EST | KYW |
| 1/9/2008 | 7:45 PM | EST | KYW |
| 1/9/2008 | 10:19 PM | EST | KYW |
| 1/9/2008 | 12:17 AM | EST | KYW |
| 1/9/2008 | 1:34 AM | EST | Residence |
| 1/10/2008 | 9:47 AM | EST | Residence |
| 1/10/2008 | 10:36 AM | EST | Residence |
| 1/10/2008 | 11:24 AM | EST | Residence |

| DATE | TIME | | LOCATION |
|------|------|------|----------|
| 1/10/2008 | 5:54 PM | EST | KYW |
| 1/10/2008 | 5:54 PM | EST | KYW |
| 1/10/2008 | 10:15 PM | EST | KYW |
| 1/10/2008 | 10:56 PM | EST | KYW |
| 1/11/2008 | 11:13 AM | EST | Residence |
| 1/11/2008 | 12:02 PM | EST | Residence |
| 1/11/2008 | 5:28 PM | EST | KYW |
| 1/11/2008 | 10:11 PM | EST | KYW |
| 1/12/2008 | 1:04 PM | EST | Residence |
| 1/13/2008 | 1:36 PM | EST | Residence |
| 1/13/2008 | 9:42 PM | EST | Residence |
| 1/13/2008 | 12:58 AM | EST | Residence |
| 1/14/2008 | 12:10 PM | EST | Residence |
| 1/14/2008 | 1:27 PM | EST | Residence |
| 1/14/2008 | 4:06 PM | EST | KYW |
| 1/14/2008 | 4:50 PM | EST | KYW |
| 1/14/2008 | 5:02 PM | EST | KYW |
| 1/14/2008 | 9:21 PM | EST | KYW |
| 1/14/2008 | 10:20 PM | EST | KYW |
| 1/15/2008 | 3:36 PM | EST | KYW |
| 1/15/2008 | 5:15 PM | EST | KYW |
| 1/15/2008 | 5:48 PM | EST | KYW |
| 1/15/2008 | 7:54 PM | EST | KYW |
| 1/15/2008 | 9:35 PM | EST | KYW |
| 1/15/2008 | 2:09 AM | EST | Residence |
| 1/16/2008 | 10:06 AM | EST | Residence |
| 1/16/2008 | 1:41 PM | EST | Residence |
| 1/16/2008 | 3:49 PM | EST | KYW |
| 1/16/2008 | 10:11 PM | EST | KYW |
| 1/16/2008 | 10:59 PM | EST | KYW |
| 1/17/2008 | 9:54 AM | EST | Residence |
| 1/17/2008 | 11:37 AM | EST | Residence |
| 1/17/2008 | 12:40 PM | EST | Residence |
| 1/17/2008 | 3:23 PM | EST | KYW |
| 1/17/2008 | 4:46 PM | EST | KYW |
| 1/17/2008 | 5:31 PM | EST | KYW |
| 1/17/2008 | 5:31 PM | EST | KYW |
| 1/17/2008 | 10:52 PM | EST | KYW |
| 1/18/2008 | 10:54 AM | EST | Residence |
| 1/18/2008 | 12:02 PM | EST | Residence |

| DATE | TIME | | LOCATION |
|---|---|---|---|
| 1/18/2008 | 3:34 PM | EST | KYW |
| 1/18/2008 | 10:49 PM | EST | KYW |
| 1/18/2008 | 1:10 AM | EST | Residence |
| 1/19/2008 | 2:00 PM | EST | Residence |
| 1/19/2008 | 3:53 PM | EST | Residence |
| 1/19/2008 | 1:24 AM | EST | Residence |
| 1/20/2008 | 12:26 AM | EST | Residence |
| 1/21/2008 | 10:23 AM | EST | Residence |
| 1/21/2008 | 3:28 PM | EST | KYW |
| 1/21/2008 | 5:07 PM | EST | KYW |
| 1/21/2008 | 1:00 AM | EST | Residence |
| 1/22/2008 | 3:03 AM | EST | Residence |
| 1/22/2008 | 10:30 AM | EST | Residence |
| 1/22/2008 | 3:27 PM | EST | KYW |
| 1/22/2008 | 4:31 PM | EST | KYW |
| 1/22/2008 | 5:28 PM | EST | KYW |
| 1/22/2008 | 5:47 PM | EST | KYW |
| 1/22/2008 | 6:07 PM | EST | KYW |
| 1/22/2008 | 7:44 PM | EST | KYW |
| 1/22/2008 | 7:51 PM | EST | KYW |
| 1/22/2008 | 8:51 PM | EST | KYW |
| 1/22/2008 | 9:57 PM | EST | KYW |
| 1/22/2008 | 10:22 PM | EST | KYW |
| 1/22/2008 | 10:49 PM | EST | KYW |
| 1/23/2008 | 11:20 AM | EST | Residence |
| 1/23/2008 | 12:49 PM | EST | Residence |
| 1/23/2008 | 1:06 PM | EST | Residence |
| 1/23/2008 | 4:47 PM | EST | KYW |
| 1/23/2008 | 5:03 PM | EST | KYW |
| 1/23/2008 | 5:37 PM | EST | KYW |
| 1/23/2008 | 5:52 PM | EST | KYW |
| 1/23/2008 | 8:37 PM | EST | KYW |
| 1/23/2008 | 10:14 PM | EST | KYW |
| 1/23/2008 | 10:54 PM | EST | KYW |
| 1/23/2008 | 11:11 PM | EST | KYW |
| 1/23/2008 | 12:54 AM | EST | Residence |
| 1/23/2008 | 1:28 AM | EST | Residence |
| 1/24/2008 | 10:35 AM | EST | Residence |
| 1/24/2008 | 10:48 AM | EST | Residence |
| 1/24/2008 | 11:42 AM | EST | Residence |

| DATE | TIME | | LOCATION |
| --- | --- | --- | --- |
| 1/24/2008 | 12:29 PM | EST | Residence |
| 1/24/2008 | 2:18 PM | EST | Residence |
| 1/24/2008 | 4:07 PM | EST | KYW |
| 1/24/2008 | 5:20 PM | EST | KYW |
| 1/24/2008 | 5:37 PM | EST | KYW |
| 1/24/2008 | 6:38 PM | EST | KYW |
| 1/24/2008 | 8:31 PM | EST | KYW |
| 1/24/2008 | 10:45 PM | EST | KYW |
| 1/24/2008 | 12:32 AM | EST | Residence |
| 1/24/2008 | 1:27 AM | EST | Residence |
| 1/25/2008 | 12:02 PM | EST | Residence |
| 1/25/2008 | 12:02 PM | EST | Residence |
| 1/25/2008 | 3:02 PM | EST | KYW |
| 1/25/2008 | 5:10 PM | EST | KYW |
| 1/25/2008 | 10:58 PM | EST | KYW |
| 1/25/2008 | 12:47 AM | EST | Residence |
| 1/26/2008 | 11:34 AM | EST | Residence |
| 1/26/2008 | 11:14 PM | EST | Residence |
| 1/26/2008 | 1:19 AM | EST | Residence |
| 1/27/2008 | 2:57 PM | EST | Residence |
| 1/27/2008 | 9:34 PM | EST | Residence |
| 1/27/2008 | 1:45 AM | EST | Residence |
| 1/28/2008 | 11:11 AM | EST | Residence |
| 1/28/2008 | 12:52 PM | EST | Residence |
| 1/28/2008 | 5:28 PM | EST | KYW |
| 1/28/2008 | 11:26 PM | EST | KYW |
| 1/28/2008 | 12:03 AM | EST | Residence |
| 1/28/2008 | 12:36 AM | EST | Residence |
| 1/29/2008 | 11:32 AM | EST | Residence |
| 1/29/2008 | 12:52 PM | EST | Residence |
| 1/29/2008 | 12:59 PM | EST | Residence |
| 1/29/2008 | 2:38 PM | EST | Residence |
| 1/29/2008 | 3:35 PM | EST | KYW |
| 1/29/2008 | 4:15 PM | EST | KYW |
| 1/29/2008 | 4:26 PM | EST | KYW |
| 1/29/2008 | 5:02 PM | EST | KYW |
| 1/29/2008 | 5:16 PM | EST | KYW |
| 1/29/2008 | 6:51 PM | EST | KYW |
| 1/29/2008 | 7:37 PM | EST | KYW |
| 1/29/2008 | 9:26 PM | EST | KYW |

| DATE | TIME | | LOCATION |
|------|------|------|----------|
| 1/29/2008 | 10:25 PM | EST | KYW |
| 1/29/2008 | 1:18 AM | EST | Residence |
| 1/30/2008 | 9:16 AM | EST | Residence |
| 1/30/2008 | 10:15 AM | EST | Residence |
| 1/30/2008 | 11:07 AM | EST | Residence |
| 1/30/2008 | 11:59 AM | EST | Residence |
| 1/30/2008 | 12:40 PM | EST | Residence |
| 1/30/2008 | 1:34 PM | EST | Residence |
| 1/30/2008 | 5:51 PM | EST | KYW |
| 1/30/2008 | 9:14 PM | EST | KYW |
| 1/30/2008 | 10:18 PM | EST | KYW |
| 1/30/2008 | 1:33 AM | EST | Residence |
| 1/31/2008 | 8:08 AM | EST | Residence |
| 1/31/2008 | 12:57 PM | EST | Residence |
| 1/31/2008 | 2:10 PM | EST | Residence |
| 1/31/2008 | 5:18 PM | EST | KYW |
| 1/31/2008 | 7:20 PM | EST | KYW |
| 2/1/2008 | 11:34 AM | EST | Residence |
| 2/1/2008 | 5:41 PM | EST | KYW |
| 2/1/2008 | 1:46 AM | EST | Residence |
| 2/2/2008 | 11:45 AM | EST | Residence |
| 2/2/2008 | 6:36 PM | EST | Residence |
| 2/2/2008 | 10:35 PM | EST | Residence |
| 2/2/2008 | 2:00 AM | EST | Residence |
| 2/3/2008 | 8:55 PM | EST | Residence |
| 2/3/2008 | 8:55 PM | EST | Residence |
| 2/3/2008 | 10:46 PM | EST | Residence |
| 2/3/2008 | 1:26 AM | EST | Residence |
| 2/4/2008 | 5:40 PM | EST | KYW |
| 2/4/2008 | 10:30 PM | EST | KYW |
| 2/5/2008 | 10:36 AM | EST | Residence |
| 2/5/2008 | 2:13 PM | EST | KYW |
| 2/5/2008 | 1:26 AM | EST | Residence |
| 2/6/2008 | 11:15 AM | EST | Residence |
| 2/6/2008 | 4:11 PM | EST | KYW |
| 2/6/2008 | 6:43 PM | EST | KYW |
| 2/6/2008 | 9:53 PM | EST | KYW |
| 2/6/2008 | 1:46 AM | EST | Residence |
| 2/7/2008 | 1:02 PM | EST | Residence |
| 2/7/2008 | 7:08 PM | EST | KYW |

| DATE | TIME | | LOCATION |
|------|------|-----|----------|
| 2/7/2008 | 9:00 PM | EST | KYW |
| 2/7/2008 | 9:53 PM | EST | KYW |
| 2/7/2008 | 12:47 AM | EST | Residence |
| 2/8/2008 | 10:27 AM | EST | Residence |
| 2/8/2008 | 11:29 AM | EST | Residence |
| 2/8/2008 | 9:33 PM | EST | KYW |
| 2/9/2008 | 11:47 AM | EST | Residence |
| 2/9/2008 | 4:16 PM | EST | Residence |
| 2/9/2008 | 2:07 AM | EST | Residence |
| 2/11/2008 | 5:30 PM | EST | KYW |
| 2/11/2008 | 9:29 PM | EST | KYW |
| 2/12/2008 | 10:20 PM | EST | KYW |
| 2/13/2008 | 1:40 PM | EST | Residence |
| 2/13/2008 | 4:23 PM | EST | KYW |
| 2/13/2008 | 11:04 PM | EST | KYW |
| 2/14/2008 | 10:42 AM | EST | Residence |
| 2/14/2008 | 12:03 PM | EST | Residence |
| 2/14/2008 | 7:34 PM | EST | KYW |
| 2/14/2008 | 10:51 PM | EST | KYW |
| 2/15/2008 | 12:30 PM | EST | Residence |
| 2/15/2008 | 12:30 PM | EST | Residence |
| 2/15/2008 | 5:17 PM | EST | KYW |
| 2/15/2008 | 5:17 PM | EST | KYW |
| 2/16/2008 | 6:34 PM | EST | Residence |
| 2/17/2008 | 11:42 PM | EST | Residence |
| 2/17/2008 | 12:44 AM | EST | Residence |
| 2/19/2008 | 10:42 AM | EST | Residence |
| 2/19/2008 | 1:14 AM | EST | Residence |
| 2/20/2008 | 9:32 AM | EST | Residence |
| 2/20/2008 | 2:53 PM | EST | Residence |
| 2/20/2008 | 4:28 PM | EST | KYW |
| 2/20/2008 | 6:00 PM | EST | KYW |
| 2/20/2008 | 7:37 PM | EST | KYW |
| 2/20/2008 | 9:10 PM | EST | KYW |
| 2/21/2008 | 9:17 AM | EST | Residence |
| 2/21/2008 | 11:24 AM | EST | Residence |
| 2/21/2008 | 4:10 PM | EST | KYW |
| 2/22/2008 | 11:44 AM | EST | Residence |
| 2/22/2008 | 1:50 PM | EST | Residence |
| 2/22/2008 | 5:12 PM | EST | KYW |

9

| DATE | TIME | | LOCATION |
|---|---|---|---|
| 2/22/2008 | 9:41 PM | EST | KYW |
| 2/22/2008 | 1:07 AM | EST | Residence |
| 2/23/2008 | 8:18 PM | EST | Residence |
| 2/23/2008 | 8:25 PM | EST | Residence |
| 2/23/2008 | 10:02 PM | EST | Residence |
| 2/23/2008 | 1:54 AM | EST | Residence |
| 2/24/2008 | 1:37 PM | EST | Residence |
| 2/24/2008 | 2:14 PM | EST | Residence |
| 2/24/2008 | 9:46 PM | EST | Residence |
| 2/24/2008 | 10:34 PM | EST | Residence |
| 2/25/2008 | 7:27 AM | EST | Residence |
| 2/25/2008 | 5:52 PM | EST | KYW |
| 2/25/2008 | 8:32 PM | EST | KYW |
| 2/25/2008 | 10:11 PM | EST | KYW |
| 2/25/2008 | 12:06 AM | EST | Residence |
| 2/26/2008 | 9:29 AM | EST | Residence |
| 2/26/2008 | 10:26 AM | EST | Residence |
| 2/26/2008 | 1:17 PM | EST | Residence |
| 2/26/2008 | 2:35 PM | EST | KYW |
| 2/26/2008 | 5:18 PM | EST | KYW |
| 2/26/2008 | 7:14 PM | EST | KYW |
| 2/26/2008 | 9:45 PM | EST | KYW |
| 2/26/2008 | 12:50 AM | EST | Residence |
| 2/26/2008 | 12:58 AM | EST | Residence |
| 2/27/2008 | 9:46 AM | EST | Residence |
| 2/27/2008 | 11:00 AM | EST | Residence |
| 2/27/2008 | 11:56 AM | EST | Residence |
| 2/27/2008 | 5:51 PM | EST | KYW |
| 2/27/2008 | 1:44 AM | EST | Residence |
| 2/28/2008 | 11:30 AM | EST | Residence |
| 2/28/2008 | 1:03 PM | EST | Residence |
| 2/28/2008 | 9:29 PM | EST | KYW |
| 2/28/2008 | 2:29 AM | EST | Residence |
| 2/29/2008 | 10:43 AM | EST | Residence |
| 2/29/2008 | 3:30 PM | EST | KYW |
| 2/29/2008 | 5:26 PM | EST | KYW |
| 2/29/2008 | 10:07 PM | EST | KYW |
| 2/29/2008 | 1:42 AM | EST | Residence |
| 3/1/2008 | 1:44 PM | EST | Residence |
| 3/1/2008 | 4:18 PM | EST | Residence |

| DATE | TIME | | LOCATION |
|------|------|------|----------|
| 3/1/2008 | 9:08 PM | EST | Residence |
| 3/1/2008 | 1:17 AM | EST | Residence |
| 3/2/2008 | 4:18 AM | EST | Residence |
| 3/2/2008 | 4:18 AM | EST | Residence |
| 3/2/2008 | 5:57 PM | EST | Residence |
| 3/2/2008 | 8:04 PM | EST | Residence |
| 3/3/2008 | 11:55 AM | EST | Residence |
| 3/3/2008 | 2:11 PM | EST | KYW |
| 3/3/2008 | 2:11 PM | EST | KYW |
| 3/3/2008 | 12:38 AM | EST | Residence |
| 3/4/2008 | 10:43 AM | EST | Residence |
| 3/4/2008 | 5:49 PM | EST | KYW |
| 3/4/2008 | 9:34 PM | EST | KYW |
| 3/5/2008 | 12:03 PM | EST | Residence |
| 3/5/2008 | 2:05 PM | EST | Residence |
| 3/6/2008 | 12:32 AM | EST | Residence |
| 3/7/2008 | 11:02 PM | EST | KYW |
| 3/7/2008 | 12:34 AM | EST | Residence |
| 3/8/2008 | 11:23 AM | EST | Residence |
| 3/8/2008 | 11:17 PM | EST | Residence |
| 3/9/2008 | 7:02 PM | EDT | Residence |
| 3/10/2008 | 12:36 PM | EDT | Residence |
| 3/10/2008 | 6:00 PM | EDT | KYW |
| 3/11/2008 | 10:46 AM | EDT | Residence |
| 3/11/2008 | 11:04 AM | EDT | Residence |
| 3/11/2008 | 12:08 PM | EDT | Residence |
| 3/11/2008 | 12:17 PM | EDT | Residence |
| 3/11/2008 | 3:59 PM | EDT | KYW |
| 3/11/2008 | 5:03 PM | EDT | KYW |
| 3/11/2008 | 6:37 PM | EDT | KYW |
| 3/11/2008 | 7:41 PM | EDT | KYW |
| 3/11/2008 | 9:38 PM | EDT | KYW |
| 3/12/2008 | 9:31 AM | EDT | Residence |
| 3/12/2008 | 1:12 PM | EDT | Residence |
| 3/12/2008 | 4:18 PM | EDT | KYW |
| 3/12/2008 | 11:59 PM | EDT | Residence |
| 3/12/2008 | 1:09 AM | EDT | Residence |
| 3/13/2008 | 7:27 AM | EDT | Residence |
| 3/13/2008 | 11:18 PM | EDT | Residence |
| 3/13/2008 | 11:21 PM | EDT | Residence |

11

| DATE | TIME | | LOCATION |
|---|---|---|---|
| 3/14/2008 | 9:58 AM | EDT | Residence |
| 3/14/2008 | 12:31 PM | EDT | Residence |
| 3/15/2008 | 3:43 PM | EDT | Residence |
| 3/15/2008 | 9:08 PM | EDT | Residence |
| 3/15/2008 | 12:38 AM | EDT | Residence |
| 3/15/2008 | 12:40 AM | EDT | Residence |
| 3/17/2008 | 11:03 AM | EDT | Residence |
| 3/17/2008 | 9:30 PM | EDT | KYW |
| 3/18/2008 | 12:23 PM | EDT | Residence |
| 3/18/2008 | 9:37 PM | EDT | KYW |
| 3/19/2008 | 10:38 AM | EDT | Residence |
| 3/19/2008 | 12:26 PM | EDT | Residence |
| 3/19/2008 | 4:08 PM | EDT | KYW |
| 3/19/2008 | 8:16 PM | EDT | KYW |
| 3/19/2008 | 11:56 PM | EDT | Residence |
| 3/20/2008 | 12:15 PM | EDT | Residence |
| 3/20/2008 | 4:22 PM | EDT | KYW |
| 3/21/2008 | 10:58 AM | EDT | Residence |
| 3/21/2008 | 5:49 PM | EDT | KYW |
| 3/21/2008 | 10:47 PM | EDT | KYW |
| 3/21/2008 | 12:34 AM | EDT | Residence |
| 3/22/2008 | 5:31 PM | EDT | Residence |
| 3/23/2008 | 8:42 PM | EDT | Residence |
| 3/23/2008 | 12:03 AM | EDT | Residence |
| 3/24/2008 | 2:27 PM | EDT | KYW |
| 3/24/2008 | 10:47 PM | EDT | KYW |
| 3/25/2008 | 10:06 AM | EDT | Residence |
| 3/25/2008 | 12:34 AM | EDT | Residence |
| 3/25/2008 | 12:44 AM | EDT | Residence |
| 3/26/2008 | 7:51 PM | EDT | Residence |
| 3/27/2008 | 9:56 AM | EDT | Residence |
| 3/28/2008 | 1:13 AM | EDT | Residence |
| 3/29/2008 | 4:26 AM | EDT | Residence |
| 3/30/2008 | 12:56 PM | EDT | Residence |
| 3/30/2008 | 11:56 PM | EDT | Residence |
| 3/30/2008 | 12:39 AM | EDT | Residence |
| 4/3/2008 | 8:30 PM | EDT | KYW |
| 4/4/2008 | 9:52 PM | EDT | KYW |
| 4/7/2008 | 10:52 AM | EDT | Residence |
| 4/8/2008 | 4:34 PM | EDT | KYW |

| DATE | TIME | | LOCATION |
|---|---|---|---|
| 4/8/2008 | 10:48 PM | EDT | KYW |
| 4/9/2008 | 12:17 PM | EDT | Residence |
| 4/10/2008 | 7:44 PM | EDT | KYW |
| 4/10/2008 | 12:14 AM | EDT | Residence |
| 4/13/2008 | 7:58 PM | EDT | Residence |
| 4/17/2008 | 12:03 AM | EDT | Residence |
| 4/18/2008 | 9:18 PM | EDT | KYW |
| 4/20/2008 | 11:37 PM | EDT | Residence |
| 4/21/2008 | 6:46 PM | EDT | KYW |
| 4/24/2008 | 2:42 PM | EDT | KYW |
| 4/25/2008 | 7:20 PM | EDT | KYW |
| 4/26/2008 | 5:33 PM | EDT | Residence |
| 4/26/2008 | 11:54 PM | EDT | Residence |
| 4/27/2008 | 11:15 PM | EDT | Residence |
| 4/28/2008 | 12:34 PM | EDT | Residence |
| 4/29/2008 | 12:37 AM | EDT | Residence |
| 4/29/2008 | 4:35 PM | EDT | KYW |
| 4/29/2008 | 9:43 PM | EDT | KYW |
| 4/30/2008 | 9:25 AM | EDT | Residence |
| 4/30/2008 | 10:21 PM | EDT | KYW |
| 5/1/2008 | 11:50 PM | EDT | KYW |
| 5/2/2008 | 11:38 AM | EDT | Residence |
| 5/2/2008 | 11:57 PM | EDT | KYW |
| 5/3/2008 | 3:50 PM | EDT | KYW |
| 5/5/2008 | 6:30 PM | EDT | KYW |
| 5/5/2008 | 7:35 PM | EDT | KYW |
| 5/6/2008 | 8:51 AM | EDT | Residence |
| 5/6/2008 | 9:49 AM | EDT | Residence |
| 5/6/2008 | 10:11 AM | EDT | Residence |
| 5/6/2008 | 12:02 PM | EDT | Residence |
| 5/6/2008 | 6:41 PM | EDT | KYW |
| 5/6/2008 | 9:08 PM | EDT | KYW |
| 5/7/2008 | 5:03 PM | EDT | KYW |
| 5/7/2008 | 8:55 PM | EDT | Residence |
| 5/7/2008 | 9:50 PM | EDT | KYW |
| 5/8/2008 | 1:11 AM | EDT | Residence |
| 5/8/2008 | 8:53 AM | EDT | Residence |
| 5/8/2008 | 2:01 PM | EDT | KYW |
| 5/8/2008 | 2:05 PM | EDT | KYW |
| 5/8/2008 | 10:25 PM | EDT | KYW |

| DATE | TIME | | LOCATION |
|---|---|---|---|
| 5/9/2008 | 5:19 PM | EDT | KYW |
| 5/9/2008 | 9:49 PM | EDT | KYW |
| 5/12/2008 | 9:57 PM | EDT | KYW |
| 5/13/2008 | 5:08 PM | EDT | KYW |
| 5/15/2008 | 8:09 AM | EDT | Residence |
| 5/15/2008 | 7:27 PM | EDT | KYW |
| 5/16/2008 | 5:09 PM | EDT | KYW |
| 5/16/2008 | 5:18 PM | EDT | KYW |
| 5/18/2008 | 8:59 PM | EDT | Residence |
| 5/19/2008 | 10:02 PM | EDT | KYW |
| 5/21/2008 | 7:55 AM | EDT | Residence |
| 5/21/2008 | 5:18 PM | EDT | KYW |
| 5/22/2008 | 12:25 AM | EDT | Residence |
| 5/22/2008 | 5:02 PM | EDT | KYW |
| 5/23/2008 | 2:53 PM | EDT | KYW |
| 5/23/2008 | 4:34 PM | EDT | KYW |
| 5/24/2008 | 8:31 PM | EDT | Vacation home |
| 5/25/2008 | 12:11 PM | EDT | Vacation home |
| 5/25/2008 | 9:15 PM | EDT | Vacation home |
| 5/25/2008 | 11:21 PM | EDT | Vacation home |
| 5/26/2008 | 1:30 PM | EDT | Residence |
| 5/26/2008 | 6:59 PM | EDT | Union League |
| 5/26/2008 | 9:28 PM | EDT | KYW |
| 5/26/2008 | 9:35 PM | EDT | KYW |
| 5/27/2008 | 7:11 PM | EDT | KYW |
| 5/28/2008 | 3:40 PM | EDT | KYW |

13.    Beginning on or about January 28, 2008 and continuing to on or about May 26, 2008, defendant LAWRENCE MENDTE accessed Alycia Lane's Yahoo account without authorization approximately 85 times, from his home, from KYW, and from other places, as follows:

| DATE | TIME | | LOCATION |
|---|---|---|---|
| 1/28/2008 | 5:28 PM | EST | KYW |
| 1/29/2008 | 4:17 PM | EST | KYW |

14

| DATE | TIME | | LOCATION |
|---|---|---|---|
| 1/29/2008 | 5:17 PM | EST | KYW |
| 1/30/2008 | 10:16 PM | EST | KYW |
| 1/31/2008 | 5:19 PM | EST | KYW |
| 1/31/2008 | 7:25 PM | EST | KYW |
| 2/8/2008 | 10:29 AM | EST | Residence |
| 2/11/2008 | 9:31 PM | EST | KYW |
| 2/12/2008 | 10:24 PM | EST | KYW |
| 2/14/2008 | 7:39 PM | EST | KYW |
| 2/14/2008 | 10:55 PM | EST | KYW |
| 2/15/2008 | 5:19 PM | EST | KYW |
| 2/20/2008 | 7:38 PM | EST | KYW |
| 2/23/2008 | 10:02 PM | EST | Residence |
| 2/25/2008 | 8:39 PM | EST | KYW |
| 2/26/2008 | 2:36 PM | EST | KYW |
| 2/26/2008 | 5:18 PM | EST | KYW |
| 2/26/2008 | 7:14 PM | EST | KYW |
| 2/26/2008 | 9:46 PM | EST | KYW |
| 2/27/2008 | 7:11 PM | EST | KYW |
| 2/27/2008 | 7:36 PM | EST | KYW |
| 2/29/2008 | 3:31 PM | EST | KYW |
| 2/29/2008 | 5:26 PM | EST | KYW |
| 2/29/2008 | 10:10 PM | EST | KYW |
| 3/3/2008 | 2:11 PM | EST | KYW |
| 3/3/2008 | 3:44 PM | EST | KYW |
| 3/3/2008 | 9:29 PM | EST | KYW |
| 3/4/2008 | 9:33 PM | EST | KYW |
| 3/8/2008 | 11:15 PM | EST | Residence |
| 3/8/2008 | 11:15 PM | EST | Residence |
| 3/10/2008 | 6:57 PM | EDT | KYW |
| 3/11/2008 | 5:01 PM | EDT | KYW |
| 3/11/2008 | 6:01 PM | EDT | KYW |
| 3/11/2008 | 7:36 PM | EDT | KYW |
| 3/11/2008 | 8:40 PM | EDT | KYW |
| 3/12/2008 | 5:17 PM | EDT | KYW |
| 3/28/2008 | 7:50 PM | EDT | KYW |
| 3/31/2008 | 10:59PM | EDT | KYW |
| 4/1/2008 | 10:53AM | EDT | Residence |
| 4/1/2008 | 3:44PM | EDT | KYW |
| 4/3/2008 | 9:29PM | EDT | KYW |
| 4/4/2008 | 10:51PM | EDT | KYW |

| DATE | TIME | | LOCATION |
|------|------|------|----------|
| 4/8/2008 | 5:32 PM | EDT | KYW |
| 4/8/2008 | 11:03 PM | EDT | KYW |
| 4/10/2008 | 8:43 PM | EDT | KYW |
| 4/13/2008 | 8:56 PM | EDT | Residence |
| 4/17/2008 | 10:41 PM | EDT | KYW |
| 4/18/2008 | 3:44 PM | EDT | KYW |
| 4/21/2008 | 12:36 AM | EDT | Residence |
| 4/21/2008 | 7:42 PM | EDT | KYW |
| 4/21/2008 | 7:44 PM | EDT | KYW |
| 4/23/2008 | 11:18 AM | EDT | Residence |
| 4/24/2008 | 5:41 PM | EDT | KYW |
| 4/25/2008 | 7:10 PM | EDT | KYW |
| 4/26/2008 | 6:32 PM | EDT | Residence |
| 4/28/2008 | 1:42 PM | EDT | Residence |
| 4/29/2008 | 5:34 PM | EDT | KYW |
| 4/29/2008 | 10:51 PM | EDT | KYW |
| 4/30/2008 | 11:28 PM | EDT | KYW |
| 5/1/2008 | 12:51 AM | EDT | Residence |
| 5/1/2008 | 11:49 PM | EDT | KYW |
| 5/2/2008 | 10:56 PM | EDT | KYW |
| 5/3/2008 | 4:44 PM | EDT | KYW |
| 5/5/2008 | 7:29 PM | EDT | KYW |
| 5/5/2008 | 8:37 PM | EDT | KYW |
| 5/6/2008 | 10:09 PM | EDT | KYW |
| 5/7/2008 | 4:12 PM | EDT | KYW |
| 5/7/2008 | 10:51 PM | EDT | KYW |
| 5/8/2008 | 1:20 PM | EDT | KYW |
| 5/8/2008 | 3:04 PM | EDT | KYW |
| 5/8/2008 | 11:25 PM | EDT | KYW |
| 5/9/2008 | 10:50 PM | EDT | KYW |
| 5/12/2008 | 11:04 PM | EDT | KYW |
| 5/13/2008 | 6:07 PM | EDT | KYW |
| 5/15/2008 | 9:11 AM | EDT | Residence |
| 5/15/2008 | 8:27 PM | EDT | KYW |
| 5/16/2008 | 6:09 PM | EDT | KYW |
| 5/19/2008 | 11:01 PM | EDT | KYW |
| 5/21/2008 | 6:19 PM | EDT | KYW |
| 5/22/2008 | 5:57 PM | EDT | KYW |
| 5/23/2008 | 3:53 PM | EDT | KYW |
| 5/23/2008 | 5:34 PM | EDT | KYW |

| DATE | TIME | | LOCATION |
|------|------|------|----------|
| 5/24/2008 | 9:27 PM | EDT | Vacation home |
| 5/26/2008 | 7:58 PM | EDT | Union League |
| 5/26/2008 | 10:27 PM | EDT | KYW |

## ALYCIA LANE'S CRIMINAL CASE

14.    Alycia Lane was a defendant in a criminal case filed in New York (Manhattan), New York. The case involved charges arising from an alleged altercation between Alycia Lane and certain New York City police officers that allegedly occurred in December 2007. Alycia Lane's defense attorney in that matter entered into discussions with the Assistant District Attorney seeking a disposition, known as Adjournment in Contemplation of Dismissal (ACD). An ACD disposition results in a complete dismissal of the charges if the person complies with the terms and condition set by the court. It was important to the completion of those negotiations that the discussions regarding the ACD disposition remain confidential.

15.    On or about January 25, 2008, at 3:28 PM (all times referred to are Eastern time), Alycia Lane's criminal attorney sent an e-mail message to her .mac account in which he discussed the consequences of an ACD disposition.

16.    On or about February 1, 2008, at 3:41 PM, Alycia Lane sent an e-mail to another person reporting that her court date had been moved to February 25. (It had originally been listed on April 3). That person replied to Ms. Lane's .mac account on the same date at 4:44 PM.

17.    Between on or about February 1, 2008 at 5:41 PM and on or about February 6, 2008 at 9:53 PM, defendant LAWRENCE MENDTE made the following unauthorized accesses to Alycia Lane's .mac account:

17

| DATE | TIME | # E-MAILS READ | LOCATION |
|------|------|----------------|----------|
| 02/01/08 | 5:41PM | 3 | KYW |
| 02/02/08 | 2:00AM | 8 | Residence |
| 02/02/08 | 11:45AM | 2 | Residence |
| 02/03/08 | 8:55PM | 6 | Residence |
| 02/04/08 | 10:30PM | 4 | KYW |
| 02/05/08 | 10:36AM | 3 | Residence |
| 02/06/08 | 1:46 AM | 0 | Residence |
| 02/06/08 | 11:15 AM | 4 | Residence |
| 02/06/08 | 6:43 PM | 0 | KYW |
| 02/06/08 | 9:53 PM | 4 | KYW |

18.     On or about February 6, 2008, between 3:11 PM and 7:00 PM, defendant LAWRENCE MENDTE made approximately two telephone calls to a reporter for the Philadelphia Daily News.

19.     On or about February 6, 2008, the Daily News website carried a story by that reporter, stating that the date for Alycia Lane's criminal hearing had been changed.

20.     On or about February 7, 2008, after an agreement for an ACD disposition was reached, Alycia Lane's criminal attorney sent her an e-mail that detailed how the proceeding would occur. At that time, the proposed disposition was not publicly known. The e-mail was sent at 11:25 AM to Ms. Lane's .mac account.

21.     Between on or about February 7, 2008 at 1:02 PM and on or about February 8, 2008 at 9:33 PM, defendant LAWRENCE MENDTE made the following unauthorized accesses to Alycia Lane's .mac account:

18

| DATE | TIME | # E-MAILS READ | LOCATION |
|------|------|----------------|----------|
| 02/07/08 | 1:02 PM | 19 | Residence |
| 02/07/08 | 7:08 PM | 4 | KYW |
| 02/07/08 | 9:00 PM | 4 | KYW |
| 02/07/08 | 9:53 PM | 0 | KYW |
| 02/08/08 | 10:27 AM | 4 | Residence |
| 02/08/08 | 11:29 AM | 2 | Residence |
| 02/08/08 | 9:33 PM | 24 | KYW |

22.     On or about February 8, 2008, between 7:09 PM and 9:00 PM, defendant LAWRENCE MENDTE made approximately two telephone calls to a reporter for the Philadelphia Daily News, and received one telephone call from the reporter.

23.     On or about February 9, 2008, the Daily News website carried a story by the reporter, stating that he had heard from sources that Alycia Lane's attorney had reached an agreement with the District Attorney's office for an ACD disposition on March 6, 2008.

## ALYCIA LANE'S CIVIL LITIGATION

### The KYW Litigation

24.     Alycia Lane had been terminated by KYW on January 1, 2008. Ms. Lane retained a civil attorney in Philadelphia to represent her in this matter.

25.     On or about January 29, 2008, the Philadelphia civil attorney sent to Alycia Lane's criminal lawyer in New York, a draft of a Notice of Pre-Complaint Depositions that he planned to file and serve upon KYW in connection with her dismissal. The Philadelphia civil attorney sent a copy of the e-mail with the attachment to Ms. Lane at her .mac account at 9:08 AM.

26.    Between on or about January 29, 2008, and on or about January 30, 2008,

defendant LAWRENCE MENDTE made the following unauthorized accesses to Alycia Lane's

.mac account:

| DATE | TIME | # E-MAILS READ | LOCATION |
|------|------|----------------|----------|
| 01/29/2008 | 11:32 AM | 3 | Residence |
| 01/29/2008 | 12:52 PM | 6 | Residence |
| 01/29/2008 | 12:59 PM | 2 | Residence |
| 01/29/2008 | 2:38 PM | 2 | Residence |
| 01/29/2008 | 3:35 PM | 4 | KYW |
| 01/29/2008 | 4:15 PM | 0 | KYW |
| 01/29/2008 | 4:26 PM | 0 | KYW |
| 01/29/2008 | 5:02 PM | 0 | KYW |
| 01/29/2008 | 5:16 PM | 0 | KYW |
| 01/29/2008 | 6:51 PM | 0 | KYW |
| 01/29/2008 | 7:37 PM | 0 | KYW |
| 01/29/2008 | 9:26 PM | 2 | KYW |
| 01/29/2008 | 10:25 PM | 10 | KYW |
| 01/30/2008 | 1:33 AM | 9 | Residence |

27.    Between on or about January 30, 2008 at 12:35 PM and on or about January 31,

2008 at 2:39 PM, defendant LAWRENCE MENDTE made approximately four telephone calls

to a reporter for the Philadelphia Daily News.

28.    On or about January 31, 2008, the Daily News website carried a story by the

reporter, stating that Alycia Lane's attorney had filed a Praecipe to issue a Writ of Summons

against CBS/KYW. The story also reported that Ms. Lane had asked to depose the President and News Director of KYW.

29.    In addition to actions taken by Alycia Lane's Philadelphia civil attorney, Ms. Lane's union, the American Federation of Television and Radio Artists (AFTRA), was also involved in representational proceedings against KYW on her behalf.

30.    Between on or about February 28, 2008, and on or about February 29, 2008, Alycia Lane's Philadelphia civil attorney and the attorney for AFTRA exchanged e-mail messages regarding a possible resolution of the union's claim and its impact upon Ms. Lane's separate, civil action.

31.    On or about March 1, 2008, at 10:13 AM, Alycia Lane's Philadelphia civil attorney forwarded a thread of the e-mail exchanges between himself and the attorney for AFTRA to Ms. Lane at her Yahoo account,.

32.    On or about March 3, 2008, defendant LAWRENCE MENDTE made the following unauthorized accesses to Alycia Lane's Yahoo account:

| DATE | TIME | LOCATION |
|------|------|----------|
| 03/03/08 | 2:11 PM | KYW |
| 03/03/08 | 3:44 PM | KYW |
| 03/03/08 | 9:29 PM | KYW |

33.    Between on or about March 4, 2008 at 1:51 PM and on or about March 25, 2008 at 3:32 PM, defendant LAWRENCE MENDTE made approximately ten telephone calls to a reporter for the Philadelphia Daily News and received approximately two telephone calls from the reporter.

21

34.    On or about March 26, 2008, the Daily News website carried a story by the reporter, stating that AFTRA was trying to help Alycia Lane get her job at KYW back.

The New York City Litigation

35.    On or about March 5, 2008, at 10:13 PM, after Alycia Lane had accepted the ACD disposition in the New York criminal case, her New York attorney sent an e-mail to her .mac account notifying her that he would file a notice of claim against the City of New York for her arrest. A copy of the notice of claim form was attached to the e-mail.

36.    The notice of claim was filed on or about March 6, 2008. As required by New York law, it was filed with the Comptroller of the City of New York, and not with any court.

37.    Between on or about March 6, 2008 at 12:32 AM, and on or about March 13, 2008 at 11:23 PM, defendant LAWRENCE MENDTE made the following unauthorized accesses to Alycia Lane's .mac account:

| DATE | TIME | # E-MAILS READ | LOCATION |
|------|------|----------------|----------|
| 03/06/08 | 12:32 AM | 6 | Residence |
| 03/07/08 | 12:34 AM | 5 | Residence |
| 03/07/08 | 11:02 PM | 6 | KYW |
| 03/08/08 | 11:17 PM | 0 | Residence |
| 03/08/08 | 11:23 AM | 0 | Residence |
| 03/10/08 | 6:00 PM | 6 | KYW |
| 03/10/08 | 12:36 PM | 4 | Residence |
| 03/11/08 | 10:46 AM | 14 | Residence |
| 03/11/08 | 11:04 AM | 0 | Residence |
| 03/11/08 | 12:08 PM | 0 | Residence |

22

| DATE | TIME | # E-MAILS READ | LOCATION |
|------|------|----------------|----------|
| 03/11/08 | 12:17 PM | 1 | Residence |
| 03/11/08 | 3:59 PM | 2 | KYW |
| 03/11/08 | 5:03 PM | 0 | KYW |
| 03/11/08 | 6:37 PM | 0 | KYW |
| 03/11/08 | 7:41 PM | 0 | KYW |
| 03/11/08 | 9:38 PM | 0 | KYW |
| 03/12/08 | 9:31 AM | 4 | Residence |
| 03/12/08 | 1:12 PM | 2 | Residence |
| 03/12/08 | 4:18 PM | 0 | KYW |
| 03/12/08 | 11:59 PM | 1 | Residence |
| 03/13/08 | 7:37 AM | 15 | Residence |
| 03/13/08 | 11:18 PM | 1 | Residence |
| 03/13/08 | 11:23 PM | 8 | Residence |

38.    Between on or about March 6, 2008 at 11:18 AM, and on or about March 14, 2008 at 1:51 PM, defendant LAWRENCE MENDTE made approximately seven telephone calls to a reporter for the Philadelphia Daily News, and received approximately one telephone call from the reporter.

39.    On or about March 14, 2008, the Daily News website carried a story by the reporter, stating that the notice of claim had been filed, on behalf of Alycia Lane.

### THE CHARGE

40.    Between in or about March 2006 and on or about May 28, 2008, in Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendant

**LAWRENCE MENDTE,**

23

in furtherance of the commission of tortious acts within the Commonwealth of Pennsylvania and the State of New York, intentionally accessed the e-mail accounts of Alycia Lane on the computers of Apple Computer (.mac) and Yahoo!, without authorization, and intentionally exceeded authorized access to computers at KYW, and thereby obtained information from protected computers (.mac, Yahoo!, and KYW) by means of interstate communications.

In violation of Title 18, United States Code, Section 1030(a)(2)(C) and 1030(c)(2)(B)(ii).


LAURIE MAGID
Acting United States Attorney

24