UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PURE POWER BOOT CAMP, INC.; PURE
POWER BOOT-CAMP FRANCHISING
CORPORATION; and PURE POWER BOOT
CAMP JERICHO INC.,

     Plaintiffs,

- against –

WARRIOR FITNESS BOOT CAMP, LLC;
ALEXANDER KENNETH FELL a/k/a ALEX FELL,
Individually; RUBEN DARIO BELLIARD
a/k/a RUBEN BELLIARD, Individually;
JENNIFER J. LEE, Individually;
and NANCY BAYNARD, Individually,

     Defendants.

Case No. 08-cv-4810
(JGK)(THK)

**ECF CASE**

---

## AFFIDAVIT OF RUBEN BELLIARD

STATE OF NEW YORK )
         ) ss:
COUNTY OF NEW YORK)

  RUBEN BELLIARD, being duly sworn, deposes and says:

  1. I am a defendant in this Action and I respectfully submit this Affidavit in opposition to Plaintiffs' Motion for a Preliminary Injunction pursuant to the Court's instruction during the July 24, 2008 oral argument concerning Pure Power Boot Camp, Inc., ("Pure Power") Pure Power Boot Camp Franchising Corps., and Pure Power Boot Camp Jericho, Inc.'s ("Jericho") (collectively "Plaintiffs") Motion for a Preliminary Injunction.

### My Background

  2. At the age of 17 I enlisted in the United States Marine Corps. On September 9, 1997, I enrolled in boot camp which began my formal military training. At boot camp I would

wake up every morning at 5:30 AM. My day would last until 10:00 PM. At boot camp I learned how to perform many of the exercises I now teach such as squat thrusts, mountain climbing and Marine Corps pushups. After graduating from my boot camp training I was assigned to 1st Battalion, 6th Marines in North Carolina. I spent two years with the 1st Battalion 6th Marines, and during my time there I was meritoriously promoted to the rank of Lance Corporal and I was deployed with the 26th Marine Expeditionary Unit overseas. During that deployment I took part in Operation "Noble Anvil," which was the American component of NATO's military operation against the Federal Republic of Yugoslavia and is considered a major part of the "Kosovo War."

   3. I also participated in Operation "Shining Hope," in which the United States military provided humanitarian relief to Kosovo refugees in Albania and the Republic of Macedonia. While supporting operation Noble Anvil, I also participated in Operation "Joint Guardian," which provided security for Kosovo Refugees at Camps Hope and Eagle in Albania. As the first U.S. Peacekeepers in Kosovo, the Marines and the Sailors of the Marine Expeditionary Units provided stability to the embattled region. I was awarded the Armed Forces Service Medal, the Joint Meritoriously Unit Citation, the Navy Unit Citation, the Kosovo Liberation Medal, and the Kosovo NATO medal as a result of my participation in these operations.

   4. After returning home from a nine month overseas deployment, I was selected to become an instructor at The Basic School in Quantico, Virginia. The Basic School trains and educates newly commissioned or appointed officers in the high standards of professional knowledge, esprit-de-Corps, physical training and leadership. During my tour in the Basic School I was tasked to teach officers combat skills and to certify them in the Marine Corps martial arts program. During my term in Quantico, I trained over 700 hundred officers. It was

this very training, as well as the boot camp experience that I described above, that provided the basis for my ability to be a physical trainer at Pure Power and later at my own gym. I also spent 6 months training in the physical fitness facility on the base. After I completed my term with the Marines, I decided to return home and start school.

5.  After the tragic events of September 11, 2001, I re-enlisted in the 2nd Battalion 25th Marines, the reserve unit in Garden City, Long Island. I was informed that this unit would be getting called into active duty to support Operation "Enduring Freedom" and I wanted to be a part of that. In December of 2001, I was dispatched to Camp Lejeune, North Carolina.

6.  My roommate at Camp Lejeune was Alex Fell, a co-defendant in this Action. During my year there I was the head Martial Arts Instructor and certified over 100 Marines in the Marine Corps Martial Arts Program. I received three certificates of commendation, and was the honor graduate of the advanced infantry training company. I was also one of the top 3 sergeants in my company, as stated by my commanding officer in my evaluation review. During this time I also attended night school and earned an Associate's Degree in Liberal Arts from Campbell University.

7.  In December of 2002 my unit was sent back home for a period of 8 weeks before we were called back to active duty. When I was finally sent to Iraq, I worked with task force Tarawa and my unit spearheaded the drive to Baghdad. My unit's mission was to hold and secure the city of An Nasiriyah, Iraq. During this time I led a combat team of 15 Marines on vehicle mounted and foot mobile combat patrols throughout the city. I also participated in several raids that resulted in the seizure of weapons, ammunition and the capture of para-military forces and Ba'ath party officials. I was awarded the Navy & Marine Corps Achievement Medal for my actions in Iraq.

8. Upon my return to New York, I spent a couple of months in Garden City, Long Island in a transitioning station before leaving active duty in February of 2004. My list of awards during my enlistment are the Navy & Marine Achievement Medal, Presidential Unit Citation, Global War on Terrorism Expeditionary Medal, Global War on Terrorism Service Medal, Combat Action Ribbon, Joint Meritorious Unit Award, Navy Unit Commendation Ribbon, Marine Corps Good Conduct Medal, National Defense Service Medal, Armed Forces Service Medal, Armed Forces Reserve Medal, Kosovo Liberation Medal, Kosovo NATO Medal and the Overseas deployment ribbon with 2 stars.

### Background of This Case

9. My first encounter with Plaintiffs' principal, Lauren Brenner, was during my transition period (after I returned stateside but prior to my formal discharge from the Marines) at the base, in Garden City, Long Island. Brenner told several of my fellow veterans who were stationed at the transition station that she was visiting the base in order to do research because she wanted to build a gym that was modeled after an actual military-style boot-camp. She also told us that she came to recruit people in order to make her gym more authentic. After listening to her, several of us decided to go to her gym to see what type of facility that she was running. I attended a class and after speaking with Brenner I left all my contact info and expected a call back. I did not hear from Brenner for a few months until I coincidentally ran into her at a gym on 23rd Street in Manhattan. Again, she invited me to attend a class. Around February of 2004, I observed about three classes and Brenner offered me a job. I decided that this was something that I would like to do and I began working for Brenner.

10. Prior to beginning work for Brenner at Pure Power Boot Camp I was not given any training manuals or any other type of written instructions on how to teach the class. The only verbal instruction that I received was being told by Brenner to make her customers "vomit."

11. I also did not receive any employment handbooks or any other document purporting to state Pure Power's policies or other conditions of employment. In particular, at no time during my employment with Pure Power, did Brenner maintain any policy governing the use of Pure Power's computers.

12. Pure Power maintained two computers. One was located at the front desk and the other was located in Ms. Brenner's office. Personal use of the computer located at the front desk was widespread, but Ms. Brenner never disciplined anybody for their use of this computer. Typically, Elizabeth Lorenzi or Denise Parker logged on to these computers in the morning and did not log off the computers until closing time. As a result, the computers were accessible by all of Pure Power's employees.

13. At the beginning of my employment with Pure Power, Pure Power was never particularly busy so I decided to get another job at a firm called Allied Security Company. I also took a construction job during that time. In April 2005, I received a phone call from Brenner who asked me to return to Pure Power to teach her classes because she needed another instructor. I agreed to Brenner's request. Again, I was not provided with an offer letter or any other type of contract of employment or terms related to my employment. Once again, Ms. Brenner did not provide me with any written direction concerning how to teach the class. However, I was well trained by the Marine Corps and my classes ran efficiently and were successful. I conducted my classes as I did when I was in the Marines, with a few changes to accommodate the physical capabilities of Pure Power's clients.

14.     I had been working at Pure Power for about one year when I ran into Alex Fell. During our encounter, I told him about my job and told him that Pure Power was looking to hire other former Marines as physical trainers. He expressed interest in the job so I introduced Alex to Ms. Brenner. He began working at Pure Power shortly afterwards.

15.     I ultimately became disillusioned at Pure Power. Among my concerns were that I was not being compensated properly and Brenner's personality made it a very difficult environment to work in. It has also always been my dream to own my own gym so I began planning to open my own business. I discussed my dissatisfaction with Alex, who, I discovered, shared my feelings. After discussing our situation, we decided that we should start our own gym based on our extensive military training and similar experiences in the Marines.

16.     Alex and I spent countless hours thinking, researching and planning to get Warrior Fitness up and running. For example, Alex and I sought out and negotiated our lease for commercial property in Manhattan, we shopped for materials with which we would build our obstacle course, and we reviewed publications and guidelines published by the Marine Corps concerning the construction and operation of indoor obstacle courses. None of our planning was done while Plaintiffs were paying us or on Plaintiffs' property. None of our planning was based upon any documents belonging to Plaintiffs, including their client lists, manuals, or pricing matrix.

### Our Gym is Vastly Different Than Plaintiffs' Gyms

17.     Alex and I finally opened our gym in 2008. Although it contains an indoor obstacle course and utilizes a boot camp training technique, it is totally distinguishable from Plaintiffs' gym. I believe that "boot camp" is a term derived from the Marine Corps, not from Brenner. In fact, this summer "boot camps" have become one of the most popular style of fitness training. Some of the major differences between our gyms include:

A. Our gym is painted in red, yellow and white - - the Marine Corps's' colors. Brenner's gyms are painted a generic green and the colors of her columns are in camouflage;

B. Our gym does not have any netting in the facility, while Brenner's gym has netting covering her ceilings;

C. Our gym has changing rooms with cubby holes and a vanity, while Brenner uses large military tents as changing areas and locker rooms;

D. The floor beneath our obstacle course is red colored – modeled after dirt, while the floor beneath Brenner's obstacle course is black;

E. The border around our obstacle course is made of wood and painted black while the border around Brenner's obstacle course is comprised of sandbags;

F. Our hurdles are not adjustable and each hurdle has a different height, while Brenner's hurdles are adjustable;

G. Our obstacles are all painted black while Brenner's obstacles are all painted green;

H. We have a rubber track surrounding our obstacle course and rubber flooring for safety is laid throughout our space while Brenner's gym does not have rubber flooring laid anywhere;

I. Our customers wear black t-shirts provided by us and can wear bottoms of their own choosing, whereas, Brenner's self-styled "recruits" wear an olive t-shirt and camouflage pants; and,

J. Our gym has stall bars, medicine balls, and resistance bands whereas Brenner's gyms do not. On the other hand, Brenner's' gyms have a rock climbing wall, a belly robber obstacle, an intensity wall (tall slanted wall with a rope on it); abdominal hurdles, a

cargo net, a tire run and a bob and weave rope obstacle while our gym does not have these features.

18. In Fell's affidavit on Plaintiffs' Motion he attached certain publicly available documents that we used while researching and planning what our gym should look like. I hereby incorporate by reference those exhibits in this affidavit.

19. Although I most often worked in Pure Power, Brenner sent me to her Jericho location on several occasions and I taught classes there for about three weeks. There are many significant differences between her own gyms. For example:

- Pure Power's obstacle course has fewer obstacles than Pure Power Jericho's obstacle course. Pure Power's course starts with hurdles and is followed by a cargo net, rope swing, abdominal hurdles, walls, monkey bars, a rock wall, belly robbers, a boxing drill, an intensity wall, a tire run and finally, a rope climb. On the other hand, Jericho's course starts with hurdles, and is followed by a ramp/slide, cargo net, rope swing, barbed wire crawl, abdominal hurdles, monkey bars, walls, rock wall, belly robbers, boxing drill, intensity wall, rope climb, hurdles and a tire run;

- Pure Power's hurdles are designed and look different than Jericho's hurdles. For example, Jericho has three sets of hurdles, while Pure Power has only two sets, and each gym's hurdles are located in different parts of the gym;

- Jericho has a ramp/slide, which follows its hurdles, while Pure Power does not have a ramp/slide and its hurdles are followed by a cargo net;

- Jericho's cargo net is shaped very differently from Pure Power's cargo net;

8

- Pure Power's rope swing has a log and a bucket of water which customers must swing over, while Jericho's rope swing has a more authentic looking pond that customers must swing over;

- Jericho's abdominal hurdles are spaced closer together than Pure Power's abdominal hurdles;

- Jericho's monkey bars are shorter in length, wider and straighter than Pure Power's monkey bars which form a "C" shape;

- Pure Power has a 2 sided climbing wall while Jericho has a 4 sided climbing wall;

- Pure Power's belly robbers have large logs that customers must roll over, while Jericho's belly robbers are designed with smaller logs;

- Pure Power has only two climbing ropes while Jericho has three climbing ropes;

- Pure Power's workout area is not padded while Jericho's workout area is padded with camouflaged interlocking tiles; and,

- Customers can do dips on Jericho's obstacle course but not on Pure Power's obstacle course.

**I Never Saw Pure Power's Client List and in Any Event It is Not Confidential**

20.     I have reviewed Plaintiffs' submissions to this Court and they claim that Alex and I stole confidential and proprietary information. As an initial matter, I did not steal any of the materials that Plaintiffs consider to be proprietary information. This is evident because Mr. Fell and I price our courses differently, offer different types of specials and our hours of operation are different. In addition, Plaintiffs made reference to their "Corporate Challenge" program and have accused us of stealing this concept. Warrior Fitness does not even offer a formal "Corporate Challenge" program.

21. In any event, Pure Power does not possess proprietary or confidential information. For example, one of Pure Power's claims is that their client lists are proprietary and confidential. In fact, Pure Power's clients are readily ascertainable. While working for Pure Power, I personally recruited several clients to join Pure Power through no help of Brenner or anyone else at Pure Power. I know Fell also recruited many clients to join Pure Power without Brenner's or anybody else's assistance and Pure Power's other drill instructors did the same.

22. In addition, the identities of Pure Power's clients are ascertainable simply by walking into Plaintiffs' gyms and asking the customers their names.

23. Plaintiffs have also waived the right to claim that these lists are proprietary and confidential. For one thing, Brenner invited her clients to review the submissions to the Court. These submissions contained a document she alleges is her so-called "confidential" client list. She also filed the same document with the Court prior to obtaining an order sealing the record. Most importantly, Ms. Lorenzi and Ms. Parker, at Brenner's direction, would email me the names and contact information of every client who missed a scheduled class so that I could follow up with the client to ensure proper attendance. A sample email from Ms. Brenner to me containing the clients' contact information is attached hereto as Exhibit A.

24. Also, I have developed personal friendships with many of my former clients at Pure Power and we have maintain relationships outside of the gym. Most of these friendships have lasted significantly longer than these former clients' membership with Pure Power lasted (and it is these clients that Plaintiffs are now seeking to enjoin us from servicing). These friends, many of whom are no longer clients of Pure Power, have no current association with Brenner or Pure Power would support my endeavor without any solicitation from my own behalf.

25. Moreover, I could probably communicate with all of Pure Power's clients by simply purchasing a mailing list from a direct marketing vendor.

26. In addition, Plaintiffs stole several emails from Fell's personal email account. One of these emails contains the subject line "Our Party List is Huge." In that email Defendant Baynard tells Defendant Lee that she has updated a party list "w/ a VERY DEAR FRIEND OF OUR's additions." Plaintiffs allege that Brenner is the "very dear friend" referred to in this email and argue that this proves that Defendants obtained Pure Power's client list. This is not accurate. I am the "very dear friend" Baynard is referring to. And to reiterate, I never stole any customer list from Plaintiffs.

### Plaintiffs' Purported Restrictive Covenant

27. Shortly after I began working at Pure Power, I recall that Brenner presented me with a contract that she forced me to sign. She did not explain to me that I had any choice in agreeing to sign the contract and I believed that I would lose my job if I did not sign the contract. Because I did not really have a choice to sign the contract, and at the time wanted to keep my job, I did not review the terms of the contract. Furthermore, Brenner never explained to me that this so-called contract would forbid me from working in any job in the fitness industry, my chosen vocation, anywhere in the world, for a period of ten years if I chose to leave or even if I was fired from Pure Power.

28. In all of my experience in the fitness industry, I have never heard of any gym that prevents its trainers from working at any other gym on the planet for a period of ten years.

29. I never saw Brenner present Fell with a similar contract, nor did Fell ever tell me that Ms. Brenner forced him to sign one.

30. Although Plaintiffs have alleged that every drill instructor was required to sign this restrictive covenant, I suspect this is inaccurate as Fell was never presented with such a

document. Nevertheless, even if every other drill instructor did sign the restrictive covenant, Plaintiffs have failed to enforce its terms with respect to the other drill instructors who have found employment in the fitness industry, some even at other boot camps. For example, Christopher Romandi, a former employee was a manager at Bally's gym. Kenny Wong, another former employee of Plaintiffs, runs his own boot camp program in Manhattan. Finally, Paul Titus runs his own personal training business. Plaintiffs have not sought to enforce the purported restrictive covenant with respect to any of these employees even thought the terms of the covenant, according to Brenner, forbids former employees from obtaining *any* job in the fitness industry for a period of ten years - - anywhere on Earth. Only later did I realize that I signed this restrictive covenant.

31. A few months prior to the conclusion of my employment with Plaintiffs, I was searching through Brenner's file cabinet, with her permission. As I often did with Brenner's instruction and direction, I entered Brenner's unlocked office and was looking for blank Drill Instructor notes. These are forms that Plaintiffs' drill instructors used to input client progress notes and other information. In the same drawer that these notes were located I saw my restrictive covenant. I had never received a copy of what I signed and in a momentary lapse of reason, I removed my restrictive covenant from the file and destroyed the copy of the agreement. I realize that my actions violated the Code of Conduct I adopted in the military and were plain wrong. I will not offer any excuses in an attempt to justify my actions. I recognize the impropriety of my deeds. I have never denied this wrongdoing. I sincerely apologize and ask the Court to understand that my actions were the result of my panic. I certainly have learned my lesson and would never repeat this mistake.

32. Although I do not specifically recall the terms of the contract Brenner made me sign, I concede that they contain the terms as provided by Brenner during the course of litigation. Specifically, I believe that the terms provided that I could not be a fitness trainer anywhere in the world for a period of ten years following the termination of my employment from Plaintiffs. If those terms were to be somehow enforceable, I would be unable to earn a living. I am qualified to be a Marine and a fitness trainer.

33. The Court has also asked me to address the circumstances of my final night under Plaintiffs' employment. Contrary to their suggestions, this was not the night that I removed and destroyed my restrictive covenant. In fact, all that happened on the night of my termination was that I entered Ms. Brenner's unlocked office to place a call to her. I intended to resign, effective immediately, that evening. Because I was well aware of Brenner's temper and similar outburst – as well as her treatment of every other employee who has quit, I did not tell her that Alex and I decided to start our own gym, rather I told her that I was going to work in my "family business." Once I got in touch with Brenner she essentially begged me to stay for at least two more weeks. I did not want to, but I agreed to work morning shifts for one additional week. At that point I left Brenner's office. I did not go through any of Pure Power's files that evening, nor did I take or destroy anything from Brenner's office that evening. Contrary to Ms. Parker's affidavit, I left Pure Power that evening with the intention of coming back the following morning. I left Pure Power that night with nothing, not even my gym bag. Later that evening, around 10:30 PM, Brenner called me in a rage and told me never to step foot in Pure Power again.

Sworn to before me this
29th day of July, 2008

_____
Notary Public

_____
Ruben Belliard

13
NY1 120588v3 07/29/08

RICHARD B COHEN
NOTARY PUBLIC, STATE OF NEW YORK
NO. 02CO4735055
QUALIFIED IN NEW YORK COUNTY
TERM EXPIRES MAY 31, 2011

EXHIBIT A

From: **Corporal Lorenzi** <lizzie@purepowerbootcamp.com>
Date: Mon, Mar 31, 2008 at 12:18 PM
Subject: noshows
To: belliardrd@gmail.com

| Client | ID | No Shows & Late Cancels | Home Phone | Work Phone | Mobile Phone |
|---|---|---|---|---|---|
| Liberatore, Kathryn | 100000923 | 4 | (917) 270-9848 | (212) 446-4936 | |
| Matarazzo, Katie | 100000151 | 2 | | (212) 626-2055 | (617) 780-7776 |
| Blum, Jessica | 100000379 | 2 | (914) 424-7434 | | |
| Castillo, Carol | 100000842 | 2 | | (718) 809-0900 | (212) 590-7091 |