UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
PURE POWER BOOT CAMP, INC.,
PURE POWER BOOT CAMP FRANCHISING           REPLY AFFIDAVIT OF LAUREN
CORPORATION, and PURE POWER BOOT           BRENNER IN SUPPORT OF
CAMP JERICHO INC.,                         MOTION FOR A PRELIMINARY
                                           INJUNCTION
                    Plaintiffs
                                           Index No.: 08 CV 4810 (JGK)(THK)
        -against-

WARRIOR FITNESS BOOT CAMP, LLC,
ALEXANDER KENNETH FELL a/k/a ALEX
FELL, Individually; RUBEN DARIO BELLIARD
a/k/a RUBEN BELLIARD, Individually;
JENNIFER J. LEE Individually; and NANCY
BAYNARD, Individually,
                    Defendants.
------------------------------------------------------------x
STATE OF NEW YORK :
                   s.s.:
COUNTY OF NEW YORK:

   LAUREN BRENNER, being duly sworn, deposes and says:

   1.   I am the president of each of the plaintiffs and make this reply affidavit to address the affidavit submitted by Ruben Belliard.

### Belliard's Document Thefts and Shredding

   2.   The significance of reliance on the e-mails attached as exhibits to the motion papers is underscored by the fact that Belliard admits only what he absolutely has, because it is documented in defendants' emails. Because there is an e-mail which specifically acknowledges Belliard's shredding of his employment agreement, he has no choice but to admit that he stole it.

   3.   Belliard attempts to explain his criminal act as a result of panic. Whatever he chooses to call it, it remains criminal theft and spoliation of evidence and is strong evidence of his overall character and credibility.

{F0326185.2} 1

4. Moreover, his explanation in his sworn affidavit as to how he came upon his agreement is a complete fabrication. He claims that he had permission to look through my file cabinet and that he was there seeking blank drill instructor notes.

5. First, Belliard never had permission to go in my office and never had permission to go through my file cabinet. I had a standing rule that no one was allowed in my private office, and all employees were instructed to stay out.

6. Second, there are no drill instructor notes in my file cabinet or my office at all. Drill instructor and recruit forms are generated at the outside computer and are maintained by my assistants, Elizabeth Lorenzi and Denise Parker, at that location.

7. Nor could the discovery of his agreement have been a chance event as he claims. Belliard's employment agreement was maintained in his personnel file along with a general file for drill instructors which contained everyone's agreements. Both of these files were taken, and have not to date been returned to me despite Judge Freedman's order that all of my documents were to be returned to me.

8. Belliard also claims that he never took any other corporate documents or electronic files. Apart from any evaluation of credibility given his admitted misconduct, the court must evaluate just how defendants suddenly had an offering memorandum, closely mirroring my offering memorandum word for word, before even beginning operations (see Exhibit P). They also mirror my business plan and my pricing. True, they changed their pricing once sued, but they maintained the same format, the same package of sessions which could be purchased and the same reward for "platinum" customers (they use the same word) for repeat business.

9. As far as Belliard's claim that the client list was not taken and that he was the "very dear friend" referred to in the e-mail updating their list, his assertions simply defy credibility. It is inconceivable that the list of 88 names with no e-mail addresses (Exhibit U) would incredibly expand to 330 names with e-mail addresses (Exhibit X) on the same evening that Belliard was alone in my office. Also, it defies credulity that the defendants would refer to Belliard himself as "my very dear friend," instead of just referring to Belliard by name.

10. Belliard claims that the expansion to 330 names was from his personal information. This does not explain how defendants went from 88 to 330 clients in 5 days, when Belliard was involved from the outset. It does not explain how they went from no e-mail addresses to full e-mail addresses; it does not explain how they had information on their list regarding each client's enrollment with Pure Power (column G) ; it does not address the actions of Lee (who is a silent partner in Warrior Fitness -- see Exhibit P, last page) and Baynard, who acted as agents to befriend and later divert Pure Power clients and whether contact information was secured by them in this capacity (in fact, if this was Belliard's personal information, how was it that Baynard and Lee were listed in column E as the contacts for nearly all) and it does not explain the notations in column F which we believe reflects active ongoing solicitation before defendants left.

11. Belliard's excuse for being in my office is equally implausible. He does not deny that he was told to stay out. He claims that he went in to place a call in order to resign. He certainly did not need my office for that call. His cell phone or home phone would have served just as well, and according to him this was not a spur of the moment impulse so it could have been done from home before he came in. Of course that would not have given him access to my

{F0326185.2 }3

office; and his claim that I fired him that evening in a rage certainly does not comport with his letter of resignation the next day (Exhibit V) resigning on April 1st and thanking me for his opportunity.

12. In fact, what took place was that on the evening of the 31st, Belliard told me he was quitting without notice, ostensibly because he had an opportunity to join his family construction business which he had to act on or lose. I told him I thought that it was reprehensible that after all I had done for him, he would leave me in the lurch, particularly since his next class was 5:30 the next morning. He finally said he would teach the 5:30 class for a couple of days but after I thought about it further, I called him up and told him not to bother.

13. As far as Belliard's claim that our clients are not confidential because anyone can walk into the gym and ask customers that their names, I really do not think that Belliard believes that to be the case, otherwise he would not have needed to use Lee and Baynard to secure the information surreptitiously. Belliard also excuses his corporate theft by saying that the list of relevant customers interested in this type of fitness commitment could be purchased from a direct marketing vendor. From my own experience, I can attest that such lists do not exist; tellingly, Belliard offers no suggestion as to which vendor has the specific list of Pure Power clients along with e-mail addresses and enrollment information.

14. Belliard also suggests that he had this information because he was periodically given it in connection with clients who did not show up for sessions. He attaches a list of four such clients as Exhibit A. This does not include e-mail addresses, it is hardly the comprehensive list they stole and more important, this was not intended to be given to Belliard to store, keep and

use if he left my employ. It was given to him in his capacity of what we believed was a loyal employee, to enable him to perform his duties. He was never given or shown the wholesale list of all Pure Power clients.

<u>Belliard Breached the Restrictive Covenant and Employee Rules</u>

15. With respect to the substance of the restrictive covenant, Belliard never states that he was compelled to sign the agreement. He simply asserts a unilateral, self-serving claim that he feared if he did not sign he would lose his job. No threat was made or implied, and Belliard does not claim otherwise. To the contrary, it was explained to him that the restrictive covenant had been recommended by franchise counsel to put the company in a position to sell nationwide franchises. It is truly absurd that he states that SHORTLY after he was hired I presented a contract and forced him to sign it. Belliard first pay check was given to him on July 31 2004. He signed his non compete confidentiality agreement on Sept 26, 2006. TWO YEARS and two months after commencement is not shortly after. Furthermore, Alex fell was sitting in the office at the same time as Belliard and signed his non compete confidentiality agreement as well. Fell told me he could not get a career going in Film which he was trying to pursue and loved PPBC so much that he wanted his future to be here.

16. Finally, with respect to his claim that the restrictive covenant has not been consistently enforced, Belliard names three other former employees who he claims were not held to its terms. He is again mistaken.

17. Christopher Romani is a manager at Bally's gym. This does not violate the restrictive covenant but in any event, he was employed before restrictive covenants were required. The same is true for Paul Titus who Belliard admits runs a personal training business.

18. Belliard claims that Kenny Wong runs a boot camp. My understanding is that Kenny Wong runs a personal training business which, as I have indicated all along, would not violate the restrictive covenant which is designed to address indoor obstacle/confidence courses based upon military-style training. However, even if he calls his business a boot camp, that is not the issue. As previously explained, boot camp is a generic term which I do not seek to protect. Attached as Exhibit A are printouts from the websites of "boot camps," including some of the ones they claim have similar regimens. They either offer traditional indoor fitness training or outdoor programs. None have an indoor confidence-building obstacle course which comprises my protectible trade dress. Anyone can teach "boot camp" style fitness; however, they must use their own program and their own style of facilities.

19. The restrictive covenant does not forbid employees from obtaining any job in the fitness industry, only a business which incorporates the indoor obstacle/confidence course and military style training. As we stated in court, we are not seeking to enforce a 10-year term or use of the generic terms "boot camp."

20. Moreover, Belliard does not address his violation of the independent obligations of the employment agreement in which he acknowledges our proprietary interest in the indoor obstacle/confidence training course (which defendants in their literature acknowledged to be unique) and commits not to use that concept; or his commitment in paragraph 2 not to disclose customer information. Again, no one is stopping him from opening a gym or engaging in personal training, or even calling himself a boot camp. What we are trying to protect is our trade dress comprising the use of an indoor obstacle/confidence training course in conjunction with military-style training, and the unauthorized use Pure Power customer information and proprietary program set-up information.

21. With respect to the claim that there was open and notorious personal use of Pure Power computers, that certainly never took place in my presence. In fact, as set forth in the prior affidavit of my assistant, Fell had to give her his password to check an ebay sale as if I saw him on the computer for an ebay inquiry, he would have been reprimanded

22. Contrary to his assertion, Belliard, did receive Pure Power's employee manual, which governs the use of computers, and a copy was on top of the refrigerator as well. Nor does he deny knowledge of that policy.

### Belliard's Personal Story

23. I would like to also address a few of his background comments. Although marginally relevant, given the litany of false statements, I feel compelled to set the record straight.

24. It is true that our first encounter was in Garden City but that is where the truth ends. I was not there to research boot camps. Garden City has a reserve base; it had no boot camp. I was there to seek out Marines who were unsure of what to do with their lives after coming back from serving. I wanted to give them a lucrative career and place to feel a part of a family. I thought they would really enjoy and appreciate the opportunity to be a part of PPBC. I knew there were Marines looking for jobs and I thought it would be a way to help them and get instructors at the same time, even though they did not have credentials as instructors.

25. Major Wally Powers gave me permission to speak to a group of Marines who might be interested and all 9 came to see my facility which was already operational. I did not hire Belliard who I felt was not suitable. I hired Major Powers. Major Powers began teaching on May 31st 2004, however he was not hired full time since he was also a firefighter.

26. Apparently Belliard asked Powers why I had no interest in him and Powers interceded. I allowed Belliard to sit in the back of my facility, auditing the courses for 2 months and then I trained him on my programs; after that I allowed him to basically back me up while I taught. He began teaching with me on July 31st 2004.

27. To the extent Belliard and Fell rely on their Marine training to suggest that this qualified them to teach, nothing could be further from the truth. The Marine methodology is to break a recruit down and then rebuild in the Marine mold. I wanted training in a supportive environment I never suggested he should make clients vomit and had no interest in breaking clients down. Most people do not pay to vomit or be broken down. I am regarded as an expert in the fitness as well as the empowerment and wellness industry and I have lectured in many arenas on motivation while focusing on all positive aspects. I have been named number entrepreneur on the Rise by Anderson Cooper CNN program based on the creativity and uniqueness of PPBC's curriculum and facility.

28. Although my training program incorporates a military theme and some exercises, all trainers are required to be certified fitness instructors; merely being in the Marines or knowing martial arts is not adequate qualification. All of my instructors not only must be certified, they are required to first observe my classes for a period of time and learn my specific training methods and style. Because Belliard did not have these qualifications, I personally trained and certified him at my own expense as well as Alex Fell. It is absurd that Belliard states in his affidavit that he says in all his experience in the fitness industry he has never heard of any gym that prevents other trainers from working at any other gym. The best part of that statement is his entire fitness experience has been with me at PPBC, and PPBC IS NOT AND HAS NEVER

BEEN DEEMED A GYM. That is one of the main reasons PPBC has received national and international press.

29. To the extent Belliard claims he was not adequately compensated or my personality was an issue, the court should note he made over $86,000, and until he turned on me, I considered him family. I paid for his wedding. Socialized with his family as well as he socialized with me and my family. I have bought him clothes, supported him at his martial arts tournaments as well as offered him a fifty percent partnership in my new Jericho location. Had he not stolen my company's trade dress, my entire curriculum, first chapter of my book which I have been working on for over a year and a half and which I asked Ruben to write a passage in (which coincidentally had the title Unleash the WARRIOR Goddess Within) customer list, customers, operating manual, Start up manual, business plan and personnel files, I might have wished him well if he simply wanted to move on. Such was not the case, and his invocation of his military record and awards does not justify his illegal activities upon his return from military duty.

30. As far as this being the dream of Belliard and Fell to open a gym, that is also self-serving nonsense. Fell was in film school when he came to me and Belliard wanted to work security in Iraq, and then own his own construction company. Fell was unsuccessful in film and Belliard did not get the security job so he came back.

<u>Belliard's Comparisons of the Trade Dress Point to Superficial Differences</u>

31. As far as trade dress, although the court has indicated that it does not intend to decide the issue on this motion, Belliard goes into it at length and so I must respond.

32. What it really comes down to is their facility is orange and mine is camouflaged.

33. The uniform is the same. The obstacle course is basically the same. Crushed rubber is my unique, original idea. Mine is black to simulate the dirt of an outdoor camp, while theirs is red to simulate clay-colored dirt.

34. We both have hurdles (what difference does it make if one is adjustable), an intensity wall, climbing ropes, monkey bars, stall bars, tires and medicine balls; their changing facilities may differ in layout but look similar and there is no netting because Justice Freedman told them to eliminate it. Attached as Exhibit B are photographs of our respective facilities. The look and feel of the facilities (other than color) are the same. The only two obstacles the defendants do not have are the belly robbers and the traverse wall because they could not get it built in time for their opening.

35. Belliard attempts to argue that many other organizations have such facilities and that a search of the Internet would facilities similar to mine. None have been made of record; I do not consider gyms such as Bally's that have a "boot camp" program in an exercise classroom to be comparable, nor is there a trade dress issue caused by outdoor programs. There is not a single facility cited by defendants which has an indoor obstacle/confidence course, a crushed rubber floor, surrounding track, and program similar to mine – until Belliard and the other defendants took the entire concept.

36. In his affidavit, Belliard states that he did not learn of the nature of my trade dress claim until they saw the video and attended the hearing. To the contrary, my affidavit submitted in support of the original preliminary injunction motion describes the trade dress in elaborate detail.

37. Finally, with respect to any other issue raised in our

injunction motion, we will rely on our prior papers.

LAUREN BRENNER

Sworn and subscribed to before
me this 30th day of July, 2008

NOTARY PUBLIC *Tiffany Chisolm*

TIFFANY CHISOLM
Notary Public - State of New York
No. 01CH6176424
Qualified in New York County
My Commission Expires Oct. 29, 2011

# NYC Boot Camps

Need a jump start?
Need motivation?
Want to meet fun people?
Park Slopes Boot Camp is for you!



| HOME | ABOUT US | PROGRAM | REGISTRATION | FAQ | RESOURCES | CONTACT US |

submit

Dramatics improvements in your physical well-being and self confidence.

**Expected results when you complete camp are:**
- 3-5% reduction in body fat
- Better Relaxation
- 3-9 cm decrease in the midsection
- 25% increase in strength
- Greatly Improved Posture
- 2-6 kg of weight loss
- 25% improvement in endurance and 100% gain in self-confidence!

## Program

**What do we do?**
NYC Boot Camps is a four week outdoor program of fitness instruction, nutritional counselling and motivational training. You will be inspired and have fun while participating in a fantastic workout led by Certified NYC Fitness Trainer. Each day, camp will be one hour in length either in the morning or evening, depending on which camp you choose to do.

**What if I'm not very fit?**
NOBODY will be left behind or asked to complete more than they are capable of doing safely. Nor will anybody go home unchallenged! Women of all ages and abilities are welcome to participate. Each day will slightly increase in intensity. You will inspire and be inspired by others.

**NEXT Boot Camp**

**Register Now!**

**Will you be opening camps in any other locations?**
Yes, we will! Upcoming camp locations include Battery Park, Central Park, Prospect Park and Marine Park.

**How often do we meet?**
Campers meet Monday through Friday for one hour each day during the four-week programme. All campers will be expected to arrive on time!

**What do I need to bring?**
An exercise mat, small hand weights (1.5kg - 3kg), water bottle, running shoes, and a sense of adventure! The best price for hand weights and mats is Game or Makro. Running shoes may be bought at any Sportsmans Warehouse, Totalsports or Mike's Sports in town.

**What can I achieve from camp?**
Your body will become more fit and toned, and you will gain more confidence making a dramatic improvement in your physical well-being. The camp programme includes exercises designed to firm your butt and thighs, flatten your stomach, reduce body fat and increase stamina. By losing fat and gaining muscle, you'll lose centimetres and gain strength while looking and feeling better. Also, you'll meet great people who share in the same vision of striving to reach their goals for a healthier mind and body.

**What else will I get?**
Every camper will receive a FREE NYC Boot Camp T-shirt, Nutrition & Motivational Seminar, Gift Pack with sponsored goodies and Welcome Package.

**Why should I participate?**
You will experience a dramatic improvement in your physical and mental well-being while enjoying the outdoors in a motivating team environment. In addition, you will meet great people who share




HOME | SCHEDULE | INSTRUCTORS | FAQ | PRESS | JOIN | CONTACT US | TESTIMONIALS | YOGA

**About us**

Are you looking for a results orientated, high calorie-burning training program guaranteed to have you looking your best in as few as six weeks? Look no further: Boot Camp Fitness, Brooklyn N.Y.C., is a three circuit exercise program consisting of Treadmills, Spin Bikes, and Floor Routines, known for taking off pounds and inches. When it comes to actual results that can be seen and measured, every second counts. That's why we have packed the one hour and fifteen minute program full of 4,500 of the most intense seconds you will ever experience, utilizing the world's most outstanding and efficient gym: your own body. Join Boot Camp now to experience the fitness revolution that caught fire in Brooklyn. Feed off the energy of the outstanding instructors, the rhythm of the music and the camaraderie of twenty-nine other recruits, all with one common goal: RESULTS. What are you waiting for? If you are tired of spending money on unwanted or unused gym memberships, personal trainers, or fad diets without getting the results you desire, come to Boot Camp Fitness and see why it's not just a workout: it's an adventure!

*Fitness Evolved..*



Get **50%** off
Personal Training
+
6 Week Program

Learn More

Get a Free
Customized
Nutritional Plan

Learn More





Enter our 6 WEEK MAKEOVER CHALLENGE

Copyright 2005 © BOOT CAMP FITNESS BROOKLYN N.Y.C.          Site Design : INTUNOVA.COM




# We train Rain or Shine! No Excuses!





**Class Dates:**



**Sign up online for our boot camp please click on the buy now button to be re-directed to Pay Pal's secure site**

<u>REGISTRATION PAGE</u> MUST BE FILLED OUT!!!!

**Boot Camp Guarantee**

If you do not see any results after your 12 sessions that

**MUST BE ATTENDED ON TIME**

Athletic CTS will Train You for ONE month

<u>**NO REFUNDS WILL BE GIVEN**</u>

<u>**ATHLETIC CTS GUARANTEE**</u>

Choose here the locations for the Boot Camps:

- <u>~Commitment Memberships~</u>
- <u>Boot Camp in NYC</u>



# THE WARRIOR
## Fitness Camp • Marine Private Training Studio

**HOME**  **WHAT WE DO**  **FACILITIES**  **GALLERY**  **TRAINERS**  **MEMBERSHIP INFO**  **Q & A**  **TESTIMONIALS**  **CONTACT US**


WEIGHT TRAINING


KICKBOXING


AEROBICS


CARDIO

28065 Smyth Drive Valencia, CA 91355    **661-295-3200**    Copyright 2006










Warrior Fitness Boot Camp | 29 W. 35th St., 3rd Floor, New York, NY 10001 | Tel: 212.967.7977 | Fax: 212.967.7477
website by Orphmedia LLC






Warrior Fitness Boot Camp | 29 W. 35th St., 3rd Floor, New York, NY 10001 | Tel: 212.967.7977 | Fax: 212.967.7477
website by Orphmedia LLC