```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
PURE POWER BOOT CAMP, INC., et. al.,    :
                                        :
                    Plaintiffs,         :   08 Civ. 4810 (THK)
                                        :
        -against-                       :        OPINION
                                        :
                                        :
WARRIOR FITNESS BOOT CAMP, LLC, et. al, :
                                        :
                                        :
                    Defendants.         :
----------------------------------------X
```

**THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE.**

Plaintiffs Pure Power Boot Camp, Inc., Pure Power Boot Camp Franchising Corporation, Pure Power Camp Jericho Inc., and Lauren Brenner (collectively "Plaintiffs" or "Pure Power"), brought this action against Defendants Warrior Fitness Boot Camp, LLC, Alexander Kenneth Fell, Ruben Dario Belliard, Jennifer J. Lee, and Nancy Baynard (collectively "Defendants" or "Warrior Fitness"), accusing Defendants of stealing their business model, customers, and confidential and commercially sensitive documents, breaching contractual and employee fiduciary duties, and infringing Plaintiffs' trade-dress. Defendants filed counterclaims asserting violations of the New York Labor Law, violations of the Stored Communications Act, and unauthorized use of Defendants' images in violation of New York Civil Rights Law. The Court's jurisdiction is derived from Plaintiffs' federal statutory trade dress claims, under 28 U.S.C. § 1338(a) and (b).

The parties consented to trial before this Court, pursuant to 28 U.S.C. § 636(c).  The Court presided over a bench trial from January 24 to February 4, and March 14-18, 2011.  The following Opinion constitutes the Court's findings of fact and conclusions of law.

**BACKGROUND**

## I.  <u>Factual Background</u>

While working as a trader on Wall Street in 2002, Plaintiff Lauren Brenner ("Brenner") decided to start her own physical fitness business, based upon the concept of a military boot camp. Investing substantial time and all of her savings, on or about December 17, 2003, Brenner opened Pure Power Boot Camp, Inc. ("Pure Power Boot Camp"), a facility located at 38 West 21st Street in Manhattan.  Pure Power Boot Camp is modeled, in part, after United States Marine Corps training facilities.  It is designed in military camouflage colors and decor and, unlike traditional gyms, does not have a membership fee; instead, clients sign renewable contracts for "tours of duty," meaning that "recruits" — as Pure Power clients are called — sign up for a program to attend a certain number of sessions per week for a set number of weeks.  If a recruit does not show up for a scheduled class, Pure Power personnel contacts them directly.

An important part of Brenner's concept is to use physical

2

objects as part of an indoor obstacle course, modeled after a Marine Corps outdoor obstacle course at Fort Knox, to build confidence, physical fitness, and self-empowerment in her clients. To construct this obstacle course, Brenner contacted a company that built high rope courses. The owner of that company arranged for Brenner to visit Fort Knox and inspect the outdoor obstacle course there, in order to assess whether any of the individual obstacles were suitable for use in a smaller, indoor facility to be used by civilians. Brenner did so and adapted some of the Marine Corps' obstacles to her concept. She designed the facility decor as well as the arrangement of the obstacles, using a flooring made of a crushed rubber tire material designed to look like outdoor dirt. The obstacles are surrounded by a running track, separated by a border of dark sand bags. One of Brenner's insights was that people will stick to an exercise regime if they work out in a group. She thus concluded that classes should be limited to 16 people who go through "training" together, and are called "recruits." The recruits wear a Pure Power Boot Camp T-shirt and camouflage pants. Another important component of her plan is to use the physical obstacles to build self-confidence. In addition, Brenner designed fitness routines involving the obstacles in order to develop various body muscles and muscle strength, as well as cardiovascular health.

3

Brenner employed former marines as "drill instructors," viewing it as an opportunity to provide jobs to veterans returning from combat in Iraq.  In addition, Brenner felt that the hiring of military personnel would lead to good press coverage for her business.  Because Pure Power's training techniques were not developed or taught in the United States military, when new drill instructors are hired, they are required to observe and participate in the Pure Power Program, and teach alongside an experienced instructor, before being allowed to teach on their own.  All drill instructors are required to obtain certification as a fitness instructor.

After the Pure Power facility was constructed according to her design, Brenner traveled to the Marines' Garden City Reserve Base to make a presentation to marines who had recently returned from combat service.  Shortly following that presentation, a number of marines came to Pure Power to experience the program.  One of those marines was Defendant Ruben Dario Belliard ("Belliard").

Belliard started working at Pure Power Boot Camp as an independent contractor in April 2005, and was hired as a full-time Pure Power drill instructor in or about July 2006.  On Belliard's recommendation, Brenner hired Defendant Alexander Kenneth Fell ("Fell"), another marine, in or about August 2005.  Fell started working as a full-time Pure Power drill instructor in or about

4

September 2006.  Both Belliard and Fell were well-liked and sought-after instructors.  Indeed, Belliard eventually became Pure Power's head drill instructor.  Belliard was paid more than the other Pure Power drill instructors and when Brenner was not around, Belliard was left in charge.  Brenner placed great trust in Belliard and, at least from her perspective, came to view him as a close friend.

Pure Power was a unique concept and unlike most other exercise facilities.  It was an immediate success, garnering attention from a variety of media outlets, including MSNBC and Inside Edition.  Brenner personally appeared on a variety of television shows, including NBC's The Today Show, the Donny Deutsch Show, and the Anderson Cooper Show on CNN.  Brenner's intent when she created Pure Power was not to have one location, but to develop a business plan that could be rolled out as a national franchise.  In 2006, she took steps to franchise the Pure Power concept.  She hired a franchise attorney, with whom she developed a business plan, as well as a start-up manual and an operations manual, which described how to open and operate a Pure Power facility.  Brenner also participated in the Franchise Expo show in California, and took Belliard along to assist her.  Pure Power had a booth at the show and a USA Today reporter featured Pure Power as a top new franchise in 2006. (See Pls.' Ex. 211.)  The publicity that Pure Power received led to numerous inquiries from potential franchisees.

In preparation for Pure Power's franchising roll-out, Brenner had the drill instructors sign an Employment Agreement as a condition of continued employment.  With the exception of Fell, every drill instructor, Belliard included, admits to having signed an Employment Agreement.  Fell, however, disputes having signed such an Employment Agreement, while Brenner insists that he did.

The Employment Agreement contains a number of contractual provisions, including: (1) a provision that requires employees of Pure Power to devote their "skills and best efforts to the Company" and to work to further the company's best interests; (2) a non-disclosure provision; (3) a provision that precludes Pure Power employees from challenging the validity or enforceability of Pure Power's alleged "Intellectual Property"; (4) a non-compete provision; and (5) a non-solicitation provision. (See Pls.' Ex. 329.)  The non-compete provision precludes post-termination employment, anywhere in the world, for a period of ten years, at any business that competes directly with Pure Power, which includes any company that uses "obstacle courses" or "exercises derived from military training" or a "military theme."  The non-solicitation provision precludes solicitation, or assisting in the solicitation of, any Pure Power clients.

To assist in the franchising of the Pure Power business, Brenner also hired a trade dress attorney, who recommended that

6

Pure Power register its trade dress.   Pure Power's initial application for registration of its trade dress was rejected by the United States Patent and Trademark Office ("USPTO").   After Plaintiffs submitted additional documentation, the USPTO eventually granted Plaintiffs a service mark.   In the USPTO registration, the Pure Power trade dress is described as follows:

> THE MARK CONSISTS OF A DRAWING OF AN EXERCISE FACILITY, STYLED TO LOOK LIKE A MILITARY BOOT CAMP TRAINING COURSE COMPRISED OF CAMOUFLAGE WALL AND CEILING DECOR, CRUSHED RUBBER FLOORING, A TIRE RUN, CLIMBING WALLS, CLIMBING NETS, AND HURDLES, WITH THE TERMS "DESIRE," "STRE," "COURAGE," AND "UTY."[1]

(Pls.' Ex. 140.)

Before actively pursuing franchise opportunities, Brenner decided to open a second fitness facility — Pure Power Boot Camp Jericho Inc. ("Jericho") — located in Jericho, New York.   The Jericho location looks somewhat different than the Manhattan location and has more obstacles.   Brenner offered Belliard a partnership in the Jericho location, which he refused, stating that he did not have enough money to invest.   In the first few months that the Jericho facility was open, Brenner spent the majority of her time there.

Around July 2007, while they were still working at Pure Power,

---

[1] "STRE" is intended to stand for "Strength" and "UTY" is intended to stand for "Unity."

Defendants Belliard and Fell began planning their own military-themed gym — Warrior Fitness Boot Camp, LLC ("Warrior Fitness"). Jennifer J. Lee Fell ("Lee"), who was a Pure Power client from March 2006 until April 2008, and is now Fell's wife, was, at that time, an owner and silent partner in Warrior Fitness.  Unbeknownst to Brenner, Fell was then dating Lee in violation of an express Pure Power policy banning social relationships between the drill instructors and Pure Power clients.  Defendants Belliard and Fell believed that Lee's business school education and her extensive background in business plan drafting would be useful in raising the capital necessary to open Warrior Fitness.  Lee was involved in the lease negotiations for spaces Warrior Fitness considered, and, ultimately, rented at 29 West 35th Street in Manhattan — a mere 15 blocks away from Pure Power.  Her name is listed as a tenant on the current Warrior Fitness lease.  She hired Warrior Fitness's media company and legal counsel and prepared a cost-benefit analysis for the business.  Lee also lent Fell $100,000.00, which Fell used to open Warrior Fitness.

Defendants took a number of steps to promote Warrior Fitness. While still a Pure Power client, Lee sent emails to Pure Power clients and others, promoting Warrior Fitness and providing detailed descriptions of the Warrior Fitness class offerings.  The Warrior Fitness class times and promotional language closely

8

mirrored those of Pure Power.  Some of these emails were sent while
Belliard was still employed at Pure Power.  Defendants also
organized a cocktail party, at which a number of Pure Power clients
were present, where Fell announced that he would be opening Warrior
Fitness.  Defendant Nancy Baynard ("Baynard"), who was a client of
Pure Power's from January 2006 until late 2007, and who was
secretly dating Belliard, created the Jen and Nancy Party List
("Party List") — a list of names of people who were to be invited
to a party celebrating Belliard's birthday and the grand opening of
Warrior Fitness.  All of the Defendants contributed names of people
whom they believed might be interested in joining Warrior Fitness.
As Baynard testified at trial, the Party List was created to obtain
a better understanding of the general interest in Warrior Fitness.
The party never took place, however, and, according to Defendants,
the Party List was never used.

But Defendants' efforts went beyond merely promoting and
planning Warrior Fitness.  As part of Defendants' combined efforts
to open Warrior Fitness, Defendant Belliard stole documents from
Brenner's private office and personal computer, included Pure
Power's business plan, start-up manual, and operations manual.
Belliard also stole a folder with Employment Agreements of Pure
Power employees, including his own, and destroyed those agreements.
In addition, Belliard, without permission, downloaded a copy of

Pure Power's confidential customer list onto a thumb-drive. The theft of the customer list, the theft of the business plan, and the theft of the Pure Power files all took place on different dates and times. Finally, Plaintiffs contend that Belliard also stole and destroyed a draft of a book that Brenner was writing, entitled "Unleash the Warrior Goddess Within."

Belliard shared the stolen materials, including Pure Power's client list, with Defendants Fell and Baynard. Belliard also provided a copy of Pure Power's business plan, operations manual, and start-up manual to Lee, who knew that these materials had been stolen from Pure Power. Plaintiffs contend that Lee relied upon these documents in drafting the Warrior Fitness business plan. During that same period of time, to further promote the success of Warrior Fitness, Lee disparaged Brenner and Pure Power in speaking to other Pure Power clients. Third-party witnesses testified that Lee expressly told them that Brenner treated her employees badly and did not pay them. There was also testimony that Lee told Pure Power clients that Brenner "hated homosexuals" and that she had fired a former Pure Power employee because he was gay. At no time while Lee was enrolled at Pure Power, discussing Belliard's and Fell's plans to open Warrior Fitness and denigrating Brenner and Pure Power more generally, did she ever disclose her significant financial interest in Warrior Fitness or her personal relationship

with Fell.

Although Fell was fired from Pure Power, it was of his own doing. Specifically, Fell, while working at Pure Power, refused to comply with several of Brenner's explicit instructions, which led to a heated exchange in which Fell repeatedly screamed at Brenner, daring Brenner to fire him. Left with no choice, Brenner terminated Fell's employment on March 16, 2008. Approximately two weeks later, on April 1, 2008, Belliard quit Pure Power, without providing Brenner with notice. Before Belliard quit Pure Power, at a time when Brenner was spending most of her time at the recently-opened Jericho facility, Belliard informed Brenner of certain alleged problems relating to another Pure Power drill instructor. Belliard recommended that this employee be fired, and Brenner, who placed a great deal of trust in Belliard, took his advice and did so. She did not know at the time that Belliard intended to quit his job at Pure Power. The loss of three senior full-time employees, in such close succession, left Pure Power understaffed and in a vulnerable position.

On April 28, 2008, Brenner found out about Defendants' plan to open Warrior Fitness and the fact that confidential materials had been stolen from her office at Pure Power. Elizabeth Lorenzi ("Lorenzi"), who was an employee of Pure Power, knew that Fell had used the Pure Power computer. She and Cheryl Dumas ("Dumas" and,

11

collectively, "Third Party Defendants"), a close friend of Brenner's and a Pure Power client, were able to access and print e-mails from three of Fell's personal email accounts. While there is no evidence that Brenner herself accessed — or requested that Lorenzi and/or Dumas access Fell's email accounts on her behalf — Brenner read the emails, which provided a detailed picture of Belliard's and Fell's scheme to set up Warrior Fitness and undermine Brenner's and Pure Power's reputations and business, before they left Pure Power, and the work that Lee and Baynard did to support those efforts. The content of these emails provided the basis for much of Plaintiffs' original Complaint.

Belliard and Fell, along with their girlfriends at the time, Lee and Baynard, opened Warrior Fitness on or about May 12, 2008.

## II.  **Procedural Background**

Approximately a week after gaining access to Fell's email accounts, Plaintiffs commenced an action in New York State Supreme Court. At that time, Plaintiffs sought a temporary restraining order, seeking, among other things, to prevent Defendants from opening their competing business. The state court determined that Plaintiffs' non-compete agreement was unenforceable as drafted, and allowed Defendants to open Warrior Fitness. (See Transcript, dated May 6, 2008 ("TRO Hr."), attached as Ex. B. to Declaration of Daniel Schnapp, dated Oct. 24, 2008, at 28, 43.) The state court,

however, directed Defendants to return certain materials that they had stolen from Pure Power and also instructed Defendants to make alterations in the decor of Warrior Fitness to further distinguish its appearance from that of Pure Power, and, thus, remedy some of the trade dress issues raised by Plaintiffs.  (See id. at 41-42.) Defendants then removed this action to this Court and sought an order precluding the use or disclosure of specific emails obtained by Plaintiffs from Fell's email accounts.

In a Report and Recommendation, dated August 22, 2008, this Court found that Plaintiffs' actions in accessing Fell's personal email accounts, without his permission, constituted a violation of the Stored Communications Act, 18 U.S.C. § 2701 et seq.  The Court recommended that Plaintiffs be precluded from using in this litigation emails obtained outside normal discovery procedures.[2] The Court also recommended that Plaintiffs be required to return or destroy all copies of emails that contained privileged attorney-client communications.   No objections to the Report and Recommendation were filed, and on October 23, 2008, United States District Judge John G. Koeltl adopted the Report in its entirety. See Pure Power Boot Camp v. Warrior Fitness Boot Camp, 587 F. Supp.

_____

[2] This action was originally referred to this Court for general pretrial supervision and Reports and Recommendations on dispositive motions, pursuant to 28 U.S.C. § 636(b)(1)(A)-(C).

2d 548, 551 (S.D.N.Y. 2008) ("Preclusion Decision").

After discovery was complete, the parties submitted cross-motions for partial summary judgment. Plaintiffs sought summary judgment on Defendants' claims under the SCA and the Electronic Communications Privacy Act ("ECPA"). Defendants sought summary judgment on the same SCA and ECPA claims. This Court granted in part Defendants' motion for partial summary judgment, finding that Plaintiffs had accessed Fell's emails in violation of the SCA. See Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC, 759 F. Supp. 2d 417 (S.D.N.Y. 2010). In particular, the Court concluded that Defendants had established four separate violations of the SCA and, as a result, were entitled to statutory damages in the amount of $4,000. See id. at 428-29. The questions of which of the named Plaintiffs was liable for the SCA violations, and whether punitive damages, attorneys' fees, and costs should be awarded, were left to be determined at trial. See id. at 429-30. The Court also granted Plaintiffs' motion for partial summary judgment, concluding that there had been no violation of the ECPA. See id. at 430-31.

## DISCUSSION

Plaintiffs seek damages and injunctive relief on the following claims: (1) breach of contract against Fell and Belliard; (2) breach of the common law duty of loyalty against Belliard, Fell,

14

Lee, and Baynard; (3) unjust enrichment against all Defendants; (4) common law unfair competition against all Defendants; (5) violation of New York General Business Law § 360 against all Defendants; (6) statutory trade dress infringement; (7) conversion against Fell and Belliard; (8) defamation against Lee; (9) tortious interference with prospective economic advantage against all Defendants; and (10) tortious interference with contract against Lee and Baynard.[3]

Defendants' Third-Party Complaint asserts the following counterclaims: (1) violation of the New York Labor Law against all Plaintiffs; (2) violations of the SCA against Plaintiffs and Third-Party Defendants; and (3) unauthorized use of imagery in violation of New York Civil Rights Law § 51 against all Plaintiffs.[4]

The Court will address, in turn, each of these separate thirteen causes of action.

## I.  **Breach of Contract**

Plaintiffs contend that both Belliard and Fell breached their Employment Agreements: (1) by failing to devote their skill and best efforts to Pure Power, and by disparaging and undermining the

---

[3] The Second Amended Complaint also includes a cause of action for copyright infringement.  Prior to trial that claim was voluntarily dismissed.

[4] The parties are in agreement that the common law claims are governed by New York law, as Defendants Belliard and Fell's employment took place in New York, as did all of the events at issue in the case.

reputation of Pure Power; (2) by disclosing confidential and commercially sensitive information; (3) by using Pure Power Intellectual Property (as defined in the Employment Agreement) in a competing business; (4) by competing directly with Pure Power within ten years of being employed by Pure Power; and (5) by soliciting Pure Power's customers.

Defendants respond that certain provisions of the Employment Agreement are unenforceable, under New York law, because they are overbroad and unreasonably restrain Defendants from working in their profession. Defendants further contend that Fell did not sign an Employment Agreement, and that the signature appearing on the agreement produced by Plaintiffs is a forgery.

A.    <u>Existence of an Agreement</u>

To establish breach of contract under New York law, Plaintiffs must show: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) a breach of contract by the defendants, and (4) damages." <u>Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.</u>, 375 F.3d 168, 177 (2d Cir. 2004); <u>accord</u> <u>JP Morgan Chase v. J.H. Elec. of New York, Inc.</u>, 69 A.D.3d 802, 803, 893 N.Y.S.2d 237, 239 (2d Dep't 2010).

To start, the Court concludes that it is not necessary to resolve, as a factual matter, whether Fell signed an Employment

Agreement, because even if the Court were to find that Fell did so, Plaintiffs have failed to prove their breach of contract claims against Fell.

    B.   <u>Non-Compete Provision</u>

    Plaintiffs contend that Defendants Belliard and Fell breached the non-compete provision of the Employment Agreement.   The non-compete provision states that an employee of Pure Power, for a period of ten years following employment at Pure Power:

> shall not, and shall not assist any third party to, conduct any business or be employed by any business that competes directly with the Company.   A business that competes directly with the Company shall include, but not be limited to, any physical exercise program, confidence program or gym: (i) that uses obstacles courses; (ii) that uses methods or exercises derived from military training; (iii) that uses a military theme in any way; or (iv) that employs the term "boot camp" in the name or description of the program or gym.

(Pls.' Ex. 329.)

    New York law subjects contractual non-compete provisions to "an overriding limitation of reasonableness." <u>Ticor Title Ins. Co. v. Cohen</u>, 173 F.3d 63, 70 (2d Cir. 1999) (quoting <u>Karpinski v. Ingrasci</u>, 28 N.Y.2d 45, 49, 320 N.Y.S.2d 1 (1971)).   Specifically, an agreement not to compete will be enforced only if "it is reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public, and not

unreasonably burdensome to the employee." <u>Reed, Roberts Assoc. v.</u> <u>Strauman,</u> 40 N.Y.2d 303, 307, 386 N.Y.S.2d 677 (1976). Such agreements may be justified by the employer's need to protect itself from unfair competition by former employees. See <u>BDO Seidman</u> <u>v. Hirshberg</u>, 93 N.Y.2d 382, 391, 690 N.Y.S.2d 854 (1999).

Here, the non-compete provision is clearly unreasonable in terms of duration and geographic scope. Indeed, Plaintiffs have conceded that the ten-year prohibition is overly broad in terms of duration, and courts have consistently held non-compete provisions of this duration unreasonable and, therefore, unenforceable. <u>See,</u> <u>e.g.</u>, <u>Baker's Aid, a Div. of M. Raubvogel Co., Inc. v. Hussmann</u> <u>Foodservice Co.</u>, 730 F. Supp. 1209, 1216 (E.D.N.Y. 1990) (concluding that a covenant not to compete for a period of ten years was unenforceable because it was overbroad and not reasonably necessary to prevent the disclosure of the plaintiff's proprietary information or the misuse of the plaintiff's plans and specifications); <u>see also</u> <u>Todd Chem. Co. v. Di Stefano</u>, 30 A.D.2d 879, 292 N.Y.S.2d 811 (2d Dep't 1968) (holding that a restrictive covenant, with a ten-year term, was unenforceable).

In addition, the non-compete provision does not provide for any geographic limitations. Plaintiffs introduced no evidence to support the proposition that a covenant restricting competition of the kind at issue in this case, anywhere in the world, is

reasonable in terms of scope; nor have Plaintiffs pointed to any cases in this jurisdiction that would support the Court drawing such a conclusion.   Indeed, the case law suggests just the opposite. See, e.g., Silipos, Inc. v. Bickel, No. 06 Civ. 2205 (RCC), 2006 WL 2265055, at *6 (S.D.N.Y. 2006) (holding that a restrictive covenant with worldwide restrictions on competition is not reasonable); Heartland Sec. Corp. v. Gerstenblatt, No. 99 Civ. 3694 (WHP), 2000 WL 303274, at *7 (S.D.N.Y. Mar. 20, 2000) (refusing to fully, or partially, enforce a non-compete with no geographic limitations); see also Good Energy, L.P. v. Kosachuk, 49 A.D.3d 331, 332, 853 N.Y.S.2d 75 (1st Dep't 2008) (holding unenforceable a non-compete covenant that covered the entire United States where employer only operated in eight states); Garfinkle v. Pfizer, Inc., 162 A.D.2d 197, 197, 556 N.Y.S.2d 322, 323 (1st Dep't 1990) (refusing to enforce a restrictive covenant whose geographic scope "encompasses the entire world").

Moreover, a non-compete provision that restricts Defendants Belliard and Fell from accepting any job in the fitness industry that "uses obstacle courses" or "exercises derived from military training" or a "military theme" or "employs the term 'boot camp'" is ambiguous and overly broad.  Brenner herself was unclear as to whether the non-compete provision purported to preclude employment at a fitness facility that used military-style push-ups, testifying

19

that she was unsure of the difference between military exercises and exercises conducted in the Army or the Marines.  In addition, as Brenner also testified, "everybody is using" the term "boot camp" nowadays.  Thus, on the basis of the non-compete provision, Defendants Belliard and Fell would be prohibited from working at any place that calls itself a boot camp (e.g., "boot camp" makeup school).  In short, the non-compete provision is unreasonably burdensome to Defendants because its enforcement is likely to result in the loss of Belliard's and Fell's ability to earn a living as fitness instructors.

Accordingly, the Court finds the non-compete provision of the Employment Agreement to be both imprecise and clearly overbroad, as well as unreasonably burdensome.  It is, therefore, unenforceable as a matter of law.

### 1.   Severance or Partial Enforcement

Anticipating that the Court might find the non-compete provision overbroad, in the alternative, Plaintiffs ask the Court to "blue-pencil" the Employment Agreement.  In particular, Plaintiffs seek partial enforcement of the non-compete provision for a period of three years and limited to the United States.

New York courts have "expressly recognized and applied the judicial power to sever or grant partial enforcement for an overbroad employee restrictive covenant." Estee Lauder Cos. Inc. v.

20

Batra, 430 F. Supp. 2d 158, 180 (S.D.N.Y. 2006) (internal quotation and citations omitted).  Partial enforcement may be justified so long as "the employer demonstrates an absence of overreaching, coercive use of dominant bargaining power, or other anti-competitive misconduct, but has in good-faith sought to protect a legitimate business interest, consistent with reasonable standards of fair dealing." BDO Seidman, 93 N.Y.2d at 394.  The burden lies with the employer to show that a restrictive covenant should be partially enforced. See Spinal Dimensions, Inc. v. Chepenuk, No. 4805-07 (RMP), 2007 WL 2296503, at *11 (N.Y. Sup. Ct. Aug. 9, 2007).

In BDO Seidman, the New York Court of Appeals determined that it could "sever" from a restrictive covenant, which was limited in duration, portions of the contract that the court deemed overbroad, thereby rendering the covenant partially enforceable. BDO Seidman, 93 N.Y.2d at 395.  Notably, "[n]o additional substantive terms [were] required.  The time and geographic limitations on the covenant remain[ed] intact.  The only change [was] to narrow the class of [plaintiff's] clients to which the covenant applied." Id.; see also Karpinski, 28 N.Y.2d at 51-52 (severing the overbroad portion of the restrictive covenant prohibiting the defendant from practicing general dentistry and enforcing only that portion of the covenant prohibiting defendant from practicing oral surgery).

21

Here, Plaintiffs have <u>not</u> requested that the Court "sever" the non-compete provision of the Employment Agreement in a particular manner.  Instead, Plaintiffs have asked the Court to insert or introduce new substantive terms into the non-compete agreement that the contracting parties themselves have not agreed upon.  Even in the context of a temporary restraining order, where there is some urgency in addressing contemporaneous conduct that violates a non-compete agreement, New York courts are reluctant to rewrite a contractual non-compete provision by adding time and geographic limitations that the court, and not the parties themselves, has deemed reasonable.  <u>See, e.g.</u>, <u>Crippen v. United Petroleum Feedstocks, Inc.</u>, 245 A.D.2d 152, 153, 666 N.Y.S.2d 156, 156-57 (1st Dep't 1997) (refusing to partially enforce a restrictive covenant by limiting its geographic scope because to do so would "alter the original contract so drastically as to preclude a present finding that plaintiff would have accepted the contract" and stating that "defendant should have drafted the agreement to include such provisions from the start and allowed plaintiff to decide whether to sign").

But, here, Plaintiffs not only seek to have the Court rewrite the contractual non-compete provision, they also seek to have the Court apply it retroactively.  Yet, a state court, when presented with the relevant facts in May 2008, when Defendants first opened

Warrior Fitness, refused to shut it down.  Likewise, the District Court, when asked in June 2008 to close Warrior Fitness, denied Plaintiffs' application for a preliminary injunction. (See Order, dated Oct. 28, 2008.)  Now, more than three years later, Plaintiffs again ask the Court to find Defendants liable for breach of the non-compete provision and seek to have the Court close Warrior Fitness, and pay as damages all of the profits earned by Warrior Fitness in the last three years, notwithstanding the Court's conclusion that the restrictive covenant is overbroad and unenforceable.  Plaintiffs have failed to cite any cases in this jurisdiction where a court, several years after the alleged violation of a non-compete provision, has rewritten or blue-penciled a restrictive covenant in the manner sought by the Plaintiffs, instead directing the Court's attention to inapposite case law. See, e.g., Omni Consulting Grp., Inc. v. Marina Consulting, Inc., No. 01-CV-511A (RJA), 2007 WL 2693813, at *6 (W.D.N.Y. Sept. 12, 2007) (blue-lining a non-solicitation provision in response to a summary judgment motion where "[t]he provision as a whole [was] not overbroad," and where the restriction applied only to defendant's ability to hire a single individual, who could perform the contracted computer services from anywhere in the United States, and "[did] not impact [defendant's] ability to maintain its business"); Unisource Worldwide, Inc. v. Valenti, 196

F. Supp. 2d 269, 277 (E.D.N.Y. 2003) (blue-lining a non-compete
provision in the context of a motion for a preliminary injunction).
Moreover, the request to rewrite the geographic scope of the non-
compete provision to cover the entire United States is unreasonable
and would be unduly onerous to Defendants Belliard and Fell.  Pure
Power presently operates in two locations in the New York
metropolitan area and has no imminent plans to open other
facilities in other states.  Yet, Plaintiffs seek to prohibit
Belliard and Fell from not just operating, but working in,
facilities located anywhere in the United States that employ
military-style exercises.

Finally, there was a coercive use of "bargaining power" by
Plaintiffs that the BDO Seidman court, in a similar context, found
unlikely to conform with reasonable standards of fair dealing.
Specifically, the non-compete provision was drafted by Pure Power's
attorneys, at the request of Brenner, and Belliard was required to
sign the Employment Agreement, on the spot, after he had been
working at Pure Power for a number of years, as a condition of his
continued employment at Pure Power, and not in exchange for a
promotion, greater responsibilities, or any other benefit beyond
continued employment. See, e.g., Scott, Stackrow & Co., C.P.A.'s,
P.C. v. Skavina, 9 A.D.3d 805, 807-08, 780 N.Y.S.2d 675, 678 (3d
Dep't 2004) (refusing to partially enforce a restrictive covenant

where plaintiff, "from a superior bargaining position," required defendant to sign the employment agreement "as a condition of continued employment" and not in exchange for "a fiduciary relationship, a position of increased responsibility within the firm or any other significant benefit"); Spinal Dimensions, 2007 WL 2296503, at *11 (concluding that plaintiffs failed to meet their burden in justifying partial enforcement, in part, because "[a]s in Scott Stackrow, there has been no showing here that in exchange for agreeing to the . . . restrictive covenant, defendant assumed a position of greater responsibility or trust, or otherwise obtained any benefit beyond the ability to continue to serve as an independent contractor"). Accordingly, Plaintiffs have failed to establish that rewriting and partially enforcing the non-compete provision is warranted.

C.    Solicitation of Pure Power Clients

Plaintiffs contend that Defendants Belliard and Fell violated the non-solicitation provision of the Employment Agreement, which states that an employee of Pure Power, for a period of ten years following employment at Pure Power:

> shall not, and shall not assist any third-
> party to, solicit any client or customer of
> [Pure Power] to discontinue his or her use of
> [Pure Power's] products and services or to use
> the competing products or services of another
> business.

25

(Pls.' Ex. 329.)

A non-solicitation provision is a type of restrictive covenant. As discussed, in order for a restrictive covenant to be enforceable, the employer must show that the restriction is necessary to protect the employer's legitimate business interests. Under New York law, an employer's legitimate business interests are generally limited "to the protection against misappropriation of the employer's trade secrets or of confidential customer lists, or protection from competition by a former employee whose services are unique or extraordinary." BDO Seidman, 93 N.Y.2d at 389. Nevertheless, even where there is no showing that a former employee has obtained a competitive advantage through the misappropriation of confidential customer information, or that the employee provided unique or extraordinary services, the employer retains "a legitimate interest in preventing former employees from exploiting the goodwill of a client or customer, which had been created and maintained at the employer's expense, to the employer's competitive detriment." Id. at 392.

In order to demonstrate that a former employee performed unique or extraordinary services, the employer must show that the employee was irreplaceable and that the employee's departure caused some special harm to the employer. See Ken J. Pezrow Corp. v. Seifert, 197 A.D.2d 856, 857, 602 N.Y.S.2d 468, 469 (4th Dep't

1993).  The employee's services must be "truly special, unique or extraordinary, and not merely of high value to his or her employer." H & R Recruiters, Inc. v. Kirkpatrick, 243 A.D.2d 680, 681, 663 N.Y.S.2d 865 (2d Dep't 1997).

With respect to the alleged use of confidential customer lists by a former employee, a restrictive employment covenant will not be enforced unless the plaintiff can demonstrate that the information contained in the lists was not readily available through other sources. See Ken J. Pezrow Corp., 197 A.D.2d at 857, 602 N.Y.S.2d at 469.  Indeed, the solicitation of a plaintiff's clients by a former employee through this means is not actionable "unless the customer list could be considered a trade secret or there was wrongful conduct by the employee such as physically taking or copying the employer's files or using confidential information." Amana Express Int'l, Inc. v. Pier-Air Int'l, Ltd., 211 A.D.2d 606, 606-07, 621 N.Y.S.2d 108 (2d Dep't 1995); see also JAD Corp. of Am. v. Lewis, 305 A.D.2d 545, 546, 759 N.Y.S.2d 388 (2d Dep't 2003) (finding restrictive covenant unenforceable because information sought to be protected by restrictive covenant was "readily available from publicly-available sources"); Buhler v Maloney Consulting, 299 A.D.2d 190, 191, 749 N.Y.S.2d 867 (1st Dep't 2002) (finding contact list prepared by former employee was "based on her knowledge of the financial services industry and on information

27

that was publicly available" and did not support enforcement of a restrictive employment covenant). Moreover, former employees can use their recollection of information about customers, and such recollected information is not considered confidential for purposes of enforcing restrictive employment covenants. See Buhler, 299 A.D.2d at 191, 749 N.Y.S.2d 867 ("It is well-settled that an employee's recollection of information pertaining to the needs and habits of particular customers is not actionable.") (citations omitted); accord Natural Organics, Inc. v. Kirkendall, 52 A.D.3d 488, 489, 860 N.Y.S.2d 142, 143 (2d Dep't 2008).

In addition, a non-solicitation provision will be rejected as overly broad if it seeks to bar the employee from soliciting clients of the employer with whom the employee did not acquire a relationship through his or her employment, or if the provision extends to clients recruited through the employee's own independent efforts. BDO Seidman, 93 N.Y.2d at 392; see also Walter Karl, Inc. v. Wood, 137 A.D.2d 22, 28, 528 N.Y.S.2d 94 (2d Dep't 1988) (finding no breach of a non-solicitation provision where the decision of certain of plaintiff's clients to transfer their accounts to a company formed by its former employee "was based upon the defendant's personal familiarity with and knowledge of their needs as well as his outstanding ability in the field").

In certain limited circumstances, the potential adverse

effects of exploitation of a close relationship between an employee and an employer's customers are sufficient to support the enforcement of a non-solicitation provision. "An employer has sufficient interest in retaining present customers to support an employee covenant where the employee's relationship with the customers is such that there is a substantial risk that the employee may be able to divert all or part of the business." <u>Serv. Syst. Corp. v. Harris</u>, 41 A.D.2d 20, 23-24, 341 N.Y.S.2d 702, 706 (4th Dep't 1973); <u>see also</u> <u>Scott, Stackrow</u>, 9 A.D.3d at 806, 780 N.Y.S.2d 675 ("An anticompetitive covenant may prevent the competitive use of client relationships that the employer assisted the employee in developing through the employee's performance of services in the course of employment."). "The risk to the employer reaches a maximum in situations in which the employee must work closely with the client or customer over a long period of time, especially when his services are a significant part of the total transaction." <u>BDO Seidman</u>, 93 N.Y.2d at 391-92 (internal quotations and citations omitted).

A close relationship between an employee and an employer's customer alone, however, is <u>not</u> sufficient to invoke the protections of a restrictive employment covenant. <u>See</u> <u>Investor Access Corp. v. Doremus & Co., Inc.</u>, 186 A.D.2d 401, 404, 588 N.Y.S.2d 842, 845 (1st Dep't 1992) (citations and internal

quotations marks omitted).  The enforcement of such covenants on the basis of a close business relationship between the employee and the employer's customers is generally limited to instances where the employee rendered specific substantive services of a confidential nature to the employer's customers. See e.g., BDO Seidman, 93 N.Y.2d at 392 (enforcing restrictive covenant which protected against "defendant's competitive use of client relationships which [plaintiff-firm] enabled him to acquire through his performance of accounting services for the firm's clientele during the course of his employment"); Chernoff Diamond & Co. v. Fitzmaurice, Inc., 234 A.D.2d 200, 202-203, 651 N.Y.S.2d 504 (1st Dep't 1996) (enforcing restrictive covenant where defendant acted as a "trusted professional advisor" and gained "invaluable and otherwise unobtainable information concerning the insurance needs and business practices [of clients] due to his position"); cf. Investor Access Corp., 186 A.D.2d at 402-04, 588 N.Y.S.2d at 842 (finding a restrictive covenant unenforceable because the position of public relations and investor relations professional did not involve the acquisition or use of trade secrets or other confidential information pertaining to either the customer or the employer).

Here, Plaintiffs' breach of the non-solicitation provision claim is based upon the contention that Defendants misappropriated

Pure Power's client list and used the confidential information contained therein to solicit at least 147 Pure Power clients.  This list of 147 allegedly solicited Pure Power clients includes all customers who signed a contract with Pure Power at any time between 2005 and 2008 and subsequently signed up for fitness classes at Warrior Fitness in 2008 or 2009.

As an initial matter, the Court's factual findings and legal conclusions regarding the non-compete provision, and its unreasonableness in terms of duration and geographic scope, apply with equal force to the non-solicitation provision, which, like the non-compete provision, runs for a period of ten years and has no express geographic limitation.  Unlike the non-compete provision, however, Plaintiffs do not seek partial enforcement of the non-solicitation provision (i.e., for a more limited duration than ten years).

In addition, the non-solicitation provision appears to prohibit only the solicitation of current (as opposed to former) clients of Pure Power.  In particular, the provision provides, in relevant part, that "you shall not . . . solicit <u>any client or customer</u> of [Pure Power] to discontinue his or her use of [Pure Power's] services or to use the competing products or services of another business." (Pls.' Ex. 329) (emphasis added).  Had Plaintiffs intended to include both current and former clients of

31

Pure Power under the non-solicitation provision of the Employment Agreement, it would have been easy enough to so state. See, e.g., ZVUE Corp. v. Bauman, No. 600269-2009 (BJF), 2009 WL 1025744, at *14 (N.Y. Sup. Ct. Apr. 15, 2009) ("The non-compete agreement provides: At no time during or after the term of my employment will I use any Proprietary Information to compete with the Company or to solicit the current or former customers, clients, employees or business contacts of the Company for business or employment.") (emphasis added).  They did not do so and any attempt to construe the provision to prohibit the solicitation of former Pure Power clients, which is not tied to the use of proprietary information, would be unreasonable.

Of the 147 clients identified by Plaintiffs as having been improperly solicited, only 20 or so were actually enrolled at Pure Power in 2008, when Defendants' alleged solicitation first took place. (See Pls.' Ex. 474.)  Indeed, several of the 147 clients had not been enrolled at Pure Power since 2006.  Although Plaintiffs contend that it is common for Pure Power clients to sign up for a set number of classes at Pure Power, to take a break, and then to return to Pure Power to sign up for additional classes, the Court does not accept that individuals who are no longer under contract for classes at Pure Power, nonetheless, remain Pure Power clients indefinitely for purposes of the non-solicitation

provision. See, e.g., Leon M. Reimer & Co., P.C. v. Cipolla, 929 F.
Supp. 154, 159 (S.D.N.Y. 1996) ("While a relationship with present
clients may be an interest that is properly protectable in some
fashion . . . to the extent that [the restrictive covenant] can be
read broadly to restrain former employees from serving any dormant
client without restriction, [it] is overbroad.").

Moreover, Plaintiffs failed to introduce any direct evidence
establishing that any one of the 147 clients, who later enrolled at
Warrior Fitness, was, in fact, improperly solicited by Defendants
Belliard or Fell to join Warrior Fitness.  The mere fact that a
Warrior Fitness client was, at some point in time, a Pure Power
client does not imply that Defendants solicited that client — no
less improperly solicited that client.  For example, several of the
147 former Pure Power clients joined Pure Power after Belliard and
Fell were no longer working at Pure Power, and Plaintiffs failed to
show that these clients had ever been in contact with any of the
Defendants, or even knew any of the Defendants, before enrolling at
Warrior Fitness.  Several other clients, whom Plaintiffs alleged
had been solicited by Defendants, testified at trial that they were
not, in fact, solicited by Defendants, nor had they ever been in
contact with any of the Defendants about Warrior Fitness.  Other
clients testified that they had learned about Warrior Fitness from
Brenner herself, or on Facebook.  Further, several Pure Power

33

clients stated that they had left Pure Power, not because
Defendants encouraged them to do so, but because they valued the
instruction provided by drill instructors Belliard and Fell, and
wanted them to continue to be their instructors. See, e.g.,
Deloitte & Touche, L.L.P. v. Chiampou, 222 A.D.2d 1026, 1027, 636
N.Y.S.2d 679, 679 (4th Dep't 1995) (holding that preliminary
injunction to enforce covenant not to compete cannot apply to
"plaintiff's former clients who had voluntarily and without
solicitations sought out defendants after defendants left
plaintiff's employ"). Finally, the record shows that some clients
had preexisting personal relationships with Defendants long before
becoming clients of Pure Power; for instance, one Pure Power
client, who later enrolled in Warrior Fitness, had been friends
with Lee in college and was the maid-of-honor at Lee's wedding.
For these clients, there could be no claim that the relationship
was developed at Pure Power's expense.

There was some evidence, however, that Lee and, to a lesser
extent, Baynard, solicited Pure Power clients, by telling Pure
Power recruits, with whom they "trained," that Belliard and Fell
were planning to open a competing facility, and that they should
come train with them. There was no evidence, however, of Belliard
or Fell having specifically instructed Lee or Baynard to contact or
solicit these Pure Power clients. Indeed, information about

34

Warrior Fitness was often provided by Lee and Baynard in response to inquiries about Belliard or Fell — both of whom, abruptly and without explanation, left Pure Power.  Moreover, Plaintiffs have failed to specifically attribute any of the 147 clients, who were allegedly solicited by Lee or Baynard, to the stolen Pure Power client list (or to the Party List).  Nor do Plaintiffs argue that Defendants, while at Pure Power, rendered specialized or personal confidential services to any of these clients.  In any event, the Court finds that leading fitness classes fails to qualify as such. Thus, even if Plaintiffs could specifically identify clients whom Baynard or Lee solicited on Belliard or Fell's request, Plaintiffs have failed to establish that this solicitation was improper insofar as the name of that client was obtained either from the stolen Pure Power client list or as a consequence of a close relationship formed while Belliard or Fell worked at Pure Power.

In short, as duplicitous as Defendants' conduct was, in the end, Belliard and Fell are fitness instructors, and some of the Pure Power clients whom they trained were more loyal to them than to the Pure Power facility. It is, therefore, not surprising that when the instructors left Pure Power for Warrior Fitness, some of their clients left as well.

For the foregoing reasons, the Court finds that the preponderance of the evidence does not support the conclusion that

the 147 Pure Power clients identified by Plaintiffs enrolled at Warrior Fitness as a result of Belliard's or Fell's improper solicitation in breach of their Employment Agreements.

D.   Intellectual Property

Plaintiffs contend that Defendants Belliard and Fell breached the "Intellectual Property" provision of the Employment Agreement. The Intellectual Property provision states that, as an employee of Pure Power,

> You acknowledge that [Pure Power's] obstacle-confidence courses and related environments, and the marketing thereof, embody and/or reflect inventions, discoveries, concepts, ideas, developments, improvements, methods, processes, know-how, trade secrets, designs, trademarks, . . . trade dress, textual and graphic material, and a distinctive overall look and feel (collectively, "Intellectual Property"). You agree that all such Intellectual Property, regardless of whether or not it is capable of patent, trademark, trade dress, trade secret or copyright protection, is exclusively owned by [Pure Power]. You shall not, during the course of your employment or any time thereafter, challenge [Pure Power's] ownership of any Intellectual Property or the validity or enforceability thereof, nor shall you use any Intellectual Property in any competing business, or in any other way without [Pure Power's] express written permission, during or after your employment with [Pure Power].

(Pls.' Ex. 329.)

Under New York law, it is well-settled that a contract is valid only if the agreement between the parties is "definite and

36

explicit so [that the Parties'] intention may be ascertained to a reasonable degree of certainty." Best Brands Beverage, Inc. v. Falstaff Brewing Corp., 842 F.2d 578, 587 (2d Cir. 1987) (internal quotation marks and citations omitted, alteration in original); accord, e.g., Alter v. Bogoricin, 97 Civ. 0662 (MBM), 1997 WL 691332, at *6 (S.D.N.Y. Nov. 6, 1997) ("Under the definitiveness doctrine, New York courts will not enforce a material contract term if it is impossible to determine what in fact the parties have agreed to . . .") (citations and internal quotations omitted). Even if the parties believe that they are bound by the contract, "if the terms of the agreement are so vague and indefinite that there is no basis or standard for deciding whether the agreement had been kept or broken, or to fashion a remedy, and no means by which such terms may be made certain, then there is no enforceable contract." Best Brands, 842 F.2d at 588 (internal quotations and citations omitted).

"Definiteness as to material matters is of the very essence of contract law, for without it a court could not intervene without imposing its own conception of what the parties should or might have undertaken, rather than confining itself to a bargain to which they have mutually committed themselves." Bernstein v. Felske, 143 A.D.2d 863, 864-65, 533 N.Y.S.2d 538, 540 (2d Dep't 1988); see also Joseph Martin, Jr. Delicatessen, Inc. v. Schumacher, 52 N.Y.2d 105,

109, 436 N.Y.S.2d 247, 249 (1981) ("[D]efiniteness as to material matters is of the very essence in contract law. Impenetrable vagueness and uncertainty will not do.").

Here, the intellectual property provision set forth in the Employment Agreement is impermissibly vague, indefinite, and overbroad. To start, the provision does not provide any durational limitations. Defendants Belliard and Fell would be subject to this restriction in perpetuity, even if Pure Power was to shut down tomorrow. Moreover, the provision does not simply prohibit Defendants from challenging the validity or enforceability of Pure Power's alleged "Intellectual Property" or using it in a competing business. Defendants cannot "use any Intellectual Property . . . in any other way." It is impossible for the Court to uphold this provision without imposing its own conception of what exactly is meant by the vague and indefinite phrase: "in any other way."

In addition, the contractual provision purports to apply to Pure Power's "obstacle-confidence courses and related environments." These terms are vague and overbroad, and are nowhere made definite or more explicit elsewhere in the contract; nor are any of these terms clarified or limited by other contractual documents in the case. There is no basis for the Court to determine, for example, whether "obstacle-confidence course" relates to the individual elements — the obstacles themselves — or

to the entire obstacle/confidence course itself, as arranged by Pure Power. In addition, "related environments" is impermissibly vague. It is unclear whether this term relates to the overall decor of Pure Power, or to any camouflage material, or to the use of military colors or artifacts or a military theme, or just the obstacle course environment (e.g., a floor covered with crushed rubber).

Moreover, it is not simply the case that, in signing the Employment Agreement, Defendants agreed not to challenge the validity of an existing trademark or patent. Here, the provision applies to Pure Power's alleged "Intellectual Property," even if the alleged intellectual property is not "capable of patent, trademark, trade dress, trade secret, or copyright protection," or even of definition.[5] This intellectual property provision,

_____

[5] Courts in this jurisdiction, typically in the context of settlement agreements or licensing agreements, have recognized that such agreements not to challenge the validity or enforceability of intellectual property "necessarily involve the public interest and have enforced such agreements only to the extent that enforcement does not result in a public injury." Idaho Potato Comm'n v. Produce Farm & Sales, 335 F.3d 130, 136 (2d Cir. 2003) (holding that licensee was not estopped from challenging the validity of a trademark) (discussing cases following Lear, Inc. v. Adkins, 395 U.S. 653, 89 S. Ct. 1902 (1969) (holding that the contract doctrine of licensee estoppel was trumped by the federal policy embodied in the patent laws)). Likewise, courts that have applied the principles articulated in Lear to analyze the validity of other similar no-challenge provisions have balanced the public interest in favor of challenging alleged intellectual property against the private

however, is vague and indefinite and cannot be said to promote predictable contractual relationships.   Permanently barring an employee from challenging an employer's alleged intellectual property — however vaguely defined — runs contrary to the "important interest in permitting full and free competition in the use of ideas which are in reality a part of public domain." <u>Lear</u>, 395 U.S. at 670, 89 S. Ct. at 1911.  Plaintiffs have failed to explain what legitimate business interest they are seeking to protect or promote, through contract, beyond that already covered by state and federal intellectual property law, or why they are entitled to an additional layer of protection substantially restricting Defendants' freedom to use and incorporate ideas and concepts relating to the United States military — ideas and concepts to which Brenner, of course has no special claim.

     In short, the Court concludes that the intellectual property provision of the Employment Agreement is vague, overbroad, and unreasonably restricts free competition in the use of ideas, and is, therefore, unenforceable as a matter of law.

---

interest in predictable contractual relationships. <u>See, e.g.</u>, <u>HSW Enters., Inc. v. Woo Lae Oak, Inc.</u>, No. 08 Civ. 8476 (LBS), 2009 WL 4823920, at *2 (S.D.N.Y. Dec. 15, 2009).

E.   Best Efforts Provision

Plaintiffs contend that Defendants Belliard and Fell breached the "Commitment to Full Effort" provision of the Employment Agreement, which provides, in relevant part, that an employee of Pure Power: "shall devote [his or her] skills and best efforts to [Pure Power]" and "shall work to further the best interests of [Pure Power]." (Pls.' Ex. 329.)

Under New York law, "when called upon to construe a clause in a contract expressly providing that a party is to apply his best efforts, a clear set of guidelines against which to measure a party's best efforts is essential to the enforcement of such a clause." Mocca Lounge, Inc. v. Misak, 94 A.D.2d 761, 763, 462 N.Y.S.2d 704, 706-07 (2d Dep't 1983) (citations omitted); see Digital Broad. Corp. v. Ladenburg, Thalmann & Co., 63 A.D.3d 647, 648, 883 N.Y.S.2d 186, 187 (1st Dep't 2009); see also Proteus Books Ltd. v. Cherry Lane Music Co., 873 F.2d 502, 508-09 (2d Cir. 1989) (enforcing a clause setting forth a duty to perform services with "due professional skill and competence" because a reference to the managerial and marketing standards of the book publishing and distribution industries was sufficient to make the phrase readily understandable); Bloor v. Falstaff Brewing Corp., 454 F. Supp. 258, 266-267 (S.D.N.Y. 1978), aff'd, 601 F.2d 609 (2d Cir. 1979) (stating that "best efforts" under a distribution contract is

41

measured against the distributor's capabilities and prior merchandising of other similar products). "To imply the terms suggested by plaintiff would be to impermissibly make a new contract for the parties rather than to enforce a bargain the parties themselves had reached." Mocca Lounge, 94 A.D.2d at 763, 462 N.Y.S.2d at 707.

Here, however, no objective criteria or standards against which Defendants Belliard and Fell's efforts can be measured are set forth in the Employment Agreement. For example, it is unclear whether it requires certain conduct in teaching fitness classes, or if it also applies more generally to recruiting new customers to Pure Power or to otherwise promoting the business. Nor may such criteria or standards be implied from the circumstances of this case. Accordingly, the Court finds that the term "best efforts" in the Employment Agreement is a patently subjective standard that is unenforceable.

F.    Disclosing Confidential Information

Plaintiffs contend that Defendants Belliard and Fell breached the non-disclosure provision of the Employment Agreement, which provides, in relevant part, that an employee of Pure Power: "shall not disclose, either orally or in writing, to anyone outside [Pure Power] any confidential or commercially sensitive information made known . . . or acquired . . . in the course of . . . employment [at

42

Pure Power].” (Pls.’ Ex. 329.)

Pure Power argues, and the Court agrees, that Pure Power’s documents, including its business plan, operations manual, start-up manual, and customer contracts are confidential and commercially sensitive business documents.  These documents were stored on a computer, equipped with username and password protection, in Brenner’s private office at Pure Power.  Although Brenner testified that she showed these materials to others, “confidential” does not mean that no one can ever see the documents.  Indeed, the documents themselves expressly anticipate that others outside of Pure Power will read them, and they make abundantly clear that the information contained within is confidential and commercially sensitive.  In the Acknowledgment of Receipt section of Pure Power’s operations manual, for example, it states that recipients of the document “must at all times treat as confidential, and not at any time disclose, copy, duplicate, record” the contents of these documents. (Pls.’ Ex. 135.)

The Court further concludes that Pure Power’s client list not only contains confidential and commercially sensitive information, but also constitutes a protectable trade secret.  Under New York law, a customer list that contains information concerning the identities and preferences of client contacts may be a protectable trade secret. See N. Atl. Instruments v. Haber, 188 F.3d 38, 44 (2d

43

Cir. 1999); C & C Metal Prods. Corp. v. Defiance Button Mach. Co., 759 F.2d 1053, 1063 (2d Cir. 1985), cert. denied, 474 U.S. 844, 106 S. Ct. 131 (1985) ("A customer list developed by a business through substantial effort and kept in confidence may be treated as a trade secret at the owner's instance against disclosure to a competitor, provided the information it contains is not otherwise readily ascertainable."); FMC Corp. v. Taiwan Tainan Giant Indus. Co., 730 F.2d 61, 63 (2d Cir. 1984) (per curiam) (reversing, as clearly erroneous, a district court's finding that a client list was not a trade secret, where it would have been difficult to find clients without the employee's help); see also Leo Silfen, Inc. v. Cream, 29 N.Y.2d 387, 394-95, 328 N.Y.S.2d 423, 430 (1972) ("A trade secret, like any other secret, is nothing more than private matter; something known to only one or a few and kept from the general public; and not susceptible to general knowledge.").

"In determining whether matter is protectable as a trade secret, courts frequently examine the method by which defendant acquired it, e.g., such as by stealing or copying." Paz Sys., Inc. v. Dakota Grp. Corp., 514 F. Supp. 2d 402, 408 (E.D.N.Y. 2007) (internal quotations and citations omitted). "[E]ven if this information did not independently rise to the level of a trade secret, the defendants' wrongful retention of the customer information would justify treating it as a trade secret." Id.; see

44

also B.U.S.A. Corp. v. Ecogloves, Inc., No. 05 Civ. 9988 (SCR), 2006 WL 3302841, at *4 (S.D.N.Y. Jan. 31, 2006) (finding a list of business contacts to be a trade secret where "plaintiffs took appropriate measures, such as locking files and using computer passwords, to protect the contact information").

Here, Pure Power's client list was obviously important to Plaintiffs' business model, which was dependent upon Pure Power building and preserving relationships with its client base. Information on when clients' classes would start and end, for example, was valuable because it would be used to contact clients to encourage re-enlisting. It was obviously valuable to Defendants because they considered such information in assessing who might fruitfully be solicited to switch to Warrior Fitness. Moreover, Pure Power's client list contained confidential information not readily available to its competitors, including, among other data, client names, contact information, the amounts that clients spent on classes, and contract term dates, and it was the product of substantial time, effort, money, and resources expended by Pure Power over the course of several years. Accordingly, Plaintiffs took reasonable measures to protect this information, including, for example, username and password protection. Moreover, there is no dispute that Belliard obtained Pure Power's client list "by improper means" in having downloaded the client list onto a

personal thumb-drive, without permission, from a Pure Power computer.

The Court finds that Defendant Belliard is liable for breach of the non-disclosure provision of the Employment Agreement. As discussed, Belliard stole Pure Power's business plan, start-up manual, and operations manual, and provided Lee with these documents. In addition, Belliard concedes having stolen Pure Power's customer list but denies having shared the information on the client list with anyone. The preponderance of the evidence, however, establishes that Belliard stole Pure Power's client list and disclosed the confidential information contained therein to, at a minimum, Baynard, who subsequently incorporated the names on the list into the Party List.

At trial, Belliard testified that the names of Pure Power clients that he contributed to the Party List came from a list Belliard had been developing since he first joined Pure Power, and which he allegedly maintained in his telephone contacts, and in various personal email accounts. It was this other list — not Pure Power's client list — that Belliard claimed to have sent to Baynard by email. Defendants, however, never produced a copy of this purported email exchange between Baynard and Belliard. Nor did Defendants produce a copy of the contact list that Belliard allegedly maintained in his telephone contacts, and in his personal

46

email accounts, despite Plaintiffs' multiple requests to do so.
When asked about the missing emails at trial, Belliard testified
that, prior to this litigation, he deleted most of his emails after
he sent them.  His testimony was not credible.  Many emails sent by
Belliard prior to the commencement of this litigation have been
produced in discovery in this case.

    Belliard testified that the names of Pure Power clients that
he contributed to the Party List were obtained by randomly
answering the phone at Pure Power's front-desk and discussing with
these clients their contracts and possible refunds — none of which
was part of Belliard's official duties as a fitness instructor.
Further, there was a great deal of testimony at trial about Pure
Power client — Iriselly Arroyo.  When she first signed up as a Pure
Power client, on March 14, 2008, her name was misspelled (entered
into the Pure Power system as Iris Selly Arroyo).  Her name was
also misspelled in the exact same way on the Party List.  When she
arrived at Pure Power, two weeks later, on March 25, 2008, for her
first class, she noticed the misspelling, and it was corrected
later that day.  She also testified that she had never met any of
the Defendants before the start of trial.

    Plaintiffs contend, and the Court agrees, that these facts
show that Pure Power's client list was stolen, not in November 2007
as Belliard testified at trial, but at some point between March 14,

2008 and March 25, 2008, and that the client list was sent by Belliard to Baynard, with the intention that the contact information contained in the list be used to solicit Pure Power customers.

This conduct represents a clear breach of the non-disclosure provision of Belliard's Employment Agreement.

      1.   <u>Compensatory Damages</u>

Plaintiffs argue that they are entitled to recover, as compensatory damages for Belliard's breach of the non-disclosure provision, the lost profit Pure Power incurred as a consequence of the breach, from May 2008 to December 2010.[6] Plaintiffs propose two alternative calculations. First, attributing all of Warrior Fitness's revenue as properly belonging to Pure Power and applying Pure Power's purported 58% profit margin, Plaintiffs claim $1,368,247.00 in lost profits from May 2008 to December 2010. Second, considering only the 147 allegedly solicited Pure Power clients, and assuming that Pure Power clients, on average, generate

---

[6] Plaintiffs seek only consequential damages, and not general damages. General damages seek to compensate the plaintiff for "the value of the very performance promised," typically as determined by the market value of the good or service provided. <u>Schonfeld v. Hilliard</u>, 218 F.3d 164, 175-76 (2d Cir. 2000). Unlike consequential damages, general damages are recoverable even if the amount of loss is not "capable of proof with reasonable certainty." <u>Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.</u>, 487 F.3d 89, 109 (2d Cir. 2007).

$2,655.00 per year in revenue, Plaintiffs calculate total lost profits from May 2008 through December 2010, in an amount of $354,177.00.[7]

Under New York law, the measure of damages for a violation of a restrictive covenant is the loss sustained by reason of the breach, including "the net profits of which the plaintiff was deprived" by the defendant's acts. See Weinrauch v. Kashkin, 64 A.D.2d 897, 898, 407 N.Y.S.2d 885 (2d Dep't 1978); see also Cargill v. Sears Petroleum & Transp. Co., 388 F. Supp. 2d 37, 70 (N.D.N.Y. 2005) (stating that the proper measure of damages for breach of a non-disclosure agreement is the net profits of which plaintiff was deprived as a consequence of the breach). Lost profits may be recovered only if: (1) lost profits were "fairly within the contemplation of the parties to the contract at the time it was made;" (2) lost profits were caused by the defendant's breach; and (3) damages are "capable of proof with reasonable certainty." Kenford Co. v. Cnty. of Erie, 67 N.Y.2d 257, 261, 502 N.Y.S.2d 131, 132 (1986); see also Carco Group, Inc. v. Maconachy, 383 Fed App'x 73, 75 (2d Cir. 2010). "[D]amages may not be merely speculative,

---

[7] Plaintiffs allege that 81 former Pure Power clients were enrolled in Warrior Fitness in 2008, 76 former Pure Power clients were enrolled in Warrior Fitness in 2009, and 73 former Pure Power clients were enrolled in Warrior Fitness in 2010. Total lost profit is then calculated as $2,655.00 x 230 = $610,650.00 x 0.58 (Pure Power's profit margin)= $354,177.00.

possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes." Kenford, 67 N.Y.2d at 261, 502 N.Y.S.2d at 132; see also Toltec Fabrics, Inc. v. August Inc., 29 F.3d 778, 784 (2d Cir. 1994) (finding evidence of lost profits insufficient where there was no reasonable certainty of future sales and plaintiff failed to demonstrate "proof of a consistent pattern of frequent ordering by a specific customer"); Trademark Research Corp. v. Maxwell Online, Inc., 995 F.2d 326, 332-33 (2d Cir. 1993) (finding no reasonable certainty of lost profits despite evidence of expert calculation of lost profits based on performance of comparable companies, market studies, business and promotional plans, subsequent sales, and earnings).

Plaintiffs fail to satisfy all three necessary elements to recover lost profits for Belliard's breach of contract. First, the Employment Agreement does not make any reference to lost profits, and Plaintiffs failed to introduce any evidence into the record suggesting that the parties contemplated such damages. See, e.g., Spherenomics Global Contact Ctrs. v. Customer Corp., 427 F. Supp. 2d 236, 252 (E.D.N.Y. 2006) (finding that parties did not contemplate lost profits liability when the non-compete was silent as to such damages).

Second, regardless of the alternative measures of lost profits

offered by Plaintiffs, Plaintiffs failed to establish that lost profits were caused by Belliard's breach of the non-disclosure provision.  The preponderance of the evidence does not support the conclusion that, but for Belliard's stealing and disclosing Pure Power's business documents and the customer list, Warrior Fitness would not have opened.  Indeed, Belliard and Fell already knew how to operate a gym.  They were familiar with Brenner's teaching methods and techniques.  They learned how to do the training.  They knew Pure Power's pricing structure.  And, Lee, their partner, had a business degree and business experience.  There is no sound basis to conclude that information contained in the stolen business documents, or the client list itself, was necessary to open Warrior Fitness.  Accordingly, it is not appropriate to consider all of Warrior Fitness's revenues as Pure Power's lost profits.

Likewise, as discussed, Plaintiffs failed to prove that the disclosure or use of the client list was the reason why the 147 former Pure Power clients signed up for classes at Warrior Fitness. Moreover, there is no support for Plaintiffs' contention that, had Belliard not breached the non-disclosure provision of the Employment Agreement, every one of these 147 Warrior Fitness clients would have enrolled in Pure Power.

Third, and finally, Plaintiffs failed to establish lost profit damages with reasonable certainty.  Plaintiffs' lost profit

calculation attributing all of Warrior Fitness's revenue to Pure Power is overreaching, inherently speculative, and cannot be tied to the breach of the non-disclosure provision.  Moreover, although the relevant information was available to Plaintiffs throughout the course of this litigation, Plaintiffs ignored the actual data in the case and chose, instead, to rely on the discredited "mass asset" theory of their damages expert — which was precluded by this Court.  In particular, prior to trial, Defendants moved the Court to exclude the expert report and opinion testimony of Plaintiffs' expert damages witness, William F. Chandler ("Chandler").[8]  In an Order, dated January 21, 2011, the Court precluded Chandler from testifying at trial regarding Pure Power's alleged lost profits. Specifically, the Court ruled that "Chandler employed a fundamentally flawed methodology in calculating plaintiffs' lost profits over a ten-year period for the New York [Pure Power] site. I consider his methodology inadequate to support his conclusions and not appropriate to the case at hand."  (Transcript, dated Jan.

---

[8] In his expert report, Chandler, without citing to any recognized authority supporting his contention, claimed that the customers allegedly solicited from Pure Power could be viewed as a "mass asset."  In particular, in his damage calculation, he treated the stolen customers as a "mass asset" that he projected would generate increased revenue each year.  He did not look at the behavior of actual individual clients of Pure Power and Warrior Fitness.  According to Chandler, the core mass asset that was developed by Pure Power could be expected to generate a increasing stream of revenue over a ten-year period.

20, 2011 ("Expert Hr."), attached as Ex. A. to Declaration of Daniel Schnapp, dated Feb. 17, 2011, at 65.)

Here, Plaintiff's lost profit calculation with respect to the 147 allegedly solicited Pure Power clients is based, not on Pure Power's financial statements or on the actual revenue generated by those clients, but, instead, on Chandler's excluded expert report. Although Plaintiffs contend that Chandler's trial testimony established that these Pure Power clients, who later joined Warrior Fitness, generated, on average, $2,655.00 per year in revenue, the Court does not agree that this conclusion can be drawn from Chandler's limited trial testimony. And, in any event, this testimony was excluded by the Court during trial as an "ambush."[9]

Similarly, Plaintiffs contend that a review of Pure Power's financial statements from 2005 to July 2009 demonstrates that Pure Power's average profit margin, over that time period, was 58%. This percentage, however, cannot be derived from Pure Power's financial statements or tax returns, but, instead, is taken

_____

[9] See Tr. at 2219 ("[T]he rules say that experts can't testify to matters that are not in their reports. His initial report was in large part stricken. There was no request to submit a supplemental report. Aside from this not being in the report, I think it's just really an ambush on the Defendants. . . . [Having] to cross-examine an expert who is now advancing ideas that he didn't advance in his report based on assumptions that were not in the original report seems to me inherently unfair.").

directly from Chandler's excluded export report, and is based upon assumptions about variable costs that are wholly arbitrary and not supported by the evidence in the case.

Accordingly, for all these reasons, Plaintiffs failed to establish all of the required elements of their breach of contract claim against Defendants Belliard and Fell.

## II.  **Breach of the Duty of Loyalty**

Plaintiffs contend that Defendants Belliard and Fell breached the common law duty of loyalty owed to Pure Power as employees of Pure Power.

### A.  Liability

"New York law with respect to disloyal or faithless performance of employment duties is grounded in the law of agency, and has developed for well over a century." Phansalkar v. Anderson Weinroth & Co., L.P., 344 F.3d 184, 200 (2d Cir. 2003).  An agent is obligated under New York law to be loyal to his employer and is "prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties." Id. (quoting Lamdin v. Broadway Surface Adver. Corp., 272 N.Y. 133, 138, 5 N.E.2d 66 (1936)).  This duty is not dependent upon an express contractual relationship, but exists even where the employment relationship is at-will. Id.; accord Design Strategies, Inc. v.

Davis, 384 F. Supp. 2d 649, 659-60 (S.D.N.Y. 2005); see also W. Elec. Co. v. Brenner, 41 N.Y.2d 291, 295, 392 N.Y.S.2d 409 (1977) ("The employer-employee relationship is one of contract, express or implied, and, in considering the obligations of one to the other, the relevant law is that of master-servant and principal-agent.") (citations omitted).

When an employee uses an employer's proprietary or confidential information when establishing a competing business, the employee breaches his or her fiduciary duty to the employer. See, e.g., CBS Corp. v. Dumsday, 268 A.D.2d 350, 353, 702 N.Y.S.2d 248 (1st Dep't 2000) (finding that plaintiffs sufficiently stated a cause of action for breach of fiduciary and common law duties owed to plaintiff-employer, where defendants, while in plaintiff's employ, "planned, and later formed, a competing corporation" that obtained a valuable "contract using confidential information"). Moreover, a person acting in a fiduciary capacity is forbidden from obtaining an improper advantage at the principal's expense. See, e.g., Sokoloff v. Harriman Estates Devlp., 96 N.Y.2d 409, 416, 729 N.Y.S.2d 425 (2001) ("[A]n agent must not seek to acquire indirect advantages from third persons for performing duties and obligations owed to [the agent's] principal.") (citation and internal quotations omitted) (alteration in original). Although an employee may, of course, make preparations to compete with his employer

while still working for the employer, he or she may not do so at the employer's expense, and may not use the employer's resources, time, facilities, or confidential information; specifically, whether or not the employee has signed an agreement not-to-compete, the employee, while still employed by the employer, may not solicit clients of his employer, may not copy his employer's business records for his own use, may not charge expenses to his employer, which were incurred while acting on behalf of his own interest, and may not actively divert the employer's business for his own personal benefit or the benefit of others. See Ashland Mgmt. Incorp. v. Altair Invs. NA, 59 A.D.3d 97, 869 N.Y.S.2d 465, 473 (1st Dep't 2008), aff'd as modified, 14 N.Y.3d 774, 898 N.Y.S.2d 542 (2010). In addition, even in the absence of trade secret protection, employees are not permitted to copy their employer's client list, and such acts have been deemed to be an "egregious breach of trust and confidence." Churchill Comms. Corp. v. Demyanovich, 668 F. Supp. 207, 211 (S.D.N.Y. 1997) (quoting Leo Silfen, Inc. v. Cream, 29 N.Y.2d 387, 392, 328 N.Y.S.2d 423 (1972)).

Here, the preponderance of the evidence establishes numerous breaches by Defendants Belliard and Fell of their duty of loyalty to Pure Power. Defendant Belliard stole Pure Power documents, including Pure Power's business plan, start-up manual, and

56

operations manual.  Belliard also stole personnel files from Brenner's private office, and destroyed his and other employees' signed Employment Agreements.  After Belliard destroyed the original Employment Agreements, he sent an email to Fell, boasting that the "cat is in the bag," to which Fell responded "hallelujah." Belliard shared the other stolen materials with Fell, who did not return them to Pure Power, but, instead, destroyed them.  Belliard also provided a copy of Pure Power's business plan, operations manual, and start-up manual to Lee, who referred to these documents in drafting business documents for Warrior Fitness.  Belliard and Fell were also aware that, on their behalf, Lee was soliciting current Pure Power clients to join Warrior Fitness, while she was still a member of Pure Power.

Both Belliard and Fell collected and maintained Pure Power client contact information, while on Pure Power's payroll and at the Pure Power facility, in anticipation of opening Warrior Fitness.  In addition, Belliard, without permission, downloaded a copy of Pure Power's customer list onto a thumb-drive and disclosed the confidential contact information contained therein to, at a minimum, Baynard, with the intention that this information be used to solicit Pure Power customers to join Warrior Fitness.  The theft of the customer list, the theft of Pure Power's business documents, and the theft of the Pure Power files all took place on different

dates and times, and within the Pure Power facility, either by logging on to Pure Power computers or by accessing Brenner's private office at Pure Power.

Finally, Belliard and Fell took deliberate steps to leave Pure Power understaffed just as Warrior Fitness was opening. Belliard provided information to Brenner about alleged problems that he was having with another Pure Power employee. Belliard recommended that this employee be fired, and Brenner, who placed a great deal of trust and confidence in Belliard, took his advice and did so. Falsely claiming that they wanted to work more hours at Pure Power, Belliard and Fell persuaded Brenner not to hire a new fitness instructor. Likewise, Fell, as part of Defendants' ill-intentioned scheme to hamstring Pure Power, brought about his own termination from Pure Power in refusing to comply with Brenner's explicit instructions, which led to a heated exchange in which Fell repeatedly screamed at Brenner, daring Brenner to fire him. Left with no choice, Brenner terminated Fell. Approximately two weeks later, Belliard quit Pure Power, on the basis of an admittedly fabricated story and without providing notice, knowing full well that the loss of three senior full-time employees, in such close succession, would leave Pure Power under-staffed and in a vulnerable position. In fact, when Belliard quit, other than Brenner, there was only one other drill instructor left to help her

run the two Pure Power facilities.  This ongoing and deliberate conduct, transpiring over the course of several months, constitutes a clear breach of the duty of loyalty owed by employees, Belliard and Fell, to their employer, Pure Power.

B.  Compensatory Damages

Plaintiffs seek as compensatory damages for Belliard and Fell's breach of their duty of loyalty to Pure Power a disgorgement of all revenues earned by Warrior Fitness from 2008 through 2010, in the amount of $2,390,082.00.

Under New York law, an employer alleging a breach of the common law duty of loyalty against an employee may choose whether to seek damages (1) through an accounting of the disloyal employee's gain (profit disgorgement) or (2) as a calculation of what the employer would have made had the employee not breached his or her duty of loyalty to the employer. See Gomez v. Bicknell, 302 A.D.2d 107, 114, 756 N.Y.S.2d 209, 214-15 (2d Dep't 2002); accord Phansalkar, 344 F.3d at 211 n.23.  If the plaintiff chooses profit disgorgement (i.e., restitution), then the plaintiff must also establish that the breach of duty by the defendant was a "substantial factor" contributing to the defendant's profits. See Am. Fed. Grp., Ltd. v. Rothenberg, 136 F.3d 897, 907 n.7 (2d Cir. 1998) (citing Diamond v. Oreamuno, 24 N.Y.2d 494, 301 N.Y.S.2d 78 (1969)).  This is a less stringent standard than but-for causation.

Id.; see also Milbank, Tweed, Hadley & McCloy v. Boon, 13 F.3d 537, 543 (2d Cir. 1994) (explaining that a less stringent causation standard is necessary because "[a]n action for breach of fiduciary duty is a prophylactic rule intended to remove all incentive to breach — not simply to compensate for damages in the event of a breach") (quoting ABKCO Music, Inc. v. Harrisongs Music, Ltd., 722 F.2d 988, 995-96 (2d Cir. 1983)).

New York courts generally find disgorgement of profits or restitution is appropriate only in "a straightforward case in which an employee makes a profit or receives a benefit in connection with transactions conducted by him on behalf of his employer." Phansalkar, 344 F.3d at 211 n.23 (citations omitted); see also W. Elec. Co., 41 N.Y.2d at 295 ("[A]n employee who makes a profit or receives a benefit in connection with transactions conducted by him on behalf of his employer is under a duty to give such profit or benefit to his employer, whether or not it was received by the employee in violation of his duty of loyalty. . . . [W]hen such benefit is not turned over, the employer has a choice of remedies, one among them being an action for restitution.").

Under certain circumstances, a plaintiff may also demonstrate a usurpation of corporate opportunity in connection with a breach of the duty of loyalty.  "[T]he corporate opportunity doctrine prohibits a corporate employee from utilizing information obtained

in a fiduciary capacity to appropriate a business opportunity belonging to the corporation." Am. Fed. Grp., 136 F.3d at 906 (citing Alexander & Alexander, Inc. v. Fritzen, 147 A.D.2d 241, 246, 542 N.Y.S.2d 530, 533 (1989)); see also Burg v. Horn, 380 F.2d 897, 899 (2d Cir. 1967) (stating that the corporate opportunity doctrine applies to "prevent [a corporate fiduciary's] acquisition of property . . . which they are otherwise under a duty to the corporation to acquire for it"). Notably, this doctrine applies to employees even after their employment has been terminated. See Abbott Redmont Thinlite Corp. v. Redmont, 475 F.2d 85, 88 (2d Cir. 1973). The corporate opportunity doctrine is limited, however, to business opportunities in which a corporation has a "tangible expectancy," which means "something much less tenable than ownership, but, on the other hand, more certain than a desire or a hope." Alexander, 147 A.D.2d at 247-48, 542 N.Y.S.2d at 534 (quotation marks omitted). "The degree of likelihood of realization from the opportunity is . . . the key to whether an expectancy is tangible." Abbott Redmont, 475 F.2d at 89.

As an initial matter, because Defendants Belliard and Fell opened Warrior Fitness after their employment by Pure Power had been terminated, the gross profit generated by Warrior Fitness from 2008 to 2010, which Plaintiffs now seek to have fully disgorged, was not earned by Defendants Belliard and Fell in connection with

transactions conducted by them on behalf of Pure Power.  Plaintiffs mistakenly conflate Defendants breaches of loyalty with the profit they earned by opening a competing business; however, opening the business was not a breach of the duty of loyalty.  While Plaintiffs are of the view that Defendants would not have been able to open their business but for their breaches, the Court disagrees.  As discussed in several other sections, the documents Defendants stole were not a substantial factor that enabled them to open Warrior Fitness.  It was the knowledge Belliard and Fell gained as trainers at Pure Power that was key.

In addition, Plaintiffs have failed to establish that they had a "tangible expectancy" in many of the Pure Power clients allegedly solicited by Defendants.  Pure Power had no tangible expectancy in clients who merely chose not to renew their subscriptions at Pure Power.  See Abbott Redmont, 475 F.2d at 88 (citing Burg, 380 F.2d at 899).  Moreover, only approximately 20 of the allegedly solicited clients who joined Warrior Fitness were, in fact, enrolled in Pure Power as of 2008.  But, even with respect to these 20 or so clients, in whose contracts Pure Power may have had a tangible expectancy for some subsequent period of time, Plaintiffs failed to establish that Defendants' breach of their duty of loyalty was a "substantial factor" in contributing to the clients' decisions to leave Pure Power and to enroll in Warrior Fitness.  In any event,

62

Plaintiffs failed to establish damages with respect to these 20 or so clients, and any reasonable estimate would surely not approach the $2,390,082.00 Plaintiffs presently seek in profit disgorgement.

Accordingly, Plaintiffs have to failed to establish that they are entitled to disgorgement of Warrior Fitness's gross profit, or that a corporate opportunity of Pure Power's has been usurped, on the basis of Defendant Belliard's and Fell's breach of their duty of loyalty.

C.   New York's Faithless Servant Doctrine

As an additional measure of compensatory damages for Defendants' breach of their duty of loyalty to Pure Power, Plaintiffs contend that, pursuant to New York's faithless servant doctrine, they are entitled to the compensation Belliard and Fell earned while working as fitness instructors at Pure Power.

Unlike a traditional breach of fiduciary duty claim, which requires a showing of actual damages, to prove a violation of New York's faithless servant doctrine, an employer is not obligated to show that it "suffered . . . provable damage as a result of the breach of fidelity by the agent." Feiger v. Iral Jewelry, Ltd., 41 N.Y.2d 928, 929, 394 N.Y.S.2d 626 (1977); see also Webb v. Robert Lewis Rosen Assoc., Ltd., No. 03 Civ. 4275 (HB), 2003 WL 23018792, at *6 (S.D.N.Y. Dec. 23, 2003) ("[While] proving a breach of fiduciary duty claim requires a showing of damages . . . the

faithless servant doctrine [ ] provides an additional mechanism for relief, notwithstanding that [the employer] suffered no damage.").

    1.  <u>Liability</u>

In determining whether an employee's conduct warrants forfeiture under the faithless servant doctrine, New York courts continue to apply two alternative standards. <u>See</u> <u>Phansalkar</u>, 344 F.3d at 200-02.  The first standard requires that "misconduct and unfaithfulness . . . substantially violate [ ] the contract of service." <u>Id.</u> at 201 (quoting <u>Turner v. Konwenhoven</u>, 100 N.Y. 115, 2 N.E. 637, 639 (1885)).  The second standard requires only that an agent "act [ ] adversely to his employer in any part of [a] transaction, or omit [ ] to disclose any interest which would naturally influence his conduct in dealing with the subject of [his] employment." <u>Id.</u> (quoting <u>Murray v. Beard</u>, 7 N.E. 553, 554 (N.Y. 1886)).

Here, the Court concludes that forfeiture is appropriate under either standard.  In particular, forfeiture is warranted under the <u>Murray</u> standard because Defendants Belliard and Fell acted "adversely to [their] employer."  As discussed, among other such adverse actions taken by Belliard and Fell, Belliard destroyed Pure Power files and stole confidential business documents, and shared them with Fell, as well as Baynard and Lee.  Belliard and Fell, in league with Baynard and Lee, caused negative rumors about Pure

Power, and Brenner specifically.  Defendants took affirmative steps to hamstring Pure Power and at no point disclosed their plans to open a competing business, using many of Pure Power's ideas and concepts, a mere fifteen blocks away from Pure Power.  Likewise, applying <u>Turner</u>, forfeiture is warranted on the grounds that Belliard and Fell committed a "substantial violation" of the terms of their employment.  Although the Second Circuit has not provided express criteria for determining whether a given violation of an employee's duty of loyalty is substantial, "[l]ower New York courts . . . have found disloyalty not to be 'substantial' only where the disloyalty consisted of a single act, or where the employer knew of and tolerated the behavior."  <u>Phansalkar</u>, 344 F.3d at 201-02.  Here, in addition to the Court's findings regarding Belliard's and Fell's disloyal conduct, Belliard and Fell cannot avoid forfeiture by contending that their disloyalty consisted of a "single act," or that Brenner was aware of, or in any way approved of, Defendants' ongoing disloyal conduct.

> 2.   <u>Total Compensation Forfeited</u>

The forfeiture of Belliard's and Fell's compensation, however, is limited to the "time period of disloyalty." <u>Design Strategy, Inc. v. Davis</u>, 469 F.3d 284, 301 (2d Cir. 2006); <u>see also</u> <u>Phansalkar</u>, 344 F.3d at 205 (observing that "New York's lower courts have endorsed limiting forfeiture to compensation paid

during the time period of disloyalty") (quoting Musico v. Champion Credit Corp., 764 F.2d 102, 113 (2d Cir. 1985)) (emphasis in original).

The Court finds that the time period of disloyalty for both Belliard and Fell began in August 2007. On or about this time, Belliard stole Pure Power's confidential business plan and shared it with Fell, as well as Lee, who relied upon the business plan to draft Warrior Fitness's business plan. Belliard and Fell's disloyal scheme to use or destroy stolen confidential Pure Power information in furtherance of their opening a competing gym continued throughout the duration of their employment at Pure Power. As discussed, Belliard stole Employment Agreements, Pure Power's customer list, and other confidential documents, all in furtherance of his and Fell's plan to open a competing gym. Brenner fired Fell on March 16, 2008. Belliard quit Pure Power on April 1, 2008.

Accordingly, the Court concludes that Belliard must forfeit $55,196.70 in total compensation ($20,280.00 (2008 salary) + $34,916.70 (42% of 2007 salary)). Likewise, Fell must forfeit $40,177.00 in total compensation ($14,200.00 (2008 salary) + $25,977.00 (42% of 2007 salary)). (See Pls.' Exs. 162-63.)

C.   Punitive Damages

New York courts allow punitive damages against disloyal

66

employees.  It is not essential that the plaintiff allege a pattern of conduct directed at the public in general to assert a claim for punitive damages. See Wrap-n-Pack, Inc. v. Kaye, 528 F. Supp. 2d 119, 126 (E.D.N.Y. 2007); see also Don Buchwald & Assoc., Inc. v. Rich, 281 A.D.2d 329, 330, 723 N.Y.S.2d 8 (1st Dep't 2001) ("The limitation of an award for punitive damages to conduct directed at the general public applies only in breach of contract cases, not in tort cases for breach of fiduciary duty.").  But "[w]here the plaintiff and defendant are parties to a contract, and the plaintiff seeks to hold the defendant liable in tort, the plaintiff must prove that the defendant breached a duty 'independent' of its duties under the contract." Carvel Corp. v. Noonan, 350 F.3d 6, 16 (2d Cir. 2003) (citing Clark-Fitzpatrick Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 389, 521 N.Y.S.2d 653 (1987) ("It is a well established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated.")); see also Kubin v. Miller, 801 F. Supp. 1101, 1119 (S.D.N.Y. 1992) ("[W]here a plaintiff includes 'additional allegations of wrongdoing,' distinct from the breach of contract claim, an action in tort is properly pled.") (quoting Matzan v. Eastman Kodak Co., 134 A.D.2d 863, 863, 521 N.Y.S.2d 917 (4th Dep't 1987)).

"Under New York law, the imposition of punitive damages is

left to the sound discretion of the finder-of-fact." <u>Mar Oil, S.A.</u> <u>v. Morrissey</u>, 982 F.2d 830, 844 (2d Cir. 1993) (citations omitted). "To sustain a claim for punitive damages in tort, one of the following must be shown: intentional or deliberate wrongdoing, aggravating or outrageous circumstances, a fraudulent or evil motive, or a conscious act that willfully and wantonly disregards the rights of another." <u>Don Buchwald</u>, 281 A.D.2d at 330, 723 N.Y.S.2d at 9.  In addition, the burden of proof for punitive damages is "clear and convincing evidence." <u>See</u> <u>Randi A.J. v. Long</u> <u>Island Surgi-Center</u>, 46 A.D.3d 74, 86, 842 N.Y.S.2d 558, 568 (2d Dep't 2007) ("[A]lthough we are aware that a different view has been expressed by other courts as to the requisite evidentiary standard, we hold that the trial court erred in failing to charge the jury that the standard of proof regarding the imposition of punitive damages was clear and convincing evidence.") (citations and internal quotation marks omitted); <u>see also</u> <u>Munoz v. Puretz</u>, 301 A.D.2d 382, 384, 754 N.Y.S.2d 463, 466 (1st Dep't 2003) (holding that an award for punitive damages must be supported by "clear, unequivocal and convincing evidence")(citation omitted).

The Court finds both Belliard and Fell liable for punitive damages for breach of the duty of loyalty owed to Pure Power.  As an initial matter, Plaintiffs' breach of fiduciary duty claim is independent of their contract claim.  Under the tort theory of a

"disloyal employee," the breach of fiduciary duty claim, asserted by Plaintiffs in the Second Amended Complaint, can be made regardless of the existence of the Employment Agreement. See Wrap-n-Pack, Inc., 528 F. Supp. 2d at 125.

      1.  Belliard

Belliard's breach of loyalty was particularly egregious, in the calculated nature of his disloyalty, and the lengths to which he went to conceal his disloyal conduct, including providing misleading and false testimony to the Court.  Belliard held a position of trust and responsibility with Pure Power and Brenner, and he utterly betrayed that trust.[10]  He schemed during the last eight months of his employment at Pure Power not only to set up a competing business, but to do so using many of Brenner's ideas and innovations.  Belliard stole and destroyed Pure Power documents, conspired with Pure Power clients (e.g., Baynard and Lee) to undermine Plaintiffs' reputation with other clients, violated Pure Power policy by having a furtive relationship with a Pure Power client, and left Pure Power in a vulnerable position at a time when Belliard knew he would be opening a competing business a mere 15

---

[10] There was a great deal of testimony about Belliard's personal betrayal of the friendship and generosity Brenner extended to him.  That betrayal, of course, does not give rise to legal liability and cannot be compensated for in monetary damages.

blocks from Pure Power.  By doing all of these things, Belliard, in conjunction with Fell, caused Brenner great personal distress and created a substantial disruption to her developing business.

In addition to his disloyal actions, which the Court finds were willful and wanton, Belliard consistently offered untruthful and misleading statements to the Court.  Belliard repeatedly lied about his disloyal conduct.  For instance, he lied about having stolen Pure Power's client list.  In his July 29, 2008 Affidavit, submitted in Opposition to Plaintiffs' Application for a Preliminary Injunction, Belliard swore that "[he] never saw Pure Power's client list."  (Pls.' Ex. 280.)  When presented with evidence at trial showing that this sworn statement could not be true, Belliard claimed that the inaccuracies in his affidavit were the result of "confusion" on his part.  Conceding at trial that he had, in fact, stolen Pure Power's client list, he then chose to lie about when he stole the client list, and to whom he disclosed the confidential information contained therein, contending that Pure Power's client list was stolen in November 2007 — not in March 2008 — and that he did not disclose the contact information contained in the client list to anyone.  The Court finds neither of these statements credible.

Belliard also testified that he did not steal Pure Power's operations manual and start-up manual.  This testimony was not

70

credible.   Belliard further denied having shared Pure Power's business plan, in August 2007, with Fell or Lee — a statement plainly contradicted by Fell's and Lee's trial testimony, as well as by the documents themselves.   In connection with the stolen Employment Agreements, which Belliard disingenuously claimed to have "stumbled" upon, he yet again offered untruthful testimony. In his deposition, Belliard stated that he did not know whose employment agreements were in the personnel file that he stole from Brenner's office.   After Fell disputed having signed such an agreement, however, Belliard testified at trial that he was now certain that the stolen file contained his Employment Agreement, as well as that of employees Evertz, Wong, Titus, and Raimondi, but not Fell.   These are just a few of the untruths Belliard proffered to the Court.

      2.   <u>Fell</u>

Fell's disloyal conduct, while not quite as egregious as Belliard's, was, nonetheless, willful and wanton and constitutes deliberate wrongdoing on his part.   Belliard provided Fell with the stolen Pure Power materials, including the Pure Power business plan, which Fell then provided to Lee.   Belliard also gave Fell the stolen customer list, which Fell viewed and retained.   Fell also encouraged other Pure Power drill instructors not to sign new Employment Agreements after Belliard had destroyed the original

71

agreements.

In addition to his disloyal conduct, like Belliard, Fell also consistently offered evasive and misleading testimony at trial. Fell, for instance, denied that Lee was involved in the negotiation of the leases for Warrior Fitness.  Only after being presented with concrete documentary evidence demonstrating that Lee had been involved did Fell acknowledge the truth.  He also provided false testimony regarding Lee being listed as a tenant on the Warrior Fitness lease.  Likewise, Fell denied having any knowledge regarding Lee's and Baynard's solicitation of Pure Power clients, despite documentary evidence showing just the opposite, including an email sent from Lee to Fell in which Lee proudly describes herself as "Ms. Conversion," as well as other emails in which Lee tells Fell that other Pure Power clients will be signing up with Warrior Fitness.  Also, Fell testified that Lee did not use Pure Power's business plan in drafting Warrior Fitness's business plan. When it became clear, however, that this testimony could not be true, Fell changed his testimony, stating that he "could have been mistaken" about whether Lee, in fact, used Pure Power's business documents. (Tr. at 720.) Finally, like Belliard, Fell also swore, in an affidavit that at no time did he steal Pure Power's "confidential information or client list." (Affidavit of Fell in Opposition to Plaintiffs' Application for a Preliminary Injunction,

dated July 3, 2008, ¶ 15.)  Although literally true, since Belliard did the stealing, the statement was misleading insofar as Belliard stole the documents on his and Fell's behalf.

In short, the Court concludes that Plaintiffs have shown, by clear and convincing evidence, that they are entitled to an award of punitive damages against both Belliard and Fell.  The Court further finds that the punitive damages for Belliard's breach of the duty of loyalty should be set equal to two times the compensatory damages awarded to Plaintiffs for the breach.  The Court concludes that the punitive damage for Fell's breach of the duty of loyalty should be in an amount equal to the compensatory damages awarded to Plaintiffs for Fell's breach.  This punitive damage award is consistent with New York law, see Kubin, 801 F. Supp. at 1122 (stating that "New York law recognizes breach of fiduciary duty as an exception to the general rule that punitive damages are not recoverable for breach of contract claims"), and comports with basic due process.  See, e.g., State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 425, 123 S. Ct. 1513, 1524 (2003) ("[I]n practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.")).

Accordingly, Plaintiffs are entitled to punitive damages from Belliard, in the amount of $150,570.40 (2 x $55,196.70 (Belliard's

total forfeited salary), and from Fell, in the amount of $40,177.00, (Fell's total forfeited salary).

## III. **Aiding and Abetting Breach of the Duty of Loyalty**

Plaintiffs contend that Defendants Lee and Baynard aided and abetted Belliard's and Fell's breach of the duty of loyalty owed to Pure Power.

### A.   Amendment to Conform Complaint to Facts at Trial

In their Second Amended Complaint, Plaintiffs did not allege a claim for aiding and abetting a breach of the duty of loyalty against Baynard and Lee.  Plaintiffs now request that the Court conform the pleadings to the proof in this case, pursuant to Federal Rule of Civil Procedure Rule 15(b)(2) ("Rule 15(b)(2)"), to include this claim against Baynard and Lee.

Rule 15(b)(2) provides that "[w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings." Fed. R. Civ. P. 15(b)(2).  Consent to try claims may be implied when an issue not raised in the pleadings is either addressed in an ongoing way by all parties prior to trial, or, alternatively, is introduced at trial, without objection, by the opposing party. See, e.g., Luria Bros. & Co. v. Alliance Assurance Co., 780 F.2d 1082, 1089 (2d Cir. 1986) ("Usually, consent may be implied from failure to object at trial to the introduction of evidence relevant

to the unpled issue."); <u>see also</u> <u>Isik Jewelry v. Mars Media, Inc.</u>, 418 F. Supp. 2d 112, 131 (E.D.N.Y. 2005) ("Rule 15(b) is satisfied where the claim . . . [is] introduced outside the complaint . . . in a pretrial memorandum — and then treated by the opposing party as having been pleaded,[ ] through his effective engagement of the claim[.]") (internal quotations and citations omitted).  "The decision to allow [a Rule 15(b)(2)] amendment is left to the discretion of the district court." <u>Fischer v. Vassar Coll.</u>, 70 F.3d 1420, 1449 (2d Cir. 1995).

Here, Defendants were aware, at least as early as April 2010, that Plaintiffs were contemplating asserting a claim against Baynard and Lee for aiding and abetting a breach of loyalty, as Plaintiffs sought a pre-motion conference to discuss moving for summary judgment on this claim.  Moreover, the aiding and abetting claims asserted against Baynard and Lee were included, without objection, in the parties' joint jury charge submission, and there was extensive evidence on the subject presented at trial.  Finally, amending the pleadings to conform to the evidence at trial in this manner adds no new issues to the case because the same set of facts involved in deciding this claim also arise under Plaintiffs' tortious interference with prospective economic advantage claim asserted against both Lee and Baynard.

The Court, therefore, deems the Complaint to be amended, <u>nunc</u>

<u>pro</u> <u>tunc</u>, to conform to the proof in this case.

    B.   <u>Legal Standard</u>

Under New York law, a plaintiff seeking to establish a cause of action for aiding and abetting a breach of fiduciary duty must show: (1) the existence of a violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of this violation on the part of the aider and abettor; and (3) plaintiff suffered actual damages as a result of the breach. <u>See</u> <u>In re Sharp Int'l.</u> <u>Corp.</u>, 403 F.3d 43, 49 (2d Cir. 2005) (citing <u>Kaufman v. Cohen</u>, 307 A.D.2d 113, 760 N.Y.S.2d 157, 169 (2003)).  A person knowingly participates in a breach of fiduciary duty when she provides "substantial assistance" to the primary violator. <u>See</u> <u>Lerner v.</u> <u>Fleet Bank, N.A.</u>, 459 F.3d 273, 294 (2d Cir. 2006); <u>see also</u> <u>Kaufman</u>, 760 N.Y.S.2d at 170.  "Substantial assistance may only be found where the alleged aider and abettor 'affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur. The mere inaction of an alleged aider and abettor constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff.'" <u>In re</u> <u>Sharp</u>, 403 F.3d at 50 (quoting <u>Kaufman</u>, 760 N.Y.S.2d at 157 (additional internal citations omitted)).

One who "knowingly participate[s]" in another's breach of fiduciary duty is jointly and severally liable for all compensatory

damages caused by the breach. See Banco de Desarrollo Agropecuario, S.A. v. Gibbs, 709 F. Supp. 1302, 1307 (S.D.N.Y. 1989); see also Wechsler v. Bowman, 285 N.Y. 284, 291, 34 N.E.2d 322, 326 (1941) ("Anyone who knowingly participates with a fiduciary in a breach of trust is liable for the full amount of the damage caused thereby to the cestuis que trust."). Liability for punitive damages, however, is several only. See Rodick v. City of Schenectady, 1 F.3d 1341, 1349 (2d Cir. 1993); see also Felice v. Delporte, 136 A.D.2d 913, 914, 524 N.Y.S.2d 919, 920 (4th Dep't 1988) ("[T]rial court erred in adjudging that defendants were jointly and severally liable for the full amount of the punitive damage award. Such damages are in the nature of a penalty and contribution among tortfeasors is not permissible."); Staudacher v. City of Buffalo, 155 A.D.2d 956, 956, 547 N.Y.S.2d 770, 771 (4th Dep't 1989) (holding that a lump sum verdict on punitive damages against all defendants was "improper since there can be no joint and several liability or contribution").

C.    Application

The Court concludes that the preponderance of the evidence establishes that only Lee, knowingly and willfully, provided substantial assistance to Belliard and Fell in their breaches of their duty of loyalty to Pure Power.

1.    Lee

77

Belliard provided Lee with the materials that he stole from Pure Power, including Pure Power's business plan, operations manual, and start-up manual.  Lee knew that Belliard had unlawfully taken these materials from Pure Power, and she relied upon them in drafting Warrior Fitness's business plan.  Indeed, in her deposition taken on March 9, 2009, Lee admitted to having Pure Power's stolen business plan in her possession while drafting Warrior Fitness's business plan in August 2007.

At trial, however, Lee provided contradictory testimony, contending that she was not in possession of the stolen Pure Power business documents when she drafted the August 2007 Warrior Fitness business plan and relied solely upon the business plan for a company named "Bobby's Burger" — which was not offered into evidence, or otherwise produced during discovery.

To start, it is unclear why Lee would exclusively consult, and rely upon, a business plan for a hamburger restaurant in drafting a business plan for a fitness facility with a fixed indoor obstacle confidence course.  In any event, the Court concludes that her testimony on this issue was not credible.  It is not consistent with her sworn deposition testimony.  Moreover, the structural similarity between Warrior Fitness's business plan and Pure Power's business plan and operations manual strongly suggests that Lee used, and relied upon, stolen Pure Power business documents as

early as August 2007.  For example, Warrior Fitness's August 2007 business plan has the same subject headings as Pure Power's business plan, and these subject headings appear in the same order as the headings in Pure Power's operations manual.  Also, Warrior Fitness's business plan lists eleven military-inspired principals upon which Warrior Fitness was founded.  The list is substantially similar to the thirteen principals of leadership enumerated in Pure Power's business plan.  And, there is presumably no such list of military-inspired values in the business plan for Bobby's Burger.

In addition, Lee repeatedly encouraged then-enrolled Pure Power clients to leave Pure Power and to join Warrior Fitness. Indeed, Lee took affirmative steps to put herself in a position to do so.  For example, while in possession of business documents which Lee knew full-well Belliard had stolen from Pure Power, she signed up for additional classes at Pure Power in October 2007. She continued to take classes at Pure Power until April 2008. During this time period, Lee participated — in her own words — in a "network and campaign" to solicit Pure Power clients to join Warrior Fitness.  In fact, Lee was so proud of her efforts to solicit Pure Power clients that, in emails sent from her to Fell, she coined herself the nickname - "Ms. Conversion."  Although Lee maintained, at trial, that neither Fell nor Belliard ever asked her to convert or solicit Pure Power clients, the Court finds her

testimony on this point not credible, and contradicted by the evidence introduced into the record, including, for example, multiple emails sent from Pure Power clients to Belliard and/or Fell, inquiring about Warrior Fitness's rates and packages, in which it was clear that these clients were contacting Belliard and/or Fell <u>after</u> having been specifically instructed to do so by Lee.

To further promote the success of Warrior Fitness, Lee also repeatedly disparaged Brenner and Pure Power to Pure Power's clients.  She did so notwithstanding the fact that previously she had been a loyal and enthusiastic client of Pure Power's.  For example, knowing that Belliard and Fell were furtively planning to open Warrior Fitness, Lee told Pure Power clients that Brenner was a liar and a "loose cannon" and that Brenner mistreated Pure Power employees and did not pay them.  Lee also told clients that Brenner "hated homosexuals" and that Brenner had fired a former employee because he was gay.  None of this was true. At no time while Lee was enrolled at Pure Power, discussing Belliard's and Fell's plans to open Warrior Fitness and denigrating Brenner, did she ever disclose her significant financial interest in Warrior Fitness.

2.  Baynard

The Court cannot conclude, however, that the preponderance of the evidence establishes that Defendant Baynard, knowingly and

willfully, provided substantial assistance to Belliard and Fell in their breaches of their duty of loyalty to Pure Power.  Unlike Lee, who is alleged to have legally defamed Brenner, Plaintiffs claim only that Baynard maligned Pure Power and Brenner, and offered no specific evidence to support this claim.[11]  Moreover, the Court found Baynard's testimony that she did not know that Belliard had stolen Pure Power's business plan, start-up manual, and operations manual, or that he had destroyed the Employment Agreements, credible, and serves to explain her negative opinion of the way Brenner — whom she had considered a friend — had treated Belliard around the time that Belliard quit Pure Power.

In addition, Plaintiffs contend that Baynard solicited Pure Power clients.  Although it is not disputed that Baynard created the Party List, Plaintiffs failed to establish that the Party List was ever used.  Moreover, communications between Baynard and then-enrolled Pure Power clients, to which Plaintiffs cite in support of their claim that Baynard encouraged current Pure Power clients to recruit other Pure Power clients to join Warrior Fitness, took place after Belliard and Fell had left Pure Power.   The only

---

[11] Although Baynard and the other Defendants maligned Brenner to other Pure Power clients, Baynard testified that Brenner "was the only person that was nice" to her when she was going through her divorce, and she was thankful for Brenner's emotional support.  (See Tr. at 1314.)

evidence of Baynard's solicitation of Pure Power clients consisted of statements, made to friends, that she was working out at a new gym — Warrior Fitness — and that she loved working out with her friends and hoped that her friends would join her at this new gym. These statements alone, however, do not constitute aiding and abetting a breach of the duty of loyalty owed to Pure Power. Indeed, once Belliard left Pure Power, Baynard was perfectly free to assist her boyfriend — Belliard — by promoting his new business, which he had a legal right to open.

Accordingly, the Court finds that Plaintiffs have proved the aiding and abetting of Belliard's and Fell's breach of the duty of loyalty against Defendant Lee only.  Lee is, therefore, jointly and severally liable for the total compensatory damages awarded for Belliard's and Fell's breach of the duty of loyalty, in the amount of $95,373.70.

## IV.  **Tortious Interference with Contract**

Plaintiffs contend that "Pure Power had valid and enforceable employment agreements with Belliard and Fell," "Defendants Lee and Baynard had knowledge of the employment agreements that Belliard and Fell had with Pure Power," and "Defendants Lee and Baynard intentionally induced Belliard and Fell to breach their respective employment agreements."  (Second Am. Compl. ¶¶ 131-32.)

To establish tortious interference with contract under New

82

York law, a plaintiff must prove: "(1) the existence of a valid contract between the plaintiff and a third-party; (2) defendant's knowledge of that contract; (3) the defendant's intentional procuring of the breach, and (4) damages." White Plains Coat & Apron Co., Inc. v. Cintas Corp., 460 F.3d 281, 285 (2d Cir. 2006); accord Foster v. Churchill, 87 N.Y.2d 744, 749-50, 642 N.Y.S.2d 583, 586 (1996).   Plaintiffs must also establish proximate causation. See Cantor Fitzgerald Assocs., L.P. v. Tradition N. Am., 299 A.D.2d 204, 204, 749 N.Y.S.2d 249 (1st Dep't 2002) ("An essential element of such claim is that the breach of contract would not have occurred but for the activities of the defendant."); Wolff v. Rare Medium, Inc., 210 F. Supp. 2d 490, 498 (S.D.N.Y. 2002) ("[T]he third party's breach must have been caused by the defendant, meaning that the breach would not have occurred but for the defendant's acts.").

With the exception of the non-disclosure provision, the Court has concluded that the remaining provisions of the Employment Agreement at issue are overbroad, vague, and indefinite and are, therefore, invalid and unenforceable.   Hence, Plaintiffs cannot satisfy the first element of their tortious interference with contract claim — the existence of a valid contract — with respect to these contractual provisions.

With respect to the non-disclosure provision, there is no

83

evidence in the record that Defendants Baynard and Lee had actual knowledge of this specific contractual provision. Moreover, Plaintiffs failed to establish that Belliard's alleged breach would not have occurred but for Lee's and Baynard's actions. Rather, the Court concludes that the decision to steal Pure Power's confidential and commercially sensitive business documents, including Pure Power's client list, business plan, operations manual, and start-up manual, was Belliard's, and that he required no additional encouragement or inducement. In any event, as previously discussed, Plaintiffs failed to establish a reasonable measure of damages for Belliard's breach of the non-disclosure provision of his Employment Agreement.

Accordingly, Plaintiffs have failed to prove their tortious interference with contract claim against Defendants Lee and Baynard.

## V.   Tortious Interference with Prospective Economic Advantage

Plaintiffs contend that Defendants interfered with the business relationship that Plaintiffs had developed with 147 Pure Power clients. (See Second Am. Compl. ¶¶ 122-23.)

Under New York law, a defendant is liable for tortious interference with prospective economic relations where: "(1) there is a business relationship between the plaintiff and a third party; (2) the defendant, knowing of that relationship, intentionally

84

interferes with it; (3) the defendant acts with the sole purpose of harming the plaintiff, or failing that level of malice, uses dishonest, unfair, or improper means; and (4) the relationship is injured." Five Star Dev. Resort Cmtys., LLC v. iStar RC Paradise Valley LLC, No. 09 Civ. 2085 (LTS), 2010 WL 2697137, at *4 (S.D.N.Y. July 6, 2010) (quoting Goldhirsh Grp., Inc. v. Alpert, 107 F.3d 105, 108-09 (2d Cir. 1997)); accord Guard-Life Corp. v. Parker Hardware Mfg. Corp., 50 N.Y.2d 183, 191-92, 428 N.Y.S.2d 628, 632-33 (1990). Typically, unless the "defendant engage[d] in conduct for the sole purpose of inflicting intentional harm on plaintiffs," a defendant's actions must amount to a crime, or an independent tort such as fraud or misrepresentation. Carvel Corp. v. Noonan, 3 N.Y.3d 182, 190-91, 785 N.Y.S.2d 359, 362 (2004). Dishonest, unfair, or improper means does not "include persuasion alone although it is knowingly directed at interference" with prospective contractual relations. NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc., 87 N.Y.2d 614, 624, 641 N.Y.S.2d 581 (1996) (internal quotation marks and citations omitted).

The New York Court of Appeals has stated that because "greater protection is accorded an interest in an existing contract . . . than to the less substantive, more speculative interest in a prospective relationship . . . liability will be imposed only on proof of more culpable conduct on the part of the interferer" under

a tortious interference with a prospective economic advantage claim. Guard-Life Corp., 50 N.Y.2d at 191, 428 N.Y.S.2d at 633; accord Medtech Prods. Inc. v. Ranir, LLC, 596 F. Supp. 2d 778, 815 (S.D.N.Y. 2008).  In addition, a plaintiff must "demonstrate both wrongful means and that the wrongful acts were the proximate cause" of injury to the plaintiff's prospective economic relations. State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada, 374 F.3d 158, 171 (2d Cir. 2004) (emphasis in original); accord RSM Prod. Corp. v. Fridman, 387 Fed. App'x 72, 74 (2d Cir. 2010); see also Pacheco v. United Med. Assoc., P.C., 305 A.D.2d 711, 712, 759 N.Y.S.2d 556, 559 (3d Dep't 2003).

As discussed, Plaintiffs failed to establish that they had business relationships with all 147 of the allegedly solicited Pure Power clients.  At least one of the 147 clients had never enrolled at Pure Power.  Several other clients testified that they had not been enrolled in Pure Power since 2006 or 2007, and there was no evidence that any of those clients intended to enroll at Pure Power in the future.  Indeed, only 20 or so of the 147 clients identified by Plaintiffs were enrolled at Pure Power in 2008.  Yet, for the same reasons set forth above, even with respect to these 20 or so clients, Plaintiffs failed to establish that Defendants, through dishonest, unfair, or improper means, intentionally caused these clients to enroll at Warrior Fitness and that these clients

otherwise would have enrolled at Pure Power.  Moreover, there was no evidence that Defendants contacted Pure Power clients with the sole purpose of harming Plaintiffs.  And, as discussed, the clients' attachment to Belliard and Fell and the quality of their training was the primary reason for their leaving Pure Power and enrolling at Warrior Fitness.

Accordingly, Plaintiffs have failed to prove tortious interference with prospective economic relations against all Defendants.

## VI.  **Unjust Enrichment**

Plaintiffs contend that "Defendants have been enriched by using the materials, concepts, Proprietary Information, and Trade Dress developed at great cost by Brenner and Pure Power in Defendants' competing facility Warrior Fitness." (Second Amended Complaint ¶ 76.)  Plaintiffs seek, as restitution, all profits Warrior Fitness has earned since its inception in 2008.  In their post-trial submissions, however, Plaintiffs seek restitution only with respect to Defendants' use of their trade dress.

Under New York law, "[t]o prevail on a claim of unjust enrichment, a Plaintiff must establish (1) that the defendant benefitted; (2) at the Plaintiff's expense; and (3) that equity and good conscience require restitution." Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc., 448 F.3d 573,

586 (2d Cir. 2006) (quoting <u>Kaye v. Grossman</u>, 202 F.3d 611, 616 (2d

Cir. 2000)); <u>accord</u> <u>Anesthesia Assocs. of Mount Kisco, LLP v. N.</u>

<u>Westchester Hosp. Center</u>, 59 A.D.3d 473, 481, 873 N.Y.S.2d 679, 686

(2d Dep't 2009). "The 'essence' of this claim 'is that one party

has received money or a benefit at the expense of another.'" <u>Kaye</u>,

202 F.3d at 616 (quoting <u>City of Syracuse v. R.A.C. Holding, Inc.</u>,

258 A.D.2d 905, 685 N.Y.S.2d 381, 381 (4th Dep't 1999)).

It is well-settled that the measure of damages for an unjust

enrichment claim is restricted to the "reasonable value" of the

benefit conferred upon the defendants. <u>See</u> <u>Giordano v. Thomson</u>, 564

F.3d 163, 170 (2d Cir. 2009); <u>Pereira v. Farace</u>, 413 F.3d 330, 340

(2d Cir. 2005) ("[R]estitution is measured by a defendant's 'unjust

gain, rather than [by a plaintiff's] loss.'" (second alteration in

original)(Ginsburg, J., dissenting)); <u>see also</u> <u>Oneida Indian Nation</u>

<u>of New York v. Cnty. of Oneida</u>, 617 F.3d 114, 144 (2d Cir. 2010)

(citing Dan B. Dobbs, <u>Law of Remedies</u>, § 4.1, at 552 (2d ed. 1993)

("[The] purpose [of restitution] is to prevent the defendant's

unjust enrichment by recapturing the gains the defendant secured in

a transaction.")); <u>U.S. ex rel. Taylor v. Gabelli</u>, No. 03 Civ. 8762

(PAC), 2005 WL 2978921, at *4 (S.D.N.Y. Nov. 4, 2005) ("Damages

typically focus on the plaintiff and provide 'make-whole,'

compensatory monetary relief; restitution, by contrast,

concentrates on the defendant — preventing unjust enrichment,

disgorging wrongfully held gains, and restoring them to the plaintiff.") (citations omitted). Unjust enrichment applies, not only where a person "receives money or property, but, also, where he otherwise receives a benefit. He receives a benefit where his debt is satisfied or where he is saved expense or loss." Blue Cross of Cent. New York, Inc. v. Wheeler, 93 A.D.2d 995, 996, 461 N.Y.S.2d 624, 626 (4th Dep't 1983); accord Pacwest, Ltd. v. R.T.C., No. 94 Civ. 2498 (AGS), 1996 WL 325647, *3 (S.D.N.Y. June 11, 1996).

Defendants, of course, benefitted from their employment at Pure Power, and from the instruction and experience that they acquired as a result; part of that experience was learning Brenner's techniques, and becoming familiar with the way she designed the Pure Power obstacle course. But that is not unjust enrichment. Businesses often attempt to replicate the successful ideas and concepts of their competitors, and this is proper so long as those ideas and concepts are not otherwise protectable. The Court, therefore, rejects Plaintiffs' contention that Warrior Fitness was unjustly enriched by using "concepts" developed by Plaintiffs that are not protected by law. Moreover, as discussed below, the Court concludes that Plaintiffs have failed to establish trade dress infringement against Warrior Fitness, and, therefore, Warrior Fitness's having employing certain elements of the Pure

Power trade dress was not unjust.

Defendants did confer a benefit upon themselves, however, in stealing Pure Power's confidential business documents.  Moreover, this benefit was clearly acquired at Plaintiffs' expense.  After all, it was Plaintiffs, and not Defendants, who expended substantial time, resources, money, and effort to develop these materials.  Plaintiffs, however, have failed to adequately quantify Defendants' "unjust gain."  As discussed, the evidence does not establish that Defendants would not have been able to create Warrior Fitness without possession of the stolen Pure Power documents.  Thus, the profit that Warrior Fitness has earned since its inception was not unjustly gained through the theft of these documents.

Indeed, the correct measure of Defendants' unjust enrichment is the value that Defendants would have paid had the parties negotiated, in good-faith, for Pure Power's confidential business documents at the time that they were misappropriated by Defendants. But, Plaintiffs have failed to provide the Court with competent evidence from which this appropriate measure of disgorgement can be calculated.

Accordingly, Plaintiffs have failed to prove their unjust enrichment claim.

VII. **Conversion**

90

In the Second Amended Complaint, Plaintiffs contend that Belliard and Fell stole and destroyed "a certain transcript of a book Brenner was writing, including handwritten notes," entitled "Unleash the Warrior Goddess Within." (Second Am. Compl. ¶¶ 108-12.)  In their post-trial submissions, however, Plaintiffs further allege a cause of action for conversion of Pure Power's confidential business documents, including its client list.

To state a claim for conversion under New York law, a plaintiff must show that "someone, intentionally and without authority, assume[d] or exercise[d] control over personal property belonging to someone else, interfering with that person's right of possession." Colavito v. N.Y. Organ Donor Network, Inc., 8 N.Y.3d 43, 49-50, 827 N.Y.S.2d 96, 100 (2006); accord Thyroff v. Nationwide Mut. Ins. Co., 460 F.3d 400, 403-04 (2d Cir. 2006) (holding that where defendant retained possession of, and deprived plaintiff access to, business records, a claim for conversion was properly stated).  A plaintiff must show: (1) a "possessory right or interest in the property; and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." Colavito, 8 N.Y.3d at 50, 827 N.Y.S.2d at 100 (citations omitted).  Interference with a plaintiff's right to possession may be "by a wrongful: (i) taking; (ii) detention; or (iii) disposal." Corporacion Fruticola De Chincha v. Watermelon Depot, Inc., No. 05

Civ. 6293 (KNF), 2008 WL 2986276, at *4 (S.D.N.Y. July 31, 2008) (citing Pierpoint v. Hoyt, 260 N.Y. 26, 29, 182 N.E. 235 (1932)). An essential element of conversion is "unauthorized dominion" to the exclusion of the rights of the plaintiff. See Fiorenti v. Cent. Emergency Physicians, PLLC, 305 A.D.2d 453, 454-55, 762 N.Y.S.2d 402 (2d Dep't 2003); accord Hart v. City of Albany, 272 A.D.2d 668, 668, 706 N.Y.S.2d 535 (3d Dep't 2000); Alpha Funding Grp., Inc. v. Aspen Funding, L.L.C., No. 19204/07 (CED), 2007 WL 3375871, at *7 (Sup. Ct. Kings Cnty. Oct. 29, 2007).[12]

Plaintiffs' conversion claim with respect to the business documents, including the client list, fails as a matter of law. While Belliard did assume or exercise control over Pure Power's client list to the extent that he accessed the client list from a Pure Power computer and downloaded it onto a thumb drive, Belliard possessed only a copy of the client list and did not, in any way, limit or otherwise deprive Pure Power of possession or use of that list. See Hair Say, Ltd. v. Salon Opus, Inc., No. 5106-01 (LBA),

---

[12] Plaintiffs did not seek compensatory and punitive damages for misappropriation of a trade secret. To prevail on a claim for misappropriation of trade secrets under New York law, a plaintiff must prove: "(1) it possessed a trade secret; and (2) defendant is using that trade secret in breach of an agreement, confidence, or as a result of discovery by improper means." Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 117 (2d Cir. 2009); accord White House/Black Mkt., Inc. v. Cache Inc., No. 10 Civ. 5266 (PGG), 2010 WL 2985232, at *4 (S.D.N.Y. July 27, 2010). Notably, unlike conversion, there is no exclusive-use requirement.

2005 WL 697538, at *5 (N.Y. Sup. Ct. Mar. 17, 2005) (granting summary judgment on a conversion claim where plaintiff retained possession of a list of beauty salon clients that had been copied by defendants); Alpha Funding, 2007 WL 3375871, at *7 (holding that where plaintiff did not allege that it was deprived of, or excluded from use of its own customer lists, it could not establish conversion).[13]   Similarly, although the Court concludes that Belliard stole Pure Power's business documents, Belliard did not deprive Pure Power of their use, because, as Brenner testified at trial, although these business documents were deleted from her personal computer in her private office at Pure Power, she was able to quickly obtain copies of these documents from her franchise attorney.   Defendants, therefore, cannot be properly said to have converted Pure Power's business materials, including its client list.

Moreover, the Court concludes that Plaintiffs have not demonstrated, by a preponderance of the evidence, that either Fell or Belliard stole a manuscript for a book entitled "Unleash the Warrior Goddess Within" from Brenner's office at Pure Power.

––––––––––––––––––

[13] Plaintiffs cite to the case, Allan Damph, PC v. Bloom, 127 A.D.2d 719, 719, 512 N.Y.S.2d 116, 117 (2d Dep't 1987), for the proposition that a customer list can be converted, regardless of whether the plaintiff was excluded from exercising rights over the list.   This case is inapposite.   The court in Allan Damph considered the question of exclusive use, not in connection with a claim of conversion, but, rather, misappropriation of trade secrets.

Plaintiffs failed to identify, with reasonable precision, the property allegedly converted by Defendants; at different times throughout the course of this litigation they referred to the stolen property as "a book," a "transcript of a book," or "handwritten notes" for a book. Indeed, Brenner's trial testimony on this issue was confusing, and Plaintiffs introduced no evidence, either at Brenner's deposition or at trial to support her contention that she had, in fact, completed a draft of this book; for instance, no earlier drafts of the book or the corroborating testimony of others to whom she may have showed, or at the very least, with whom she might have discussed this book and its progress, were offered into evidence at trial.

In any event, Plaintiffs concede that there is insufficient evidence of the amount of time Brenner spent working on her book, and seek to have the Court award Brenner $1 for Belliard's alleged conversion of her book, in addition to punitive damages based upon this award of nominal compensatory damages. Punitive damages for this conduct, however, have already been awarded against Belliard in connection with the Court's finding that he breached his duty of loyalty to Pure Power. To further award punitive damages for conversion would be redundant and excessive.

Accordingly, the Court concludes that Plaintiffs are not entitled to damages for conversion of either Pure Power's business

materials, including its client list, or Brenner's alleged manuscript.

## VIII.    __Trade Dress Infringement__

Plaintiffs allege that "Defendants have willfully copied and employed the distinctive 'look and feel' of Pure Power in their own facility and are in violation of Section 43(a) of the Lanham Trademark Act." (Second Am. Compl. ¶ 96.) Defendants respond that: (1) Plaintiffs do not have a protectable trade dress; (2) Warrior Fitness did not copy Pure Power's look and feel in any way that could cause confusion; and (3) there is neither a likelihood of confusion, nor is there evidence that there has been any actual confusion.

Section 43(a) of the Lanham Act, which protects unregistered trademarks, also extends protection to trade dress. See Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205, 209, 120 S. Ct. 1339, 1342 (2000). The term "trade dress" has a broad meaning and is defined as the "total image" of a business, good, or service "as defined by its overall composition and design, including size, shape, color, texture, and graphics." Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108, 115 (2d Cir. 2006) (citation and quotation marks omitted).[14]

--------

[14] By way of distinction, the Lanham Act defines a trademark as "any word, name, symbol, or device, or any combination

95

To succeed on a claim of trade dress infringement under Section 43(a), Plaintiffs must show: (1) that their trade dress is either "inherently distinctive," or that it has acquired distinctiveness through "secondary meaning," although an inherently distinctive trade dress is entitled to protection only if it is also non-functional; and (2) that there is a "likelihood of confusion" between Defendants' trade dress and their own. Two Pesos v. Taco Cabana, 505 U.S. 763, 769-70, 112 S. Ct. 2753, 2760 (1992); accord Fun-Damental Too, Ltd. v. Gemmy Indus. Corp., 111 F.3d 993, 999 (2d Cir. 1997).

The standard for assessing the distinctiveness of a product's trade dress depends on the category of trade dress for which protection is sought. See Fun-Damental Too, 111 F.3d at 999-1000. Trade dress generally falls into one of two categories: product packaging or product design. See id. at 1000.[15] Here, Plaintiffs have not drawn a distinction as to whether their alleged dress is properly classified as product packaging or product design, and

---

thereof" which is used or intended to be used by a person "in commerce . . . to identify and distinguish his or her goods . . . from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127.

[15] "Product packaging" trade dress refers to the "dressing" or "packaging" of a product. See Jeffrey Milstein, Inc. v. Gregor, Lawlor, Roth, Inc., 58 F.3d 27, 31 (2d Cir. 1995). "Product design" trade dress, on the other hand, refers to the design or configuration of the product itself. See id.

have, instead, sought to protect a trade dress that encompasses the layout and interior decor of the Pure Power facility.  Although it is difficult to fit a trade dress involving interior decor into one of these two classifications, based on the way Plaintiffs define their trade dress, and the manner in which courts view such cases, the Court concludes that it is appropriate to analyze Pure Power's trade dress under the product packaging standard for analyzing distinctiveness. See, e.g., Samara Bros., 529 U.S. at 215, 120 S. Ct. at 1345 (describing interior decor as either product packaging or a "tertium quid" akin to product packaging); see also Best Cellars Inc. v. Wine Made Simple Inc., 320 F. Supp. 2d 60, 70 (S.D.N.Y. 2003) (concluding that interior decor is not product design and should be analyzed under the product packaging standard for inherent distinctiveness).[16]

    A.   Inherent Distinctiveness

The distinctiveness of a trade dress under the product packaging standard is evaluated under the test set forth in Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 9 (2d Cir. 1976), which classifies trade dress on a spectrum of increasing distinctiveness, as either: (1) generic; (2)

---

[16] This approach relieves Plaintiff of the burden of establishing that its product design has achieved secondary meaning. See Samara Bros., 529 U.S. at 1344-46, 120 S. Ct. at 213-15.

97

descriptive; (3) suggestive; or (4) arbitrary or fanciful. See
Paddington Corp. v. Attiki Imps. & Distrib., Inc., 996 F.2d 577,
583 (2d Cir. 1993) (citation omitted).  Suggestive and arbitrary or
fanciful trade dress are deemed "inherently distinctive," and
always satisfy the first prong of the test for protection. Two
Pesos, 505 U.S. at 768, 112 S. Ct. at 2757.  If a trade dress is
merely descriptive, however, then Plaintiffs must establish that
the trade dress has acquired "secondary meaning" in order for it to
be deemed distinctive. See id. at 769, 112 S. Ct. at 2757-58.  A
generic trade dress is never protectable. See id. at 768, 112 S.
Ct. at 2757.

     "The focus of the distinctiveness inquiry, and the ultimate
test of protectability under the Lanham Act, is whether the
plaintiff's trade dress is capable of distinguishing the
plaintiff's goods from those of others." Nora Beverages, Inc. v.
Perrier Grp. of Am., Inc., 164 F.3d 736, 743 (2d Cir. 1998) (citing
Two Pesos, Inc., 505 U.S. at 768, 112 S. Ct. at 2757); see also
Forschner Grp., Inc. v. Arrow Trading Co., Inc., 124 F.3d 402,
407-08 (2d Cir. 2007) (finding trade dress is inherently
distinctive if it serves "primarily as an indication of origin,
such that consumers will readily rely on it to distinguish the
product from those of competing manufacturers").  The requirement
that trade dress be distinctive in order to enjoy protection under

the Lanham Act reflects the fear that overbroad trade dress protection would result in ordinary product design creating a monopoly in the goods or services themselves. See Landscape Forms, Inc. v. Columbia Cascade Co., 113 F.3d 373, 380 (2d Cir. 1997). Nevertheless, each element of a claimed trade dress need not be individually distinctive. See Paddington, 996 F.2d at 584. So long as "the overall dress is arbitrary, fanciful or suggestive, it is inherently distinctive despite its incorporation of generic or descriptive elements." Id.

To start, the Court has had some difficulty in identifying the elements of Pure Power's trade dress, in large part, because Plaintiffs themselves keep re-describing it.   In the USPTO registration, for example, Pure Power's trade dress is described as follows:

> THE MARK CONSISTS OF A DRAWING OF AN EXERCISE FACILITY, STYLED TO LOOK LIKE A MILITARY BOOT CAMP TRAINING COURSE COMPRISED OF CAMOUFLAGE WALL AND CEILING DECOR, CRUSHED RUBBER FLOORING, A TIRE RUN, CLIMBING WALLS, CLIMBING NETS, AND HURDLES, WITH THE TERMS "DESIRE," "STRE," "COURAGE," AND "UTY."

(See Pls.' Ex. 140.)   The USPTO registration makes no express mention of an indoor obstacle course.

In their post-trial submissions to the Court, Plaintiffs contend, however, that "[t]he registration itself depicts only a portion of the overall trade dress because of limitations of the

size of the image the Trademark Office can use in a registration."

(See PFF ¶ 280.)  Plaintiffs further argue that the application to

the USPTO included a description of the mark as follows:

> The mark consists of a drawing of an exercise
> facility styled to look like a military boot
> camp training course which includes but is not
> limited to camouflage wall and ceiling decor,
> crushed rubber flooring, a tire run, climbing
> walls, climbing nets and hurdles.

(See id. ¶ 282.)  Yet, the "but is not limited to" language is one

of the reasons why the USPTO initially denied Plaintiffs'

registration, stating that "the applicant should replace the

indefinite wording 'which includes but is not limited to' with

'comprised of.'" (See Pls.' Ex. 139 at 105.)

In their Second Amended Complaint, Plaintiffs further describe

"Pure Power's Trade Dress" as comprising "the Equipment" and "the

Design Features." (See Second Am. Compl. ¶ 19.)  The "Equipment" is

described as the obstacles, which include "monkey bars, barbed wire

crawl, high hurdles, an intensity wall, a traverse wall, a cargo

net, a rope climb and a tire run, as well as obstacles entitled

'swing-to-beam,' 'commando crawl,' and 'belly robbers.'" (Id.)  The

"Design Features" include:

> [W]alls that are covered with green camouflage
> netting, changing rooms that are World War II
> tents, flooring that is bordered by military-
> looking sandbags, and a flooring surface of
> the obstacle course that is crushed-rubber,
> recycled surface that has the look and feel of

100

> dirt.  Eleven standing pillars stenciled with
> principles of leadership are also part of the
> Design  Features.    Finally,  individuals
> entering the Pure Power facility are greeted
> with a life-size statue of a screaming marine
> carrying a machine gun.

(Id. ¶ 20.)

At trial, Plaintiffs yet again expanded the description of their alleged trade dress to include elements listed in Pure Power's business plan, for instance, the size of fitness classes, programs, corporate team-building, and a description of consumer markets.

The confusion as to what exactly constitutes Pure Power's trade dress largely follows from the fact that Plaintiffs improperly seek to include within the definition of their trade dress Brenner's ideas, concepts, and innovations. See Jeffrey Milstein, 58 F.3d at 32 (stating that "trade dress law" does not "protect an idea, a concept, or a generalized type of appearance"); accord Best Cellars, 320 F. Supp. 2d at 69.  Throughout trial, Plaintiffs placed great emphasis on the claim that Pure Power was the first indoor exercise facility that used a fixed indoor obstacle course.  The general idea or concept of a fixed indoor obstacle course, however, is not protectable as a trade dress. Rather, it is the particular "look and feel" of Pure Power's facility that is protectable as a trade dress.  In other words,

although a plaintiff must provide "a precise expression of the character and scope of the claimed trade dress" so that courts can sensibly evaluate claims of infringement and fashion relief tailored to the distinctive combination of elements that warrant protection. Landscape Forms, 113 F.3d at 381. The trade dress itself is not "the combination of words which a party uses to describe or represent [its] 'total image,'" but, "[r]ather, the trade dress is that image itself, however it may be represented in or by the written word." Cartier, Inc. v. Four Star Jewelry Creations, Inc., No. 01 Civ. 11295 (CBM), 2003 WL 21056809, at *5 (S.D.N.Y. May 8, 2003) (emphasis in original).

Defining Pure Power's trade dress, therefore, as what the Pure Power facility actually looks like, the Court finds, on the basis of the numerous photographs of the Pure Power facility introduced into evidence, that the "look and feel" of the Pure Power facility — its total image — is source-indicating and distinctive. See R.F.M.A.S., Inc. v. Mimi So, 619 F. Supp. 2d 39, 78 n.19 (S.D.N.Y. 2009) (finding the overall image of the product for which plaintiffs sought trade dress protection was adequately conveyed by means of the pictures in the complaint). The "essence" of this "look and feel," as principally set forth in the Second Amended Complaint, is a fixed indoor obstacle/confidence course, surrounded by a running track in which the floor of the obstacle course is

102

covered in crushed shredded rubber tire material to simulate dirt, with obstacles, including military hurdles arranged in ascending order, a low crawl apparatus, scaling walls of different heights, monkey bars, a traverse wall, a rope climb, parallel or dip bars, a rope swing over a water pit, a tire run, a cargo net climb, and rolling logs used in a "belly robber," coupled with special design features inspired by the United States Marine Corps, including green camouflage netting hanging from the ceiling, changing rooms that are World War II tents, flooring that is bordered by military-looking sandbags, eleven standing pillars stenciled with principles of leadership derived from the Marine Corps, and a life-size statue of a screaming marine carrying a machine gun.   It is this combination of elements that defines Pure Power's protectable trade dress, as it is this combination that a customer observes upon entering the Pure Power facility. See Best Cellars, 320 F. Supp. 2d at 72.

The Pure Power facility is clearly unlike traditional exercise facilities, which tend to have standard workout equipment arranged in a linear fashion with a utilitarian appearance.   Indeed, at least as far as the record reflects, Pure Power's combination of arranged obstacles and special military decor did not exist in any indoor exercise facility in the United States at the time Pure Power opened.   Brenner was the first to recognize its significant

profit potential.[17]

Because Pure Power's trade dress, as defined here, is not registered with the USPTO, the Court must determine whether this trade dress is functional. See 15 U.S.C. § 1125(a)(3); accord TrafFix Devices, Inc. v. Marketing Displays, Inc., 532 U.S. 23, 28-29 121 S. Ct. 1255, 1259-60 (2001).

    1.   Functionality

A trade dress feature is functional "'if it is essential to the use or purpose of the article or it affects the cost or quality of the article,' that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." Qualitiex Co. v. Jacobson Prods. Co., Inc., 514 U.S. 159, 165, 115 S. Ct. 1300, 1304 (1995) (quoting Inwood Laboratories, Inc. v. Ives Laboratories, Inc., 456 U.S. 844, 850 n.10, 102 S. Ct. 2182, 2186 (1982)); see also Fun-Damental Too, 111 F.3d at 1002 (stating that functionality requires showing that "the features in question are essential to effective competition in a particular market") (citing Landscape Forms, 70 F.3d at 253).  Where the asserted trade dress extends to the "overall look" of the combination of features comprising a product or product line, the Court must evaluate the

_____

[17] Having found that Pure Power's trade dress is "inherently distinctive," the Court need not examine whether Plaintiffs' trade dress has acquired "secondary meaning." See Two Pesos, 505 U.S. at 769, 112 S. Ct. at 2758.

functionality of those features taken together, not in isolation.
See Jeffrey Milstein, 58 F.3d at 32 (stating that even if
individual elements of a trade dress are functional, their
arrangement or combination may be "arbitrary, fanciful, or
suggestive," and thus, deserve trade dress protection); see also
LeSportsac, Inc. v. K Mart Corp., 754 F.2d 71, 76 (2d Cir. 1985)
(finding a sports bag non-functional "when viewed in its entirety,"
despite the functionality of the individual elements of the bag).

It is clear that what is distinctive about Pure Power's trade
dress is neither essential to operating a gym, or even a gym with
a fixed indoor obstacle course, or to effectively competing in the
fitness industry.  Indeed, it is possible to open and operate a
fitness facility with a fixed indoor obstacle course, even one
employing a military-themed decor, in a way that does not resemble
the overall look and feel of the Pure Power facility.  Pure Power's
distinctive combination of equipment and design features is not
essential to the purpose of a fitness facility, even one with an
indoor obstacle course, which is to experience a particular kind of
exercise program.  Nor is there any basis to conclude that having
to employ a different appearance and a different arrangement of
obstacles would put competitors in this particular market at a
competitive disadvantage — Warrior Fitness's financial success
suggests as much.

105

Having found that Pure Power's trade dress is inherently distinctive and non-functional, the Court now considers the second prong of the analysis set forth in Two Pesos — the likelihood of confusion.

B.   Likelihood of Consumer Confusion

"To determine the likelihood of confusion, courts in the Second Circuit apply the eight factors set forth in Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d Cir. 1961)." Natural Organics, Inc. v. Nutraceutical Corp., 426 F.3d 576, 578 (2d Cir. 2005) (internal quotes and edits omitted); see also Paddington, 996 F.2d at 584.  These eight factors are: (1) the strength of the plaintiff's trade dress; (2) similarity of the trade dresses; (3) proximity of the products in the marketplace; (4) the likelihood that the plaintiff will "bridge the gap" and offer a product like the defendant's; (5) evidence of actual confusion between the trade dresses; (6) the defendant's bad faith; (7) the quality of the defendant's product as compared to the plaintiff's; and (8) the sophistication of the purchasers. See Polaroid, 287 F.2d at 495; Paddington, 996 F.2d at 584; Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc., 973 F.2d 1033, 1043 (2d Cir. 1992).

"The eight-factor list is not exclusive. Furthermore, the evaluation of the Polaroid factors is not a mechanical process where the party with the greatest number of factors weighing in its

106

favor wins.  Rather, a court should focus on the ultimate question of whether consumers are likely to be confused." Paddington, 996 F.2d at 584 (internal quotation marks and citations omitted).  See also Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 799 F.3d 867, 872 (2d Cir. 1986) ("The [Polaroid] factors "are designed to help grapple with the vexing problem of resolving the likelihood of confusion issue.  Therefore, each factor must be evaluated in the context of how it bears on the ultimate question of likelihood of confusion as to the source of the product.") (citations and quotations marks omitted).  Further, it is incumbent upon the Court to "engage in a deliberate review of each factor, and, if a factor is inapplicable to a case, to explain why." New Kayak Pool Corp. v. R & P Pools, Inc., 246 F.3d 183, 185 (2d Cir. 2001).

The Court, thus, addresses each of the Polaroid factors in turn.

### 1.   Strength of Plaintiffs' Trade Dress

The strength of a mark "is its distinctiveness, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source." Paddington, 996 F.2d at 585 (citation and quotation marks omitted); see also Banff, Ltd. v. Federated Dep't Stores, Inc., 841 F.2d 486, 491 (2d Cir. 1988) ("[T]he strength of a mark depends ultimately on its 'origin-indicating' quality in the eyes of the

purchasing public.") (quoting <u>McGregor-Doniger Inc. v. Drizzle Inc.</u>, 599 F.2d 1126, 1131 (2d Cir. 1979)).  "The strength of a mark should be examined in its commercial context." <u>Bristol-Myers Squibb</u>, 973 F.2d ay 1044.

As discussed, the Pure Power trade dress is inherently distinctive as a suggestive or arbitrary and fanciful trade dress. The look and feel of the Pure Power trade dress is source-indicating and unique.  Its combination of elements and decorative features convey the appearance of an actual military boot camp. The record indicates that there are no similar indoor exercise facilities in New York, or, for that matter, in the entire United States.  For these reasons, the Court finds that the Pure Power trade dress is strong.[18]

2.   Similarity of the Trade Dresses

In determining the similarity of the trade dresses, courts consider whether "the similarity of the marks is likely to cause confusion among potential customers." <u>Arrow Fastener Co., Inc. v. Stanley Works</u>, 59 F.3d 384, 394 (2d Cir. 1995).  A court assessing similarity between competing trade dresses should consider "all

---

[18] The strength of Plaintiffs' trade dress, however, is weakened, to some extent, by the fact that the trade dress is not consistent in the two Pure Power locations.  In particular, as Defendants established at trial, the "look and feel" of the Jericho location is somewhat different, and has more obstacles than the Pure Power Manhattan facility.

factors that could reasonably be expected to be perceived by and remembered by potential purchasers." McGregor-Doniger Inc. v. Drizzle Inc., 599 F.2d 1126, 1133 (2d Cir. 1979) (overruled on other grounds).  In other words, "[t]o apply this factor, courts must analyze the mark's overall impression on a consumer, considering the context in which the marks are displayed and the totality of factors that could cause confusion among prospective purchasers." Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp., 426 F.3d 532, 537 (2d Cir. 2005); see also Bristol-Myers Squibb, 973 F.2d at 1046 (stating that "the question is not how many points of similarity exist between the two [products]," but, rather, the general impression conveyed).

Pure Power and Warrior Fitness both use similar exercise equipment at their facilities.  For example, in addition to each facility having a crushed rubber flooring surface and a running track, Pure Power and Warrior Fitness both use monkey bars, parallel or dip bars, high hurdles, rope climbs, a tunnel or low crawl apparatus, scaling walls, and tire runs.  Yet, this is not surprising, as both facilities have based their businesses, to varying degrees, on obstacle courses derived from those used by the United States military.  The individual obstacles themselves, however, as far as the Court is aware, enjoy no special protection under, for example, patent law.  Hence, any similarity between the

two facilities insofar as that similarity relates only to the use of individual functional, non-patented equipment and obstacles, is of little consequence in assessing the similarity of the two trade dresses.[19]

Turning from the equipment and individual obstacles themselves to their more general arrangement, and the overall layout of the two facilities, there is also some similarity.  For instance, the obstacles in both facilities are clustered in the center of the space and are surrounded by a running track.  But, it is not just Pure Power's arrangement of obstacles in an exercise facility that makes its trade dress distinctive — the very same obstacle course in another exercise facility dressed up in a safari-themed decor, or a superhero decor geared towards young adults, for example, would give rise to an entirely different "look and feel" and would not cause consumer confusion as to source.  Rather, it is Pure Power's use of an arrangement of obstacles, in combination with its military-inspired design elements, that make its trade dress inherently distinctive.

---

[19] This may explain why the New York Supreme Court did not enjoin Warrior Fitness from opening, and merely instructed Defendants to remove the tents and all camouflage netting from the facility, and to paint Warrior Fitness in some other color than military green. (See Transcript of Oral Argument, dated May 8, 2008, attached as Ex B. to Declaration of Daniel A. Schnapp, dated July 3, 2008, ¶ 5.)

110

A comparison of these military-inspired design elements with those of Warrior Fitness's, however, shows that Warrior Fitness and Pure Power do not share a confusingly similar trade dress.  It is true that Warrior Fitness employs a military theme insofar as the walls at the Warrior Fitness facility are painted in the yellow and red colors of the United States Marine Corps and are sparsely decorated with military memorabilia, including posters and flags, as well as certain inspirational quotes, and that, like Pure Power, the trainers at Warrior Fitness wear camouflage fatigues, T-shirts, and combat boots.  Yet, in nearly every other important design detail, Warrior Fitness's appearance differs from Pure Power's. The Warrior Fitness facility, for instance, does not employ any of the design elements described in the USPTO certificate of registration, including camouflage color walls, camouflage décor, hurdles with written words, and climbing nets.  Nor does the Warrior Fitness facility have any of the design elements alleged in the Second Amended Complaint, including World War II tents that serve as changing rooms, camouflage cargo netting, flooring bordered by sandbags, standing pillars stenciled with principles of leadership, barbed wire, and a life-size statue of a screaming soldier.  In addition, unlike Pure Power, Warrior Fitness does not provide its clients with fatigues, or require its clients to wear camouflage attire.

111

In short, it is only in the broadest sense — that is, in the use of an obstacle course and a military theme — that Warrior Fitness's trade dress is similar to that of Pure Power's.  But, Pure Power, as a fitness facility, is not entitled to the exclusive use of fixed obstacles and a military theme — which may be executed in any number of ways.  Pure Power enjoys protection only with respect to its own distinctive blend and manner of implementing these elements and concepts, and that implementation is quite different from the "look and feel" of Warrior Fitness. Specifically, through the use of camouflage colors, sand bags, tents, barbed wire, and various other props, including a life-size reproduction of a combat soldier holding a machine gun, the Pure Power facility achieves something of a "theme park" look and feel, while the Warrior Fitness facility, by contrast, with its relative lack of decoration, florescent lights, plain white ceilings, and simple white walls with two bands painted yellow and red, is more clinical in its effect.

>3.   Proximity of the Products in the Marketplace and
>the Likelihood of Bridging the Gap

The proximity of the parties' services in the marketplace involves the extent to which they appeal to the same universe of

purchasers and compete with each other. See Cadbury Beverages, Inc.
v. Cott Corp., 73 F.3d 474, 480 (2d Cir. 1996).  Here, Defendants
opened their facility a mere 15 blocks from Plaintiffs' Manhattan
facility.   Beyond mere physical proximity, the two Manhattan
facilities compete in the same market, at a comparable price range,
for customers seeking a similar workout experience.   The Court
finds that the two facilities are clearly competitors in the
market, which weighs in favor of finding a likelihood of confusion.
See Paddington, 996 F.2d at 586.   Because the two facilities
already compete in the same market, the likelihood-of-bridging-the-
gap factor, which examines whether the prior user may wish to enter
Defendants' market in the future, is irrelevant and is not examined
here. See id.

          4.   Evidence of Actual Confusion

     This factor tests whether the trade dresses at issue have
actually confused consumers in the marketplace.   In the absence of
direct consumer testimonials, both anecdotal and market research
survey evidence can be used to prove this factor. See Centaur
Commc'ns, Ltd. v. A/S/M Comm'ns, Inc., 830 F.2d 1217, 1227 (2d Cir.
1987) (rev'd on other grounds).

     The evidence of actual confusion adduced by Plaintiffs is weak
and unpersuasive.   To start, several clients who attended fitness
classes at both Pure Power and Warrior testified at trial that Pure

113

Power and Warrior Fitness each had a different "look and feel."
Plaintiffs failed to introduce a single credible witness who could
testify that he or she considered enrolling in classes at both Pure
Power and Warrior Fitness and was confused as to whether Warrior
Fitness was related, in any way, to Pure Power.  Moreover, there
was no evidence that anyone considered signing up for classes at
Pure Power, but, instead, signed up for classes at, or otherwise
contacted, Warrior Fitness, erroneously thinking that Warrior
Fitness was Pure Power.  Indeed, Plaintiffs' only evidence of
alleged confusion was the testimony of one Pure Power client who
visited the Warrior Fitness website and concluded "it's the same
thing" (Tr. at 1236-38), and the anecdotal testimony of four
rebuttal witnesses — none of whom had ever visited Warrior Fitness
— who testified that they saw advertisements for Warrior Fitness in
the back of New York City taxi cabs and believed the advertisements
to be for Pure Power, or were otherwise confused.

These advertisements, however, do not display the Warrior
Fitness trade dress.  Instead, they consist of a 30-second video of
Defendants, and other Warrior Fitness clients, performing various
exercises, including running in place, doing lunges, jumping-jacks,
sit-ups, and running down stairs.  These exercises are not part of
Pure Power's distinctive trade dress, and could be used by any
number of other fitness facilities in the New York City

114

metropolitan area. The Warrior Fitness facility itself is displayed sporadically, and only for a few seconds. Indeed, what the trial testimony of these allegedly confused witnesses conveyed is their knowledge of the fact that, like Warrior Fitness, Brenner operated a gym based on a Marine boot camp model, with drill instructors who were taught to yell out commands as their clients exercised. This is not confusion as to Pure Power's trade dress, but, rather, as to more general concepts and innovations to which Brenner is not entitled trade dress protection. In any event, possible consumer confusion arising from these advertisements is unlikely given that Warrior Fitness's emblem or mark is shown both in the beginning and at the end of the video clip, as well as by the fact that throughout the duration of the advertisement, Warrior Fitness's website address is prominently displayed at the bottom of the video screen.

"[T]he absence of actual confusion alone is not dispositive of the question of likelihood of confusion," Arrow Fastener, 59 F.3d at 397, the minimal evidence of such confusion here, after Pure Power and Warrior Fitness have been in competition for more than three years, weighs strongly against Pure Power's trade dress infringement claim. See, e.g., Nora, 269 F.3d at 124 ("[D]e minimis evidence of actual confusion does not establish the existence of a genuine issue of material fact regarding the

115

likelihood of confusion.") (citation and internal quotation marks omitted).

     5.   Defendants' Bad Faith

This factor considers "whether the defendant adopted its [trade dress] with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." <u>Lang v. Retirement Living Publ'g Co.</u>, 949 F.2d 576, 583 (2d Cir. 1991) (citation omitted). "[B]ad faith should not be inferred simply from the act of copying." <u>Fun-Damental, Too</u>, 111 F.3d at 1005. "[C]opying in order to market a functionally equivalent product might well benefit consumers, which is one of the aims of the Lanham Act." <u>Id.</u>  Although intentional copying can raise a presumption of consumer confusion, <u>see</u> <u>Paddington</u>, 996 F.2d at 586-87, it is also true that "[t]he intent to compete by imitating the successful features of another's product is vastly different from the intent to deceive purchasers as to the source of the product." <u>Streetwise Maps, Inc. v. VanDam, Inc.</u>, 159 F.3d 739, 745 (2d Cir. 1998).  Indeed, only the latter form of imitation represents bad-faith copying.

Although there is no doubt that Defendants copied many elements of the Pure Power concept, Brenner's ideas, concepts, and innovations are not a part of her protectable trade dress.  The copying that is relevant here relates only to the total "look and

116

feel" of the two gyms, and efforts to confuse consumers as to source. But, as discussed, the "look and feel" of the Pure Power and Warrior Fitness facilities are not substantially similar. And, there is no evidence that Defendants intended to mislead customers as to the identity of Warrior Fitness. This is not a case where Defendants profited by selling "knock-off" copies of Plaintiffs' products or services, see, e.g., Samara Bros., 529 U.S. at 205, 120 S. Ct. at 1339, and the names of the two businesses are not confusingly similar. See, e.g., Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 588 F.3d 97, 118 (2d Cir. 2009) (holding that "the District Court reasonably concluded that Black Bear did not intend to mislead the public that the Charbucks coffees were Starbucks products"); see also W.W.W. Pharm. Co. v. Gillette Co., 984 F.2d 567, 575 (2d Cir. 1993)(finding RIGHT GUARD SPORT STICK and SPORTSTICK not confusing similar) (limited on other grounds by Deere & Co. v. MTD Prods., Inc., 41 F.3d 39, 46 (2d Cir. 1994); Bristol-Myers Squibb, 973 F.2d at 1045-46 (finding EXCEDRIN PM and TYLENOL PM not confusingly similar).

> 6.   Quality of the Defendant's Product Relative to the
>       Plaintiff's

This factor examines whether Pure Power's reputation could be

117

jeopardized by virtue of the fact that Warrior Fitness's program and facility is of inferior quality. See Arrow Fastener, 59 F.3d at 398 (citing Lois Sportswear, 799 F.3d at 875).

Although the parties, no doubt, have differing views as to the relative quality of the other's facility, neither party has presented any evidence that would support a finding that either facility enjoys a qualitative advantage over the other, in terms of either the quality of the facility itself or the instructional services provided. The Court is, therefore, unable to conclude on the basis of the evidence in the record that the relative quality of Defendants' product has, in any way, jeopardized Plaintiff's reputation, or otherwise contributed to a likelihood of consumer confusion.

7.   Sophistication of the Purchasers

In determining the likelihood of confusion, the sophistication of the purchasers refers, not to the education or training of the purchasers, but, rather, to the ability of the purchasers to distinguish between the two trade dresses, given the attention that such purchasers ordinarily give in buying products or services. See Gillette, 984 F.2d at 575 (limited on other grounds by Deere, 41 F.3d at 46). Typically, the more sophisticated the consumers of a product are, "the less likely it is that similarities in trade dress . . . will result in confusion concerning the source or

sponsorship of the product." <u>Bristol-Myers Squibb</u>, 973 F.2d at
1046; <u>see also</u> <u>Centaur</u>, 830 F.2d at 1228 (rev'd on other grounds)
("Sophistication of consumers usually militates against a finding
of a likelihood of confusion.").[20]

Here, neither party presented evidence regarding the
sophistication of its customers.  On the basis of the trial
testimony of several customers, however, as well as that of the
parties themselves, the Court finds that the training offered in
the Pure Power and Warrior Fitness facilities is of a different
type and more strenuous nature than most traditional gym exercise
regimes.  Most Pure Power and Warrior Fitness customers have
patronized one or more traditional fitness facilities before
joining either of the two facilities and, accordingly, tend to be
more sophisticated consumers of fitness services compared to the
average consumer of such services.  They are not "casual purchasers
prone to impulse buying," whom courts generally find
unsophisticated. <u>W.W.W. Pharm. Co.</u>, 984 F.2d at 575; <u>see also</u>
<u>Patsy's Brand, Inc. v. I.O.B. Realty, Inc.</u>, 317 F.3d 209, 219 (2d

---

[20] Courts in this jurisdiction have held that consumer
sophistication may, in some cases, increase the likelihood of
confusion, depending on the facts and circumstances of the given
market. <u>See</u> <u>Paddington</u>, 996 F.2d at 587.  Here, because Pure
Power's and Warrior Fitness's trade dresses are <u>not</u> substantially
similar, however, consumer sophistication serves to decrease the
likelihood of confusion.

Cir. 2003).  Given the facts and circumstances of this market, the Court finds the relative sophistication of Pure Power's and Warrior Fitness's customers weighs against a finding of a likelihood of confusion.

>   C.   <u>Weighing the Polaroid Factors</u>

Weighing the various <u>Polaroid</u> factors, the Court finds that Warrior Fitness's trade dress is <u>not</u> sufficiently similar to Pure Power's trade dress such that consumers are likely to be confused. The Court finds that the "look and feel" of Pure Power and Warrior Fitness are not confusingly similar, nor is there any meaningful proof of actual confusion among their customers, who are sophisticated and able to distinguish between the two facilities. As the Court has noted, what is most similar is the general concept underlying the operation of two facilities, but this is not protectable as a trade dress.  Thus, although Pure Power's trade dress is strong and designates its source, Plaintiffs have failed to show that Defendants have intentionally copied their distinctive trade dress in a way that is likely to, or actually does, cause confusion among the relevant subset of customers in the marketplace.

Accordingly, the Court concludes that Plaintiffs have failed to prove a claim of trade dress infringement.

**X.**   **<u>New York General Business Law § 360-1</u>**

Plaintiffs also bring a claim of dilution of trade dress under New York General Business Law § 360-1 (formerly § 368-d).

Section 360-l states:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

"This section applies with equal force to the protection of trade dress." Merriam-Webster, Inc. v. Random House, Inc., 35 F.3d 65, 73 (2d Cir. 1994).

To prevail on this claim, Plaintiff must prove (1) that its trade dress is of "truly distinctive quality" or has acquired "secondary meaning," and (2) that there is "likelihood of dilution." Deere, 41 F.3d 39, 42 (2d Cir. 1994); accord Fireman's Ass'n of State of New York v. French Am. Sch. of New York, 41 A.D.3d 925, 928, 839 N.Y.S.2d 238, 241-42 (3d Dep't 2007); see also New York Stock Exch., Inc. v. New York, New York Hotel LLC, 293 F.3d 550, 557 (2d Cir. 2002) ("New York law accords protection against dilution to marks that are distinctive as a result of acquired secondary meaning as well as to those that are inherently distinctive."). A likelihood of confusion is not a necessary element of this claim. See Sally Gee, Inc. v. Myra Hogan, Inc.,

121

699 F.2d 621, 624 (2d Cir. 1983) (citing Allied Maintenance Corp. v. Allied Mechanical Trades, Inc., 42 N.Y.2d 538, 544-45, 399 N.Y.S.2d 628 (1977)).

Courts have defined the likelihood of dilution as "either the blurring of a mark's product identification or the tarnishment of the affirmative associations a mark has come to convey." Deere, 41 F.3d at 42 (internal citation omitted). Here, Plaintiffs base their dilution claim on the contention that Defendants have opened a competing facility "with very similar trade dress [that] causes the Pure Power trade dress to lose its distinctiveness and weakens its propensity to call Pure Power to mind." (Pls.' Mem. at 21.) In other words, Plaintiffs' dilution claim is principally based upon a theory of blurring, not tarnishment. Blurring typically involves "the whittling away of an established trademark's selling power through its unauthorized use by others." Deere, 41 F.3d at 43 (internal citation omitted); accord Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC, 221 F. Supp. 2d 410, 421-22 (S.D.N.Y. 2002). Thus, dilution by blurring is likely to occur when an unauthorized use of the trademark by others raises "the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product." Deere, 41 F.3d at 43.

Courts apply a six-factor test (a modified Polaroid test) to determine whether there is a "likelihood of dilution" by blurring;

specifically, courts look to the: "1) similarity of the dress; 2) similarity of the products covered [by the dress]; 3) sophistication of the consumers; 4) predatory intent; 5) renown of the senior mark [the appearance of plaintiff's product]; and 6) renown of the junior mark [the appearance of the defendant's product]." Sports Auth. Inc. v. Prime Hospitality Corp., 89 F.3d 955, 966 (2d Cir. 1996) (citing Deere, 41 F.3d at 43 n.8).[21]

Having weighed the Polaroid factors and found that there is not a likelihood of confusion, the Court must analyze those factors not included in the Polaroid analysis to determine whether Warrior Fitness's continued operation might present a likelihood of dilution.[22]  "The only factor without a counterpart among the Polaroid factors is the renown of the junior trademark." Paco Sport, Ltd. v. Paco Rabanne Parfums, 86 F. Supp. 2d 305, 330 (S.D.N.Y. 2000).  This factor has been described as addressing the possibility that:

---

[21] Unlike federal dilution law, New York law recognizes a dilution claim only if the trade dresses are "very" or "substantially similar." See Starbucks, 588 F.3d at 114.

[22] With respect to the renown of the senior mark, the evidence demonstrating the strength of Pure Power's trade dress establishes the renown of its mark.  "New York's trademark dilution law does not require a mark to be 'famous' for protection against dilution to apply." Starbucks Corp., 588 F.3d at 114.  Moreover, Pure Power received very substantial publicity in its first few years of operation, with Brenner appearing on a variety of widely-watched television programs.

> a junior mark may become so famous that it
> will overwhelm the senior mark. Dilution under
> this theory might occur where the senior
> user's advertising and marketing have
> established certain associations for its
> product among a particular consumer group, but
> the junior mark's subsequent renown causes the
> senior user's consumers to draw the
> associations identified with the junior user's
> mark.

Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc., 875 F.2d 1026, 1038 (2d Cir. 1989) (Sweet, J., concurring).

Beyond what was introduced in connection with their Lanham Act claim, the parties have not presented any additional evidence that would allow the Court to specifically assess the state law dilution claim. In particular, there was no evidence as to the popularity and renown of Warrior Fitness's trade dress, nor was there any argument as to how to weigh this factor. Moreover, as discussed, there is not a substantial similarity between the Pure Power and Warrior Fitness trade dresses, there is no evidence of predatory intent, the relevant customers are sophisticated, and Plaintiffs have not demonstrated that any of its customers made any association between Pure Power and Warrior Fitness.

Thus, the Court concludes that Plaintiffs have failed to prove their state law trade dress claim that Warrior Fitness's trade dress is likely to "blur" the distinctiveness of Pure Power's trade dress.

## X.   **Unfair Competition**

Plaintiffs claim that Defendants engaged in unfair competition.

"The essence of unfair competition under New York common law is the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods." Jeffrey Milstein, 58 F.3d 27, 34 (2d Cir. 1995) (citation and internal quotation marks omitted). "New York's law of unfair competition is a broad and flexible doctrine that depends more upon the facts set forth . . . than in most causes of action." Telecom Intern. America, Ltd. v. AT & T Corp., 280 F.3d 175, 197 (2d Cir. 2001). "It has been broadly described as encompassing any form of commercial immorality, or simply as endeavoring to reap where one has not sown; it is taking the skill, expenditures and labors of a competitor, and misappropriating for the commercial advantage of one person a benefit or property right belonging to another." Id. at 197-98 (citation and internal alterations omitted); see also Ronson Art Metal Works, Inc. v. Gibson Lighter Mfg. Co., 3 A.D.2d 227, 230-31, 159 N.Y.S.2d 606, 609-10 (1957) ("Unfair competition is a form of unlawful business injury. . . . The incalculable variety of illegal commercial practices denominated as unfair competition is proportionate to the unlimited ingenuity that overreaching entrepreneurs and trade

pirates put to use.").

The breadth and flexibility of an unfair competition claim, however, is limited by "the allegation of facts that, if true, would constitute misuse of plaintiffs' property." Dow Jones & Co., Inc. v. Int'l Secs. Exch., Inc., 451 F.3d 295, 302 n.8 (2d Cir. 2006). Where unfair competition is pled in connection with the misappropriation of trade dress — as Plaintiffs do here — the elements necessary to prevail on a claim of unfair competition essentially track those required under the Lanham Act. See Jeffrey Milstein, 58 F.3d at 35; see also Lorillard Tobacco Co. v. Jamelis Grocery, Inc., 378 F. Supp. 2d 448, 456 (S.D.N.Y. 2005) ("It is well-established that the elements necessary to prevail on causes of action for . . . unfair competition under New York common law mirror the Lanham Act claims.") (citation and internal quotation marks omitted). In particular, the two claims are the same except that, unlike its federal counterpart, before monetary relief may be awarded, a viable common law claim for unfair competition requires an additional showing of bad faith. See Empresa Cubana del Tabaco v. Culbro Corp., 399 F.3d 462, 485 (2d Cir. 2005); Genesee Brewing Co., Inc. v. Stroh Brewing Co., 124 F.3d 137, 149 (2d Cir. 1997); see also Saratoga Vichy Spring Co., Inc. v. Lehman, 625 F.2d 1037, 1044 (2d Cir. 1980) (noting that central to the "notion" of unfair competition under New York law is "some element of bad faith").

126

As discussed, Plaintiffs have failed to prove their Lanham Act claim of trade dress infringement.  In particular, Plaintiffs failed to show that Pure Power's and Warrior Fitness's respective trade dresses are substantially similar, or that there has been either actual confusion, or a likelihood of confusion. Accordingly, the Court finds that Plaintiffs' common law unfair competition claim fails.

## XI.  **Defamation**

Plaintiffs bring a cause of action for defamation against Defendant Lee.  Plaintiffs allege that Lee told Pure Power clients that: (1) Brenner "hated homosexuals;" (2) Brenner treated her employees "like garbage;" (3) Brenner was a "loose cannon;" (4) Brenner fired one of her drill instructors because he was gay; and (5) Brenner was a liar. (See Second Am. Compl. ¶¶ 115-16.)

Under New York law, defamation is defined as "the making of a false statement which tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him . . ." Dillon v. City of New York, 261 A.D.2d 34, 37-38, 704 N.Y.S.2d 1, 5 (1st Dep't 1999) (citation and internal quotations omitted); see also Albert v. Loksen, 239 F.3d 256, 265 n.6 (2d Cir. 2001) ("Modern courts in New York still use variations on arcane definitions of defamatory: that which exposes an individual to public hatred, shame, obloquy, contumely, odium, contempt,

127

ridicule, aversion, ostracism, degradation, or disgrace, or . . .
induces an evil opinion of one in the minds of right-thinking
persons, and . . . deprives one of . . . confidence and friendly
intercourse in society.") (citations and internal quotation marks
omitted).   The elements of defamation are "a false statement,
published without privilege or authorization to a third party,
constituting fault as judged by, at a minimum, a negligence
standard, and, it must either cause special harm or constitute
defamation per se." Dillon, 261 A.D.2d at 38, 704 N.Y.S.2d at 5;
accord Peters v. Baldwin Union Free Sch. Dist., 320 F.3d 164, 169
(2d Cir. 2003).

Under New York law, "only statements alleging facts can
properly be the subject of a defamation action." 600 West 115th St.
Corp. v. Von Gutfeld, 80 N.Y.2d 130, 139, 589 N.Y.S.2d 825 (1992);
see also Celle v. Filipino Reporter Enterprises Inc., 209 F.3d 163,
178 (2d Cir. 2000) ("[T]he New York Constitution provides for
absolute protection of opinions."); cf. Steinhilber v. Alphonse, 68
N.Y.2d 283, 289, 508 N.Y.S.2d 901 (1986) (recognizing a distinction
between pure opinion, which "does not imply that it is based upon
undisclosed facts," and mixed opinion, which "implies that it is
based upon facts which justify the opinion but are unknown to those
reading or hearing it").   In addition, a plaintiff must allege the
time, place, and manner of the false statement and identify to whom

128

the false statement was made. See Vardi v. Mut. Life Ins. Co. of New York, 136 A.D.2d 453, 455, 523 N.Y.S.2d 95 (1st Dep't 1988).

Special harm means economic or pecuniary loss. See Liberman v. Gelstein, 80 N.Y.2d 429, 434-35, 590 N.Y.S.2d 857 (1992); see also Albert, 239 F.3d at 271; Gallo v. Alitalia-Linee Aeree Italiane-Societa, 585 F. Supp. 2d 520, 548 (S.D.N.Y. 2008). Special harm "must flow directly from the injury to reputation caused by the defamation, not from the effects of defamation." Matherson v. Marchello, 100 A.D.2d 233, 235, 473 N.Y.S.2d 998 (2d Dep't 1984).

Defamation per se is an exception to the requirement that a plaintiff must prove special harm. Defamation per se consists of any one of the following: (1) a statement charging an individual with a serious crime; (2) a statement that tends to injure another in his or her trade, business, or profession; (3) a statement that claims an individual has a "loathsome disease;" or (4) a statement "imputing unchastity to a woman." Liberman, 80 N.Y.2d at 435, 590 N.Y.S.2d 857; accord Albert, 239 F.3d at 271.

To find that a statement qualifies as one that tends to injure another in his or her "trade, business, or profession," the statement "must be made with reference to a matter of significance and importance for [the operation of the business], rather than a more general reflection upon the plaintiff's character or qualities." Liberman, 80 N.Y.2d at 436, 590 N.Y.S.2d 857. The

129

allegedly defamatory statement must be targeted at the specific standards of performance relevant to the plaintiff's business and must impute conduct that is "of a kind incompatible with the proper conduct of the business, trade, profession or office itself." Id.; see also Aronson v. Wiersma, 65 N.Y.2d 592, 593, 493 N.Y.S.2d 1006 (1985) (holding statements regarding plaintiff's unsatisfactory job performance not defamatory per se); Van-Go Transp. Co., Inc. v. New York City Bd. of Educ., 971 F. Supp. 90, 98 (E.D.N.Y. 1997) ("Reputational injury to a person's business, or to a company, consists of a statement that either imputes some form of fraud or misconduct or a general unfitness, incapacity, or inability to perform one's duties."). "The statement must be more than a remark on the business's ability to make a profit or remain in business in a particular field or geographical area." Kforce, Inc. v. Alden Personnel, Inc., 288 F. Supp. 2d 513, 517 (S.D.N.Y. 2003).

While the Court concludes, as a factual matter, that Defendant Lee denigrated Brenner and Pure Power to Pure Power clients, as a legal matter Lee's statements do not rise to the level of defamation. Plaintiffs failed to adduce any competent evidence showing that any statements made by Lee caused pecuniary or economic harm to Brenner, or to Pure Power more generally. Moreover, Plaintiffs have failed to establish that any of the alleged statements made by Lee constitute defamation per se.

Lee did not allege that Brenner committed a serious crime or had a "loathsome disease," or that Brenner was unchaste. Although some of Lee's statements did indirectly touch upon the manner in which Brenner operated Pure Power, Plaintiffs have failed to establish that any of Lee's statements would tend to injure Brenner in her trade, business, or profession. The statements that Brenner treated her employees "like garbage" and fired an employee because he was gay are not sufficiently targeted at the specific standards of performance relevant to her duties as the owner of Pure Power to qualify as defamation <u>per se</u>. These statements do not impute fraud or misconduct to Brenner, nor do they suggest a general unfitness, incapacity, or inability to perform her duties.[23]   Further, the statements that Brenner "hates homosexuals" and was "a loose cannon" and a liar do not specifically reflect upon her competence as a fitness instructor or as an owner of Pure Power, but, rather, constitute a "more general reflection" upon Brenner's character and, therefore, do not fall within the "trade, business, or profession" exception.

---

[23] Where the plaintiff is a corporation, such as Pure Power, a cause of action for defamation <u>per se</u> requires the plaintiff to establish that the publication injured its overall business reputation or its credit standing. <u>See</u> <u>Sandals Resorts Intern. Ltd. v. Google, Inc.</u>, N.Y. Slip Op. 04179 (DBS), 2011 WL 1885939, at *4 (1st Dep't May 19, 2011).  Plaintiffs introduced no such evidence into the record here.

Moreover, with the exception of Lee's statements regarding Brenner's firing of one of her drill instructors, the Court finds the remaining allegedly defamatory statements to be statements of pure opinion, and not fact. See Daniel Goldreyer, Ltd. v. Van de Wetering, 217 A.D.2d 434, 435, 630 N.Y.S.2d 18 (1st Dep't 1995) (holding that "imaginative expression" and "rhetorical hyperbole" are "pure" opinion subject to New York constitutional protection).

Accordingly, the Court concludes that Plaintiffs failed to establish a claim of defamation against Lee.

**Defendants' Counterclaims**

Defendants assert three counterclaims against Plaintiffs. In particular, Defendants contend that: (1) Plaintiffs violated New York Labor Law § 191 et seq., by failing to pay Belliard and Fell for work performed during their employment at Pure Power; (2) Plaintiffs violated the SCA, and that they are entitled to punitive damages, costs, and attorneys' fees under the SCA; and (3) Plaintiffs violated New York's Civil Rights Law § 51, by using images of Fell and Belliard, without their written consent, in Pure Power's advertising.

**I.   Violations of New York Labor Law**

Defendants claim Plaintiffs violated New York Labor Law § 191 et seq.  In particular, Defendants contend that Plaintiffs failed to compensate Belliard for 351 hours worked at Pure Power and Fell

132

for 156.5 hours worked at Pure Power.  At trial, Belliard testified to not having been paid by Pure Power for the following: (1) 80 hours in 2005 preparing for, attending, and cleaning up after a 24-hour Survivor Weekend; (2) an unspecified number of hours setting up, attending, and cleaning up after a 2005 Holiday Party; (3) an unspecified number of hours preparing for, attending, and cleaning up after a Survivor Weekend in 2006; (4) 5 to 6 hours repainting the radiators at Pure Power and 3 hours repairing the swing-to-beam rope; (5) 8 hours spent setting up and attending the 2006 Holiday Party; (6) building and repairing walls at Pure Power in 2007, for an unspecified amount of hours; and (7) unspecified work related to the 2007 Holiday Party, for an unspecified amount of time. Likewise, Fell testified that he was not paid for the following: (1) 10 hours spent setting up and attending the 2006 Holiday Party; (2) 11 hours spent setting up and attending the 2007 Holiday party; (3) 24 hours spent creating a wall at Pure Power; (4) 11.5 hours of miscellaneous work, including time spent at a Bonus Meeting and a party at the Jericho facility; and (5) 100 hours replacing sandbags.

The New York Labor Law ("NYLL") establishes certain minimum wage rates and, also, requires overtime pay at one-and-a-half times the regular hourly rate for hours worked in excess of forty hours

per week. See N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2.[24]
Under the NYLL, the party seeking compensation has the burden of
proving the number of hours worked. See Padilla v. Manlapaz, 643 F.
Supp. 2d 302, 307 (E.D.N.Y. 2009) (interpreting New York law). It
is the employer's responsibility, however, to maintain accurate
records of an employee's hours. See N.Y. Lab. Law § 195(4)
(requiring employers to "establish, maintain and preserve for not
less than six years contemporaneous, true, and accurate payroll
records"). When an employer's records are inadequate, an employee
may meet her burden by producing "sufficient evidence to show the
amount and extent of that work as a matter of just and reasonable
inference." Padilla, 643 F. Supp. at 307. A plaintiff may meet
this burden solely through her own recollection. See id. The
burden then shifts to the employer to prove, by a preponderance of
the evidence, that the plaintiff was, in fact, paid for the hours
allegedly worked. See N.Y. Lab. Law § 196-a (providing that where
an employer fails "to keep adequate records . . . the employer in
violation shall bear the burden of proving that the complaining
employee was paid wages, benefits and wage supplements"); see also
Jiao v. Shi Ya Chen, No. 03 Civ 0165 (DF), 2007 WL 4944767, *3
(S.D.N.Y. Mar. 30, 2007) (noting that New York law places a more

---

[24] Defendants do not contend that any of the unpaid wages
constitute lost overtime pay.

demanding burden on employers than the Fair Labor Standards Act).

As an initial matter, Pure Power produced its payroll records, which included the hours that Defendants Belliard and Fell worked. Hence, the burden lies with Belliard and Fell to prove the number of unpaid hours worked.

Defendants Belliard and Fell, however, have failed to establish the number of unpaid hours worked with any degree of reasonable certainty. In their post-trial submissions, Defendants provided two spreadsheets purporting to establish the number of unpaid hours worked by Belliard and Fell, respectively. Yet, the bulk of the alleged unpaid wages claimed is not based on any evidence in the record, and, in some instances, conflicts with Defendants' trial testimony (e.g., Fell seeks payment for 24 hours of work spent creating a wall at Pure Power in 2007; yet, at trial, when questioned as to when exactly Brenner had asked him to create this wall, Fell testified that, in fact, Brenner had never asked him to create the wall — Brenner had asked Belliard to do this work). With the exception of some handwritten notes, the only evidence offered of unpaid wages was Belliard's and Fell's trial testimony. The Court, however, does not find this testimony, which, again, relates to only a subset of the total unpaid hours claimed (e.g., Belliard's testimony related to only approximately 97 of the 351 hours sought in unpaid wages) to be credible.

Defendants contend, for example, that they should be compensated for unpaid hours spent organizing and attending Pure Power holiday parties — at which Pure Power employees received, in addition to other holiday gifts from Pure Power clients, their annual bonuses.  Although Brenner acknowledged that Belliard and Fell were not paid for hours worked in connection with the holiday parties, Brenner testified that Defendants' bonuses specifically encompassed such discrete activities as setting up and attending the holiday parties.  In addition, at trial, Belliard could not specify the exact amount of hours spent working in connection with the holiday parties.  Although Fell claimed 20 hours of unpaid work, setting up and attending two Pure Power holiday parties, at trial Fell conceded that he was drunk at these parties, and the Court find his estimates to be exaggerated and unbelievable.  In short, Belliard and Fell's testimony is not a sound basis upon which the Court may determine, with any degree of accuracy, the number of unpaid hours worked by either Belliard or Fell at the Pure Power holiday parties.

Belliard's testimony regarding other alleged instances of unpaid hours is no more persuasive.  Belliard testified, for example, that he worked 80 unpaid hours in preparing for, and attending, the 2005 Survivor Weekend.  Belliard, however, failed to provide any evidence in support of his having actually worked this

136

substantial number of hours in connection with this single weekend,
nor did he provide any evidence that would allow the Court to infer
that he would have worked this same number of hours during each of
the other Survivor Weekends for which he claims an unspecified
number of unpaid hours.  There were no contemporaneous documents
reflecting unpaid hours for the Survivor Weekends, nor were there
any emails, or other communications, reflecting complaints to
Brenner about not being paid for the Survivor Weekends.  Moreover,
Brenner testified that she did, in fact, pay Belliard for hours
worked in connection with the Survivor Weekends, and the Court
finds her testimony on this issue to be credible.  Likewise, aside
from Belliard's self-serving testimony, there is no evidence that
Belliard was not paid for maintenance work or the construction of
a wall at Pure Power.  Indeed, at trial, Brenner testified that she
paid Belliard and Fell for maintenance work performed, including,
for instance, patching up a wall, even after she had expressly told
Belliard and Fell to discontinue teaching a particular exercise
that was causing damage to the wall.

Fell's contentions regarding unpaid wages are similarly
unavailing.  Unlike Belliard, Fell claimed to have kept
contemporaneous notes of the various instances in which he was not
paid.  Indeed, at his deposition, Fell claimed that both he and
Belliard kept track of their unpaid wages in Microsoft Word

137

documents and Microsoft Excel spreadsheets.  These materials, however, were not offered into evidence at trial, or otherwise produced by Defendants during discovery.  The only document that Fell could point to reflecting unpaid hours was a one-and-one-half page document containing his handwritten notes, which were not contemporaneous with when Fell worked, but reflected his after-the-fact attempt to recollect unpaid hours.  Even these notes, however, referenced only three hours of the 156.5 hours for which he was allegedly not paid. (See Pls.' Ex. 432.)

That Fell was not paid for any of the remaining hours is supported only by Fell's testimony, which the Court does not find credible.  For instance, Fell seeks compensation for 100 unpaid hours allegedly spent rearranging the sandbags at Pure Power on the nights that he worked.  Fell, in effect, contends that six days a week, 50 weeks a year, for two straight years, he would punch out for the day (as reflected in the payroll records), and then remember that he still had to spend ten more minutes at work rearranging the sandbags.  At no point did it occur to Fell to complain of this unpaid time to Brenner, or any other Pure Power employee for that matter, or to punch out for the day only after having replaced or rearranged the sandbags.

In short, the payroll records produced by Plaintiffs demonstrate that Belliard and Fell were paid for the time that they

138

put in at Pure Power.  Indeed, these records show that Belliard and Fell requested adjustments to their pay in a few isolated instances, and that, in each instance, Pure Power fully compensated them for any unpaid hours worked. (See Pls.' Ex. 166.)  Moreover, there was some evidence that Belliard and Fell, while employed at Pure Power in the winter of 2007, submitted false wage claims to Brenner, and received wage payments for time that they did not work.[25]

Accordingly, the Court concludes that Defendants have failed to establish, by a preponderance of the evidence, a violation of New York Labor Law § 191.

## II.  **Stored Communications Act**

The SCA provides that "whoever intentionally accesses without authorization a facility through which an electronic communication service is provided; or intentionally exceeds an authorization to access that facility; and thereby obtains . . . access to a wire of electronic communication while it is in electronic storage in such system shall be punished . . ." 18 U.S.C. § 2701(a).

---

[25] Brenner testified at trial that she conducted a review of Pure Power payroll records in response to Defendants' allegations of unpaid wages.  Given the number of classes taught each week at Pure Power, and the hours for which other drill instructors were paid (assuming the records for these other instructors were accurate), Brenner concluded that Belliard and Fell were, in fact, overpaid, and could not have actually worked all of the hours that they submitted to Pure Power.

Early in the litigation, before Defendants had yet to bring a counterclaim against Plaintiffs alleging that they had violated the SCA and ECPA, and prior to Brenner's deposition, Defendants moved, on the basis of the SCA, to preclude the use of emails taken from Fell's personal email accounts, and the Court granted the motion. See Pure Power, 587 F. Supp. 2d at 553.  It was not critical to the Court's decision that Brenner was necessarily the party who directly accessed Fell's email accounts in violation of the SCA, although, at the time of the decision, Brenner did not dispute that she had done so.  To the extent that the Court found Brenner personally violated the SCA, it did so preliminarily, and only in the context of deciding a discovery sanction issue.  Moreover, the finding was made before there was an opportunity for pretrial discovery.  Indeed, in granting Defendants' subsequent motion for partial summary judgment on their SCA claim, the Court found its prior finding with respect to the preclusion of Fell's emails was not case-dispositive with respect to Brenner's liability under the SCA, and that the "task" of establishing liability under the SCA "remains for the jury." Pure Power Boot Camp, 759 F. Supp. 2d at 425.

At trial, there was some, but not a great deal of, testimony as to Brenner's involvement with the stolen emails.  What did occur, however, was Third-Party Defendants Lorenzi and Dumas both

invoked their Fifth Amendment privilege against self-incrimination with respect to all questions relating to violations of the SCA.

A.   Liability

It is well-established that "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." Baxter v. Palmigiano, 425 U.S. 308, 318-19, 96 S. Ct. 1551, 1557-58 (1976).  Moreover, where one party declines to answer questions in a civil case on the basis of the Fifth Amendment privilege against self-incrimination, an adverse inference may be drawn against a party who is associated with the witness, depending on the circumstances of the particular case. See LiButti v. United States, 107 F.3d 110, 120-21 (2d Cir. 1997); Brink's Inc. v. City of New York, 717 F.2d 700, 709 (2d Cir. 1983); see also John Paul Mitchell Sys. v. Quality King Distrib., Inc., 106 F. Supp. 2d 462, 471 (S.D.N.Y. 2000) (following LiButti in determining whether to apply an adverse inference from one party's invocation of the Fifth Amendment privilege against another party). The Second Circuit has identified "a number of nonexclusive factors" to guide this determination, including the nature of the relevant relationships, the degree of control over the non-testifying witness, the compatibility of the interests between the non-testifying witness and the party, and the role of the

141

non-testifying witness in the litigation. See LiButti, 107 F.3d at 123–24.   "[T]he overarching concern is fundamentally whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth." Id. at 124.

Thus, the Court is permitted to, and does, draw a negative inference from Third-Party Defendants Lorenzi's and Dumas's refusal to answer any questions at trial regarding their roles in accessing Fell's email accounts, pursuant to their Fifth Amendment privilege against self-incrimination.   And, on the basis of that inference, the Court finds that Lorenzi and Dumas accessed Fell's personal email accounts in violation of the SCA.   Brenner, in fact, testified that Dumas and Lorenzi brought her the emails and did so only out of a sense of loyalty, at a time when they discovered that Belliard and Fell had been secretly plotting to compete with Pure Power and had stolen Pure Power's confidential business documents.

The Court also concludes that an adverse inference based on Lorenzi's and Dumas's refusal to answer questions at trial is not warranted against Brenner or Pure Power.   Defendants failed to present any evidence showing that Brenner personally accessed any of Fell's email accounts — at best, Plaintiffs established only that Lorenzi or Dumas brought these emails to Brenner's attention. But, there was no evidence that either Lorenzi or Dumas was acting at Brenner's request or direction in accessing Fell's personal

142

email accounts. Moreover, although Lorenzi was employed by Pure Power, she was never given access to other Pure Power employees' personal email accounts, and her actions clearly fell outside of the scope of her employment duties at Pure Power. Likewise, while Pure Power issued checks to Dumas — who was a close friend of Brenner's but was never her employee — these payments represented reimbursements for expenses Dumas incurred solely on behalf of Pure Power (e.g., purchases Dumas made at an office supply store) and do not relate to the SCA claim at issue here.

Accordingly, the Court concludes that Third-Party Defendants Lorenzi and Dumas, alone, should be held jointly and severally liable for the $4,000 in compensatory damages that the Court awarded in its summary judgment decision for four independent violations of the SCA.

B.    Punitive Damages and Attorneys' Fees

Defendants now seek to have the Court award punitive damages, attorneys' fees, and costs, under the SCA. The Court declines to do so.[26]

Punitive damages are available for a violation of the SCA "[i]f the violation is willful or intentional." 18 U.S.C. §

---

[26] Defendants did not specify the amount of attorneys' fees and costs to which they believe they are entitled, but offered to submit an application for attorneys' fees and costs at the Court's direction.

2707(c).  If a court finds a violation of the SCA to be "willful or intentional," then it <u>may</u> assess punitive damages.  <u>Id.</u>  Likewise, the SCA provides, in relevant part, that "[i]n the case of a successful action to enforce liability under this section, the Court <u>may</u> assess the costs of the action, together with reasonable attorney fees determined by the court."  18 U.S.C.  § 2707(c) (emphasis added).

The Court concludes that Lorenzi's and Dumas's violation of the SCA was neither willful nor intentional.  There is no basis to conclude that Lorenzi or Dumas was aware of the statute, or knew that their conduct in accessing Fell's email accounts was otherwise unlawful.  Lorenzi and Dumas were aware that Fell had been using the Pure Power computers for personal matters and that Fell had left his password on the computer; they reflexively accessed Fell's email accounts on learning of his plans to sabotage Pure Power. They disclosed the emails obtained from Fell's accounts to Brenner in an effort to thwart Defendants' unlawful efforts to harm the Pure Power business.  In other words, accessing Fell's email accounts was not done for malicious reasons, and the emails obtained, which showed that Belliard had stolen Pure Power documents and that he and Fell had been disloyal employees in the extreme, were used in a purely prophylactic manner.  In addition, neither Lorenzi nor Dumas personally benefitted from obtaining

144

access to Fell's email accounts; indeed, their lives have been made more difficult as a consequence of having discovered and disclosed to Brenner Defendants' outrageous scheme to steal Pure Power's client list, and other confidential business documents, and to undermine Brenner's business.   To award equitable remedies to Defendants, in view of their egregious conduct, would simply not be just.   Moreover, Defendants have already received the benefit of an in limine ruling precluding the use of the stolen emails at trial.

Accordingly, the Court finds that an award of punitive damages, attorneys' fees, or costs is not warranted under the SCA.

III. **New York Civil Rights Law § 51**

Finally, Defendants contend that Brenner and Pure Power violated their right of publicity, as protected by New York Civil Rights Law § 51, by using images of Defendants Belliard and Fell, without their written consent, in advertisements for Pure Power.

Section 51 of the New York Civil Rights Law provides for an injunction and damages in favor of "[a]ny person whose name, portrait, picture, or voice is used within this state for advertising purposes or for the purposes of trade without . . . written consent[.]" N.Y. Civ. Rights Law § 51 (McKinney 2009); accord Oliveira v. Frito-Lay, Inc., 251 F.3d 56, 63 (2d Cir. 2001). In assessing a claim under this statute, New York courts consider

145

whether the commercial exploitation contains a "clear representation of the plaintiff, recognizable from the advertisement itself." <u>Negri v. Schering Corp.</u>, 333 F. Supp. 101, 103 (S.D.N.Y. 1971) (collecting cases). "[T]here can be no appropriation of plaintiff's identity for commercial purposes if he or she is not recognizable from the picture and a privacy action could not be sustained, for example, because of the non-consensual use of a photograph of a hand or a foot without identifying features." <u>Cohen v. Herbal Concepts, Inc.</u>, 63 N.Y.2d 379, 383-84, 482 N.Y.S.2d 457 (1984); <u>accord</u> <u>Shamsky v. Garan, Inc.</u>, 167 Misc.2d 149, 154, 632 N.Y.S.2d 930, 933 (N.Y. Sup. 1995).

Here, the advertisement in question consists of a photograph of Brenner, flanked by four drill instructors, all of whose backs are turned to the camera. Other than Brenner, none of the individuals appearing in the picture is recognizable.

Accordingly, Defendants have failed to prove a violation of New York Civil Rights Law § 51.

## CONCLUSION

For the foregoing reasons, the Court finds that Plaintiffs established that Defendants Belliard and Fell breached their duty of loyalty to Plaintiff Pure Power and were faithless servants. Plaintiffs are entitled to forfeiture damages against Defendant Belliard in the amount of $55,196.70, and punitive damages in the

146

amount of $110,393.40.    Plaintiffs are further entitled to forfeiture damages against Defendant Fell in the amount of $40,177.00, and punitive damages in the amount of $40,177.00. Defendant Lee is jointly and severally liable for Belliard's and Fell's forfeiture damages.    All of the remaining claims and counterclaims are dismissed with prejudice.

The Clerk shall enter Judgment in accordance with this Opinion.

_____
THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE

Date: September 12, 2011
      New York, New York

147